**LITE DEPALMA GREENBERG, LLC**
Bruce D. Greenberg
Jeffrey A. Shooman
Two Gateway Center, Suite 1201
Newark, New Jersey 07102
Tel: (973) 623-3000
Fax: (973) 623-0858
Email: bgreenberg@litedepalma.com
        jshooman@litedepalma.com

*Counsel for Plaintiffs*
[Additional Counsel listed on signature page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| KIMBERLY COLE, ALAN COLE, JAMES MONICA, LINDA BOYD, MICHAEL MCMAHON, RAY SMINKEY, JAMES MEDDERS, JUDY MEDDERS, ROBERT PEPERNO, SARAH PEPERNO, and KELLY MCCOY, on behalf of themselves and all others similarly situated, | Civil Action No. 3:13-cv-07871-FLW-TJB |
| Plaintiffs, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| vs. | **JURY TRIAL DEMANDED** |
| NIBCO, Inc., | |
| Defendant. | |

Plaintiffs Kimberly Cole, Alan Cole, James Monica, Linda Boyd, Michael McMahon, Ray Sminkey, James Medders, Judy Medders, Robert Peperno, Sarah Peperno, and Kelly McCoy (together "Plaintiffs"), on behalf of themselves and all persons similarly situated ("the Class"), by and through their attorneys, allege as follows upon personal knowledge as to facts pertaining to themselves, and upon information and belief (based on the investigation of their counsel) as to all other matters.

**NATURE OF THE ACTION**

1.      This case concerns cross-linked polyethylene plumbing tubes (herein "PEX Tubing"), the brass fittings required to connect the PEX Tubing together (herein "PEX Fittings"), and the stainless steel clamps (herein "PEX Clamps") required for joining the PEX Tubing and PEX Fittings.  As discussed below, the PEX Tubing, the PEX Fittings and the PEX Clamps at issue are all manufactured or distributed by Defendant NIBCO, Inc. ("NIBCO" or "Defendant") and suffer from undisclosed design and/or manufacturing defects that inevitably cause them to fail prematurely.



2.      Specifically, the PEX Tubing suffers from a design and/or manufacturing defect because it is prone to premature oxidative failure and creep rupture.

3.      The PEX Fittings suffer from a design and/or manufacturing defect because they are prone to dezincification corrosion.

4.      The PEX Clamps suffer from a design and/or manufacturing defect because they are prone to failure by chloride-induced stress corrosion cracking.

5.     When any of these components fail, it leads to the release of water, which causes significant damage to surrounding property and/or prevents the plumbing system from functioning as intended.

6.     Unless specified otherwise below, the phrase "PEX Products" will collectively refer to NIBCO's defective PEX Tubing, PEX Clamps and/or PEX Fittings.

7.     NIBCO has manufactured and advertised its PEX Products for use in plumbing systems throughout the United States.  It has repeatedly represented that consumers should trust NIBCO to provide the highest quality PEX Products because the company has over 100 years of industry experience and is an industry leader in the manufacture of PEX Products.

8.     NIBCO manufactures, warrants, advertises and sells the PEX Products at issue. NIBCO's sales catalog advertised that, *inter alia*, its PEX tubing was the highest quality PEX tubing available, and that its cross chemical bonding process gave it "superior characteristics." NIBCO warranted that its PEX tubing would be free from any defects in materials and workmanship for a period ranging from ten (10) years to twenty-five (25) years, depending upon whether NIBCO PEX fittings and NIBCO valves and installation accessories were also used in the installation.

9.     Contrary to these affirmative statements, the PEX Products suffer from design and/or manufacturing defects.  Specifically, and as a result of such defects, the PEX Tubing is predisposed to premature oxidative failure and creep rupture, the PEX Fittings are predisposed to prematurely fail as a result of dezincification corrosion, and the PEX Clamps are predisposed to prematurely fail as a result of chloride-induced stress corrosion cracking (collectively, the "PEX Product Defects").

3

10.     NIBCO has systematically breached its warranty by failing to fully or adequately compensate property owners who have been injured as a result of the PEX Product Defects. NIBCO also failed to disclose this material information to Plaintiffs and Class Members.

11.     Before manufacturing, warranting, advertising and/or selling the PEX Products, NIBCO failed to take appropriate steps to ensure that its products were safe for their intended use.  Defendant knew or should have known that the PEX Products were not suitable for use within water-carrying plumbing systems and that the PEX Products suffered from the PEX Product Defects.

12.     The PEX Product Defects have caused plumbing systems to fail and release water, which has caused and will continue to cause Plaintiffs and the Class to incur damages through no fault of their own.

13.     Plaintiffs seek relief for damages sustained by Plaintiffs and the Class that were proximately caused by NIBCO's Defective PEX Products used or installed in Plaintiffs' and Class members' homes and other structures.  They seek relief to remedy NIBCO's breach of express warranty, breach of implied warranty, violations of various states' consumer protection statutes, negligence and, alternatively, unjust enrichment.  Plaintiffs and the putative Class also seek declaratory and injunctive relief, as described below.

**PARTIES**

**The Coles**

14.      Plaintiffs Kimberly Cole and Alan Cole ("the Coles") are husband and wife. Both are citizens of Tennessee and both reside in Gadsden, Tennessee.

15.     Construction of the Coles' new home in Gadsden, Tennessee began in August of 2008 and was substantially completed in May of 2009.

16.     A hot water line was installed as a part of the residential plumbing system.  Water was supplied to their home from a local, municipally treated water source.

17.     The Coles' residential plumbing system was installed using NIBCO PEX Products, including NIBCO PEX Tubing, PEX Fittings, PEX Clamps and installation accessories.

18.     The Coles hired a licensed professional contractor to install the plumbing system.

19.     After construction was completed in May 2009, the Coles moved into their home in Gadsden and began using it as their primary residence.

20.     In November 2010, only eighteen months after installation, the Coles experienced a water leak as the result of a failure to a PEX Fitting assembly.

21.     In May 2012, the Coles observed another leak and retained a licensed plumber who discovered a leak in the plumbing around the master bedroom and master bathroom area of their home.  Upon further investigation, the plumber discovered the leak originated from a crack in the PEX Tubing.  Similar PEX Tubing was used throughout their home.

22.     Since the initial leak in the PEX Tubing, the Coles have continued to discover additional leaks that have caused areas of water saturation and damage throughout their home. Most recently, the Coles experienced a water leak in early August 2014.  Damage has occurred in the kitchen, laundry room, master bedroom and master bathroom.  The Coles subsequently learned that all of the water damage inside their home was caused by water leakage from cracks or other failure that developed within the PEX Products.

23.     On two occasions, and in order to repair the leaks, the Coles were forced to leave their home because of the severity of the leaks caused by the PEX Tubing.  There were numerous

other occasions when the PEX Tubing leaked, but the Coles were unable leave their home during repairs, despite desiring to do so, for personal and/or financial reasons.

24.     After discovery of the leaks, the Coles contacted Defendant NIBCO and requested replacement of the defective PEX Tubing within their home under the terms of the express warranty.  Despite the Coles fulfilling all of their warranty obligations, NIBCO has declined to replace the Coles' defective PEX Tubing (or otherwise compensate them for the substantial damages this product caused), thereby violating the terms of the express warranty.

25.     To date, the Coles have experienced significant damages on multiple occasions due to the PEX Product Defects.

26.     The Coles have suffered an ascertainable loss as a result of Defendant's omissions and/or misrepresentations associated with the PEX Products, including but not limited to out-of-pocket loss associated with catastrophic plumbing failures and attempted repairs of such within their home.  As a result of the significant damages caused by the detective PEX Products, the Coles' homeowners' insurance premiums have substantially increased as well.

27.     At no time did Defendant or any of its agents, dealers or other representatives inform the Coles of Defendant's omission and/or misrepresentations related to the PEX Product Defects. As a result of Defendant's conduct as alleged herein, the Coles have been injured.

**James Monica**

28.     Plaintiff James Monica is a citizen of New Jersey, and a resident of Warren, New Jersey.

29.     On or about September 2010, the installation of a residential plumbing system began within Plaintiff Monica's home located in Warren, New Jersey.  Installation of the plumbing system was substantially completed in December 2010.  A hot water line was installed

as a part of the residential plumbing system.  Water was supplied to his home from a local, municipally treated water source.

30.     Plaintiff Monica's residential plumbing system was installed using NIBCO PEX Products, including NIBCO PEX Tubing, NIBCO PEX Fittings, NIBCO PEX Clamps and other installation accessories.

31.     Plaintiff Monica hired a licensed professional contractor to install the plumbing system in his home.

32.     After installation of the plumbing system had been completed, Plaintiff Monica moved into his home in Warren, New Jersey and began using it as his primary residence.

33.     In November of 2012, Plaintiff Monica discovered water saturation on the walls and ceiling in the basement area of his home.

34.     Plaintiff Monica retained a licensed plumber who discovered a leak coming from the basement ceiling of his home.  Upon further investigation, the plumber discovered the leak originated as the result of a NIBCO PEX Fitting assembly.  Similar NIBCO PEX Fitting assemblies were used throughout his home.  The failed PEX Fitting assembly was replaced with another NIBCO PEX Fitting assembly, which also subsequently failed prematurely in November 2013.

35.     The below photograph depicts the outside surface of a single NIBCO brass fitting from Monica's home where clear evidence of dezincification corrosion is seen.  The white deposit on the exterior surface of the fitting is the result of water that has wept through the corroded fitting.  As the water evaporates, scale and/or zinc-rich corrosion product from the brass fitting is left behind.  The brass fitting appears coppery-red because the zinc contained in the brass has selectively leached into the water (giving rise to the term "dezincification").  This form

of corrosion causes the material to change from a solid brass material to a spongy copper-rich structure, grossly weakening the fitting.



36.   The below photograph is a side view of a NIBCO ASTM-F1807 PEX Fitting from Monica's home which demonstrates the corrosion and scale affecting the NIBCO brass fittings.



37.   The below photograph is a top view of a NIBCO ASTM-F1807 brass PEX fitting from Monica's home which demonstrates meringue-type dezincification corrosion.   This particular form of corrosion causes the interior of the brass fitting to become plugged with corrosion product.   The fitting shown in this view is approximately 75% plugged, which causes a

significant loss of water pressure.  When the system becomes plugged and the water pressure decreases the plumbing system no longer functions as intended.



38.     Since the initial leak in the NIBCO brass PEX Fittings, Plaintiff Monica has experienced two additional leaks as a result of the NIBCO PEX Fittings in his first floor plumbing.

39.     After discovery of the water leaks, and after finding that other exposed PEX Fittings in Monica's basement are exhibiting similar corrosion, Plaintiff Monica contacted NIBCO and requested replacement of the defective NIBCO PEX Fittings under the terms of the express warranty.  Despite Plaintiff Monica fulfilling all of his warranty obligations, NIBCO has declined to replace Plaintiff Monica's Defective NIBCO PEX Products (or otherwise compensate him for the substantial damages this product caused), thereby violating the terms of the express warranty.

40.     To date, Plaintiff Monica has experienced significant damages on three separate occasions due to the PEX Product Defects.

9

41.     Plaintiff Monica has suffered an ascertainable loss as a result of Defendant's omissions and/or misrepresentations associated with the PEX Products, including, but not limited to, out-of-pocket loss associated with catastrophic plumbing failures and attempted repairs of such within his home.

42.     At no time did Defendant or any of its agents, dealers or other representatives inform Plaintiff Monica of Defendant's omissions and/or misrepresentations related to the PEX Product Defects. As a result of Defendant's conduct as alleged herein, Plaintiff Monica has been injured.

**Linda Boyd**

43.     Plaintiff Linda Boyd is a citizen of Alabama, and is a resident of Foley, Alabama.

44.     Construction of Plaintiff Boyd's new home in Foley, Alabama began during the early summer of 2008 and was substantially completed in August, 2008.

45.     On or about June 2008, the installation of a residential plumbing system began within Plaintiff Boyd's home.  Installation of the plumbing system was substantially completed in July 2008.  A hot water line was installed as a part of the residential plumbing system.  Water was supplied to her home from a local, municipally treated water source.

46.     Plaintiff Boyd's residential plumbing system was installed using NIBCO PEX Products, including NIBCO PEX Tubing, NIBCO PEX Fittings, NIBCO PEX Clamps and other installation accessories.

47.     Plaintiff Boyd hired a licensed professional contractor to install the plumbing system in her home.

48.     After installation of the plumbing system had been completed, Plaintiff Boyd moved into her home in December, 2008 and began using it as her primary residence.

49.     On or about March 26, 2013, Plaintiff Boyd observed a water leak in the attic above her laundry room.

50.     On or about September 15, 2013, Plaintiff Boyd observed another water leak in the tubing above her hot water heater in her garage.

51.     On or about October 31, 2013, Plaintiff Boyd observed a third leak in the cold water tubing near the hot water heater in her garage.

52.     On all three occasions, Plaintiff Boyd called a plumber to inspect the water leak and resultant damage.  On all three occasions, the plumber informed Plaintiff Boyd that the tubing had "split" and water was leaking out of the tubing as a result.

53.     On or about November 9, 2013, Plaintiff Boyd mailed a sample of the defective tubing to NIBCO and requested replacement or reimbursement of her losses pursuant to NIBCO's express warranty.  Despite Plaintiff Boyd fulfilling all of her warranty obligations, NIBCO has declined to replace Plaintiff Boyd's Defective NIBCO PEX Products (or otherwise compensate her for the substantial damages this product caused), thereby violating the terms of the express warranty.

54.      To date, Plaintiff Boyd has experienced significant damages on three separate occasions due to PEX Product Defects.   Plaintiff Boyd installed replacement plumbing throughout her entire home, installed replacement sheet rock above the ceiling in her laundry room and repainted it as a result of the first leak, and repainted her garage walls as a result of the second and third leaks.

55.     Plaintiff Boyd has suffered an ascertainable loss as a result of Defendant's omissions and/or misrepresentations associated with the PEX Products, including, but not limited

to, out-of-pocket loss associated with catastrophic plumbing failures and attempted repairs of such within her home.

56.     At no time did Defendant or any of its agents, dealers or other representatives inform Plaintiff Boyd of Defendant's omissions and/or misrepresentations related to the PEX Product Defects. As a result of Defendant's conduct as alleged herein, Plaintiff Boyd has been injured.

**Michael McMahon**

57.     Plaintiff Michael McMahon is a citizen of Texas and is a resident of Rio Vista, Texas.

58.     Construction of Plaintiff McMahon's home in Rio Vista, Texas began in early 2007 and was substantially completed in August 2007.

59.     Plaintiff McMahon's residential plumbing system was installed using NIBCO PEX Products, including NIBCO PEX Tubing, NIBCO PEX Fittings, NIBCO PEX Clamps and other installation accessories.  A hot water line was installed as a part of the residential plumbing system.  Water is supplied to his home from a local, municipally treated water source.

60.     Licensed professional contractors were hired to install the plumbing system in Plaintiff McMahon's home.

61.     Plaintiff McMahon moved into his home in Rio Vista, Texas on January 1, 2013 and began using it as his primary residence.

62.     Starting in early 2013, approximately six leaks in NIBCO's Dura-Pex tubing have occurred in Plaintiff McMahon's home.   The first four leaks were located at the top of his garage.  The two most recent leaks caused significant damage inside Plaintiff McMahon's home.

63.     Plaintiff McMahon called a plumber to inspect the water leaks and resultant damage.  On all six occasions, the plumber informed Plaintiff McMahon that the tubing had "split" and water was leaking from the tubing as a result.

64.      To date, Plaintiff McMahon has experienced significant damages due to the PEX Product Defects.  The leaking water saturated the walls of his garage, damaged personal property located in the garage, damaged the walls of his home, and flooded the first floor of his home as well as his garage.

65.     Plaintiff McMahon has suffered an ascertainable loss as a result of Defendant's omissions and/or misrepresentations associated with the PEX Products, including, but not limited to, out-of-pocket loss associated with catastrophic plumbing failures and attempted repairs of such within his home. As a result of Defendant's conduct as alleged herein, Plaintiff McMahon has been injured.

**Ray Sminkey**

66.     Plaintiff Ray Sminkey is a citizen of Oklahoma and is a resident of Elgin, Oklahoma.

67.     Construction of Plaintiff Sminkey's home began in early 2008 and was substantially completed by early 2009.

68.     During spring of 2008, the installation of a residential plumbing system began within Plaintiff Sminkey's home, located in Elgin, Oklahoma.   Installation of the plumbing system was substantially completed by December 2008.  A hot water line was installed as a part of the residential plumbing system.  Water is supplied to Plaintiff Sminkey's home from a city-owned well.

69.     Plaintiff Sminkey's residential plumbing system was installed using NIBCO PEX Tubing.

70.     Plaintiff Sminkey hired a licensed professional contractor to install the plumbing system in his home.

71.     After installation of the plumbing system had been completed, Plaintiff Sminkey moved into his home in Elgin, Oklahoma in February, 2009 and began using it as his primary residence.

72.     On or about November 5, 2013, Plaintiff Sminkey observed a water leak in the residential hot water line coming off of the hot water heater in Plaintiff Sminkey's garage.

73.     The following week, Plaintiff Sminkey observed two additional water leaks in the same residential hot water line coming off of the hot water heater in Plaintiff Sminkey's garage.

74.     A plumber came out to inspect the aforementioned water leaks in Plaintiff Sminkey's home and informed Plaintiff Sminkey that the tubing had burst, causing the water to leak from the tubing.  The plumber replaced the sections of Plaintiff Sminkey's tubing that were leaking on all three occasions.

75.     To date, Plaintiff Sminkey has experienced significant damages on three separate occasions due to PEX Product Defects.  The dry wall and insulation were soaked and replaced as a result of the water leaks and some household goods that were stored in the garage were ruined and needed to be replaced.

76.     Plaintiff Sminkey has suffered an ascertainable loss as a result of Defendant's omissions and/or misrepresentations associated with the PEX Products, including, but not limited to, out-of-pocket loss associated with catastrophic plumbing failures and attempted repairs of

such within his home. As a result of Defendant's conduct as alleged herein, Plaintiff Sminkey has been injured.

**The Medders**

77.    Plaintiffs James and Judy Medders (hereinafter, the "Medders") are citizens of Texas and currently reside in Morgan Mill, Texas.

78.    Construction of the Medders' home in Morgan Hill, Texas began in June 2011.

79.    On or about July 1, 2011, the installation of a residential plumbing system began within the Medders' home, located in Morgan Mill, Texas.  Installation of the plumbing system was substantially completed on or about February 25, 2011.  Water was supplied to their home from a private well and is not treated.

80.    The Medders' residential plumbing system was installed using NIBCO PEX Products, including NIBCO PEX Tubing, NIBCO PEX Fittings, NIBCO PEX Clamps and other installation accessories.

81.    Licensed professional contractors were hired to install the plumbing system in the Medders' home.

82.    The Medders moved into their home in Morgan Mill, Texas on March 3, 2012 and began using it as their primary residence.

83.    On or about December 5, 2013, the Medders observed a leak in a NIBCO Tee Fitting in the attic of the utility room of their home.  On or about December 8, 2013, the Medders retained a plumber to inspect and repair the water leak and resultant damage.

84.    On or about May 31, 2014, the Medders observed a leak in a NIBCO nipple located behind a wall in the master bathroom of their home.  Mr. Medder repaired the leak that day.

85. On or about June 10, 2014, the Medders observed a leak caused by a NIBCO Tee Fitting located in the attic of their home resulting in damage to the ceiling of the master bathroom. On or about June 10, 2014, the Medders retained a plumber to inspect and repair the resultant damage.

86. Within a reasonable amount of time following the losses, the Medders provided NIBCO with actual notice of the failures of its PEX Products and NIBCO has failed to repair or replace the PEX Products within the Medders' home or otherwise fulfill its warranty obligations.

87. To date, the Medders have experienced significant damages on three separate occasions due to PEX Product Defects.

88. The Medders have suffered an ascertainable loss as a result of Defendant's omissions and/or misrepresentations associated with the PEX Products, including, but not limited to, out-of-pocket loss associated with catastrophic plumbing failures and attempted repairs of such within their home.

89. At no time did Defendant or any of its agents, dealers or other representatives inform the Medders of Defendant's omissions and/or misrepresentations related to the PEX Product Defects. As a result of Defendant's conduct as alleged herein, the Medders have been injured.

**The Pepernos**

90. Plaintiffs Robert and Sara Peperno (hereinafter, "the Pepernos") are citizens of Pennsylvania and residents of Old Forge, Pennsylvania.

91. Construction of the Pepernos' new home in Old Forge, Pennsylvania began during the July of 2007 and was substantially completed in February of 2008.

92.     On or about September, 2007 the installation of a residential plumbing system began within the Pepernos' home located in Old Forge, Pennsylvania.   Installation of the plumbing system was substantially completed by October, 2007.   Water was supplied to the Pepernos' home from a local, municipally treated water source.

93.     The Pepernos' residential plumbing system was installed using NIBCO plumbing accessories, including NIBCO PEX Tubing, NIBCO PEX Fittings, NIBCO PEX Clamps and other installation accessories.

94.     The Pepernos hired a licensed professional contractor to install the plumbing system in their home.

95.     After installation of the plumbing system had been completed, the Pepernos moved into their home in Old Forge, Pennsylvania in February, 2008 and began using it as their primary residence.

96.     On or about December 15, 2013, the Pepernos observed a water leak in the tubing located in the basement of their home.

97.     On or about April 19, 2014 the Pepernos observed another water leak in the tubing in the basement of their home.

98.     On or about June 7, 2014, the Pepernos observed a third leak in the tubing in the basement of their home.

99.     On all three occasions, the Pepernos called a plumber to inspect the water leak and resultant damage.   On all three occasions, the plumber informed the Pepernos that the tubing had "split" and water was leaking as a result.

100.    Within a reasonable amount of time following the losses, the Pepernos provided NIBCO with actual notice of the failures of its PEX Products and NIBCO has failed to repair or replace the PEX Products within the Pepernos' home or otherwise fulfill its warranty obligations.

101.    To date, the Pepernos have experienced damages on three separate occasions due to PEX Product Defects.  The Pepernos installed replacement plumbing in their basement to replace the tubing that had leaked on the above-referenced three occasions.

102.    The Pepernos have suffered an ascertainable loss as a result of Defendant's omissions and/or misrepresentations associated with the PEX Products, including, but not limited to, out-of-pocket loss associated with catastrophic plumbing failures and attempted repairs of such within her home.

103.    At no time did Defendant or any of its agents, dealers or other representatives inform the Pepernos of Defendant's omissions and/or misrepresentations related to the PEX Product Defects. As a result of Defendant's conduct as alleged herein, the Pepernos have been injured.

**Kelly McCoy**

103.    Plaintiff Kelly McCoy is a citizen of Georgia and a resident of Marietta, Georgia.

104.    Plaintiff McCoy's home suffered a fire, which required his home to be rebuilt. That reconstruction occurred in 2010.  From and after the time of that reconstruction, Plaintiff McCoy has used that home as his primary residence.

105.    Plaintiff McCoy's residential plumbing system was installed using NIBCO PEX Products, including NIBCO PEX Tubing, NIBCO PEX Fittings, NIBCO PEX Clamps and other installation accessories.   A hot water line was installed as a part of the residential plumbing

system.  Water was supplied to Plaintiff McCoy's home from a local, municipally treated water source.

106.    Plaintiff McCoy hired a licensed professional contractor to install the plumbing system in his home.

107.    Thereafter, however, the NIBCO tubing repeatedly failed, requiring six repairs. The NIBCO tubing split lengthwise on the hot water side.  Among other repairs that were required by those failures, a bathroom wall had to be torn out and replaced.  Additionally, the failed tubing had to be replaced.  Plaintiff McCoy hired the same licensed professional contractor who had installed the plumbing system to make the necessary repairs and to replace the defective NIBCO tubing.

108.    Plaintiff McCoy has suffered an ascertainable loss as a result of Defendant's omissions and/or misrepresentations associated with the PEX Products, including, but not limited to, out-of-pocket loss associated with catastrophic plumbing failures and attempted repairs of such within his home.

109.    At no time did Defendant or any of its agents, dealers or other representatives inform Plaintiff McCoy of Defendant's omissions and/or misrepresentations related to the PEX Product Defects.   As a result of Defendant's conduct as alleged herein, Plaintiff McCoy has been injured.

**The Defendant**

104.    Defendant NIBCO, Inc. is incorporated under the laws of the State of Indiana with its principal place of business located at 1516 Middlebury Street, Elkhart, Indiana 46515-1167.   In addition to the PEX Products previously described, NIBCO INC. manufactures plumbing valves, plastic fittings and flow control solutions for commercial, industrial and

institutional construction, and for the residential and irrigation markets. NIBCO operates ten manufacturing plants in the United States, Mexico and Poland, and has more than 2,000 employees.

## JURISDICTION AND VENUE

105.    This Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5 million, exclusive of interest and costs, and is a class action in which some members of the Class are citizens of states different than Defendant. *See* 28 U.S.C. § 1332(d)(2)(A).

106.    This Court has personal jurisdiction over Defendant because NIBCO conducts substantial business in New Jersey. Defendant has sufficient minimum contacts with the State of New Jersey and intentionally avails itself of the consumers and markets within the State of New Jersey through the promotion and sales of its products, including its PEX Products.

107.    Venue properly lies in this district pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the acts giving rise to Plaintiffs' claims occurred in this district, and because Defendant conducts substantial business in this judicial district.

## FACTUAL ALLEGATIONS

A.    **The Defective NIBCO PEX Products**

108.    NIBCO sells various plumbing products including PEX Tubing, PEX Fittings, PEX Clamps and other plumbing accessories.

109.    NIBCO has been in business for over 100 years and has manufactured plumbing systems and parts for nearly as long.

110.    NIBCO states, on its website, that it is a "recognized leading provider of valves, fittings and flow control products for commercial, industrial and institutional construction as well as residential and irrigation markets."[1]

111.    PEX is an acronym for cross-linked polyethylene.  Polyethylene (denoted by "PE") is the raw material and the letter "X" in the acronym "PEX" refers to the cross-linking "chemical bonding" of the polyethylene across its molecular chains.

112.    NIBCO touts its PEX tubing as possessing "superior characteristics" due to NIBCO's cross-linking process.   Specifically, NIBCO states the following about its PEX manufacturing process:

> Cross-linking is the process that gives NIBCO DURA-PEX tubing its superior characteristics. The long, simple chains in a polyethylene molecule are altered to form a more stable, three-dimensional network. This process changes the material from a thermoplastic into a thermoset. A thermoset differs from a thermoplastic because a thermoset cannot be melted and then reformed. This change in molecular structure creates a polyethylene product with enhanced mechanical properties. Many manufacturers use a chemical additive to activate the cross-linking process, but NIBCO employs a sterile, electron beam process that provides superior properties. This process, which is called PEX-c, delivers the highest quality PEX tubing available today, while reducing the use of chemicals.[2]

## B.    NIBCO's Defective PEX Tubing.

113.    Despite NIBCO's attestations to the quality and superiority of its PEX Tubing, consumers all across the United States have experienced water damage and catastrophic PEX Tubing failures caused by slow growth cracking mechanisms consistent with oxidative failure and/or creep rupture.   These slow growth cracking mechanisms have been caused by the

---

[1] *About NIBCO*, http://www.nibco.com/About/ (last visited Dec. 22, 2013).
[2] *See* NIBCO, NIBCO® DURA-PEX® Piping Systems, Catalog C-PEX-0509, 4 (Apr. 29, 2009); see also NIBCO, NIBCO® PEX Piping Systems, Catalog C-PEX-1013, 4 (Oct. 1, 2013) (describing identical cross-linking process for NIBCO's PEX tubing that also gives the tubing "superior characteristics" and "delivers the highest quality PEX tubing available today").

insufficient stabilization and/or improper cross-linking of the PEX material used by NIBCO to manufacture its PEX Tubing.

114.    NIBCO's PEX Tubing comes with an express warranty that warrants against defects in the materials and workmanship of the tubing.  Specifically, NIBCO's express warranty states, *inter alia*, the following:

> NIBCO Inc. warrants that when NIBCO® PEX tube is used with NIBCO® PEX fittings, and NIBCO® valves and installation accessories, they will, under normal conditions, use and service in potable water and radiant heat systems, be free from defects in materials and workmanship for a period of twenty-five (25) years from the date of purchase when installed by a licensed professional contractor. This 25-year warranty is voided if any non-NIBCO products are used in the PEX system. NIBCO INC. warrants NIBCO PEX tube, when used under normal conditions, use and service in potable water and radiant heat systems with brass insert fittings meeting NSF/ANSI 61, ASTM F1807 and ASTM F877 to be free from defects in materials and workmanship for a period ten (10) years form [sic] the date of purchase.[3]

115.    Plaintiffs and the putative Class substantially complied with their obligations under the NIBCO PEX warranty. NIBCO, however, has failed to fulfill its obligation to replace the defective PEX Tubing and compensate Plaintiffs and Class members for the foreseeable property damage it caused.

116.    To the extent that the NIBCO PEX Warranty purports to limit or eliminate certain contractual rights afforded to Plaintiffs (*e.g.,* on the type of recoverable damages, ability to recover property damages), such limitations are unconscionable and unenforceable under the circumstances.

C.    **NIBCO's Defective PEX Fittings and Clamps**

---

[3] A true and correct copy of NIBCO's PEX warranty is attached to the Complaint as Exhibit 1.

117.   In addition to its PEX Tubing, NIBCO also manufactures and sells the fittings, clamps, valves and installation accessories required to install a completed residential or commercial plumbing system.

118.   NIBCO manufactures and sells PEX Fittings that purportedly conform to ASTM standard F1807.

119.   The ASTM is a globally recognized organization (formerly known as the American Society for Testing and Materials) that develops international voluntary consensus standards.   The F1807 standard applies to metal insert fittings for use with SDR9 cross-linked polyethylene (PEX) tubing, which is manufactured and/or sold by NIBCO

120.   F1807 insert fitting systems typically use a crimped stainless steel or copper ring to secure the PEX tubing to the fitting.   The brass alloy fitting is inserted into the PEX tubing using a special tool that crimps a copper ring or stainless steel clamp around the outside of the tubing, which, in turn, creates a seal between the PEX tubing and the brass fitting.   Below are examples of NIBCO's ASTM-F1807 insert fittings used with PEX Tubing.



121.   Not only does NIBCO manufacture and sell ASTM-F1807 fittings, but it encourages consumers to purchase and install the fittings with its PEX Tubing.   NIBCO's

express warranty covers 10 years if only its PEX Tubing is installed, but NIBCO increases its express warranty coverage to 25 years if its PEX Fittings, valves, and installation accessories are used in conjunction with its PEX Tubing.

122.    Defendant's ASTM-F1807 fittings are easily identified by a "NIBCO" stamp placed on the brass insert fittings.

123.    NIBCO's PEX Tubing comes with an express warranty that warrants against defects in the materials and workmanship of the fittings.   Specifically, NIBCO's express warranty states, *inter alia*, the following:

> NIBCO Inc. warrants that when NIBCO® PEX tube is used with NIBCO® PEX fittings, and NIBCO® valves and installation accessories, they will, under normal conditions, use and service in potable water and radiant heat systems, be free from defects in materials and workmanship for a period of twenty-five (25) years from the date of purchase when installed by a licensed professional contractor.[4]

124.    Plaintiffs and the putative Class substantially complied with their obligations under the NIBCO PEX warranty.  NIBCO, however, has failed to fulfill its obligation to replace any defective fittings and compensate Plaintiffs and Class members for the foreseeable property damage the PEX Fittings and Clamps caused.

125.    To the extent that the NIBCO PEX Warranty purports to limit or eliminate certain contractual rights afforded to Plaintiffs (*e.g.,* on the type of recoverable damages, ability to recover property damages), such limitations are unconscionable and unenforceable under the circumstances.

**D**.     **Failure of NIBCO's Defective PEX Fittings and Clamps.**

126.    Consumers who purchased and installed NIBCO's PEX Fittings and Clamps have experienced cracking and leaking of these products in their residential and commercial plumbing

---

[4] *See* Exhibit 1.

systems, causing water leaks that have and will cause extensive damage to homes, businesses and personal property of the consumers as a result of water leaks from the plumbing system.

127.    During the foreseeable and intended use, the NIBCO PEX Fittings are exposed to elements in residential and commercial plumbing systems which cause the NIBCO PEX Fittings to corrode and prematurely fail as the result of dezincification corrosion.

128.    After undergoing dezincification, the PEX Fittings prematurely fail and become brittle, sponge-like and/or plugged.  As a result, a continuous network of tiny holes develop in the PEX Fittings, allowing water to weep through the walls of the fitting.  Weakened fittings may crack or break, causing significant water damage.  They may become plugged with corrosion product causing, a low water pressure condition.  Corroded fittings may also allow chloride-rich water to weep through the wall of the fittings, wetting the adjacent stainless steel PEX Clamp and causing the PEX Clamp to fail due to chloride induced stress corrosion cracking.

129.    Defendant knew or should have known that the PEX Fittings and/or stainless steel PEX Clamps they manufactured, marketed and/or sold were susceptible to premature failure through dezincification corrosion and chloride-induced stress corrosion cracking respectively.

130.    The design, materials choices, and manufacturing practices of the brass fittings and stainless steel PEX Clamps marketed and sold by Defendant have created damaged products that begin to fail on their first day of use, even if properly installed in their intended environment.  Upon information and belief, Defendant no longer advertises these defective PEX Fittings on its website due to the design defect and susceptibility to dezincification.  Currently, Defendant advertises fittings that are "dezincification resistant."[5]

---

[5] *See, e.g.*, http://www.nibco.com/PEX/PEX-Fittings/PEX-Metal-Fittings/?pageNumber=1 (last visited Dec. 27, 2013).

131.   The stainless steel PEX Clamps fail slowly over time due to a fracture mechanism known as "chloride-induced stress corrosion cracking," which is caused by defective design and/or defective manufacturing by Defendant.   For stress corrosion cracking to occur, a susceptible material must be simultaneously exposed to tensile stress and chlorides.   If any one of these three things (material susceptibility, tensile stress, or chlorides) is eliminated or sufficiently reduced, stress corrosion cracking cannot occur.

132.   The failing PEX Clamps are manufactured from a stainless steel alloy that is known to be susceptible to stress corrosion cracking in the presence of chlorides, and these clamps are used in a design where simultaneous exposure to static tensile stress and chlorides is (or should have been) reasonably anticipated.   Stress corrosion cracking could not occur in the PEX Clamps if the clamps were manufactured from a material that is not susceptible to chloride-induced stress corrosion cracking.   Alternate materials that are generally immune to chloride-induced stress corrosion cracking (exhibiting little or no susceptibility) and that are approved for plumbing applications in the United States were readily available at little or no additional cost at the time the failing clamps were manufactured.

133.   Additionally, the failing PEX Clamps are designed in a manner that allows tensile stresses to exceed the yield strength of the material during normal installation (meaning that the tensile stresses are so high that the clamp permanently changes shape during installation, through a process known as "necking").   The clamps are designed in such a way that the tensile stresses created during normal and proper installation promote chloride-induced stress corrosion cracking, and the tensile stress condition is made even more detrimental by other aspects of the clamp design and/or manufacture (smearing of surface material, sharp edges, etc.).   Stress corrosion cracking cannot occur in the absence of static tensile stress, so the PEX Clamp could

26

not have failed in the manner that it did if commonly accepted principles of engineering design and manufacturing had been employed to sufficiently reduce tensile stresses.

134.    Chlorides are one of the most abundant compounds on the planet.  They are routinely found in potable water, solder flux, masonry materials, concrete curing accelerants, perspiration, flame retardants, and numerous other materials routinely encountered in building construction.  The presence of chlorides is (or should have been) reasonably anticipated and accounted for in the design and manufacture of the PEX Clamps.

135.    NIBCO acknowledges that liquid and paste fluxes for soldering applications of copper and copper-alloy fittings are corrosive and that they contain chlorides of zinc and ammonia.[6]  Additionally, NIBCO provides step-by-step brazing instructions to the installer. These instructions specify the application of flux.  The final step requires that the finished brazed assembly be wiped with a rag until all flux is removed.[7]  NIBCO fails to warn the installer against allowing chloride-rich flux to come into contact with the stainless steel PEX Clamp. Nevertheless, NIBCO knows or should have known that it is impossible to completely remove all traces of chloride-rich flux, and that by wiping the flux with a rag it is near certain that the chloride-rich flux will be smeared onto the adjacent stainless steel PEX Clamp.

136.    Additionally, NIBCO knows or should have known that chlorides from any source would be problematic for the stainless steel PEX Clamps.  NIBCO acknowledges that their PEX Clamps are "covered by international patents held by Oetiker International."  Oetiker

---

[6] *See* NIBCO, NIBCO® Copper Fittings, Catalog C-CF-0513, pg. 37 (May 9, 2013).
[7] *See Id.* pg. 47.

warns that chloride-rich environments can be problematic for their PEX Clamps.[8]   NIBCO fails to disclosures these vulnerabilities.

## **TOLLING OF THE STATUTE OF LIMTATIONS**

137.    Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment and denial of the facts alleged herein.   Plaintiffs and members of the Class could not have reasonably discovered the true, latent defective nature of the Defective PEX Products until shortly before this class action litigation was commenced.

138.    Defendant was and remains under a continuing duty to disclose to Plaintiffs and members of the Class the true character, quality and nature of NIBCO's defective PEX Tubing, PEX Clamps, and/or PEX Fittings, and the fact that they suffer from the PEX Product Defects that will inevitably cause them to fail.   As a result of the active concealment by Defendant, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

---

[8]http://www.oetiker.com/en/Services/~/media/Downloads/Operating%20Instructions/Operating%20Instructions%20PEX/Installation%20Instructions%20PEX/PEX%20Clamps%20Installation%20Instructions.pdf?la=es

## CLASS ALLEGATIONS

139.     This action is brought on behalf of Plaintiffs, individually and as a class action, pursuant to FED. R. CIV. P. 23(a), 23(b)(2) and/or 23(b)(3), on behalf of a nationwide class of consumers who purchased NIBCO's PEX Products (the "Nationwide Class").  Specifically, the Nationwide Class consists of:

> All persons or entities who sustained damages proximately caused by the defects in NIBCO's PEX Products used in the water plumbing systems of Plaintiffs' and Class members' homes and other structures, or which otherwise were installed in the homes and structures of Plaintiffs and the Class and require remediation.

140.     Alternatively, or in addition to the nationwide Class claims, Plaintiffs bring these claims under FED. R. CIV. P. 23(a), 23(b)(2) and/or 23(b)(3) on behalf of themselves and on behalf of Subclasses of individuals and entities residing in each of the states in which a named Plaintiff resides and each of the states where the laws are similar to each of the states in which a named Plaintiff resides ("State Subclasses").  The State Subclasses are defined as:

> All persons or entities who sustained damages proximately caused by the defects in NIBCO's PEX Products used in the water plumbing systems of Plaintiffs and Class members' homes and other structures, physically located in the applicable States, or which otherwise was installed in the homes and structures of Plaintiffs and the Class and require remediation.

141.     Plaintiffs reserve the right to re-define the Class(es) prior to class certification.

142.     The rights of each member of the Class were violated in a similar fashion based upon Defendant's uniform actions.

143.     This action has been brought and may be properly maintained as a class action for the following reasons:

a.     <u>Numerosity</u>:  Members of the Class are so numerous that their individual joinder is impracticable.  Plaintiffs are informed and believe that the proposed Class contains

hundreds and perhaps thousands of individuals or entities that own properties with Defendant's defective PEX Products.  The Class is therefore sufficiently numerous to make joinder impracticable, if not impossible.  The precise number of Class members is unknown to Plaintiffs.

    b.   <u>Existence and Predominance of Commons Questions of Fact and Law</u>:  Common questions of law and fact exist as to all members of the Class.  These questions predominate over any questions affecting individual Class members.  These common legal and factual questions include, but are not limited to, the following:

    i.   Whether Defendant's PEX Tubing, Fittings and/or Clamps were defectively designed and/or manufactured for their intended purpose.

    ii.   Whether Defendant's PEX Tubing, Fittings and/or Clamps were fit for their intended purpose.

    iii.   Whether Defendant's PEX Tubing, Fittings and/or Clamps were merchantable.

    iv.   Whether Defendant failed to warn consumers that its PEX Tubing, Fittings and/or Clamps were not properly tested during the design and development process.

    v.   Whether Defendant made fraudulent, false, deceptive, and/or misleading statements in connection with the sale of its PEX Tubing, Fittings and/or Clamps in its product literature, including those relating to standards and reliability.

    vi.   Whether Defendant omitted material information when it sold its PEX Tubing, Fittings and/or Clamps.

vii.   Whether Defendant exercised reasonable care in the design, manufacture, and testing of its PEX Tubing, Fittings and/or Clamps.

viii.   Whether Defendant owed a duty to Plaintiffs and the putative Class to exercise reasonable and ordinary care in the formulation, testing, design, manufacture, warranting and marketing of its PEX Tubing, Fittings and/or Clamps.

ix.   Whether Defendant breached its duty to Plaintiffs and the putative Class by designing, manufacturing, advertising, and selling to Plaintiffs and the Class defective PEX Tubing, Fittings and/or Clamps.

x.   Whether Defendant's PEX Tubing, Fittings and/or Clamps are progressively deteriorating at an accelerated rate.

xi.   Whether Defendant's PEX Tubing, Fittings and/or Clamps fail prematurely.

xii.   Whether Defendant knowingly sold or allowed its PEX Tubing, Fittings and/or Clamps to be distributed after it knew the PEX Tubing, Fittings and/or Clamps were failing at an increased rate.

xiii.   Whether Defendant knew or should have known of the defective nature of its PEX Tubing, Fittings and/or Clamps.

xiv.   Whether Plaintiffs and the putative Class are entitled to relief under Defendant's express warranties.

xv.   Whether Defendant breached its contracts with Plaintiffs and the putative Class.

xvi.   Whether Defendant breached the terms of its express warranty.

xvii.   Whether Defendant violated the New Jersey Consumer Fraud Act.

xviii.   Whether Defendant's actions constituted an unjust enrichment for it because Defendant has received and is holding funds rightfully belonging to Plaintiffs and the Class.

xix.   The appropriate nature of class-wide equitable relief.

xx.   The appropriate measurement of restitution and/or measure of damages to award to Plaintiffs and members of the Class.

xxi.   Whether the Defendant should be required to notify all Class members about its Defective PEX Products.

These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Class.

c.   Typicality:  Plaintiffs' claims are typical of the claims of the Class since Plaintiffs and all members of the putative Class own Defendant's defective PEX Products. Furthermore, Plaintiffs and all members of the Class sustained monetary and economic injuries arising out of Defendant's wrongful conduct by, *inter alia,* paying more for the PEX Products than they otherwise would have had they been aware of their defects.  Had this material information been disclosed to Plaintiffs and putative class members, they would not have purchased the PEX Products (or, at a minimum, would have paid substantially less for them).   Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent Class members.

d.   Adequacy:  Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class that they seeks to represent; they have retained counsel competent and highly experienced in complex class action litigation

and they intend to prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

e.  <u>Superiority</u>:  A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class.  The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct.  It would be virtually impossible for members of the Class to individually and effectively redress the wrongs done to them.  Even if the members of the Class could afford such individual litigation, the court system could not.  Individualized litigation presents a potential for inconsistent or contradictory judgments.  Individualized litigation also increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.

f.  <u>Ascertainability</u>: Class members are readily ascertainable, and can be identified by Defendant's records.  Upon information and belief all (or nearly all) of Class members' purchases can be located via Defendant's business records.

g.  Defendant has acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

h.  In the absence of a class action, Defendant would be unjustly enriched because it would be able to retain the benefits and fruits of its wrongful conduct.

**VIOLATIONS ALLEGED**

**COUNT I**
**BREACH OF EXPRESS WARRANTY**
**(On Behalf of the Nationwide Class or, Alternatively, the State Subclasses)**

144.     Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

145.     Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the Class against Defendant.

146.     Defendant's PEX Products are goods and thus Plaintiffs' and the Class' breach of express warranty claim is governed by the Uniform Commercial Code.

147.     Defendant's PEX Products contained an express warranty with every purchase.  A true and correct copy of such warranty can be found in Exhibit #1 to this Complaint.  NIBCO warranted that the PEX Products would be free from defects in materials and workmanship and such warranty became part of the basis of the transaction between Plaintiffs and the putative Class and Defendant.

148.     Defendant's express warranty states its PEX Products will be free from defects in materials and workmanship for a period of twenty-five (25) years from the date of purchase when installed by a licensed professional contractor and when installed along with NIBCO PEX fittings and NIBO valves and installation accessories.

149.     Defendant's express warranty states its PEX Tubing will be free from defects in materials and workmanship for a period of ten (10) years from the date of purchase if installed by a licensed professional contractor.

150.     Defendant expressly warrants that if a consumer's PEX Products are defective, NIBCO will replace them free of charge.

151.    Plaintiffs and the putative Class complied with the terms of Defendant's express warranty, including any and all conditions precedent and all obligations owed to NIBCO related to installation of the PEX Components.   Contrary to the terms of the express warranty, Defendant has failed to replace the defective PEX Products purchased by Plaintiffs and the putative Class.

152.    As NIBCO took no action to cure said breaches of warranties, Plaintiffs and the putative Class took corrective action at their own cost and expense so as to mitigate any further damage related to the failure of the PEX Products.

153.    As a result of Defendant's conduct, Plaintiffs and Class members have suffered an ascertainable loss in the form of direct monetary losses because Defendant has forced Plaintiffs to pay for repairs and/or the replacement of the defective PEX Products.

154.    Plaintiffs and Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.  In addition, Defendant was put on notice of the defect because it had knowledge of the existence of the PEX Product Defects at all relevant times.

### COUNT II
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
#### (On Behalf of the Nationwide Class or, Alternatively, the State Subclasses)

155.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

156.    Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the Class against Defendant.

157.    At all times mentioned herein, Defendant manufactured and/or supplied the PEX Products, and prior to the time the PEX products were purchased by Plaintiffs and the putative

Class, Defendant impliedly warranted to Plaintiffs, and to Plaintiffs' agents, that the PEX Products were of merchantable quality and fit for the use for which they were intended.

158.    Plaintiffs and Plaintiffs' agents relied on the skill and judgment of Defendant in using the PEX Products.

159.    The PEX Products were unfit for their intended use and were not of merchantable quality, as warranted by Defendant, but instead contained the PEX Product Defects. Specifically, and as a result of such defects, the PEX Tubing is predisposed to premature oxidative failure and creep rupture, the PEX Fittings are predisposed to prematurely fail as a result of dezincification corrosion, and the PEX Clamps are predisposed to prematurely fail as a result of chloride-induced stress corrosion cracking.  These defects cause the PEX Products to fail to perform when put to their intended use.

160.    Defendant breached the implied warranty of merchantability, as the PEX Products were not of a merchantable quality due to the PEX Product Defects.

161.    As a direct and proximate result of the breach of said warranties, Plaintiffs and the putative Class suffered and will continue to suffer losses and damages as alleged herein in an amount to be determined at trial.

162.    Plaintiffs and Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

### COUNT III
### BREACH OF IMPLIED WARRANTY OF FITNESS
### FOR A PARTICULAR PURPOSE
### (On Behalf of the Nationwide Class or, Alternatively, the State Subclasses)

163.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

164.    At the time of contracting, Defendant had reason to know of Plaintiffs' and Class members' particular purpose for purchasing NIBCO's PEX Products.

165.    Plaintiffs and Class members relied on Defendant's skill or judgment to select or furnish suitable goods, thereby creating an implied warranty that the goods would be fit for such purpose.

166.    The defective NIBCO PEX Products were not fit for these purposes, thereby causing injuries to Plaintiffs and Class members.

**COUNT IV**
**NEGLIGENCE**
**(On Behalf of the Nationwide Class)**

167.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

168.    Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the Class against Defendant.

169.    Defendant owed Plaintiffs and the putative Class a duty to exercise reasonable and ordinary care in the formulation, testing, design, manufacture, warranting and marketing of the PEX Products.

170.    The failure of the PEX Products in Plaintiffs' and the Class member's residential and commercial properties was caused by poor and improper workmanship and manufacture, negligence, and lack of reasonable and ordinary care by NIBCO, acting through its duly authorized agents, servants, and employees.  Defendant failed to properly test and/or evaluate the PEX Products to ensure they would not fail when they were used for their intended purpose.

171.    After being notified of the foregoing breaches, NIBCO took no action to cure its breaches of its duty to exercise ordinary care, thus requiring Plaintiffs and the putative Class to

take corrective action at their own cost and expense to avoid continued failure of the PEX Products, as well as further damage to their homes, business and personal property.

172.     As a direct and proximate result of NIBCO's negligence, carelessness and breaches of its duty of reasonable and ordinary care, Plaintiffs and the putative Class have been caused to suffer losses and damages, including the cost of repairing and replacing the PEX Products, interruption of their businesses and home life, damage to their homes, businesses and personal property due to leakage, and other incidental expenses associated with the failure of Defendant's PEX Products, all of which damages were foreseeable by Defendant.

173.     Plaintiffs and Class members comprise an identifiable class, which Defendant knew or had reason to know were likely to suffer damages as a result of its conduct, including property damage beyond that sustained only to the Defective NIBCO PEX Products.

**COUNT V**
**VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT ("NJCFA")**
**(On Behalf of the New Jersey Class)**

174.     Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

175.     Plaintiff Monica brings this cause of action on behalf of himself and on behalf of the members of the New Jersey Class against Defendant.

176.     The NJCFA was enacted to protect consumers from deceptive, fraudulent, and misleading commercial practices and makes such practices unlawful.

177.     The NJCFA protects consumers against "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such

38

concealment, suppression or omission, in connection with the sale or advertisement of any

merchandise…"  N.J.S.A. 56:8-2.

178.    Defendant's advertisements that its PEX Tubing was of a superior quality and that

its cross-linking process produced the highest quality PEX tubing available constitutes a

violation of N.J.S.A. 56:8-2 since Defendant made an affirmative misrepresentation regarding

the quality, characteristics, and durability of its PEX Tubing.

179.    Defendant's representations that it would honor the terms of the PEX express

warranty constitutes a false promise as well as the knowing concealment, suppression and

omission of material fact under N.J.S.A. 56:8-2 because Defendant had no intention of honoring

its obligations to replace any defective PEX Product under its express warranty.

180.    Defendant's representation of the quality and durability of its PEX Products

constitutes a misrepresentation under N.J.S.A. 56:8-2 because Defendant knew that the design

and/or manufacturing defect led to a product that was defective, inferior, and not fit for its

intended use.

181.    Defendant also engaged in unlawful conduct in violation of the NJCFA by

making knowing and intentional omissions.  Defendant knowingly failed to disclose the PEX

Product Defects in order to secure the sale of the PEX Products, and to offer them at a premium

price.

182.    As a result of Defendant's conduct, Plaintiff Monica and the putative New Jersey

Class have suffered ascertainable losses in the form of direct monetary losses.

183.    A causal relationship exists between Defendant's unlawful, false, deceptive, and

misleading conduct and the injuries suffered by Plaintiff Monica and the putative New Jersey

Class, including, but not limited to, the amount of out-of-pocket losses from damage to

Plaintiff's and the putative New Jersey Class members' homes, businesses and personal property from water leaks, unpaid insurance claims, the cost to repair any leaks, and the cost of replacement tubing and fittings.  Had Defendant not engaged in the aforementioned deceptive conduct, Plaintiff and the putative New Jersey Class would not have purchased and installed Defendant's PEX Products in their residential and commercial properties.

**COUNT VI**
**VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 PA. STAT. ANN. § 201-1, *et seq.*)**
**(On Behalf of the Pennsylvania Class)**

184.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

185.    The Pepernos bring this cause of action on behalf of themselves and the members of the Pennsylvania Class against Defendant.

186.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") makes it unlawful to engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.  73 PA. STAT. ANN. § 201-3. Defendant has engaged in deceptive business practices prohibited by the UTPCPL, including (1) representing that the PEX Products have characteristics, uses, benefits, and qualities which they do not have, (2) representing that PEX Products are of a particular standard, quality, and grade when they are not, (3) advertising the PEX Products with the intent not to sell them as advertised, and (4) engaging in acts or practices which are otherwise unfair, misleading, false, or deceptive to the consumer.

187.    NIBCO's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including the Pepernos, about the true performance and characteristics of the PEX Products.

188.    As a result of Defendant's conduct, Plaintiffs and the Pennsylvania Class have suffered ascertainable losses in the form of direct monetary losses.

189.    A causal relationship exists between Defendant's unlawful, false, deceptive, and misleading conduct and Plaintiffs' and the Pennsylvania Class members' injuries, including, but not limited to, the amount of out-of-pocket losses from damage to Plaintiffs' and the Pennsylvania Class members' homes, businesses and personal property from water leaks, unpaid insurance claims, the cost to repair any leaks, and the cost of replacement tubing and fittings. Had Defendant not engaged in the aforementioned deceptive conduct, Plaintiffs and the Pennsylvania Class would not have purchased and installed Defendant's PEX Products in their residential and commercial properties.

## COUNT VII
### VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT
(TEX. BUS. & COM. CODE § 17.41, *et seq.*)
**(On Behalf of the Texas Class)**

190.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

191.    The McMahon and Medders Plaintiffs bring this cause of action on behalf of themselves and the members of the Texas Class against Defendant.

192.    The Texas Deceptive Trade Practices Act ("TDTPA") makes it unlawful to commit "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." TEX. BUS. & COM. CODE § 17.46.  A person commits a false, misleading, or deceptive act or practice in the conduct of trade or commerce by "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have." *Id.* at § 17.46(5).

41

193.    A person also commits a deceptive trade practice under the TDTPA when "representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."  *Id.* at § 17.46(7).

194.    NIBCO's actions as set forth above occurred in the conduct of trade or commerce, and constitute deceptive trade practices under the TDTPA.

195.    NIBCO's actions impact the public interest because Plaintiffs were injured in exactly the same way as thousands of others purchasing NIBCO's PEX products as a result of NIBCO's generalized course of deception.

196.    All procedural prerequisites, including notice, have been met. Pursuant to TEX. BUS. & COM. CODE § 17.505(b), Plaintiffs, individually and on behalf of the other Texas Class members, will send to the Texas Consumer Protection Division a copy of this Complaint.

197.    As a result of Defendant's conduct, Plaintiffs and the Texas Class have suffered ascertainable losses in the form of direct monetary losses.

198.    A causal relationship exists between Defendant's unlawful, false, deceptive, and misleading conduct and Plaintiffs' and the Texas Class members' injuries, including, but not limited to, the amount of out-of-pocket losses from damage to Plaintiffs' and the Texas Class members' homes, businesses and personal property from water leaks, unpaid insurance claims, the cost to repair any leaks, and the cost of replacement tubing and fittings.  Had Defendant not engaged in the aforementioned deceptive conduct, Plaintiffs and the Texas Class would not have purchased and installed Defendant's PEX Products in their residential and commercial properties.

## COUNT VIII
## VIOLATIONS OF THE OKLAHOMA CONSUMER DECEPTIVE TRADE PRACTICES ACT (OKLA. STAT. TIT. 78 § 51-55, *et seq.*)
### (On Behalf of the Oklahoma Class)

199.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

200.    Plaintiff Sminkey brings this cause of action on behalf of himself and the members of the Oklahoma Class against Defendant.

201.    Oklahoma's Deceptive Trade Practices Act, OKLA. STAT. TIT. 78 § 51-55, *et seq.* ("Oklahoma DTPA") makes it unlawful to engage in deceptive trade practices in the course of a business, vocation, or occupation.  A person commits a deceptive trade practice when he "[k]nowingly makes a false representation as to the characteristics, ingredients, uses, benefits or quantities of goods or services or a false representation as to the sponsorship, approval, status, affiliation, or connection of a person therewith."  OKLA. STAT. TIT. 78 § 53(5).

202.    A person also commits a deceptive trade practice under the Oklahoma DTPA when he "[r]epresents that goods or services are a particular standard, quality, or grade, or that goods are a particular style or model, if they are another."  *Id.* at §53(7).

203.    NIBCO's actions as set forth above occurred in the conduct of trade or commerce, and constitute deceptive trade practices under the Oklahoma DTPA.

204.    NIBCO's actions impact the public interest because Plaintiffs were injured in exactly the same way as thousands of others purchasing NIBCO's PEX products as a result of NIBCO's generalized course of deception.

205.    As a result of Defendant's conduct, Plaintiff Sminkey and the Oklahoma Class have suffered ascertainable losses in the form of direct monetary losses.

206.    A causal relationship exists between Defendant's unlawful, false, deceptive, and misleading conduct and Plaintiff Sminkey's and the Oklahoma Class members' injuries, including, but not limited to, the amount of out-of-pocket losses from damage to Plaintiff and the

Oklahoma Class members' homes, businesses and personal property from water leaks, unpaid insurance claims, the cost to repair any leaks, and the cost of replacement tubing and fittings. Had Defendant not engaged in the aforementioned deceptive conduct, Plaintiff and the Oklahoma Class would not have purchased and installed Defendant's PEX Products in their residential and commercial properties.

207.    Plaintiff seeks an award of actual damages, attorney's fees and costs, as permitted by the Oklahoma DTPA.

**COUNT IX**
**UNJUST ENRICHMENT**
**(On Behalf of the Nationwide Class or, Alternatively, the State Subclasses)**

208.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

209.    This claim is pled in the alternative to Plaintiffs' contract claims, pursuant to FED. R. CIV. P. 8.

210.    Plaintiffs and Class members conferred a tangible economic benefit upon NIBCO by purchasing its PEX Products.  Plaintiffs and Class members would not have purchased NIBCO's PEX Products had they known that those PEX Products were defective and that NIBCO would not honor the terms of its express warranty.

211.    Failing to require Defendant to provide remuneration under these circumstances would result in Defendant being unjustly enriched at the expense of Plaintiffs and the Class members.

212.    Defendant's retention of the benefit conferred upon them by Plaintiffs and members of the Class would be unjust and inequitable.

**COUNT X**
**DECLARATORY AND INJUNCTIVE RELIEF**

**(On Behalf of the Nationwide Class or, Alternatively, the State Subclasses)**

213.     Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

214.     Plaintiffs, on behalf of themselves and the Class, seek a Court declaration of the following:

a.     The NIBCO PEX Products have defects which cause failures and leaks resulting in water damage to the property and the necessity of the removal and replacement of the PEX Products;

b.     The NIBCO PEX Products have a defect in workmanship and material that causes failures;

c.     NIBCO knew of the defects in its PEX Products and that the limitations contained in its purported limited warranties are unenforceable;

d.     NIBCO shall re-audit and reassess all prior warranty claims on their PEX Products, including claims previously denied in whole or in part, where the denial was based on warranty or other grounds; and

e.     NIBCO shall establish an inspection program and protocol to be communicated to Class members that will require Defendant to inspect, upon request, a Plaintiff's or Class member's structure to determine whether the PEX Product failure is manifest, and make any replacements (or take other appropriate measures) as may be necessary.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request, on behalf of themselves and members of the Class, that this Court:

A.    determine that the claims alleged herein may be maintained as a class action under Rule 23(a), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above and designating Plaintiffs' counsel as counsel for the Class;

B.    award all actual, general, special, incidental, statutory, treble or other multiple, punitive and consequential damages to which Plaintiffs and Class members are entitled;

C.    award pre-judgment and post-judgment interest on such monetary relief;

D.    grant appropriate injunctive and/or declaratory relief as the Court may deem reasonable;

E.    award reasonable attorneys' fees and costs; and grant such further and other relief that this Court deems appropriate.  This relief may include, without limitation, any remediation, inspection, notice, and/or other necessary steps to be undertaken with respect to putative class members with PEX Products on which the defect has not yet manifested.

## JURY DEMAND

Plaintiffs, on behalf of themselves and the putative class, demand a trial by jury on all issues so triable.

Dated:  September 3, 2014                **LITE DEPALMA GREENBERG, LLC**

                                    By:    */s/ Bruce D. Greenberg*
                                           Bruce D. Greenberg
                                           Jeffrey A. Shooman
                                           Two Gateway Center
                                           Suite 1201

Newark, NJ 07102
Telephone: (973) 623-3000
Email: bgreenberg@litedepalma.com
          jshooman@litedepalma.com

CHIMICLES & TIKELLIS LLP
Joseph G. Sauder
Matthew D. Schelkopf
Benjamin F. Johns
Joseph B. Kenney
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633
E-mail: JGS@chimicles.com
          MDS@chimicles.com
          BFJ@chimicles.com
          JBK@chimicles.com

STUTMAN LAW
Daniel Hogan
Michael Hopkins
500 Office Center Drive, 301
Fort Washington, PA 19034
Telephone: (215) 283-1177
Facsimile: (215) 283-1188
Email: HoganD@stutmanlaw.com
          HopkinsM@stutmanlaw.com

***Attorneys for Plaintiffs and Proposed Interim Co-
Lead Counsel***

Michael McShane
AUDET & PARTNERS LLP
221 Main Street, Suite 1460
San Francisco, CA 94105
Telephone: (415) 568-2555
Facsimile: (415) 568-2556
Email: MMcShane@audetlaw.com

Stewart Cohen
COHEN, PLACITELLA & ROTH, PC
Two Commerce Square
Suite 2900
2001 Market Street

Philadelphia, PA 19103
Telephone: (215) 567-3500
Facsimile: (215) 567-6019
Email: scohen@cprlaw.com

Charles J. LaDuca
CUNEO GILBERT & LADUCA, LLP
8120 Woodmont Avenue
Suite 810
Bethesda, Maryland 20814
Telephone: (202) 789-3960
Facsimile: (202) 789-1813
Email: charles@cuneolaw.com

Robert K. Shelquist
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
Email: rkshelquist@locklaw.com

***Attorneys for Plaintiffs and
the Proposed Executive Committee***

<u>**CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2**</u>

Plaintiffs, by their attorneys, hereby certify that to the best of their knowledge, the matter in controversy is not related to any other action.  Plaintiffs are not currently aware of any other party who should be joined in this action.

I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.


Dated: September 3, 2014                     **LITE DEPALMA GREENBERG, LLC**


                                        By:      <u>*/s/ Bruce D. Greenberg*</u>
                                                 Bruce D. Greenberg
                                                 Two Gateway Center
                                                 Suite 1201
                                                 Newark, NJ 07102
                                                 Telephone: (973) 623-3000
                                                 Email: <u>bgreenberg@litedepalma.com</u>

# EXHIBIT 1



# NIBCO® PEX Warranty

### NIBCO INC. LIMITED WARRANTY
Applicable to NIBCO INC. PEX Piping Systems

NIBCO INC. warrants that when NIBCO® PEX tube is used with NIBCO® PEX fittings, and NIBCO® valves and installation accessories, they will, under normal conditions, use and service in potable water and radiant heat systems, be free from defects in materials and workmanship for a period of twenty-five (25) years from the date of purchase when installed by a licensed professional contractor. This 25-year warranty is voided if any non-NIBCO products are used in the PEX system. NIBCO INC. warrants NIBCO PEX tube, when used under normal conditions, use and service in potable water and radiant heat systems with brass insert fittings meeting NSF/ANSI 61, ASTM F1807 and ASTM F877 to be free from defects in materials and workmanship for a period of ten (10) years form the date of purchase. NIBCO INC. warrants NIBCO® PEX fittings, manifolds, transition fittings and valves under normal conditions, use and service in potable water and radiant heat systems, to be free from defects in materials and workmanship for a period of ten (10) years from the date of purchase. NIBCO INC. warrants NIBCO® associated hardware and tools for a period of 90 days from the date of purchase.

In the event any defect occurs which the owner believes is covered by this warranty, the owner should immediately contact NIBCO Technical Services, either in writing or by telephone at 1.888.446.4226 or 1.574.295.3000. The owner will be instructed to return said tube, fittings or accessories, at the owner's expense, to NIBCO INC., or an authorized representative for inspection. In the event said inspection discloses to the satisfaction of NIBCO INC. that said tube, fitting or accessory is defective, a replacement shall be mailed free of charge to the owner.

IN ORDER FOR THIS LIMITED WARRANTY TO APPLY, THE ABOVE REFERENCED PRODUCTS MUST BE INSTALLED BY A LICENSED PROFESSIONAL PLUMBER IN ACCORDANCE WITH NIBCO INSTALLATION INSTRUCTIONS AND IN COMPLIANCE WITH ALL APPLICABLE CODE REQUIREMENTS. FAILURE TO DO SO WILL VOID ALL APPLICABLE WARRANTIES.

This warranty does not apply and you do not have a right of reimbursement if the failure or resulting damage is caused by:

1. breaks, tearing, kinking, gouges, punctures or other external damages before, during, or after installation;
2. exposure to temperatures and pressures beyond the product ratings as specified on the product or in the NIBCO installation manual;
3. exposure to damaging chemicals, substances or corrosive water conditions;
4. damage from abnormal operating conditions;
5. damage due to accident, abuse, misuse, or unauthorized modification or repair;
6. improper installation due to worn, damaged, unauthorized or improperly calibrated tools;
7. components in the plumbing system other than those manufactured or sold by NIBCO;
8. not designing, installing, inspecting or testing the system in accordance with NIBCO installation instructions at the time of the installation; or
9. failure to follow applicable code requirements and good plumbing practices.

TO THE EXTENT PERMITTED BY LAW, THIS WARRANTY SPECIFICALLY EXCLUDES INCIDENTAL AND CONSEQUENTIAL DAMAGES OF EVERY TYPE AND DESCRIPTION RESULTING FROM ANY CLAIMED DEFECT IN MATERIAL OR WORKMANSHIP, INCLUDING BUT NOT LIMITED TO, PERSONAL INJURIES AND PROPERTY DAMAGES.

Some states or countries do not allow the exclusion or limitation of incidental or consequential damages so these limitations may not apply to you.

TO THE EXTENT PERMITTED BY LAW, IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE LIMITED IN DURATION.



This warranty gives you specific legal rights, and you may also have other rights which vary from state to state and country to country.

To the best of our knowledge, the information contained in this publication is accurate. However, NIBCO does not assume any liability whatsoever for the accuracy or completeness of such information. Final determinations of the suitability of any information or product for the use to be contemplated is the sole responsibility of the user. The manner of that use, and whether there is any infringement of patents, is also the sole responsibility of the user.



NIBCO INC. WORLD HEADQUARTERS • 1516 MIDDLEBURY ST. • ELKHART, IN 46516-4740 • USA • PH: 1.800.234.0227
TECH SERVICES PH: 1.888.446.4226 • FAX: 1.888.336.4226 • INTERNATIONAL OFFICE PH: +1.574.295.3327 • FAX: +1.574.295.3455
www.nibco.com