# EXHIBIT 19

KIMBERLY COLE                                February 13, 2017

Page 1

1              UNITED STATES DISTRICT COURT
                  DISTRICT OF NEW JERSEY
2  _____

3  KIMBERLY COLE, ALAN COLE,
   JAMES MONICA, LINDA BOYD,
4  MICHAEL MCMAHON, RAY
   SMINKEY, JAMES MEDDERS,
5  JUDY MEDDERS, ROBERT
   PEPERNO, SARAH PEPERNO,
6  and KELLY MCCOY, on behalf
   of themselves and all
7  others similarly situated,

8              Plaintiffs,

9  vs.                              No. 13-cv-07871-FLW-TJB

10 NIBCO, INC.,

11             Defendant.
   _____

12

13

14

15

16
                   Deposition of:
17
                   KIMBERLY COLE
18
                   Taken on behalf of the Defendant
19                 February 13, 2017

20

21

22

23

24 _____

25 Reported by:  SARAH M. MOTLEY, LCR

KIMBERLY COLE                                        February 13, 2017

---

### Page 2

```
1
2
3
4
5
              A P P E A R A N C E S
6
7
8    For the Plaintiffs:
9         MR. JOSEPH B. KENNEY
          Attorney at Law
10        McCuneWright, LLP
          1055 Westlakes Drive, Suite 300
11        Berwyn, PA  19312
          (610)727-4360
12        jbk@mccunewright.com
13
14
     For the Defendant:
15
          MS. RACHEL E. STEPHENS
16        Attorney at Law
          Lathrop & Gage, LLP
17        2345 Grand Blvd., Suite 2200
          Kansas City, MO  64108
18        (816)292-2000
          rstephens@lathropgage.com
19
20
21   Also Present:
22        MR. ALAN COLE
23
24
25
```

### Page 4

```
1    EXHIBITS (cont'd)
2    Exhibit Number 13                    120
               Installation Guide
3
     Exhibit Number 14                    122
4          Claim # 1 of 2012
5    Exhibit Number 15                    129
           Claim # 2 of 2012
6
     Exhibit Number 16                    130
7          Calendar
8
9
10
```

### Page 3

```
1
2              I N D E X
                                      Page
3    Examination
4    By Ms. Stephens                    6
5
              E X H I B I T S
6
                                      Page
7    Exhibit Number 1                   21
8          Notice of Deposition
9    Exhibit Number 2                   25
           Interrogatories
10
     Exhibit Number 3                   27
11         Product Return Authorization
12   Exhibit Number 4                   39
           Cole Leaks
13
     Exhibit Number 5                   74
14         Notes
15   Exhibit Number 6                   79
           Photographs
16
     Exhibit Number 7                   82
17         Photographs
18   Exhibit Number 8                   88
           Photographs
19
     Exhibit Number 9                   92
20         Photographs
21   Exhibit Number 10                  98
           Photographs
22
     Exhibit Number 11                 102
23         Lowe's Budget
24   Exhibit Number 12                 111
           Website Info & Forums
25         About PEX Piping
```

### Page 5

```
1
2
3
4          S T I P U L A T I O N S
5
6
7         The deposition of KIMBERLY COLE was taken by
8    counsel for the Defendant, at Sherrard & Roe, 150 3rd
9    Avenue South, Suite 1100, Nashville, Tennessee, on
10   February 13, 2017, for all purposes under the Federal
11   Rules of Civil Procedure.
12        All formalities as to caption, notice,
13   statement of appearance, et cetera, are waived.  All
14   objections, except as to the form of the questions,
15   are reserved to the hearing, and that said deposition
16   may be read and used in evidence in said cause of
17   action in any trial thereon or any proceeding herein.
18        It is agreed that SARAH M. MOTLEY, LCR, Notary
19   Public and Court Reporter for the State of Tennessee,
20   may swear the witness, and that the reading and
21   signing of the completed deposition by the witness
22   are not waived.
23
24
25
```

KIMBERLY COLE                                              February 13, 2017

Page 6

1                          *   *   *
2                      KIMBERLY COLE,
3    was called as a witness, and having first been duly
4    sworn, testified as follows:
5
6                      EXAMINATION
7    QUESTIONS BY MS. STEPHENS:
8    Q.        Good morning.  Could you state your name for
9    the record.
10   A.        Kimberly Cole.
11   Q.        Mrs. Cole, have you ever given a deposition
12   before?
13   A.        Yes.
14   Q.        Okay.  And under what circumstances have you
15   given a deposition?
16   A.        Through my work.
17   Q.        Okay.  And what was your job at the time that
18   you gave that deposition?
19   A.        A registered nurse.
20   Q.        Could you say that louder.
21   A.        Yeah, sure.  I'm sorry.  A registered nurse.
22   Q.        Okay.  And that was some sort of -- was it
23   like a malpractice suit?
24   A.        Uh-huh.
25   Q.        Yes?

Page 7

1    A.        Yes.
2    Q.        Okay.  That response reminds me that when
3    you're giving a deposition, one of the things we need
4    to make sure that we do is that, first of all, you
5    and I try to talk one at a time as much as possible.
6    Okay?
7    A.        Yes.
8    Q.        Second thing is, when you're giving a
9    response, make sure that your response is verbal and
10   that -- yes and no, rather than uh-huh and uh-uh.
11   Does that make sense?
12   A.        Yes.
13   Q.        That makes it easier on the court reporter
14   here to make sure she gets down your answers and that
15   they're clear.  Okay?
16   A.        Yes.
17   Q.        Another thing today is if I ask you a
18   question and you don't understand my question, please
19   let me know.  Otherwise, I'm going to assume that you
20   understand my question.  Is that fair?
21   A.        Yes.
22   Q.        Occasionally, your attorney here, Mr. Kenney,
23   may object to a question I ask.  Most of the time,
24   that means you still need to answer my question if
25   you understand it, but if you don't remember the

Page 8

1    question that I asked, just let me know.  We can have
2    the court reporter read it back or I can try to
3    rephrase it.  Is that fair?
4    A.        Yes.
5    Q.        How long ago did you give that deposition in
6    the malpractice lawsuit?
7    A.        Three months ago.
8    Q.        Okay.  So relatively recently?
9    A.        Yeah.  Maybe three months ago.
10   Q.        Okay.  And how long have you been a
11   registered nurse?
12   A.        Almost 16 years.
13   Q.        Okay.  Great.
14             What year did you graduate from high school?
15   A.        1994.
16   Q.        Okay.  And then did you continue on to study
17   in college?
18   A.        Yes.
19   Q.        Okay.  And what year did you graduate from
20   college?
21   A.        2001.
22   Q.        And then since 2001, you've been a registered
23   nurse?
24   A.        Yes.
25   Q.        Okay.  Where do you currently live,

Page 9

1    Mrs. Cole?
2    A.        Gadsden, Tennessee.
3    Q.        And what's your address?
4    A.        19207 Highway 79.
5    Q.        And that house on Highway 79, is that the
6    house that has had the plumbing issues that are at
7    issue in this lawsuit?
8    A.        Yes.
9    Q.        Occasionally today I might refer to that as
10   your house, and you understand me, that that's the
11   house we're talking about?  Does that make sense?
12   A.        Yes.
13   Q.        I'm here representing NIBCO, Inc.  When is
14   the first you had ever heard of NIBCO?
15   A.        Really, after my first leak.
16   Q.        Okay.  So perhaps somewhere around 2010,
17   maybe?
18   A.        I really can't give a specific date.
19   Q.        Okay.  I might ask you again after we go
20   through some things and maybe that will jog your
21   memory.
22   A.        Okay.
23   Q.        What year was your house built?
24   A.        Construction started around 2008.
25   Q.        And when was construction completed?

KIMBERLY COLE                                            February 13, 2017

Page 10

1    A.    We moved in, in 2009.  May, I believe.
2    Q.    Before you moved into the house on
3    Highway 79, did you own a home?
4    A.    Yes.
5    Q.    And where was that house?
6    A.    136 Beaver Run Cove.
7    Q.    Also in Gadsden?
8    A.    Bells.
9    Q.    Bells, Tennessee?
10   A.    Yes.
11   Q.    Why did you decide to move -- well, my
12   understanding is that you guys built the house on
13   Highway 79.  Is that correct?
14   A.    Yes.
15   Q.    And why did you decide to build a house?
16   A.    We wanted a bigger home.
17   Q.    And my understanding, do you have four
18   children?
19   A.    Yes.
20   Q.    How big is the house on Highway 79?
21   A.    Roughly, 28 square feet.
22   Q.    2800 square feet?
23   A.    2800.  Sorry.
24   Q.    How many bedrooms?
25   A.    One, two, three -- five, or four and a study,

Page 11

1    just depending on how you want to do it.
2    Q.    So approximately, five bedrooms.
3          And how many bathrooms?
4    A.    Two-and-a-half.
5    Q.    Who designed the house on Highway 79?
6    A.    I'm not certain what you mean.
7    Q.    Okay.  Well, did you have an architect draw
8    up plans?
9    A.    No.  We picked them out ourselves.  We went
10   through books and online and -- I can't really
11   remember where we found the actual one, if it was
12   online or in a book, but we ordered the plans.
13   Q.    Who built the house on Highway 79?
14   A.    Cobb Construction.
15   Q.    Cobb Construction is owned by your father?
16   A.    Yes.
17   Q.    His name is Roger Cobb?
18   A.    Yes.
19   Q.    What is your father's background in
20   construction?
21   A.    What do you mean?
22   Q.    Well, he has a -- Cobb Construction Company.
23   Do you know how long he's had that company?
24   A.    Well, I'm 40, so...  Before I was born, so
25   40-plus years.

Page 12

1    Q.    So for as long as you remember, your father
2    has been involved in the construction business?
3    A.    Yes.
4    Q.    Okay.  So your understanding is that you took
5    the plans that you ordered online, and then your
6    general contractor was Cobb Construction?
7    A.    Yes.
8    Q.    Okay.  Was there a subcontractor who
9    installed the plumbing?
10   A.    No.
11   Q.    Did Cobb Construction install the plumbing,
12   then?
13   A.    I'm not really sure what you're...
14   Q.    Okay.  Well, Cobb Construction was the
15   general contractor, correct?
16   A.    Yes.
17   Q.    For your house?  Okay.
18         Did your father or someone who worked for him
19   also install the plumbing in your house?
20   A.    I know he's a licensed plumber, as well, if
21   that's what you're asking.  I'm not --
22   Q.    Well, who did the work?
23   A.    He did.
24   Q.    Okay.  And at the time, you said your father
25   was also a licensed plumber; is that correct?

Page 13

1    A.    Yes.  Yes, ma'am.
2    Q.    Okay.  And was Cobb Construction typically in
3    the residential home business?  Is that something
4    that they typically did?
5          MR. KENNEY:  Object to the form.
6          You can answer if you know.
7          THE WITNESS:  I don't know.
8    BY MS. STEPHENS:
9    Q.    Okay.
10   A.    I don't understand, really.
11   Q.    Did your father's company also build other
12   houses?
13   A.    Yes.
14   Q.    Okay.  Was that typically what your father
15   did, build houses?
16   A.    Oh, yes.
17   Q.    Okay.  When you were discussing the new house
18   with your father, did you guys talk about the
19   plumbing at all?
20   A.    (Shaking head negatively.)
21         No.  Sorry.
22   Q.    It's okay.
23         And do you understand that at some point,
24   your house -- excuse me.  Do you understand that your
25   father installed PEX plumbing in your house?

KIMBERLY COLE                                                February 13, 2017

Page 14

1   A.      Yes.
2   Q.      As part of the original construction?
3   A.      Yes.
4   Q.      Had you ever heard of PEX plumbing before?
5   A.      No.
6   Q.      Okay.  So to your knowledge, did your father
7   pick out that material for your house?
8   A.      Yes.
9   Q.      Do you understand -- have an understanding of
10  what PEX plumbing is, P-E-X?
11  A.      As in?
12  Q.      Like, what it -- what does that mean, what is
13  PEX plumbing?
14  A.      No, not really.
15  Q.      Okay.  Do you have an understanding that
16  NIBCO, who I'm representing here today, is a
17  manufacturer of PEX plumbing materials?
18  A.      Yes, I understand that.
19  Q.      Okay.  Have you ever seen the tubing or the
20  piping in your house?
21  A.      Yes.
22  Q.      Okay.  Is it, like, red and blue?
23  A.      Yes.
24  Q.      Okay.  And it had -- did it have any sort of
25  stamp on it?

Page 15

1   A.      Yes.
2   Q.      Okay.  And was it -- do you recall what you
3   saw on the tube?
4   A.      NIBCO, in capital letters.
5   Q.      Okay.  I just want to make sure that we're on
6   the same page so that we're talking about the same
7   thing.  Is that okay?
8   A.      Yes, ma'am.
9   Q.      Okay.  Do you understand that other companies
10  also manufacture PEX tubing?
11  A.      Yes.
12  Q.      Okay.  So PEX, P-E-X, is just a generic term
13  for a type of tubing, and that NIBCO in particular
14  manufactures a particular brand of materials.  Does
15  that make sense to you?
16  A.      Yes.
17  Q.      Do you know what kind of -- do you know what
18  a fitting is, a plumbing fitting?
19  A.      Yes.
20  Q.      Okay.  And what, in your understanding, is a
21  fitting?
22  A.      What connects it.
23  Q.      Okay.  So you mean to say that a fitting is
24  what connects two pieces of piping together?
25  A.      Yes.

Page 16

1   Q.      Okay.  Do you know what kind of fittings were
2   installed in your home?
3   A.      What do you mean by that?
4   Q.      Okay.  Were they made of metal or plastic?
5   A.      It depended -- I'm not -- like, they were
6   metal, gold-looking metal things.
7   Q.      So best you know, they were kind of a gold in
8   color.  Do you know if they were manufactured by
9   NIBCO?
10  A.      Yes, ma'am.
11  Q.      Okay.  During the construction phase of your
12  house, did you have the opportunity to observe the
13  house as it was being put together, essentially?
14  A.      Yes.
15  Q.      Okay.  So you saw -- did you ever see, during
16  the construction phase, the red and blue pipes in
17  your house before, like, it was Sheetrocked or
18  drywall was put up?
19  A.      Yes.
20  Q.      Where are the water heaters in your house?
21  A.      In the attic.
22  Q.      And I understand you have two water heaters.
23  Is that correct?
24  A.      Yes.
25  Q.      Do you have gas or electric water heaters?

Page 17

1   A.      I have no idea.
2   Q.      Have you ever -- do you know what the
3   settings are on your water heater, like what the
4   temperature is set to?
5   A.      No.
6   Q.      Have you ever gone up and messed with the
7   settings on your water heater?
8   A.      No.
9   Q.      Do you know whether your husband has ever
10  done that?
11  A.      No.
12  Q.      So for all you know, the settings on your
13  water heaters were what they were when they were
14  originally installed?
15  A.      Yes.
16  Q.      And correct me if I'm wrong, but the water
17  heaters in your house are in the attic.  Is that
18  correct?
19  A.      Yes.
20  Q.      And how many stories is your house?
21  A.      Two.
22  Q.      Okay.  So the ground floor, a second level,
23  and then an attic above that, correct?
24  A.      Yes.
25  Q.      Okay.  And then, again, the water heaters

KIMBERLY COLE                                    February 13, 2017

Page 18

1  are --
2  A.     No.  Wait.  Say that again.
3  Q.     Okay.  Is there a ground floor?
4  A.     Yes.
5  Q.     Okay.  And then a second level?
6  A.     Yes.
7  Q.     And then there's an attic above the second
8  level?
9  A.     Yes.
10 Q.     Okay.
11 A.     But we have two attics.
12 Q.     Okay.  Please explain.
13 A.     We have a ground floor, and there's an attic
14 over our garage.  And then there's an upstairs, and
15 an attic above that.
16 Q.     Okay.  So your garage is one level and it's
17 on the same level as the ground floor of your house,
18 correct?
19 A.     Yes.
20 Q.     And there's an attic space above the garage,
21 correct?
22 A.     Yes.
23 Q.     Okay.  Which attic are the water heaters in?
24 A.     The one above the garage.
25 Q.     Okay.  So the water heaters are technically

Page 19

1  on the second level of your house because they're on
2  the same plane or the same level as the second level
3  of the living area; is that correct?
4  A.     I don't really understand.
5  Q.     Okay.  That's fair enough.
6         When was the first you learned -- let me back
7  up.
8         During the construction phase of your house,
9  did you have any conversations with your father about
10 the plumbing that he was installing?
11 A.     Not really.
12 Q.     Okay.  What do you mean, not really?  Like
13 you might have talked to him about it?
14 A.     No.  I don't really think I did.  I can't
15 really remember.  But you know, I would go out there
16 and look while it was building.  My daughter was,
17 like, three, and she was running around, and I'd be,
18 like, look, here's our house.  But that's about it.
19 You know, I didn't really pay any attention.  It
20 wasn't really relevant to me.
21 Q.     So you entrusted your father with picking out
22 the materials for the house; is that correct?
23 A.     Yes.
24 Q.     Okay.  That would include the plumbing and
25 other aspects of the house?

Page 20

1  A.     Yes.
2  Q.     Okay.
3  A.     And my husband.
4  Q.     Do you know what type of plumbing you had in
5  your previous house in Bells?
6  A.     No.
7  Q.     You don't know whether it was copper or PEX,
8  for example?
9  A.     No.
10 Q.     Okay.  In that -- in your house in Bells or
11 in any previous residence, have you ever had any
12 plumbing issues?
13 A.     No.
14 Q.     So when did you learn that your house on
15 Highway 79 had PEX plumbing in it?
16 A.     I'm not sure what you're asking me.
17 Q.     Okay.  Well, you described to me that you
18 just would kind of observe generally the construction
19 of the house.  Could you tell when you observed it
20 that you had PEX plumbing in it because the walls
21 weren't up yet or did you -- did that mean anything
22 to you?
23 A.     I mean, I saw red and blue piping.
24 Q.     Right.
25        Did you understand that to be PEX at the time

Page 21

1  or was it later that you learned what PEX is?
2  A.     I'm still not really certain what -- I mean,
3  I don't know what you're asking.
4  Q.     Okay.  Well, I'm just trying to understand
5  when you first discovered that PEX as a material was
6  in your house.  Some people know that because they
7  picked it out; some people know because they found it
8  out later.  I'm just trying to understand when you
9  discovered that.
10 A.     I don't think I really have a definite
11 answer.  I guess when it started leaking would be
12 when I figured out, you know, something is wrong.
13 Q.     Okay.
14 A.     That would be when I figured it out.
15        MS. STEPHENS:  Let me hand you what we'll
16 mark as Cole Exhibit 1.
17        (WHEREUPON, the above-mentioned document
18 was marked as Exhibit Number 1.)
19 BY MS. STEPHENS:
20 Q.     Go ahead and take a look at Exhibit 1 for me,
21 please.
22 A.     (Witness reviews document.)
23 Q.     Have you ever seen this defendant's notice of
24 deposition of Kimberly Cole before?
25 A.     Yes.

KIMBERLY COLE                                    February 13, 2017

Page 22

1  Q.     Okay.  And this is just, I'll represent to
2  you, what -- you know, the notice that we sent to
3  your counsel that notices of your deposition, but I
4  wanted to direct your attention to the first page,
5  the top part.  You see a bunch of names and -- we
6  call that a caption.  Do you see that part?
7  A.     Yes.
8  Q.     And do you see your name there listed first,
9  Kimberly Cole?
10 A.     Yes.
11 Q.     And then Alan Cole is your husband, correct?
12 A.     Yes.
13 Q.     Okay.  Do you recognize any of the other
14 names that are listed there?
15 A.     No.
16 Q.     Okay.  If you look at the last page of
17 Exhibit 1, there's some various attorneys listed
18 there.  Do you recall whether any of the attorneys
19 listed there was the first person that you contacted
20 regarding your leaks?
21 A.     Yes.
22 Q.     Okay.  And who is that?
23 A.     Joseph Sauder.
24 Q.     And how did you find Mr. Sauder's name?
25 A.     On the internet.

Page 23

1  Q.     And do you recall exactly where on the
2  internet you found Mr. Sauder's name?
3  A.     Yes.  On a site when I was researching why I
4  was having so many leaks.
5  Q.     When did you do that research?
6  A.     Oh, my goodness.  Years ago.  Probably -- I
7  can't give you a definite answer, but around about
8  maybe the third or fourth leak, maybe, when I
9  recognized something was going on.
10 Q.     Do you recall when you officially hired an
11 attorney in this case?
12 A.     Not a specific date, no.
13 Q.     Okay.  Do you have an understanding of what
14 your role is as a class representative or potential
15 class representative in this case?
16 A.     Yes.
17 Q.     And what is your understanding of that role?
18        MR. KENNEY:  Object to the extent it
19 calls for a legal conclusion, but you can answer to
20 the extent you know.
21        THE WITNESS:  Can you ask the question
22 again?
23 BY MS. STEPHENS:
24 Q.     Sure.
25        You said you understand what your role is as

Page 24

1  a potential class representative.  I just wanted you
2  to explain to me what your understanding is of that
3  role.
4  A.     That I represent a group as a whole.
5  Q.     Okay.  Did you sign any sort of engagement
6  letter or agreement with your counsel related to this
7  lawsuit?
8  A.     No.
9  Q.     Okay.  So you don't know what the -- do you
10 know what the terms of your engagement are with your
11 counsel?
12 A.     I'm not really certain what you're asking.
13 Q.     Okay.  So when you decided to hire Mr. Sauder
14 and his firm or anyone else that's listed here, did
15 you have to sign any sort of an agreement with them?
16 A.     No, I don't think so.  I don't really know
17 what you're saying.  What kind of agreement?
18 Q.     Did you have to sign anything?  Did they send
19 you something and say, hey, sign here, and we're
20 officially hired and we'll represent you?
21 A.     Yes.
22 Q.     Okay.  You did sign something like that?
23 A.     Yes.
24 Q.     Sometimes we call that -- and I don't know
25 what form it took.  Sometimes it's called an

Page 25

1  engagement letter; sometimes it's called a retention
2  agreement.  Do you know what the terms of your
3  agreement with your counsel are regarding this
4  lawsuit?
5  A.     Yes.
6  Q.     Does that agreement promise you any sort of
7  bonus or anything to be a plaintiff in this case?
8  A.     No.
9  Q.     Do you understand that agreement to be a
10 contingency agreement?  Does that mean something to
11 you?
12 A.     Yes.
13        MS. STEPHENS:  I'll hand you what we'll
14 mark Cole Exhibit 2.
15        (WHEREUPON, the above-mentioned document
16 was marked as Exhibit Number 2.)
17 BY MS. STEPHENS:
18 Q.     Now, Cole Exhibit 2 -- and please take a look
19 at it.
20 A.     Oh, sorry.
21 Q.     And let me know when you're ready to answer
22 questions.  But for the record, I'll state this is a
23 document entitled, Plaintiff Kimberly and Alan Cole's
24 Objections and Responses to Defendant NIBCO, Inc.'s,
25 First Set of Interrogatories.

KIMBERLY COLE                                    February 13, 2017

Page 26

1   A.      (Witness reviews document.)
2           I suppose I'm ready.
3   Q.      Okay.
4   A.      Am I supposed to read this?
5   Q.      Well, that's my first question, is, have you
6   ever seen this before?
7           MR. KENNEY:  You can flip through if you
8   want.
9           THE WITNESS:  Okay.
10          MS. STEPHENS:  Yeah.  Please take your
11  time.
12          MR. KENNEY:  Do you need any water?
13          THE WITNESS:  Yes.
14          MR. KENNEY:  Okay.  The information
15  you're looking for starts on Page 3.
16          THE WITNESS:  Okay.  Here we go.  Thank
17  you.
18          Yes, I've seen this.  I've seen so much.
19  BY MS. STEPHENS:
20  Q.      Fair enough.
21          So do you believe you provided some of the
22  information that's in this document?
23  A.      Yes.
24  Q.      And do you see on the last -- I think it's
25  the last page of Exhibit 2, you'll see a verification

Page 27

1   and some signatures.
2   A.      Yeah.  Yes.
3   Q.      Is that your signature above Kimberly Cole?
4   A.      Yes.
5   Q.      And it's dated October 20th, 2015?
6   A.      Yes.
7   Q.      And do you recognize your husband's signature
8   below that?
9   A.      Yes.
10  Q.      Could you turn to Page 10 of Exhibit 2,
11  please.  See Question Number 20, and then the answer
12  below it?  Take your time and review it, please, and
13  then I'll ask you a couple questions.
14  A.      (Witness reviews document.)
15  Q.      Are you ready?
16  A.      Yes.
17  Q.      I'm going to hand you what I'm going to mark
18  as Cole Exhibit 3 because it's related to my
19  question.
20          (WHEREUPON, the above-mentioned document
21  was marked as Exhibit Number 3.)
22  BY MS. STEPHENS:
23  Q.      Now, Cole Exhibit 3 is three pages of
24  documents.  Do you see the numbering at the bottom,
25  which says, Cole, and then, 574?

Page 28

1   A.      Yes.
2   Q.      Okay.  This is a three-page document.  And
3   just so you know, those numbers at the bottom are
4   what we call Bates labels for attorneys.  They're
5   just a way for us to keep track of documents that we
6   produce to one another.  And that Cole designation
7   there signifies that that document was produced to me
8   by your counsel.  Okay?
9   A.      Uh-huh.
10  Q.      Understand that?  Yes or no?
11  A.      Yes.  I'm sorry.
12  Q.      That's okay.
13          Does Cole Exhibit 3 look familiar to you?
14  That -- there's a form on top, and then, I think, two
15  e-mails behind it.
16  A.      (Witness reviews document.)
17          Yes.
18  Q.      Does Exhibit 3 help refresh your recollection
19  at all about when you might have first heard of NIBCO
20  or when you started researching NIBCO?
21  A.      I don't really know what you're asking.
22  Q.      Okay.  Well, we were trying to remember
23  earlier about when you'd first heard of NIBCO, and
24  you kind of generally said when you started having
25  leaks.

Page 29

1   A.      Yes.
2   Q.      So based on Exhibit 2, that response that you
3   gave, you were in contact with NIBCO at some time,
4   and I believe it says that you -- the dates of those
5   contacts would be reflected in the documents that
6   we've been given.  Are these -- is this form and
7   these e-mails what you're referring to in that
8   response?
9   A.      You mean, as far as the first time I
10  contacted them?
11  Q.      Well -- sure, yes.
12  A.      Then yes.
13  Q.      Okay.  Do you think before you had contacted
14  NIBCO you had heard of them before that time?  I'm
15  trying to figure out when you started --
16  A.      No, I've never -- no.
17  Q.      Okay.  So you think maybe in this, like,
18  April or March 2012 time frame is when you first
19  heard of NIBCO specifically?
20  A.      Yes.
21  Q.      Before contacting NIBCO, how many leaks had
22  you had in the plumbing in your house?  Could you
23  say?
24  A.      I can't give you an accurate answer.  It was
25  three or four.

KIMBERLY COLE                                        February 13, 2017

Page 30

1   Q.      Okay.  Is there a document that would help
2   you answer my question more accurately?
3   A.      No.
4   Q.      Do you recall when the first leak was in your
5   house?
6   A.      Not off the top of my head.
7   Q.      Do you remember what year it was in?
8   A.      Yes.
9   Q.      What year?
10  A.      2010.
11  Q.      Do you know where that leak was?
12  A.      Yes, in my kitchen.
13  Q.      Where exactly in your kitchen?
14  A.      Under the -- like, by the dishwasher and
15  kitchen sink.
16  Q.      Did that leak cause any damage to your home?
17          MR. KENNEY:  Object to the extent it
18  calls for a legal conclusion or expert testimony, but
19  you can answer if you know.
20          THE WITNESS:  Yes.
21  BY MS. STEPHENS:
22  Q.      What kind of damage to your home did that
23  leak cause?
24          MR. KENNEY:  Same objections, but you can
25  still answer.

Page 31

1           THE WITNESS:  A lot.
2   BY MS. STEPHENS:
3   Q.      Can you please explain further?
4   A.      What do you mean, as far as damage?
5   Q.      Well, if it was a lot of damage, I would
6   assume --
7   A.      Like, over $10,000 worth of damage.
8   Q.      And what exactly was damaged?
9   A.      My entire downstairs.  The floors, the walls,
10  the baseboards.
11  Q.      The kitchen is on the first level of your
12  house?
13  A.      Yes, ma'am.
14  Q.      And you said this leak was near the kitchen
15  sink?
16  A.      By the kitchen sink and dishwasher.
17  Q.      Okay.  How did you discover this leak?
18  A.      My son woke me up.
19  Q.      Okay.  And what did your son tell you?
20  A.      He was screaming in my face, telling me, Mom,
21  our whole downstairs is full of water.
22  Q.      So the -- was the water on the floor of your
23  kitchen?  Is that correct?
24  A.      The entire downstairs, yeah.
25  Q.      What did you guys do after that?

Page 32

1   A.      My husband was out of town, and I just jumped
2   up out of the bed and ran and just stood there and
3   looked around.  You know, I was a little in shock.
4   Q.      Did you then call someone to help you fix
5   your plumbing?
6   A.      Yes.
7   Q.      Who did you call?
8   A.      My dad.
9   Q.      And what did your dad do?
10  A.      He came and shut the water off and told me to
11  call my insurance company, and he had shop vacs and
12  just started sucking the water out.
13  Q.      And your insurance company is?
14  A.      Allstate.
15  Q.      Allstate.
16  A.      At that time.
17  Q.      Who is your current home insurance through?
18  A.      La Grange.
19  Q.      L-a-G-r-a-n-g-e?
20  A.      Yes.
21  Q.      When did that change?
22  A.      Last month.
23  Q.      So at the beginning of this year, you changed
24  home insurance to La Grange.  Why did you change home
25  insurance companies?

Page 33

1   A.      Because I could no longer afford the
2   $5,000-a-year insurance policy for my home.
3   Q.      So your home insurance, had it always cost
4   $5,000 a year?
5   A.      Absolutely not.
6   Q.      Okay.  When did you first get home insurance
7   through Allstate for your house on Highway 79?
8   A.      When I first built it.  I've always had
9   Allstate.
10  Q.      So for at least -- so you had Allstate before
11  that, but then when you moved into your new house in
12  May 2009, you had it insured through Allstate again;
13  is that correct?
14  A.      Yes, ma'am.
15  Q.      Do you recall what your premiums were the
16  first year?
17  A.      Around $1,200.
18  Q.      And you said that that premium had risen to
19  $5,000 last year?
20  A.      No.  After the first three claims.
21  Q.      So when did the premium -- what do you mean,
22  after the first three claims?
23  A.      After the first three claims, my homeowners
24  went up to almost $5,000, relatively.  4,000-some-odd
25  dollars.

KIMBERLY COLE                                      February 13, 2017

Page 34

1  Q.      Okay.  So in 2013, maybe?  Is that when it
2  went up to that?
3  A.      I don't know for sure.
4  Q.      What is your current premium for your La
5  Grange policy?
6  A.      $2,400.  Around that.
7  Q.      Is it the same coverage you had through
8  Allstate?
9  A.      No.
10 Q.      How is it different?
11 A.      For Allstate, we had two claims come off, and
12 it was 20 -- went down to $2,500, somewhere around
13 that, with a $5,000 deductible if anything happened.
14 For La Grange, we have a $1,000 deductible.
15 Q.      So at the end of your coverage with Allstate,
16 you had a higher deductible?
17 A.      Yes.
18 Q.      Okay.  And that deductible was $5,000?
19 A.      Yes.
20 Q.      To the extent you understand, is the
21 coverage, other than the deductibles and the
22 premiums, is the coverage essentially the same
23 between the two policies?
24 A.      Yes.  It's probably a little better with La
25 Grange because there's actually claims falling off.

Page 35

1  Q.      What do you mean, claims falling off?
2  A.      With any insurance, you know, there's a five-
3  to seven-year -- in case you have claims.  After the
4  third claim, we didn't claim anything else.
5  Q.      And that was because you didn't want more
6  claims on your insurance?
7  A.      Yes.
8  Q.      So by the time you switched to La Grange, you
9  believe some of your insurance claims that you made
10 through Allstate had fallen off the report.  Is that
11 your understanding?
12 A.      Yes.
13 Q.      Would that include the 2012 claims?
14 A.      March 2012?
15 Q.      Yeah.
16 A.      No.  They come off in March of 2017.
17 Q.      Okay.  So your first claim that we've been
18 talking about that was related to the 2010 leak, that
19 came off?
20 A.      Yes.  That was how I was able to get another
21 carrier this year.
22 Q.      Let's go back to that 2010 leak.  Did your --
23 I know you said that you called your insurance
24 company, but who fixed the actual plumbing issue?
25 A.      On the first one?

Page 36

1  Q.      Yes.
2  A.      My father.
3  Q.      Okay.  Do you know what he did?
4  A.      As in?
5  Q.      How did he fix the leak?
6  A.      No, I have no idea.
7  Q.      Was the leak on the hot water side?
8  A.      Yes.
9  Q.      Do you know what actual -- where the pipe was
10 that he found to be leaking?
11 A.      No, not really.
12 Q.      You just know it was near the kitchen sink
13 area?
14 A.      Yes.
15 Q.      Was it accessible under the kitchen sink or
16 was it in the wall?
17 A.      Like -- not really.  I mean, it was close to
18 the wall, but it's, like, behind a -- no.  Really, I
19 don't know.  I'm just...
20 Q.      Okay.  Did he have to open up a wall to fix
21 it or do you -- under the kitchen sink?
22 A.      I think it was already open.  Like, it was in
23 that area.
24 Q.      Okay.  So your dad fixed the actual plumbing,
25 and then do you end up making -- you did make a claim

Page 37

1  to Allstate, correct?
2  A.      Yes.
3  Q.      Okay.  And you said you got about $10,000 out
4  of that claim, correct?
5  A.      (Nodding head affirmatively.)
6  Q.      Yes or no?
7  A.      Yes.  Sorry.
8  Q.      Did that claim cover the extent of the damage
9  to your home and your belongings?
10 A.      Yes.
11 Q.      So your house was, for lack of a better
12 phrase, back to normal after that cleanup and that
13 repair was done?
14 A.      Yes.
15 Q.      At the time of this leak in November 2010,
16 did you have any discussions with your dad about the
17 plumbing in your house?
18 A.      No.
19 Q.      Did you have any discussions with the
20 insurance company about the plumbing in your house?
21 A.      What do you mean, like what happened?  Or as
22 far as?
23 Q.      Yeah.
24 A.      Why did this happen?
25 Q.      Right.  For example.

KIMBERLY COLE                                              February 13, 2017

---

Page 38

1  A.     No.  I just -- you know, not -- no, not
2  really.  I just thought it was a fluke.  You know,
3  something just happened.
4  Q.     Okay.  So you don't believe at the time of
5  this 2010 leak you were aware that there was NIBCO
6  products in your house?
7  A.     Do you mean -- when you're asking me that, do
8  you mean, like, NIBCO products, like the specific
9  company?  Like, did I say, oh --
10  Q.     That's a great question.
11  A.     Yeah.
12  Q.     I want to make sure we're on the same page
13  today.  When I'm referring to NIBCO, yes, I mean
14  specifically NIBCO products.  When I'm referring to
15  just PEX, I mean more generally the product type.
16  Again, do you understand that more than one company
17  has manufactured PEX tubing?
18  A.     Yes.  And at that point, NIBCO was irrelevant
19  to me.  I didn't know what NIBCO was at that time.
20  Q.     Okay.  Great.  And again, thank you for
21  clarifying.
22  A.     I wasn't certain what you were saying.
23  Q.     We'll all have a better time today if we make
24  sure we understand.
25  A.     Yes.

---

Page 39

1  Q.     Okay.  Do you recall when the next leak was
2  in your home after that 2010 leak?
3  A.     I believe in March, but I can't -- I'd have
4  to look at my stuff, but I think it was March.
5  Q.     Okay.  I just wanted to start there, but I'm
6  going to hand you an exhibit.
7  A.     Okay.
8         MS. STEPHENS:  This is marked Kimberly
9  Cole Exhibit 4.
10         (WHEREUPON, the above-mentioned document
11  was marked as Exhibit Number 4.)
12  BY MS. STEPHENS:
13  Q.     Do you recognize Kimberly Cole Exhibit 4?
14  A.     (Witness reviews document.)
15         Yes.
16  Q.     Did you prepare this document?
17  A.     Yes.
18  Q.     Okay.  And this is a typed-up document, and
19  it has a title at the top called, Cole Leaks,
20  correct?
21  A.     Yes.
22  Q.     And when did you type this document up?
23  A.     Oh, I don't even remember.  I have no idea.
24  Several months ago.
25  Q.     So it was after this lawsuit was filed?

---

Page 40

1  A.     Yes.
2  Q.     Do you recall why you typed up this document?
3  A.     Yes.  I had a bunch of video -- I took videos
4  and did them as I went, so I was trying to get an
5  idea of just how many I had.  So I went back with my
6  videos to try to get a round-about idea of how many,
7  because after this one (indicating), after November
8  and March, we didn't do any more.
9  Q.     What do you mean, after November and March
10  you didn't do any more?
11  A.     I didn't have any with insurance companies,
12  so...
13  Q.     So this was your attempt to track the
14  approximate dates and locations of the leaks in your
15  house?
16  A.     Yes.
17  Q.     And what documents did you refer to, to come
18  up with this list?  Just the videos?
19  A.     My -- yes, and my handwritten stuff I had.
20  Receipts, documents.  All my documents I had.
21  Q.     And I've been produced in this case some
22  copies of, like, a journal or a calendar.
23  A.     Uh-huh.
24  Q.     Those are your notes?
25  A.     Yes.

---

Page 41

1  Q.     Okay.  Now, we see here on Exhibit 4 there's
2  actually a listing for a leak at the end of 2009.  Do
3  you see that?
4  A.     Yes.
5  Q.     Okay.  So does this refresh your recollection
6  about perhaps maybe you had a previous leak before
7  November 2010?
8  A.     Oh, yes.  But that, to me, was -- that wasn't
9  a claim.  That was something Alan did on his own.
10  Q.     Okay.  Can you recall the circumstances of
11  that leak that is indicated here as being the end of
12  2009?
13  A.     No.
14  Q.     Okay.  It says something about the showerhead
15  in the master bath.  Do you recall that?
16  A.     No.
17  Q.     So maybe I should ask Alan?
18  A.     Yes.  I remember it happening, but I didn't
19  know anything -- I can't give you any details about
20  it.
21  Q.     Okay.  So after the leak in November 2010,
22  this indicates two leaks in March 2012; is that
23  correct?
24  A.     Yes.
25  Q.     And both of those were related -- ended up

---

KIMBERLY COLE                                    February 13, 2017

Page 42

1  being related to an insurance claim; is that correct?
2  A.    Yes.
3  Q.    Can you talk about the first March 2010 --
4  2012 leak listed there, please?  How did you discover
5  that leak?
6  A.    It's so hard to remember, to be honest.  I
7  mean, it's happened so many times and there's so
8  many.  As you can see, if you go down to October,
9  there's master -- I mean, it's just so much in the
10 same spots.  I can't give you -- I can't give you
11 definite.  I think we woke up that morning and the
12 floor was squishy.  I think, but I'm not certain.
13 I'm pretty sure the floor was squishy, and I looked
14 up and it was pouring out of the ceiling.
15 Q.    Is the master bedroom upstairs?
16 A.    No, it's downstairs.
17 Q.    It's downstairs.
18 A.    (Nodding head affirmatively.)
19 Q.    So you had water in the ceiling of your
20 master bedroom, you think?
21 A.    Yep.
22 Q.    Again, this indicates -- this typed-up list
23 says:  Hot water split.
24 A.    Yep.  Yes.  Sorry.
25 Q.    Do you recall what you did after discovering

Page 43

1  this leak in March 2012, in the master bedroom
2  ceiling?
3  A.    I woke him up and...
4  Q.    Did you call someone to fix the leak again?
5  A.    Yes.
6  Q.    Did you call your father?
7  A.    No.
8  Q.    Okay.  Who did you call to fix this leak in
9  March 2012, in the master bedroom?
10 A.    I called my insurance company, and they
11 called Jackson Backhoe & Plumbing.
12 Q.    So you called Allstate, and Allstate sent out
13 a plumber from Jackson Backhoe; is that correct?
14 A.    And Plumbing.  Uh-huh.
15 Q.    Do you know what Jackson Backhoe did to
16 repair this hot water line split?
17 A.    I just know they fixed it.
18 Q.    Okay.  Did you have any conversation with the
19 plumber from Jackson Plumbing about the leak?
20 A.    As in -- I mean, he showed it to me and
21 showed me the piece that he took out and said, Right
22 here is where it happened.  And he showed me what it
23 looked like.  And he said -- you know, pointed up
24 there and he said, I fixed it right there.
25 Q.    Okay.  Do you recall what color the pipe was?

Page 44

1  A.    Yes.
2  Q.    What color?
3  A.    Red.
4  Q.    And what did -- can you describe to me what
5  he showed you that the leak looked like?
6  A.    Yeah.  It was a little bitty, white mark on
7  it.  I'd have to show you with a pen what it looked
8  like.
9  Q.    Okay.  Was the -- what do you mean, a mark?
10 Was it a split, in your observation?
11 A.    Yes.
12 Q.    Okay.  Did the split run across the tube or
13 along the tube?
14 A.    Along.
15 Q.    Okay.
16 A.    I think.  If that's what you're asking me.
17 Along (indicating).
18 Q.    Like, horizontally along the tube?
19 A.    Yes.
20 Q.    Instead of around the tube?
21 A.    Yeah.  No, it was not around.
22 Q.    Okay.  Do you know what happened to that pipe
23 that the plumber from Jackson Plumbing removed?
24 A.    You mean, like, after that?  Like, where is
25 it?

Page 45

1  Q.    Yeah.  Did you keep it?
2  A.    No.
3  Q.    Did he take it?
4  A.    No.
5  Q.    What happened to it?
6  A.    Allstate took it.
7  Q.    Do you know what Allstate did with the pipe?
8  A.    That day, no.  I don't think they took it
9  that day, to be honest.
10 Q.    So at some point, Allstate acquired it?
11 A.    Yeah.  They -- I gave it to them at some
12 point.  They asked me for it.
13 Q.    At this point, after this March 2012 leak in
14 the master bedroom, did you -- is that perhaps when
15 you first heard of NIBCO specifically?
16 A.    After the master bedroom leak?
17 Q.    Yes.
18 A.    No.  Probably the next one.
19 Q.    What damage to your house and belongings did
20 this leak number two cause, if any?
21       MR. KENNEY:  Objection to the extent it
22 calls for a legal conclusion or expert testimony, but
23 you can answer as best you know.
24       THE WITNESS:  When you're asking that,
25 what do you mean?  Like, what did it damage?

KIMBERLY COLE                                    February 13, 2017

Page 46

1   BY MS. STEPHENS:
2   Q.      Like -- I believe the water, you said, was in
3   the ceiling of the master bedroom.  Correct?
4   A.      Uh-huh.
5   Q.      Yes?
6   A.      Yes.
7   Q.      Okay.  What did you -- did you have to have
8   repairs done to your house, as a result of that leak?
9   A.      Yes.
10  Q.      Okay.  And what types of repairs were done?
11  A.      I can't recollect them all.  It was quite a
12  bit.  But there's insurance documents that have been
13  submitted that have a detailed list of all of that.
14  Q.      So to the extent that repairs were done to
15  your home and things were replaced, it's documented
16  in those insurance documents; is that correct?
17  A.      Yes.
18  Q.      Okay.  To the extent damage was done to your
19  home, as a result of that March 2012 leak in the
20  master bedroom ceiling, was that fully covered by
21  Allstate?
22  A.      Yes.
23  Q.      And at the time -- do you recall what your
24  deductible was related to the November 2010 leak?
25  A.      Yes.

Page 47

1   Q.      How much was it?
2   A.      $1,000.
3   Q.      Was it still $1,000 in March of 2012?
4   A.      Yep.  Yes.
5   Q.      Did you pay Jackson Plumbing to repair that
6   leak in 2012?
7   A.      Yes.
8   Q.      Do you recall how much you paid them?
9   A.      No.
10  Q.      So the next leak on Exhibit 4 is listed in
11  March 2012, as kitchen ceiling.  Do you see that?
12  A.      Yes.
13  Q.      And do you recall how you discovered that
14  particular leak?
15  A.      Well, it was, roughly, two days or three days
16  or maybe even a day, I can't remember, but it was
17  right there, right after -- it was somewhere close to
18  around that area, at that time, I believe, somewhere.
19  Q.      So there was water -- you could observe water
20  in the kitchen ceiling; is that correct?
21  A.      Yes.
22  Q.      And what did you do after you discovered this
23  particular leak?
24  A.      Called Allstate.
25  Q.      Okay.  And what did Allstate do?

Page 48

1   A.      The same thing as before, called a...
2   Q.      Did they call Jackson Plumbing again?
3   A.      I think so, but I can't -- I'd have to look
4   at the documents again.  I can't remember.
5   Q.      So a plumber of some sort came out and fixed
6   it, but that plumber was sent by Allstate?
7   A.      Yes, yes.
8   Q.      Do you know what the plumber did to fix this
9   leak in the kitchen ceiling?
10  A.      The same as before.
11  Q.      Okay.  Did -- for these two ceiling repairs,
12  did they have to open up the ceiling?
13  A.      I think so, yes.  Yes.
14  Q.      The master bedroom and the kitchen ceiling
15  are both on the first floor of the house?
16  A.      Yes.
17  Q.      Okay.  And so -- there are rooms above
18  them?
19  A.      Yes, yes.
20  Q.      So the plumbing, perhaps, to those runs
21  between the floors, to the best of your knowledge?
22  A.      Yes, yes.
23  Q.      Do you recall whether this kitchen ceiling
24  leak in March 2012, was on the hot water side or the
25  cold water side?

Page 49

1   A.      It was hot water.
2   Q.      Did you open a new claim with Allstate or did
3   they consolidate the claims together in March 2012?
4   A.      No, they did not consolidate.
5   Q.      Okay.  Did this kitchen ceiling leak cause
6   damage to your home?
7   A.      Yes.
8           MR. KENNEY:  Object to the extent it
9   calls for a legal conclusion or expert testimony, but
10  you can answer.
11  BY MS. STEPHENS:
12  Q.      Could you generally describe what happened,
13  please.
14  A.      Yes.  The same.  It's on the documents.  I
15  can't remember, but yes, it caused damage to my
16  kitchen.
17  Q.      Other than the deductible that you paid
18  yourself -- did you pay another deductible for that
19  particular damage?
20  A.      Yes.
21  Q.      Okay.  Other than paying that deductible, was
22  the damage fully paid for?
23  A.      Yes.
24  Q.      Who did the repairs for the November 2010
25  leak, as far as the house repairs?

KIMBERLY COLE                                    February 13, 2017

Page 50

1   A.      I don't -- yeah, I do.  I don't -- I don't
2   remember who did what.
3   Q.      Okay.  Was it --
4   A.      But I do have documents that show who did
5   them, so...
6   Q.      Was it a company?
7   A.      Yeah, I do believe so.
8   Q.      Okay.  What about the March 2012, repairs to
9   the house?  Did a company do those repairs?
10  A.      I do believe so.
11  Q.      Okay.  Was there a time when you decided that
12  rather than have an outside company do the repairs,
13  you would just keep the money and do the repairs
14  yourself?
15  A.      Some of it.  We did the flooring and stuff
16  ourselves because we had done -- like, the day
17  before, Alan had installed some laminate flooring in
18  the kitchen, and then the leak happened, so we just
19  replaced it ourselves because we had done it
20  ourselves anyway.
21  Q.      So you -- some of the repairs, you recall
22  being done by a company, but some of them, you did do
23  yourself?
24  A.      Yep.
25  Q.      Yes?

Page 51

1   A.      Yes.
2           MR. KENNEY:  And Rachel, whenever you're
3   at a point, can we take a break?
4           MS. STEPHENS:  I was just saying we're
5   going to jump in time, so why don't we take a break.
6           (Short break.)
7   BY MS. STEPHENS:
8   Q.      Mrs. Cole, we're back on the record.  Do you
9   understand that you're still under oath?
10  A.      Yes, ma'am.
11  Q.      During the break, did you recall anything
12  about some of the answers you had already given this
13  morning that you want to clarify or change?
14  A.      No.
15  Q.      Okay.  When we stopped, we were getting ready
16  to talk about the next leak after the March 2012
17  leak.  Now, according to Exhibit 4, that was in
18  October 2012.
19  A.      Yes.
20  Q.      And that was in the laundry room?
21  A.      Yes.
22  Q.      Now, there's a little note that says:  Now
23  foyer to living room.
24          Was there -- did you guys kind of change the
25  layout of that area?

Page 52

1   A.      Yes.
2   Q.      Okay.  Do you recall this leak in October
3   2012, in the laundry room?
4   A.      Not really.  I mean, yes, I do, but not
5   really.
6   Q.      Do you know whether that was on the hot side
7   or the cold side of the water?
8   A.      Hot side.
9   Q.      And did this leak in the laundry room, in
10  October 2012, cause damage to the house?
11  A.      Yes.
12  Q.      Okay.  And what damage was that?
13          MR. KENNEY:  Object to the extent it
14  calls for a legal conclusion or expert testimony, but
15  you can answer if you know.
16          THE WITNESS:  Can you say the question
17  again?
18  BY MS. STEPHENS:
19  Q.      What damage did this October 2012, laundry
20  room leak cause to your house?
21          MS. STEPHENS:  And Joe, your objection is
22  noted.
23          THE WITNESS:  I mean, ceiling, walls.
24  BY MS. STEPHENS:
25  Q.      Did you have that damage repaired?

Page 53

1   A.      Yes.
2   Q.      Who repaired it?
3   A.      You know, actually, I can't remember their
4   names, but it was -- what do you call people that
5   come do that?  I don't know what they're called.
6   Q.      Was it, like, a restoration service?
7   A.      You know, like, contract people who --
8   Q.      Like, a contractor?  Handyman?
9   A.      Yeah.  I don't know what they're -- Benard
10  was his last name.  That's all I know.  I can't --
11  that's what they do.  You know, they go and repair
12  Sheetrock and ceilings and stuff like that.
13  Q.      Did you also hire a plumber to come fix that
14  leak?
15  A.      You know, I can't remember.
16  Q.      Would your husband maybe remember more about
17  that?
18  A.      He may, but -- yeah.  I'm pretty sure on this
19  one -- you know, that's -- at that point, we were
20  not, obviously, turning it in to our insurance
21  company.  I think I called my dad, actually, at that
22  time, and these were guys he used within his company,
23  and he came out with them and they all fixed it,
24  because right after that was when we changed out the
25  hot water line.  So it was all in that process.

KIMBERLY COLE                                    February 13, 2017

Page 54

1  Q.    So through, maybe, your dad, a plumber came
2  out and fixed this laundry room leak, correct?
3  A.    Yes.
4  Q.    Did you pay for that repair?
5  A.    Yes.
6  Q.    Do you have an invoice for that repair?
7  A.    Yes.
8  Q.    Do you believe you turned that over?
9  A.    Yes.
10 Q.    Do you recall how much you paid?
11 A.    No.
12 Q.    What about the -- they also fixed the
13 Sheetrock and things like that, you said?
14 A.    Yes.
15 Q.    Was it the same people who did that repair?
16 A.    (Nodding head affirmatively.)
17 Q.    Is that a yes?
18 A.    Yes.  Sorry.
19 Q.    Let's go back to the March 2012 leaks.  If I
20 remember you correctly, you think after that second
21 March 2012, leak you ended up contacting NIBCO?
22 A.    Yes.
23 Q.    And how did you know to contact NIBCO in
24 particular?
25 A.    Because I looked -- at that point is when I

Page 55

1  realized there's something wrong with this pipe.
2  This is not normal for this to keep happening.
3  Because it was actually in the pipe itself.  It
4  wasn't, you know, somewhere -- it was -- the pipe was
5  busting, you know, so there's obviously something
6  wrong with it.  So at that point is when my dad was
7  like -- you know, he didn't know what was going on
8  either, because he said, Well, this was something
9  that was supposed to be really good.  And kind of --
10 really -- he said, you know, I know this stuff has
11 a -- I think it was a 50-year warranty and a lifetime
12 warranty for some point.
13       Because I was really upset and had told him,
14 you know, We can't afford to put anything else on our
15 insurance; they're going to drop us.
16       And he said, Let's get in here and start
17 looking to figure out what's going on, and you know,
18 Call them, ask them.  You know, They should pay to
19 replace this.
20       So at that point is when he started helping
21 me find out who I needed to contact.  And he went
22 back and looked because he had it in some of the
23 other houses he had built, and he helped me find out
24 what it was.
25 Q.    The section of pipe that was repaired for

Page 56

1  this March 2012 leak in the kitchen ceiling, do you
2  know what happened to that section of pipe?
3  A.    Which one are we talking about?
4  Q.    The second leak in March 2012.
5  A.    Yes.  Allstate had it.
6  Q.    So that one was also --
7  A.    Eventually, it was given to them.
8  Q.    Given to Allstate?
9  A.    Yes.
10 Q.    And did you get that back eventually?
11 A.    No.
12 Q.    So that one, you didn't get back.  Did you
13 get anything back from Allstate?
14 A.    No.
15 Q.    Did you request that they send those back to
16 you?
17 A.    Yes.
18 Q.    But they never did?
19 A.    No.
20 Q.    So you think after the second leak in March
21 2012, your dad then helped you figure out who to
22 contact; is that correct?
23 A.    Yes.
24 Q.    You mentioned that he believed he had
25 installed NIBCO products in other houses he built?

Page 57

1  A.    Say that again.
2  Q.    You said he mentioned that he had installed
3  NIBCO products in other houses?
4  A.    Yeah.  At that point, he was, like -- he
5  didn't know what was going on, you know, that he had
6  been told that this product -- you know, that's why
7  he had used this product, was because he had been
8  told that, you know, it had a 50-year warranty, a
9  lifetime warranty, and that it was supposed to be
10 really good.  And obviously, there was something bad
11 wrong and we needed to figure out what was happening,
12 because I was really upset and had said that I
13 couldn't, you know, claim any more on my insurance.
14 And he said, you know, You need to contact them about
15 the warranty.
16 Q.    And then is that the first you had heard
17 about whatever warranty there was related to the
18 plumbing in your house?
19 A.    I think so.
20 Q.    Do you know where your father bought the
21 NIBCO products that he installed in your home?
22 A.    Yes.
23 Q.    Where did he buy them?
24 A.    Kenny Pipe.
25 Q.    Now, my understanding is there's many Kenny

KIMBERLY COLE                                          February 13, 2017

Page 58

1  Pipe locations in Tennessee.  Do you know which
2  particular location he bought it at?
3  A.      Jackson, Tennessee.
4  Q.      Do you know when he bought it?
5  A.      Do you mean, like, a specific date?  No.
6  Q.      Just in general.
7  A.      No.
8  Q.      So your understanding is that your dad had
9  been using NIBCO PEX tubing in other houses he had
10 built?
11 A.      Yes.
12 Q.      And to that point, in March 2012, when you
13 had this conversation with him, had he had leaks in
14 other houses he had built?
15 A.      He had had a few, like one or two, and at
16 that point is when he said something is wrong.
17 Q.      Since that conversation, do you know whether
18 other homes that your dad built have had plumbing
19 issues?
20 A.      Yes.
21 Q.      Okay.  How many houses?  Do you know?
22 A.      I have no idea.
23 Q.      Do you know the names of any of those
24 people --
25 A.      No.

Page 59

1  Q.      -- who own those homes?
2          So just based on what your father told you?
3  A.      Yes.  Some of them are rental properties that
4  he owns.
5  Q.      So you believe that some rental properties
6  your father owned have had some plumbing issues; is
7  that correct?
8  A.      Yes.
9  Q.      Do you know whether your dad has made any
10 claims to NIBCO --
11 A.      I haven't asked him.
12 Q.      -- based on those leaks?
13 A.      (Shaking head negatively.)
14 Q.      You don't know?
15 A.      I don't know.
16 Q.      So what was your first contact with NIBCO?
17 Was it via phone?
18 A.      Yes.
19 Q.      Okay.  And who did you call?
20 A.      The warranty -- there's a -- I think, if my
21 memory serves me right, that it was a number, a
22 warranty number, like, you know, a customer service
23 number or whatever.
24 Q.      Okay.  So you called that.  We'll just call
25 it a customer service number for now.

Page 60

1  A.      Yeah.
2  Q.      And do you recall who you spoke to?
3  A.      No.  I don't recall the first person I spoke
4  to.
5  Q.      Okay.  If you look back at Exhibit, I think,
6  3, do you see those e-mails on the second two pages
7  of that exhibit?
8  A.      Uh-huh.
9  Q.      Is that a yes?
10 A.      Yes.
11 Q.      Okay.  Do you see -- I believe it's from a
12 Jared?
13 A.      Yes.
14 Q.      Okay.  Do you recall speaking with a Jared at
15 NIBCO?
16 A.      Yes, but he was not the first person I spoke
17 to.
18 Q.      That's what -- you anticipated my question.
19         So you spoke to someone before Jared.  Do you
20 recall what you spoke to that person before Jared
21 about?
22 A.      Yes.
23 Q.      Okay.  And what did you -- what was that
24 conversation?
25 A.      I was asking about the warranty.

Page 61

1  Q.      And what did this NIBCO person tell you?
2  A.      Well, he asked me about an expansion tank,
3  and I had no idea what an expansion tank was.  And he
4  asked me several other things, and he was very rude
5  and he laughed at me on the telephone, and he was not
6  helpful at all.  That's about what I remember.
7  Q.      As a result -- how did you become -- get in
8  contact with Jared at NIBCO?
9  A.      After I hung up the phone, if I recall
10 correctly, because I really don't, because, to be
11 honest, I was very upset with the way the phone call
12 went -- I don't know if you've ever heard of an
13 expansion tank, but I have not.  We don't have those
14 at our home, and I don't know much about stuff like
15 that.  So after I hung up, it may have been a few
16 days later, I'm not really sure, but I know I started
17 thinking, like, okay, don't let my feelings get the
18 best of me, you know, get your intellect back
19 together and call back and let them explain this to
20 you; you know, ask more questions of, okay, now what
21 do I need to do correctly?  Because I mean, he
22 basically spoke to me like, you know, you're dumb and
23 we don't care and we've got to go.  That's more or
24 less how he spoke to me on the phone.  And this is
25 something that was an installation error and you're

KIMBERLY COLE                                           February 13, 2017

Page 62

1   wasting your time, is how he spoke to me.
2           So when I called back, this Jared, he was
3   nicer, and he told me what I was going to have to do
4   to -- you know, he told me I needed to send a piece
5   of the pipe in. And I did ask him the process, and
6   he explained the process to me.
7   Q.      Okay. So you believe a couple days after
8   your initial call to NIBCO, you called the same
9   number, and this time, you were connected to Jared?
10  A.      Yes.
11  Q.      Okay.
12  A.      And I told him how the guy behaved, as well.
13  Q.      And you see the e-mail there from Jared to
14  you. And what's the date of that e-mail?
15  A.      March 5th, 2012.
16  Q.      Is it March or --
17  A.      No. Sorry. April 5th. Sorry.
18  Q.      It's okay. So on April 5th -- sorry.
19          As reflected in Exhibit 3, on April 5th,
20  2012, Jared sent you an e-mail; is that correct?
21  A.      Yeah. Yes.
22  Q.      And do you believe that there was an
23  attachment to that e-mail and that's perhaps the
24  first page of that exhibit?
25  A.      I have no idea.

Page 63

1   Q.      You're not sure.
2           Could you look at that first page, please,
3   and see if that -- do you recognize the first page of
4   Exhibit 3? Does that look familiar to you?
5   A.      Yes.
6   Q.      Okay. And do you see at the top, on the
7   right-hand corner, there's some information? Does it
8   have your -- I think it has installing plumber on
9   there.
10  A.      Uh-huh.
11  Q.      Do you see that?
12  A.      Where it says, Installer?
13  Q.      Yes.
14  A.      Yes.
15  Q.      And what does it read?
16  A.      Blank.
17  Q.      Blank. Okay.
18          But it has your address on there and your
19  information?
20  A.      Yes. It has our old address.
21  Q.      That's your old address.
22  A.      Yes.
23  Q.      The one in Bells?
24  A.      No. It has 19150.
25  Q.      Okay. So it's -- the address to your home

Page 64

1   was changed at some point?
2   A.      Yes.
3   Q.      As some sort of renumbering process?
4   A.      A 9-1-1 address change thing.
5   Q.      Right.
6   A.      Yes.
7   Q.      My family is from rural areas. That happens
8   a lot.
9   A.      Yes.
10  Q.      Do you recall receiving an e-mail from Jared?
11  I mean, does that look familiar to you, that e-mail
12  that is reflected in Exhibit 3?
13  A.      Yes.
14  Q.      And what did you do in response to receiving
15  this e-mail?
16  A.      I don't remember. I don't think I replied --
17  I don't think you could reply, actually. I don't
18  think you could, like, say anything back. You know,
19  like, I couldn't have a conversation with him.
20  Q.      You couldn't hit reply and send an e-mail
21  back?
22  A.      No, uh-uh. Or maybe I did. Maybe I did and
23  he never said anything back. I don't remember. I
24  think maybe I did send him one back. Or maybe I
25  didn't. I don't know. I can't remember. That's the

Page 65

1   truth, I can't remember.
2   Q.      So you don't recall one way or another
3   whether you ended up sending anything back to --
4   A.      Oh, I know I didn't.
5   Q.      So you never sent product into NIBCO?
6   A.      No. They did not want -- they wanted the
7   piece with the actual leak in it.
8   Q.      And at that time, did Allstate already have
9   that piece?
10  A.      Yes. They had told me to send it to them.
11  But I offered them a piece of -- at this time, when
12  they had pulled out the -- we were having the main
13  hot water lines replaced in our home, so I had other
14  pieces of that pipe that had leaked already all those
15  times before that's listed on here, and I offered
16  NIBCO a piece of that pipe. And they -- Jared told
17  me they could not take that.
18  Q.      I just want to make sure I understand what
19  you're saying.
20          So at the time that you were in contact with
21  Jared in April 2012 --
22  A.      Yes.
23  Q.      -- you had in your possession other pieces of
24  pipe that had leaked?
25  A.      Yes.

KIMBERLY COLE                                February 13, 2017

Page 66

1    Q.        Now, the two March 2012 leaks, you had
2    already -- Allstate already had those?
3    A.        Yes.
4    Q.        Okay.  And the November 2010 leak, you told
5    me you don't know what happened to that?
6    A.        Yes.  I told them we could get them other
7    pieces of pipe.
8    Q.        Where were those other pieces from?
9    A.        In the house on that main hot water line.
10   Q.        Had they leaked at that time?
11   A.        No.
12   Q.        Okay.
13   A.        But it was just, like, one piece.  Where
14   it -- like, the way it was leaking in our home, it
15   came from the hot water heater, all the way down
16   this -- like, it ran through our whole house.  And
17   every time a leak was happening, it was coming off
18   that main piece of pipe.  So I told him, you know, we
19   can get you some of that, because they can come in
20   and clip out and put another one.  But he didn't want
21   that.  They only wanted the piece with the hole
22   already in it.
23   Q.        Well, yeah.  They wanted a piece that had
24   been leaking.
25   A.        Yes.  And I said, I don't have a piece that's

Page 67

1    been leaking.
2    Q.        After this conversation -- well, perhaps the
3    first conversation you had with NIBCO, where you
4    heard the phrase "expansion tank" for the first time,
5    you think?
6    A.        Yes.
7    Q.        Did you ask your dad or anyone else about
8    what an expansion tank is?
9    A.        Yes.
10   Q.        Who did you ask?
11   A.        I think I asked my dad.
12   Q.        Okay.  And did you ask whether you had one or
13   not?
14   A.        Yes.
15   Q.        Does your house have an expansion tank?
16   A.        Uh-uh, no.
17   Q.        Okay.  Do you know what a recirculation pump
18   is?
19   A.        No.
20   Q.        Okay.  When you turn on the water in your
21   house, do you get hot water right away?
22   A.        No.
23   Q.        When you had this conversation with your dad
24   about an expansion tank, did he have any reaction to
25   that suggestion?

Page 68

1    A.        When you say "reaction," what do you mean?
2    Q.        Like, did he -- he explained what an
3    expansion tank is, right?  Did he explain that to
4    you?
5    A.        A little bit, but not really.  I didn't --
6    you know, I just asked, do we have one?  He was,
7    like, no.  I mean, he thought -- his reaction was he
8    thought it was a rather stupid question.
9    Q.        Why is that?
10   A.        He just acted like it was irrelevant, like
11   what difference did it make.
12   Q.        Do you believe after this e-mail that Jared
13   sent you in April 2012, you had any other contact
14   with NIBCO?
15   A.        No, I did not.
16   Q.        So if we're looking at Exhibit 4 and you've
17   got a list of leaks, for all the leaks after October
18   2012 -- or starting with October 2012, you never
19   contacted NIBCO regarding those issues?
20   A.        Not that I recall.
21   Q.        With each of these other leaks, again,
22   starting with October 2012, on down on Exhibit 4,
23   have you had plumbers that come out and fix those
24   leaks?
25   A.        No.

Page 69

1    Q.        Have you been fixing them yourself?
2    A.        Yes.  Well, not me personally, no.
3    Q.        Well, who has been fixing them?
4    A.        My dad and my husband.
5    Q.        Do you know what kind of material they've
6    been using to fix those leaks?
7    A.        Well, I'm a little nervous to say what it's
8    called, between -- now that we --
9    Q.        Is it metal?
10   A.        No.
11   Q.        Is it PEX?
12   A.        I'm still confused between NIBCO, PEX, and --
13   Q.        Okay.
14   A.        I need clarification on that.
15   Q.        Does it look like the same type of material
16   that the previous piping in your house was?
17   A.        I believe the term my husband has used is
18   SharkBite, but I cannot promise you that that is
19   correct.
20   Q.        Okay.  I will ask your husband.  Maybe he can
21   clarify.
22   A.        Thank you.  I just don't want to say the
23   wrong thing.
24   Q.        I understand.
25            Now, you say -- I think you believe, you

KIMBERLY COLE                                    February 13, 2017

Page 70

1  said, that during the spring 2012, after these two
2  leaks in March, you then had the main line in your
3  house replaced.  Is that correct?
4  A.    Yes, I think that's right.
5  Q.    Okay.  And who --
6  A.    I believe.  Yes.
7  Q.    Okay.  And who did that replacement?
8  A.    Benard.  I can't remember his -- I can't
9  remember his name.
10 Q.    Do you think your husband might remember?
11 A.    He may, but probably not.  It's someone that
12 my dad had used with his company, that worked for my
13 dad.  It was someone who had worked with my dad for
14 years that did a lot of, like, drywall and plumbing
15 and -- you know, a little construction company, like
16 subcontract -- you know how contractors subcontract
17 other people?  It was that kind of deal.
18 Q.    Okay.  So this -- can you try to spell what
19 you're saying?  Benard?
20 A.    B-e-n-a-r-d, maybe.
21 Q.    Okay.
22 A.    It's in documents that -- where we -- I have
23 receipts and documents where I paid him.
24 Q.    Okay.  And so your understanding, at least,
25 of what was done during this main line replacement

Page 71

1  was -- did they replace the plumbing from the water
2  heater?
3  A.    The main hot water line --
4  Q.    Okay.
5  A.    -- is what they replaced.
6  Q.    And to the best of your recollection, with a
7  SharkBite material -- or material manufactured by
8  SharkBite, to the best of your recollection?
9  A.    Yes.  It looks -- yes.  It's the same type,
10 but I know it didn't say NIBCO on it.
11 Q.    Since the replacement of that main line, that
12 main hot water line, have you had any leaks in that
13 line?
14 A.    No.
15 Q.    All the leaks that are described here in
16 Exhibit 4, and maybe any others that you might
17 recall, were all the leaks in the tubing itself, to
18 your knowledge?
19 A.    All of them but one.
20 Q.    Okay.  And can you point out to me the one --
21 A.    Well, other than the one -- the showerhead
22 that he fixed when we first got there, the leak.  I
23 think that was a fitting.  But then there was another
24 one.  But I don't remember where.  I know it was a
25 fitting.

Page 72

1  Q.    Can you describe to me what you mean?  Like,
2  was the fitting -- like, was water coming out of the
3  fitting?  Or can you describe to me what you mean?
4  A.    No.  It's a video of it somewhere.  You can
5  see it.
6  Q.    Okay.  So you think there's a video of that
7  particular one?
8  A.    I know there's a video of it.
9  Q.    Okay.  I've been given 17 videos.
10 A.    I know.  I'm sorry.
11 Q.    So I think to identify that, we'll have to go
12 through those later.
13 A.    Okay.
14 Q.    Do you know how much money you've spent --
15 after you stopped making insurance claims, do you
16 know how much money you've spent on repairs to either
17 the plumbing or to your house?
18 A.    A lot.
19 Q.    Can you be more specific?
20 A.    No.  There is no way I can tell you.  I've
21 never sat and calculated all of it.
22 Q.    Who has done those repairs?
23 A.    We have.  You mean --
24 Q.    Yeah.  Who has done the actual work?
25 A.    Me, my husband.  So as far as labor, no, we

Page 73

1  haven't spent any money on labor.  We've labored
2  ourselves.
3  Q.    And you bought the materials locally there?
4  A.    Yes.
5  Q.    Have you produced, like, receipts and
6  invoices for those materials to your counsel?
7  A.    Yes.
8  Q.    Did Allstate communicate to you that they
9  were going to drop you as an insured if you made
10 another claim?
11 A.    No.  They told me they couldn't drop me.
12 Q.    What do you mean by that?
13 A.    I have a gold -- what they consider the gold
14 package.
15 Q.    And what's your understanding of the gold
16 packages?
17 A.    I really didn't understand them.  It's, like,
18 their premium package.
19 Q.    Okay.  Because you had been a customer for
20 long enough?
21 A.    I think so.
22 Q.    So they couldn't drop you, but they could
23 increase your premium.  Is that your understanding?
24 A.    Yes.  Continued to increase it until I left.
25        MS. STEPHENS:  I'll hand you what we'll

KIMBERLY COLE                                    February 13, 2017

Page 74

1    mark Kimberly Cole Exhibit 5.
2           (WHEREUPON, the above-mentioned document
3    was marked as Exhibit Number 5.)
4    BY MS. STEPHENS:
5    Q.      Please take a look at that exhibit and let me
6    know when you're ready to answer questions.
7    A.      (Witness reviews document.)
8            Okay.
9    Q.      Are the pages in Exhibit 5, which just for
10   the record are Cole566 through Cole573, are these all
11   notes taken by you?
12   A.      Yes.
13   Q.      And this is just a notebook where you were
14   writing things down?
15   A.      Yes, for -- yes.
16   Q.      And are these notes related to a particular
17   leak?
18   A.      Yes.
19   Q.      Which leak?
20   A.      The very first one.
21   Q.      The one in November 2010?
22   A.      Yes.
23   Q.      And does Exhibit 5 refresh your recollection
24   or remind you who did the repair work to your house
25   in that instance?

Page 75

1    A.      Yes.
2    Q.      And who was that?
3    A.      What do you mean, repair work?  What do you
4    mean?  Like, who came out and did the water -- like,
5    the water that -- you know, when you say repair work,
6    there's a broad term there.  You know, first, you
7    have to -- like, you know, I called my dad that
8    morning.  Obviously, all of our stuff had to be moved
9    out, so his company people came in and, like, moved
10   all of our furniture out.  They started sucking out
11   the water with the wet vacs.  Our floor was floating
12   at the time, and all that such things.  And then
13   Rytech of Memphis is who came in and, like, do all
14   the -- those things that make the loud noises.
15   Q.      Okay.
16   A.      The water thing.
17   Q.      So when you were giving that description, you
18   were looking at Page 571; is that correct?  See the
19   numbers in the little corner down there?  It's kind
20   of hard to read.
21   A.      Yeah.
22   Q.      Okay.  And there's a page that says -- at the
23   top that says:  A.M., first cleanup.
24   A.      Yeah.
25   Q.      Okay.  And that's what you were just

Page 76

1    describing?
2    A.      Yeah.
3    Q.      That's the work that Cobb Construction did,
4    correct?
5    A.      Yeah.  Like, they came in and moved out --
6    because Alan was out of town.  And they came in and
7    started moving out, because, like I said, there was
8    standing -- the water was to my ankles in the whole
9    entire downstairs, so you know, I was more concerned
10   about my furniture and all of my stuff getting more
11   damaged, so I wanted it, like, out of my house.  Get
12   it all out.  And so they were coming -- if you've
13   ever dealt with insurance companies, they don't move
14   very fast, and I didn't just care to have my stuff
15   just sitting in there.  I wanted it out in the
16   driveway, like, not to be damaged any further.  So
17   they moved all the stuff out and started sucking all
18   the water out of the house.
19   Q.      And then on 572, we see this reference to
20   Rytech Metro.
21   A.      Yeah.  And it -- and when he got there,
22   that's when he, like, came in with all the -- you
23   know, finished sucking out more water.
24   Q.      Basically, a big vacuum-type thing?
25   A.      Not really, because there wasn't much water

Page 77

1    left.  It had ran all out, you know, because my house
2    is on a slab.  He set up, like, the drying machines,
3    you know, all over your house, and put holes in our
4    cabinets around the bottom.  I don't know what those
5    things are called, but they made a whole lot of
6    noise.
7    Q.      I understand.
8    A.      That thing.  Uh-huh.
9    Q.      Did you take a video during the November 2010
10   leak or the repairs?
11   A.      No, uh-uh.
12   Q.      Okay.  When did you start taking videos?
13   A.      I may have videoed, like, the damage
14   afterwards, but the actual leak I did not video.  But
15   that was for insurance purposes.
16   Q.      If we go through every leak video -- or every
17   video that has been turned over to me in this case,
18   would you be able to tell me the date of that video?
19   A.      No.
20   Q.      Who would be able to tell me that?
21   A.      I don't know.  Nobody, probably.  I sent
22   them -- like, the first time -- I'm trying to
23   remember.  It's a lot of information.  Let's see.
24   The first -- the first leak, we just talked about.
25   The second leak, I know Alan videoed.

Page 78

1       The problem is they run in the same rooms, so
2   when you're looking at them, you're still looking at
3   the same room.  You know what I mean?  Because, like,
4   they get repaired back to where -- in the beginning,
5   we were repairing them to where they looked the same.
6   You know, so when you go -- when it happened again,
7   the room looks the same.
8   Q.      Right.
9   A.      But then afterward, every time I would get
10  one, I would send it in.
11  Q.      Were the videos taken on a phone?
12  A.      Yes.
13  Q.      Whose phone?
14  A.      Different phones.  My phone or Alan's phone.
15  Some of them were taken on a video camera.  It was
16  all different.  And it's over the years, so
17  technology -- you know, we would, like, put them on a
18  flash drive or we would do -- you know, we don't have
19  that phone anymore or --
20  Q.      Okay.  All right.
21  A.      -- we dropped the phone.  You know.
22  Q.      No one has ever dropped a phone before.  What
23  are you talking about?
24  A.      And I still haven't figured the iPod out, so
25  that could be faster.

Page 79

1   Q.      Did you also take photographs of the damage
2   in your home?
3   A.      Yes.
4   Q.      And did you also take photographs of the pipe
5   that was taken out of your house?
6   A.      Yes.
7   Q.      And at some point, were those submitted to
8   your counsel in this case or --
9   A.      Yes.
10          MS. STEPHENS:  Okay.  I'm going to hand
11  you what's been marked as Cole Exhibit 6.
12          (WHEREUPON, the above-mentioned document
13  was marked as Exhibit Number 6.)
14  BY MS. STEPHENS:
15  Q.      Now, I'll represent to you that these
16  documents were turned over to us by your counsel, and
17  they have the Bates numbers Cole308 through Cole344.
18  Please take a look if you'd like, but these are a
19  series of color photographs.
20  A.      (Witness reviews document.)
21  Q.      Do you recognize the photographs in
22  Exhibit 6?
23  A.      Yes, ma'am.
24  Q.      Who took these photographs?
25  A.      Alan or I, one.

Page 80

1   Q.      So you're not sure who took them?
2   A.      No.  One of us.
3   Q.      Do you know whether they were all taken at
4   the same time?
5   A.      No, they weren't.
6   Q.      Can you tell by looking at them what date the
7   particular photographs were taken?
8   A.      No.
9   Q.      This first page, Cole308, is that your
10  laundry room?
11  A.      Yes.
12  Q.      Do you recall --
13  A.      The new laundry room.
14  Q.      The new laundry room.  What do you mean?
15  Where is the new laundry room in your house?
16  A.      I don't -- I don't know how to explain what
17  you're asking me.  I'm sorry.
18  Q.      Is it on the first floor?
19  A.      Yes.
20  Q.      Is it near the kitchen?
21  A.      Yes.  It used to be on the other side of this
22  wall (indicating); now, it's on this side of the
23  wall.
24  Q.      And why was the laundry room moved?
25  A.      In the process of all of this, we took off --

Page 81

1   I don't even know how to word it.  We had a close --
2   we took in three children based on a kinship -- well,
3   one on a kinship program, and then later we were
4   contacted by the Department of Children's Services
5   through Tennessee that her siblings -- we have a
6   daughter who we had privately adopted, and we were
7   contacted by the Department of Children's Services
8   that her siblings had been taken into DCS custody and
9   that they would be placed in foster care and that our
10  daughter would not be allowed to see them anymore
11  once they were removed, and so would we be willing to
12  become foster parents.  And so we took them in.  So
13  during all of this, we had to find room for them.
14  Q.      So you did some remodeling of the house to
15  accommodate your expanded family at that time; is
16  that correct?
17  A.      (Nodding head affirmatively.)
18          Yes.
19          (Short break.)
20  BY MS. STEPHENS:
21  Q.      All right.  We're back on the record
22  Mrs. Cole, do you understand you're still under oath?
23  A.      Yes.
24  Q.      Okay.  During the break, did you recall
25  anything about the answers you've given this morning

KIMBERLY COLE                                    February 13, 2017

Page 82

1   that you wanted to clarify?
2   A.     No.
3          MS. STEPHENS: Okay. You can set aside
4   Exhibit 6. I'm going to show you another exhibit,
5   photos, marked Cole Exhibit 7.
6          (WHEREUPON, the above-mentioned document
7   was marked as Exhibit Number 7.)
8   BY MS. STEPHENS:
9   Q.     Take your time and look through it, please.
10  A.     (Witness reviews document.)
11         Okay.
12  Q.     Do the pictures in Exhibit 7 look familiar to
13  you?
14  A.     It's my house.
15  Q.     Okay. Did you take these pictures?
16  A.     Some of them.
17  Q.     Who else would have taken some of the
18  pictures?
19  A.     Alan would have taken some of them. The
20  company that NIBCO sent out may have taken some of
21  them. Cindy, with -- I don't know who she's with.
22  Q.     Maybe Paragon?
23  A.     Yes. She may have taken some of them. And
24  that's about all.
25  Q.     And just for the record, this is -- Exhibit 7

Page 83

1   has Bates labels Cole466 through 489; is that
2   correct?
3          MR. KENNEY: The first one is 345.
4          MS. STEPHENS: Oh. I'm sorry.
5          MR. KENNEY: It goes 345 --
6          MS. STEPHENS: Okay. I grabbed the wrong
7   one. I apologize.
8   BY MS. STEPHENS:
9   Q.     So again, Exhibit 7 is Cole345 through, it's
10  hard to read, I think it's Cole395. And that's just
11  to note for the record. That's not a test for you.
12  A.     Okay.
13  Q.     Now, it says on the first page of this
14  exhibit, it says: Images provided by homeowner on US
15  drive folder leaks.
16         Does that sound familiar? Did you provide,
17  like, a thumb drive or something to them?
18  A.     Yes.
19  Q.     Okay. And you gave that to maybe Cynthia
20  Smith?
21  A.     Yes.
22  Q.     And these pictures are maintained on the
23  computer at your house?
24  A.     Well, yes. Multiple electronics, and then
25  I've tried to just put it all on a flash drive

Page 84

1   because technology seems to advance quite fast.
2   Faster than this has. So we just try to keep it on a
3   flash drive. It seems to be easier.
4   Q.     And you mentioned that NIBCO sent someone
5   out. Was that the inspection that was related to
6   this lawsuit?
7   A.     Yes.
8   Q.     And Ms. Smith was also there?
9   A.     Yes.
10  Q.     Is that the -- previously, had Cynthia Smith
11  or anyone from her company visited your house?
12  A.     No.
13  Q.     Were you present during that inspection?
14  A.     Yes.
15  Q.     And was some plumbing removed from your house
16  as part of that inspection?
17  A.     I think so.
18  Q.     And then a plumber maybe replaced it with
19  something else?
20  A.     Yes.
21  Q.     Could you turn to -- now, the Bates labels
22  are kind of messed up. It's about the middle --
23  there's a page that's from Disaster Services. Joe is
24  going to help you out here.
25         MR. KENNEY: Okay. I think we're on the

Page 85

1   right page.
2   BY MS. STEPHENS:
3   Q.     Unfortunately, the page numbers on this are
4   kind of overlapped at the bottom, so I'm just going
5   to refer to the pages of the actual report. Does
6   this look familiar to you, this page that I'm looking
7   at with, Disaster Services, on top?
8   A.     Yes.
9   Q.     And who is Disaster Services?
10  A.     It was a company we called to get an estimate
11  for repairs for our home, to have the plumbing
12  replaced and to have all the damages repaired in our
13  home.
14  Q.     And this was done in, it looks like, maybe
15  September 13th, 2016?
16  A.     Uh-huh.
17  Q.     Is that yes?
18  A.     Yes. I'm sorry.
19  Q.     And if we flip a few pages, we can perhaps
20  find a total. I think on Page 12.
21  A.     There we go. Yes.
22  Q.     Okay. And it says: Net claim, $56,331.09.
23  A.     Yes.
24  Q.     Does that appear to be correct? Is that what
25  you remember the total being for their estimate?

KIMBERLY COLE                                    February 13, 2017

Page 86

1    A.    For his, uh-huh.
2    Q.    For Disaster Services?
3    A.    Yes.
4    Q.    Okay.  And have you had any of this work
5    done?
6    A.    No.
7    Q.    This was just getting an estimate?
8    A.    Yes.
9    Q.    And you said that this estimate, again,
10   includes not just repairing the damage to the house,
11   but also, replacing all the plumbing?
12   A.    Yes.
13   Q.    Okay.  So if you look on Page 15, it says:
14   Recap by category.
15         Do you see that?
16   A.    Yes.
17   Q.    Okay.  And this outlines the different
18   categories of work that this company would do for you
19   if you accepted this bid?
20   A.    Yes.
21   Q.    Okay.  And you see that plumbing indication
22   that says about $22,000?
23   A.    Yes.
24   Q.    And during this replumb, would they replace
25   just the NIBCO products or replace everything in the

Page 87

1    plumbing?
2    A.    The plumbing is NIBCO.  All of it is NIBCO.
3    So I'm assuming --
4    Q.    Well, let's stop you there.  I thought you
5    said you had the main line redone at some point, the
6    hot water line?
7    A.    Oh, yes.
8    Q.    Okay.  So do you know whether this plumbing
9    estimate includes replacing all the plumbing,
10   including that hot water line?
11   A.    I don't know that answer.
12   Q.    Okay.  Do you know what type of material
13   Disaster Services was going to use for this
14   replumbing?
15   A.    No.
16   Q.    Did you have another estimate -- go ahead.
17   A.    No, I don't know.
18   Q.    Okay.  Did you have another estimate done for
19   these proposed repairs to your house?
20   A.    Yes.
21   Q.    And who did that estimate?
22   A.    Lowe's.
23   Q.    And do you recall how much that estimate was
24   for?
25   A.    I think it was $67,000.

Page 88

1    Q.    So it was more than this estimate?
2    A.    Yes.
3    Q.    Have you decided whether you're going to
4    pursue one of these estimates or are you waiting?
5    A.    I can't afford to pursue one of these
6    estimates at this time.
7    Q.    Okay.  So were they done for purposes of this
8    lawsuit?
9    A.    No.  We were looking at refinancing our house
10   and to see what it was going to cost us.
11   Q.    And the Lowe's estimate you got, it's for the
12   same type of repairs, including a replumb?
13   A.    Yes.
14         MS. STEPHENS:  All right.  I'm going to
15   hand you what's been marked Cole Exhibit 8.
16         (WHEREUPON, the above-mentioned document
17   was marked as Exhibit Number 8.)
18   BY MS. STEPHENS:
19   Q.    This is a document with Bates label Cole396
20   through 463.
21   A.    (Witness reviews document.)
22   Q.    All right.  Do the photographs in Exhibit 8
23   look familiar to you?
24   A.    Yes, yes.
25   Q.    All right.  Did you take any of these

Page 89

1    photographs?
2    A.    Yes.
3    Q.    Did you take all of them?
4    A.    No.
5    Q.    Who took -- who do you believe took any of
6    the other photographs?
7    A.    My husband.  Possibly, Cindy.  Possibly,
8    those two men that I don't know their names.
9    Q.    If you turn to the second page, Cole397, do
10   those photographs look familiar to you?
11   A.    Yep.  Yes.
12   Q.    Do you believe you took those photos?
13   A.    Yes.
14   Q.    And did you also -- there's, like, a black --
15   okay.  Let me start over.
16         On Page Cole397, there's two photographs,
17   right?
18   A.    Yes.
19   Q.    And they're both showing a red pipe?
20   A.    Yes.
21   Q.    Do you believe this pipe was from one of the
22   leaks in your house?
23   A.    Yes.
24   Q.    Could you tell me which one it is.
25   A.    No.

KIMBERLY COLE                                    February 13, 2017

Page 90

1  Q.     I believe there's some, like, marks, marker
2  on the pipe.
3  A.     Yes.
4  Q.     Did you draw that on the pipe?
5  A.     I think either I or Alan did.
6  Q.     Okay.  And what -- were you circling
7  something there?
8  A.     Yeah.  Like, the leak.
9  Q.     Okay.  And can you describe to me what
10 exactly you mean?  What do you see on that pipe that
11 you were circling?
12 A.     Where the water was coming out.
13 Q.     Okay.  And can you describe to me what you
14 see in -- like, for instance --
15 A.     Like, a long, white looking, little line.
16 Q.     Okay.  Would you describe that as a split?
17 A.     Yes.  A long split.
18 Q.     To the extent you observed the pipes in your
19 house that were believed to be leaking, did they all
20 look like this, with some sort of split in them?
21 A.     Yes.  Some were small; some were big.
22 Q.     And were all of them kind of, for lack of a
23 better term, horizontal along the pipe like this one
24 that we can see on Page Cole397?
25 A.     Yes.

Page 91

1  Q.     Did you take a picture of any of the fittings
2  that you believe were leaking?
3  A.     Yes.
4  Q.     Okay.  Do you recall whether those were
5  attached to a blue pipe or a red pipe?
6  A.     I don't remember.  There should be a picture
7  somewhere.
8  Q.     Did you see a picture of that in this set on
9  Exhibit 8?
10 A.     I think -- let's see.
11        (Witness reviews document.)
12        Now, what's the question?
13 Q.     I was asking about whether you believe
14 there's any pictures of the -- you said you thought
15 one of the leaks was a fitting, so I'm trying to
16 figure out if there's a picture of what fitting you
17 believe was leaking.
18 A.     There's pictures of fittings in here, but I'm
19 not sure if it's the leaky one or not.  Does that
20 answer what you're asking me?
21 Q.     Well, do you recall what the -- what type of
22 fitting you believed was leaking?  Was it, like, a T?
23 A.     Yes.  Yes, it was a T.  Both times.
24 Q.     But you don't recall whether --
25 A.     And I believe that one time, it was connected

Page 92

1  to a red pipe, and another time, it was connected to
2  a blue pipe.  Those are the two times I recall.  A
3  long time ago, and then closer to -- like, maybe up
4  here.  You know.
5  Q.     All right.
6  A.     But they were all sent in.
7  Q.     I can't recall if I asked you this.  The
8  fitting leak that you recall that's been more recent,
9  was the water coming out of the connection between
10 the pipe and the fitting or was there a hole or a
11 crack or something in the fitting itself?
12 A.     I don't recall.  I know there's a video.
13 Q.     Okay.
14 A.     And you can just -- the water is just -- we
15 could just see water coming out of it and -- you
16 know, we didn't know.  We just fixed it.  We didn't
17 know how it was coming -- you know, how it was coming
18 out.  We just took it off and replaced it.  It just
19 shows a drip.
20        MS. STEPHENS:  I'll hand you what's been
21 marked as Cole Exhibit 9.
22        (WHEREUPON, the above-mentioned document
23 was marked as Exhibit Number 9.)
24 BY MS. STEPHENS:
25 Q.     This is a series of photographs with Bates

Page 93

1  numbers Cole466 through Cole489.  Go ahead and take a
2  look and me know if you recognize those photos.
3  A.     (Witness reviews document.)
4         Yes, ma'am.
5  Q.     Okay.  And again, just like the previous two
6  exhibits, the first page of this has a logo for
7  Paragon on the front page, and it says:  Images
8  provided by homeowner on US drive.
9         Do you see that on the first page of
10 Exhibit 9?
11 A.     Yes, ma'am.
12 Q.     Okay.  So these, again, were images that you
13 provided to Cynthia Smith, you believe?
14 A.     Yes.
15 Q.     And these were maintained somewhere on a
16 flash drive you have at home?
17 A.     Yes.
18 Q.     And same question as before.  Did you take
19 all of these photographs in Exhibit 9?
20 A.     Alan and I.
21 Q.     So these are ones you recognize as ones that
22 you particularly took?
23 A.     Yes.
24 Q.     Do you recall on what date you took these
25 photos?

KIMBERLY COLE                                        February 13, 2017

Page 94

1  A.     No, no.
2  Q.     Did you see any photos when you were flipping
3  through Exhibit 9 that appear to be the fitting issue
4  that you were talking about?
5  A.     Yes, the last -- the second one.  That I
6  remember.
7  Q.     Was that the more recent fitting leak?
8  A.     Yes, yes.
9  Q.     Correct?  Okay.
10         Can you tell me which photograph specifically
11 looked familiar?
12 A.     This one (indicating).
13 Q.     Okay.  And can you tell me the page number
14 that you're looking at?
15         MS. STEPHENS:  Joe, maybe?
16         MR. KENNEY:  476.  That's Cole476.
17 Sorry.
18 BY MS. STEPHENS:
19 Q.     So Cole476, which is part of Exhibit 9, this
20 you recognize as the fitting that was removed as part
21 of the leak recently?
22 A.     Yes.  Well, not recently.  I don't remember.
23 I mean, it could have been a year ago, as far as time
24 goes.
25 Q.     Okay.

Page 95

1  A.     But yes.  This is the one I remember it
2  dripping from, and there is a video of it dripping
3  from it.
4  Q.     If you look back at Exhibit 4, which is the
5  leak -- Cole Leak List, and we compare that to
6  Page 476, if you look at the leaks list, does that
7  remind you at all of where this fitting -- or which
8  particular leak this fitting could have been related
9  to?
10 A.     Yes.  It would have been the right side of
11 sink on the kitchen.  Kitchen, right side of sink,
12 September 2014.
13 Q.     All right.  So if we look on Page Cole476,
14 both of those photographs are labeled, Kitchen,
15 correct?
16 A.     Yep.
17 Q.     Okay.  And again, you believe --
18 A.     Yes.
19 Q.     That's helped to remind you that the fitting
20 leak that you recall being more recent is the
21 September 2014, kitchen, right side of sink, correct?
22 A.     Yes.
23 Q.     Okay.  And do you know whether this blue --
24 whether this fitting was on the cold side or the hot
25 side?

Page 96

1  A.     Well, it was on the cold.
2  Q.     Okay.  So to the best of your knowledge, the
3  cold side was blue piping?
4  A.     Yes.
5  Q.     Okay.  And the hot water was red piping?
6  A.     Yes.  It was originally.  It's white now.
7  Q.     Okay.  During --
8  A.     So in the pictures, I think, of this, it will
9  be white because it's been changed.  In the video,
10 the pipe next to it is white.
11 Q.     Have you had any other leaks on the cold side
12 of your water, other than this September 2014 leak?
13 A.     I believe so.
14 Q.     Okay.  Which leaks?
15 A.     I have no idea.  Like, I mean, I can't just
16 tell you off the top of my head right here.
17 Q.     How many of the leaks?
18 A.     He will -- Alan will know more on that than I
19 will.  Probably along -- halfway down here is when I
20 got really frustrated and maybe handed it over to him
21 for a bit.
22 Q.     The picture that -- these two pictures that
23 we see on Cole476, were those taken by you or Alan?
24 A.     I think both of us, actually, that night.
25 It's kind of hard to do that for a one-man show.

Page 97

1  Q.     So this was taken around the time of the
2  actual leak?
3  A.     Oh, yeah.  We finally learned that as soon as
4  it happened, for documentation purposes, it was best
5  to take care of everything at the time it was
6  happening.  You know, when it was removed, take your
7  picture, put it in a bag.  You know, we learned to do
8  things that way.
9  Q.     And do you believe, to the extent there was
10 pipe or fittings removed from your house during any
11 of these leaks, that those have -- do you have any of
12 those left in your possession?
13 A.     No.  Everything I have, I sent.
14 Q.     Was either sent to your counsel or was taken
15 maybe during the inspection?
16 A.     Yes.
17 Q.     Have you ever followed up with Allstate
18 trying to get the pipe that you sent to them back?
19 A.     Yes.  I sent them a letter one time, and they
20 never replied to me.
21 Q.     I've seen some pictures and perhaps in the
22 videos that you've sent that some of the ceilings and
23 the walls have been opened up, correct, to do some of
24 these repairs?
25 A.     Yes.

KIMBERLY COLE                                February 13, 2017

Page 98

1  Q.      Okay.  Do you still have openings in your
2  ceilings and walls right now?
3  A.      Yes.
4  Q.      And that's part of the repair work that is
5  included in those estimates that you got?
6  A.      Yes.
7          MS. STEPHENS:  I'm going to hand you what
8  I've marked Cole Exhibit 10.
9          (WHEREUPON, the above-mentioned document
10  was marked as Exhibit Number 10.)
11  BY MS. STEPHENS:
12  Q.      It's another series of photographs, this time
13  with the Bates labels Cole724 through 794.
14  A.      (Witness reviews document.)
15          Okay.
16  Q.      Do you recognize the photographs that are
17  contained in Cole Exhibit 10?
18  A.      Yes.
19  Q.      And did you take some of these photographs?
20  A.      Yes.
21  Q.      Did your husband take some of these
22  photographs?
23  A.      Yes.
24  Q.      Did Cynthia Smith take some of these
25  photographs?

Page 99

1  A.      It's possible, yes.
2  Q.      Okay.  You're not sure?
3  A.      I'm not sure.
4  Q.      And if I asked you the dates of these
5  photographs, could you tell me?
6  A.      No.
7  Q.      Okay.  On the first page of Kimberly Cole
8  Exhibit 10, there's a picture of an elbow connection
9  and some blue pipe.  Do you see that?
10  A.      Yes.
11  Q.      Actually, three different pictures, correct?
12  A.      Yes.
13  Q.      And I think they're all of the same
14  connection?
15  A.      Yes.
16  Q.      Is this a picture of that fitting connection
17  that was later removed?
18  A.      No, no.
19  Q.      Do you know why this photograph was taken?
20  A.      No.  I can't remember.
21          MR. KENNEY:  Just to clarify, this is a
22  T fitting, right?
23          MS. STEPHENS:  Sorry.  Excuse me.  Yes,
24  it is a T fitting.  Excuse me.
25          MR. KENNEY:  Just for the record.

Page 100

1  BY MS. STEPHENS:
2  Q.      All right.  Could you flip to page Cole733
3  for me, please.
4  A.      You know, I think I do remember.  Maybe it
5  was taken because -- to show that it said NIBCO.
6  Q.      Okay.
7  A.      Maybe Joe had asked us to make sure to check
8  everything or someone had asked us to make sure that
9  all of our -- each of our fittings said NIBCO.  Or
10  maybe it had -- it may have been replaced.  I don't
11  know.  Alan would know that.  But I think it was to
12  make sure something said NIBCO, that each one said
13  NIBCO.
14  Q.      Okay.  Thanks for that clarification.
15          Are you on -- you're at Cole733?  Do you see
16  those two photographs?
17  A.      Uh-huh.
18  Q.      Is that a yes?
19  A.      Yes.
20  Q.      They appear to be of a T fitting?
21  A.      Uh-huh.
22  Q.      And I can see, like, a keyboard in the
23  background.  Do you see that?  Like, I see, like, an
24  alt key.
25  A.      Yes.

Page 101

1  Q.      All right.  Do you believe you or Alan took
2  these two photographs?
3  A.      Yes.
4  Q.      Okay.  Do you recall which one of you?
5  A.      No.
6  Q.      All right.  Is this the same T fitting we
7  were looking at in the previous exhibit?
8  A.      I don't know.
9  Q.      Okay.
10  A.      I think so, but I don't know.
11  Q.      Okay.  I see some, like, little asterisks
12  drawn.  I think they're drawn on the photo.  I can't
13  tell.  Or maybe they're drawn on the fitting itself.
14  Do you see those?
15  A.      I don't know.
16  Q.      You don't know.
17          So those two photographs don't look familiar
18  to you?
19  A.      Maybe to highlight the Duravit.  I don't
20  know.
21  Q.      Okay.  So you don't recall making those
22  markings?
23  A.      I may have, but I don't know.  No, I don't
24  remember.
25  Q.      Okay.  All right.  Let's turn to Page

KIMBERLY COLE                                          February 13, 2017

Page 102

1   Cole764, please.  Do you see the second photo on that
2   page, the one on the bottom?
3   A.     Yes.
4   Q.     And there's, like, a drawn-on arrow or
5   something?
6   A.     Yes.
7   Q.     I can't tell if that arrow is on the photo or
8   on the pipe itself.  Do you know?
9   A.     No, I don't know.
10  Q.     Okay.  Do you think you guys took that photo?
11  A.     Yes.
12  Q.     Okay.  But you don't recall whether you guys
13  marked up the photo or the pipe itself?
14  A.     No.
15  Q.     But that's something that we, at least, saw
16  from previous photos, that sometimes you would mark
17  around the pipe?
18  A.     Yeah.  Well, that we would put the circle
19  around the little leak.
20  Q.     Right.
21  A.     Uh-huh.
22             MS. STEPHENS:  Put away that exhibit.
23  I'm going to hand you -- I'm going to mark Cole
24  Exhibit 11.
25             (WHEREUPON, the above-mentioned document

Page 103

1   was marked as Exhibit Number 11.)
2   BY MS. STEPHENS:
3   Q.     Take a look at it.  For the record, this is a
4   multiple-page document with Bates labels Cole669
5   through 672.  Do you recognize the documents in Cole
6   Exhibit 11?
7   A.     (Witness reviews document.)
8          Yes.
9   Q.     And is this that the Lowe's budget that you
10  were speaking of earlier?
11  A.     Yes.
12  Q.     Okay.  And you -- it looks like the date on
13  this is December 2015?
14  A.     Yes.
15  Q.     Okay.  And the first two pages, it appears,
16  totals a little over $13,000.  Would you agree with
17  me?
18  A.     Yes.  The first two pages, yes.
19  Q.     Okay.  And then the second two pages, there's
20  a total of a little over $50,000.  Do you see that?
21  A.     Yes.
22  Q.     Okay.  So put these together, it's about
23  $63,000?
24  A.     Yes.
25  Q.     Okay.  And this, again, is the same scope of

Page 104

1   work that you had Disaster Services give you an
2   estimate for, which would be to replumb the house and
3   to fix the interior of your house?
4   A.     Yes.
5   Q.     Okay.  Have you had issues with mold in your
6   house?
7   A.     From?
8   Q.     Just, have you had issues with mold in your
9   house?
10  A.     Yes.
11  Q.     Okay.  And when did that --
12  A.     Like, have I seen mold when the -- yes, I
13  have seen mold when I removed, like, Sheetrock when
14  we have had water, like one of these really tiny
15  leaks and I remove, like, the Sheetrock or whatever,
16  there will be, like, mold there.
17  Q.     Okay.  Have you had -- when did those issues
18  begin?  When did you start seeing the mold issues?
19  A.     Each time there's a leak, there's always mold
20  there, because it takes so long for the leak to show
21  up because they're so tiny.  You know, there's
22  insulation in my walls.  And it's just like
23  (demonstrating).  It's really slow.  So you know, it
24  may take a month for the actual leak to cause enough
25  damage to show up.  So you have tons of moisture in

Page 105

1   there.  So any time you cut -- as soon as you cut it
2   out, you know, and you look, there it is.
3   Q.     So just to describe, since we're doing a
4   deposition today --
5   A.     Yeah.  I'm sorry.
6   Q.     The noise that you just made --
7   A.     I'm sorry.
8   Q.     -- is perhaps like a low hiss?
9   A.     Yes, yes.
10  Q.     And you said it's hard to detect because it's
11  in the walls and -- in your insulated walls?
12  A.     Absolutely.
13  Q.     And back to the mold question, have you had
14  any of the mold in your house -- have you done any
15  sort of repairs related to that specifically?
16  A.     They spray, you know, when the companies
17  come.  Initially, when they came, they sprayed.
18  Whatever they do, you know.  I saw them spray stuff
19  in there, but they didn't talk to me about mold or
20  say anything.  I didn't address it, really.  I was
21  really too upset to say anything.  I didn't ask them
22  about it.
23  Q.     Have you had the mold in your house tested?
24  A.     No.
25  Q.     But whenever whomever would come out to do

KIMBERLY COLE                                        February 13, 2017

Page 106

1  repairs on your house, you said they would spray
2  something?
3   A.     Yeah.  I saw them, when they cut those holes,
4  like on the baseboards, like under my kitchen
5  cabinets, you know, they'll stick stuff in there and
6  spray for moisture.  He would just say, This is for
7  moisture.
8   Q.     I recall seeing an allegation in the
9  complaint on this that, on occasion, the leaks have
10  caused you to have to not be in your home overnight.
11   A.     Uh-huh.
12   Q.     Is that correct?
13   A.     Yes.
14   Q.     Do you recall how many nights you spent out
15  of your house because of the leaks?
16   A.     Not an accurate.  Many days.
17   Q.     More than five?
18   A.     I don't know.  We had to leave, you know, for
19  the -- there was seven of us, so we would have to --
20  you know, there's no way.  You've got six of those
21  machines roaring in your home.  Our kids were three,
22  five, seven, nine, eleven, and fourteen.  I don't
23  know.  There's a bunch of them.  So yeah.  We would
24  have to leave while they fixed the house, but we
25  would come back as soon as we could because it --

Page 107

1  that's a lot of packing.  That's a lot of stuff to
2  take out of your house.  So at one point, when we
3  came back, we just lived upstairs.  We moved our bed
4  upstairs and just tried to stay upstairs.
5        So no, I don't know a specific day.  I think
6  we were gone three or four days one time, and another
7  time, maybe two days.  So I can't give you a specific
8  yes it was five days.
9   Q.     Okay.
10   A.     I have no idea how many days it was.
11   Q.     Was the first that you learned of a warranty
12  on the NIBCO products in your house from your dad
13  when you had that conversation with him?
14   A.     Yes.
15   Q.     Have you ever read the NIBCO PEX warranty?
16   A.     Yes.
17   Q.     Okay.  What's your understanding of the terms
18  of that warranty?
19   A.     Well, to be honest, I can't recall.  What I
20  do recall from, what, eight years ago, eight, nine,
21  however -- when was our first leak?  So that'd be
22  seven years ago.  Three months later is when I
23  probably -- three or four months later, so...
24        I know there was, like, a 50-year warranty on
25  a certain amount of time of something, and then a

Page 108

1  lifetime warranty on a particular part of it, and
2  that was about the gist of it.
3   Q.     Okay.  And just to clarify, I think you told
4  me that you had that conversation with your father
5  after these 2012 leaks, the ones in March.
6   A.     Yes.
7   Q.     Okay.  So sometime after --
8   A.     When he said something is wrong.
9   Q.     Okay.  So sometime after that, did you find
10  the warranty online or did someone give you a copy of
11  it?
12   A.     I found it online.
13   Q.     Okay.  And you looked it over at that time?
14   A.     Yes.
15   Q.     Do you believe that you satisfied the terms
16  of that warranty on your end?
17        MR. KENNEY:  Object to the extent it
18  calls for a legal conclusion, but you can answer to
19  the extent you understand.
20        THE WITNESS:  I believe yes, I did, to
21  the best of my ability.
22  BY MS. STEPHENS:
23   Q.     Do you recall whether that warranty required
24  you to send in the defective product or not?
25   A.     Yes, it did.

Page 109

1   Q.     Okay.  And did you do that?
2   A.     I tried.  They refused to accept it.
3   Q.     Now, I'm just trying to understand what you
4  testified to earlier.  You offered them some of the
5  pipe that had not leaked; is that correct?
6   A.     No, I offered them the stretch -- a piece of
7  the stretchy -- the long stretch of defective pipe.
8   Q.     Well, that didn't have an actual leak in it
9  at the time, did it?
10   A.     No.
11   Q.     Okay.
12   A.     But they knew I didn't have it.
13   Q.     So the parts that had been leaking had been
14  taken by Allstate, correct?
15   A.     Yes.
16   Q.     Or otherwise disposed of prior to that time,
17  correct?
18   A.     Yes.
19   Q.     Okay.  So the time that you offered --
20   A.     Well, not disposed of.
21   Q.     Well, you don't know what happened to those,
22  right?
23   A.     No, no.  Yes, ma'am, you're right.
24   Q.     So at the time that you made that offer to
25  NIBCO, you didn't have an actual, you know, piece of

KIMBERLY COLE                                        February 13, 2017

Page 110

1  pipe that perhaps you'd circled a leak in or
2  something like that, right; you just offered them the
3  actual pipe that had been in your house?
4  A.    Yes.
5  Q.    Okay.
6  A.    From the same section.
7  Q.    From the same section, but no --
8  A.    That the leak was in, uh-huh.
9  Q.    But you didn't have a split in that part yet?
10 A.    No, ma'am.
11 Q.    Okay.  Now, as part of your research that I
12 believe led you to become a plaintiff in this
13 lawsuit, did you find any materials related to other
14 lawsuits?
15 A.    Say that again.  I'm sorry.  I don't
16 understand.
17 Q.    Okay.  Let me ask a different question.
18       What else, other than finding a lawyer when
19 you did this internet research regarding the leaks in
20 your home, what else did you find online?
21 A.    I actually found, like, a blog.  Is that what
22 you're asking me?
23 Q.    Yes, ma'am.
24 A.    Where other people had had problems, as well.
25       MS. STEPHENS:  I'm going to hand you what

Page 111

1  we'll mark Kimberly Cole Exhibit 12.
2       (WHEREUPON, the above-mentioned document
3  was marked as Exhibit Number 12.)
4  BY MS. STEPHENS:
5  Q.    This is a series of documents starting with
6  Cole632 through Cole652, and the first page reads:
7  Website info informs about PEX piping.
8       Go ahead and take a look, and then I'll ask
9  you questions.
10 A.    (Witness reviews document.)
11 Q.    Are you done reviewing this exhibit?
12 A.    Yes.
13 Q.    Okay.  Did you put together this set of
14 documents?
15 A.    I printed them out, yes.
16 Q.    Okay.  Is this website info and forums about
17 PEX piping, is that something that you typed up?
18 A.    Yes.  This is just my way of keeping my stuff
19 separated and what was -- what I had, what --
20 Q.    Kind of, like, a filing system for what was
21 going on?
22 A.    Yes.
23 Q.    Okay.  Is this handwriting at the top of the
24 page yours?
25 A.    No.

Page 112

1  Q.    Okay.  It appears to read:  Received 9/20/16
2  from Cole, re: 2013115.
3       Correct?
4  A.    Yes.
5  Q.    Okay.  But you don't know whose handwriting
6  that is?
7  A.    No.
8  Q.    Okay.  All right.  If we look at this
9  exhibit, the first -- after the cover page, the first
10 seven pages appear to be a printout from an online
11 forum.  Is that a pretty good description?
12 A.    Yes, uh-huh.
13 Q.    And it has various posts that appear to start
14 in 2009 --
15 A.    Uh-huh.
16 Q.    -- and go into 2011.  Would you agree with
17 me?
18 A.    Yes.
19 Q.    And did you print these seven pages out?
20 A.    Yes.
21 Q.    And this is one of the things that you found
22 when you did internet research, maybe in 2012?
23 A.    Yes.
24 Q.    And what did you do when you printed these
25 out?

Page 113

1  A.    I took them home to show Alan.  You can see.
2  They -- I was at work, and I took them home to Alan
3  and was just showing him, like, look here, we're not
4  the only ones that are having problems with this.
5  And I was showing him all the different things that
6  were going on with different people, because we were
7  just -- by 2012, to be quite honest, we were pretty
8  devastated with what was going on in our lives, and
9  so we were just trying to figure out, you know, is
10 this happening to everybody or, you know, what's
11 happening here?  And why?  You know, why is this
12 happening?
13 Q.    Okay.  And it appears --
14 A.    Obviously, I had talked to NIBCO.
15 Q.    Yeah.  About this time or around this time.
16 A.    Yeah.
17 Q.    Well, I was about to go -- to date this
18 document a little bit better, the first seven pages,
19 which are Cole633 through Cole639, it looks like they
20 were printed on April 3rd, 2012, at the bottom.
21 A.    Uh-huh.
22 Q.    Is that correct?
23 A.    Yes.
24 Q.    And you believe you printed these out at
25 work?

KIMBERLY COLE                                        February 13, 2017

Page 114

1    A.    Yes.
2    Q.    Did you make any posts on this forum
3    yourself?
4    A.    I did one, but I can't say that this is the
5    exact one.  But I did post one time on one of them.
6    But I don't know if it was around this date or if it
7    was later, but just said, you know, that we were
8    having -- was anybody having these particular
9    problems that we were having with the splits.
10   Q.    You don't know whether it was on this --
11   A.    This particular -- there's multiple different
12   sites, other than just this one, I'm fairly certain,
13   so...
14   Q.    Did you post under your name or did you
15   post --
16   A.    I think I did.  I think I put my e-mail,
17   actually.  I think I put my actual e-mail.  But it
18   was -- I went back and checked it throughout the
19   years, but I can't remember what it was.  I quit at
20   one time.
21   Q.    And did you do anything with this particular
22   forum printout, other than show it to your husband?
23   A.    Stuck it with my claims.
24   Q.    What do you mean?
25   A.    Like, I had a file folder that had, like, my

Page 115

1    insurance claims.
2    Q.    Did you send this to your insurance company?
3    A.    No.  This?
4    Q.    Yes.
5    A.    No.  No, no, no.  This was after those
6    claims, so no, I did not send this to my insurance
7    company.  I didn't mention this to my insurance
8    company.
9    Q.    Okay.  Well, I'm just trying to understand
10   because this was printed in April 2012 --
11   A.    Yeah.
12   Q.    -- and you, I think, had insurance claims
13   pending at that time.  Is that correct?
14   A.    Yeah.  I don't think I sent it to them.  I
15   don't know why I would have.  I know I started
16   Googling about it after I made the phone call to
17   NIBCO.
18   Q.    All right.  Let's look at page -- excuse me,
19   Exhibit 12, starting at Page Cole640.  This is, like,
20   an eight-page segment of this exhibit, from 640 to
21   647.  And again, this is the same thing, just a
22   printout you made from a forum, maybe another thread
23   on that same forum.
24   A.    Okay.
25   Q.    Is that true?

Page 116

1    A.    Say that again.
2    Q.    Is this another thread that you printed out
3    from that forum, these eight pages starting with --
4    A.    Yes.  Oh, because it's separate?  Is that
5    what you're talking about?
6    Q.    Yes.
7    A.    Yeah, I guess it was two separate ones.  Or
8    is it the same one?  I don't know.  I can't really --
9    I have no idea.  I'm sure at the time something must
10   have caught my eye that was similar to our house,
11   which is why I printed those pages to take home.
12   Q.    Do you know anybody else personally that has
13   had plumbing issues similar to yours?
14   A.    No.  Like, on a personal level, like a
15   friend?
16   Q.    Like, to name their names.
17   A.    No, no.  Other than my father, no.
18   Q.    You don't know the names of the people he's
19   talking about; is that correct?
20   A.    No, because when he says it -- no.
21   Q.    Okay.  Let's look at Cole648, which is the
22   next thing.  This appears to be a two-page printout
23   of an article from the internet entitled:  Zurn PEX
24   Faces Class Action Lawsuit.
25         Do you see that?

Page 117

1    A.    Yes.
2    Q.    Do you recall printing out this article?
3    A.    Uh-huh.
4    Q.    Is that a yes?
5    A.    Yes.
6    Q.    And at the time, did Zurn mean anything to
7    you, Z-u-r-n?
8    A.    No.
9    Q.    Okay.  So you didn't know perhaps whether you
10   had Zurn PEX in your house or not; is that correct?
11   A.    No.
12   Q.    Flip to Page Cole650.  Again, there's a
13   two-page article.  Is this something that you printed
14   out?
15   A.    About the warranty here?
16         MR. KENNEY:  This page.
17         650, correct?
18         MS. STEPHENS:  Correct.
19         THE WITNESS:  Yes.
20   BY MS. STEPHENS:
21   Q.    Okay.  And this article, I believe, has a
22   title:  Zurn PEX, Inc., Plumbing Fixture Defects.
23         Is that correct?
24   A.    Yes.
25   Q.    And do you believe your house, at any time,

KIMBERLY COLE                                    February 13, 2017

Page 118

1  had any Zurn products in it?
2  A.      No.
3  Q.      And this last page that I've included in this
4  exhibit is Cole652. Can you tell me, did you print
5  out this particular document?
6  A.      Uh-huh, yes.
7  Q.      Okay. And why did you print out this
8  document?
9  A.      All of these are printed out at the same
10 time, and the reason I started diving into the
11 internet was after I made that phone call, the first
12 phone call to NIBCO, it was very obvious that they
13 were not going to help me. He made it very obvious
14 in a very laughing matter, and at this point, I did
15 not find it to be a laughing matter, what was going
16 on in my life and what was happening to the home that
17 I had saved money for, for a very long time, and I
18 felt like he was making a joke of me.
19         And I personally like to think that my --
20 I'm, at least, average intelligence, so at that
21 point, I knew that there was something wrong and that
22 they were totally blowing me off, and I felt as
23 though I could do absolutely nothing about it. And
24 so I got -- I was angry, I was hurt, and I felt like
25 I was being taken advantage of, so I began to dive

Page 119

1  into whatever information I could find to see what --
2  if this was happening to anybody else, because he
3  treated me on the phone as if ha, ha, ha, I got to
4  go.
5  Q.      Okay.
6  A.      And he hung up on me. So this was just stuff
7  that I got on there and printed out and took home to
8  Alan, and I was, like, whatever we have -- there's
9  obviously an issue. Something is going on somewhere,
10 and we need to start keeping track of what's
11 happening because this seems like it's -- that Dad's
12 right, there's something wrong. There's something
13 wrong with this pipe.
14         And so this was just information I stuck into
15 my file folder. And when I was represented, when
16 they asked me for everything I had, this was put on
17 the front of it. I stapled it with all my other
18 stuff and sent it over. I mean, does it have
19 relevance to me? No. That's just what it is.
20         MS. STEPHENS: Okay.
21         (Lunch break taken.)
22 BY MS. STEPHENS:
23 Q.      We are coming back from our lunch break.
24 Mrs. Cole, do you understand that you're still under
25 oath?

Page 120

1  A.      Yes.
2          MS. STEPHENS: Mrs. Cole, I'm going to
3  hand you what I'm going to mark as Cole Exhibit 13.
4          (WHEREUPON, the above-mentioned document
5  was marked as Exhibit Number 13.)
6  BY MS. STEPHENS:
7  Q.      Flip through and tell me if you recognize
8  that document.
9  A.      (Witness reviews document.)
10 Yes.
11 Q.      Okay. Now, that was produced to me by your
12 counsel. Do you recall printing that off at some
13 point?
14 A.      Yes.
15 Q.      Okay. And that was -- and this appears to be
16 a NIBCO PEX installation guide of some sort.
17 A.      Yes.
18 Q.      Okay. And do you recall when you printed
19 this out?
20 A.      Uh-huh. When I was familiarizing myself with
21 the situation, you know, with what I had, what was in
22 my home.
23 Q.      Okay. So some of the things that we saw in
24 the previous exhibit that you had printed out, you
25 printed this out about the same time?

Page 121

1  A.      Yes, reading about the warranty and
2  everything.
3  Q.      So that's the first you'd ever seen of this?
4  A.      Uh-huh.
5  Q.      Is that yes?
6  A.      Yes. I'm sorry.
7  Q.      Okay. And did you ever talk to your dad
8  about whether he'd seen any of these manuals or
9  catalogs about NIBCO?
10 A.      As far as?
11 Q.      Had he ever seen any of these? Did you show
12 them to him?
13 A.      No. I didn't show him this, no. I talked to
14 him about it. I mean, as far as the actual system,
15 yes, I talked to him about it. But I didn't talk to
16 him about me printing off this piece of paper, no.
17 Q.      Okay. And what did your conversation about
18 the system entail with your father?
19 A.      I just asked him, you know, about it, like,
20 you know, what are we supposed to do.
21 Q.      Do you know, to the extent your dad had
22 installed NIBCO products in other homes, if that's
23 something he had been doing a couple years or if
24 that's something new for him?
25 A.      I don't know.

KIMBERLY COLE                                            February 13, 2017

Page 122

1  Q.      Okay.  So you don't know one way or another
2  what experience he has involving PEX or NIBCO in
3  particular?
4  A.      No.  He just -- I think he was just as
5  bewildered as I was.  You know, he just kept telling
6  me that it was supposed to be a really good product
7  and he just didn't know what was going on, but that
8  something was going on.
9         MS. STEPHENS:  I'm going to hand you what
10  we'll mark as Cole Exhibit 14.
11         (WHEREUPON, the above-mentioned document
12  was marked as Exhibit Number 14.)
13  BY MS. STEPHENS:
14  Q.      This is a set of documents, and I've given it
15  to you in the order that it was produced to me, that
16  starts with Cole490.  I believe the last page is 519.
17  Does Exhibit 14 look familiar to you, or the
18  documents in it?
19  A.      (Witness reviews document.)
20         Uh-huh, yes.
21  Q.      Now, again, the first page appears to be,
22  like, a cover page.  Is that something that you typed
23  up?
24  A.      Yeah.  It was just to help me keep all of
25  this organized.

Page 123

1  Q.      Okay.  And at the top of the page, there's
2  some handwriting with the words:  Received 9/20/16.
3         Is that your handwriting?
4  A.      No.
5  Q.      Do you know whose handwriting that is?
6  A.      No.
7  Q.      And so this is just various documents related
8  to, I believe, the March 20th, 2012, insurance claim
9  you made to Allstate.  Is that correct?
10  A.      Yes.
11  Q.      Okay.  Turn to Page 508, please.  Do you
12  recognize what's on page 508?
13  A.      (Witness reviews document.)
14         Okay.  Now, what did you ask me about this?
15  Q.      Okay.  Do you recognize this letter?
16  A.      Yes.
17  Q.      And it's dated April 19th, 2012?
18  A.      Uh-huh.
19  Q.      Is that a yes?
20  A.      Yes.
21  Q.      And it's addressed originally -- it's typed
22  up.  Did you type this up?
23  A.      Yes.
24  Q.      And originally, it looks like it was
25  addressed to a Cindy, but then it's crossed out and

Page 124

1  Debbie is written in.
2  A.      Yes.
3  Q.      Do you know who Debbie is?
4  A.      Yes.  It was Allstate's attorney.
5  Q.      And who is Cindy?
6  A.      She was Allstate's attorney, as well.  They
7  changed over.  Like, somehow during -- you know, the
8  fist one was Cindy, and I think maybe then Debbie.  I
9  don't really know.  I can't remember, to be honest.
10  Q.      And why were you sending -- why were you
11  sending this letter?  And then, also, it says:
12  Enclosed are labeled pipes for both of our claims.
13  A.      Yes.  This is the Allstate -- these are the
14  representatives for Allstate.
15  Q.      Okay.  And this is the letter that you
16  included when you sent them the pipes that you
17  submitted to them; is that correct?
18  A.      Yes.
19  Q.      And those are the labeled pipes that you've
20  never gotten back; is that correct?
21  A.      Yes.
22  Q.      Okay.  Do you know whether Allstate ever
23  pursued a lawsuit against NIBCO?
24  A.      I think they did.
25  Q.      Do you know the outcome of that lawsuit?

Page 125

1  A.      No, I do not.
2  Q.      Were you ever asked to provide any
3  information for that lawsuit?
4  A.      I was asked for this information that I was
5  given, but once I was representing myself, I was no
6  longer to be involved with whatever they were doing.
7  Q.      So by that, you mean, once you became
8  involved in the lawsuit that we're here for today,
9  you were no longer involved in the lawsuit Allstate
10  was involved in?
11  A.      Yes.
12  Q.      Was that a yes?
13  A.      Yes.  Can you resay that again?
14  Q.      Okay.  Once you became -- you made the
15  decision to pursue this lawsuit that you're being
16  deposed in, on behalf -- let me start over.
17         Once you became in the lawsuit that we're
18  here for today --
19  A.      Yes.
20  Q.      -- you were no longer involved in the lawsuit
21  that you believe Allstate brought against NIBCO?
22  A.      Yes.  I provided them with a letter letting
23  them know that I could no longer be involved with
24  anything they did.
25  Q.      Okay.  So I see there -- about a third of the

KIMBERLY COLE                                    February 13, 2017

Page 126

1  way down, do you see the sentence that starts: After
2  you are all done with this evidence, I ask it be
3  returned to me?
4  A.      Yes.
5  Q.      Okay. And that's, again, where you were
6  indicating that you wanted them to send that pipe
7  back to you when they were done?
8  A.      Yes.
9  Q.      Okay. But to your knowledge, they have not?
10 A.      No, they have not.
11 Q.      About four lines up -- three lines, it says:
12 Our contractor is also having issues with this piping
13 in some other homes he has built and would be happy
14 to discuss it with your legal department if needed.
15         Do you know whether your dad ever talked to
16 Allstate about the issues in your house or other
17 homes?
18 A.      I don't.
19 Q.      Did you ever speak to the salesman T.R. Dunn?
20 A.      I did not.
21 Q.      Did you get that name from your dad?
22 A.      Yes.
23 Q.      Did you ever talk to anyone at Kenny Pipe
24 about the PEX that ended up in your house?
25 A.      Not that I recall.

Page 127

1  Q.      Turn a few pages before that to Cole505,
2  please. Do you see this appears to be under
3  letterhead for Jackson Backhoe & Plumbing, LLC?
4  A.      Yes.
5  Q.      And as I recall, Allstate hired Jackson
6  Backhoe. Is that correct?
7  A.      No. We had to -- they recommended. You
8  know, they have a list of people that they -- like
9  most insurance companies, this is who you can call.
10 You know, we use this plumber; you can call this
11 plumber.
12 Q.      Okay.
13 A.      Because we didn't know who to call. You
14 know, at this point, I didn't want to call my dad
15 anymore. So they just said these people do it, so we
16 called them ourselves. We had to call them
17 ourselves. As you know, an insurance company only
18 covers damage costs, not the actual damage itself.
19 That was something really difficult for me to
20 understand.
21 Q.      So you hired Jackson Backhoe & Plumbing off
22 the recommendation, you believe, of Allstate to do
23 the plumbing repairs in your house at some point?
24 A.      Yes.
25 Q.      Okay. And did you ask them to type up this

Page 128

1  letter?
2  A.      Yes. I -- yes.
3  Q.      And who at Jackson Backhoe wrote this letter?
4  A.      I don't know. I just told the guy I needed a
5  letter. I don't know his name.
6  Q.      Did you ever know his name? Do you have it
7  written down somewhere?
8  A.      No. The guy that was -- that fixed it.
9  Really, to be honest, I don't remember how this
10 letter came about or why I decided I needed it, to be
11 quite honest. Somebody must have told me I needed
12 one at some point in time for me to have one and
13 gotten it.
14 Q.      Other than the repairs, it indicates here
15 that Jackson Backhoe & Plumbing came out and did
16 repairs on March 20th and March 27th, 2012. Did
17 Jackson Backhoe & Plumbing do any other repairs for
18 you at your home?
19 A.      No.
20 Q.      As I recall, you testified that the other
21 plumbing repairs that were done at your home were
22 either done by you, Alan, your dad, or perhaps
23 Benard. Is that correct?
24 A.      The plumbing -- yes, yes.
25 Q.      Okay. Set that aside.

Page 129

1          Were you the one who primarily handled the
2  insurance claims, between you and Alan?
3  A.      Yes.
4          MS. STEPHENS: I'll hand you what I've
5  marked Kimberly Cole Exhibit 15.
6          (WHEREUPON, the above-mentioned document
7  was marked as Exhibit Number 15.)
8  BY MS. STEPHENS:
9  Q.      This is a set of documents, again, that's
10 produced to you -- to us by your counsel. The Bates
11 label is Cole520 through 534 -- excuse me. It should
12 only be 533. Looks like there's an extra page on
13 there.
14         All right. So as modified, the exhibit is
15 now 520 through 533. Do you recognize the documents
16 in this Exhibit 15?
17 A.      (Witness reviews document.)
18         Yes.
19 Q.      As I recall, you testified earlier today that
20 other than the deductible that you had to pay and the
21 plumbing repairs that you had to pay for, you were
22 fully compensated for the damage to your home from
23 these March 2012 leaks. Is that correct?
24         MR. KENNEY: Object to the extent it
25 calls for a legal conclusion or expert testimony, but

KIMBERLY COLE                                    February 13, 2017

Page 130

1  you can answer if you know.
2          THE WITNESS:  Can you say the question
3  again?
4          MS. STEPHENS:  Can you repeat the
5  question?
6          (WHEREUPON, the reporter read back the
7  pending question.)
8          THE WITNESS:  Yes.
9  BY MS. STEPHENS:
10 Q.    So through the repairs that were paid for by
11 Allstate, your house was, for lack of a better term,
12 put back together as it was?
13         MR. KENNEY:  Same objections, but you can
14 answer.
15         THE WITNESS:  Yes, it looked the same.
16 BY MS. STEPHENS:
17 Q.    You're making a distinction between looking
18 the same and being the same?
19 A.    Yes.
20 Q.    Okay.  And what is that distinction?
21 A.    Outwardly, appearance, it looked the same.
22 On the inside, I don't really know.
23         MS. STEPHENS:  Okay.  I'll hand you what
24 was marked Kimberly Cole Exhibit 16.
25         (WHEREUPON, the above-mentioned document

Page 131

1  was marked as Exhibit Number 16.)
2  BY MS. STEPHENS:
3  Q.    Take a look and let me know when you're
4  ready.  For the record, this is Cole673 through
5  Cole679.
6  A.    (Witness reviews document.)
7          Okay.
8  Q.    These appear to be a set of copies of some
9  calendar pages; is that correct?
10 A.    Yeah, yes.
11 Q.    And is this the calendar that you maintained?
12 A.    Yes.
13 Q.    And this is your handwriting on here?
14 A.    Yes.
15 Q.    Okay.  I'm just going to draw your attention
16 to some of the notes, if you can help me read them.
17 A.    Sure.
18 Q.    On March 21st, 2012, I was trying to read
19 this note.  It says:  Spoke to Jeremy.
20         Could you read that whole note for me?
21 A.    Sure.  Some of this is medical abbreviations,
22 you know.  I'm sorry.
23         Spoke with Jeremy about my concerns.  Paul
24 Davis not looking enough.  This keeps happening.  Was
25 first flood work not done correctly?

Page 132

1  Q.    Okay.  And who is Jeremy?  Do you remember?
2  A.    I think Jeremy was with Allstate.
3  Q.    Okay.  Maybe the claims adjuster?
4  A.    Yeah, uh-huh.
5  Q.    And who -- and Paul Davis was one of the
6  people who did some repairs on your house?
7  A.    Yes.
8  Q.    Okay.  They did some of the restoration work?
9  A.    Yes.
10 Q.    Okay.  Well, I'm trying to understand what,
11 First flood work not done correctly, means.
12 A.    Oh, they forgot to put some insulation back
13 in above our -- in the ceiling, and I was not happy
14 about that.  That was what that was about.
15 Q.    So you're making sure that that got done
16 correctly?
17 A.    Yes.
18 Q.    On -- if you look at the next page --
19 A.    Wait.  Can we go to --
20 Q.    Yeah.  Sure.
21 A.    I was telling you, they run together.
22 Where's my timeline?  That may have been another
23 concern I had.  Hang on.  Where's my claim?  I have
24 to get my dates right before I say anything.  This
25 was on the 21st.  The first leak was on the 20th.

Page 133

1  Hang on.
2          MR. KENNEY:  A lot of documents.
3          THE WITNESS:  Yes.
4          That was not right.  What my concern was,
5  was when they were there the first time for claim
6  one, that I was worried that they didn't find -- that
7  there was more than one area leaking, because when we
8  found the water damage, I had saw another spot that
9  was wet and I had told them about it, and he said,
10 Oh, that was probably just overhead spray.
11         And I said, Well, y'all didn't go look
12 over there; can somebody go look over there?
13         And then however many days later -- so --
14 and I ended up having to have two separate claims.
15 And I felt like at that -- I was really concerned
16 about that wet spot that was far away that had dried,
17 so that's what that was about.  It was something
18 totally --
19 BY MS. STEPHENS:
20 Q.    Let me make sure I -- just see if I
21 understand what you're saying.  You were concerned
22 that when they came out to look at -- that when they
23 looked at the wet spot for the original March 2012
24 leak, that they missed something, and that there was
25 another area that was --

KIMBERLY COLE                                    February 13, 2017

Page 134

1    A.      That there were two separate areas leaking in
2    the pipe.  Not that they had done something wrong,
3    but that they didn't find all the leaky spots.  That
4    there was another spot leaking.
5    Q.      And then if we see the notes from March 23rd,
6    we see another call to Jeremy.  It looks like you
7    called in a claim?
8    A.      Yep.
9    Q.      And that's the second claim?
10   A.      Yeah.
11   Q.      When you're making these notes on here, are
12   you making them, you know, throughout the day or
13   what?
14   A.      (Nodding head affirmatively.)
15   Q.      Yes?
16   A.      Yes.
17   Q.      Can you flip to the next page, please?  The
18   March 27th, 2012, entry, there's a thing that says:
19   Plumber Daniel.
20           Is that correct?
21   A.      Where am I looking again?
22   Q.      March 27th.
23   A.      Plumber came.  Plumber came.  Okay.  Yeah, it
24   just says:  Plumber Daniel.
25           Okay.

Page 135

1    Q.      Does that refresh your recollection about the
2    name of the plumber from Jackson?
3    A.      I guess Daniel was his name.  That's about
4    all.  That would be it.
5    Q.      Now, can you read the note below that?
6    A.      Yeah.  Called T.R. at Kenny Pipe.
7    Q.      I'm sorry.  You're on March 26th?
8    A.      No, I'm on the 27th.
9           MR. KENNEY:  There's one on the line
10   right above that.
11          THE WITNESS:  Found mold in laundry.
12   BY MS. STEPHENS:
13   Q.      And then it says:  Called T.R. at Kenny Pipe.
14   A.      Uh-huh.
15   Q.      Do you recall talking to T.R. at Kenny Pipe?
16   A.      No.
17   Q.      What does the little note coming up off that
18   say?
19   A.      Found mold in laundry.
20           And right above it, it says:  Joe said it was
21   new.
22   Q.      Who is Joe?
23   A.      Joe is with Paul Davis, I believe.
24   Q.      Do you remember -- do you know what that
25   means?  What was new?

Page 136

1    A.      I guess the mold.
2    Q.      You're not sure?
3    A.      No, I'm not sure.
4    Q.      Can you flip to the next page, please?  It's
5    Page Cole675.  On -- can you look at the entry for
6    April 4th, please?  Do you see that there's an
7    indication for Williams Plumbing?
8    A.      Uh-huh.
9    Q.      Yes, you see that?
10   A.      Yes.
11   Q.      It says:  Estimate for replacing.
12           Do you see that?
13   A.      Yes.
14   Q.      Okay.  Can you tell me what that notation
15   means?
16   A.      Yes, I sure can.  We called Williams Plumbing
17   to come out and give us an estimate, and they
18   declined and left.
19   Q.      And why did they decline?  Did they say?
20   A.      Because they could not give us appropriate
21   estimate because they would -- because of the leaks
22   and because of what was going on, and then the way,
23   like, it's ran in our walls -- the piping, the way
24   it's done in our walls, you know, like, how pipe is
25   ran, they couldn't see, like, how much damage was

Page 137

1    actually done in there from all of the leaks that had
2    been going on and the --
3    Q.      Was this estimate that you received from
4    Williams Plumbing --
5    A.      We didn't get an estimate.
6    Q.      Okay.  Sorry.  I misspoke.
7           Is this -- what you were seeking from
8    Williams Plumbing an estimate to replace all of the
9    piping in your house or just some of it?
10   A.      All of it.
11   Q.      Did you ever talk to Williams Plumbing again?
12   A.      No.
13   Q.      The next day, the entry for April 5th, 2012,
14   some of it is hard to read, but there's a 10:00 a.m.
15   Kim and Kathy.  Do you know who that is?
16   A.      Yes.
17   Q.      Is that personal thing unrelated to this?
18   A.      It's for my daughter, our adopted daughter's
19   therapy.
20   Q.      Okay.  And then it looks like there's some
21   notes that might be related to some of the plumbing
22   stuff, if you can read them.
23   A.      Called and spoke with a Jared.
24           That's all it says.  Well, maybe:  At NIBCO.
25   Q.      Okay.  And this might be reflecting that --

KIMBERLY COLE                                    February 13, 2017

Page 138

1  you know, we saw earlier on that e-mail that Jared
2  was someone you spoke to at NIBCO --
3      A.      Regarding --
4      Q.      -- approximately, on April 5th.  Is that
5  correct?
6      A.      Yeah, I guess.  Or maybe --
7      Q.      We can look back at the exhibit if you'd
8  like.
9      A.      It has to be.  I think that that's just done
10 in pencil and maybe my pencil died, maybe, is what
11 that looks like.  I don't think it's erased because
12 it says called and -- yeah.  It says called and...
13     Q.      Okay.  And below that, it appears to say:
14 Said it's usually an installation problem.
15     A.      Uh-huh.
16     Q.      And that's something that Jared told you?
17     A.      Yes, that I have to send pipe in for testing.
18 That's when he told me about the expansion tank and
19 if I didn't have an expansion tank, that was what was
20 wrong.
21     Q.      And it says something about end of Alan call.
22     A.      I don't know what that means.
23     Q.      Okay.
24     A.      I don't remember.
25     Q.      So it appears that, if I can read this note,

Page 139

1  it says:  I have to send pipe in for testing to use
2  warranty.
3      A.      Uh-huh, yes.
4      Q.      So you understood, at that time, that to use
5  the warranty, you needed to send the pipe in to
6  NIBCO?
7      A.      Yes.
8      Q.      Now, when I flip through these, and the last
9  page that I get to is October 2012, do you have any
10 more calendar notes related to the leaks that you had
11 later than October 2012?
12     A.      No.
13     Q.      Okay.  So this is the last you kind of kept
14 track of this thing?
15     A.      Yes.
16     Q.      I didn't want to interrupt you.  Are you
17 trying to --
18     A.      I was just thinking about your last question
19 and trying to remember if I wrote anything down
20 anywhere else, but if I did, I would have submitted
21 it to them.
22     Q.      Okay.  At some point, you indicated that you
23 kind of gave this project over to your husband; is
24 that correct?
25     A.      I wouldn't say "gave."

Page 140

1      Q.      Okay.  Well, passed the baton?
2      A.      I think by the -- after the March 2012 claim,
3  with five children and -- that I was -- the next one
4  that occurred, I was, like, this one is yours; I
5  can't -- I can't take anything right now.  So...  And
6  then, you know, he would do it for a while, and then
7  I would get back involved.  We try to be a good team.
8  So I was involved in a lot of these, and he was, as
9  well.
10     Q.      What are you seeking from NIBCO in this
11 lawsuit, Mrs. Cole?
12             MR. KENNEY:  Object to the extent it
13 calls for a legal conclusion or expert testimony, but
14 you can answer if you know.
15             THE WITNESS:  My life back how it was
16 before this all started.  That's what I want.
17 BY MS. STEPHENS:
18     Q.      How in your mind does that work?  How does
19 NIBCO give you your life back?
20     A.      Well, in all actuality, they can't give me my
21 time back, but financially, I would like to be back
22 where I was when this all started.
23     Q.      And what does that include?
24     A.      I couldn't give you an exact estimate right
25 now.

Page 141

1      Q.      Can you give me a category of what that
2  includes, how -- the things that would go into it?
3      A.      My losses, what I've lost from this.
4      Q.      And what have you lost?  This is my
5  opportunity to ask you these questions, so I'd like
6  the best answers that you can give me.
7      A.      My entire financial savings.  You know --
8  let's see.  After from March the 12th, from --
9  October the 12th to September of 2016, every bit of
10 that was paid for by my husband and I.  And what --
11 you know, $5,000 a year for a homeowners insurance
12 that you -- I can't even begin to explain to you.
13     Q.      Okay.
14     A.      I understand what you're asking me.
15     Q.      I'm not trying to antagonize you.
16     A.      No, I understand.
17     Q.      But this is my opportunity, and I have a job
18 to do here today --
19     A.      I absolutely understand.
20     Q.      -- on behalf of my client, and I need to
21 know, okay, what out-of-pocket expenses you have
22 incurred, as a result of -- you know, the things that
23 you have not been compensated for, to the best of
24 your ability.
25     A.      First, I was not prepared to answer that.

KIMBERLY COLE                                    February 13, 2017

---

Page 142

1  Second, I can't answer it.  I would have to sit down
2  and go through my documentation and calculate it all
3  together to give you an estimate.  I mean, you have
4  an estimate of what it would be to fix my house, but
5  even people who come in to give me an estimate can't
6  give me an exact cost.  I want my home back how it
7  was the day I moved in.  I want all my money back
8  that I saved up for years to provide for my children.
9  I want everything back that I worked hard for to give
10 myself the life that I deserved.  And it was taken
11 from me for nothing.  That's what I want.
12         MR. KENNEY:  Do you want to take a break?
13         THE WITNESS:  No, I'm good.
14         MS. STEPHENS:  Speak up if you need to.
15 It's fine.
16         THE WITNESS:  No.
17         I feel like they robbed me.  And they
18 laughed at me.  If they would have just kept up with
19 the warranty, and then just came in and fixed the
20 problem to begin with, nobody would be here.  And
21 it's a slap in the face and it's hurtful.  So there
22 is no estimated number I can -- I don't even know
23 what to say.
24         MS. STEPHENS:  Let's take a quick break.
25 I want to show her the videos and I want to make sure

---

Page 143

1  I do that in the most efficient manner possible, so
2  let's take a quick break so I can set that up.
3         (Short break.)
4         MS. STEPHENS:  We're back on the record.
5         Mrs. Cole, before I ask you some more
6  questions, I'm going to put something on the record
7  with your counsel.
8         We just talked about off the record the
9  videos that have been submitted to me in this case.
10 I believe they're a collection of 18 -- 17 or 18
11 videos that have the Bates labels Cole800 through
12 Cole817.  And your counsel and I have come to an
13 agreement about after this deposition, your counsel
14 conferring with you to try to determine the
15 approximate dates that those videos were taken and
16 the location of the house where they were taken, and
17 that you're going to do your best to provide that
18 information to me instead of going over it in the
19 deposition today.
20         MR. KENNEY:  That's correct.  And that's
21 fine with us.
22         MS. STEPHENS:  Okay.  Thank you.
23 BY MS. STEPHENS:
24 Q.     I do want to ask a couple questions about the
25 videos in general for a little more context behind

---

Page 144

1  them.  Do you understand that you're still under
2  oath?
3  A.     Yes, ma'am.
4  Q.     Okay.  Were the videos something that you
5  took and submitted as part of any of your insurance
6  claims?
7  A.     Not that I recall.
8  Q.     Okay.  It's just something that you started
9  doing to try to document what was going on in your
10 house?
11 A.     Yes.
12 Q.     And as I recall, you believe they were made
13 on some phones that you had over the years and
14 perhaps, also, a video camera.  Is that correct?
15 A.     Yes.
16 Q.     To the extent -- and we went through, you
17 know, a bunch of those batches of the photos.  To the
18 extent the photos in there were taken by you or your
19 husband, were those, again, taken on phones that you
20 owned, probably?
21 A.     Yes.
22 Q.     Did you also have, like, a photo -- an actual
23 just regular camera that you would occasionally take
24 pictures with?
25 A.     In the very beginning, like back when

---

Page 145

1  everybody had those cameras.
2  Q.     Back when we all had digital cameras instead
3  of phones?
4  A.     Yeah.  Like, the Sony cameras.  Yeah, some
5  were on those, but then it went to regular phones.
6  Q.     The estimates that you had regarding
7  replumbing your house, do you believe those were to
8  replace the plumbing with PEX materials or with a
9  different material?
10 A.     I don't know.
11 Q.     Other than the discussions we've already
12 talked about today, have you had any other
13 discussions with your dad about the issues you've
14 been having in your house, the plumbing issues,
15 specifically?
16 A.     Can you elaborate a little more?
17 Q.     Sure.
18         Well, you said you had a discussion with your
19 dad, I think after the March 2012 leaks, about the
20 issues you were having.  Do you remember that?
21 A.     Yes.
22 Q.     Okay.  And he suggested that you contact the
23 manufacturer; is that correct?
24 A.     Yes.
25 Q.     Did he know it was NIBCO at that time or did

---

KIMBERLY COLE                                          February 13, 2017

Page 146

1  he have to look into it, as well?
2  A.      I think he had to look into it.  I think --
3  yeah, I'm fairly certain he had to look into it.
4  Like, he had to call -- he knew it was NIBCO, but you
5  know, at that time is when he told me there's -- he
6  knew there was a warranty and he told me that he
7  would call the salesman.  And when I looked at that
8  one exhibit somewhere in here, it was my calendar, it
9  refreshed my memory of what kind of went down.  You
10 know, that was however many years ago.  But he called
11 them and told me that that's how I needed to get
12 started on what I needed to do.  I think that's what
13 you're asking me.  I'm really not sure.
14 Q.      Subsequent to that, I think you might have
15 mentioned earlier that you stopped having your dad
16 help you with the plumbing stuff at some point.
17 A.      Yes.
18 Q.      Was there a reason for that or just --
19 A.      Oh, no, no.  No.  Like, we -- I really -- I
20 didn't stop getting him to help me because I thought
21 he was doing something wrong, if that's what you're
22 asking me.
23 Q.      Well, then why?  I'm just trying to
24 understand.
25 A.      No, because he didn't know.  He was, like,

Page 147

1  You need to pursue -- like, This is a warranty issue;
2  there's something wrong with this.
3          He still came and helped Alan every time we
4  had one, like showed us how to do that.
5  Q.      And that's what I was trying to --
6  A.      Yes.  I'm sorry.
7  Q.      -- figure out, between those two pieces of
8  testimony what you meant exactly.
9          Are you aware that as part of this lawsuit
10 that I served your dad with a subpoena for documents?
11 A.      Yes.
12 Q.      Okay.  Did you talk to your dad about that?
13 A.      Not really.
14 Q.      Okay.  Do you know whether he retained
15 counsel to help him respond to that?
16 A.      No, I don't know.
17 Q.      He didn't?
18 A.      I know he has an attorney, but I don't know
19 if he retained counsel for that.
20 Q.      Okay.
21 A.      He has an overall attorney all the time.
22 Q.      Okay.  Did you see the affidavit that he
23 submitted to me in this case?
24 A.      No.
25 Q.      I understand, at least based on that, what

Page 148

1  was represented, that your father no longer --
2  construction business closed down a few years ago or
3  they don't have the records?
4  A.      Yes.
5  Q.      Did you ask your dad for any records
6  regarding the plumbing that was in your house?
7  A.      When?
8  Q.      At any time.
9  A.      Yeah.  I asked him, like, if there was any
10 records because at one point, they said sun exposure
11 could cause, you know, breakdown of the pipe or
12 something.  That's what the guy told me on the phone.
13 So I asked him, like, how long did he have it, but
14 that was back when I first built the house.  But
15 that's really all I ever asked him for.  I didn't ask
16 him for -- I had no reason to ask him for any
17 records.
18 Q.      Okay.  And you said the construction of the
19 house started in 2008; is that correct?
20 A.      Yes.
21 Q.      And do you know what month, approximately?
22 A.      Oh, I can't remember, but I have it written
23 down on something.  I think it might have been August
24 of 2008, but I can't be for sure.
25 Q.      When was the most recent leak in your house

Page 149

1  that you can remember?
2  A.      Like, in my bathroom was the last one, maybe.
3  Q.      Okay.  Do you want to maybe refer to that
4  exhibit?
5  A.      Yeah.
6          MR. KENNEY:  Got it.
7          THE WITNESS:  Yeah.  September.
8  BY MS. STEPHENS:
9  Q.      September 2016?
10 A.      Yeah.
11 Q.      Which reminds me, when did you type this up;
12 that is, Cole Exhibit 4?
13 A.      I think it was sometime around when I was
14 getting everything together to submit to them, like,
15 everything.  They were asking me the same questions
16 you were about the videos and all my pictures and
17 everything.
18 Q.      So you --
19 A.      So I tried to sit down with everything and...
20 Q.      Have you had any leaks since that September
21 2016 leak?
22 A.      No.  Not so far.  You'll notice there's a
23 trend.  If you look at it, there will be a few
24 months, and then it will come back.
25 Q.      Do you recall having a discussion, when you

KIMBERLY COLE                                    February 13, 2017

---

Page 150

1  were deciding to build this house, about what kind of
2  plumbing the house was going to have?
3  A.     No.
4  Q.     So not with Alan or your dad or anyone?
5  A.     No.
6  Q.     How much did your house cost to construct?
7  A.     200-- -- $220,000.  Somewhere around that.
8  That's an estimated range.  $220,000, I think.
9  Q.     Now, since your -- I don't know.  But since
10 your dad was your general contractor, did you guys
11 have, like, a formal agreement with him or did he
12 just kind of charge you as you went along?  What kind
13 of arrangement did you guys have?
14 A.     I don't really understand the question.
15 Like, what are you asking me?
16 Q.     Okay.  Well --
17 A.     Like, we took out a construction loan, Alan
18 and I.
19 Q.     Okay.
20 A.     And my dad was the contractor and he built
21 it.  And then we wrote -- you know, we had an account
22 that we paid for the construction as it went along.
23 Q.     It's just a different situation because it
24 was your dad building it --
25 A.     Right.

---

Page 151

1  Q.     -- as opposed to a home builder that you're
2  not related to.  I wasn't sure what the situation
3  was.
4         So you think you paid your dad -- or you
5  spent about $220,000 on the construction of the home;
6  is that correct?
7  A.     Yes.
8  Q.     When you were trying to refinance the home,
9  did you get an estimate about what the home is worth?
10 A.     Yes, I did.
11 Q.     And what is that?
12 A.     230-something.
13 Q.     Okay.
14 A.     The market had went down.  I think originally
15 it was 248-, and then I think it was 236-, actually.
16        MS. STEPHENS:  I don't have any more
17 questions for you today.  I appreciate your time
18 today and I appreciate you working with Joe on those
19 videos.  That will be very helpful to me.  Okay?
20        THE WITNESS:  Thank you.
21        FURTHER DEPONENT SAITH NOT
22
23
24
25

---

Page 152

1        E R R A T A   P A G E
2        I, KIMBERLY COLE, having read the foregoing
   deposition, Pages 1 through 151, do hereby certify
3  said testimony is a true and accurate transcript,
   with the following changes (if any):
4
5  PAGE   LINE    SHOULD HAVE BEEN
6  _____  _____   _____
7  _____  _____   _____
8  _____  _____   _____
9  _____  _____   _____
10 _____  _____   _____
11 _____  _____   _____
12 _____  _____   _____
13 _____  _____   _____
14 _____  _____   _____
15 _____  _____   _____
16 _____  _____   _____
17 _____  _____   _____
18
19
20
21        _____
          KIMBERLY COLE
22
23 _____
   Notary Public
24
   My Commission Expires: _____
25 U.S. Legal Support Job No. 556219

---

Page 153

1        REPORTER'S CERTIFICATE
2  STATE OF TENNESSEE
3  COUNTY OF WILLIAMSON
4        I, SARAH M. MOTLEY, Licensed Court Reporter,
5  with offices in Franklin, Tennessee, hereby certify
6  that I reported the foregoing deposition of KIMBERLY
7  COLE by machine shorthand to the best of my skills
8  and abilities, and thereafter the same was reduced to
9  typewritten form by me.
10       I further certify that I am not related to
11 any of the parties named herein, nor their counsel,
12 and have no interest, financial or otherwise, in the
13 outcome of the proceedings.
14       I further certify that in order for this
   document to be considered a true and correct copy, it
15 must bear my original signature and that any
   unauthorized reproduction in whole or in part and/or
16 transfer of this document is not authorized, will not
   be considered authentic, and will be in violation of
17 Tennessee Code Annotated 39-14-104, Theft of
   Services.
18
   Dated: February 20, 2017
19
20 _____
   SARAH M. MOTLEY, LCR
21 Licensed Court Reporter (TN)
   Notary Public State of Tennessee
22
   My Notary Commission Expires:  1/9/2021
23 LCR #383 - Expires:  6/30/2018
24
25

---

U.S. Legal Support, Inc.
(312) 236-8352

KIMBERLY COLE

February 13, 2017
Index: $1,000..6

## Exhibits

**EX 0001 K. Cole 021317**
3:7 21:16,18,20 22:17

**EX 0002 K. Cole 021317**
3:9 25:14,16,18 26:25 27:10 29:2

**EX 0003 K. Cole 021317**
3:10 27:18,21,23 28:13,18 62:19 63:4 64:12

**EX 0004 K. Cole 021317**
3:12 39:9,11,13 41:1 47:10 51:17 68:16,22 71:16 95:4 149:12

**EX 0005 K. Cole 021317**
3:13 74:1,3,9,23

**EX 0006 K. Cole 021317**
3:15 79:11,13,22 82:4

**EX 0007 K. Cole 021317**
3:16 82:5,7,12,25 83:9

**EX 0008 K. Cole 021317**
3:18 88:15,17,22 91:9

**EX 0009 K. Cole 021317**
3:19 92:21,23 93:10,19 94:3,19

**EX 0010 K. Cole 021317**
3:21 98:8,10,17 99:8

**EX 0011 K. Cole 021317**
3:22 102:24 103:1,6

**EX 0012 K. Cole 021317**
3:24 111:1,3 115:19

**EX 0013 K. Cole 021317**
4:2 120:3,5

**EX 0014 K. Cole 021317**
4:3 122:10,12,17

**EX 0015 K. Cole 021317**
4:5 129:5,7,16

**EX 0016 K. Cole 021317**
4:6 130:24 131:1

## $

**$1,000** 34:14 47:2,3

**$1,200** 33:17

**$10,000** 31:7 37:3

**$13,000** 103:16

**$2,400** 34:6

**$2,500** 34:12

**$22,000** 86:22

**$220,000** 150:7,8 151:5

**$5,000** 33:4,19,24 34:13,18 141:11

**$5,000-a-year** 33:2

**$50,000** 103:20

**$56,331.09** 85:22

**$63,000** 103:23

**$67,000** 87:25

## 1

**1** 21:16,18,20 22:17

**10** 27:10 98:8,10,17 99:8

**10:00** 137:14

**11** 102:24 103:1,6

**12** 85:20 111:1,3 115:19

**12th** 141:8,9

**13** 120:3,5

**136** 10:6

**13th** 85:15

**14** 122:10,12,17

**15** 86:13 129:5,7,16

**16** 8:12 130:24 131:1

**17** 72:9 143:10

**18** 143:10

**19150** 63:24

**19207** 9:4

**1994** 8:15

**19th** 123:17

## 2

**2** 25:14,16,18 26:25 27:10 29:2

**20** 27:11 34:12

**200-** 150:7

**2001** 8:21,22

**2008** 9:24 148:19,24

**2009** 10:1 33:12 41:2,12 112:14

**2010** 9:16 30:10 35:18,22 37:15 38:5 39:2 41:7,21 42:3 46:24 49:24 66:4

74:21 77:9

**2011** 112:16

**2012** 29:18 35:13, 14 41:22 42:4 43:1, 9 45:13 46:19 47:3, 6,11 48:24 49:3 50:8 51:16,18 52:3, 10,19 54:19,21 56:1,4,21 58:12 62:15,20 65:21 66:1 68:13,18,22 70:1 108:5 112:22 113:7, 20 115:10 123:8,17 128:16 129:23 131:18 133:23 134:18 137:13 139:9,11 140:2 145:19

**2013** 34:1

**2013115** 112:2

**2014** 95:12,21 96:12

**2015** 27:5 103:13

**2016** 85:15 141:9 149:9,21

**2017** 35:16

**20th** 27:5 123:8 128:16 132:25

**21st** 131:18 132:25

**230-something** 151:12

**236-** 151:15

**23rd** 134:5

**248-** 151:15

**26th** 135:7

**27th** 128:16 134:18,22 135:8

**28** 10:21

**2800** 10:22,23

## 3

**3** 26:15 27:18,21,23

28:13,18 60:6 62:19 63:4 64:12

**345** 83:3,5

**3rd** 113:20

## 4

**4** 39:9,11,13 41:1 47:10 51:17 68:16, 22 71:16 95:4 149:12

**4,000-some-odd** 33:24

**40** 11:24

**40-plus** 11:25

**463** 88:20

**476** 94:16 95:6

**489** 83:1

**4th** 136:6

## 5

**5** 74:1,3,9,23

**50-year** 55:11 57:8 107:24

**508** 123:11,12

**519** 122:16

**520** 129:15

**533** 129:12,15

**534** 129:11

**571** 75:18

**572** 76:19

**574** 27:25

**5th** 62:15,17,18,19 137:13 138:4

## 6

**6** 79:11,13,22 82:4

KIMBERLY COLE

February 13, 2017
Index: 640..Beaver

**640** 115:20
**647** 115:21
**650** 117:17
**672** 103:5

---

**7**

**7** 82:5,7,12,25 83:9
**79** 9:4,5 10:3,13,20 11:5,13 20:15 33:7
**794** 98:13

---

**8**

**8** 88:15,17,22 91:9

---

**9**

**9** 92:21,23 93:10,19 94:3,19
**9-1-1** 64:4
**9/20/16** 112:1 123:2

---

**A**

**a.m.** 75:23 137:14
**abbreviations** 131:21
**ability** 108:21 141:24
**above-mentioned** 21:17 25:15 27:20 39:10 74:2 79:12 82:6 88:16 92:22 98:9 102:25 111:2 120:4 122:11 129:6 130:25
**absolutely** 33:5 105:12 118:23 141:19

**accept** 109:2
**accepted** 86:19
**accessible** 36:15
**accommodate** 81:15
**account** 150:21
**accurate** 29:24 106:16
**accurately** 30:2
**acquired** 45:10
**acted** 68:10
**Action** 116:24
**actual** 11:11 35:24 36:9,24 65:7 72:24 77:14 85:5 97:2 104:24 109:8, 25 110:3 114:17 121:14 127:18 144:22
**actuality** 140:20
**address** 9:3 63:18,20,21,25 64:4 105:20
**addressed** 123:21,25
**adjuster** 132:3
**adopted** 81:6 137:18
**advance** 84:1
**advantage** 118:25
**affidavit** 147:22
**affirmatively** 37:5 42:18 54:16 81:17 134:14
**afford** 33:1 55:14 88:5
**afterward** 78:9
**agree** 103:16 112:16
**agreement** 24:6,15,17 25:2,3,6,

9,10 143:13 150:11
**ahead** 21:20 87:16 93:1 111:8
**Alan** 22:11 25:23 41:9,17 50:17 76:6 77:25 79:25 82:19 90:5 93:20 96:18,23 100:11 101:1 113:1, 2 119:8 128:22 129:2 138:21 147:3 150:4,17
**Alan's** 78:14
**allegation** 106:8
**allowed** 81:10
**Allstate** 32:14,15 33:7,9,10,12 34:8, 11,15 35:10 37:1 43:12 45:6,7,10 46:21 47:24,25 48:6 49:2 56:5,8,13 65:8 66:2 73:8 97:17 109:14 123:9 124:13,14,22 125:9, 21 126:16 127:5,22 130:11 132:2
**Allstate's** 124:4, 6
**alt** 100:24
**amount** 107:25
**angry** 118:24
**ankles** 76:8
**answers** 7:14 51:12 81:25 141:6
**antagonize** 141:15
**anticipated** 60:18
**anymore** 78:19 81:10 127:15
**apologize** 83:7
**appearance** 130:21
**appears** 103:15 112:1 113:13 116:22 120:15

122:21 127:2 138:13,25
**approximate** 40:14 143:15
**approximately** 11:2 138:4 148:21
**April** 29:18 62:17, 18,19 65:21 68:13 113:20 115:10 123:17 136:6 137:13 138:4
**architect** 11:7
**area** 19:3 36:13,23 47:18 51:25 133:7, 25
**areas** 64:7 134:1
**arrangement** 150:13
**arrow** 102:4,7
**article** 116:23 117:2,13,21
**aspects** 19:25
**assume** 7:19 31:6
**assuming** 87:3
**asterisks** 101:11
**attached** 91:5
**attachment** 62:23
**attempt** 40:13
**attention** 19:19 22:4 131:15
**attic** 16:21 17:17, 23 18:7,13,15,20,23
**attics** 18:11
**attorney** 7:22 23:11 124:4,6 147:18,21
**attorneys** 22:17, 18 28:4
**August** 148:23
**average** 118:20

**aware** 38:5 147:9

---

**B**

**B-E-N-A-R-D** 70:20
**back** 8:2 19:6 35:22 37:12 40:5 51:8 54:19 55:22 56:10,12,13,15 60:5 61:18,19 62:2 64:18,21,23,24 65:3 78:4 81:21 95:4 97:18 105:13 106:25 107:3 114:18 119:23 124:20 126:7 130:6, 12 132:12 138:7 140:7,15,19,21 142:6,7,9 143:4 144:25 145:2 148:14 149:24
**background** 11:19 100:23
**Backhoe** 43:11, 13,15 127:3,6,21 128:3,15,17
**bad** 57:10
**bag** 97:7
**baseboards** 31:10 106:4
**based** 29:2 59:2, 12 81:2 147:25
**basically** 61:22 76:24
**batches** 144:17
**Bates** 28:4 79:17 83:1 84:21 88:19 92:25 98:13 103:4 129:10 143:11
**bath** 41:15
**bathroom** 149:2
**bathrooms** 11:3
**baton** 140:1
**Beaver** 10:6

KIMBERLY COLE

February 13, 2017
Index: bed..Cole520

**bed** 32:2 107:3

**bedroom** 42:15, 20 43:1,9 45:14,16 46:3,20 48:14

**bedrooms** 10:24 11:2

**began** 118:25

**begin** 104:18 141:12 142:20

**beginning** 32:23 78:4 144:25

**behalf** 125:16 141:20

**behaved** 62:12

**believed** 56:24 90:19 91:22

**Bells** 10:8,9 20:5, 10 63:23

**belongings** 37:9 45:19

**Benard** 53:9 70:8,19 128:23

**bewildered** 122:5

**bid** 86:19

**big** 10:20 76:24 90:21

**bigger** 10:16

**bit** 46:12 68:5 96:21 113:18 141:9

**bitty** 44:6

**black** 89:14

**Blank** 63:16,17

**blog** 110:21

**blowing** 118:22

**blue** 14:22 16:16 20:23 91:5 92:2 95:23 96:3 99:9

**bonus** 25:7

**book** 11:12

**books** 11:10

**born** 11:24

**bottom** 27:24 28:3 77:4 85:4 102:2 113:20

**bought** 57:20 58:2,4 73:3

**brand** 15:14

**break** 51:3,5,6,11 81:19,24 119:21,23 142:12,24 143:2,3

**breakdown** 148:11

**broad** 75:6

**brought** 125:21

**budget** 103:9

**build** 10:15 13:11, 15 150:1

**builder** 151:1

**building** 19:16 150:24

**built** 9:23 10:12 11:13 33:8 55:23 56:25 58:10,14,18 126:13 148:14 150:20

**bunch** 22:5 40:3 106:23 144:17

**business** 12:2 13:3 148:2

**busting** 55:5

**buy** 57:23

**C**

**cabinets** 77:4 106:5

**calculate** 142:2

**calculated** 72:21

**calendar** 40:22 131:9,11 139:10 146:8

**call** 22:6 24:24 28:4 32:4,7,11 43:4, 6,8 48:2 53:4 55:18 59:19,24 61:11,19 62:8 115:16 118:11, 12 127:9,10,13,14, 16 134:6 138:21 146:4,7

**called** 6:3 24:25 25:1 35:23 39:19 43:10,11,12 47:24 48:1 53:5,21 59:24 62:2,8 69:8 75:7 77:5 85:10 127:16 134:7 135:6,13 136:16 137:23 138:12 146:10

**calls** 23:19 30:18 45:22 49:9 52:14 108:18 129:25 140:13

**camera** 78:15 144:14,23

**cameras** 145:1, 2,4

**capital** 15:4

**caption** 22:6

**care** 61:23 76:14 81:9 97:5

**carrier** 35:21

**case** 23:11,15 25:7 35:3 40:21 77:17 79:8 143:9 147:23

**catalogs** 121:9

**categories** 86:18

**category** 86:14 141:1

**caught** 116:10

**caused** 49:15 106:10

**ceiling** 42:14,19 43:2 46:3,20 47:11, 20 48:9,11,12,14,23 49:5 52:23 56:1 132:13

**ceilings** 53:12 97:22 98:2

**change** 32:21,24 51:13,24 64:4

**changed** 32:23 53:24 64:1 96:9 124:7

**charge** 150:12

**check** 100:7

**checked** 114:18

**children** 10:18 81:2 140:3 142:8

**Children's** 81:4, 7

**Cindy** 82:21 89:7 123:25 124:5,8

**circle** 102:18

**circled** 110:1

**circling** 90:6,11

**circumstances** 6:14 41:10

**claim** 35:4,17 36:25 37:4,8 41:9 42:1 49:2 57:13 73:10 85:22 123:8 132:23 133:5 134:7, 9 140:2

**claims** 33:20,22, 23 34:11,25 35:1,3, 6,9,13 49:3 59:10 72:15 114:23 115:1, 6,12 124:12 129:2 132:3 133:14 144:6

**clarification** 69:14 100:14

**clarify** 51:13 69:21 82:1 99:21 108:3

**clarifying** 38:21

**class** 23:14,15 24:1 116:24

**cleanup** 37:12 75:23

**clear** 7:15

**client** 141:20

**clip** 66:20

**close** 36:17 47:17 81:1

**closed** 148:2

**closer** 92:3

**Cobb** 11:14,15, 17,22 12:6,11,14 13:2 76:3

**cold** 48:25 52:7 95:24 96:1,3,11

**Cole** 6:2,10,11 9:1 21:16,24 22:9,11 25:14,18 27:3,18, 23,25 28:6,13 39:9, 13,19 51:8 74:1 79:11 81:22 82:5 88:15 92:21 95:5 98:8,17 99:7 102:23 103:5 111:1 112:2 119:24 120:2,3 122:10 129:5 130:24 140:11 143:5 149:12

**Cole's** 25:23

**Cole308** 79:17 80:9

**Cole344** 79:17

**Cole345** 83:9

**Cole395** 83:10

**Cole396** 88:19

**Cole397** 89:9,16 90:24

**Cole466** 83:1 93:1

**Cole476** 94:16, 19 95:13 96:23

**Cole489** 93:1

**Cole490** 122:16

**Cole505** 127:1

**Cole520** 129:11

KIMBERLY COLE

February 13, 2017
Index: Cole566..decided

**Cole566** 74:10

**Cole573** 74:10

**Cole632** 111:6

**Cole633** 113:19

**Cole639** 113:19

**Cole640** 115:19

**Cole648** 116:21

**Cole650** 117:12

**Cole652** 111:6 118:4

**Cole669** 103:4

**Cole673** 131:4

**Cole675** 136:5

**Cole679** 131:5

**Cole724** 98:13

**Cole733** 100:2, 15

**Cole764** 102:1

**Cole800** 143:11

**Cole817** 143:12

**collection** 143:10

**college** 8:17,20

**color** 16:8 43:25 44:2 79:19

**communicate** 73:8

**companies** 15:9 32:25 40:11 76:13 105:16 127:9

**company** 11:22, 23 13:11 32:11,13 35:24 37:20 38:9,16 43:10 50:6,9,12,22 53:21,22 70:12,15 75:9 82:20 84:11 85:10 86:18 115:2, 7,8 127:17

**compare** 95:5

**compensated** 129:22 141:23

**complaint** 106:9

**completed** 9:25

**computer** 83:23

**concern** 132:23 133:4

**concerned** 76:9 133:15,21

**concerns** 131:23

**conclusion** 23:19 30:18 45:22 49:9 52:14 108:18 129:25 140:13

**conferring** 143:14

**confused** 69:12

**connected** 62:9 91:25 92:1

**connection** 92:9 99:8,14,16

**connects** 15:22, 24

**consolidate** 49:3,4

**construct** 150:6

**construction** 9:24,25 11:14,15, 20,22 12:2,6,11,14 13:2 14:2 16:11,16 19:8 20:18 70:15 76:3 148:2,18 150:17,22 151:5

**contact** 29:3 54:23 55:21 56:22 57:14 59:16 61:8 65:20 68:13 145:22

**contacted** 22:19 29:10,13 68:19 81:4,7

**contacting** 29:21 54:21

**contacts** 29:5

**contained** 98:17

**context** 143:25

**contingency** 25:10

**continue** 8:16

**Continued** 73:24

**contract** 53:7

**contractor** 12:6, 15 53:8 126:12 150:10,20

**contractors** 70:16

**conversation** 43:18 58:13,17 60:24 64:19 67:2,3, 23 107:13 108:4 121:17

**conversations** 19:9

**copies** 40:22 131:8

**copper** 20:7

**copy** 108:10

**corner** 63:7 75:19

**correct** 10:13 12:15,25 16:23 17:16,18,23 18:18, 21 19:3,22 22:11 31:23 33:13 37:1,4 39:20 41:23 42:1 43:13 46:3,16 47:20 54:2 56:22 59:7 62:20 69:19 70:3 75:18 76:4 81:16 83:2 85:24 94:9 95:15,21 97:23 99:11 106:12 109:5, 14,17 112:3 113:22 115:13 116:19 117:10,17,18,23 123:9 124:17,20 127:6 128:23 129:23 131:9 134:20 138:5 139:24 143:20 144:14 145:23 148:19 151:6

**correctly** 54:20 61:10,21 131:25 132:11,16

**cost** 33:3 88:10 142:6 150:6

**costs** 127:18

**counsel** 22:3 24:6,11 25:3 28:8 73:6 79:8,16 97:14 120:12 129:10 143:7,12,13 147:15, 19

**couple** 27:13 62:7 121:23 143:24

**court** 7:13 8:2

**Cove** 10:6

**cover** 37:8 112:9 122:22

**coverage** 34:7, 15,21,22

**covered** 46:20

**covers** 127:18

**crack** 92:11

**crossed** 123:25

**current** 32:17 34:4

**custody** 81:8

**customer** 59:22, 25 73:19

**cut** 105:1 106:3

**Cynthia** 83:19 84:10 93:13 98:24

**D**

**dad** 32:8,9 36:24 37:16 53:21 54:1 55:6 56:21 58:8,18 59:9 67:7,11,23 69:4 70:12,13 75:7 107:12 121:7,21 126:15,21 127:14 128:22 145:13,19 146:15 147:10,12 148:5 150:4,10,20,

24 151:4

**Dad's** 119:11

**damage** 30:16,22 31:4,5,7 37:8 45:19, 25 46:18 49:6,15, 19,22 52:10,12,19, 25 77:13 79:1 86:10 104:25 127:18 129:22 133:8 136:25

**damaged** 31:8 76:11,16

**damages** 85:12

**Daniel** 134:19,24 135:3

**date** 9:18 23:12 58:5 62:14 77:18 80:6 93:24 103:12 113:17 114:6

**dated** 27:5 123:17

**dates** 29:4 40:14 99:4 132:24 143:15

**daughter** 19:16 81:6,10 137:18

**daughter's** 137:18

**Davis** 131:24 132:5 135:23

**day** 45:8,9 47:16 50:16 107:5 134:12 137:13 142:7

**days** 47:15 61:16 62:7 106:16 107:6, 7,8,10 133:13

**DCS** 81:8

**deal** 70:17

**dealt** 76:13

**Debbie** 124:1,3,8

**December** 103:13

**decide** 10:11,15

**decided** 24:13 50:11 88:3 128:10

KIMBERLY COLE

February 13, 2017
Index: deciding..exhibit

**deciding** 150:1

**decision** 125:15

**decline** 136:19

**declined** 136:18

**deductible** 34:13,14,16,18 46:24 49:17,18,21 129:20

**deductibles** 34:21

**defective** 108:24 109:7

**Defects** 117:22

**Defendant** 25:24

**defendant's** 21:23

**definite** 21:10 23:7 42:11

**demonstrating** 104:23

**department** 81:4,7 126:14

**depended** 16:5

**depending** 11:1

**DEPONENT** 151:21

**deposed** 125:16

**deposition** 6:11,15,18 7:3 8:5 21:24 22:3 105:4 143:13,19

**describe** 44:4 49:12 72:1,3 90:9, 13,16 105:3

**describing** 76:1

**description** 75:17 112:11

**deserved** 142:10

**designation** 28:6

**designed** 11:5

**detailed** 46:13

**details** 41:19

**detect** 105:10

**determine** 143:14

**devastated** 113:8

**died** 138:10

**difference** 68:11

**difficult** 127:19

**digital** 145:2

**direct** 22:4

**Disaster** 84:23 85:7,9 86:2 87:13 104:1

**discover** 31:17 42:4

**discovered** 21:5,9 47:13,22

**discovering** 42:25

**discuss** 126:14

**discussing** 13:17

**discussion** 145:18 149:25

**discussions** 37:16,19 145:11,13

**dishwasher** 30:14 31:16

**disposed** 109:16,20

**distinction** 130:17,20

**dive** 118:25

**diving** 118:10

**document** 21:17,22 25:15,23 26:1,22 27:14,20 28:2,7,16 30:1 39:10,14,16,18,22 40:2 74:2,7 79:12, 20 82:6,10 88:16,

19,21 91:11 92:22 93:3 98:9,14 102:25 103:4,7 111:2,10 113:18 118:5,8 120:4,8,9 122:11,19 123:13 129:6,17 130:25 131:6 144:9

**documentation** 97:4 142:2

**documented** 46:15

**documents** 27:24 28:5 29:5 40:17,20 46:12,16 48:4 49:14 50:4 70:22,23 79:16 103:5 111:5,14 122:14,18 123:7 129:9,15 133:2 147:10

**dollars** 33:25

**downstairs** 31:9,21,24 42:16,17 76:9

**draw** 11:7 90:4 131:15

**drawn** 101:12,13

**drawn-on** 102:4

**dried** 133:16

**drip** 92:19

**dripping** 95:2

**drive** 78:18 83:15, 17,25 84:3 93:8,16

**driveway** 76:16

**drop** 55:15 73:9, 11,22

**dropped** 78:21, 22

**drying** 77:2

**drywall** 16:18 70:14

**duly** 6:3

**dumb** 61:22

**Dunn** 126:19

**Duravit** 101:19

**E**

**e-mail** 62:13,14, 20,23 64:10,11,15, 20 68:12 114:16,17 138:1

**e-mails** 28:15 29:7 60:6

**earlier** 28:23 103:10 109:4 129:19 138:1 146:15

**easier** 7:13 84:3

**efficient** 143:1

**eight-page** 115:20

**elaborate** 145:16

**elbow** 99:8

**electric** 16:25

**electronics** 83:24

**eleven** 106:22

**Enclosed** 124:12

**end** 34:15 36:25 41:2,11 108:16 138:21

**ended** 41:25 54:21 65:3 126:24 133:14

**engagement** 24:5,10 25:1

**entail** 121:18

**entire** 31:9,24 76:9 141:7

**entitled** 25:23 116:23

**entrusted** 19:21

**entry** 134:18 136:5 137:13

**erased** 138:11

**error** 61:25

**essentially** 16:13 34:22

**estimate** 85:10, 25 86:7,9 87:9,16, 18,21,23 88:1,11 104:2 136:11,17,21 137:3,5,8 140:24 142:3,4,5 151:9

**estimated** 142:22 150:8

**estimates** 88:4,6 98:5 145:6

**eventually** 56:7, 10

**evidence** 126:2

**exact** 114:5 140:24 142:6

**EXAMINATION** 6:6

**excuse** 13:24 99:23,24 115:18 129:11

**exhibit** 21:16,18, 20 22:17 25:14,16, 18 26:25 27:10,18, 21,23 28:13,18 29:2 39:6,9,11,13 41:1 47:10 51:17 60:5,7 62:19,24 63:4 64:12 68:16,22 71:16 74:1,3,5,9,23 79:11, 13,22 82:4,5,7,12, 25 83:9,14 88:15, 17,22 91:9 92:21,23 93:10,19 94:3,19 95:4 98:8,10,17 99:8 101:7 102:22, 24 103:1,6 111:1,3, 11 112:9 115:19,20 118:4 120:3,5,24 122:10,12,17 129:5, 7,14,16 130:24 131:1 138:7 146:8 149:4,12

KIMBERLY COLE

**exhibits** 93:6

**expanded** 81:15

**expansion** 61:2, 3,13 67:4,8,15,24 68:3 138:18,19

**expenses** 141:21

**experience** 122:2

**expert** 30:18 45:22 49:9 52:14 129:25 140:13

**explain** 18:12 24:2 31:3 61:19 68:3 80:16 141:12

**explained** 62:6 68:2

**exposure** 148:10

**extent** 23:18,20 30:17 34:20 37:8 45:21 46:14,18 49:8 52:13 90:18 97:9 108:17,19 121:21 129:24 140:12 144:16,18

**extra** 129:12

**eye** 116:10

---

**F**

**face** 31:20 142:21

**Faces** 116:24

**fair** 7:20 8:3 19:5 26:20

**fairly** 114:12 146:3

**fallen** 35:10

**falling** 34:25 35:1

**familiar** 28:13 63:4 64:11 82:12 83:16 85:6 88:23 89:10 94:11 101:17 122:17

**familiarizing** 120:20

**family** 64:7 81:15

**fast** 84:1

**faster** 78:25 84:2

**fastly** 76:14

**father** 11:15 12:1, 18,24 13:14,18,25 14:6 19:9,21 36:2 43:6 57:20 59:2,6 108:4 116:17 121:18 148:1

**father's** 11:19 13:11

**feel** 142:17

**feelings** 61:17

**feet** 10:21,22

**felt** 118:18,22,24 133:15

**figure** 29:15 55:17 56:21 57:11 91:16 113:9 147:7

**figured** 21:12,14 78:24

**file** 114:25 119:15

**filed** 39:25

**filing** 111:20

**finally** 97:3

**financial** 141:7

**financially** 140:21

**find** 22:24 55:21, 23 81:13 85:20 108:9 110:13,20 118:15 119:1 133:6 134:3

**finding** 110:18

**fine** 142:15 143:21

**finished** 76:23

**firm** 24:14

**fist** 124:8

**fitting** 15:18,21, 23 71:23,25 72:2,3 91:15,16,22 92:8, 10,11 94:3,7,20 95:7,8,19,24 99:16, 22,24 100:20 101:6, 13

**fittings** 16:1 91:1, 18 97:10 100:9

**five-** 35:2

**fix** 32:4 36:5,20 43:4,8 48:8 53:13 68:23 69:6 104:3 142:4

**fixed** 35:24 36:24 43:17,24 48:5 53:23 54:2,12 71:22 92:16 106:24 128:8 142:19

**fixing** 69:1,3

**Fixture** 117:22

**flash** 78:18 83:25 84:3 93:16

**flip** 26:7 85:19 100:2 117:12 120:7 134:17 136:4 139:8

**flipping** 94:2

**floating** 75:11

**flood** 131:25 132:11

**floor** 17:22 18:3, 13,17 31:22 42:12, 13 48:15 75:11 80:18

**flooring** 50:15,17

**floors** 31:9 48:21

**fluke** 38:2

**folder** 83:15 114:25 119:15

**forgot** 132:12

**form** 13:5 24:25 28:14 29:6

**formal** 150:11

**forum** 112:11 114:2,22 115:22,23 116:3

**forums** 111:16

**foster** 81:9,12

**found** 11:11 21:7 23:2 36:10 108:12 110:21 112:21 133:8 135:11,19

**fourteen** 106:22

**fourth** 23:8

**foyer** 51:23

**frame** 29:18

**friend** 116:15

**front** 93:7 119:17

**frustrated** 96:20

**full** 31:21

**fully** 46:20 49:22 129:22

**furniture** 75:10 76:10

---

**G**

**Gadsden** 9:2 10:7

**garage** 18:14,16, 20,24

**gas** 16:25

**gave** 6:18 29:3 45:11 83:19 139:23, 25

**general** 12:6,15 58:6 143:25 150:10

**generally** 20:18 28:24 38:15 49:12

**generic** 15:12

**gist** 108:2

**give** 8:5 9:18 23:7 29:24 41:19 42:10 104:1 107:7 108:10 136:17,20 140:19,

**giving** 7:3,8 75:17

**gold** 16:7 73:13,15

**gold-looking** 16:6

**good** 6:8 55:9 57:10 112:11 122:6 140:7 142:13

**goodness** 23:6

**Googling** 115:16

**grabbed** 83:6

**graduate** 8:14, 19

**Grange** 32:18,24 34:5,14,25 35:8

**great** 8:13 38:10, 20

**ground** 17:22 18:3,13,17

**group** 24:4

**guess** 21:11 116:7 135:3 136:1 138:6

**guide** 120:16

**guy** 62:12 128:4,8 148:12

**guys** 10:12 13:18 31:25 51:24 53:22 102:10,12 150:10, 13

---

**H**

**ha** 119:3

**halfway** 96:19

**hand** 21:15 25:13 27:17 39:6 73:25 79:10 88:15 92:20 98:7 102:23 110:25 120:3 122:9 129:4 130:23

**handed** 96:20

20,24 141:1,6 142:3,5,6,9

---

**handled** 129:1

**handwriting** 111:23 112:5 123:2, 3,5 131:13

**handwritten** 40:19

**Handyman** 53:8

**Hang** 132:23 133:1

**happen** 37:24

**happened** 34:13 37:21 38:3 42:7 43:22 44:22 45:5 49:12 50:18 56:2 66:5 78:6 97:4 109:21

**happening** 41:18 55:2 57:11 66:17 97:6 113:10, 11,12 118:16 119:2, 11 131:24

**happy** 126:13 132:13

**hard** 42:6 75:20 83:10 96:25 105:10 137:14 142:9

**head** 13:20 30:6 37:5 42:18 54:16 59:13 81:17 96:16 134:14

**heard** 9:14 14:4 28:19,23 29:14,19 45:15 57:16 61:12 67:4

**heater** 17:3,7 66:15 71:2

**heaters** 16:20,22, 25 17:13,17,25 18:23,25

**helped** 55:23 56:21 95:19 147:3

**helpful** 61:6 151:19

**helping** 55:20

**hey** 24:19

**high** 8:14

**higher** 34:16

**highlight** 101:19

**Highway** 9:4,5 10:3,13,20 11:5,13 20:15 33:7

**hire** 24:13 53:13

**hired** 23:10 24:20 127:5,21

**hiss** 105:8

**hit** 64:20

**hole** 66:21 92:10

**holes** 77:3 106:3

**home** 10:3,16 13:3 16:2 30:16,22 32:17,24 33:2,3,6 37:9 39:2 46:15,19 49:6 57:21 61:14 63:25 65:13 66:14 79:2 85:11,13 93:16 106:10,21 110:20 113:1,2 116:11 118:16 119:7 120:22 128:18,21 129:22 142:6 151:1, 5,8,9

**homeowner** 83:14 93:8

**homeowners** 33:23 141:11

**homes** 58:18 59:1 121:22 126:13, 17

**honest** 42:6 45:9 61:11 107:19 113:7 124:9 128:9,11

**horizontal** 90:23

**horizontally** 44:18

**hot** 36:7 42:23 43:16 48:24 49:1 52:6,8 53:25 65:13 66:9,15 67:21 71:3, 12 87:6,10 95:24 96:5

**house** 9:5,6,10, 11,23 10:2,5,12,15, 20 11:5,13 12:17,19 13:17,24,25 14:7,20 16:12,13,17,20 17:17,20 18:17 19:1,8,18,22,25 20:5,10,14,19 21:6 29:22 30:5 31:12 33:7,11 37:11,17,20 38:6 40:15 45:19 46:8 48:15 49:25 50:9 52:10,20 57:18 66:9,16 67:15,21 69:16 70:3 72:17 74:24 76:11,18 77:1,3 79:5 80:15 81:14 82:14 83:23 84:11,15 86:10 87:19 88:9 89:22 90:19 97:10 104:2, 3,6,9 105:14,23 106:1,15,24 107:2, 12 110:3 116:10 117:10,25 126:16, 24 127:23 130:11 132:6 137:9 142:4 143:16 144:10 145:7,14 148:6,14, 19,25 150:1,2,6

**houses** 13:12,15 55:23 56:25 57:3 58:9,14,21

**hung** 61:9,15 119:6

**hurt** 118:24

**hurtful** 142:21

**husband** 17:9 20:3 22:11 32:1 53:16 69:4,17,20 70:10 72:25 89:7 98:21 114:22 139:23 141:10 144:19

**husband's** 27:7

---

**I**

**idea** 17:1 36:6 39:23 40:5,6 58:22

61:3 62:25 96:15 107:10 116:9

**identify** 72:11

**images** 83:14 93:7,12

**Inc.'s** 25:24

**include** 19:24 35:13 140:23

**included** 98:5 118:3 124:16

**includes** 86:10 87:9 141:2

**including** 87:10 88:12

**increase** 73:23, 24

**incurred** 141:22

**indicating** 40:7 44:17 80:22 94:12 126:6

**indication** 86:21 136:7

**info** 111:7,16

**information** 26:14,22 63:7,19 77:23 119:1,14 125:3,4 143:18

**informs** 111:7

**initial** 62:8

**Initially** 105:17

**inside** 130:22

**inspection** 84:5, 13,16 97:15

**install** 12:11,19

**installation** 61:25 120:16 138:14

**installed** 12:9 13:25 16:2 17:14 50:17 56:25 57:2,21 121:22

**Installer** 63:12

**installing** 19:10 63:8

**instance** 74:25 90:14

**insulated** 105:11

**insulation** 104:22 132:12

**insurance** 32:11,13,17,24,25 33:2,3,6 35:2,6,9,23 37:20 40:11 42:1 43:10 46:12,16 53:20 55:15 57:13 72:15 76:13 77:15 115:1,2,6,7,12 123:8 127:9,17 129:2 141:11 144:5

**insured** 33:12 73:9

**intellect** 61:18

**intelligence** 118:20

**interior** 104:3

**internet** 22:25 23:2 110:19 112:22 116:23 118:11

**Interrogatories** 25:25

**interrupt** 139:16

**invoice** 54:6

**invoices** 73:6

**involved** 12:2 125:6,8,9,10,20,23 140:7,8

**involving** 122:2

**ipod** 78:24

**irrelevant** 38:18 68:10

**issue** 9:7 35:24 94:3 119:9 147:1

**issues** 9:6 20:12 58:19 59:6 68:19 104:5,8,17,18 116:13 126:12,16 145:13,14,20

KIMBERLY COLE

February 13, 2017
Index: Jackson..lunch

**J**

**Jackson** 43:11, 13,15,19 44:23 47:5 48:2 58:3 127:3,5, 21 128:3,15,17 135:2

**Jared** 60:12,14, 19,20 61:8 62:2,9, 13,20 64:10 65:16, 21 68:12 137:23 138:1,16

**Jeremy** 131:19, 23 132:1,2 134:6

**job** 6:17 141:17

**Joe** 52:21 84:23 94:15 100:7 135:20, 22,23 151:18

**jog** 9:20

**joke** 118:18

**Joseph** 22:23

**journal** 40:22

**jump** 51:5

**jumped** 32:1

**K**

**Kathy** 137:15

**keeping** 111:18 119:10

**Kenney** 7:22 13:5 23:18 26:7,12, 14 30:17,24 45:21 49:8 51:2 52:13 83:3,5 84:25 94:16 99:21,25 108:17 117:16 129:24 130:13 133:2 135:9 140:12 142:12 143:20 149:6

**Kenny** 57:24,25 126:23 135:6,13,15

**key** 100:24

**keyboard** 100:22

**kids** 106:21

**Kim** 137:15

**Kimberly** 6:2,10 21:24 22:9 25:23 27:3 39:8,13 74:1 99:7 111:1 129:5 130:24

**kind** 15:17 16:1,7 20:18 24:17 28:24 30:22 51:24 55:9 69:5 70:17 75:19 84:22 85:4 90:22 96:25 111:20 139:13,23 146:9 150:1,12

**kinship** 81:2,3

**kitchen** 30:12,13, 15 31:11,14,16,23 36:12,15,21 47:11, 20 48:9,14,23 49:5, 16 50:18 56:1 80:20 95:11,14,21 106:4

**knew** 109:12 118:21 146:4,6

**knowledge** 14:6 48:21 71:18 96:2 126:9

**L**

**L-A-G-R-A-N-G-E** 32:19

**La** 32:18,24 34:4, 14,24 35:8

**label** 88:19 129:11

**labeled** 95:14 124:12,19

**labels** 28:4 83:1 84:21 98:13 103:4 143:11

**labor** 72:25 73:1

**labored** 73:1

**lack** 37:11 90:22 130:11

**laminate** 50:17

**laughed** 61:5 142:18

**laughing** 118:14, 15

**laundry** 51:20 52:3,9,19 54:2 80:10,13,14,15,24 135:11,19

**lawsuit** 8:6 9:7 24:7 25:4 39:25 84:6 88:8 110:13 116:24 124:23,25 125:3,8,9,15,17,20 140:11 147:9

**lawsuits** 110:14

**lawyer** 110:18

**layout** 51:25

**leak** 9:15 23:8 30:4,11,16,23 31:14,17 35:18,22 36:5,7 37:15 38:5 39:1,2 41:2,6,11,21 42:4,5 43:1,4,8,19 44:5 45:13,16,20 46:8,19,24 47:6,10, 14,23 48:9,24 49:5, 25 50:18 51:16,17 52:2,9,20 53:14 54:2,21 56:1,4,20 65:7 66:4,17 71:22 74:17,19 77:10,14, 16,24,25 90:8 92:8 94:7,21 95:5,8,20 96:12 97:2 102:19 104:19,20,24 107:21 109:8 110:1, 8 132:25 133:24 148:25 149:21

**leaked** 65:14,24 66:10 109:5

**leaking** 21:11 36:10 66:14,24 67:1 90:19 91:2,17,22 109:13 133:7 134:1, 4

**leaks** 22:20 23:4 28:25 29:21 39:19 40:14 41:22 54:19 58:13 59:12 66:1 68:17,21,24 69:6 70:2 71:12,15,17 83:15 89:22 91:15 95:6 96:11,14,17 97:11 104:15 106:9, 15 108:5 110:19 129:23 136:21 137:1 139:10 145:19 149:20

**leaky** 91:19 134:3

**learn** 20:14

**learned** 19:6 21:1 97:3,7 107:11

**leave** 106:18,24

**led** 110:12

**left** 73:24 77:1 97:12 136:18

**legal** 23:19 30:18 45:22 49:9 52:14 108:18 126:14 129:25 140:13

**letter** 24:6 25:1 97:19 123:15 124:11,15 125:22 128:1,3,5,10

**letterhead** 127:3

**letters** 15:4

**letting** 125:22

**level** 17:22 18:5,8, 16,17 19:1,2 31:11 116:14

**licensed** 12:20, 25

**life** 118:16 140:15, 19 142:10

**lifetime** 55:11 57:9 108:1

**lines** 65:13 126:11

**list** 40:18 42:22 46:13 68:17 95:5,6 127:8

**listed** 22:8,14,17, 19 24:14 42:4 47:10 65:15

**listing** 41:2

**live** 8:25

**lived** 107:3

**lives** 113:8

**living** 19:3 51:23

**LLC** 127:3

**loan** 150:17

**locally** 73:3

**location** 58:2 143:16

**locations** 40:14 58:1

**logo** 93:6

**long** 8:5,10 11:23 12:1 73:20 90:15,17 92:3 104:20 109:7 118:17 148:13

**longer** 33:1 125:6,9,20,23 148:1

**looked** 32:3 42:13 43:23 44:5,7 54:25 55:22 78:5 94:11 108:13 130:15,21 133:23 146:7

**losses** 141:3

**lost** 141:3,4

**lot** 31:1,5 64:8 70:14 72:18 77:5,23 107:1 133:2 140:8

**loud** 75:14

**louder** 6:20

**low** 105:8

**Lowe's** 87:22 88:11 103:9

**lunch** 119:21,23

KIMBERLY COLE

**M**

**machines** 77:2
106:21

**made** 16:4 35:9
59:9 73:9 77:5
105:6 109:24
115:16,22 118:11,
13 123:9 125:14
144:12

**main** 65:12 66:9,
18 70:2,25 71:3,11,
12 87:5

**maintained**
83:22 93:15 131:11

**make** 7:4,9,11,14
9:11 15:5,15 36:25
38:12,23 65:18
68:11 75:14 100:7,
8,12 114:2 133:20
142:25

**makes** 7:13

**making** 36:25
72:15 101:21
118:18 130:17
132:15 134:11,12

**malpractice**
6:23 8:6

**manner** 143:1

**manuals** 121:8

**manufacture**
15:10

**manufactured**
16:8 38:17 71:7

**manufacturer**
14:17 145:23

**manufactures**
15:14

**March** 29:18
35:14,16 39:3,4
40:8,9 41:22 42:3
43:1,9 45:13 46:19
47:3,11 48:24 49:3
50:8 51:16 54:19,21
56:1,4,20 58:12
62:15,16 66:1 70:2

108:5 123:8 128:16
129:23 131:18
133:23 134:5,18,22
135:7 140:2 141:8
145:19

**mark** 21:16 25:14
27:17 44:6,9 74:1
102:16,23 111:1
120:3 122:10

**marked** 21:18
25:16 27:21 39:8,11
74:3 79:11,13 82:5,
7 88:15,17 92:21,23
98:8,10 102:13
103:1 111:3 120:5
122:12 129:5,7
130:24 131:1

**marker** 90:1

**market** 151:14

**markings**
101:22

**marks** 90:1

**master** 41:15
42:9,15,20 43:1,9
45:14,16 46:3,20
48:14

**material** 14:7
21:5 69:5,15 71:7
87:12 145:9

**materials** 14:17
15:14 19:22 73:3,6
110:13 145:8

**matter** 118:14,15

**means** 7:24
132:11 135:25
136:15 138:22

**meant** 147:8

**medical** 131:21

**memory** 9:21
59:21 146:9

**Memphis** 75:13

**men** 89:8

**mention** 115:7

**mentioned**
56:24 57:2 84:4

146:15

**messed** 17:6
84:22

**metal** 16:4,6 69:9

**Metro** 76:20

**middle** 84:22

**mind** 140:18

**missed** 133:24

**misspoke** 137:6

**modified** 129:14

**moisture** 104:25
106:6,7

**mold** 104:5,8,12,
13,16,18,19 105:13,
14,19,23 135:11,19
136:1

**Mom** 31:20

**money** 50:13
72:14,16 73:1
118:17 142:7

**month** 32:22
104:24 148:21

**months** 8:7,9
39:24 107:22,23
149:24

**morning** 6:8
42:11 51:13 75:8
81:25

**move** 10:11 76:13

**moved** 10:1,2
33:11 75:8,9 76:5,
17 80:24 107:3
142:7

**moving** 76:7

**multiple** 83:24
114:11

**multiple-page**
103:4

**N**

**names** 22:5,14
53:4 58:23 89:8

116:16,18

**needed** 55:21
57:11 62:4 126:14
128:4,10,11 139:5
146:11,12

**negatively**
13:20 59:13

**nervous** 69:7

**Net** 85:22

**NIBCO** 9:13,14
14:16 15:4,13 16:9
25:24 28:19,20,23
29:3,14,19,21 38:5,
8,13,14,18,19 45:15
54:21,23 56:25
57:3,21 58:9 59:10,
16 60:15 61:1,8
62:8 65:5,16 67:3
68:14,19 69:12
71:10 82:20 84:4
86:25 87:2 100:5,9,
12,13 107:12,15
109:25 113:14
115:17 118:12
120:16 121:9,22
122:2 124:23
125:21 137:24
138:2 139:6 140:10,
19 145:25 146:4

**nicer** 62:3

**night** 96:24

**nights** 106:14

**nodding** 37:5
42:18 54:16 81:17
134:14

**noise** 77:6 105:6

**noises** 75:14

**normal** 37:12
55:2

**notation** 136:14

**note** 51:22 83:11
131:19,20 135:5,17
138:25

**notebook** 74:13

**noted** 52:22

**notes** 40:24
74:11,16 131:16
134:5,11 137:21
139:10

**notice** 21:23 22:2
149:22

**notices** 22:3

**November**
37:15 40:7,9 41:7,
21 46:24 49:24 66:4
74:21 77:9

**number** 21:18
25:16 27:11,21
39:11 45:20 59:21,
22,23,25 62:9 74:3
79:13 82:7 88:17
92:23 94:13 98:10
103:1 111:3 120:5
122:12 129:7 131:1
142:22

**numbering**
27:24

**numbers** 28:3
75:19 79:17 85:3
93:1

**nurse** 6:19,21
8:11,23

**O**

**oath** 51:9 81:22
119:25 144:2

**object** 7:23 13:5
23:18 30:17 49:8
52:13 108:17
129:24 140:12

**objection** 45:21
52:21

**objections**
25:24 30:24 130:13

**observation**
44:10

**observe** 16:12
20:18 47:19

**observed** 20:19
90:18

**obvious** 118:12, 13

**occasion** 106:9

**occasionally** 7:22 9:9 144:23

**occurred** 140:4

**October** 27:5 42:8 51:18 52:2,10, 19 68:17,18,22 139:9,11 141:9

**offer** 109:24

**offered** 65:11,15 109:4,6,19 110:2

**officially** 23:10 24:20

**one-man** 96:25

**online** 11:10,12 12:5 108:10,12 110:20 112:10

**open** 36:20,22 48:12 49:2

**opened** 97:23

**openings** 98:1

**opportunity** 16:12 141:5,17

**opposed** 151:1

**order** 12:15

**ordered** 11:12 12:5

**organized** 122:25

**original** 14:2 133:23

**originally** 17:14 96:6 123:21,24 151:14

**out-of-pocket** 141:21

**outcome** 124:25

**outlines** 86:17

**Outwardly** 130:21

**overhead** 133:10

**overlapped** 85:4

**overnight** 106:10

**owned** 11:15 59:6 144:20

**owns** 59:4

---

**P**

**P-E-X** 14:10 15:12

**package** 73:14, 18

**packages** 73:16

**packing** 107:1

**pages** 27:23 60:6 74:9 85:5,19 103:15,18,19 112:10,19 113:18 116:3,11 127:1 131:9

**paid** 47:8 49:17,22 54:10 70:23 130:10 141:10 150:22 151:4

**paper** 121:16

**Paragon** 82:22 93:7

**parents** 81:12

**part** 14:2 22:5,6 84:16 94:19,20 98:4 108:1 110:9,11 144:5 147:9

**parts** 109:13

**passed** 140:1

**Paul** 131:23 132:5 135:23

**pay** 19:19 47:5 49:18 54:4 55:18 129:20,21

**paying** 49:21

**pen** 44:7

**pencil** 138:10

**pending** 115:13 130:7

**people** 21:6,7 53:4,7 54:15 58:24 70:17 75:9 110:24 113:6 116:18 127:8, 15 132:6 142:5

**person** 22:19 60:3,16,20 61:1

**personal** 116:14 137:17

**personally** 69:2 116:12 118:19

**PEX** 13:25 14:4, 10,13,17 15:10,12 20:7,15,20,25 21:1, 5 38:15,17 58:9 69:11,12 107:15 111:7,17 116:23 117:10,22 120:16 122:2 126:24 145:8

**phase** 16:11,16 19:8

**phone** 59:17 61:9,11,24 78:11, 13,14,19,21,22 115:16 118:11,12 119:3 148:12

**phones** 78:14 144:13,19 145:3,5

**photo** 101:12 102:1,7,10,13 144:22

**photograph** 94:10 99:19

**photographs** 79:1,4,19,21,24 80:7 88:22 89:1,6, 10,16 92:25 93:19 95:14 98:12,16,19, 22,25 99:5 100:16 101:2,17

**photos** 82:5 89:12 93:2,25 94:2 102:16 144:17,18

**phrase** 37:12 67:4

**pick** 14:7

**picked** 11:9 21:7

**picking** 19:21

**picture** 91:1,6,8, 16 96:22 97:7 99:8, 16

**pictures** 82:12, 15,18 83:22 91:14, 18 96:8,22 97:21 99:11 144:24 149:16

**piece** 43:21 62:4 65:7,9,11,16 66:13, 18,21,23,25 109:6, 25 121:16

**pieces** 15:24 65:14,23 66:7,8 147:7

**pipe** 36:9 43:25 44:22 45:7 55:1,3,4, 25 56:2 57:24 58:1 62:5 65:14,16,24 66:7,18 79:4 89:19, 21 90:2,4,10,23 91:5 92:1,2,10 96:10 97:10,18 99:9 102:8,13,17 109:5,7 110:1,3 119:13 126:6,23 134:2 135:6,13,15 136:24 138:17 139:1,5 148:11

**pipes** 16:16 90:18 124:12,16,19

**piping** 14:20 15:24 20:23 69:16 96:3,5 111:7,17 126:12 136:23 137:9

**plaintiff** 25:7,23 110:12

**plane** 19:2

**plans** 11:8,12 12:5

**plastic** 16:4

**plumber** 12:20, 25 43:13,19 44:23 48:5,6,8 53:13 54:1 63:8 84:18 127:10, 11 134:19,23,24 135:2

**plumbers** 68:23

**plumbing** 9:6 12:9,11,19 13:19,25 14:4,10,13,17 15:18 19:10,24 20:4,12, 15,20 29:22 32:5 35:24 36:24 37:17, 20 43:11,14,19 44:23 47:5 48:2,20 57:18 58:18 59:6 70:14 71:1 72:17 84:15 85:11 86:11, 21 87:1,2,8,9 116:13 117:22 127:3,21,23 128:15, 17,21,24 129:21 136:7,16 137:4,8, 11,21 145:8,14 146:16 148:6 150:2

**point** 13:23 38:18 45:10,12,13 51:3 53:19 54:25 55:6, 12,20 57:4 58:12,16 64:1 71:20 79:7 87:5 107:2 118:14, 21 120:13 127:14, 23 128:12 139:22 146:16 148:10

**pointed** 43:23

**policies** 34:23

**policy** 33:2 34:5

**possession** 65:23 97:12

**Possibly** 89:7

**post** 114:5,14,15

**posts** 112:13 114:2

**potential** 23:14 24:1

**pouring** 42:14

**premium** 33:18, 21 34:4 73:18,23

KIMBERLY COLE

**premiums** 33:15 34:22

**prepare** 39:16

**prepared** 141:25

**present** 84:13

**pretty** 42:13 53:18 112:11 113:7

**previous** 20:5,11 41:6 69:16 93:5 101:7 102:16 120:24

**previously** 84:10

**primarily** 129:1

**print** 112:19 118:4,7

**printed** 111:15 112:24 113:20,24 115:10 116:2,11 117:13 118:9 119:7 120:18,24,25

**printing** 117:2 120:12 121:16

**printout** 112:10 114:22 115:22 116:22

**prior** 109:16

**privately** 81:6

**problem** 78:1 138:14 142:20

**problems** 110:24 113:4 114:9

**process** 53:25 62:5,6 64:3 80:25

**produce** 28:6

**produced** 28:7 40:21 73:5 120:11 122:15 129:10

**product** 38:15 57:6,7 65:5 108:24 122:6

**products** 38:6,8, 14 56:25 57:3,21 86:25 107:12 118:1

121:22

**program** 81:3

**project** 139:23

**promise** 25:6 69:18

**properties** 59:3, 5

**proposed** 87:19

**provide** 83:16 125:2 142:8 143:17

**provided** 26:21 83:14 93:8,13 125:22

**pulled** 65:12

**pump** 67:17

**purposes** 77:15 88:7 97:4

**pursue** 88:4,5 125:15 147:1

**pursued** 124:23

**put** 16:13,18 55:14 66:20 77:3 78:17 83:25 97:7 102:18, 22 103:22 111:13 114:16,17 119:16 130:12 132:12 143:6

**Q**

**question** 7:18, 20,23,24 8:1 23:21 26:5 27:11,19 30:2 38:10 52:16 60:18 68:8 91:12 93:18 105:13 110:17 130:2,5,7 139:18 150:14

**questions** 6:7 25:22 27:13 61:20 74:6 111:9 141:5 143:6,24 149:15 151:17

**quick** 142:24 143:2

**quit** 114:19

**R**

**Rachel** 51:2

**ran** 32:2 66:16 77:1 136:23,25

**range** 150:8

**reaction** 67:24 68:1,7

**read** 8:2 26:4 63:15 75:20 83:10 107:15 112:1 130:6 131:16,18,20 135:5 137:14,22 138:25

**reading** 121:1

**reads** 111:6

**ready** 25:21 26:2 27:15 51:15 74:6 131:4

**realized** 55:1

**reason** 118:10 146:18 148:16

**recall** 15:2 22:18 23:1,10 30:4 33:15 39:1 40:2 41:10,15 42:25 43:25 46:23 47:8,13 48:23 50:21 51:11 52:2 54:10 60:2,3,14,20 61:9 64:10 65:2 68:20 71:17 80:12 81:24 87:23 91:4,21,24 92:2,7,8,12 93:24 95:20 101:4,21 102:12 106:8,14 107:19,20 108:23 117:2 120:12,18 126:25 127:5 128:20 129:19 135:15 144:7,12 149:25

**Recap** 86:14

**receipts** 40:20 70:23 73:5

**received** 112:1 123:2 137:3

**receiving** 64:10, 14

**recent** 92:8 94:7 95:20 148:25

**recently** 8:8 94:21,22

**recirculation** 67:17

**recognize** 22:13 27:7 39:13 63:3 79:21 93:2,21 94:20 98:16 103:5 120:7 123:12,15 129:15

**recognized** 23:9

**recollect** 46:11

**recollection** 28:18 41:5 71:6,8 74:23 135:1

**recommendati on** 127:22

**recommended** 127:7

**record** 6:9 25:22 51:8 74:10 81:21 82:25 83:11 99:25 103:3 131:4 134:3,4, 6,8

**records** 148:3,5, 10,17

**red** 14:22 16:16 20:23 44:3 89:19 91:5 92:1 96:5

**redone** 87:5

**refer** 9:9 40:17 85:5 149:3

**reference** 76:19

**referring** 29:7 38:13,14

**refinance** 151:8

**refinancing** 88:9

**reflected** 29:5 62:19 64:12

**reflecting** 137:25

**refresh** 28:18 41:5 74:23 135:1

**refreshed** 146:9

**refused** 109:2

**registered** 6:19, 21 8:11,22

**regular** 144:23 145:5

**related** 24:6 27:18 35:18 41:25 42:1 46:24 57:17 74:16 84:5 95:8 105:15 110:13 123:7 137:21 139:10 151:2

**relevance** 119:19

**relevant** 19:20

**remember** 7:25 11:11 12:1 19:15 28:22 30:7 39:23 41:18 42:6 47:16 48:4 49:15 50:2 53:3,15,16 54:20 61:6 64:16,23,25 65:1 70:8,9,10 71:24 77:23 85:25 91:6 94:6,22 95:1 99:20 100:4 101:24 114:19 124:9 128:9 132:1 135:24 138:24 139:19 145:20 148:22 149:1

**remind** 74:24 95:7,19

**reminds** 7:2 149:11

**remodeling** 81:14

**remove** 104:15

**removed** 44:23 81:11 84:15 94:20 97:6,10 99:17 104:13

KIMBERLY COLE

February 13, 2017
Index: rental..sitting

**rental** 59:3,5

**renumbering** 64:3

**repair** 37:13 43:16 47:5 53:11 54:4,6,15 74:24 75:3,5 98:4

**repaired** 52:25 53:2 55:25 78:4 85:12

**repairing** 78:5 86:10

**repairs** 46:8,10, 14 48:11 49:24,25 50:8,9,12,13,21 72:16,22 77:10 85:11 87:19 88:12 97:24 105:15 106:1 127:23 128:14,16, 17,21 129:21 130:10 132:6

**repeat** 130:4

**rephrase** 8:3

**replace** 55:19 71:1 86:24,25 137:8 145:8

**replaced** 46:15 50:19 65:13 70:3 71:5 84:18 85:12 92:18 100:10

**replacement** 70:7,25 71:11

**replacing** 86:11 87:9 136:11

**replied** 64:16 97:20

**replumb** 86:24 88:12 104:2

**replumbing** 87:14 145:7

**reply** 64:17,20

**report** 35:10 85:5

**reporter** 7:13 8:2 130:6

**represent** 22:1 24:4,20 79:15

**representative** 23:14,15 24:1

**representatives** 124:14

**represented** 119:15 148:1

**representing** 9:13 14:16 125:5

**request** 56:15

**required** 108:23

**resay** 125:13

**research** 23:5 110:11,19 112:22

**researching** 23:3 28:20

**residence** 20:11

**residential** 13:3

**respond** 147:15

**response** 7:2,9 29:2,8 64:14

**Responses** 25:24

**restoration** 53:6 132:8

**result** 46:8,19 61:7 141:22

**retained** 147:14, 19

**retention** 25:1

**returned** 126:3

**review** 27:12

**reviewing** 111:11

**reviews** 21:22 26:1 27:14 28:16 39:14 74:7 79:20 82:10 88:21 91:11 93:3 98:14 103:7 111:10 120:9 122:19 123:13 129:17 131:6

**right-hand** 63:7

**risen** 33:18

**roaring** 106:21

**robbed** 142:17

**Roger** 11:17

**role** 23:14,17,25 24:3

**room** 51:20,23 52:3,9,20 54:2 78:3, 7 80:10,13,14,15,24 81:13

**rooms** 48:17 78:1

**roughly** 10:21 47:15

**round-about** 40:6

**rude** 61:4

**run** 10:6 44:12 78:1 132:21

**running** 19:17

**runs** 48:20

**rural** 64:7

**Rytech** 75:13 76:20

**S**

**SAITH** 151:21

**salesman** 126:19 146:7

**sat** 72:21

**satisfied** 108:15

**Sauder** 22:23 24:13

**Sauder's** 22:24 23:2

**saved** 118:17 142:8

**savings** 141:7

**school** 8:14

**scope** 103:25

**screaming** 31:20

**section** 55:25 56:2 110:6,7

**seeking** 137:7 140:10

**segment** 115:20

**send** 24:18 56:15 62:4 64:20,24 65:10 78:10 108:24 115:2, 6 126:6 138:17 139:1,5

**sending** 65:3 124:10,11

**sense** 7:11 9:11 15:15

**sentence** 126:1

**separate** 116:4,7 133:14 134:1

**separated** 111:19

**September** 85:15 95:12,21 96:12 141:9 149:7, 9,20

**series** 79:19 92:25 98:12 111:5

**served** 147:10

**serves** 59:21

**service** 53:6 59:22,25

**Services** 81:4,7 84:23 85:7,9 86:2 87:13 104:1

**set** 17:4 25:25 77:2 82:3 91:8 111:13 122:14 128:25 129:9 131:8 143:2

**settings** 17:3,7, 12

**seven-year** 35:3

**shaking** 13:20 59:13

**Sharkbite** 69:18 71:7,8

**Sheetrock** 53:12 54:13 104:13,15

**Sheetrocked** 16:17

**shock** 32:3

**shop** 32:11

**short** 51:6 81:19 143:3

**show** 44:7 50:4 82:4 96:25 100:5 104:20,25 113:1 114:22 121:11,13 142:25

**showed** 43:20, 21,22 44:5 147:4

**showerhead** 41:14 71:21

**showing** 89:19 113:3,5

**shows** 92:19

**shut** 32:10

**siblings** 81:5,8

**side** 36:7 48:24,25 52:6,7,8 80:21,22 95:10,11,21,24,25 96:3,11

**sign** 24:5,15,18, 19,22

**signature** 27:3,7

**signatures** 27:1

**signifies** 28:7

**similar** 116:10,13

**sink** 30:15 31:15, 16 36:12,15,21 95:11,21

**sit** 142:1 149:19

**site** 23:3

**sites** 114:12

**sitting** 76:15

**situation** 120:21 150:23 151:2

**slab** 77:2

**slap** 142:21

**slow** 104:23

**small** 90:21

**Smith** 83:20 84:8, 10 93:13 98:24

**son** 31:18,19

**Sony** 145:4

**sort** 6:22 14:24 24:5,15 25:6 48:5 64:3 90:20 105:15 120:16

**sound** 83:16

**space** 18:20

**speak** 126:19 142:14

**speaking** 60:14 103:10

**specific** 9:18 23:12 38:8 58:5 72:19 107:5,7

**specifically** 29:19 38:14 45:15 94:10 105:15 145:15

**spell** 70:18

**spent** 72:14,16 73:1 106:14 151:5

**split** 42:23 43:16 44:10,12 90:16,17, 20 110:9

**splits** 114:9

**spoke** 60:2,3,16, 19,20 61:22,24 62:1 131:19,23 137:23 138:2

**spot** 133:8,16,23 134:4

**spots** 42:10 134:3

**spray** 105:16,18 106:1,6 133:10

**sprayed** 105:17

**spring** 70:1

**square** 10:21,22

**squishy** 42:12,13

**stamp** 14:25

**standing** 76:8

**stapled** 119:17

**start** 39:5 55:16 77:12 89:15 104:18 112:13 119:10 125:16

**started** 9:24 21:11 28:20,24 29:15 32:12 55:20 61:16 75:10 76:7,17 115:15 118:10 140:16,22 144:8 146:12 148:19

**starting** 68:18,22 111:5 115:19 116:3

**starts** 26:15 122:16 126:1

**state** 6:8 25:22

**stay** 107:4

**STEPHENS** 6:7 13:8 21:15,19 23:23 25:13,17 26:10,19 27:22 30:21 31:2 39:8,12 46:1 49:11 51:4,7 52:18,21,24 73:25 74:4 79:10,14 81:20 82:3,8 83:4,6, 8 85:2 88:14,18 92:20,24 94:15,18 98:7,11 99:23 100:1 102:22 103:2 108:22 110:25 111:4 117:18,20 119:20,22 120:2,6 122:9,13 129:4,8 130:4,9,16,23 131:2 133:19 135:12 140:17 142:14,24 143:4,22,23 149:8 151:16

**stick** 106:5

**stood** 32:2

**stop** 87:4 146:20

**stopped** 51:15 72:15 146:15

**stories** 17:20

**stretch** 109:6,7

**stretchy** 109:7

**stuck** 114:23 119:14

**study** 8:16 10:25

**stuff** 39:4 40:19 50:15 53:12 55:10 61:14 75:8 76:10, 14,17 105:18 106:5 107:1 111:18 119:6, 18 137:22 146:16

**stupid** 68:8

**subcontract** 70:16

**subcontractor** 12:8

**submit** 149:14

**submitted** 46:13 79:7 124:17 139:20 143:9 144:5 147:23

**subpoena** 147:10

**Subsequent** 146:14

**sucking** 32:12 75:10 76:17,23

**suggested** 145:22

**suggestion** 67:25

**suit** 6:23

**sun** 148:10

**suppose** 26:2

**supposed** 26:4 55:9 57:9 121:20 122:6

**switched** 35:8

**sworn** 6:4

**system** 111:20 121:14,18

---

**T**

**T.R.** 126:19 135:6, 13,15

**takes** 104:20

**taking** 77:12

**talk** 7:5 13:18 42:3 51:16 105:19 121:7, 15 126:23 137:11 147:12

**talked** 19:13 77:24 113:14 121:13,15 126:15 143:8 145:12

**talking** 9:11 15:6 35:18 56:3 78:23 94:4 116:5,19 135:15

**tank** 61:2,3,13 67:4,8,15,24 68:3 138:18,19

**team** 140:7

**technically** 18:25

**technology** 78:17 84:1

**telephone** 61:5

**telling** 31:20 122:5 132:21

**temperature** 17:4

**Tennessee** 9:2 10:9 58:1,3 81:5

**term** 15:12 69:17 75:6 90:23 130:11

**terms** 24:10 25:2 107:17 108:15

**test** 83:11

**tested** 105:23

**testified** 6:4 109:4 128:20 129:19

**testimony** 30:18 45:22 49:9 52:14 129:25 140:13 147:8

**testing** 138:17 139:1

**that'd** 107:21

**therapy** 137:19

**thing** 7:8,17 15:7 48:1 64:4 69:23 75:16 76:24 77:8 115:21 116:22 134:18 137:17 139:14

**things** 7:3 9:20 16:6 46:15 54:13 61:4 74:14 75:12,14 77:5 97:8 112:21 113:5 120:23 141:2, 22

**thinking** 61:17 139:18

**thought** 38:2 68:7,8 87:4 91:14 146:20

**thread** 115:22 116:2

**three-page** 28:2

**thumb** 83:17

**time** 6:17 7:5,23 12:24 20:25 26:11 27:12 29:3,9,14,18 32:16 35:8 37:15 38:4,19,23 46:23 47:18 50:11 51:5 53:22 62:1,9 65:8, 11,20 66:10,17 67:4 75:12 77:22 78:9 80:4 81:15 82:9 88:6 91:25 92:1,3 94:23 97:1,5,19 98:12 104:19 105:1 107:6,7,25 108:13 109:9,16,19,24 113:15 114:5,20

115:13 116:9 117:6, 25 118:10,17 120:25 128:12 133:5 139:4 140:21 145:25 146:5 147:3, 21 148:8 151:17

**timeline** 132:22

**times** 42:7 65:15 91:23 92:2

**tiny** 104:14,21

**title** 39:19 117:22

**today** 7:17 9:9 14:16 38:13,23 105:4 125:8,18 129:19 141:18 143:19 145:12 151:17,18

**told** 32:10 55:13 57:6,8 59:2 62:3,4, 12 65:10,16 66:4,6, 18 73:11 108:3 128:4,11 133:9 138:16,18 146:5,6, 11 148:12

**tons** 104:25

**top** 22:5 28:14 30:6 39:19 63:6 75:23 85:7 96:16 111:23 123:1

**total** 85:20,25 103:20

**totally** 118:22 133:18

**totals** 103:16

**town** 32:1 76:6

**track** 28:5 40:13 119:10 139:14

**treated** 119:3

**trend** 149:23

**true** 115:25

**truth** 65:1

**tube** 15:3 44:12, 13,18,20

**tubing** 14:19 15:10,13 38:17 58:9

71:17

**turn** 27:10 67:20 84:21 89:9 101:25 123:11 127:1

**turned** 54:8 77:17 79:16

**turning** 53:20

**Two-and-a-half** 11:4

**two-page** 116:22 117:13

**type** 15:13 20:4 38:15 39:22 69:15 71:9 87:12 88:12 91:21 123:22 127:25 149:11

**typed** 40:2 111:17 122:22 123:21

**typed-up** 39:18 42:22

**types** 46:10

**typically** 13:2,4, 14

**U**

**uh-huh** 6:24 7:10 28:9 40:23 43:14 46:4 60:8 63:10 77:8 85:16 86:1 100:17,21 102:21 106:11 110:8 112:12,15 113:21 117:3 118:6 120:20 121:4 122:20 123:18 132:4 135:14 136:8 138:15 139:3

**uh-uh** 7:10 64:22 67:16 77:11

**understand** 7:18,20,25 9:10 13:10,23,24 14:9,18 15:9 16:22 19:4 20:25 21:4,8 23:25 25:9 28:10 34:20 38:16,24 51:9 65:18

69:24 73:17 77:7 81:22 108:19 109:3 110:16 115:9 119:24 127:20 132:10 133:21 141:14,16,19 144:1 146:24 147:25 150:14

**understanding** 10:12,17 12:4 14:9, 15 15:20 23:13,17 24:2 35:11 57:25 58:8 70:24 73:15,23 107:17

**understood** 139:4

**unrelated** 137:17

**upset** 55:13 57:12 61:11 105:21

**upstairs** 18:14 42:15 107:3,4

**V**

**vacs** 32:11 75:11

**vacuum-type** 76:24

**verbal** 7:9

**verification** 26:25

**video** 40:3 72:4,6, 8 77:9,14,16,17,18 78:15 92:12 95:2 96:9 144:14

**videoed** 77:13,25

**videos** 40:3,6,18 72:9 77:12 78:11 97:22 142:25 143:9, 11,15,25 144:4 149:16 151:19

**visited** 84:11

**W**

**Wait** 18:2 132:19

**waiting** 88:4

**wall** 36:16,18,20 80:22,23

**walls** 20:20 31:9 52:23 97:23 98:2 104:22 105:11 136:23,24

**wanted** 10:16 22:4 24:1 39:5 65:6 66:21,23 76:11,15 82:1 126:6

**warranty** 55:11, 12 57:8,9,15,17 59:20,22 60:25 107:11,15,18,24 108:1,10,16,23 117:15 121:1 139:2, 5 142:19 146:6 147:1

**wasting** 62:1

**water** 16:20,22,25 17:3,7,13,16,25 18:23,25 26:12 31:21,22 32:10,12 36:7 42:19,23 43:16 46:2 47:19 48:24,25 49:1 52:7 53:25 65:13 66:9,15 67:20,21 71:1,3,12 72:2 75:4,5,11,16 76:8,18,23,25 87:6, 10 90:12 92:9,14,15 96:5,12 104:14 133:8

**website** 111:7,16

**wet** 75:11 133:9, 16,23

**white** 44:6 90:15 96:6,9,10

**whomever** 105:25

**Williams** 136:7, 16 137:4,8,11

**woke** 31:18 42:11 43:3

**word** 81:1

**words** 123:2

**work** 6:16 12:22 72:24 74:24 75:3,5 76:3 86:4,18 98:4 104:1 113:2,25 131:25 132:8,11 140:18

**worked** 12:18 70:12,13 142:9

**working** 151:18

**worried** 133:6

**worth** 31:7 151:9

**writing** 74:14

**written** 124:1 128:7 148:22

**wrong** 17:16 21:12 55:1,6 57:11 58:16 69:23 83:6 108:8 118:21 119:12,13 134:2 138:20 146:21 147:2

**wrote** 128:3 139:19 150:21

**Y**

**y'all** 133:11

**year** 8:14,19 9:23 30:7,9 32:23 33:4, 16,19 35:21 94:23 141:11

**years** 8:12 11:25 23:6 70:14 78:16 107:20,22 114:19 121:23 142:8 144:13 146:10 148:2

**Z**

**Z-U-R-N** 117:7

**Zurn** 116:23 117:6,10,22 118:1