# EXHIBIT 28

JAMES MEDDERS                                    November 16, 2016

1                   UNITED STATES DISTRICT COURT
                       DISTRICT OF NEW JERSEY
2
    KIMBERLY COLE, ALAN COLE,     §   CIVIL ACTION
3   JAMES MONICA, LINDA BOYD,     §
    MICHAEL McMAHON, RAY          §   NO. 13-cv-07871-FLW-TJB
4   SMINKEY, JAMES MEDDERS,       §
    JUDY MEDDERS, ROBERT          §
5   PEPERNO, SARAH PEPERNO and    §
    KELLY McCOY, on behalf of     §
6   themselves and all others     §
    similarly situated,           §
7                                 §
         Plaintiffs,              §
8                                 §
    VS.                           §
9                                 §
    NIBCO, INC.,                  §
10                                §
         Defendant.               §
11

12  ------------------------------------------------------------

13                    ORAL DEPOSITION OF

14                       JAMES MEDDERS

15                     NOVEMBER 16, 2016

16                      VOLUME 1 OF 1

17  ------------------------------------------------------------

18

19          ORAL DEPOSITION OF JAMES MEDDERS, produced as a

20  witness at the instance of the Defendant and duly sworn,

21  was taken in the above-styled and numbered cause on the

22  16th day of November, 2016, from 7:58 a.m. to 10:22 a.m.

23  before Terri L. Edwards, Certified Shorthand Reporter in

24  and for the State of Texas, reported by machine shorthand

25  at Hampton Inn & Suites, 910 South Harbin Drive,

JAMES MEDDERS                                    November 16, 2016

---

**Page 2**

```
 1   Stephenville, Texas, pursuant to the Federal Rules of Civil
 2   Procedure and the provisions stated on the record or
 3   attached hereto.
 4
 5
 6                    A P P E A R A N C E S
 7   FOR THE PLAINTIFFS:
         MR. KYLE E. SHAMBERG
 8       LITE DePALMA GREENBERG LLC
         211 West Wacker Drive
 9       Suite 500
         Chicago, Illinois 60606
10       Telephone: 312.750.1265
         Email: kshamberg@litedepalma.com
11
     FOR THE DEFENDANT:
12       MS. RACHEL E. STEPHENS
         LATHROP & GAGE LLP
13       2345 Grand Boulevard
         Suite 2200
14       Kansas City, Missouri 64108-2618
         Telephone: 816.292.2000
15       Fax: 816.292.2001
         Email: rstephens@lathropgage.com
16
     ALSO PRESENT:
17       Judy Medders
18
19
20
21
22
23
24
25
```

---

**Page 3**

```
 1                        INDEX
 2                                                       Page
 3   Appearances ......................................     2
 4   JAMES MEDDERS
         Examination by Ms. Stephens .................     5
 5       Examination by Mr. Shamberg .................   100
         Further Examination by Ms. Stephens .........   101
 6
     Changes and Signature ...........................   107
 7
     Court Reporter's Certificate ....................   109
 8
 9
10                      EXHIBITS
11   NO.  IDENTIFICATION
12    1   Defendant's Amended Notice ..................     8
      2   Second Amended Class Action Complaint .......    13
13    3   ASAP Plumbing, L.L.C. Invoice ...............    32
      4   Plaintiffs James and Judy Medders' Objections
14        and Responses to Defendant's NIBCO Inc.'s First
          Set of Interrogatories ......................    34
15    5   J & S Enterprises Estimate ..................    37
      6   02-11-2014 Letter from Debbie Parker ........    39
16    7   Structural Damage Claim Policy ..............    41
      8   06-09-2014 Letter from Debbie Parker ........    64
17    9   06-11-2014 Letter from Debbie Parker ........    65
     10   07-09-2014 Letter from Beverly Turk .........    68
18   11   Photographs .................................    75
     12   Photographs .................................    77
19   13   Handwritten Notes ...........................    94
20
21
22
23
24
25
```

---

**Page 4**

```
 1          THE REPORTER:  This is the Oral Deposition
 2   of James Medders.  Today is November 16, 2016.  My name is
 3   Terri Edwards with U.S. Legal Support, 5910 North Central
 4   Expressway, Suite 100, Dallas, Texas.  And today we are at
 5   the Hampton Inn & Suites, 910 South Harbin Drive in
 6   Stephenville, Texas.  The time now is 7:58 a.m.  And will
 7   Counsel please introduce themselves for the record?  And,
 8   also, everyone in the room, if you'll please state your
 9   name.
10          MS. STEPHENS:  Okay.  Rachel Stephens with
11   Lathrop & Gage.  I am counsel for Defendant NIBCO.
12          MR. SHAMBERG:  Kyle Shamberg of Lite DePalma
13   Greenberg, LLC.  I'm counsel for the Plaintiffs in the
14   putative class in this case.
15          MS. MEDDERS:  Judy Medders.
16          THE WITNESS:  James Medders.
17          THE REPORTER:  And now, Mr. Medders, I'll
18   need to place you under oath --
19          THE WITNESS:  Okay.
20          THE REPORTER:  -- if you'll please raise
21   your right hand.  Do you solemnly swear or affirm that the
22   testimony you give will be the truth, the whole truth, and
23   nothing but the truth?
24          THE WITNESS:  I do.
25          THE REPORTER:  Thank you.
```

---

**Page 5**

```
 1                    JAMES MEDDERS,
 2   having been first duly sworn, testified as follows:
 3                     EXAMINATION
 4   BY MS. STEPHENS:
 5      Q   Good morning, Mr. Medders.
 6      A   Good morning.
 7      Q   Now, the court reporter just read you the oath.
 8   Do you understand that today's deposition is as if you're
 9   sitting in a courtroom testifying in front of a jury?
10      A   Yes.
11      Q   Okay.  And so, according to that oath, you're
12   supposed to give truthful and complete answers today.  Do
13   you understand that?
14      A   Yes.
15      Q   Okay.  Now, have you ever taken a deposition
16   before or had your deposition --
17      A   No.
18      Q   Okay.  Let's go over one quick thing.  It's
19   important for the court reporter and for the record being
20   taken that you and I try to talk one at a time.  So if you
21   will wait until I finish my question, I will also wait for
22   you to finish your answer --
23      A   Okay.
24      Q   -- before proceeding.  Just like that.  Just wait
25   until I'm done and then respond.  It really helps Terri out
```

---

JAMES MEDDERS                                    November 16, 2016

Page 6

1  today so that we can get an accurate record that's very
2  clear for everybody.  Other things to keep in mind is that
3  Terri's taking down the words that we say.  She's not
4  taking down the gestures that we make so please don't nod
5  your head or shake your head in response to a question.
6  Please give oral answers.  And at certain times I might
7  remind you and say, "Is that a 'yes?'"  And I don't want
8  you to be offended by that.  I want to just make the record
9  clear.  Is that fair?
10     A   Yes.
11     Q   Okay.  Another thing is if I ask you any
12 questions today you don't understand my question,
13 please tell me that, and I'll try to ask it a better way or
14 get you to understand my question because I want -- again,
15 I want you to understand my questions, and I want you to be
16 able to give responses.  Is that fair?
17     A   Okay.
18     Q   Are you taking any medications or do you have
19 anything going on in your life right now that will prevent
20 you from giving full and complete responses today?
21     A   No.
22     Q   What did you do to prepare for today's
23 deposition?
24     A   Visited with my lawyer.
25     Q   Okay.  Is that Mr. Shamberg next to you?

Page 7

1      A   Yes, it is.
2      Q   Okay.  Did you look at any documents with him?
3      A   Yes, I did.
4      Q   Okay.  Generally can you describe what documents
5  you looked at?
6      A   Just the depo -- just the written reports that we
7  had given our lawyer.
8      Q   Okay.  Did you discuss today's deposition with
9  anyone else?
10     A   No.
11     Q   Did you talk to your wife, Judy, about it?
12     A   Well, yes, we talked about it.  My wife and I
13 did.
14     Q   Okay.  What did you and Judy talk about?
15     A   Just general things about the deposition.
16     Q   Okay.  What do you mean "general things"?
17     A   About being nervous about doing it and trying to
18 give exact answers and not remembering things in the past.
19     Q   Okay.  Did you talk to your kids about it or
20 anybody else?
21     A   No.
22     Q   Okay.  What about Steve Forbus?  Did you talk to
23 him prior to your deposition?
24     A   No.
25     Q   I'm going to show you what I'm going to have

Page 8

1  marked Exhibit 1.  Let me know if you've seen this document
2  before.
3              (Exhibit No. 1 marked)
4      A   No, I have not.
5      Q   Okay.  Well, just for the record, this is
6  Defendant's Amended Notice of Deposition of James Medders.
7  And just for your information, Mr. Medders, this is just a
8  notice that I sent to your attorney to bring you here today
9  for your deposition.  Okay?
10     A   (Moving head up and down)
11     Q   Do you understand that?
12     A   Yes, I do.
13     Q   Okay.  And we're sitting here today on
14 November 16th at 8:00 a.m. taking your deposition.
15     A   Yes.
16     Q   Now, if you look at the top -- we call this the
17 caption -- and you see a bunch of names listed on the top
18 left-hand corner?  Do you see those names?
19     A   Yes.
20     Q   Do you know -- other than Judy Medders, who I
21 presume that you know quite well, do you know any of the
22 other plaintiffs in this case personally?
23     A   I don't know one personally.  I know the name.
24     Q   Okay.  What name is that?
25     A   No.  No, that's -- Linda Boyd, I think, but I --

Page 9

1  No, I'm not going to say that I know any of them.  I don't
2  know any of them but my wife.
3      Q   Okay.  And you see listed down below there it
4  says "NIBCO, Inc.," and you understand that NIBCO is the
5  defendant in this case?
6      A   Yes.
7      Q   Okay.  When is the first time you had ever heard
8  of NIBCO as a company?
9      A   When I talked to my plumber.
10     Q   When you talked to what plumber?
11     A   ASAP Plumbing.
12     Q   Is that Steve Forbus?
13     A   That is Steve Forbes [sic].  He's the owner.
14     Q   Steve Forbes.  Okay.
15     A   Forbes, uh-huh.
16     Q   And when did you talk to Mr. Forbes about NIBCO?
17     A   When I had my first leak.
18     Q   Okay.  So prior to the first leak in your home,
19 you had never heard of NIBCO before?
20     A   Never.
21     Q   Okay.  Now, you understand that this lawsuit is
22 about PEX products?  Does that make sense to you?
23     A   Yes, it does.
24     Q   Okay.  And do you understand that PEX is a type
25 of material that is used to make tubing for plumbing?

JAMES MEDDERS                                              November 16, 2016

Page 10

1    A    Yes.
2    Q    And that there are also fittings that attach
3  pieces of plumbing together in a plumbing system?  Do you
4  understand that as well?
5    A    Yes.
6    Q    Okay.  Now, I'll try to be consistent.  I usually
7  use the term "tubing," but I also might use the term
8  "piping."  But, again, I -- just to be clear, those are
9  both types of -- tubing and piping are the same thing.  Is
10 that fair?
11   A    Yes.
12   Q    Okay.  And you understand that you're a putative
13 class representative in this lawsuit?
14   A    Yes.
15   Q    Do you understand what that means?
16   A    Yes.
17   Q    And what does that mean to you?
18   A    That means that I am here to try to get punitive
19 damages and damages for my home and I'm representing other
20 people.
21   Q    Okay.  And how did you become involved in this
22 particular lawsuit?
23   A    We -- I contacted NIBCO.  They refused to talk to
24 me, so we got on the internet and started finding
25 someone -- or an attorney.  We started looking for an

Page 11

1  attorney.
2    Q    Okay.  And what attorney did you find -- end up
3  finding an attorney?
4    A    I don't remember the -- yes, we did, and I don't
5  remember their name.
6    Q    Okay.  And who would know that information?
7    A    My wife knows that information.  I think she
8  remembers that, but I'm not positive.
9    Q    Okay.  Well, I'll ask her that.  And is that --
10 the attorney that you ended up contacting, is that the same
11 attorney that is sitting next to you today?
12   A    No, it's not.
13   Q    It's a different law firm --
14   A    Yes.
15   Q    -- altogether?
16   A    Yes, it is.
17   Q    Is it a law firm here in Texas?
18   A    No, it's not, not to my knowledge.
19   Q    Okay.  Now, as a part of this lawsuit and your
20 engagement with counsel, did you sign some sort of
21 engagement letter or retention agreement?
22   A    With counsel, yes.
23   Q    Okay.  Does that agreement entitle you any sort
24 of bonus or award based on the outcome of the lawsuit?
25   A    I don't know the answer to that.

Page 12

1    Q    Okay.  Who might know the answer to that?
2    A    I'm not sure.
3    Q    Okay.  I want to be clear.  I should have
4  clarified this at the beginning of the deposition, but my
5  intent today is to never ask you about conversations you
6  have with your lawyers.  Okay?
7    A    Uh-huh.
8    Q    There is certain information that I believe I'm
9  entitled to, and if Kyle disagrees with me, he will object
10 accordingly.  But if you believe that the only source of
11 certain information is a conversation with your attorney,
12 please just say that.  And if I have follow-up questions,
13 I'll make that clear.  Is that okay?
14   A    Okay.
15   Q    Okay.  Now, what have you, as a class
16 representative in this lawsuit, done as far as -- Let me
17 start again.  As a class representative, as a Plaintiff in
18 this lawsuit, what have you done as far as -- have you
19 reviewed any materials that have been filed?
20   A    Not to my knowledge.
21   Q    Okay.  Did you review the complaint that was
22 filed in this case before it was filed?
23   A    Yes.
24   Q    Okay.
25   A    Well, no.  Well, I'm sorry.  I'm not going to say

Page 13

1  that I reviewed it before it was filed.  I don't remember
2  that.
3    Q    Okay.  You did provide information to the lawyers
4  before they filed the complaint, I assume.
5    A    To the best of my knowledge, we did.
6    Q    Okay.  What about -- we have a thing in lawsuits
7  called discovery, and there were some questions that were
8  asked of you and your wife.  Did you help provide responses
9  to those?
10   A    We did provide -- provide responses to questions.
11   Q    Okay.  And did you suggest any changes to those
12 that were written, or did you just provide the information
13 and leave it at that?
14   A    I just provided the information.
15   Q    Okay.  I'm going to hand you what we'll mark
16 Exhibit 2.  It's the complaint.
17        Do you want another copy?
18        (Exhibit No. 2 marked)
19        Do you recognize this document at all?  And
20 I'll represent to you, sir, that this was filed by your
21 attorneys in this lawsuit.  It's called the Second Amended
22 Class Action Complaint.  Have you seen this before?
23   A    I don't remember seeing this exact piece of
24 paper.
25   Q    Okay.  What about a previous version of the

JAMES MEDDERS                                            November 16, 2016

Page 14

1    complaint?  Did you see that?
2         A    I did see that.
3         Q    Okay.  Well, again, like Exhibit 1, this has a
4    caption at the top, and you're listed as one of Plaintiffs.
5    Is that correct?
6         A    Yes.
7         Q    Okay.  Now, just so we're clear, if you turn the
8    page and if you'll look at paragraph one, paragraph one has
9    some terms.  And I think we're going to use the same terms
10   today to the best of our ability just to make sure we're
11   clear about what we're talking about.  Now, it says, "This
12   case concerns cross-linked polyethylene plumbing tubes,"
13   and it says, "(herein 'PEX Tubing')."  Do you understand
14   the PEX tubing is something that's at issue in this
15   lawsuit?
16        A    Yes.
17        Q    Okay.  And then it says, "The brass fittings
18   required to connect the PEX tubing together," and it says,
19   "(herein 'PEX Fittings')."  Do you understand that PEX
20   fittings may be at issue in this lawsuit?
21        A    Yes.
22        Q    Okay.  And then it says, "The stainless steel
23   clamps (herein 'PEX Clamps') required for joining the PEX
24   tubing and fittings."  Do you see that?
25        A    Yes.

Page 15

1         Q    Do you believe that stainless steel clamps are at
2    issue in this lawsuit?
3         A    I don't think so.
4         Q    Okay.  What of those products that we just listed
5    were installed in your home at one time?
6         A    The tubing and the fittings and the clamps.
7         Q    Okay.  Do you know what brand those tubings,
8    fittings, and clamps were?
9         A    They had the name on them of "NIBCO."
10        Q    Okay.  And is your information based on seeing
11   the products themselves or what someone else told you?
12        A    Looking at them myself.
13        Q    Okay.  And this says here "brass fittings
14   required to connect the tubing together."  Do you know what
15   kind of brass fittings they were?  What material they were
16   made of?
17        A    No, I don't, other than they call it "brass."
18        Q    Okay.  So if I asked you if it was yellow brass
19   or DZR brass fittings, that wouldn't mean anything to you?
20        A    I would not know the difference.
21        Q    Okay.  Who selected the PEX products for the
22   plumbing in your home?
23        A    My plumber did, ASAP.
24        Q    Okay.  I think we'll refer to it as "ASAP."
25        A    Okay.

Page 16

1         Q    And we're talking to Mr. Forbes later today.
2    Okay?
3         A    Okay.
4         Q    Well, let's back up and talk about the home that
5    we're discussing today.  What year was your house built?
6         A    It was started in 2011, finished in 2012.
7         Q    Okay.  And were you involved in the construction
8    of the home?  I mean, did you help plan out the home and
9    hire the builders and things like that?
10        A    Yes.
11             MR. SHAMBERG:  Objection, form.
12             THE WITNESS:  I'm sorry?
13             MR. SHAMBERG:  That's okay.  I just made an
14   objection.
15             THE WITNESS:  Oh, okay.
16             MR. SHAMBERG:  You can go ahead and answer.
17             THE WITNESS:  I'm answering too soon.  I'm
18   sorry.  I'll wait.
19        Q    (BY MS. STEPHENS)  Okay.  So you hired a
20   contractor to help you design and build the house; is that
21   correct?
22        A    No.
23        Q    Okay.  Well, can you explain to me how your house
24   came to be built as far as the plan?
25        A    I designed the house, and I built most of it.  I

Page 17

1    subbed out plumbing and other things.
2         Q    So you were kind of the general contractor for
3    your house?
4         A    I was.
5         Q    So what's your background?  Do you have a
6    construction background?
7         A    I was in the construction business for several
8    years.
9         Q    Okay.  And can you elaborate on that?  Like, do
10   you have, like, a business related to that or --
11        A    In years past I did.
12        Q    Okay.  Well, let's back up.  What year did you
13   graduate from high school?
14        A    I have a GED.
15        Q    Okay.  Wonderful.  And what year did you obtain
16   that?
17        A    I don't remember.
18        Q    Okay.  And then what's kind of your work
19   background?  What did you do, you know, in your twenties,
20   for instance?
21        A    I was -- have been a machinist.  I've been a
22   rancher.  I've been a carpenter.  I've owned a barbecue
23   business.  And I was in the utility business.
24        Q    Wonderful.  And what kind of ranching did you do?
25        A    Just general ranching.

JAMES MEDDERS                                      November 16, 2016

Page 18

1     Q    Okay.
2     A    Just born and raised on a ranch.
3     Q    Wonderful.  How did you come to have your
4  carpentry background?  Did you just learn on the job, or
5  did you teach yourself?
6     A    I helped -- I worked for my grandfather when I
7  was younger.
8     Q    Okay.  Did you ever have any professional
9  licenses related to a construction business or carpentry or
10 anything like that?
11    A    No.
12    Q    So you're generally self-taught.  Is that a good
13 description?
14    A    Yes.
15    Q    Okay.  Learning from your grandfather and then
16 teaching yourself as you go; is that right?
17    A    Yes.
18    Q    Okay.  So let's go to -- Actually, let's wait.
19 Do you know generally what allegations you've made in this
20 lawsuit against NIBCO?
21         MR. SHAMBERG:  Objection, vague.
22    A    No.
23    Q    Okay.  Well, let's go to page -- in Exhibit 2
24 here, starting with paragraph 78, which is on page 15.
25 Now, take a moment, please, and review where it says "The

Page 19

1  Medders --"
2     A    Uh-huh.
3     Q    -- starting with paragraph 78 through a couple of
4  pages to paragraph 90, if you'll just look at those.  And
5  I'm mostly curious whether you have reviewed these at any
6  time, if these look familiar to you, these allegations.
7         MR. SHAMBERG:  Take your time.
8         THE WITNESS:  Now, what was your question,
9  please?
10    Q    (BY MS. STEPHENS)  Do those paragraphs look
11 familiar to you?
12    A    Yes, they do.
13    Q    Okay.  Do you believe you helped write those or
14 at least provided information for those paragraphs?
15    A    We provided information for those paragraphs.
16    Q    Okay.  And after they were written, did you
17 review them?
18    A    At some point.  I don't remember.
19    Q    To your knowledge, is the information in those
20 paragraphs complete and accurate?
21    A    It is.
22    Q    Okay.  So going back to your home in Morgan Mill,
23 Texas -- correct?  --
24    A    Uh-huh.
25    Q    -- what were your fact -- why did you build that

Page 20

1  house?
2     A    As a retirement home.
3     Q    Okay.  And what were the factors that contributed
4  to how you designed it?  What was important to you to have
5  in your home?
6     A    We just made it small for two people.
7     Q    So your kind of an empty-nester-home-type thing?
8  Your kids all old and grown up?
9     A    Yes, yes.
10    Q    Now, you -- now, who selected the plumbing
11 materials for the house?
12    A    My plumber did.
13    Q    Okay.  And when you say "my plumber," let's just
14 understand --
15    A    ASAP.
16    Q    -- each other.
17    A    ASAP Plumbing.
18    Q    And, again, if you continue to call him "my
19 plumber," we're just -- I just want to put on the record --
20    A    That's fine.
21    Q    -- that we understand that you're talking about
22 Steve Forbes of ASAP Plumbing.  Okay?
23    A    Okay.
24    Q    Did you have any discussion with Mr. Forbes about
25 what kind of plumbing material you wanted in the house?

Page 21

1     A    No, I did not.
2     Q    Did you discuss with him, you know, even the
3  material, like copper verses PEX, or anything like that?
4     A    No, I did not.
5     Q    Okay.  So you left that discussion [sic] entirely
6  up to him?
7     A    Yes.
8     Q    Did he provide you an estimate for that work
9  ahead --
10    A    Yes.
11    Q    -- of time?
12    A    Yes.
13    Q    Okay.  Did you get multiple estimates for that --
14    A    Yes, I did.
15    Q    -- work?
16    A    Yes, I did.
17    Q    I'm just going to remind you to -- I know you
18 know the answers probably before I finish the question.
19 But just try to give me a second to finish my question.  It
20 makes it just much easier on Terri here.  Okay?
21    A    Okay.
22    Q    Do you still have copies of any of the estimates
23 that you were provided?
24    A    I think so.
25    Q    Okay.  Were any of the estimates for a material

JAMES MEDDERS                                          November 16, 2016

Page 22

1   other than a PEX plumbing system?
2       A    None of them specified the type of material.
3       Q    Okay.  So when you chose ASAP Plumbing to do the
4   plumbing in your new home, what was the number one
5   consideration for you?
6       A    It was -- I knew the -- I knew him prior, and it
7   was based on price.
8       Q    Okay.  So was his price lower than the others?
9       A    Yes.
10      Q    Okay.  Do you recall whether any of the estimates
11  mentioned what type of materials they were going to use for
12  the plumbing?
13            MR. SHAMBERG:  Objection, asked and
14  answered.  Go ahead.
15      A    No.
16      Q    Who else did you get estimates from?
17      A    I don't remember.
18      Q    Where were they located?
19      A    In Stephenville.
20      Q    Okay.  And you may have copies of those
21  estimates; is that correct?
22      A    I do have copies.
23      Q    You do have copies.  Have you provided those to
24  your attorneys?
25      A    No.

Page 23

1       Q    Okay.  What discussions did you have with ASAP
2   Plumbing after you selected -- Okay.  At some point you
3   selected ASAP Plumbing to be your plumbing contractor; is
4   that correct?
5       A    Yes.
6       Q    Did you have any discussions with ASAP Plumbing
7   before the installation began about what materials they
8   were going to be using?
9       A    No.
10      Q    Were you present during any of the installation
11  of the plumbing?
12      A    Yes.
13      Q    Okay.  Did you ever have any discussions during
14  the installation of the plumbing about the materials that
15  they were using?
16      A    No.
17      Q    Did you ever help them do any of the
18  installation?
19      A    No.
20      Q    Okay.  Are you aware of whether there were any
21  issues during the installation of the plumbing?
22      A    No.
23      Q    Do you recall approximately how much it cost to
24  have ASAP install the plumbing in your home?
25      A    No.

Page 24

1       Q    Was it 10,000 -- more or less than $10,000?
2       A    Less.
3       Q    Okay.  Was it more or less than $5,000?
4       A    I don't remember.
5       Q    Okay.  Now, in paragraph 80, if you flip back to
6   that, it says that the installation of the plumbing system
7   began in July 2011 and was completed in February 2012.  Do
8   you know why it took that many months to complete the
9   installation of the plumbing?
10      A    Yes, I do.
11      Q    And why is that?
12      A    It's just you have to install it in stages.
13      Q    Okay.  So during the time the plumbing was being
14  installed in your home, there was also other construction
15  activity going on?
16      A    Yes.
17      Q    Okay.  So, for instance, if you built the lower
18  level, you could maybe install plumbing there; but until
19  you get the upper level done, you can't install the
20  plumbing up there?
21      A    That's correct.
22      Q    Okay.  Did you Mister --  It says, also, here in
23  paragraph 80 that the water is supplied from a private
24  well; it is not treated.  Did you tell that to Mister -- or
25  to ASAP Plumbing before they did the installation?

Page 25

1       A    No.
2       Q    Okay.  Do you believe they were aware of that
3   before the installation?
4            MR. SHAMBERG:  Objection, calls for
5   speculation.
6       A    Yes.
7       Q    Okay.  And why do you think they were aware of
8   that?
9       A    There's no other water service out there.
10      Q    Okay.  And I believe you live in an
11  unincorporated area of Erath County.  Is that right?
12      A    That's correct.
13      Q    Am I saying that right?
14            MS. MEDDERS:  Erath.
15      A    Erath, yes, that's correct.
16      Q    Erath County.  Thank you.  Now, in paragraph 82,
17  if you'll flip to the next page, it said a licensed
18  professional contractor was installed to -- was hired to
19  install the plumbing system in the Medderses' home.  Did
20  you check Mr. Forbes' licensure before you selected him?
21      A    No.
22      Q    Okay.  You just believe him to be licensed; is
23  that correct?
24      A    Yes.
25      Q    And, again, you are the one who hired ASAP

JAMES MEDDERS                                November 16, 2016

Page 26

1  Plumbing, correct?
2       A    Yes.
3       Q    All right.  When designing your home did you draw
4  up physical plans, like a -- or how did that happen?  How
5  did the design process work?
6       A    I drew them up.
7       Q    Okay.  Do you still have copies of those plans?
8       A    Yes.
9       Q    Okay.  Can you generally describe the house to
10  me, for instance, how many floors it has, how many rooms,
11  how many bathrooms?
12      A    One floor, a bathroom and a half, a bedroom,
13  closet, a large living area, a washroom.
14      Q    Okay.  Does it have a basement?
15      A    No.
16      Q    I didn't think it would down here, but I just had
17  to ask.  And during the construction process of the home,
18  you were the one doing most of the building yourself; is
19  that correct?
20      A    Yes.
21      Q    Did you hire other people to help you with that
22  work, other than subcontractors for specific areas?
23      A    No.
24      Q    Okay.  Excuse me.  Now, I believe we already
25  discussed and you said that you did not discuss with

Page 27

1  Mr. Forbes before the installation what he was -- what
2  materials he was going to use; is that correct?
3       A    That's correct.
4       Q    Did you ever talk to him after the installation
5  about what he used, what materials he used?
6       A    No.
7       Q    Okay.  What about after any of the leaks that
8  occurred?  Did you discuss with him what materials he used?
9       A    Yes.
10      Q    Okay.  And what did you guys discuss?
11           MR. SHAMBERG:  Object to form.
12      A    Just trying to find out what I could -- what I
13  could do about getting someone to -- getting ahold of NIBCO
14  to get them to take care of the problem.
15      Q    Okay.  Did you ask Mr. Forbes why he selected
16  NIBCO products?
17      A    No, I didn't.
18      Q    Okay.  Did you ask him why he selected PEX
19  products in specific?
20      A    No.
21      Q    Do you have any experience installing plumbing at
22  all?
23      A    Yes.
24      Q    Okay.  But in this particular instance you hired
25  someone else to do it; is that correct?

Page 28

1       A    Yes.
2       Q    What's your plumbing experience?
3       A    Just general plumbing.
4       Q    Okay.
5       A    Very general.
6       Q    Okay.  And I believe you said earlier that you
7  learned -- you first learned about NIBCO after the first
8  leak.  Is that correct?
9       A    That's correct.
10      Q    Okay.  Can you describe to me the circumstances
11  of that first leak?  When did it happen, for instance?
12      A    I don't remember the date.
13      Q    Okay.  Well, let's refer to the allegations in
14  the complaint, and let's start with paragraph 84.  Okay?
15      A    Eighty-four.
16      Q    Yes.
17      A    Okay.
18      Q    All right.  And I'm just going to read it into
19  the record.
20      A    Okay.
21      Q    It says, "On or about December 5, 2013, the
22  Medders observed a leak in a NIBCO Tee Fitting in the attic
23  of the utility room of their home."  Do you see that?
24      A    That's correct.
25      Q    Okay.  And that's -- that's a complete and

Page 29

1  accurate description of that leak?
2       A    Yes.
3       Q    Okay.  Now, it says, "The Medders observed a
4  leak."  Where did you observe the leak?
5       A    Well, it was pouring out of the attic.
6       Q    Okay.  So the water was coming through the attic.
7  How did you observe the leak in the tee fitting is my
8  question.
9       A    Well, we had to cut the water off and get up
10  there and look to see.
11      Q    So you went up into the attic and looked at --
12      A    Yes.
13      Q    -- what was going on?  Okay.  And you did that
14  yourself?
15      A    I think I had my son-in-law do that, and I was --
16      Q    Okay.  So you didn't observe the leak.  Did your
17  wife observe the leak in the tee fitting?
18      A    No.
19      Q    Okay.  So someone else did; is that correct?
20      A    Yes.
21      Q    What did you do after you discovered the leak?
22      A    Called the plumber.
23      Q    Okay.  And what plumber did you call?
24      A    I called ASAP Plumbing.
25      Q    Okay.  And what did they do?

JAMES MEDDERS                                    November 16, 2016

Page 30

1    A    They came out and repaired the leak.
2    Q    Okay.  And what did they do to repair the leak?
3    A    I did not observe them doing it.  I'm sure they
4  used fittings and things to put it back together.
5    Q    Okay.  And is your understanding the leak was
6  only in the fitting itself?
7    A    Yes.
8    Q    Okay.  Did they replace any tubing, to your
9  knowledge?
10   A    I don't know.
11   Q    Okay.  And I guess the next sentence here in that
12 paragraph 84 does say, "On or about December 8, 2013, the
13 Medders retained a plumber to inspect and repair the water
14 leak and resultant damage."  Do you see that?
15   A    Yes.
16   Q    Okay.  What -- so ASAP repaired the leak itself;
17 is that correct?
18   A    Now, which one are we talking about?
19   Q    Okay.  Well, we're talking about this on
20 December 8th --
21   A    Yes.
22   Q    -- this paragraph right here.
23   A    Yes.
24   Q    So ASAP was the one who fixed that?
25   A    Yes.

Page 31

1    Q    Okay.  Who fixed the resultant damage?
2    A    I'm sorry.  Say that again.
3    Q    Well, it says right here, "The Medders retained a
4  plumber to inspect and repair the water leak and the
5  resultant damage."  Did ASAP also fix some damage to your
6  home?
7    A    No.
8    Q    Okay.  Well, who fixed the damage to your home?
9    A    This was in the --
10   Q    The first leak.
11   A    The first leak.  What damage was repaired, I did.
12   Q    Okay.  What damage was there?
13   A    Mostly the wet insulation was removed and
14 replaced.
15   Q    Okay.  Do you have a business name under which
16 you work at all as a carpenter or anything like that?
17   A    Medders Building & Remodeling.
18   Q    Okay.  So you don't know what ASAP did as far as
19 fixing the plumbing leak, do you?
20   A    No.
21   Q    Okay.  So you don't know what materials they
22 installed or replaced --
23   A    No.
24   Q    -- is that right?  Okay.  Do you know what
25 happened to the fitting that they -- that was apparently

Page 32

1  leaking?
2    A    Subsequently?
3    Q    Yes.
4    A    Yes.
5    Q    I mean, I assume it was removed from your home.
6    A    It was given to my insurance company.
7    Q    Okay.  And what insurance company is that?
8    A    State Farm.
9    Q    Are you still insured by State Farm?
10   A    Yes, I am.
11   Q    Okay.  I'm going to hand you what we'll mark
12 Exhibit 3.
13            (Exhibit No. 3 marked)
14            Do you recognize Exhibit 3?
15   A    Yes.
16   Q    Okay.  And for the record Exhibit 3 has a Bates
17 number, and we're going to refer to these sometimes today,
18 sir.  There at the bottom, the corner it says "Medders" and
19 has some numbers after it.  Do you see that?
20   A    Uh-huh.
21   Q    Those are called Bates stamps by lawyers, and it
22 just helps us track which document we're talking about.
23   A    Okay.
24   Q    Okay?  Now, Exhibit 3 has the Bates number
25 Medders 000024.  Can you tell me what Exhibit 3 is, please?

Page 33

1    A    It is the cost for repairs of the leak.
2    Q    Of the leak.  Which one?
3    A    Of the first leak.
4    Q    Okay.  So the leak we've just been discussing,
5  this is an invoice from ASAP Plumbing to repair that leak?
6    A    Yes, it is.
7    Q    And I believe the total is $125.  Is that
8  correct?
9    A    That's correct.
10   Q    And you paid that?
11   A    Yes, I paid.
12   Q    Okay.  Did ASAP Plumbing provide you with any
13 sort of warranty for the work that they did during the
14 installation for the installation of the plumbing in your
15 home?
16   A    No.
17   Q    So they didn't say anything like, you know, "If
18 you have any issues in the first year, we'll come out and
19 fix it no charge"?  They didn't offer you anything like
20 that?
21   A    No.
22   Q    Did you ever ask for anything like that?
23   A    No.
24   Q    Okay.  Did you ever say to Mr. Forbes, "Hey," you
25 know, "I shouldn't have to pay for this," you know, "You

JAMES MEDDERS                                          November 16, 2016

Page 34

1   picked these materials"?  You never had any conversation
2   like that with him?
3       A   No.
4       Q   All right.  I'm going to hand you what's been
5   marked -- or what will be marked Exhibit 4.
6           (Exhibit No. 4 marked)
7           Do you recognize this document, Exhibit 4?
8       A   Yes.
9       Q   Okay.  And for the record the title of this
10  document is Plaintiffs James and Judy Medders's Objections
11  and Responses to NIBCO's First Set of Interrogatories.  If
12  you flip to the last page, sir, I believe there's a
13  verification.  Do you see that?
14      A   Yes.
15      Q   And is that your signature?
16      A   Yes, it is.
17      Q   And it looks like you signed in October -- on
18  October 14, 2015.  Do you see that?
19      A   Yes.
20      Q   Okay.  And you were verifying, at least as part
21  of that, that the information is true and correct to the
22  best of your knowledge --
23      A   Yes.
24      Q   -- at that time.  Okay.  Sir, could you turn to
25  page five for me, please?  And if you look at -- there's a

Page 35

1   question number six, and there's an answer below that.  Do
2   you just generally see that, where I'm referring?
3       A   Yes.
4       Q   Okay.  Now, at least in the first full paragraph
5   it talks about that December 5th leak.  Do you see that?
6       A   I'm sorry?
7       Q   The first full paragraph that says "On or about
8   December 5, 2013."
9       A   Okay.
10      Q   Do you see that paragraph?  Okay.  And in the
11  middle there it does say ASAP Plumbing came to repair the
12  water line on December 8th and charged $125.  And that's
13  the invoice we were just looking at in Exhibit 3?
14      A   Yes, it is.
15      Q   Okay.  And it says, "Don Small performed
16  emergency cleanup of [the] water and charged $300."  Do you
17  see that?
18      A   Yes.
19      Q   Okay.  And what kind of emergency cleanup did
20  Mr. Small do?
21      A   Evacuating the water from the home and drying it.
22      Q   Okay.  Provided some sort of equipment for that;
23  is that correct?
24      A   Yes.
25      Q   Okay.  And then it says in the last -- I guess

Page 36

1   second-to-last sentence, "Expenses for replacing
2   insulation, drying the attic and ceiling and replacing a
3   light fixture and ceiling as needed cost $2,892.50."  Do
4   you see that?
5       A   That's correct.
6       Q   Okay.  It says, "This work was performed by James
7   Medders and Don Small."  Is that correct?
8       A   That's correct.
9       Q   Was that work performed pursuant to a
10  business, or was it just something that you guys did
11  yourself?  Was there an invoice for that work or anything
12  like that?
13      A   No.
14      Q   Okay.  So how do you know it cost that much?
15      A   I had an estimate.
16      Q   Okay.  So you did have some sort of documentation
17  reflecting that?
18      A   Well, I -- yes, I did, I guess.  I had an
19  estimate for it.
20      Q   Okay.  And who provided that estimate?
21      A   I'm trying to remember his name -- his company.
22  It's Starnes Construction, I believe.
23      Q   So Starnes Construction, or whoever it is,
24  provided you an estimate, but they didn't actually do the
25  work?

Page 37

1       A   Right.
2       Q   Okay.  You did it yourself?
3       A   I did.
4       Q   Okay.  I'll hand you what we'll mark Exhibit 5.
5           (Exhibit No. 5 marked)
6           Do you recognize that document?
7       A   Yes.
8       Q   Okay.  And, again, this has been Bates stamped at
9   the bottom with "Medders 000025."  So this is a document
10  that was produced to NIBCO or their lawyers, me, as part of
11  this lawsuit.  Did you provide this estimate to your
12  attorneys?
13      A   Yes.
14      Q   Okay.  And what is this document?
15      A   That is the estimate for repairs to the ceiling.
16      Q   Okay.  And it's from J & S Enterprises?
17      A   Yes.
18      Q   And it has Mr. Starnes' name here at the bottom?
19      A   Yes.
20      Q   And it has the same total, $2,892.50 -- do you
21  see that? -- that we -- that we just discussed in your
22  interrogatory responses?
23      A   That's correct.
24      Q   Okay.  But Mr. Starnes was not paid this much,
25  was he?

JAMES MEDDERS                                    November 16, 2016

Page 38

1    A    No.
2    Q    Okay.  Did you make any sort of insurance claim
3  related to this leak in December of 2013?
4    A    Yes, I did.
5    Q    Okay.  And you made that claim to your insurer,
6  State Farm; is that correct?
7    A    Yes.
8    Q    Okay.  Were you paid any money by State Farm as a
9  result of that claim?
10   A    Yes.
11   Q    Do you recall how much?
12   A    No.
13   Q    Actually, let's turn to the interrogatory
14  responses, page eight.
15   A    This one?
16   Q    The one right in front of you, correct.
17        MR. SHAMBERG:  One more page to page eight.
18        THE WITNESS:  Oh, I'm sorry.
19   Q    (BY MS. STEPHENS)  And there's a question number
20  fourteen, and you see the answer below it?
21   A    Yes.
22   Q    Now, that claim number one, it says, "Plaintiffs
23  presented a claim to State Farm in the amount of $2,992.50.
24  State Farm issued a check in the amount of $1,655.50."  Is
25  that true?

Page 39

1    A    That's correct.
2    Q    I'm going to hand you what's been -- what we'll
3  mark Exhibit 6.
4        (Exhibit No. 6 marked)
5        For the record, this is Medders 00008 and 9.
6  Do you recognize this document?
7    A    I don't remember it.
8    Q    Okay.  It appears to be a letter from your
9  insurance company, State Farm -- is that correct? -- and
10  it's addressed to James and Judy Medders.
11   A    That's correct.
12   Q    Do you see below where it says "Dear Mr. and
13  Mrs. Medders" and it says, "Enclosed is payment in the
14  amount of $1,955.50 for repairs to the utility room --"
15   A    Okay.
16   Q    -- "ceiling and clean up of water."  Do you see
17  that?
18   A    Yes.
19   Q    So is your answer to my previous question the
20  same that the interrogatory response is accurate?
21   A    I don't remember what the difference is, so --
22   Q    Okay.  Well, turn to the next page on Exhibit 6,
23  the letter I just handed you, sir.
24   A    Oh, I'm sorry.
25   Q    It's okay.  It appears that was a check for

Page 40

1  $1,955.50.
2    A    Okay.
3    Q    Yeah.  And on the previous page it appears
4  someone wrote in handwriting.  Do you recognize that
5  handwriting?
6    A    Yes.
7    Q    Is that your handwriting?
8    A    Yes, it is.
9    Q    Okay.  It says, "Payment & paper work --"  Can
10  you read it to me, actually?
11   A    "Payment & paper work for damages to utility
12  room, Received 2-13-14."
13   Q    Do you believe you deposited the check --
14   A    Yes.
15   Q    -- that you received?  So you can't explain to me
16  the difference between this letter and the interrogatory
17  response?  I'm just trying to see if -- I just want to have
18  the most accurate information possible.  I'm trying to
19  figure out what money you actually received.
20   A    I think I know the difference.
21   Q    Okay.  What's the difference?
22   A    But I'm not positive.
23   Q    Okay.  Well, can you --
24   A    I hate to put it in the record when I'm not
25  positive.

Page 41

1    Q    Okay.  Well, what's your guess?
2    A    That the 300 is what my son-in-law received for
3  his work.
4    Q    And who is your son-in-law?
5    A    Donald Small.
6    Q    So you and your son-in-law were the ones who did
7  the work?
8    A    The cleanup.
9    Q    The cleanup.  Okay.  And you believe you paid to
10  him some of it; is that correct?
11   A    Yes.
12   Q    Okay.  And does Mr. Small have a company related
13  to this work, that does this kind of work?
14   A    No.
15   Q    Okay.  How did you know it was worth $300 then?
16   A    I just asked him to give me a bill, and he did.
17   Q    All right.  Let me hand you what we'll mark as
18  Exhibit 7.
19        (Exhibit No. 7 marked)
20        And these are Medders 10 through 18.  Do you
21  recognize this document?
22   A    I don't recall it.
23   Q    Okay.  Well, at least on the first page it says
24  "Structural Damage Claim Policy," and in the upper
25  right-hand corner it says "43-405P-313."  In the upper

JAMES MEDDERS                                    November 16, 2016

Page 42

1  left-hand corner it says, "Medders, James."  Do you see
2  that?
3      A     Yes.
4      Q     And I believe, again, this is something you
5  provided to your attorneys as part of this lawsuit.
6      A     Yes.
7      Q     Okay.  And on the next page, the second page, it
8  has various information, but it says -- do you see where it
9  says "Net payment $1,955.50"?
10     A     Yes.
11     Q     And if you go to the next page, page three, it
12  says -- do you see where it says "Description" and it says
13  "13"?
14     A     Yes.
15     Q     It has "Drywall"?  Do you see that?
16     A     Yes.
17     Q     And it says -- I'm going to read it completely.
18  It says, "Drywall (bid item) - repair utility room ceiling
19  per bid from J & S Enterprises."  Do you see that?
20     A     Yes.
21     Q     Okay.  And the amount is $2,892.50.
22     A     Yes.
23     Q     Okay.  And then number 14 says, "Water Extraction
24  & Remediation (Bid item)- per Press Control Systems."  Do
25  you see that?

Page 43

1      A     Yes.
2      Q     Is Press Control Systems the one who did the
3  cleanup?
4      A     That is my son-in-law's company.
5      Q     Okay.  And what does Press Control Systems do?
6      A     He works on printing presses.
7      Q     Okay.  And so his company does not actually --
8  Do they do water extraction --
9      A     No.
10     Q     -- and remediation?  Okay.  So but he did have --
11  provided some labor and equipment or what?  I'm trying to
12  understand how Press Control Systems came into it.
13     A     It was just my son-in-law did it.
14     Q     Okay.  And you said, "Hey, give me an estimate or
15  a bill for that work"?
16     A     Just to give me a bill for the work.
17     Q     Okay.  Did State Farm understand that your
18  son-in-law's the one who did the work?
19           MR. SHAMBERG:  Objection, calls for
20  speculation.  Go ahead.
21     A     I don't know.
22     Q     Okay.  And did State Farm understand that J & S
23  Enterprises was not going to do the repair work, that that
24  was just an estimate?
25           MR. SHAMBERG:  Objection, calls for

Page 44

1  speculation.
2      A     I don't know.
3      Q     So you just sent them the information and said
4  this is -- this is the estimate for how much it's going to
5  cost?
6      A     That is correct.
7      Q     Okay.  So that net payment, that $1,955.50,
8  that -- it was a check that came to you; is that correct?
9      A     To the best of my knowledge.
10     Q     Okay.  And you believe -- did you -- you only
11  kept $1,655.50 of that?  Is that what you believe?  You
12  paid that $300 to your son-in-law?
13     A     That's correct.
14     Q     Okay.  Do you have a copy of that check where you
15  paid --
16     A     No, I don't.
17     Q     -- your son-in-law?  Who would have a copy of
18  that?
19     A     There's no copy.  It was just cash money.
20     Q     You just gave him cash.  Do you remember --
21     A     I just gave --
22     Q     -- when?
23     A     I just gave him money.
24     Q     Okay.  Was there equipment involved in the
25  cleanup process?

Page 45

1      A     Yes.
2      Q     What kind of equipment?
3      A     A blower and a wet -- wet-dry vac.
4      Q     Okay.  And were those property of your son-in-
5  law or --
6      A     Yes.
7      Q     Okay.  Not his company's?
8      A     No.
9      Q     Okay.  Regarding this first leak that we're
10  talking about in December 2013 and the subsequent repairs,
11  was there any other -- was there any other damage to your
12  home that's not reflected in these repairs or estimates?
13     A     Not to my knowledge.
14     Q     Okay.  And what kind of materials or equipment
15  did you need -- did you have to buy to do the repairs that
16  you did?
17     A     Insulation.
18     Q     Okay.  Do you recall approximately how much time
19  it took to do those repairs?
20     A     No, I don't.
21     Q     Was it more or less than 40 hours, do you think?
22     A     Probably less.
23     Q     Okay.  Was it more or less than 20 hours?
24     A     Probably less.
25     Q     Okay.  And that's the kind of work you've done --

JAMES MEDDERS                                        November 16, 2016

Page 46

1  you've done that sort of work before, install --
2      A   Yes.
3      Q   Okay.  And I assume when you got the check from
4  State Farm you just deposited it in your own bank account.
5  Is that correct?
6      A   That's correct.
7      Q   Okay.  So at least if we're referring to this
8  particular claim that you made to State Farm -- Let's look
9  at that again, actually, that Exhibit 7, page two, the one
10 in your right hand, sir.  Do you see that summary?  And it
11 says, "Line Item Total $3,192.50."  Do you see that?
12     A   Yes.
13     Q   And then it has a less -- it has a replacement
14 cost value of the same amount, and it says "Less Deductible
15 $1,237."  Do you see that?
16     A   Yes.
17     Q   So you received the full amount you claimed minus
18 your deductible in payment?
19     A   Yes.
20     Q   Okay.  Do you have any other out-of-pocket
21 expenses for this first leak other than what you claimed to
22 the insurance company?
23     A   Not that I recall.
24     Q   Okay.  Have you had any leaks in that area of
25 your home since the repairs were made?

Page 47

1      A   Not in that area.
2      Q   Right.  Okay.  All right.  Well, let's go to
3  paragraph 85 on Exhibit 2.  It says, "On or about May 31,
4  2014, the Medders observed a leak in the NIBCO nipple
5  located behind a wall in the master bedroom of their home."
6  Do you see that?
7      A   Yes.
8      Q   Okay.  Between this December 2013 leak and this
9  May 2014 leak, were there any other leaks in your home in
10 the plumbing?
11     A   No.
12     Q   Okay.  Who observed the leak in the nipple
13 located behind the wall in the master bedroom?  Who
14 actually saw it physically?
15     A   Myself.
16     Q   Okay.  Well, did you have to open the wall up to
17 see that?
18     A   I did.
19     Q   Okay.  Did your wife also see it?
20     A   I don't recall.
21     Q   Okay.  Now, what did you do in response to this
22 particular leak?
23     A   Repaired it.
24     Q   And what do you mean by that?  Can you explain?
25     A   Well, we just -- my son-in-law -- I had my

Page 48

1  son-in-law just clamp it for the night.  It was late.
2      Q   What do you mean "just clamp it for the night"?
3      A   We bought -- we went to Home Depot and bought
4  some clamps, some fittings, and fixed it --
5      Q   Okay.  What --
6      A   And repaired -- repaired -- just clamped it off,
7  plugged it so we could use the water.
8      Q   Okay.  So you went to -- What brand material did
9  you buy to fix the leak?
10     A   We had to buy the same type fittings, and I don't
11 know that they were PEX.  I don't know that.
12     Q   Okay.  Well, let's back up.  Do you remember the
13 brand that you purchased?
14     A   No, I don't.
15     Q   You believe they were a PEX fitting, but you
16 don't recall?
17     A   I don't know what brand they were.
18     Q   Okay.  What tools did you use to install the
19 clamps?
20     A   I purchased a tool to do that.
21     Q   Okay.  Like a crimp ring or something like that?
22     A   Like a crimper.
23     Q   Okay.  Do you still have that tool?
24     A   Yes, I do.
25     Q   Do you know what brand it is?

Page 49

1      A   No, I don't.
2      Q   And you said you went to Home Depot?
3      A   If I'm not mistaken, he went to Home Depot.  I'm
4  not positive about that.
5      Q   Okay.  So you sent your son-in-law to go purchase
6  that?
7      A   Yes.
8      Q   Okay.  Have you had any -- has your repair been
9  successful?  Have you had any other leaks in that area?
10     A   It's all been removed.
11     Q   Okay.  What do you mean by that?
12     A   It's all been taken out.
13     Q   All of the NIBCO?
14     A   No.
15     Q   Okay.  What --
16     A   We're talking about one leak now.  That leak is
17 gone.  That part of it is gone.
18     Q   So the tubing is still there, but the fitting is
19 different?
20     A   No.  It's all gone.
21     Q   Okay.  Can you explain what you mean by "all
22 gone"?
23     A   Okay.  Because of that leak, it ruined cabinets
24 in the bathroom.  It all had to be replaced.  So all of
25 that plumbing from the attic down is replaced.

JAMES MEDDERS                                    November 16, 2016

Page 50

1     Q    Okay.  And who replaced that plumbing?
2     A    I would have to refer to some information.  I
3 don't remember.
4     Q    Okay.  Fair enough.  And we'll get there.  I'm
5 just asking the question.  So at least -- or as -- is it
6 fair to call it a stopgap measure?  You and your son-in-law
7 went in and fixed the leak for the time being?  Is that
8 correct?
9     A    Yes.
10     Q    Okay.  And did that fix hold until the
11 replacement was done?
12     A    Yes.
13     Q    Okay.  Now, you described some of the damage that
14 you believe was caused by that leak.  Again, could you just
15 describe it to me?  You said there were some cabinets and
16 other things that were damaged?
17     A    Yes.
18     Q    Okay.  Those are the cabinets in the master
19 bedroom?
20     A    Yes.
21     Q    Or, I guess, master bathroom.
22     A    Master bathroom.
23     Q    Okay.  Now, at the --  Let's back up to the first
24 leak, December 2013.  When do you first recall talking to
25 Mr. Forbes about what fitting or what materials he'd used

Page 51

1 for the plumbing?
2     A    I don't recall exactly when I talked to him about
3 that.
4     Q    Okay.  Do you think it was after the first leak?
5     A    It was definitely after the first leak.
6     Q    So in between the first leak and the second leak
7 you talked to Mr. Forbes about what he used in the plumbing
8 system; is that --
9     A    Yes.
10     Q    -- correct?  What did you do with that
11 information?  Did he tell you -- Let's back up.  Did he
12 tell you it was NIBCO specifically or just PEX?
13     A    I don't recall.
14     Q    Okay.  What did you do with that information when
15 he told you that?
16     A    I got a number from him to call -- or a person's
17 name and number so I could call NIBCO.
18     Q    Okay.  Did you call that number?
19     A    I did.
20     Q    Okay.  And what happened during that call?
21     A    That's when I had the conversation with the
22 gentleman about seeing if they would honor their warranty
23 on this, and they would not talk to me.  They said, "You
24 either talk to the contractor or insurance company."
25     Q    Okay.  Did they tell you anything else?

Page 52

1     A    No.
2     Q    Okay.  What did you -- what did you demand during
3 that call?
4     A    I didn't demand anything.
5     Q    What did you -- what did you ask?
6     A    I just asked what they were -- if they would
7 honor their guarantee on their plumbing.
8     Q    Okay.  So you demanded that they honor their
9 warranty?
10     A    I asked if they would.
11     Q    Okay.  Did you -- when you made that call, did
12 you understand the terms of the NIBCO warranty at that
13 time?
14     A    Not -- no.
15     Q    Okay.
16     A    No.
17     Q    Had you ever seen it at that point?
18     A    No, I had not.
19     Q    Had your wife seen it, to your knowledge?
20     A    Not to my knowledge.
21     Q    So at that point at least you hadn't gone and
22 investigated what the warranty was at all?
23     A    No.
24     Q    So you just got a name and a number from your
25 plumber, and that's who you called?  Is that correct?

Page 53

1     A    That's correct.
2     Q    Okay.  At the time that you made that call, did
3 you have the fitting itself that you believe leaked?
4     A    I don't remember.
5     Q    Okay.  When did the insurance company get that
6 fitting?
7     A    I don't recall the exact time they got it.
8     Q    Did you give it to the claims adjuster?  How did
9 the insurance company get it?
10     A    I did give it to my claims adjuster.
11     Q    Okay.  And where do you believe that fitting is
12 today?
13     A    I don't know for sure.
14     Q    Okay.
15     A    I really don't know.
16     Q    Okay.  You don't have it then?
17     A    I don't have it.
18     Q    And do you believe your attorneys in this lawsuit
19 have it?
20     A    I don't know.
21     Q    Okay.  Fair enough.  Okay.  So let's go back
22 to --  Okay.  After that phone call did you try to contact
23 NIBCO again?
24     A    I did not.
25     Q    Okay.  So that was the only time you've ever

JAMES MEDDERS                                    November 16, 2016

Page 54

1  tried to contact NIBCO?
2      A   That's correct.
3      Q   Do you have an understanding of what the NIBCO
4  warranty is, what its terms are?
5      A   No, I don't.
6      Q   Okay.  Have you ever seen a copy of that?
7      A   No, I have not.
8      Q   Do you believe your wife's ever seen a copy of
9  it?
10     A   Not to my knowledge.
11     Q   Okay.  Prior to filing this lawsuit then -- or
12 prior to this lawsuit being filed and you being one of the
13 plaintiffs, you believe that's the only contact you've had
14 with NIBCO; is that correct?
15     A   The only what?
16     Q   The only contact you've had with NIBCO.
17     A   Yes.
18     Q   What about whatever attorney you might have had
19 prior to the attorneys in this lawsuit?  Do you believe
20 they ever contacted NIBCO?
21     A   I --
22         MR. SHAMBERG:  Object to form.
23     A   I don't know.
24         MS. STEPHENS:  Okay.  What are we on time?
25         MR. SHAMBERG:  It's almost 9:00.

Page 55

1          MS. STEPHENS:  Let's just take a quick
2  break.
3          MR. SHAMBERG:  That's fine.
4          MS. STEPHENS:  All right.
5          (Recess from 8:57 a.m. to 9:05 a.m.)
6      Q   (BY MS. STEPHENS)  All right, Mr. Medders.  We're
7  back on the record.  And I just want to remind you you're
8  still under oath.  At the break did you recall anything
9  about your answers that you've already given this morning
10 that you believe you need to update or clarify?
11     A   No.
12     Q   Okay.  Let's look at paragraph 85 of the exhibit
13 in front of you, which is second amended complaint, the
14 last sentence of that paragraph.  It says, "A contractor
15 was called to repair the damage and replace the exterior
16 and interior coverings of the exterior wall of the
17 bathroom, including replacing the cabinets."  What
18 contractor is that?
19     A   I don't remember their name.
20     Q   Okay.  So who hired that contractor?
21     A   I did.
22     Q   Okay.  Does Alpine ring a bell?
23     A   That's correct.
24     Q   Okay.  So Alpine was the contractor who repaired
25 the damage for this second leak; is that correct?

Page 56

1      A   That's correct.
2      Q   And, excuse me, did Alpine also do any of the
3  repair plumbing related to that leak?
4      A   Yes.
5      Q   Okay.  Do you think Alpine themselves did it, or
6  do you think they had a subcontractor do it?
7      A   They had a subcontractor.
8      Q   Do you know the name of that subcontractor?
9      A   No, I don't.
10     Q   Who found Alpine to do that repair work?  Were
11 you the one who found it, or was it the insurance company?
12     A   I did.
13     Q   Did you get estimates from other contractors?
14     A   No.
15     Q   So you went out and got an estimate from Alpine,
16 and you submitted it to your insurance company.  Is that
17 correct?
18     A   That's correct.
19     Q   Okay.  And I guess I should back up.  Did you
20 also make an insurance claim to State Farm as a result of
21 the second leak?
22     A   I did.
23     Q   And you were also paid a certain amount for that
24 claim; is that correct?
25     A   I was.

Page 57

1      Q   And if you look at the interrogatory exhibit
2  that's also in front of you on page eight, that's the
3  second claim that's listed there in response number 14,
4  Claim 43-467V-239?
5      A   Yes.
6      Q   Okay.  And you've been paid -- you made a claim
7  in the amount $4,915.01, and you were paid a certain amount
8  of that.  Is that correct?
9      A   Yes.
10     Q   Okay.  Do you know what happened to the -- again,
11 this leak in May of 2014 involved a nipple fitting; is that
12 correct?
13     A   Yes.
14     Q   And did -- is that what someone told you, or is
15 that what you observed yourself?
16     A   I observed it.
17     Q   Okay.  What happened to that fitting, that nipple
18 fitting?
19     A   It was broken.
20     Q   Okay.  What do you mean "broken"?  Was there a
21 hole in it, or was it, like, literally broken in half?
22     A   It wasn't literally broken in half, but you could
23 see water spewing out of it.
24     Q   Okay.  Did you call ASAP again regarding that, or
25 that's just the one you fixed yourself?

JAMES MEDDERS                                    November 16, 2016

Page 58

1    A    That's the one I fixed myself.
2    Q    Did you consider calling ASAP again?
3    A    Not on this.
4    Q    Okay.  After that nipple -- Okay.  So was the
5    nipple still there when you fixed it; you just clamped over
6    it?
7    A    No.  We removed it.
8    Q    What happened to that nipple after it was
9    removed?
10   A    It was given to my insurance company -- I mean my
11   lawyer.
12   Q    Okay.  And the name of that lawyer is?
13   A    I don't even know their name.
14   Q    Okay.
15   A    I'm sorry.  It was --
16   Q    The lawyers that are here today?
17   A    The lawyer that's here today.  I'm sorry.
18   Q    And his firm?
19   A    Yes.
20   Q    And --
21   A    Well, to the best --
22   Q    All I can do is ask for you --
23   A    I'm not --
24   Q    -- to give the best answers you can.
25   A    Well, I'm not -- I'm not sure because it has

Page 59

1    changed --
2    Q    Sure.
3    A    -- from the first lawyer that I talked to to this
4    lawyer.  I don't know that it's the same company.
5    Q    Okay.
6    A    But I'm not positive.
7    Q    But that's the last you've seen of it?
8    A    Yes.
9    Q    Okay.  Okay.  Let's go to paragraph 86 in the
10   complaint.  It says, "On or about June 10, 2014, the
11   Medders observed a leak caused by a --" nipple -- nibble --
12   "NIBCO Tee Fitting located in the attic of their home
13   resulting in damage to the ceiling of the master bathroom."
14   Do you see that?
15   A    Yes, I do.
16   Q    Okay.  Is that an accurate statement of what
17   happened on June 10th?
18   A    Yes.
19   Q    Okay.  Who observed the leak caused by a
20   nipple -- NIBCO tee fitting?
21   A    I did.
22   Q    Okay.  So you went up to the attic and you saw
23   that?
24   A    No.
25   Q    Okay.

Page 60

1    A    I did, but I saw it downstairs first.
2    Q    Okay.  So you saw some water leaking, and you
3    went to investigate.  Is that correct?
4    A    That's correct.
5    Q    Okay.  At this time on June 10th were there
6    already repairs being made as a result of the previous leak
7    on May -- in May?
8    A    I don't recall.  I don't recall.
9    Q    Okay.  I guess my question is:  Was this leak
10   folded into the second State Farm claim, or did you make
11   another claim?
12   A    It was folded into the same one.
13   Q    Okay.  So whatever happened as a result of this
14   claim was added onto this claim number two that we're
15   talking about.
16   A    It was?
17   Q    Okay.  When this leak was occurring, I believe
18   you hired a plumber to come out and repair it; is that
19   correct?
20   A    Yes.
21   Q    And who was that?
22   A    That would've been ASAP.
23   Q    Do you know what they did to repair that leak?
24   A    Just removed the faulty part.
25   Q    Okay.  Do you know what they replaced that part

Page 61

1    with?
2    A    No, I don't.
3    Q    Okay.  Do you know if they replaced any tubing?
4    A    No, I don't.
5    Q    Okay.  Has any of the NIBCO PEX tubing in your
6    home been replaced to your knowledge?
7    A    Yes.
8    Q    Okay.  And which -- how much?  Where?
9    A    Quite a bit because the insurance -- because the
10   attorneys have come out, and they -- they've -- they've
11   removed a bunch of it for testing.
12   Q    Okay.  And that was the inspection that occurred,
13   I think, in August; is that correct?
14   A    I don't know the date.
15   Q    Okay.  This year; is that correct?
16   A    I don't know the date.
17   Q    You don't know whether the inspection in this
18   case happened this year, this calendar year?
19   A    I think it did, but I'm not positive.
20   Q    Okay.  That's fair enough.  And as a part of that
21   inspection, certain parts of the tubing in your house and
22   the fittings were removed?
23   A    Yes.
24   Q    Okay.  But prior to that occurring, the tubing in
25   your house was mostly still intact?

JAMES MEDDERS                                          November 16, 2016

Page 62

1    A   It was.
2    Q   Okay.  Have you ever had any leaks in your home
3  in the tubing, the PEX tubing?
4    A   Not to my knowledge.
5    Q   Okay.  Have you ever had any leaks that you
6  believe were caused by any clamps or rings in your house?
7    A   Not to my knowledge.
8    Q   So at least as part of this lawsuit you're only
9  claiming leaks as a result of fittings?
10    A   Yes.
11            MR. SHAMBERG:  Objection, calls for a legal
12  conclusion.
13    Q   (BY MS. STEPHENS)  And you believe that those are
14  brass fittings; is that correct?
15    A   Yes.
16    Q   Okay.  But you don't know whether they were
17  yellow brass or DZR brass?  That doesn't mean anything to
18  you?
19    A   No.
20    Q   Okay.  Now, when ASAP came out to help repair
21  this June 2014 leak, did you discuss with Mr. Forbes at
22  that time the materials he'd used in your home?
23    A   No.
24    Q   Okay.  Did you ask him whether it was also a
25  NIBCO product?

Page 63

1    A   No.
2    Q   Okay.  As a result of this May 2014 leak or this
3  June 2014 leak, did you ever contact NIBCO?
4    A   No.
5    Q   Okay.  Do you know whether your insurance company
6  investigated any of these leaks and the cause of them?
7    A   I don't know.
8    Q   Okay.  Do you know -- and to your knowledge then,
9  if they did, you don't know the conclusions that they
10  reached?
11    A   No.
12    Q   Okay.  All right.  Let's look at paragraph 87.
13  It says, "Within a reasonable amount of time following the
14  losses, the Medders provided NIBCO with actual notice of
15  the failures of its PEX Products and NIBCO has failed to
16  repair or replace the PEX Products within the Medders' home
17  or otherwise fulfill its warranty obligations."  Do you see
18  that?
19    A   Yes, I do.
20    Q   And, again, you reviewed this complaint in some
21  form before it was filed, you believe?
22    A   I -- I don't recall.
23    Q   Okay.  Well, when did you provide NIBCO with
24  actual notice of the failures of its PEX products?
25    A   In the original phone call --

Page 64

1    Q   And that's the only --
2    A   -- after the first leak.  That's the only call.
3    Q   Okay.  So you didn't call NIBCO after the other
4  two leaks; is that right?
5    A   No, I didn't.
6    Q   And you never wrote them or emailed them or
7  anything; is that correct?
8    A   No.
9    Q   So at least as far as NIBCO's concerned, you only
10  provided them notice of the first failure; is that correct?
11    A   That's correct.
12    Q   Okay.  If you look at the interrogatory
13  responses, now, it says there on response number 14 at
14  least that second claim you were -- issued a check to the
15  Plaintiffs in the amount of $3,678.01.  Do you see that?
16  On 14.
17    A   Oh, down here.  I'm sorry.  Yes.
18    Q   Okay.  Did that come -- payment come all in one
19  check, or was that multiple payments?
20    A   I don't recall.
21    Q   Okay.  Well, let's just clear it up.  I'm going
22  to hand you what we'll mark as Exhibit 8.
23            (Exhibit No. 8 marked)
24            Tell me if you recognize that.  And for the
25  record Exhibit 8 is Medders 000036 through 47.  Does that

Page 65

1  look familiar to you, sir?
2    A   It's not familiar.  It's been a long time since I
3  saw the documents.
4    Q   Fair enough.  And if you look at least on the
5  second --  The first page is a letter to Mr. and
6  Mrs. Medders; is that correct?
7    A   That's correct.
8    Q   And it says at least -- on the letter it says,
9  "Enclosed is a payment in the amount of $2,212.28."  Do you
10  see that?
11    A   That's correct.
12    Q   And the next page appears to be a check.  Do you
13  see some handwriting on that check?
14    A   "Check deposited by phone."
15    Q   Is that your handwriting?
16    A   Yes, it is.
17    Q   Okay.  So you deposited this check on, it
18  appears, June 11th, 2014.
19    A   That's correct.
20    Q   Okay.  And this is related to that second
21  insurance claim you made, it appears.
22    A   To the best of my knowledge.
23    Q   Okay.  Great.  I'm going to hand you what we'll
24  mark Medders Exhibit 9.
25            (Exhibit No. 9 marked)

JAMES MEDDERS                                    November 16, 2016

Page 66

1           And for the record, while you're looking at
2   that, sir, this is Medders 000048 through 60.  Does that
3   look familiar to you, sir?
4       A    No.  It's been a long time.
5       Q    Okay.  And do you see -- it appears, at least on
6   the first page, it's a letter, again, sent to you and
7   Mrs. Medders from State Farm.
8       A    Yes.
9       Q    And it says, "Enclosed is a payment in the amount
10  $229.09."  Do you see that?
11      A    That's correct.
12      Q    And this appears to relate to that second
13  insurance claim; is that correct?
14      A    I am not sure.  I don't recall.
15      Q    Okay.  Well, let's look on the first page.  It
16  says -- it has a claim number, and it has the same claim
17  number as Exhibit 8 -- is that correct? -- and the same
18  date of loss.
19      A    Yes, it does.
20      Q    Okay.  So this at least looks like another
21  payment under that claim; is that correct?
22      A    It appears --
23           MR. SHAMBERG:  I'll -- I'll -- Sorry.
24           THE WITNESS:  That's all right.
25           MR. SHAMBERG:  I'll just have a running

Page 67

1   objection to questions about the contents of this document
2   to the extent that Mr. Medders has testified that he
3   doesn't recall reviewing the document or the contents aside
4   from looking at them now, so --
5           MS. STEPHENS:  I'm trying to lay a
6   foundation to get some information out of him that he says
7   he's not -- he does not recall.
8           MR. SHAMBERG:  Okay.
9           MS. STEPHENS:  So your objections are noted,
10  but you did produce these documents to us.
11          MR. SHAMBERG:  Right.
12          MS. STEPHENS:  And we're entitled to
13  understand why.
14          MR. SHAMBERG:  Oh, no, yeah, I understand.
15          MS. STEPHENS:  And --
16          MR. SHAMBERG:  You're welcome to ask the
17  questions, of course.
18          MS. STEPHENS:  Yeah.
19          MR. SHAMBERG:  I'll just note that running
20  objection.  You can go ahead and do your thing.
21          MS. STEPHENS:  Okay.  Thank you.
22      Q    (BY MS. STEPHENS)  So at least -- And do you
23  know whether this check -- I believe there's some
24  handwriting on page two in the bottom left-hand corner.  Do
25  you see that, where it says, "Deposited by phone"?

Page 68

1       A    Yes, I do.
2       Q    Is that your handwriting?
3       A    Yes, it is.
4       Q    So you believe you deposited this check?
5       A    That's correct.
6       Q    Excuse me.  All right.  One more of these.
7   Sir, we'll mark this Exhibit 10.
8           (Exhibit No. 10 marked)
9           There you go.
10          And I know you said it's been a long time,
11  but does this look familiar to you at all?
12      A    No, I don't remember seeing them.
13      Q    Okay.  Exhibit 10, for the record, is Medders
14  000066 through 74.  And you see here, again, this -- the
15  first page appears to be a letter sent to you, James
16  Medders, from State Farm.  Do you see that?
17      A    Yes.
18      Q    Does this have the same claim number -- it
19  appears -- as those previous letters, Exhibits 8 and 9, and
20  the same date of loss?
21      A    Yes.
22      Q    Okay.  And, again, this letter says, "Enclosed is
23  a payment in the amount of $1,236.64."  Do you see that?
24      A    Yes.
25      Q    Okay.  It appears the second page of this packet

Page 69

1   is that check.
2       A    Yes.
3       Q    And, again, there's some handwriting.
4       A    Yes.
5       Q    Is that your handwriting?
6       A    Yes, it is.
7       Q    It says deposited by phone July 16, 2014.
8       A    Yes, it is.
9       Q    Okay.  Now, I'm not going to ask you to do mental
10  math, but would you believe me if I said that the amounts
11  of these three checks adds up to $3,678.01?
12      A    Okay.
13      Q    Okay.  So do you believe that's the extent of the
14  money that you received from State Farm for this claim?
15      A    To the best of my knowledge.
16      Q    Great.  Let's look at Exhibit 10 real
17  quick and go to page -- it's Medders 70.  It's page three
18  of the document.  Do you see that?  It has like -- it says
19  "State Farm" at the top, and it says, "Summary for Coverage
20  A - Dwelling."
21      A    Yes.
22      Q    It has some numbers below it.  And it says, "Line
23  Item Total $4,915.01."  Do you see that?
24      A    Yes.
25      Q    And you believe that's the amount you made a

JAMES MEDDERS                                    November 16, 2016

Page 70

1  claim for -- is that correct? -- for the repairs.
2       A    To the best of my knowledge.
3       Q    Okay.  And then again -- again it says, "Less
4  Deductible $1,237.00."
5       A    That's correct.
6       Q    Do you see that?  And so then they get -- and
7  then they say, "Prior claim payment $2,441.37."
8       A    Okay.  Yes.
9       Q    And then that totals up to the net payment
10  they're making on this particular --
11      A    Yes.
12      Q    Okay.  So, again, on this second insurance claim,
13  other than the deductible, State Farm paid the full amount
14  you made a claim for?
15      A    Yes.
16      Q    Okay.  Regarding these -- and, again, you believe
17  that the May 2014 and the June 2014 leak were both handled
18  under the same insurance claim; is that correct?
19      A    Yes, they were.
20      Q    Okay.  Other than what you made a claim for to
21  State Farm, do you have any other out-of-pocket expenses
22  related to those two leaks?
23      A    Yes.
24      Q    Okay.  And what are those expenses?
25      A    The fittings and tool to repair the first one.

Page 71

1       Q    Okay.  Did you attempt to make a claim for those,
2  too, to State Farm?
3       A    No.
4       Q    Okay.  Do you know how much you paid for those?
5       A    No.
6       Q    Did you pay cash?
7       A    Yes.
8       Q    So how would I know how much you paid for those?
9       A    I don't have -- I don't have a -- I don't know.
10      Q    Other than the three leaks that are described in
11  the complaint that we've talked about today, have you had
12  any other leaks in the plumbing in your home?
13      A    No.
14      Q    Okay.  So that leak in June of 2014 was the last
15  leak you had to date?
16      A    Yes.
17      Q    Okay.  Do you know what kind of materials were
18  used when piping and fittings were replaced in your home as
19  a part of -- you know, as part of that inspection that
20  happened?
21      A    No.
22      Q    Okay.  You don't know what brand was used?
23      A    No.
24      Q    Did you discuss with anyone what brand you would
25  like to use?

Page 72

1       A    Yes.
2       Q    And what did you tell them?
3       A    They gave me the choice of -- as I recall, of
4  brass fittings or maybe it is two types of plastic
5  fittings.  And I went with plastic.
6       Q    Okay.  And who gave you that choice?  The
7  plumber?
8       A    The inspector.
9       Q    Who is the inspector?
10      A    And I don't recall her name.
11      Q    Okay.  Cynthia Smith?
12      A    Cynthia Smith.  Thank you.
13      Q    Do you know what brand of fittings were used?
14      A    No, I don't.
15      Q    Do you know what brand of tubing was used?
16      A    No, I don't.
17      Q    Do you believe it's still PEX in your home?
18      A    I have no idea.
19      Q    Okay.  Let's go to paragraph 89 of the complaint.
20  It says, "The Medders have suffered an ascertainable loss
21  as a result of Defendant's omissions and/or
22  misrepresentations associated with the PEX Products,
23  including, but not limited to, out-of-pocket loss
24  associated with catastrophic plumbing failures and
25  attempted repairs of such within their home, including the

Page 73

1  physical damage caused to their home."  Do you see that?
2       A    Yes.
3       Q    Okay.  What out-of-pocket losses have you
4  suffered as a result of these leaks that we've discussed
5  today?
6       A    The tools to repair the leak, the second leak.
7       Q    And you don't know how much --
8       A    And I don't know --
9       Q    -- that cost?
10      A    -- what that was, no.
11      Q    Okay.  Any other out-of-pocket expenses?
12      A    Not that I recall.
13      Q    Okay.  And you at least -- other than the
14  deductible, you've been reimbursed for the damage to your
15  home --
16      A    That's correct.
17      Q    -- by State Farm?  Okay.  And to date you're
18  still insured by State Farm; is that correct?
19      A    That's correct.
20      Q    Okay.  And at least, as far as I can tell, the
21  three leaks all caused different -- different extent of
22  damage; is that correct?
23      A    That's correct.
24      Q    And the repairs to fix them all cost a different
25  amount; is that correct?

JAMES MEDDERS                                        November 16, 2016

Page 74

1    A   That's correct.
2    Q   What other types of damage are you claiming in
3 this lawsuit?  What are you claiming in this lawsuit as far
4 as what you want to be paid for by NIBCO?
5    A   I would like --
6        MR. SHAMBERG:  Objection, calls for a legal
7 conclusion.
8    A   I would like for my plumbing to be replaced and
9 the suffering that I still go through.
10   Q   And what suffering is that?
11   A   I have to turn my water off every time I leave
12 overnight because I'm afraid I'll have a leak and come home
13 to a flooded house.
14   Q   What else do you want?
15   A   That's it.
16   Q   Okay.  And at least so far as it goes for you,
17 what products sold by NIBCO do you believe are defective
18 that are in your home?
19        MR. SHAMBERG:  Objection, calls for expert
20 testimony and a legal conclusion.
21   A   The fittings.
22   Q   Just the fittings?
23   A   The faulty fittings.
24   Q   Are you claiming that the tubing is defective?
25        MR. SHAMBERG:  Objection, calls for a legal

Page 75

1 conclusion.
2    A   Not to my knowledge.
3    Q   Okay.  So the NIBCO PEX tubing that was installed
4 in your home and still may be in your home to some extent,
5 you've never had a leak in that?
6    A   I have not had a leak.
7    Q   Okay.  I can't recall if I asked this already, so
8 I'm going to ask it one more time.  Do you know if Mr.
9 Forbes or anyone with ASAP Plumbing ever contacted NIBCO
10 about the leaks in your home?
11   A   Not to my knowledge.
12   Q   Okay.  Did you ever ask Mr. Forbes or anyone else
13 at ASAP Plumbing where they purchased the materials that
14 were installed in your home for the plumbing?
15   A   No.
16   Q   So you don't know where they came from other than
17 they were manufactured -- you believe they were
18 manufactured by NIBCO?
19   A   Yes.
20   Q   Okay.  I'm going to hand you what we'll mark
21 Exhibit 11.
22        (Exhibit No. 11 marked)
23        For the record these are Medders 000103
24 through 111.  Once you have a chance to flip through those,
25 let me know if you recognize them.  Do you recognize them,

Page 76

1 sir?
2    A   Yes.
3    Q   And what are these -- what is Exhibit 11?
4    A   Pictures of the faulty plumbing, faulty fittings.
5    Q   Okay.  Now, there are multiple pictures here, but
6 they all appear to be, I believe, a tee fitting; is that
7 correct?
8    A   That's correct.
9    Q   So are these relating to one of the leaks in
10 particular that we've discussed today?
11   A   That's correct.
12   Q   Which one?
13   A   I think the first one.
14   Q   So you think these are pictures of the
15 December 5th, 2013, leak; is that correct?
16   A   That's correct.
17   Q   Okay.  Who took these photos?
18   A   I did.
19   Q   Okay.  And when did you take them?
20   A   I -- I don't know.  I don't recall.
21   Q   Was it, like, the same week of the leak, or was
22 it sometime --
23   A   I -- I don't recall.
24   Q   Okay.  And you took these photos before you gave
25 the fitting to anybody else?

Page 77

1    A   That's correct.
2    Q   Okay.  Okay.  When you saw this fitting and took
3 these photos, did you see any indication on the fitting
4 that it was manufactured by NIBCO?
5    A   Not at that time.
6    Q   Okay.  Do you have any information today that
7 would support that this was manufactured by NIBCO, this tee
8 fitting in particular?
9    A   No.
10   Q   Okay.
11        MR. SHAMBERG:  Is an exhibit hiding
12 somewhere?
13        MS. STEPHENS:  By the way, this is why
14 people joke that you can never give lawyers original copies
15 of anything.  Because we will lose them in a flash.  And
16 that's on the record, and I'm glad.  Okay.  Let's go off
17 the record just one second.
18        (Recess from 9:33 a.m. to 9:34 a.m.)
19   Q   (BY MS. STEPHENS)  All right.  We're back on the
20 record.
21        (Exhibit No. 12 marked)
22        I found my exhibit.  Sir, I'm handing you
23 what's been marked Exhibit 12.  And for the record, while
24 you're looking at them, this is Meadows [sic] 000112
25 through 126.  Do you recognize Exhibit 12?

JAMES MEDDERS                                    November 16, 2016

Page 78

1    A    Yes.
2    Q    Okay.  And what is Exhibit 12?
3    A    Pictures of the coupling on the second leak.
4    Q    Okay.  So you believe these are photos of the
5    leak that occurred in May of 2014; is that correct?  The
6    NIBCO nipple?
7    A    Yes.
8    Q    Okay.  And these are all related to that
9    particular leak?
10   A    Yes.
11   Q    And who took these photos?
12   A    I did.
13   Q    When did you take them?
14   A    The day of the leak, I think, but I'm not
15   positive.
16   Q    Okay.  Are these your hands?
17   A    Well, I'm not sure.  That may be the hands of my
18   son-in-law holding the fitting, probably.
19   Q    Okay.  Was anyone else present while you were
20   taking these photos?
21   A    Yes.
22   Q    Who?
23   A    My grandson-in-law.
24   Q    Okay.  What's his name?
25   A    Brady Romans.

Page 79

1    Q    And your son-in-law is Don Small; is that --
2    A    Donald Small.
3    Q    Okay.  Now, if we look at page -- All right.  So
4    112 through 119, are those all the same coupling or what
5    you described as a coupling?
6    A    Yes.
7    Q    Okay.  So those are the all the same fitting.
8    And then I turn to 120 and I see an elbow.
9    A    Yes.
10   Q    Do you see that?  So that's a different fitting?
11   A    Yes, it is.
12   Q    Did you have a leak in that fitting?
13   A    No.
14   Q    Why did you take a picture of that?
15   A    Showing the calcification on the outside.
16   Q    Okay.  And what do you believe was the cause of
17   that calcification?
18        MR. SHAMBERG:  Objection, calls for expert
19   testimony.
20   A    Just from the water.
21   Q    Okay.  Did you actually have a leak in
22   that elbow --
23   A    No.
24   Q    -- fitting?  Okay.  And is this the same elbow
25   pictured in 120, 121, 122, and 123, all the way through

Page 80

1    125?  Is that the same fitting?
2    A    Yes.
3    Q    Okay.  Was this particular fitting still in your
4    home until the recent inspection, this elbow fitting?  Or
5    was that something that was --
6    A    No.  That was removed.
7    Q    When was that removed?
8    A    At the time the bathroom was remodeled.
9    Q    Okay.  We believe that work was done by Alpine;
10   is that correct?
11   A    That's correct.
12   Q    Now, the last picture, I believe, is another --
13   is a tee fitting again?
14   A    It is.
15   Q    Okay.  And where is that tee fitting?
16   A    And I don't -- I don't recall why that picture
17   was taken.
18   Q    Okay.  And was that taken at the same time as the
19   other pictures?
20   A    I don't recall.
21   Q    Okay.  But you believe you took it?
22   A    Yes.
23   Q    Okay.  And do you believe that fitting was again
24   removed during the rerouting -- rerouting?
25   A    I don't recall where that fitting was.

Page 81

1    Q    Okay.  And why was this picture taken?
2    A    I don't remember.  I don't remember why I took
3    that picture.
4    Q    Fair enough.  Okay.  Thank you.  Okay.  You can
5    put those exhibits away.  When did you -- have you ever
6    endeavored to find out more about NIBCO or PEX after you've
7    had these leaks in your home?
8    A    I'm not sure what you're asking me.
9    Q    Okay.  Did you go online and look at anything or
10   investigate NIBCO specifically or PEX?
11   A    We went online and investigated other -- found
12   out if there was any -- any other leaks, any other people
13   having the same problem.
14   Q    Okay.  And what did you find?
15   A    Well, we found that there were several.
16   Q    Okay.  What do you mean?  Did you find a website?
17   Or what did you find?
18   A    I don't remember what we found.  My wife and I
19   did that together, and I don't remember exactly what we
20   found.
21   Q    Okay.  When did you do that?  Before you found a
22   lawyer or --
23   A    I don't recall.
24   Q    Okay.  If I ask your wife, do you think she might
25   remember better?

JAMES MEDDERS                                    November 16, 2016

Page 82

1    A    That's possible.
2    Q    Okay.
3    A    But I'm not positive.
4    Q    Okay.  We'll try that.  Are you aware that one of
5    claims you're making in this case regards an allegation
6    that NIBCO failed to warn you about its products?
7             MR. SHAMBERG:  Objection, calls for a legal
8    conclusion.
9    A    I'm not sure what you're asking.
10   Q    Okay.  Well, let's look at the complaint
11   specifically.  I believe it is page 43.  If you look at
12   paragraph -- actually, page 44 -- if you look at paragraph
13   216 -- and this is Exhibit 2.  Would you look at that
14   paragraph real quick?  And I'll ask you a couple of
15   questions.
16   A    Which one?
17   Q    Paragraph 216.
18   A    Okay.
19   Q    Okay.  Do you see that part two where it says,
20   "NIBCO failed to provide Mr. McMahon and the Medders and
21   other class members with adequate and sufficient warnings
22   regarding the known and foreseeable risks and dangers
23   inherent in NIBCO PEX Products"?
24   A    That's correct.
25   Q    Okay.  What warnings do you believe NIBCO should

Page 83

1    have provided to you?
2             MR. SHAMBERG:  Objection, calls for a legal
3    conclusion.
4    A    I don't know.
5    Q    Okay.  Where should NIBCO have provided those
6    warnings?
7             MR. SHAMBERG:  Objection, calls for a legal
8    conclusion.
9    A    I don't know.
10   Q    Did you purchase the NIBCO products that were
11   installed in your home?
12   A    No.
13   Q    Do you know who did?
14   A    Yes.
15   Q    Who?
16   A    ASAP Plumbing.
17   Q    Do you know where ASAP Plumbing purchased those
18   products?
19             MR. SHAMBERG:  Objection --
20   A    No.
21             MR. SHAMBERG:  -- asked and answered.
22   Q    (BY MS. STEPHENS)  If NIBCO had issued a warning
23   regarding its products of any type, what would you have
24   done differently regarding the plumbing in your home?
25   A    At this point I do not know.

Page 84

1    Q    So if you had never had a leak in your home and
2    NIBCO had issued a warning regarding its PEX fittings,
3    would you have replaced all the fittings in your home after
4    that warning came out?
5    A    No.
6    Q    Why not?
7    A    That would be a cost that I could not afford.
8    Q    Okay.  And cost was an important consideration to
9    you when considering the plumbing that was going to be
10   installed in your home on who to hire?
11   A    Yes.
12   Q    Flip back a page to paragraph 213 and review that
13   paragraph and let me know when you're ready.
14   A    Okay.
15   Q    Now, I think we've already established that you
16   don't know where ASAP Plumbing purchased the NIBCO
17   products.
18   A    That's correct.
19   Q    Correct?  Okay.  Do you know when the NIBCO
20   products installed in your home were purchased?
21   A    No.
22   Q    Do you know how those products were stored?
23   A    No.
24   Q    Do you know how they were stored by ASAP Plumbing
25   specifically?

Page 85

1    A    No.
2    Q    Do you know how they were stored by whatever
3    supplier he bought them from?
4             MR. SHAMBERG:  Objection, asked and
5    answered.
6    A    No.
7             MS. STEPHENS:  Can we just take a quick
8    break?
9             MR. SHAMBERG:  We can.
10            MS. STEPHENS:  Thanks.
11            (Recess from 9:43 a.m. to 9:51 a.m.)
12   Q    (BY MS. STEPHENS)  All right, Mr. Medders.  We're
13   back on the record after taking a quick break.  You
14   understand you're still under oath?
15   A    Yes.
16   Q    Okay.  When we were talking about the second
17   insurance claim, I think you mentioned that the plumbing in
18   your home was rerouted as part of those repairs; is that
19   correct?
20   A    That's correct.
21   Q    And the expense for that was covered under the
22   insurance; is that correct?
23   A    Alpine took care of it.
24   Q    Okay.  So it was part of their estimate of the
25   work that they did?

JAMES MEDDERS                                      November 16, 2016

Page 86

1      A    Yes.
2      Q    Okay.  So that was included in the, roughly,
3  $4900 that --
4      A    Yes.
5      Q    Okay.  And, again, you don't recall who did the
6  actual plumbing work?
7      A    No.
8      Q    Alpine took care of it, but you understand that
9  some sort of subcontractor did the work?
10     A    Through Alpine, yes.
11     Q    Okay.  And as part of that work through Alpine,
12 did you communicate to Alpine or that subcontractor what
13 kind of materials you wanted to be used in the rerouting
14 process?
15     A    No.
16     Q    Okay.
17     A    Well, I don't remember.  I think I told Alpine
18 anything but NIBCO, but I'm not positive of that either.
19     Q    Okay.  And did you specify no PEX or you prefer
20 copper, anything like that?
21     A    No.  I just said no NIBCO.
22     Q    Okay.  Did the leaks in your home ever cause you
23 to not be able to spend the night in your house?
24     A    No.
25     Q    As part of any of these -- either of these

Page 87

1  insurance claims through State Farm, did you assign any of
2  your rights to the insurance company?
3      A    Not to my knowledge.
4      Q    Okay.  Do you know whether State Farm ever made a
5  claim to NIBCO?
6      A    I don't know.
7      Q    Okay.  Do you know whether NIBCO's ever paid any
8  money to State Farm related to any of these claims?
9      A    I don't know.
10     Q    Okay.  Do you believe that the NIBCO plumbing
11 that was installed by ASAP Plumbing was properly installed
12 in your home?
13     A    To the best of my knowledge.
14     Q    Okay.  Do you know what experience or background
15 ASAP Plumbing had installing NIBCO PEX products?
16     A    No.
17     Q    Did ASAP Plumbing ever provide you with any
18 documents regarding the NIBCO products in your home, like a
19 catalog or installation manual or anything like that?
20     A    No.
21     Q    Okay.  And I believe you testified -- I just want
22 to make sure I remember correctly -- that the first you
23 ever heard of NIBCO was after the first leak.
24     A    That's correct.
25     Q    Okay.  Let's look at the complaint again, Exhibit

Page 88

1  2.  If you look at page three, paragraph seven, that
2  paragraph reads, "NIBCO has manufactured and advertised its
3  PEX Products for use in plumbing systems throughout the
4  United States.  It has repeatedly represented that
5  consumers should trust NIBCO to provide the highest quality
6  PEX Products because the company has over 100 years of
7  industry experience and is an industry leader in the
8  manufacture of PEX Products."  Do you see that?
9      A    Yes.
10     Q    Have you ever seen an advertisement by NIBCO?
11     A    No.
12     Q    Even after the experiences in your -- in your
13 home?
14     A    Not to my knowledge.
15     Q    Okay.  You see paragraph nine down there?  I
16 won't read the whole paragraph, but I believe -- do you see
17 the part that says, "The PEX fittings are predisposed" --
18 in paragraph nine it says, "the PEX fittings are
19 predisposed to prematurely fail as a result of
20 dezincification corrosion."  Do you see that?
21     A    Yes.
22     Q    Do you believe that's what occurred in your home?
23     A    I don't know.
24          MR. SHAMBERG:  Objection, calls for expert
25 testimony.

Page 89

1          THE WITNESS:  I don't know.
2      Q    (BY MS. STEPHENS)  Do you believe any of the
3  tubing, PEX tubing -- NIBCO PEX tubing in your home had any
4  defects?
5          MR. SHAMBERG:  Objection, calls for expert
6  testimony.
7      A    Not to my knowledge.
8      Q    Okay.  What about the PEX clamps that may have
9  been in your home?
10         MR. SHAMBERG:  Objection, calls for expert
11 testimony.
12     A    I don't know.
13     Q    Has anyone -- have you ever had a discussion with
14 anyone about what may have caused the fittings to leak in
15 your home?
16     A    No.
17     Q    Okay.  So no one's even ever guessed to you what
18 caused it?
19     A    No.
20     Q    You just believe that NIBCO's at fault for those
21 leaks?
22     A    Yes.
23     Q    And why is that?
24     A    Faulty product.
25     Q    Okay.  Do you know in what way you believe the

JAMES MEDDERS                                          November 16, 2016

Page 90

1   product is faulty?  Do you believe it's designed
2   defectively?
3        A    I don't know.
4        Q    Do you believe it's manufactured defectively?
5        A    I don't know.
6        Q    Do you believe that the NIBCO fittings that were
7   installed in your home are not proper to use in a home like
8   yours?
9        A    I'm not sure what you're asking.  I don't know.
10       Q    Okay.  Do you think that NIBCO's fittings that
11  were installed in your home shouldn't be used in a home
12  plumbing system?
13       A    Repeat that.
14       Q    Do you believe the NIBCO fittings installed in
15  your home should not be used in a home plumbing system?
16       A    I think -- I believe they should not be.
17       Q    Okay.  Do you know anyone else who has had NIBCO
18  PEX products installed in their home?
19       A    No.
20       Q    So you don't know anyone who's had leaks similar
21  to yours?
22       A    I don't know them.
23       Q    Okay.  What do you mean by that?
24       A    Well, we looked online and found some other
25  people, but I don't know them.

Page 91

1        Q    Okay.  Have you ever communicated with those
2   people?
3        A    No.
4        Q    Do you know where those people are located?
5        A    No.
6        Q    So you don't know whether they're in Texas or in
7   other states?
8        A    No.
9        Q    Okay.  Let's look at paragraph 12 of the
10  complaint, please.  It's on page four.  I'm specifically
11  referring to the second sentence in this paragraph.  It
12  says, "All Plaintiffs and Class Members have also been
13  injured at the time of sale by virtue of paying more for
14  the PEX Products than they would have had the existence of
15  the PEX Product Defects been disclosed."  Do you see that?
16       A    Yes.
17       Q    Do you believe you paid too much for the PEX
18  products that were installed in your home?
19       A    I don't know.
20       Q    Do you know what -- how much you did pay for
21  those products?
22       A    No, I don't.
23       Q    Do you know whether NIBCO's product cost more or
24  less than other products that were available for the
25  plumbing?

Page 92

1        A    I don't know.
2        Q    Do you know whether NIBCO's PEX products cost
3   more or less than other PEX products made by other
4   manufacturers?
5        A    I don't know.
6        Q    In your -- I assume you've lived in other homes
7   in your life.
8        A    Yes.
9        Q    Okay.  Have you ever had any plumbing leaks in
10  those homes?
11       A    Not that I can recall right now, not that I can
12  recall.
13       Q    Do you know what kind of plumbing systems you've
14  had in your previous homes, like whether copper or --
15       A    I had copper.
16       Q    Okay.  Is this your first home with a non-copper
17  plumbing system to your knowledge?
18       A    Yes.
19       Q    Did you do any research when designing your home
20  or hiring someone to install plumbing in your home about
21  what kind of material you should use for the plumbing in
22  your house?
23       A    No.
24       Q    The last leak of the three in June 2014, do you
25  know what happened to that particular fitting after the

Page 93

1   leak?  Was it removed and replaced?
2        A    Yes, yes.
3        Q    And do you know what happened to that replaced
4   fitting?
5        A    I gave it to my attorney.
6        Q    Okay.  And do you know where that fitting is now?
7        A    No, I don't.
8        Q    Okay.  Do you know whether any of the fittings
9   that were removed from your home were submitted to NIBCO
10  for inspection or evaluation?
11       A    Not to my knowledge.
12       Q    Okay.  Does your house have a recirculation tank?
13       A    No.
14       Q    Does it have an expansion tank?
15       A    No.
16       Q    Do you know what the settings are in your home as
17  far as water pressure and temperature?
18       A    No.
19       Q    Do you know who would have set those?
20       A    My -- the well man would have set the pressure.
21       Q    Who did?
22       A    My well -- Associated Services would have set the
23  pressure.
24       Q    Who's Associated Services?
25       A    That's the well service.

Page 94

1    Q   I believe you said in response to an
2  interrogatory that you didn't have to do any sort of
3  inspection or get a permit for the construction.
4    A   That's correct.
5         MS. STEPHENS:  Okay.  Let's take a quick
6  break.  I might just have a couple of questions.  I want to
7  find one outline.
8         THE WITNESS:  Okay.
9         MR. SHAMBERG:  Okay.
10        (Recess from 10:05 a.m. to 10:07 a.m.)
11   Q   (BY MS. STEPHENS)  We're back on the record, sir.
12 I just remind you that you're under oath.  I apologize I
13 don't have an extra copy, but I'm going to hand you what
14 we'll mark Medders Exhibit 13.
15        (Exhibit No. 13 marked)
16        And, for the record, this is Medders 000065.
17 Tell me if you recognize that page.
18   A   Okay.
19   Q   Do you recognize that, sir?
20   A   Well, it's been a long time, but that -- it's my
21 writing.
22   Q   That was my next question.  Is all the
23 handwriting on that page your handwriting?
24   A   With the exception of the tag you put on there,
25 yes.

Page 95

1    Q   Okay.  And are those just generally some notes
2  regarding the insurance claims?
3    A   I don't recall what all this is.  It's just
4  information I gave to my lawyer, I guess, because of
5  the claim numbers and things.
6    Q   Okay.  And I apologize because I don't have an
7  extra copy, if you can just hand it to me real quick --
8    A   I just don't --
9         MS. STEPHENS:  Thank you, Kyle.
10   Q   (BY MS. STEPHENS)  All right.  I'm going to ask
11 you just a quick -- a couple of questions.  Up in the
12 right-hand corner there's a -- it says the name Cathy
13 S.F.F.
14   A   Uh-huh.
15   Q   Who is that?
16   A   I don't recall.  I presume an adjuster.
17   Q   Okay.  And what about Deb Parker?
18   A   Deb Parker was the adjuster.
19   Q   Okay.  And what about -- there's a Daniel Mart --
20 something.  It says, "Claim office Daniel" something.
21   A   That would have been State Farm claim offices.
22   Q   Okay.  And "Sandy Parker" below that, do you see
23 that?
24   A   That would all have been State Farm.
25   Q   Okay.  And I see Alpine Construction again.

Page 96

1  That's who we believe did the repairs for the second --
2    A   That's correct.
3    Q   -- leak.  Okay.  Who's Mary?
4    A   She works for Alpine.
5    Q   Okay.  Tom Nichols [sic]?
6    A   He's the gentleman that came out to run the job.
7    Q   And Guillermo?
8    A   He's one of the employees of them.
9    Q   Okay.  And then over on the right it says "Steve
10 Forbes," and that's the plumber we've been discussing
11 today?
12   A   That's correct.
13   Q   Okay.  And then there's some various numbers
14 written in here that you think relate to all of the State
15 Farm information; is that --
16   A   I don't remember what they relate to.
17   Q   Okay.  So this is just something you had in your
18 records and you gave it to your lawyers?
19   A   Yes.
20   Q   Okay.  I guess up at the top there's "Laura Lee."
21 You believe she's a claims department person?  In the top
22 left-hand corner.
23   A   What's the --
24   Q   Left.  It's says State Farm Claim Department, "I
25 called 5-31-14, talked to Laura Lee."

Page 97

1    A   Oh, okay.  Okay.  I'm sure she's with -- in the
2  Claims Department at State Farm.
3    Q   Okay.  So at most this page just means to you
4  just some notes you kept?
5    A   Just notes that I had.
6    Q   Sure.  Okay.  Great.  Thank you.  When you called
7  NIBCO between the first and second leak, did you talk to
8  that person about just the fitting itself, or what did
9  you -- what did you talk to them about?
10   A   I don't remember the conversation.
11   Q   Okay.  Had you ever heard of PEX before the
12 construction of your new home?
13   A   No.
14   Q   So you didn't know it existed at all?
15   A   No.
16   Q   Okay.  We talked about the warnings a little bit
17 earlier.  Do you believe NIBCO should have provided a
18 warning before the PEX was installed in your home?  The PEX
19 products, I should clarify.
20        MR. SHAMBERG:  Calls for a legal conclusion.
21   A   I don't know.
22   Q   Okay.  What about after the PEX products were
23 installed in your home?
24   A   I don't know.
25   Q   I can't remember if I asked you this, but I'm

JAMES MEDDERS                                          November 16, 2016

1  going to try one more time.  If NIBCO had issued some type
2  of warning regarding its NIBCO PEX products, what would you
3  have done differently?
4       A   I'm not sure.
5       Q   Are you looking for any form of relief from NIBCO
6  other than money?
7       A   I want my plumbing replaced and suffering.
8       Q   Okay.  And how much for suffering do you want?
9       A   Well --
10          MR. SHAMBERG:  Calls for a legal conclusion.
11      A   -- I don't know.
12          MS. STEPHENS:  I'm going to disagree that it
13  calls for a legal conclusion.
14          THE WITNESS:  I'm not --
15      Q   (BY MS. STEPHENS)  Have you ever tried to
16  monetize it in any way?
17      A   Tried to what?
18      Q   Monetize it in any way --
19      A   No.
20      Q   -- and say, "I think it's worth this."
21      A   No.
22      Q   And just to date, again, to reiterate, you've not
23  had a leak in your home since June 2014 in the plumbing?
24      A   That's correct.
25      Q   Is there any other sort of plumbing in your home?

1  Is there, like, radiant heat at all?
2       A   No.
3       Q   Have you ever served as a plaintiff in a class
4  action before?
5       A   Not to my knowledge.
6       Q   Have you ever been involved in a lawsuit before?
7       A   No.
8       Q   Have you ever posted anything online about NIBCO?
9       A   No.
10      Q   When did you learn that NIBCO had a warranty on
11  its products?
12      A   I don't recall when I learned that.
13      Q   Okay.  You believe you learned it between the
14  first and second leaks?
15      A   I don't recall.
16      Q   Okay.  Do you know the terms of that warranty at
17  all?
18      A   No, I don't.
19      Q   So you wouldn't know whether you complied with
20  the terms of that warranty at all?
21      A   I would not know.
22      Q   Okay.  We've looked at your interrogatory
23  responses today regarding the leaks.  Do you have anything
24  to add?  Do you believe those are inaccurate or incomplete
25  in any way?

1       A   Not to my knowledge.
2       Q   So, at least, to your knowledge, since you
3  verified those in October of last year you don't believe
4  you've learned any new information?
5       A   Not to my knowledge.
6       Q   And I believe we talked about you think you have
7  the estimates that you received from plumbers to construct
8  your house -- to --
9       A   I think I still have them.
10      Q   Sorry.
11      A   I think so.
12      Q   Not to construct your home but to install the
13  plumbing in your home.  Is that --
14      A   Yes.
15          MS. STEPHENS:  Okay.  All right.  That's all
16  the questions I have for Mr. Medders.
17          MR. SHAMBERG:  I just have a few.
18          MS. STEPHENS:  Sure.
19                  EXAMINATION
20  BY MR. SHAMBERG:
21      Q   Mr. Medders, prior to the construction of your
22  current home, if NIBCO had provided you a warning that its
23  PEX products would fail prematurely within the warranty
24  period, would you still have installed those products in
25  your home?

1       A   I may not have.
2       Q   And if ASAP Plumbing had informed you that it had
3  received a warning from NIBCO that its PEX products would
4  fail prematurely within the warranty period, would you have
5  permitted ASAP Plumbing to install those products --
6       A   No.
7       Q   -- in your home?
8       A   I would not have.
9       Q   And we've discussed today that your home is
10  insured by State Farm.  Is that correct?
11      A   That's correct.
12      Q   If you experience another leak with the PEX
13  products before December of this year, what if -- and
14  submitted a claim for the damage, what, if anything, would
15  happen to your insurance?
16      A   It's possible that they would cancel my
17  insurance.
18      Q   They informed you of that?
19      A   It's possible.  Yes.
20          MR. SHAMBERG:  Okay.  I think that's it.
21          MS. STEPHENS:  Okay.
22              FURTHER EXAMINATION
23  BY MS. STEPHENS:
24      Q   So, as we sit here today, Mr. Medders, this is
25  November 16, 2016; is that correct?

JAMES MEDDERS                                                    November 16, 2016

Page 102

1    A   Yes.
2    Q   And you believe -- I believe you thought if you
3  have a leak before December of this year you might have
4  your insurance canceled by State Farm.
5    A   It's possible.
6    Q   Okay.  And that's approximately a month.  It's
7  just a few weeks away before it's --
8    A   Uh-huh.
9    Q   -- December.  Correct?  Okay.  And at least for
10  the last -- since June 2014, which is over two years ago,
11  you have not had a leak at all.
12    A   That's correct.
13    Q   Okay.  Now, Mr. Shamberg asked you a couple of
14  questions about some warnings, and you said you might not
15  have allowed them to install NIBCO products in your home.
16    A   That's very possible.  I don't know.
17    Q   Okay.  But, to your knowledge or as you recall,
18  the cost that you received from Mr. Forbes was the lowest
19  of the estimates?
20    A   As I recall, yes.
21    Q   And that was a factor in selecting that --
22    A   It was.  Yes, it was.
23    Q   So if Mr. Forbes had told you what Mr. Shamberg
24  described about NIBCO, you would have disregarded the cost
25  difference and you would have gone with someone who was

Page 103

1  more expensive; is that correct?
2    A   I'm not sure what you're asking me.
3    Q   Okay.  Fair enough.  That was probably a bad way
4  to ask.  I believe you testified in response to
5  Mr. Shamberg's question that if ASAP Plumbing had told you
6  about -- that NIBCO products fail prematurely, you wouldn't
7  have allowed them to use their products.
8    A   Probably so.
9    Q   Okay.  So do you know whether their bid was based
10  on the cost of the NIBCO products?
11    A   I have no idea.
12    Q   Do you know whether other PEX manufacturers'
13  products fail prematurely from time to time?
14    A   I have no idea.
15    Q   Do you know whether plumbing in general can
16  sometimes have leaks prematurely?
17    A   I don't know.  I don't know.
18    Q   Okay.  In all your years of carpentry work and
19  construction, have you ever worked on homes that have had
20  plumbing leaks?
21    A   For various reasons, yes.
22    Q   Okay.  And what are those reasons?
23    A   Well, they get hit by nails.  They get hit by
24  saws, things of that nature.
25    Q   Okay.  So while a home is being constructed or

Page 104

1  worked on, other workers working on other parts of the home
2  can damage the plumbing?
3    A   It's possible.
4    Q   Okay.  What are some other possible reasons that
5  plumbing can -- leaks can happen?
6    A   Well, there's a number of reasons.  I can't -- I
7  can't tell you why.
8    Q   Okay.  Well, I'm asking --
9    A   It's something --
10    Q   -- for you to tell me right now.
11    A   It's something I'm -- I can't tell you why
12  something would fail.  I don't know.
13    Q   So in your experience why have things failed in
14  the past?
15    A   I don't know.
16    Q   Can things fail because they're not installed
17  properly?  Can plumbing fail that --
18    A   It's possible.
19    Q   Okay.  And I think we just discussed that
20  plumbing can fail or have a leak because it's damaged by
21  the environment --
22    A   It's possible.
23    Q   -- it's in.  By people, for instance?
24    A   It's possible.
25    Q   Do you think it's important that the person

Page 105

1  installing a product during the construction of a home
2  follow the installation instructions for that product?
3    A   Yes.
4    Q   Okay.  Do you know whether Steve Forbes followed
5  the installation manual for NIBCO products when he
6  installed NIBCO in your home?
7    A   I don't know.
8    Q   Did you ever ask him that?
9    A   No.
10    Q   And you don't know his experience or knowledge
11  regarding NIBCO products?
12    A   No.
13    Q   Okay.  Now, in response to Mister --
14  Mr. Shamberg's question about whether NIBCO had warned you
15  about whether its products would fail prematurely or not, I
16  think you said you may not have allowed it to be installed
17  in your home.
18    A   That's possible.
19    Q   Okay.  Why would you still have selected NIBCO
20  even if you had received that warning?
21    A   I didn't say I wouldn't.
22    Q   Well, you said --
23    A   I said it's possible.
24    Q   -- you may not have.
25    A   I may not have.  I don't know.

JAMES MEDDERS                                    November 16, 2016

Page 106

1     Q    Okay.  And why would you have still gone with
2   NIBCO despite that warning?  Would it be cost mostly?
3     A    I don't know.
4     Q    Okay.  So you're not sure whether you would have
5   acted differently at the time or not?
6     A    I don't know.
7          MS. STEPHENS:  I don't have any further
8   questions.
9          MR. SHAMBERG:  I think we're done.
10         MS. STEPHENS:  Okay.  We're done with you,
11  Mr. Medders.  Thank you.
12         THE WITNESS:  All right.  Thank you.
13         THE REPORTER:  The time now is 10:22.  Is
14  Mr. Medders going to read and sign?
15         MR. SHAMBERG:  Yes.
16         THE REPORTER:  Do you want me to send them
17  to you?
18         MR. SHAMBERG:  Yeah, to me, please.
19         THE REPORTER:  Okay.
20         (The deposition concluded at 10:22 a.m.)
21
22
23
24
25

Page 107

1                    CHANGES AND SIGNATURE
2   WITNESS:  JAMES MEDDERS          DATE:  NOVEMBER 16, 2016
3   PAGE   LINE   CHANGE              REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

Page 108

1          I, JAMES MEDDERS, have read the foregoing
2   deposition and hereby affix my signature that the same is
3   true and correct, except as noted above.
4
5          _____
6                    JAMES MEDDERS
7   STATE OF TEXAS         §
8   COUNTY OF _____§
9          Before me, _____, on this
10  day personally appeared JAMES MEDDERS, known to me or
11  proved to be under oath or through _____(description
12  of identify card or other document) to be the person whose
13  name is subscribed to the foregoing instrument and
14  acknowledged to me that he executed the same for the
15  purpose and consideration therein expressed.
16         Given under my hand and seal of office on
17  this _____ day of _____, 20_____.
18
19
20
21         _____
22         NOTARY PUBLIC IN AND FOR THE
           STATE OF TEXAS
23         COMMISSION EXPIRES:  _____
24
25

Page 109

1               UNITED STATES DISTRICT COURT
                  DISTRICT OF NEW JERSEY
2
    KIMBERLY COLE, ALAN COLE,    §  CIVIL ACTION
3   JAMES MONICA, LINDA BOYD,    §
    MICHAEL McMAHON, RAY         §  NO. 13-cv-07871-FLW-TJB
4   SMINKEY, JAMES MEDDERS,      §
    JUDY MEDDERS, ROBERT         §
5   PEPERNO, SARAH PEPERNO and   §
    KELLY McCOY, on behalf of    §
6   themselves and all others    §
    similarly situated,          §
7                                §
8          Plaintiffs,           §
                                 §
9   VS.                          §
                                 §
10  NIBCO, INC.,                 §
                                 §
11         Defendant.            §
12         DEPOSITION OFFICER'S CERTIFICATE
           ORAL DEPOSITION OF JAMES MEDDERS
13               NOVEMBER 16, 2016
14         I, TERRI L. EDWARDS, Certified Shorthand
15  Reporter in and for the State of Texas, do hereby certify
16  that there came before me on the 16th day of November,
17  2016, at 7:58 a.m. at 910 South Harbin Drive, Stephenville,
18  Texas, the following named person, to-wit:  JAMES MEDDERS,
19  who was by me duly sworn to testify to the truth and
20  nothing but the truth of his knowledge touching and
21  concerning the matters in controversy in this case; that he
22  was thereupon carefully examined upon his oath and his
23  examination reduced to typewriting with the aid of
24  Computer-Assisted Transcription; and that the deposition is
25  a true record of the testimony given by the witness; that

JAMES MEDDERS                                    November 16, 2016

Page 110

1  it was requested that the witness review the transcript;
2  and that the transcript was submitted on
3  _____, 2016, to the attorney for the witness
4  for the witness's review, signature, and return to me by
5  _____, 2016.
6          I further certify that I am neither attorney
7  nor counsel for, not related to or employed by any of the
8  parties to the action in which this deposition is taken and
9  further that I am not a relative or employee of any
10  attorney or counsel employed by the parties hereto or
11  financially interested in this action.
12          Further certification requirements will be
13  certified to after they have occurred.
14          Certified to by me this 28th day of November,
15  2016.
16
17
18          _____
19          TERRI L. EDWARDS, Texas CSR 4055
            Expiration Date:  12.31.17
20          U.S. Legal Support, Inc.
            Firm Registration No. 343
21          5910 North Central Expressway
            Suite 100
22          Dallas, Texas 75206
            Phone:  214.741.6001
23
24
25

U.S. Legal Support, Inc.
(312) 236-8352

JAMES MEDDERS

November 16, 2016
Index: $1,236.64..9

### Exhibits

**EX 0001 James Medders 111**
**616** 3:12 8:1,3 14:3

**EX 0002 James Medders 111**
**616** 3:12 13:16,18 18:23 47:3 82:13 87:25 88:1

**EX 0003 James Medders 111**
**616** 3:13 32:12,13, 14,16,24,25 35:13

**EX 0004 James Medders 111**
**616** 3:13 34:5,6,7

**EX 0005 James Medders 111**
**616** 3:15 37:4,5

**EX 0006 James Medders 111**
**616** 3:15 39:3,4,22

**EX 0007 James Medders 111**
**616** 3:16 41:18,19 46:9

**EX 0008 James Medders 111**
**616** 3:16 64:22,23, 25 66:17

**EX 0009 James Medders 111**
**616** 3:17 65:24,25

**EX 0010 James Medders 111**
**616** 3:17 68:7,8,13 69:16

**EX 0011 James Medders 111**
**616** 3:18 75:21,22 76:3

**EX 0012 James Medders 111**
**616** 3:18 77:21,23, 25 78:2

**EX 0013 James Medders 111**
**616** 3:19 94:14,15

### $

**$1,236.64** 68:23
**$1,237** 46:15
**$1,237.00** 70:4
**$1,655.50** 38:24 44:11
**$1,955.50** 39:14 40:1 42:9 44:7
**$10,000** 24:1
**$125** 33:7 35:12
**$2,212.28** 65:9
**$2,441.37** 70:7
**$2,892.50** 36:3 37:20 42:21
**$2,992.50** 38:23
**$229.09** 66:10
**$3,192.50** 46:11
**$3,678.01** 64:15 69:11
**$300** 35:16 41:15 44:12
**$4,915.01** 57:7 69:23
**$4900** 86:3
**$5,000** 24:3

### 0

**000024** 32:25
**000025** 37:9
**000036** 64:25

**000048** 66:2
**000065** 94:16
**000066** 68:14
**00008** 39:5
**000103** 75:23
**000112** 77:24

### 1

**1** 8:1,3 14:3
**10** 41:20 59:10 68:7,8,13 69:16
**10,000** 24:1
**100** 4:4 88:6
**10:05** 94:10
**10:07** 94:10
**10:22** 106:13,20
**10th** 59:17 60:5
**11** 75:21,22 76:3
**111** 75:24
**112** 79:4
**119** 79:4
**11th** 65:18
**12** 77:21,23,25 78:2 91:9
**120** 79:8,25
**121** 79:25
**122** 79:25
**123** 79:25
**125** 80:1
**126** 77:25
**13** 42:13 94:14,15
**14** 34:18 42:23 57:3 64:13,16
**15** 18:24
**16** 4:2 69:7 101:25
**16th** 8:14

**18** 41:20

### 2

**2** 13:16,18 18:23 47:3 82:13 88:1
**2-13-14** 40:12
**20** 45:23
**2011** 16:6 24:7
**2012** 16:6 24:7
**2013** 28:21 30:12 35:8 38:3 45:10 47:8 50:24 76:15
**2014** 47:4,9 57:11 59:10 62:21 63:2,3 65:18 69:7 70:17 71:14 78:5 92:24 98:23 102:10
**2015** 34:18
**2016** 4:2 101:25
**213** 84:12
**216** 82:13,17

### 3

**3** 32:12,13,14,16, 24,25 35:13
**300** 41:2
**31** 47:3

### 4

**4** 34:5,6,7
**40** 45:21
**43** 82:11
**43-405P-313** 41:25
**43-467V-239** 57:4
**44** 82:12
**47** 64:25

### 5

**5** 28:21 35:8 37:4,5
**5-31-14** 96:25
**5910** 4:3
**5th** 35:5 76:15

### 6

**6** 39:3,4,22
**60** 66:2

### 7

**7** 41:18,19 46:9
**70** 69:17
**74** 68:14
**78** 18:24 19:3
**7:58** 4:6

### 8

**8** 30:12 64:22,23,25 66:17 68:19
**80** 24:5,23
**82** 25:16
**84** 28:14 30:12
**85** 47:3 55:12
**86** 59:9
**87** 63:12
**89** 72:19
**8:00** 8:14
**8:57** 55:5
**8th** 30:20 35:12

### 9

**9** 39:5 65:24,25 68:19

JAMES MEDDERS

**90** 19:4

**910** 4:5

**9:00** 54:25

**9:05** 55:5

**9:33** 77:18

**9:34** 77:18

**9:43** 85:11

**9:51** 85:11

---

**A**

**a.m.** 4:6 8:14 55:5
77:18 85:11 94:10
106:20

**ability** 14:10

**account** 46:4

**accurate** 6:1
19:20 29:1 39:20
40:18 59:16

**acted** 106:5

**action** 13:22 99:4

**activity** 24:15

**actual** 63:14,24
86:6

**add** 99:24

**added** 60:14

**addressed**
39:10

**adds** 69:11

**adequate** 82:21

**adjuster** 53:8,10
95:16,18

**advertised** 88:2

**advertisement**
88:10

**affirm** 4:21

**afford** 84:7

**afraid** 74:12

**agreement**
11:21,23

**ahead** 16:16 21:9
22:14 43:20 67:20

**ahold** 27:13

**allegation** 82:5

**allegations**
18:19 19:6 28:13

**allowed** 102:15
103:7 105:16

**Alpine** 55:22,24
56:2,5,10,15 80:9
85:23 86:8,10,11,
12,17 95:25 96:4

**altogether** 11:15

**amended** 8:6
13:21 55:13

**amount** 38:23,24
39:14 42:21 46:14,
17 56:23 57:7 63:13
64:15 65:9 66:9
68:23 69:25 70:13
73:25

**amounts** 69:10

**and/or** 72:21

**answering**
16:17

**answers** 5:12 6:6
7:18 21:18 55:9
58:24

**apologize** 94:12
95:6

**apparently**
31:25

**appears** 39:8,25
40:3 65:12,18,21
66:5,12,22 68:15,
19,25

**approximately**
23:23 45:18 102:6

**area** 25:11 26:13
46:24 47:1 49:9

**areas** 26:22

**ASAP** 9:11 15:23,
24 20:15,17,22 22:3
23:1,3,6,24 24:25
25:25 29:24 30:16,

24 31:5,18 33:5,12
35:11 57:24 58:2
60:22 62:20 75:9,13
83:16,17 84:16,24
87:11,15,17 101:2,5
103:5

**ascertainable**
72:20

**assign** 87:1

**assume** 13:4
32:5 46:3 92:6

**attach** 10:2

**attempt** 71:1

**attempted** 72:25

**attic** 28:22 29:5,6,
11 36:2 49:25
59:12,22

**attorney** 8:8
10:25 11:1,2,3,10,
11 12:11 54:18 93:5

**attorneys** 13:21
22:24 37:12 42:5
53:18 54:19 61:10

**August** 61:13

**award** 11:24

**aware** 23:20 25:2,
7 82:4

---

**B**

**back** 16:4 17:12
19:22 24:5 30:4
48:12 50:23 51:11
53:21 55:7 56:19
77:19 84:12 85:13
94:11

**background**
17:5,6,19 18:4
87:14

**bad** 103:3

**bank** 46:4

**barbecue** 17:22

**based** 11:24
15:10 22:7 103:9

**basement** 26:14

**Bates** 32:16,21,24
37:8

**bathroom** 26:12
49:24 50:21,22
55:17 59:13 80:8

**bathrooms**
26:11

**bedroom** 26:12
47:5,13 50:19

**began** 23:7 24:7

**beginning** 12:4

**bell** 55:22

**bid** 42:18,19,24
103:9

**bill** 41:16 43:15,16

**bit** 61:9 97:16

**blower** 45:3

**bonus** 11:24

**born** 18:2

**bottom** 32:18
37:9,18 67:24

**bought** 48:3 85:3

**Boyd** 8:25

**Brady** 78:25

**brand** 15:7 48:8,
13,17,25 71:22,24
72:13,15

**brass** 14:17
15:13,15,17,18,19
62:14,17 72:4

**break** 55:2,8 85:8,
13 94:6

**bring** 8:8

**broken** 57:19,20,
21,22

**build** 16:20 19:25

**builders** 16:9

**building** 26:18
31:17

**built** 16:5,24,25
24:17

**bunch** 8:17 61:11

**business** 17:7,
10,23 18:9 31:15
36:10

**buy** 45:15 48:9,10

---

**C**

**cabinets** 49:23
50:15,18 55:17

**calcification**
79:15,17

**calendar** 61:18

**call** 8:16 15:17
20:18 29:23 50:6
51:16,17,18,20
52:3,11 53:2,22
57:24 63:25 64:2,3

**called** 13:7,21
29:22,24 32:21
52:25 55:15 96:25
97:6

**calling** 58:2

**calls** 25:4 43:19,
25 62:11 74:6,19,25
79:18 82:7 83:2,7
88:24 89:5,10 97:20
98:10,13

**cancel** 101:16

**canceled** 102:4

**caption** 8:17 14:4

**care** 27:14 85:23
86:8

**carpenter** 17:22
31:16

**carpentry** 18:4,9
103:18

**case** 4:14 8:22 9:5
12:22 14:12 61:18
82:5

**cash** 44:19,20
71:6

JAMES MEDDERS

**catalog** 87:19

**catastrophic** 72:24

**Cathy** 95:12

**caused** 50:14 59:11,19 62:6 73:1, 21 89:14,18

**ceiling** 36:2,3 37:15 39:16 42:18 59:13

**Central** 4:3

**chance** 75:24

**changed** 59:1

**charge** 33:19

**charged** 35:12, 16

**check** 25:20 38:24 39:25 40:13 44:8,14 46:3 64:14, 19 65:12,13,14,17 67:23 68:4 69:1

**checks** 69:11

**choice** 72:3,6

**chose** 22:3

**circumstances** 28:10

**claim** 38:2,5,9,22, 23 41:24 46:8 56:20,24 57:3,4,6 60:10,11,14 64:14 65:21 66:13,16,21 68:18 69:14 70:1,7, 12,14,18,20 71:1 85:17 87:5 95:5,20, 21 96:24 101:14

**claimed** 46:17,21

**claiming** 62:9 74:2,3,24

**claims** 53:8,10 82:5 87:1,8 95:2 96:21 97:2

**clamp** 48:1,2

**clamped** 48:6 58:5

**clamps** 14:23 15:1,6,8 48:4,19 62:6 89:8

**Clamps'** 14:23

**clarified** 12:4

**clarify** 55:10 97:19

**class** 4:14 10:13 12:15,17 13:22 82:21 91:12 99:3

**clean** 39:16

**cleanup** 35:16,19 41:8,9 43:3 44:25

**clear** 6:2,9 10:8 12:3,13 14:7,11 64:21

**closet** 26:13

**communicate** 86:12

**communicated** 91:1

**company** 9:8 32:6,7 36:21 39:9 41:12 43:4,7 46:22 51:24 53:5,9 56:11, 16 58:10 59:4 63:5 87:2 88:6

**company's** 45:7

**complaint** 12:21 13:4,16,22 14:1 28:14 55:13 59:10 63:20 71:11 72:19 82:10 87:25 91:10

**complete** 5:12 6:20 19:20 24:8 28:25

**completed** 24:7

**completely** 42:17

**complied** 99:19

**concerned** 64:9

**concerns** 14:12

**concluded** 106:20

**conclusion** 62:12 74:7,20 75:1 82:8 83:3,8 97:20 98:10,13

**conclusions** 63:9

**connect** 14:18 15:14

**consideration** 22:5 84:8

**consistent** 10:6

**construct** 100:7, 12

**constructed** 103:25

**construction** 16:7 17:6,7 18:9 24:14 26:17 36:22, 23 94:3 95:25 97:12 100:21 103:19 105:1

**consumers** 88:5

**contact** 53:22 54:1,13,16 63:3

**contacted** 10:23 54:20 75:9

**contacting** 11:10

**contents** 67:1,3

**continue** 20:18

**contractor** 16:20 17:2 23:3 25:18 51:24 55:14, 18,20,24

**contractors** 56:13

**contributed** 20:3

**Control** 42:24 43:2,5,12

**conversation** 12:11 34:1 51:21 97:10

**conversations** 12:5

**copies** 21:22 22:20,22,23 26:7 77:14

**copper** 21:3 86:20 92:14,15

**copy** 13:17 44:14, 17,19 54:6,8 94:13 95:7

**corner** 8:18 32:18 41:25 42:1 67:24 95:12 96:22

**correct** 14:5 16:21 19:23 22:21 23:4 24:21 25:12, 15,23 26:1,19 27:2, 3,25 28:8,9,24 29:19 30:17 33:8,9 34:21 35:23 36:5,7, 8 37:23 38:6,16 39:1,9,11 41:10 44:6,8,13 46:5,6 50:8 51:10 52:25 53:1 54:2,14 55:23, 25 56:1,17,18,24 57:8,12 60:3,4,19 61:13,15 62:14 64:7,10,11 65:6,7, 11,19 66:11,13,17, 21 68:5 70:1,5,18 73:16,18,19,22,23, 25 74:1 76:7,8,11, 15,16 77:1 78:5 80:10,11 82:24 84:18,19 85:19,20, 22 87:24 94:4 96:2, 12 98:24 101:10,11, 25 102:9,12 103:1

**correctly** 87:22

**corrosion** 88:20

**cost** 23:23 33:1 36:3,14 44:5 46:14 73:9,24 84:7,8 91:23 92:2 102:18, 24 103:10 106:2

**counsel** 4:7,11, 13 11:20,22

**County** 25:11,16

**conversations** 12:5

**couple** 19:3 82:14 94:6 95:11 102:13

**coupling** 78:3 79:4,5

**court** 5:7,19

**courtroom** 5:9

**Coverage** 69:19

**covered** 85:21

**coverings** 55:16

**crimp** 48:21

**crimper** 48:22

**cross-linked** 14:12

**curious** 19:5

**current** 100:22

**cut** 29:9

**Cynthia** 72:11,12

---

**D**

**Dallas** 4:4

**damage** 30:14 31:1,5,8,11,12 41:24 45:11 50:13 55:15,25 59:13 73:1,14,22 74:2 101:14 104:2

**damaged** 50:16 104:20

**damages** 10:19 40:11

**dangers** 82:22

**Daniel** 95:19,20

**date** 28:12 61:14, 16 66:18 68:20 71:15 73:17 98:22

**day** 78:14

**Dear** 39:12

**Deb** 95:17,18

**December** 28:21

JAMES MEDDERS

30:12,20 35:5,8,12
38:3 45:10 47:8
50:24 76:15 101:13
102:3,9

**deductible**
46:14,18 70:4,13
73:14

**defective** 74:17,
24

**defectively**
90:2,4

**defects** 89:4
91:15

**defendant** 4:11
9:5

**Defendant's**
8:6 72:21

**demand** 52:2,4

**demanded** 52:8

**Depalma** 4:12

**department**
96:21,24 97:2

**depo** 7:6

**deposited** 40:13
46:4 65:14,17 67:25
68:4 69:7

**deposition** 4:1
5:8,15,16 6:23 7:8,
15,23 8:6,9,14 12:4
106:20

**Depot** 48:3 49:2,3

**describe** 7:4
26:9 28:10 50:15

**description**
18:13 29:1 42:12

**design** 16:20
26:5

**designed** 16:25
20:4 90:1

**designing** 26:3
92:19

**dezincification**
88:20

**difference** 15:20
39:21 40:16,20,21
102:25

**differently** 83:24
98:3 106:5

**disagree** 98:12

**disagrees** 12:9

**disclosed** 91:15

**discovered**
29:21

**discovery** 13:7

**discuss** 7:8 21:2
26:25 27:8,10 62:21
71:24

**discussed**
26:25 37:21 73:4
76:10 101:9 104:19

**discussing** 16:5
33:4 96:10

**discussion**
20:24 21:5 89:13

**discussions**
23:1,6,13

**disregarded**
102:24

**document** 8:1
13:19 32:22 34:7,10
37:6,9,14 39:6
41:21 67:1,3 69:18

**documentation**
36:16

**documents** 7:2,
4 65:3 67:10 87:18

**Don** 35:15 36:7
79:1

**Donald** 41:5 79:2

**downstairs**
60:1

**draw** 26:3

**drew** 26:6

**Drive** 4:5

**drying** 35:21 36:2

**Drywall** 42:15,18

**duly** 5:2

**Dwelling** 69:20

**DZR** 15:19 62:17

---

**E**

**earlier** 28:6 97:17

**easier** 21:20

**Edwards** 4:3

**Eighty-four**
28:15

**elaborate** 17:9

**elbow** 79:8,22,24
80:4

**emailed** 64:6

**emergency**
35:16,19

**employees** 96:8

**empty-nester-
home-type** 20:7

**Enclosed** 39:13
65:9 66:9 68:22

**end** 11:2

**endeavored**
81:6

**ended** 11:10

**engagement**
11:20,21

**Enterprises**
37:16 42:19 43:23

**entitle** 11:23

**entitled** 12:9
67:12

**environment**
104:21

**equipment**
35:22 43:11 44:24
45:2,14

**Erath** 25:11,14,
15,16

**established**
84:15

**estimate** 21:8
36:15,19,20,24
37:11,15 43:14,24
44:4 56:15 85:24

**estimates** 21:13,
22,25 22:10,16,21
45:12 56:13 100:7
102:19

**Evacuating**
35:21

**evaluation**
93:10

**exact** 7:18 13:23
53:7

**EXAMINATION**
5:3 100:19 101:22

**exception** 94:24

**excuse** 26:24
56:2 68:6

**exhibit** 8:1,3
13:16,18 14:3 18:23
32:12,13,14,16,24,
25 34:5,6,7 35:13
37:4,5 39:3,4,22
41:18,19 46:9 47:3
55:12 57:1 64:22,
23,25 65:24,25
66:17 68:7,8,13
69:16 75:21,22 76:3
77:11,21,22,23,25
78:2 82:13 87:25
94:14,15

**exhibits** 68:19
81:5

**existed** 97:14

**existence** 91:14

**expansion**
93:14

**expense** 85:21

**expenses** 36:1
46:21 70:21,24
73:11

**expensive** 103:1

**experience**
27:21 28:2 87:14
88:7 101:12 104:13
105:10

**experiences**
88:12

**expert** 74:19
79:18 88:24 89:5,10

**explain** 16:23
40:15 47:24 49:21

**Expressway**
4:4

**extent** 67:2 69:13
73:21 75:4

**exterior** 55:15,16

**extra** 94:13 95:7

**extraction** 42:23
43:8

---

**F**

**fact** 19:25

**factor** 102:21

**factors** 20:3

**fail** 88:19 100:23
101:4 103:6,13
104:12,16,17,20
105:15

**failed** 63:15 82:6,
20 104:13

**failure** 64:10

**failures** 63:15,24
72:24

**fair** 6:9,16 10:10
50:4,6 53:21 61:20
65:4 81:4 103:3

**familiar** 19:6,11
65:1,2 66:3 68:11

**Farm** 32:8,9 38:6,
8,23,24 39:9 43:17,
22 46:4,8 56:20
60:10 66:7 68:16
69:14,19 70:13,21
71:2 73:17,18 87:1,
4,8 95:21,24 96:15,

JAMES MEDDERS

24 97:2 101:10
102:4

**fault** 89:20

**faulty** 60:24 74:23
76:4 89:24 90:1

**February** 24:7

**figure** 40:19

**filed** 12:19,22
13:1,4,20 54:12
63:21

**filing** 54:11

**find** 11:2 27:12
81:6,14,16,17 94:7

**finding** 10:24
11:3

**fine** 20:20 55:3

**finish** 5:21,22
21:18,19

**finished** 16:6

**firm** 11:13,17
58:18

**fitting** 28:22 29:7,
17 30:6 31:25 48:15
49:18 50:25 53:3,6,
11 57:11,17,18
59:12,20 76:6,25
77:2,3,8 78:18 79:7,
10,12,24 80:1,3,4,
13,15,23,25 92:25
93:4,6 97:8

**fittings** 10:2
14:17,20,24 15:6,8,
13,15,19 30:4 48:4,
10 61:22 62:9,14
70:25 71:18 72:4,5,
13 74:21,22,23 76:4
84:2,3 88:17,18
89:14 90:6,10,14
93:8

**Fittings'** 14:19

**fix** 31:5 33:19 48:9
50:10 73:24

**fixed** 30:24 31:1,8
48:4 50:7 57:25
58:1,5

**fixing** 31:19

**fixture** 36:3

**flash** 77:15

**flip** 24:5 25:17
34:12 75:24 84:12

**flooded** 74:13

**floor** 26:12

**floors** 26:10

**folded** 60:10,12

**follow** 105:2

**follow-up** 12:12

**Forbes** 9:13,14,
15,16 16:1 20:22,24
27:1,15 33:24 50:25
51:7 62:21 75:9,12
96:10 102:18,23
105:4

**Forbes'** 25:20

**Forbus** 7:22 9:12

**foreseeable**
82:22

**form** 16:11 27:11
54:22 63:21 98:5

**found** 56:10,11
77:22 81:11,15,18,
20,21 90:24

**foundation** 67:6

**fourteen** 38:20

**front** 5:9 38:16
55:13 57:2

**fulfill** 63:17

**full** 6:20 35:4,7
46:17 70:13

**G**

**Gage** 4:11

**gave** 44:20,21,23
72:3,6 76:24 93:5
95:4 96:18

**GED** 17:14

**general** 7:15,16
17:2,25 28:3,5
103:15

**generally** 7:4
18:12,19 26:9 35:2
95:1

**gentleman**
51:22 96:6

**gestures** 6:4

**give** 4:22 5:12 6:6,
16 7:18 21:19 41:16
43:14,16 53:8,10
58:24 77:14

**giving** 6:20

**glad** 77:16

**good** 5:5,6 18:12

**graduate** 17:13

**grandfather**
18:6,15

**grandson-in-
law** 78:23

**Great** 65:23 69:16
97:6

**Greenberg** 4:13

**grown** 20:8

**guarantee** 52:7

**guess** 30:11
35:25 36:18 41:1
50:21 56:19 60:9
95:4 96:20

**guessed** 89:17

**Guillermo** 96:7

**guys** 27:10 36:10

**H**

**half** 26:12 57:21,
22

**Hampton** 4:5

**hand** 4:21 13:15
32:11 34:4 37:4
39:2 41:17 46:10
64:22 65:23 75:20

94:13 95:7

**handed** 39:23

**handing** 77:22

**handled** 70:17

**hands** 78:16,17

**handwriting**
40:4,5,7 65:13,15
67:24 68:2 69:3,5
94:23

**happen** 26:4
28:11 101:15 104:5

**happened** 31:25
51:20 57:10,17 58:8
59:17 60:13 61:18
71:20 92:25 93:3

**Harbin** 4:5

**hate** 40:24

**head** 6:5 8:10

**heard** 9:7,19
87:23 97:11

**heat** 99:1

**helped** 18:6
19:13

**helps** 5:25 32:22

**Hey** 33:24 43:14

**hiding** 77:11

**high** 17:13

**highest** 88:5

**hire** 16:9 26:21
84:10

**hired** 16:19 25:18,
25 27:24 55:20
60:18

**hiring** 92:20

**hit** 103:23

**hold** 50:10

**holding** 78:18

**hole** 57:21

**home** 9:18 10:19
15:5,22 16:4,8
19:22 20:2,5 22:4

23:24 24:14 25:19
26:3,17 28:23 31:6,
8 32:5 33:15 35:21
45:12 46:25 47:5,9
48:3 49:2,3 59:12
61:6 62:2,22 63:16
71:12,18 72:17,25
73:1,15 74:12,18
75:4,10,14 80:4
81:7 83:11,24 84:1,
3,10,20 85:18 86:22
87:12,18 88:13,22
89:3,9,15 90:7,11,
15,18 91:18 92:16,
19,20 93:9,16
97:12,18,23 98:23,
25 100:12,13,22,25
101:7,9 102:15
103:25 104:1 105:1,
6,17

**homes** 92:6,10,
14 103:19

**honor** 51:22 52:7,
8

**hours** 45:21,23

**house** 16:5,20,23,
25 17:3 20:1,11,25
26:9 61:21,25 62:6
74:13 86:23 92:22
93:12 100:8

**I**

**idea** 72:18 103:11,
14

**important** 5:19
20:4 84:8 104:25

**inaccurate**
99:24

**included** 86:2

**including** 55:17
72:23,25

**incomplete**
99:24

**indication** 77:3

**industry** 88:7

JAMES MEDDERS

**information** 8:7
11:6,7 12:8,11 13:3,
12,14 15:10 19:14,
15,19 34:21 40:18
42:8 44:3 50:2
51:11,14 67:6 77:6
95:4 96:15 100:4

**informed** 101:2,
18

**inherent** 82:23

**injured** 91:13

**Inn** 4:5

**inspect** 30:13
31:4

**inspection**
61:12,17,21 71:19
80:4 93:10 94:3

**inspector** 72:8,9

**install** 23:24
24:12,18,19 25:19
46:1 48:18 92:20
100:12 101:5
102:15

**installation**
23:7,10,14,18,21
24:6,9,25 25:3 27:1,
4 33:14 87:19
105:2,5

**installed** 15:5
24:14 25:18 31:22
75:3,14 83:11
84:10,20 87:11
90:7,11,14,18 91:18
97:18,23 100:24
104:16 105:6,16

**installing** 27:21
87:15 105:1

**instance** 17:20
24:17 26:10 27:24
28:11 104:23

**instructions**
105:2

**insulation** 31:13
36:2 45:17

**insurance** 32:6,
7 38:2 39:9 46:22
51:24 53:5,9 56:11,

16,20 58:10 61:9
63:5 65:21 66:13
70:12,18 85:17,22
87:1,2 95:2 101:15,
17 102:4

**insured** 32:9
73:18 101:10

**insurer** 38:5

**intact** 61:25

**intent** 12:5

**interior** 55:16

**internet** 10:24

**Interrogatories**
34:11

**interrogatory**
37:22 38:13 39:20
40:16 57:1 64:12
94:2 99:22

**introduce** 4:7

**investigate** 60:3
81:10

**investigated**
52:22 63:6 81:11

**invoice** 33:5
35:13 36:11

**involved** 10:21
16:7 44:24 57:11
99:6

**issue** 14:14,20
15:2

**issued** 38:24
64:14 83:22 84:2
98:1

**issues** 23:21
33:18

**item** 42:18 46:11
69:23

**J**

**James** 4:2,16 5:1
8:6 34:10 36:6
39:10 42:1 68:15

**job** 18:4 96:6

**joining** 14:23

**joke** 77:14

**Judy** 4:15 7:11,14
8:20 34:10 39:10

**July** 24:7 69:7

**June** 59:10,17
60:5 62:21 63:3
65:18 70:17 71:14
92:24 98:23 102:10

**jury** 5:9

**K**

**kids** 7:19 20:8

**kind** 15:15 17:2,
18,24 20:7,25 35:19
41:13 45:2,14,25
71:17 86:13 92:13,
21

**knew** 22:6

**knowledge**
11:18 12:20 13:5
19:19 30:9 34:22
44:9 45:13 52:19,20
54:10 61:6 62:4,7
63:8 65:22 69:15
70:2 75:2,11 87:3,
13 88:14 89:7 92:17
93:11 99:5 100:1,2,
5 102:17 105:10

**Kyle** 4:12 12:9
95:9

**L**

**labor** 43:11

**large** 26:13

**late** 48:1

**Lathrop** 4:11

**Laura** 96:20,25

**law** 11:13,17 45:5

**lawsuit** 9:21
10:13,22 11:19,24

12:16,18 13:21
14:15,20 15:2 18:20
37:11 42:5 53:18
54:11,12,19 62:8
74:3 99:6

**lawsuits** 13:6

**lawyer** 6:24 7:7
58:11,12,17 59:3,4
81:22 95:4

**lawyers** 12:6
13:3 32:21 37:10
58:16 77:14 96:18

**lay** 67:5

**leader** 88:7

**leak** 9:17,18 28:8,
11,22 29:1,4,7,16,
17,21 30:1,2,5,14,
16 31:4,10,11,19
33:1,2,3,4,5 35:5
38:3 45:9 46:21
47:4,8,9,12,22 48:9
49:16,23 50:7,14,24
51:4,5,6 55:25 56:3,
21 57:11 59:11,19
60:6,9,17,23 62:21
63:2,3 64:2 70:17
71:14,15 73:6 74:12
75:5,6 76:15,21
78:3,5,9,14 79:12,
21 84:1 87:23 89:14
92:24 93:1 96:3
97:7 98:23 101:12
102:3,11 104:20

**leaked** 53:3

**leaking** 32:1 60:2

**leaks** 27:7 46:24
47:9 49:9 62:2,5,9
63:6 64:4 70:22
71:10,12 73:4,21
75:10 76:9 81:7,12
86:22 89:21 90:20
92:9 99:14,23
103:16,20 104:5

**learn** 18:4 99:10

**learned** 28:7
99:12,13 100:4

**Learning** 18:15

**leave** 13:13 74:11

**Lee** 96:20,25

**left** 21:5 96:24

**left-hand** 8:18
42:1 67:24 96:22

**legal** 4:3 62:11
74:6,20,25 82:7
83:2,7 97:20 98:10,
13

**letter** 11:21 39:8,
23 40:16 65:5,8
66:6 68:15,22

**letters** 68:19

**level** 24:18,19

**licensed** 25:17,
22

**licenses** 18:9

**licensure** 25:20

**life** 6:19 92:7

**light** 36:3

**limited** 72:23

**Linda** 8:25

**listed** 8:17 9:3
14:4 15:4 57:3

**Lite** 4:12

**literally** 57:21,22

**live** 25:10

**lived** 92:6

**living** 26:13

**LLC** 4:13

**located** 22:18
47:5,13 59:12 91:4

**long** 65:2 66:4
68:10 94:20

**looked** 7:5 29:11
90:24 99:22

**lose** 77:15

**loss** 66:18 68:20
72:20,23

**losses** 63:14 73:3

JAMES MEDDERS

**lower** 22:8 24:17

**lowest** 102:18

---

**M**

**machinist** 17:21

**made** 15:16 16:13 18:19 20:6 38:5 46:8,25 52:11 53:2 57:6 60:6 65:21 69:25 70:14,20 87:4 92:3

**make** 6:4,8 9:22, 25 12:13 14:10 38:2 56:20 60:10 71:1 87:22

**makes** 21:20

**making** 70:10 82:5

**man** 93:20

**manual** 87:19 105:5

**manufacture** 88:8

**manufactured** 75:17,18 77:4,7 88:2 90:4

**manufacturers** 92:4

**manufacturers'** 103:12

**mark** 13:15 32:11 37:4 39:3 41:17 64:22 65:24 68:7 75:20 94:14

**marked** 8:1,3 13:18 32:13 34:5,6 37:5 39:4 41:19 64:23 65:25 68:8 75:22 77:21,23 94:15

**Mart** 95:19

**Mary** 96:3

**master** 47:5,13 50:18,21,22 59:13

**material** 9:25 15:15 20:25 21:3,25 22:2 48:8 92:21

**materials** 12:19 20:11 22:11 23:7,14 27:2,5,8 31:21 34:1 45:14 50:25 62:22 71:17 75:13 86:13

**math** 69:10

**Mcmahon** 82:20

**Meadows** 77:24

**means** 10:15,18 97:3

**measure** 50:6

**Medders** 4:2,15, 16,17 5:1,5 8:6,7,20 19:1 25:14 28:22 29:3 30:13 31:3,17 32:18,25 36:7 37:9 39:5,10,13 41:20 42:1 47:4 55:6 59:11 63:14 64:25 65:6,24 66:2,7 67:2 68:13,16 69:17 72:20 75:23 82:20 85:12 94:14,16 100:16,21 101:24 106:11,14

**Medders'** 63:16

**Medders's** 34:10

**Medderses'** 25:19

**medications** 6:18

**members** 82:21 91:12

**mental** 69:9

**mentioned** 22:11 85:17

**middle** 35:11

**Mill** 19:22

**mind** 6:2

**minus** 46:17

**misrepresentations** 72:22

**mistaken** 49:3

**Mister** 24:22,24 105:13

**moment** 18:25

**monetize** 98:16, 18

**money** 38:8 40:19 44:19,23 69:14 87:8 98:6

**month** 102:6

**months** 24:8

**Morgan** 19:22

**morning** 5:5,6 55:9

**moving** 8:10

**multiple** 21:13 64:19 76:5

---

**N**

**nails** 103:23

**names** 8:17,18

**nature** 103:24

**needed** 36:3

**nervous** 7:17

**net** 42:9 44:7 70:9

**nibble** 59:11

**NIBCO** 4:11 9:4, 8,16,19 10:23 15:9 18:20 27:13,16 28:7,22 37:10 47:4 49:13 51:12,17 52:12 53:23 54:1,3, 14,16,20 59:12,20 61:5 62:25 63:3,14, 15,23 64:3 74:4,17 75:3,9,18 77:4,7 78:6 81:6,10 82:6, 20,23,25 83:5,10,22 84:2,16,19 86:18,21 87:5,10,15,18,23 88:2,5,10 89:3 90:6,

14,17 93:9 97:7,17 98:1,2,5 99:8,10 100:22 101:3 102:15,24 103:6,10 105:5,6,11,14,19 106:2

**NIBCO's** 34:11 64:9 87:7 89:20 90:10 91:23 92:2

**Nichols** 96:5

**night** 48:1,2 86:23

**nipple** 47:4,12 57:11,17 58:4,5,8 59:11,20 78:6

**nod** 6:4

**non-copper** 92:16

**North** 4:3

**note** 67:19

**noted** 67:9

**notes** 95:1 97:4,5

**notice** 8:6,8 63:14,24 64:10

**November** 4:2 8:14 101:25

**number** 22:4 32:17,24 35:1 38:19,22 42:23 51:16,17,18 52:24 57:3 60:14 64:13 66:16,17 68:18 104:6

**numbers** 32:19 69:22 95:5 96:13

---

**O**

**oath** 4:18 5:7,11 55:8 85:14 94:12

**object** 12:9 27:11 54:22

**objection** 16:11, 14 18:21 22:13 25:4 43:19,25 62:11 67:1,20 74:6,19,25

**objections** 34:10 67:9

**obligations** 63:17

**observe** 29:4,7, 16,17 30:3

**observed** 28:22 29:3 47:4,12 57:15, 16 59:11,19

**obtain** 17:15

**occurred** 27:8 61:12 78:5 88:22

**occurring** 60:17 61:24

**October** 34:17, 18 100:3

**offended** 6:8

**offer** 33:19

**office** 95:20

**offices** 95:21

**omissions** 72:21

**one's** 89:17

**online** 81:9,11 90:24 99:8

**open** 47:16

**oral** 4:1 6:6

**original** 63:25 77:14

**out-of-pocket** 46:20 70:21 72:23 73:3,11

**outcome** 11:24

**outline** 94:7

**overnight** 74:12

**owned** 17:22

**owner** 9:13

JAMES MEDDERS

November 16, 2016
Index: packet..question

**P**

**packet** 68:25

**pages** 19:4

**paid** 33:10 37:24
38:8 41:9 44:12,15
56:23 57:6,7 70:13
71:4,8 74:4 87:7
91:17

**paper** 13:24 40:9,
11

**paragraph** 14:8
18:24 19:3,4 24:5,
23 25:16 28:14
30:12,22 35:4,7,10
47:3 55:12,14 59:9
63:12 72:19 82:12,
14,17 84:12,13
88:1,2,15,16,18
91:9,11

**paragraphs**
19:10,14,15,20

**Parker** 95:17,18,
22

**part** 11:19 34:20
37:10 42:5 49:17
60:24,25 61:20 62:8
71:19 82:19 85:18,
24 86:11,25 88:17

**parts** 61:21 104:1

**past** 7:18 17:11
104:14

**pay** 33:25 71:6
91:20

**paying** 91:13

**payment** 39:13
40:9,11 42:9 44:7
46:18 64:18 65:9
66:9,21 68:23 70:7,
9

**payments** 64:19

**people** 10:20
20:6 26:21 77:14
81:12 90:25 91:2,4
104:23

**performed**
35:15 36:6,9

**period** 100:24
101:4

**permit** 94:3

**permitted** 101:5

**person** 96:21
97:8 104:25

**person's** 51:16

**personally** 8:22,
23

**PEX** 9:22,24
14:13,14,18,19,23
15:21 21:3 22:1
27:18 48:11,15
51:12 61:5 62:3
63:15,16,24 72:17,
22 75:3 81:6,10
82:23 84:2 86:19
87:15 88:3,6,8,17,
18 89:3,8 90:18
91:14,15,17 92:2,3
97:11,18,22 98:2
100:23 101:3,12
103:12

**phone** 53:22
63:25 65:14 67:25
69:7

**photos** 76:17,24
77:3 78:4,11,20

**physical** 26:4
73:1

**physically** 47:14

**picked** 34:1

**picture** 79:14
80:12,16 81:1,3

**pictured** 79:25

**pictures** 76:4,5,
14 78:3 80:19

**piece** 13:23

**pieces** 10:3

**piping** 10:8,9
71:18

**place** 4:18

**plaintiff** 12:17
99:3

**plaintiffs** 4:13
8:22 14:4 34:10
38:22 54:13 64:15
91:12

**plan** 16:8,24

**plans** 26:4,7

**plastic** 72:4,5

**plugged** 48:7

**plumber** 9:9,10
15:23 20:12,13,19
29:22,23 30:13 31:4
52:25 60:18 72:7
96:10

**plumbers** 100:7

**plumbing** 9:11,
25 10:3 14:12 15:22
17:1 20:10,17,22,25
22:1,3,4,12 23:2,3,
6,11,14,21,24 24:6,
9,13,18,20,25 25:19
26:1 27:21 28:2,3
29:24 31:19 33:5,
12,14 35:11 47:10
49:25 50:1 51:1,7
52:7 56:3 71:12
72:24 74:8 75:9,13,
14 76:4 83:16,17,24
84:9,16,24 85:17
86:6 87:10,11,15,17
88:3 90:12,15 91:25
92:9,13,17,20,21
98:7,23,25 100:13
101:2,5 103:5,15,20
104:2,5,17,20

**point** 19:18 23:2
52:17,21 83:25

**Policy** 41:24

**polyethylene**
14:12

**positive** 11:8
40:22,25 49:4 59:6
61:19 78:15 82:3
86:18

**posted** 99:8

**pouring** 29:5

**predisposed**
88:17,19

**prefer** 86:19

**prematurely**
88:19 100:23 101:4
103:6,13,16 105:15

**prepare** 6:22

**present** 23:10
78:19

**presented** 38:23

**Press** 42:24 43:2,
5,12

**presses** 43:6

**pressure** 93:17,
20,23

**presume** 8:21
95:16

**prevent** 6:19

**previous** 13:25
39:19 40:3 60:6
68:19 92:14

**price** 22:7,8

**printing** 43:6

**prior** 7:23 9:18
22:6 54:11,12,19
61:24 70:7 100:21

**private** 24:23

**problem** 27:14
81:13

**proceeding**
5:24

**process** 26:5,17
44:25 86:14

**produce** 67:10

**produced** 37:10

**product** 62:25
89:24 90:1 91:15,23
105:1,2

**products** 9:22
15:4,11,21 27:16,19
63:15,16,24 72:22
74:17 82:6,23
83:10,18,23 84:17,

20,22 87:15,18
88:3,6,8 90:18
91:14,18,21,24
92:2,3 97:19,22
98:2 99:11 100:23,
24 101:3,5,13
102:15 103:6,7,10,
13 105:5,11,15

**professional**
18:8 25:18

**proper** 90:7

**properly** 87:11
104:17

**property** 45:4

**provide** 13:3,8,
10,12 21:8 33:12
37:11 63:23 82:20
87:17 88:5

**provided** 13:14
19:14,15 21:23
22:23 35:22 36:20,
24 42:5 43:11 63:14
64:10 83:1,5 97:17
100:22

**punitive** 10:18

**purchase** 49:5
83:10

**purchased**
48:13,20 75:13
83:17 84:16,20

**pursuant** 36:9

**put** 20:19 30:4
40:24 81:5 94:24

**putative** 4:14
10:12

**Q**

**quality** 88:5

**question** 5:21
6:5,12,14 19:8
21:18,19 29:8 35:1
38:19 39:19 50:5
60:9 94:22 103:5
105:14

**questions** 6:12, 15 12:12 13:7,10 67:1,17 82:15 94:6 95:11 100:16 102:14 106:8

**quick** 5:18 55:1 69:17 82:14 85:7,13 94:5 95:7,11

---

**R**

**Rachel** 4:10

**radiant** 99:1

**raise** 4:20

**raised** 18:2

**ranch** 18:2

**rancher** 17:22

**ranching** 17:24, 25

**reached** 63:10

**read** 5:7 28:18 40:10 42:17 88:16 106:14

**reads** 88:2

**ready** 84:13

**real** 69:16 82:14 95:7

**reasonable** 63:13

**reasons** 103:21, 22 104:4,6

**recall** 22:10 23:23 38:11 41:22 45:18 46:23 47:20 48:16 50:24 51:2,13 53:7 55:8 60:8 63:22 64:20 66:14 67:3,7 72:3,10 73:12 75:7 76:20,23 80:16,20, 25 81:23 86:5 92:11,12 95:3,16 99:12,15 102:17,20

**received** 40:12, 15,19 41:2 46:17 69:14 100:7 101:3

**recent** 80:4

**recess** 55:5 77:18 85:11 94:10

**recirculation** 93:12

**recognize** 13:19 32:14 34:7 37:6 39:6 40:4 41:21 64:24 75:25 77:25 94:17,19

**record** 4:7 5:19 6:1,8 8:5 20:19 28:19 32:16 34:9 39:5 40:24 55:7 64:25 66:1 68:13 75:23 77:16,17,20, 23 85:13 94:11,16

**records** 96:18

**refer** 15:24 28:13 32:17 50:2

**referring** 35:2 46:7 91:11

**reflected** 45:12

**reflecting** 36:17

**refused** 10:23

**reimbursed** 73:14

**reiterate** 98:22

**relate** 66:12 96:14,16

**related** 17:10 18:9 38:3 41:12 56:3 65:20 70:22 78:8 87:8

**relating** 76:9

**relief** 98:5

**remediation** 42:24 43:10

**remember** 11:4, 5 13:1,23 17:17 19:18 22:17 24:4 28:12 36:21 39:7,21 44:20 48:12 50:3 53:4 55:19 68:12

**102:18 105:20

**remembering** 7:18

**remembers** 11:8

**remind** 6:7 21:17 55:7 94:12

**remodeled** 80:8

**Remodeling** 31:17

**removed** 31:13 32:5 49:10 58:7,9 60:24 61:11,22 80:6,7,24 93:1,9

**repair** 30:2,13 31:4 33:5 35:11 42:18 43:23 49:8 55:15 56:3,10 60:18,23 62:20 63:16 70:25 73:6

**repaired** 30:1,16 31:11 47:23 48:6 55:24

**repairs** 33:1 37:15 39:14 45:10, 12,15,19 46:25 60:6 70:1 72:25 73:24 85:18 96:1

**Repeat** 90:13

**repeatedly** 88:4

**replace** 30:8 55:15 63:16

**replaced** 31:14, 22 49:24,25 50:1 60:25 61:3,6 71:18 74:8 84:3 93:1,3 98:7

**replacement** 46:13 50:11

**replacing** 36:1,2 55:17

**reporter** 4:1,17, 20,25 5:7,19 106:13,16,19

**reports** 7:6

**represent** 13:20

**representative** 10:13 12:16,17

**represented** 88:4

**representing** 10:19

**required** 14:18, 23 15:14

**rerouted** 85:18

**rerouting** 80:24 86:13

**research** 92:19

**respond** 5:25

**response** 6:5 39:20 40:17 47:21 57:3 64:13 94:1 103:4 105:13

**responses** 6:16, 20 13:8,10 34:11 37:22 38:14 64:13 99:23

**result** 38:9 56:20 60:6,13 62:9 63:2 72:21 73:4 88:19

**resultant** 30:14 31:1,5

**resulting** 59:13

**retained** 30:13 31:3

**retention** 11:21

**retirement** 20:2

**review** 12:21 18:25 19:17 84:12

**reviewed** 12:19 13:1 19:5 63:20

**reviewing** 67:3

**right-hand** 41:25 95:12

**rights** 87:2

**ring** 48:21 55:22

**rings** 62:6

**risks** 82:22

**Romans** 78:25

**room** 4:8 28:23 39:14 40:12 42:18

**rooms** 26:10

**roughly** 86:2

**ruined** 49:23

**run** 96:6

**running** 66:25 67:19

---

**S**

**S.F.F.** 95:13

**sale** 91:13

**Sandy** 95:22

**saws** 103:24

**school** 17:13

**second-to-last** 36:1

**seconded** 55:13

**selected** 15:21 20:10 23:2,3 25:20 27:15,18 105:19

**selecting** 102:21

**self-taught** 18:12

**send** 106:16

**sense** 9:22

**sentence** 30:11 36:1 55:14 91:11

**served** 99:3

**service** 25:9 93:25

**Services** 93:22, 24

**set** 34:11 93:19,20, 22

**settings** 93:16

**shake** 6:5

**Shamberg** 4:12
6:25 16:11,13,16
18:21 19:7 22:13
25:4 27:11 38:17
43:19,25 54:22,25
55:3 62:11 66:23,25
67:8,11,14,16,19
74:6,19,25 77:11
79:18 82:7 83:2,7,
19,21 85:4,9 88:24
89:5,10 94:9 97:20
98:10 100:17,20
101:20 102:13,23
106:9,15,18

**Shamberg's**
103:5 105:14

**show** 7:25

**Showing** 79:15

**sic** 9:13 21:5 77:24
96:5

**sign** 11:20 106:14

**signature** 34:15

**signed** 34:17

**similar** 90:20

**sir** 13:20 32:18
34:12,24 39:23
46:10 65:1 66:2,3
68:7 76:1 77:22
94:11,19

**sit** 101:24

**sitting** 5:9 8:13
11:11

**small** 20:6 35:15,
20 36:7 41:5,12
79:1,2

**Smith** 72:11,12

**sold** 74:17

**solemnly** 4:21

**son-in-** 45:4

**son-in-law**
29:15 41:2,4,6
43:13 44:12,17
47:25 48:1 49:5
50:6 78:18 79:1

**son-in-law's**
43:4,18

**sort** 11:20,23
33:13 35:22 36:16
38:2 46:1 86:9 94:2
98:25

**source** 12:10

**South** 4:5

**specific** 26:22
27:19

**specifically**
51:12 81:10 82:11
84:25 91:10

**speculation**
25:5 43:20 44:1

**spend** 86:23

**spewing** 57:23

**stages** 24:12

**stainless** 14:22
15:1

**stamped** 37:8

**stamps** 32:21

**Starnes** 36:22,23
37:24

**Starnes'** 37:18

**start** 12:17 28:14

**started** 10:24,25
16:6

**starting** 18:24
19:3

**state** 4:8 32:8,9
38:6,8,23,24 39:9
43:17,22 46:4,8
56:20 60:10 66:7
68:16 69:14,19
70:13,21 71:2
73:17,18 87:1,4,8
95:21,24 96:14,24
97:2 101:10 102:4

**statement** 59:16

**states** 88:4 91:7

**steel** 14:22 15:1

**Stephens** 4:10
5:4 16:19 19:10
38:19 54:24 55:1,4,
6 62:13 67:5,9,12,
15,18,21,22 77:13,
19 83:22 85:7,10,12
89:2 94:5,11 95:9,
10 98:12,15 100:15,
18 101:21,23 106:7,
10

**Stephenville**
4:6 22:19

**Steve** 7:22 9:12,
13,14 20:22 96:9
105:4

**stopgap** 50:6

**stored** 84:22,24
85:2

**Structural** 41:24

**subbed** 17:1

**subcontractor**
56:6,7,8 86:9,12

**subcontractor
s** 26:22

**submitted** 56:16
93:9 101:14

**subsequent**
45:10

**Subsequently**
32:2

**successful** 49:9

**suffered** 72:20
73:4

**suffering** 74:9,
10 98:7,8

**sufficient** 82:21

**suggest** 13:11

**Suite** 4:4

**Suites** 4:5

**summary** 46:10
69:19

**supplied** 24:23

**supplier** 85:3

**support** 4:3 77:7

**supposed** 5:12

**swear** 4:21

**sworn** 5:2

**system** 10:3 22:1
24:6 25:19 51:8
90:12,15 92:17

**systems** 42:24
43:2,5,12 88:3
92:13

**T**

**tag** 94:24

**taking** 6:3,4,18
8:14 78:20 85:13

**talk** 5:20 7:11,14,
19,22 9:16 10:23
16:4 27:4 51:23,24
97:7,9

**talked** 7:12 9:9,10
51:2,7 59:3 71:11
96:25 97:16 100:6

**talking** 14:11
16:1 20:21 30:18,19
32:22 45:10 49:16
50:24 60:15 85:16

**talks** 35:5

**tank** 93:12,14

**teach** 18:5

**teaching** 18:16

**tee** 28:22 29:7,17
59:12,20 76:6 77:7
80:13,15

**temperature**
93:17

**term** 10:7

**terms** 14:9 52:12
54:4 99:16,20

**Terri** 4:3 5:25
21:20

**Terri's** 6:3

**testified** 5:2 67:2
87:21 103:4

**testifying** 5:9

**testimony** 4:22
74:20 79:19 88:25
89:6,11

**testing** 61:11

**Texas** 4:4,6 11:17
19:23 91:6

**thing** 5:18 6:11
10:9 13:6 20:7
67:20

**things** 6:2 7:15,
16,18 16:9 17:1
30:4 50:16 95:5
103:24 104:13,16

**thought** 102:2

**time** 4:6 5:20 9:7
15:5 19:6,7 21:11
24:13 34:24 45:18
50:7 52:13 53:2,7,
25 54:24 60:5 62:22
63:13 65:2 66:4
68:10 74:11 75:8
77:5 80:8,18 91:13
94:20 98:1 103:13
106:5,13

**times** 6:6

**title** 34:9

**today** 4:2,4 5:12
6:1,12,20 8:8,13
11:11 12:5 14:10
16:1,5 32:17 53:12
58:16,17 71:11 73:5
76:10 77:6 96:11
99:23 101:9,24

**today's** 5:8 6:22
7:8

**told** 15:11 51:15
57:14 86:17 102:23
103:5

**Tom** 96:5

**tool** 48:20,23
70:25

**tools** 48:18 73:6

**top** 8:16,17 14:4 69:19 96:20,21

**total** 33:7 37:20 46:11 69:23

**totals** 70:9

**track** 32:22

**treated** 24:24

**true** 34:21 38:25

**trust** 88:5

**truth** 4:22,23

**truthful** 5:12

**tubes** 14:12

**tubing** 9:25 10:7, 9 14:14,18,24 15:6, 14 30:8 49:18 61:3, 5,21,24 62:3 72:15 74:24 75:3 89:3

**Tubing'** 14:13

**tubings** 15:7

**turn** 14:7 34:24 38:13 39:22 74:11 79:8

**twenties** 17:19

**type** 9:24 22:2,11 48:10 83:23 98:1

**types** 10:9 72:4 74:2

**U**

**U.S.** 4:3

**uh-huh** 9:15 12:7 19:2,24 32:20 95:14 102:8

**understand** 5:8, 13 6:12,14,15 8:11 9:4,21,24 10:4,12, 15 14:13,19 20:14, 21 43:12,17,22 52:12 67:13,14 85:14 86:8

**understanding** 30:5 54:3

**unincorporated** 25:11

**United** 88:4

**update** 55:10

**upper** 24:19 41:24,25

**utility** 17:23 28:23 39:14 40:11 42:18

**V**

**vac** 45:3

**vague** 18:21

**verification** 34:13

**verified** 100:3

**verifying** 34:20

**verses** 21:3

**version** 13:25

**virtue** 91:13

**Visited** 6:24

**W**

**wait** 5:21,24 16:18 18:18

**wall** 47:5,13,16 55:16

**wanted** 20:25 86:13

**warn** 82:6

**warned** 105:14

**warning** 83:22 84:2,4 97:18 98:2 100:22 101:3 105:20 106:2

**warnings** 82:21, 25 83:6 97:16 102:14

**warranty** 33:13 51:22 52:9,12,22 54:4 63:17 99:10,

16,20 100:23 101:4

**washroom** 26:13

**water** 24:23 25:9 29:6,9 30:13 31:4 35:12,16,21 39:16 42:23 43:8 48:7 57:23 60:2 74:11 79:20 93:17

**website** 81:16

**week** 76:21

**weeks** 102:7

**wet** 31:13 45:3

**wet-dry** 45:3

**wife** 7:11,12 9:2 11:7 13:8 29:17 47:19 52:19 81:18, 24

**wife's** 54:8

**Wonderful** 17:15,24 18:3

**words** 6:3

**work** 17:18 21:8, 15 26:5,22 31:16 33:13 36:6,9,11,25 40:9,11 41:3,7,13 43:15,16,18,23 45:25 46:1 56:10 80:9 85:25 86:6,9, 11 103:18

**worked** 18:6 103:19 104:1

**workers** 104:1

**working** 104:1

**works** 43:6 96:4

**worth** 41:15 98:20

**would've** 60:22

**write** 19:13

**writing** 94:21

**written** 7:6 13:12 19:16 96:14

**wrote** 40:4 64:6

**Y**

**year** 16:5 17:12,15 33:18 61:15,18 100:3 101:13 102:3

**years** 17:8,11 88:6 102:10 103:18

**yellow** 15:18 62:17

**yes?'** 6:7

**younger** 18:7