**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| KIMBERLY COLE and ALAN COLE, *et al.*, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NIBCO INC.,<br>Defendant. | : | CIVIL ACTION NO. 13-CV-07871-FLW-TJB<br><br>Document Electronically Filed<br><br>Oral Argument Requested |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT NIBCO, INC.'S MOTION TO EXCLUDE EXPERT OPINIONS AND REPORT OF ED SLOVAK**

J. Gordon Cooney, Jr.
(admitted *pro hac vice*)
Franco A. Corrado
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, Pennsylvania 19103-2921
Tel: (215) 963-5000

Jean Paul Bradshaw II
J. A. (Jay) Felton
Kevin M. Kuhlman
Rachel E. Stephens
(all admitted *pro hac vice*)
Lathrop Gage LLP
2345 Grand Boulevard, Suite 2200
Kansa City, Missouri 64108-2618
Tel: (816) 292-2000

# TABLE OF CONTENTS

**Page**


INTRODUCTION ....................................................................................1

BACKGROUND FACTS ...........................................................................4

A. NIBCO ..............................................................................................4

B. PEX Tubing Is Installed In A Variety Of Ways, And With Varying Levels Of Accessibility ..........................................................4

C. Only A Miniscule Percentage Of PEX Is Reported To Have Leaked...............................................................................................5

D. Plaintiffs' Motion for Class Certification .............................................6

E. Slovak's Damages Methodology ........................................................7

ARGUMENT AND AUTHORITY .........................................................10

A. *Daubert* Requires Plaintiffs To Make Threshold Showings Of Relevance And Reliability...................................................................10

B. Slovak's Classwide Damages Methodology Does Not "Fit" Any Of The Remaining Claims...................................................................12

1. Slovak's methodology does not fit Plaintiffs' strict liability claims because no member of the putative class can recover the cost to repair or replace NIBCO PEX. ......................................13

2. Mr. Slovak's methodology does not fit Plaintiffs' implied warranty claims because it seeks recovery for products that have not yet failed..........................................................................16

3. Mr. Slovak's methodology does not fit Plaintiffs' express warranty claims because it allows recovery for products that have not yet failed and includes costs disclaimed in the NIBCO PEX Limited Warranty. .....................................................19

4. Mr. Slovak's opinions regarding damages should also be excluded at trial if Plaintiffs pursue other remaining claims on an individual basis. ...................................................................22

C. Mr. Slovak's Opinion Does Not "Fit" And Is Not Reliable Because A "One-Size-Fits-All" Per-Fixture Recovery Is Not Supported By The Record Or Common Sense....................................23

D. Mr. Slovak's Should Be Barred From Opining On Whether The Original NIBCO Plumbing Products Were Installed Properly In The Named Plaintiffs' Homes. ....................27

CONCLUSION ....................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Air Bag Prods. Liab. Litig.*,
7 F. Supp. 2d 792 (E.D. La. 1998) ... 23

*Ajose v. Interline Brands, Inc.*,
187 F. Supp. 3d 899 (M.D. Tenn. 2016) ... 22, 23

*Angel v. Goodman Mfg. Co., L.P.*,
330 F. App'x 750 (10th Cir. 2009) ... 25

*Argabright v. Rheem Mfg. Co.*,
201 F. Supp. 3d 578, 592 (D.N.J. 2016) ... 27

*In re Blood Reagents Antitrust Litig.*,
783 F.3d 183 (3d Cir. 2015) ... 17

*Chin v. Chrysler Corp.*,
182 F.R.D. 448 (D.N.J. 1998) ... 25

*Cole v. General Motors Corp.*,
484 F.3d 717 (5th Cir. 2007) ... 24

*Cole v. NIBCO, INC.*,
Civ. No. 3:13-cv-07871, 2015 WL 2414740 (D.N.J. May 20, 2015) ... 26

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013) ... 8, 17, 18

*Cooper v. Samsung Elecs. Am., Inc.*,
No. 07-3853, 2008 WL 4513924 (D.N.J. Sept. 30, 2008) ... 26

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ... 8, 16, 17, 29

*Elcock v. Kmart Corp.*,
233 F.3d 734 (3d Cir. 2000) ... 29

*Fed. Ins. Co. v. Dean Const. Co.*,
432 F. Supp. 2d 1256 (M.D. Ala. 2006) ... 25

*Ford Motor Credit Co., LLC v. Mendola*,
48 A.3d 366 (N.J. App. Div. 2012) ....................25

*Fowler v. Goodman Mfg. Co. LP*,
No. 2:14-CV-968, 2014 WL 7048581 (N.D. Ala. Dec. 12, 2014)....................27

*In re: Gen. Motors LLC Ignition Switch Litig.*,
No. 14-MC-2543, 2016 WL 3920353 (S.D.N.Y. July 15, 2016)....................25

*Goodson v. Boston Sci. Corp.*,
*No*. 1:11-CV-3023, 2011 WL 6840593 (N.D. Ga. Dec. 29, 2011) ....................20

*Grant v. Bridgestone Firestone Inc.*,
57 Pa. D. & C.4th 72, 2002 WL 372941 (Pa. Com. Pl. 2002) ....................22

*Gumbs v. Int'l Harvester, Inc.*,
718 F.2d 88 (3d Cir.1983) ....................36

*Hess v. Volkswagen of America, Inc.*,
221 P.3d 132 (Okla. Civ. App. 2009)....................25

*Highland Capital Mgmt., L.P. v. Schneider*,
379 F. Supp. 2d 461 (S.D.N.Y.2005) ....................36

*Hobbs. v. Gen. Motors Corp.*,
134 F. Supp. 2d 1277 (M.D. Ala. 2001)....................26

*Kee v. Zimmer*,
871 F. Supp. 2d 405 (E.D. Pa. 2012)....................26

*Krys v. Aaron*,
112 F. Supp. 3d 181 (D.N.J. 2015)....................35

*Maness v. Boston Sci*.,
751 F. Supp. 2d 962 (E.D. Tenn. 2010)....................21

*Marcus v. BMW of N. Am., LLC*,
687 F.3d 583 (3d Cir. 2012) ....................25

*Oddi v. Ford Motor Co.*,
234 F.3d 136 (3d Cir. 2000) ....................16

*Oppenheimer v. York Int'l*,
No. 4348 MARCH TERM 2002, 2002 WL 31409949
(Pa. Com. Pl. Oct. 25, 2002)....................25

*Plas-Tex, Inc. v. U.S. Steel Corp.*,
772 S.W.2d 442 (Tex. 1989) ....................23

*Rosa v. American Water Heater Co.*,
177 F. Supp. 3d 1025 (S.D. Tex. 2016)....................23

*Schneider v. Fried*,
320 F.3d 396 (3d Cir. 2003) ....................16

*Solarz v. DaimlerChrysler Corp.*,
No. 2033, 2002 WL 452218 (Pa. Com. Pl. Mar. 13, 2002)....................23, 25

*Surace v. Caterpillar, Inc.*,
111 F.3d 1039 (3d Cir. 1997) ....................21

*Talley v. City Tank Corp.*,
279 S.E.2d 264 (Ga. Ct. App. 1981)....................21

*In re TMI Litig.*,
193 F.3d 613 (3d Cir. 1999) ....................17

*Wheeler v. HO Sports Inc.*,
232 F.3d 754 (10th Cir. 2000) ....................21

*Wilcox v. Hillcrest Mem'l Park of Dallas*,
696 S.W.2d 423 (Tex. App. 1985)....................26

*Wooten v. Motorola Commc'ns & Elecs., Inc.*,
488 P.2d 1284 (Okla. 1971)....................26

*Zaza v. Marquess & Nell, Inc.*,
675 A.2d 620 (N.J. 1996) ....................20

**Other Authorities**

Fed. R. Civ. P. 26....................35

Fed. R. Evid. 702 ....................16, 35

Fed. R. Civ. P. 23....................17, 18, 35

Defendant NIBCO INC. ("Defendant"), by and through counsel of record, for its Motion to Exclude Expert Opinions and Report of Ed Slovak, states as follows.

## INTRODUCTION

Plaintiffs allege that NIBCO's 1006 PEX tubing ("Tubing"), yellow brass fittings ("Fittings"), and stainless steel clamps ("Clamps") are defective. On March 7, 2017, Ed Slovak issued his "Expert Report Concerning Methodology to Calculate Damages and Installation of NIBCO PEX Products." (hereinafter referred to as the "Slovak Report"). In his Report, Mr. Slovak purports to provide a methodology to calculate a single, "per-fixture" price for the removal and replacement of all NIBCO PEX products currently installed in putative class members' homes, regardless of whether or not their plumbing system leaked and regardless of whether removal and replacement would be simple or difficult depending on the circumstances and location of the PEX's installation in particular class members' homes. He concludes that this replumbing will cost $600 per fixture, per home, regardless of where the PEX is located in the home, whether there are efficiencies based on the number of fixtures in the home, the composition of the system, or the home's floorplan and design features. (Ex. A, Slovak Report at 2, 5.) Mr. Slovak's Report does not purport to estimate or provide a model for

reimbursing class members for PEX that allegedly has leaked and has already been replaced, or to pay to repair physical damage caused by a leak.[1]

Mr. Slovak's opinions should be excluded because under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), his damages model does not "fit" the claims or facts in this case because it seeks remedies that are not available under the current operative claims for which Plaintiffs are seeking class certification. The Court, for instance, already has held that the cost to repair or replace PEX is an economic loss that is not available as a remedy for Plaintiffs' tort claims. (Doc. 84 at 22-25.) That is all that Mr. Slovak's "cost-per-fixture" figure methodology purports to model, however. His model further does not "fit" because it necessarily contemplates recovering damages to replace all installed PEX, including PEX that has not leaked and for which there can be no recovery as a matter of law. The record demonstrates that only a miniscule percentage (less than .001%) of PEX products installed in the field are reported to have leaked. Yet, Mr. Slovak's methodology would provide a damages remedy to everyone in seven states, regardless of whether or not they have ever had a problem with their PEX.

[1] Mr. Slovak was deposed regarding his Report on May 18, 2017. By agreement of the parties, Slovak's deposition was cross-noticed between this matter and *Meadow, et al. v. NIBCO, INC.*, Case No. 3:15-cv-1124, which is currently pending in the United States District Court for the District of Middle Tennessee.

Likewise, Mr. Slovak's opinion that all PEX can be replaced using a single "standard" $600 cost-per-fixture price does not "fit" the record and is not reliable because it purports to identify a uniform recovery that is based on Mr. Slovak's anecdotal experiences rather than any cited, disclosed, or verifiable data sources. Moreover, his opinion neither considers nor accounts for the variety of locations where PEX is installed, or the differing levels of accessibility that necessarily will have a direct impact on the cost to remove and replace it. By way of example, Mr. Slovak assumes that every fixture will require the removal of patches of drywall, its replacement with new drywall, and work to repaint the new drywall to blend it into the area. (Ex. A, Slovak Report at 3, n.1.) But, as the record here demonstrates, some PEX may be readily accessible and can be removed and replaced without any demolition or associated repair costs. Other PEX may be behind more expensive and diverse materials like faux paint, wallpaper, or other structural features, which would make removal and replacement more expensive and which admittedly is unaccounted for in Mr. Slovak's opinion. Indeed, his $600 per-fixture "standard" cost is belied by the record, including deviations in estimates received by named Plaintiffs in this matter, proving there is no "standard" price at all. In short, it is a wholly unreliable approach to measuring any particular class member's actual damages.

## BACKGROUND FACTS

### A. NIBCO

NIBCO is based in Elkhart, Indiana. NIBCO has been manufacturing and selling plumbing products since 1922. These products include fittings, valves, piping, and tools to install and maintain these products.

Since 2004, NIBCO has sold plumbing tubing made out of crosslinking polyethylene ("PEX") for use in potable water applications, as well as fittings, crimps and clamps to be used with this PEX tubing. Fittings are used to connect tubing or as an accessory to tubing, and crimps or clamps are used to secure the fitting to the tubing.

### B. PEX Tubing Is Installed In A Variety Of Ways, And With Varying Levels Of Accessibility.

PEX Tubing and related components are installed in a variety of different locations in homes, and, depending on the facts of a particular home, may be readily accessible or may require different levels of disruptive or damaging construction to access it. (*See generally* Ex. C (Jalnos Report).) For example, some PEX is run under and behind wallpaper or faux paint, or other structural materials like tile or concrete. (*See* Ex. B, Slovak Dep. at 176:11-181:6; Ex. C, Jalnos Rep.; Ex. D, Shah/Duvall Rep. at 3 (noting certain Plaintiffs' installations obscured from visual inspection).) These materials may be damaged or destroyed during the replumbing process. (Ex. C at 1-3.) Other PEX may be openly

accessible in basements, attics, or crawlspaces without the need to cut through or remove any structural features to remove the old PEX and run new PEX and, consequently, no need to repair or replace those structural features. (*Id.* at 1-2.)

### C. Only A Miniscule Percentage Of PEX Is Reported To Have Leaked.

Mr. Slovak purports to offer a "damages" calculation for all class members, regardless of whether or not they have experienced a leak and experienced damage. Only a miniscule percentage of PEX is reported to have leaked.

When NIBCO is contacted about an alleged product issue, its Technical Services Department initiates a Product Evaluation Request ("PER") and seeks to obtain a sample for evaluation. (Ex. E, McCoy Decl. ¶¶ 3-5.) NIBCO has shipped over 39 million pounds of Tubing and 35 million Fittings over the class period. (Ex. F, Coe Decl. ¶¶ 23, 25.) Nationally, there have been only 756 PERs related to PEX Tubing and 203 PERs related to PEX Fittings from 2007 to August 2015. (Ex. E, McCoy Decl. ¶¶ 23-32.)[2] These numbers show that NIBCO was contacted about a potential claim for less than .001% of its Tubing and non-LINX Fittings in the field and demonstrate there is no widespread problem. Yet, Mr. Slovak's

[2] Included in the Tubing total are all 76 Tubing PERs in the MS Access database and all 680 Tubing PERs in the SAP Report related to at-issue products. (*See* Ex. E, McCoy Declaration ¶¶ 16, 23.) Included in the Fitting total are all 26 Fitting PERs in the MS Access database and all 177 non-LINX Fitting PERs in the SAP Report related to at-issue products. (*See id*. ¶¶ 16, 32-33.) If LINX claims are included, the total would be 1,088 Fitting PERs. (*Id*. at 20.)

model purports to provide damages to those who have experienced no performance issue.

### D. Plaintiffs' Motion for Class Certification.

Plaintiffs are seeking certification of seven statewide classes based on alleged defects in the Tubing and Fittings[3] on three different theories of liability:

| State | Products | Class Period | Claims |
|---|---|---|---|
| Alabama Class | Tubing, Fittings | Took Possession On or After 12/27/2007 | Express Warranty |
| Georgia Class | Tubing | Constructed On or After 12/27/2009 | Strict Liability |
| New Jersey Class | Tubing, Fittings | Took Possession On or After 12/27/2009 | Express Warranty, Strict Liability |
| Oklahoma Class | Tubing, Fittings | Took Possession On or After 12/27/2008 | Express Warranty, Strict Liability |
| Pennsylvania Class | Tubing, Fittings | Took Possession On or After 05/01/2007 | Express Warranty, Implied Warranty, Strict Liability |
| Tennessee Class | Tubing, Fittings | Took Possession On or After 05/01/2007 | Strict Liability |
| Texas Class | Tubing, Fittings | Took Possession On or After 05/01/2007 | Express Warranty, Implied Warranty |

(Doc. 109 at 3.) Plaintiffs proposed a class definition that includes: "All persons who reside in [the respective State] who took possession of or constructed homes or other residential structures . . . in which NIBCO PEX 1006 tubing and/or yellow brass fittings were installed." (*Id.*)

[3] Plaintiffs are not seeking certification of any claims based on alleged defects in the Clamps.

**E. Slovak's Damages Methodology.**

In support of their Motion for Class Certification, Plaintiffs put forth the opinions of Ed Slovak, a licensed Master Plumber based in Nevada. (Doc. 109 at 34, 36.) Mr. Slovak was asked by Plaintiffs to "provide a methodology to calculate repair or repiping costs for Plaintiffs and class members." (Ex. A, Slovak Report at 2.) He concluded:

> If NIBCO's PEX products are defective as alleged, it is my professional opinion that a complete replumb (also known as a repipe) of Plaintiffs' and class members' homes and other structures containing NIBCO's PEX products is necessary because it is the only way to prevent the NIBCO PEX products from failing and causing catastrophic damage to the structures and personal property.

(*Id*.) Plaintiffs argue that Mr. Slovak's methodology establishes that one type of damages they are seeking in this case—the cost of re-piping Class members' homes in order to replace NIBCO PEX Tubing and/or Fittings that have not leaked—can be calculated on a class-wide basis. (Doc. 109 at 36.)

To calculate the cost of a repipe of an existing plumbing system, Mr. Slovak proposes using a "cost-per-fixture" method, i.e., adding up the number of fixtures in a particular home and multiplying that total by $600. (Ex. A at 3-4.) According to Mr. Slovak, the $600 figure includes the cost (1) to remove the old plumbing, (2) to install new plumbing, and (3) to repair some of the damage to the home caused by demolition work necessary to carry out the replumbing process. (*See id*. at 3, n. 1.)

Contrary to the record, Mr. Slovak assumes that each fixture for which PEX is replaced will necessitate the replacement of drywall, with the need to repaint and texture the area to match the new drywall to the existing drywall. (*See* Ex. A, Slovak Report at 1-3.) He thus applies the same $600-per-fixture number even though some NIBCO PEX Products may be run though open spaces in basements, attics or crawlspaces, thus requiring no demolition work or attendant repairs. (*See id.*) On the flip side, he applies the same "one size fits all" $600 figure even though the re-plumbing may require the need to cut through and replace custom building materials like faux paint, wallpaper, or even more expensive materials to demolish and replace like tile or concrete. He concedes that his price does not account for such variations. (Ex. B, Slovak Dep. at 176:11-181:6.)

Mr. Slovak admittedly does not have any idea how many homes have NIBCO Tubing or Fittings installed in them or how many feet of NIBCO Tubing has been installed in homes in the United States or the number of Fittings installed. (Ex. B, Slovak Dep. at 224:14-225:1.) It follows that Mr. Slovak has no idea the number of fixtures that are potentially at issue that would need to be re-plumbed if Plaintiffs' theory were to pass muster.

Regarding the named Plaintiffs, Mr. Slovak admits that he does not know whether the PEX plumbing in their homes is all behind drywall, whether some of it is exposed, or whether some of it is under concrete slab. (Ex. B, Slovak Dep. at

155:7-16.) And he has not been to the named Plaintiffs' homes and expressed no interest in even what states those homes are in. (*Id*. at 19:7:20:11.) Mr. Slovak also did not apply his methodology to the named Plaintiffs' homes; in fact, he could not say how many plumbing fixtures are in the named Plaintiffs' homes, claiming it does not matter. (*Id*. at 140:4-141:7, 144:7-24.)

As NIBCO's damages expert, Robert Jalnos, noted in his report, Mr. Slovak's one size fits all approach ignores "plumbing and construction variables like materials, home conditions, system logistics, and environmental conditions, not to mention geographic considerations like neighborhoods, municipalities, and states." (Ex. C at 1.) Moreover, Mr. Jalnos notes that tract homes in planned subdivisions and individually designed homes present different issues that must be considered. (*Id*. at 2.)

The home of named Plaintiffs Kimberly and Alan Cole illustrate some of these issues. The Coles' home is in Gadsden, Tennessee. It is not a tract home; rather, it was built by Mrs. Cole's father based on designs the Coles ordered. (Ex. I, K. Cole Dep. at 8:25-9:2, 11:5-18.) Plaintiffs claim that based on Mr. Slovak's methodology, "the cost to entirely re-pipe the homes of Class members . . . will amount to *no more* than $15,000-$20,000." (Doc. 109 at 34-35 (emphasis in original).) But the Coles received an estimate that totaled almost $27,000 to re-plumb their home, and that estimate did not include replacement of plumbing

below concrete slab. (Ex, J, Disaster Serve Estimate at 2.) Thus, Mr. Slovak's methodology could significantly shortchange some class members; others may receive a substantial windfall.

## ARGUMENT AND AUTHORITY

### A. *Daubert* Requires Plaintiffs To Make Threshold Showings Of Relevance And Reliability.

Federal Rule of Evidence 702 governs the admission of expert testimony and provides that an expert may testify if:

> a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> b) The testimony is based on sufficient facts or data;
>
> c) The testimony is the product of reliable principles and methods; and
>
> d) The expert has reliably applied the principles and methods to the facts of the case.

In other words, Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit." *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741–43 (3d Cir. 1994).

In Daubert, the United States Supreme Court made it clear a district court must ensure all expert testimony or evidence admitted "is not only relevant, but reliable." 509 U.S. at 589; *see also Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d

Cir. 2000) (discussing "general observations" that "serve as guideposts in determining if proffered expert testimony is sufficiently relevant and reliable to be admissible"). The Court must make preliminary assessments of "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue," the latter of which also was described as a question of "fit." *Daubert*, 509 U.S. at 592-93; *id*. at 591. The proponent of expert testimony bears the burden to establish both fit and reliability. *See In re TMI Litig*., 193 F.3d 613, 663 (3d Cir. 1999).

Consistent with the "fit" requirement, in *Comcast*, the Supreme Court held a plaintiffs' proposed damages model "must measure only those damages attributable to that theory." *Comcast*, 133 S. Ct. at 1433. "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id*. "[F]or purposes of Rule 23, courts must conduct a rigorous analysis to determine whether that is so." *Id*. (citation and internal quotation marks omitted).

This rigorous gatekeeping function must be applied prior to or in conjunction with deciding the issue of class certification because "[e]xpert testimony that is insufficiently reliable to satisfy the *Daubert* standard cannot prove that the Rule 23(a) prerequisites have been met in fact, nor can it establish

through evidentiary proof that Rule 23(b) is satisfied." *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015) (internal quotations omitted). Because Plaintiffs rely on Mr. Slovak's damages model in arguing for class certification, this court must examine the "fit" of plaintiffs' proposed damages methodology to ensure it is consistent with a classwide theory of liability and capable of measurement on a classwide basis. *See Comcast*, 133 S. Ct. at 1433 (finding that plaintiffs' damages "model failed to measure damages resulting from the particular antitrust injury on which petitioners' liability in this action is premised"). To ignore this requirement would "reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Id.*

**B. Slovak's Classwide Damages Methodology Does Not "Fit" Any Of The Remaining Claims.**

Mr. Slovak's opinions should be excluded from consideration by this Court for purposes of class certification and barred from any trial because his proposed methodology does not "fit" any remaining claims.[4] His methodology is explicitly based on replacing all Tubing and Fittings in putative class members' homes, regardless of whether they have failed. Mr. Slovak claims this is because "a complete replumb is the only way to prevent the NIBCO PEX products from

[4] Plaintiffs admit that property damage arising from plumbing leaks, i.e., "the cost of repair damage caused by the failure of the PEX Products," will not be uniform for all Class members and do not propose a classwide damages methodology for those damages. (*See* Doc. 109 at 36.)

failing and causing catastrophic damage to the structures and personal property." (Ex. A, Slovak Report. at 2; *see also* Ex. B, Slovak Dep. at 132:18-133:17 (admitting he would recommend a replumb for all homes that have the allegedly defective NIBCO products, not just homes that have had a leak).)

Plaintiffs would use Mr. Slovak's method the same way. In fact, their class definition includes all persons with homes in the seven states at issue that have NIBCO Tubing and Fittings installed, not just those that have suffered leaks attributable to those products. (Doc. 109 at 3.) But this damages approach does not "fit" the types of claims for which Plaintiffs are seeking certification because it necessarily seeks remedies that are not recoverable under those theories. Accordingly, the Court should exclude Mr. Slovak's opinions from consideration as part of Plaintiffs' Motion for Class Certification and from evidence at trial and exclude Mr. Slovak's testimony as an expert witness.

**1. Slovak's methodology does not fit Plaintiffs' strict liability claims because no member of the putative class can recover the cost to repair or replace NIBCO PEX.**

Plaintiffs seek class certification of strict liability claims under the laws of five states: Georgia, New Jersey, Oklahoma, Pennsylvania, and Tennessee. (*Id.*) Slovak's cost-per-fixture damages methodology does not fit these strict liability claims because the economic loss doctrine bars plaintiffs and any putative class members from recovering the cost to repair or replace the Tubing or Fittings in

their homes.[5] Plaintiffs have already conceded in their response to NIBCO's Partial Motion to Dismiss Plaintiffs' Second Amended Complaint that "the economic loss doctrine bars [Plaintiffs] from recovering the economic cost to repair or replace their PEX products." (Doc. 65 at 25.) The Court acknowledged this concession in its Order on NIBCO's Motion, dismissing all strict liability claims related to non-failing PEX Products and further and noting that "the only injuries at issue for these claims are secondary injuries resulting from water leakages." (Doc. 84 at 22-25.) This demonstrates the fallacy of Mr. Slovak's opinions in two respects.

***First***, just as Plaintiffs failed to state strict liability claims vis-à-vis non-failing PEX Products, Mr. Slovak's methodology does not fit Plaintiffs' remaining strict liability claims insofar as Plaintiffs seek to apply it to putative class members who have not had any Tubing or Fitting leaks. Georgia, New Jersey, Oklahoma, Pennsylvania, and Tennessee all require a plaintiff pursuing a strict liability claim to have sustained an injury that was caused by the allegedly defective product.[6] As

[5] Plaintiffs seek class certification based on strict liability for both Tubing and Fittings in all of these states except for Georgia, where Plaintiffs' claim is based only on Tubing. *See* page 6, *supra*.

[6] *Goodson v. Boston Sci. Corp., No*. 1:11-CV-3023-TWT, 2011 WL 6840593, at *4 (N.D. Ga. Dec. 29, 2011) (noting that to establish strict liability under Georgia law, plaintiff must show product was "not merchantable" and that the product's "condition when sold is the proximate cause of the injury sustained"); *Zaza v. Marquess & Nell, Inc*., 675 A.2d 620, 627 (N.J. 1996) ("To succeed under a strict liability design-defect theory, a plaintiff must prove that the product was defective, that the defect existed when the product left the defendant's control, and that the

the Georgia Court of Appeals put it in *Talley v. City Tank Corp.*, 279 S.E.2d 264 (Ga. Ct. App. 1981): "Strict liability is imposed for injuries which are the proximate result of product defects, not for the manufacture of defective products. Unless the manufacturer's defective product can be shown to be the proximate cause of the injuries, there can be no recovery." *Id*. at 269. Thus, if a putative class member has not had a leak caused by NIBCO Tubing or Fittings, then he or she has not sustained damages recoverable under strict liability.

***Second***, even if the Plaintiffs can show that the Tubing and Fittings are defective and that they and other class members have experienced some leaks and sustained some property damage as a result, the Class cannot recover the economic cost to repair or replace their NIBCO PEX products in tort. Plaintiffs have already conceded this point; the same economic loss bar applies equally to the putative class members they seek to represent; and the Court has held that the only damages not barred by the economic loss doctrine are "secondary injuries resulting from the water leakages caused by the defects in the PEX Products." (Doc. 84 at 22.) Mr.

---

defect caused injury to a reasonably foreseeable user.") (internal quotations omitted); *Wheeler v. HO Sports Inc*., 232 F.3d 754, 756 (10th Cir. 2000) (Oklahoma law) (strict liability requires plaintiff to prove that defective product caused plaintiff's injury); *Surace v. Caterpillar, Inc*., 111 F.3d 1039, 1044 (3d Cir. 1997) (Pennsylvania law) ("To establish a case under the strict liability doctrine, a plaintiff must prove that the product was defective, and that the defect proximately caused the plaintiff's injuries."); *Maness v. Boston Sci*., 751 F. Supp. 2d 962, 968 (E.D. Tenn. 2010) (noting that strict liability claim under the TPLA requires proof of a defective product and that plaintiff's injury was proximately caused by the defective product).

Slovak's proposed methodology purports to measure only economic loss (the cost of repairing and replacing the allegedly defective product itself) and fails to reflect any "secondary injuries resulting from the water leakages" (which Plaintiffs concede cannot be done on a class-wide basis). It thus does not "fit" Plaintiffs' strict liability claims. It must be excluded and cannot be used to support certification or damages of any of the strict liability claims.

**2. Mr. Slovak's methodology does not fit Plaintiffs' implied warranty claims because it seeks recovery for products that have not yet failed.**

Plaintiffs seek class certification of their implied warranty of merchantability claims under Pennsylvania and Texas law. (Doc. 109 at 3.) Under Pennsylvania law, a merchant is only liable for a breach of implied warranty of merchantability "for harm caused by a defect in their product." *Grant v. Bridgestone Firestone Inc.*, 57 Pa. D. & C.4th 72, 2002 WL 372941, at *5 (Pa. Com. Pl. 2002) (internal quotation marks omitted). In *Grant*, the court dismissed plaintiffs' claim for breach of implied warranty regarding allegedly defective tires because plaintiffs had not alleged a manifested defect. *Id*. Similarly, in *Ajose v. Interline Brands, Inc.*, 187 F. Supp. 3d 899 (M.D. Tenn. 2016), the district court noted that an implied warranty of merchantability claim brought under Pennsylvania law requires a manifested defect. *Id*. at 917. It allowed plaintiffs' claim based on allegedly defective toilet connectors to proceed only because plaintiffs did not seek

redress for "possible future injuries to unnamed putative class members"—just those who had already experienced the alleged defect. *Id*.; *see also Solarz v. DaimlerChrysler Corp*., No. 2033, 2002 WL 452218, at *13 (Pa. Com. Pl. March 13, 2002) (dismissing some plaintiffs' breach of implied warranty claims because they did not allege damage as a result of manifestation of the defect at issue).

Likewise, under Texas law, to state a claim for breach of the implied warranty of merchantability, a plaintiff must establish a product is defective, i.e., that the product is "unfit for the ordinary purposes for which they are used because of a lack of something necessary for adequacy." *Plas-Tex, Inc. v. U.S. Steel Corp*., 772 S.W.2d 442, 444 (Tex. 1989). Texas law does not allow recovery for breach of an implied warranty regarding most consumer products without manifestation of the actual defect alleged. For example, in *Rosa v. American Water Heater Co*., 177 F. Supp. 3d 1025 (S.D. Tex. 2016), plaintiffs brought a putative class action based on an allegedly defective water heater sold by the defendant. *Id*. at 1030-31. The district court dismissed plaintiffs' implied warranty claim because of "the extensive body of case law indicating that Texas law does not permit plaintiffs to recover unless they have experienced some injury to a product with a limited usable life." *Id*. at 1053.[7]

---

[7] *See also In re Air Bag Prods. Liab. Litig*., 7 F. Supp. 2d 792, 804 (E.D. La. 1998) (dismissing claims based on defective air bags brought under Texas law because "the absence of manifest injury is so fundamental a deficiency in tort or implied

As the record shows, there has been no reported leak for approximately 99.9% of the Tubing or Fittings sold. Because Pennsylvania and Texas law both require manifestation of the alleged defect (here, a leak) before a plaintiff can recover under an implied warranty theory, Mr. Slovak's cost-per-fixture methodology is inapplicable to the overwhelming majority of putative class members who have Tubing and/or Fittings in their homes but have never had a leak. This is true even insofar as a putative class member has experienced a leak of one or both of the Tubing or Fitting components that have already been replaced. Plaintiffs seek the prospective replacement ***of all*** Tubing and Fittings in those homes, even Tubing and Fittings that are continuing to function and fulfill their "ordinary purpose" of transporting water.

Accordingly, Mr. Slovak's methodology does not "fit" Plaintiffs' implied warranty of merchantability of claims brought under Pennsylvania or Texas law and should be excluded from consideration when the Court rules on the Plaintiffs' motion for class certification and from use at trial to support such claims.

---

warranty claims that such claims are more appropriately dismissed"); *Cole v. General Motors Corp*., 484 F.3d 717, 729 (5th Cir. 2007) (in reversing certification, finding lack of predominance because many jurisdictions, including Texas, require manifestation of defect as prerequisite to recovery, while others may not).

### 3. Mr. Slovak's methodology does not fit Plaintiffs' express warranty claims because it allows recovery for products that have not yet failed and includes costs disclaimed in the NIBCO PEX Limited Warranty.

Plaintiffs seek class certification of their express warranty claims under Alabama, New Jersey, Oklahoma, Pennsylvania and Texas law. (Doc. 109 at 3.) Even assuming Plaintiffs can establish that the NIBCO PEX Limited Warranty applies to each putative class member's installation (itself an inquiry steeped in individual facts),[8] to prevail on any such claim each putative class member must show, among other things, that the PEX products failed as a result of an alleged covered defect.[9,10] Similarly, these states all require a purchaser of an allegedly

---

[8] Putative class members must demonstrate that the Limited Warranty was the basis of the bargain and, if so, that they satisfied the conditions of warranty coverage, including installation by a licensed plumber in conformity with applicable codes and NIBCO's installation instructions. Ex. G, NIBCO-Cole 00004827 (Limited Warranty).

[9] *Fed. Ins. Co. v. Dean Const. Co.*, 432 F. Supp. 2d 1256, 1258 (M.D. Ala. 2006) (referring to jury instructions that asked jury whether defendant breached any express warranties and if that breach was a proximate cause of the plaintiff's damages); *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 600, n.8 (3d Cir. 2012) (noting that a claim for breach of express warranty requires proof of proximate cause and damages); *Ford Motor Credit Co., LLC v. Mendola*, 48 A.3d 366, 375 (N.J. App. Div. 2012) ("Proof of causation must still be shown in a case based on breach of an express warranty."); *Hess v. Volkswagen of America, Inc.*, 221 P.3d 132, 140 (Okla. Civ. App. 2009) ("In Oklahoma, as in most states, actions for breach of an express or implied warranty require proof of damages as an element."); *Oppenheimer v. York Int'l*, No. 4348 MARCH TERM 2002, 2002 WL 31409949, at *3 (Pa. Com. Pl. Oct. 25, 2002) ("A successful claim for breach of express warranty must plead such statements, reliance on behalf of the consumer, which presumes an awareness of the warranty, and, finally, damages."); *Angel v. Goodman Mfg. Co., L.P.*, 330 F. App'x 750, 753 (10th Cir. 2009) (Texas law) (successful claim for breach of express warranty under Texas law requires injury to

defective product to provide the manufacturer with notice and a chance to cure.[11] In fact, this Court already held that the Limited Warranty is not "breached" until a repair or replacement is requested in accordance with outlined procedures and a remedy refused. *Cole v. NIBCO, INC.*, Civ. No. 3:13-cv-07871, 2015 WL 2414740, at *9 (D.N.J. May 20, 2015).

Mr. Slovak's methodology does not "fit" the express warranty claims for unknown class members who have never had a manifested Tubing or Fitting leak, or for putative class members who have never contacted NIBCO and afforded it an opportunity to cure in the event they did experience a leak. After all, why would

---

plaintiff that was proximately caused by failure of the product to comply with the warranty).

[10] *See, e.g., Chin v. Chrysler Corp.*, 182 F.R.D. 448, 460 (D.N.J. 1998) ("In most jurisdictions, the courts recognize that unless a product actually manifests the alleged defect, no cause of action for breach of express or implied warranty or fraud is actionable."); *In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MC-2543 (JMF), 2016 WL 3920353, at *37 (S.D.N.Y. July 15, 2016) ("Courts interpreting Oklahoma warranty law have held that a manifested defect is also required for a breach of warranty claim."); *Solarz*, 2002 WL 452218, at *9 (dismissing express warranty claim of plaintiffs who did not allege damages); *Angel*, 330 F. App'x at 754 (noting that Texas law has yet to recognize a breach of express warranty claim for unmanifested defects in products with distinctly limited useful lives).

[11] *See, e.g., Hobbs. v. Gen. Motors Corp.*, 134 F. Supp. 2d 1277, 1284 (M.D. Ala. 2001) ("In other words, notice must be given to the manufacturer in some fashion."); *Cooper v. Samsung Elecs. Am., Inc.*, No. 07-3853, 2008 WL 4513924, at *4 (D.N.J. Sept. 30, 2008) ("Since the Limited Warranty expressly required notice to Samsung in the form specified . . . Samsung could not have breached the warranty by failing to repair a problem Cooper failed to bring to its attention."); *Wooten v. Motorola Commc'ns & Elecs., Inc.*, 488 P.2d 1284, 1286 (Okla. 1971) (notice of a breach of warranty is condition precedent for recovery); *Kee v. Zimmer*, 871 F. Supp. 2d 405, 411 (E.D. Pa. 2012) (dismissing claim because plaintiff did not plead pre-suit notice); *Wilcox v. Hillcrest Mem'l Park of Dallas*, 696 S.W.2d 423, 423 (Tex. App. 1985) (notice to remote manufacturers required).

they contact NIBCO when their plumbing is working properly? Accordingly, Mr. Slovak's damages methodology cannot support certification of Plaintiffs' express warranty claims.

Moreover, Mr. Slovak's damages methodology does not "fit" Plaintiffs' express warranty claims and likewise does not provide a reliable methodology for calculating damages because it accounts for costs that fall outside the terms of the NIBCO Limited Warranty. The Limited Warranty requires an owner to return an allegedly defective product to NIBCO for inspection, and if that inspection satisfies NIBCO "that said tube, fitting or accessory is defective, a replacement will be mailed free of charge to the owner." (Ex. G.) The Limited Warranty does not promise that NIBCO will pay for costs to install the replacement product or house repairs needed as a result of said installation, and NIBCO specifically disclaims incidental and consequential damages. (*Id.*) These limitations are generally enforceable. *See, e.g.*, *Fowler v. Goodman Mfg. Co. LP*, No. 2:14-CV-968-RDP, 2014 WL 7048581, at *5 (N.D. Ala. Dec. 12, 2014) (dismissing warranty's limitation on remedies enforceable, where warranty provided for replacement parts at no cost but did not cover labor); *Argabright v. Rheem Mfg. Co.*, 201 F. Supp. 3d 578, 592 (D.N.J. 2016) (dismissing claim for breach where warranty provided for repair or replacement but did not cover labor costs or expenses for service or reinstallation).

Here, Mr. Slovak's opinion that it will cost $600 per full plumbing fixture incorporates consequential economic loss relating to the removal of existing NIBCO PEX plumbing, the installation of a new system, and the repair of any damage to the home caused by the repair process. (Ex. A at 3, n.1.) These consequential costs simply are not available under the terms of the Limited Warranty. Yet Mr. Slovak does not specify the cost for the actual replacement parts (the only remedy provided under the Limited Warranty) from the unrecoverable elements discussed above. He does not break out how much these replacement parts will cost, what brand of product he would use for a replacement, or the percentage of his flat, $600 cost is attributed to new PEX materials. (*See id*.) Thus, Mr. Slovak's methodology cannot be made to "fit" the terms of the NIBCO Limited Warranty, which limits recovery for a defective product to a replacement product from NIBCO.

**4. Mr. Slovak's opinions regarding damages should also be excluded at trial if Plaintiffs pursue other remaining claims on an individual basis.**

Plaintiffs do not seek class treatment for any (1) negligence claims, (2) manufacturing defect and failure to warn claims, (3) strict liability claims under Alabama or Texas law, or (4) claims over NIBCO's clamps. *See generally* Doc. 84. But should any of these claims survive summary judgment and this case proceed to trial, Mr. Slovak's damages methodology cannot be used to prove

named Plaintiffs' damages vis-à-vis these claims because it does not "fit" these theories.

As this Court recognized, Plaintiffs cannot recover the economic cost to repair or replace the alleged defective NIBCO PEX Products under their negligence claims, regardless of whether there are being pursued under the remaining design defect, manufacturing defect, or failure to warn theories. (Doc. 84 at 22, 39-40, 42.) This reasoning applies to Plaintiffs' Alabama and Texas strict liability claims as well, again regardless of theory. (*See id*.) The economic loss doctrine would also bar recovery of these damages vis-à-vis claims for defective Clamps based on strict liability or negligence. (*See* Doc. 84 at 46.)

### C. Mr. Slovak's Opinion Does Not "Fit" And Is Not Reliable Because A "One-Size-Fits-All" Per-Fixture Recovery Is Not Supported By The Record Or Common Sense.

Mr. Slovak's opinions and testimony also fail the *Daubert* standards because they unreliably fail to account for the uncontroverted evidence regarding meaningful variations in how PEX is installed in homes, do not fit the facts of the case, and are based on plainly invalid assumptions. Indeed, his $600 per-fixture estimate is not based on an assessment of any named Plaintiff's home or any independent pricing data, much less from any geography where the named Plaintiffs or putative class members reside. *See Elcock v. Kmart Corp.*, 233 F.3d 734, 754-56 (3d Cir. 2000) ("[E]conomic damages model relied on several

empirical assumptions that were not supported by the record" and thus was unreliable). These common flaws permeate his entire opinion.

Mr. Slovak purports to "estimate" the amount of money it would cost to rip out all NIBCO PEX Tubing and Fittings – whether it has leaked or not – from class member homes and to replace it with a different product, including the costs to repair any home demolition work necessary to remove and replace the old PEX. (Ex. A at 2-4.) But he completely ignores material, site-specific variables that unquestionably will impact the cost of removing and replacing PEX. No doubt this is because it would be impossible to set a "standard" per-fixture price due to individual issues established by the record in this case, such as, without limitation:

- Whether the PEX is installed in an open, accessible area of a garage or basement such that no demolition work is necessary to access, remove, and replace it. Some of the PEX in the named Plaintiffs' homes was and is accessible in this manner. Thus, applying a single-price-per-fixture that necessarily factors in the cost to remove and repaint drywall materially overstates the nature of the work and cost necessary to replace this PEX. *See, e.g.*, Ex. C, Jalnos Rep. at 2-3.

- Whether the PEX is obscured behind some building material that is more difficult and expensive to remove and replace than ordinary drywall. For example, the record likewise establishes that some PEX may be run through concrete slab that will need to be demolished and replaced, and which would potentially drastically increase the construction costs. (*See, e.g.*, Ex. J, Cole Replumbing Estimate at 2.

- Whether, even if the PEX is behind drywall there will be more expensive features of some homes that will be disrupted or damaged in the course of the PEX replacement. Mr. Slovak concedes that his $600 standard charge would not cover commonly encountered features like faux paint or wallpaper. (Ex. B, Slovak Dep. at 176:11-181:6.) The additional

> possibilities are endless, and are in no way captured by Plaintiffs' so-called expert's opinion.

Mr. Slovak's failure (and indeed predictable inability) to account for such variations critically undermines the integrity of his entire opinion.

Moreover, there is simply no support for Mr. Slovak's proposition that a standard, cost-per-fixture price is utilized in the industry regardless of geography and context. He cites no studies or data establishing that all PEX replumbings are charged at a standard rate of $600 per-fixture, and he failed to substantiate that number with any documentation. Although he claims to have based the $600 rate on his review of about 20 "[p]ast bids" on single family home repipe jobs in the files in his office (Ex. B, Slovak Dep. at 173:22-174:18), Mr. Slovak did not identify these files (or any files) in his Report or his deposition that he allegedly used as a basis of his opinions, and no such files were disclosed to NIBCO. (*See* Ex. A at 7.) Neither does he explain how 20 past bids that he provided can be extrapolated into a standard price for potentially thousands of putative class members across seven states.

Mr. Slovak's anecdotal experiences with classwide remedies involve negotiated class settlements where certain large plumbing companies agree to a set, per-fixture price in exchange for voluminous work. (*See* Ex. B, Slovak Dep. at

85:24-86:25.)[12] Put simply, he does not account for the real-world scenario proposed here where putative class members (presumably after coming forth with individual evidence to prove that they have NIBCO PEX and a certain number of fixtures) recover a check based on a $600 per-fixture opinion and are left to fend for themselves to identify and negotiate with a plumber to complete the work as a one-off job, without the bargaining power flexed by the class action lawyers who negotiated with the plumbers in Mr. Slovak's experiences.

And offering a "free" replumb (assuming that the check covers the full amount of the work) does not mean that every homeowner will go through with that work. Mr. Slovak admitted that in his experience working on the Kitec settlement, which offered fully paid replumbs, some homeowners declined altogether, even some who had leaks. (*Id*. at 135:15-136:20.)

Mr. Slovak's "standard" price is likewise refuted by contrasting experiences of the named Plaintiffs. For example, Mrs. Cole received an estimate from someone who actually conducted a visual inspection of her home. (Ex. J at 1.) The replumbing part of that estimate totaled almost $27,000 and did not even include replacement of Tubing within the concrete slab. (*Id*. at 2.) Mr. Slovak's $600 per-fixture estimate logically cannot reliably be considered a nationwide, industry

[12] Those rates, notably, are less than the $600 "standard" rate quoted here, and likewise failed to consider variables discussed above. (*See id*. at 85:24:86:1; 95:7-97:6.)

"standard" – and certainly does not "fit" the facts of this case – where other plumbers have quoted or charged materially different and varying amounts to conduct the very re-plumbings for which the named Plaintiffs here are attempting recovery. His report is inadmissible for these additional reasons.

### D. Mr. Slovak's Should be Barred from Opining on Whether the Original NIBCO Plumbing Products Were Installed Properly in the Named Plaintiffs' Homes.

In his Report, Mr. Slovak stated that his "decades of plumbing experience, including as a Master Plumber, along with my review of these NIBCO [PEX Installation] Manuals, qualifies me to give my opinion on any installation questions that may arise in expert discovery in this case." (Ex. A at 5.) But his Report does not contain any actual opinions regarding the installation of NIBCO products in the Plaintiffs' homes. (*See* Ex. A.) When asked about that statement during his deposition, Mr. Slovak revealed that it was his opinion that "there were no installation issues related to the original installation of NIBCO PEX Products in the named plaintiffs' homes." (Ex. B, Slovak Dep. at 190:11-15.) The Court should not allow Mr. Slovak to give this opinion or similar testimony at trial because it was not disclosed in his Report and his opinion is not based on sufficient facts.

When asked the basis of his opinion regarding the installation of NIBCO PEX products at the named Plaintiffs' homes, Mr. Slovak said it was based on his

"experience of years of PEX systems" and claimed that installation of the NIBCO PEX system "is going to be similar to other PEX systems I have installed." (*Id*. at 190:16-22.) Mr. Slovak admitted he has never installed NIBCO PEX products. (*Id*. at 188:12-14.) He also admitted that the only thing he knew about the installation of NIBCO PEX products at the named Plaintiffs' homes was a "few pictures" that he "glanced at" from "one residence." (*Id*. at 190:23-191:2.)

Mr. Slovak confirmed that the "few pictures" that he "glanced at" were pictures taken by ESI (NIBCO's liability expert) at the home of Ken McLaughlin. (*Id*. at 191:3-4; 219:10-220:3.) Mr. McLaughlin is not a plaintiff in this case; rather, he is a named plaintiff in *Meadow, et al. v. NIBCO, Inc*., which is currently pending in the district court for the Middle District of Tennessee. The pictures from the McLaughlin house are the only photos that Mr. Slovak reviewed related to either this matter or the *Meadow* lawsuit. (*Id*. at 220:4-8.) In other words, Mr. Slovak's opinion that there are no installation issues regarding the original NIBCO PEX installations in the named Plaintiffs' homes is based solely on: (1) some pictures from a home owned by a person who is not a named Plaintiff in this case, and (2) his experience working with non-NIBCO PEX pipe. (*See* Ex. B, Slovak Dep. at 191:12-19.)

Moreover, when asked about some of those pictures from the McLaughlin home, Mr. Slovak could not identify whether red PEX piping in one of the pictures

was part of the original NIBCO PEX installation or part of a repair. (*Id*. at 220:9-17.) He also said he "assumed" that the type of fittings used as part of the original McLaughlin PEX installation were NIBCO (*id*. at 220:18-21), but he later admitted he did not know for sure (*id*. at 222:7-12). In fact, "[t]here were no NIBCO brand fittings found in the McLaughlin home." (Ex H, Weishaupt Report at 20.)

Mr. Slovak's apparent opinion that the original installation of the NIBCO PEX products in the named Plaintiffs' homes was done properly should be excluded because it does not meet the requirements of Fed. R. Civ. P. 26 or Fed. R. Evid. 702. Rule 26 (a)(2)(B) requires retained expert witnesses to provide a report containing "a complete statement of all opinions the witness will express and the basis and reasons for them." "[I]t is axiomatic that an expert may not present new opinions on topics not timely included or otherwise disclosed in the expert's report." *Krys v. Aaron*, 112 F. Supp. 3d 181, 207 (D.N.J. 2015). In *Krys*, the district court precluded a proffered expert from providing testimony regarding a financial statement that was not referenced in his report. *Id*.

Here, Mr. Slovak's opinion on the original installation of the NIBCO PEX products in the named Plaintiffs' homes was not disclosed in his Report. He stated only that he believed his review of NIBCO's PEX Installation Manuals and his plumbing experience *qualified* him to give opinions on that topic. (Ex. A at 5.) And the opinion that Mr. Slovak finally gave during his deposition was based on

"glanc[ing] at" a "few pictures" that he did not cite as having been "reviewed or considered" in preparing his Report. (*Id*. at 7.) In fact, other than the Second Amended Class Complaint, Mr. Slovak did not review any documents or testimony related specifically to the named Plaintiffs in this case or their homes. (*See* Ex. B at 7.)

Mr. Slovak also did no rely on sufficient facts in forming his opinion on the original installation of the NIBCO PEX products in the named Plaintiffs' homes. He did not personally observe or even review pictures of ***any*** of the named Plaintiffs' PEX plumbing, and indeed it would have been impossible to observe the some of the original installations in situ because some of the named Plaintiffs' homes had been re-plumbed before this litigation was filed. Mr. Slovak logically cannot opine about the propriety of PEX installations he has never seen and has no idea about. "[A]n expert's testimony must be accompanied by a sufficient factual foundation." *Gumbs v. Int'l Harvester, Inc*., 718 F.2d 88, 98 (3d Cir.1983). In other words, "an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence." *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005). Mr. Slovak simply has no factual basis for his opinion that the named Plaintiffs' original plumbing installations were done correctly. Thus, he should be precluded from testifying on that topic at trial.

## CONCLUSION

For the above reasons, NIBCO respectfully requests the Court grant Defendant's Motion, exclude the Slovak Expert Report from consideration as part of Plaintiffs' Motion for Class Certification and from evidence at trial, and exclude Mr. Slovak's testimony as an expert witness, and for such other relief as this Court deems just and proper.

Respectfully Submitted,

*/s/ Franco A. Corrado*

Jean Paul Bradshaw II (*pro hac vice*)
J. A. (Jay) Felton (*pro hac vice*)
Kevin M. Kuhlman (*pro hac vice*)
Rachel E. Stephens (*pro hac vice*)
2345 Grand Boulevard, Suite 2200
Kansas City, Missouri 64108-2618
Tel: (816) 460-5726; Fax: 816-292-2001
jbradshaw@lathropgage.com
jfelton@lathropgage.com
kkuhlman@lathropgage.com
rstephens@lathropgage.com

J. Gordon Cooney, Jr. (*pro hac vice*)
Franco A. Corrado
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, Pennsylvania 19103-2921
Tel: (215) 963-5000; Fax: (215) 963-5001
gordon.cooney@morganlewis.com
franco.corrado@morganlewis.com

*Attorneys for Defendant NIBCO, INC.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of July, 2017, I served a true and correct copy of the foregoing via the Court's electronic filing system to the following:

Benjamin F. Johns
Steven A. Schwartz
Chimicles & Tikelllis, LLP
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
bfj@chimicles.com
sas@chimicles.com

Joseph B. Kenney
Joseph G. Sauder
Matthew D. Schelkopf
McCune Wright, LLP
1055 Westlakes Drive
Berwyn, PA 19312
jgs@mccunewright.com
mds@mccunewright.com
jbk@mccunewright.com

Bruce Daniel Greenberg
Lite Depalma Greenberg, LLC
570 Broad Street, Suite 1201
Newark, NJ 07102
bgreenberg@litedepalma.com

Kyle A. Shamberg
Lite Depalma Greenberg, LLC
211 W. Wacker Drive, Suite 500
Chicago, IL 60606
kshamberg@litedepalma.com

*/s/ Franco A. Corrado*
Franco A. Corrado