**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| KIMBERLY COLE, ALAN COLE, JAMES MONICA, LINDA BOYD, MICHAEL MCMAHON, RAY SMINKEY, JAMES MEDDERS, JUDY MEDDERS, ROBERT PEPERNO, SARAH PEPERNO, and KELLY MCCOY, on behalf of themselves and all others similarly situated, | Civil Action No.: 13-cv-7871(FLW)(TJB) |
| Plaintiffs, | Motion returnable: August 21, 2017 |
| vs. | |
| NIBCO, Inc., | |
| Defendant. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF DONALD E. DUVALL AND ANAND R. SHAH**

**LITE DEPALMA GREENBERG, LLC**
Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, NJ 07102
Phone: (973) 623-3000
Email: bgreenberg@litedepalma.com

***Attorneys for Plaintiffs and Interim Co-Lead Counsel***

[*Additional counsel on signature page*]

## TABLE OF CONTENTS


I. PRELIMINARY STATEMENT ....................................................1

II. STATEMENT OF FACTS ....................................................3

A. Shah's Lack of Plumbing Experience and Qualifications ....................3

B. Duvall's Lack of Plumbing Experience and Qualifications....................3

C. Shah and Duvall's "Minimum Carbonyl Index" Concept Lacks Proper Factual Support....................................................4

III. STANDARD OF REVIEW ....................................................12

IV. ARGUMENT....................................................15

A. The Court Should Preclude Duvall and Shah's Testimony Regarding the Propriety of Tubing Installation Because They Lack the Qualifications to Opine on the Subject ....................................................15

B. Duvall and Shah's "Minimum Carbonyl Index" Opinion is Not Based on a Reliable Methodology, and Should be Excluded .............18

V. CONCLUSION....................................................21

# TABLE OF AUTHORITIES

## Cases

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) ....................................................................................13

*Elcock v. Kmart Corp.*,
233 F.3d 734 (3d Cir. 2000)..........................................................................13

*General Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ............................................................................ 15, 19

*Heller v. Shaw Indus., Inc.*,
167 F.3d 146 (3d Cir. 1999)..........................................................................14

*Higginbotham v. Volkswagenwerk Aktiengesellschaft*,
551 F. Supp. 977 (M.D. Pa. 1982) ................................................................16

*IKannankeril v. Terminix Int'l, Inc.*,
128 F.3d 802 (3d Cir. 1997)..........................................................................14

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3d Cir. 1994)..................................................................... 13, 14

*Magistrini v. One Hour Martinizing Dry Cleaning*,
180 F. Supp. 2d 584 (D.N.J. 2002) ...............................................................19

*Massok v. Keller Indus.*,
147 F. App'x 651 (9th Cir. 2005) ..................................................................16

*McDowell v. Brown*,
392 F.3d 1283 (11th Cir. 2004) .....................................................................20

*Meadows v. Anchor Longwall & Rebuild, Inc.*,
306 F. App'x 781 (3d Cir. 2009) ...................................................................15

*Netwig v. Georgia-Pac. Corp.*,
2005 WL 2122316 (D. Kan. July 26, 2005) ..................................................16

*Oddi v. Ford Motor Co.*,
234 F.3d 136 (3d Cir. 2000)....................................................................13

*Pineda v. Ford Motor Co.*,
520 F.3d 237 (2008)............................................................................ *passim*

*Player v. Motiva Enters. LLC*,
No. 02-cv-3216, 2006 U.S. Dist. LEXIS 2288 (D.N.J. Jan. 20, 2006),
aff'd, 240 F. App'x 513 (3d Cir. 2007) ...............................................................14

*Reliance Ins. Co. v. Keystone Shipping Co.*,
102 F.Supp.2d 181 (S.D.N.Y.2000) ......................................................................19

*Schneider v. Fried*,
320 F.3d 396 (3d Cir. 2003)....................................................................13

*Sloan Valve Co. v. Zurn Indus., Inc.*,
2013 WL 6068790 (N.D. Ill. Nov. 18, 2013) ..........................................................15

*State v. Fortin*,
745 A.2d 509 (N.J. 2000)...........................................................................20

*Sterbenz v. Anderson*,
2012 WL 5387885 (M.D. Fla. Nov. 2, 2012) ..........................................................17

*Waldorf v. Shuta*,
142 F.3d 601 (3d Cir. 1998)....................................................................13

*Windmere, Inc. v. International Ins. Co.*,
522 A.2d 405 (N.J. 1987)...........................................................................20

*Yarchak v. Trek Bicycle Corp.*,
208 F. Supp. 2d 470 (D.N.J. 2002) ................................................... 12, 19

*Young v. Burton*,
567 F. Supp. 2d 121 (D.D.C. 2008) ......................................................................19

*ZF Meritor, LLC v. Eaton Corp.*,

696 F.3d 254 (3d Cir. 2012) ........................................................................ 14

**Rules**

F.R.E. 702 ........................................................................................................ 18

## I. PRELIMINARY STATEMENT

In their report, NIBCO's experts for its 1006 PEX tubing product, Donald E. Duvall and Anand R. Shah of Engineering Systems, Inc. ("ESI"), opine that "[t]he PEX tubing failures experienced by each Plaintiff are a result of different causes and/or a combination of factors," including "improper installation practices." *See* Confidential Investigation Report, May 5, 2017 ("Duvall/Shah Report") (attached to Declaration of Bruce D. Greenberg as **Exhibit 1**), at 4. Shah and Duvall go so far as to attribute the root cause of the failures at issue to improper installation for a number of Plaintiffs. *Id.* at 86, 92, 97-98, 112.

Neither Duvall nor Shah has the proper background or experience to provide this opinion. They are not plumbers and have no plumbing experience. Nor did they actually perform the on-site inspections of any of the Plaintiffs' plumbing systems. Instead, they sent a representative, Joseph Grzetic, a lab technician who is also not a plumber. As such, their opinion that any Plaintiffs' PEX tubing was "improperly installed" should be excluded.

Separately, in support of their opinion that oxidative degradation did not cause the tubing failures at issue, Duvall and Shah conclude that there is a "minimum carbonyl index" required to produce a premature failure in the pipe. Ex. 1, Duvall/Shah Report, at 23. Though this concept will be discussed in greater detail below, in essence, the carbonyl index is a quantification of the level of

degradation, created as a result of the tubing's exposure to chlorinated water, present at the tubing's interior surface. This degradation causes the tubing to become embrittled, and can lead to premature failure.

This "minimum" index, however, is premised almost entirely on a single study looking at a different material under different conditions. The author of this study was advised throughout the process by Duvall. In fact, the handful of literature discussing this methodology for determining whether a particular level of oxidation is "good enough" to cause tubing to fail is all traceable back to a small group of interconnected individuals, including Mr. Duvall. Neither Duvall nor Shah cite to any other studies concluding that this minimum carbonyl index is necessary in order for a piece of PEX tubing to fail due to oxidative degradation, and, in fact, Duvall's *own work* directly contradicts this methodology.

Duvall and Shah also did not perform additional tests that would have been more probative of whether Plaintiffs' PEX tubing failures were a result of oxidative degradation – tests Duvall has performed and relied upon in the past for that exact reason. Instead, they rely exclusively on results regarding the carbonyl index that are simply *not* indicative of the failure mechanism on their own.

Accordingly, Plaintiffs request that this Court enter an order:

(1) Precluding Shah and/or Duvall from offering any opinion that the PEX tubing in any of the Plaintiffs' homes was improperly installed;

(2) Precluding Shah and/or Duvall from offering any opinion that

Plaintiffs' NIBCO PEX Tubing did not fail as a result of oxidative degradation or, in the alternative, precluding Shah and/or Duvall from offering any opinion that there is a "minimum carbonyl index" below which oxidative failure does not occur.

## II. STATEMENT OF FACTS

### A. Shah's Lack of Plumbing Experience and Qualifications

Shah is not a plumber and has never designed or installed a PEX plumbing system. *See* Deposition of Anand R. Shah ("Shah Dep") (attached to Declaration of Bruce D. Greenberg as **Exhibit 2**), at 158:15-23; 182:17-183:5. He did not consult with any plumbers while forming his opinions in this case. *Id.*, 158:24-159:2. Nor did Mr. Shah review the transcripts of any of the depositions counsel for NIBCO took of the plumbers who installed the plumbing systems in Plaintiffs' homes. *Id.*, 160:8-16.

Shah is therefore not an expert in the proper installation practices for PEX plumbing systems. In fact, he noted at deposition that ESI's "data may have been used by NIBCO for a plumbing expert that they may have had in other cases." *Id.*, 159:6-8; *see also id.* at 159:11-13 ("I'm not sure if they did it on this case. I think in other cases our work product was shared with plumbing experts"). NIBCO has not presented any plumbing experts in this case.

### B. Duvall's Lack of Plumbing Experience and Qualifications

Duvall is not a plumber and has never designed or installed a PEX plumbing system. *See* Deposition of Donald E. Duvall ("Duvall Dep.") (attached to

Declaration of Bruce D. Greenberg as **Exhibit 3**), at 21:15-22:5, 152:3-8. Indeed, the words "plumber" or "plumbing" do not appear anywhere in his curricula vitae. Ex. 1, Duvall/Shah Report, at Appendix A. He was not aware that the plumbers who installed the plumbing systems in Plaintiffs' homes had been deposed. *Id.*, 499:5-9.

Duvall is therefore not an expert in the proper installation practices for PEX plumbing systems.

### C. Shah and Duvall's "Minimum Carbonyl Index" Concept Lacks Proper Factual Support

As Shah and Duvall state in their report:

> There are analytical methods that have been developed through the years to identify and quantify the presence of oxidative degradation in polyolefin pipes. Infrared spectroscopy was utilized as early as the 1950's as a technique by which oxidation could be identified in polyethylene. When it became desirable to examine polyolefin pipe for oxidative degradation, a parameter called the "carbonyl index" was created to quantify the extent of degradation. The carbonyl index was defined as the intensity of the infrared absorption peak of a specific carbonyl moiety formed in the oxidation of polyolefin material normalized by the intensity of a methylene absorption peak in the same spectrum. ***It was determined that there was a minimum carbonyl index required in at least the first 50 microns***[1] ***or so of the inside surface of a pipe that was needed to embrittle that surface and produce premature failure in the pipe. It has also been***

[1] Approximately 2/1000ths of an inch.

> ***shown that lesser quantities and depths of oxidation than that do not adversely affect the pipe lifetime.*** Infrared spectroscopy continues to be utilized today to assess polyolefin pipe materials for the presence of oxidation.

Ex. 1, Duvall/Shah Report, at 23 (emphasis added).

Both Duvall and Shah, as well as Plaintiff's expert, Cynthia Smith, conducted testing to evaluate the level of oxidation and, hence, the carbonyl index, on samples taken from various Plaintiffs' homes (via a method called "Fourier Transform Infrared Spectroscopy," or "FTIR"). *See* Ex. 1, Duvall/Shah Report, 65; Ex. 3, Duvall Dep., 305:1-9 (Smith also performed FTIR).

Both Duvall and Shah went on to explain the concept of a minimum required carbonyl index at their depositions:

> [I]n terms of what the analysis of the FTIR work is, for us to analyze the FTIR data, what we were looking for is does the FTIR data indicate that we have substantial carbonyl index above .1, which is a measure of oxidative degradation, and whether that is deep enough, whether 2 mills or 3 mills or 4 mills…

Ex. 2, Shah Dep. 306:12-18 (emphasis added); *see also* Ex. 3, Duvall Dep., 349:2-6 ("Q: Have you ever concluded that a piece of PEX tubing failed due to [oxidative degradation] where the carbonyl index at the point of failure was less than .1? A: No."); *see also id.* at 349:17-350:2 (Duvall testimony that carbonyl index of .1 or greater in the first thousandth of inch from the interior surface of the tubing is

necessary to attribute a failure to oxidative degradation, and "approaching .1 for the second [ ] thousandth of an inch").

Duvall's discussion of how this supposed minimum requirement was derived makes clear that the scientific authority is either inapplicable to the present analysis or was generated by a small group of researchers, all of whom are personally connected in some way to Duvall himself. As he explains with respect to ESI's FTIR work generally:

> The way that we have employed [FTIR], it had its roots in the work of this Gedde fellow and his colleagues in Sweden, and then it evolved. It was refined by work that was done at -- well, by students of Professor Lawrence Broutman at Illinois Institute of Technology, which is down here on the near south side. Dr. Broutman, first of all, Dr. Broutman had multiple students that looked at the impact of surface embrittlement on performance properties of plastics.
>
> He had one student, Sunwoong Choi, who looked at the effect of surface embrittlement on the long-term performance, the creep-rupture performance of polyethylene pipe materials. And Choi, a lot of the analytical work was actually done in Professor Broutman's consulting firm and testing laboratories lab. Choi had the advantage of Broutman having started this business in the early 1980s, and Dr. Broutman hired a very gifted analytical chemist, Dr. Lee Nylander. Nylander and his associate, Mary Stellmack, worked with Choi to refine the method, the FTIR method of quantifying oxidative degradation in polyethylene pipe.

Ex. 3, Duvall Dep., 59:19-60:17. When specifically asked for the basis for the .1 minimum requirement, Duvall again pointed to Gedde and Choi:

Q. Is there a degree of oxidation that one could find in PEX pipe that you would say the pipe is going to fail?

A: The criterion that we have employed for more than 30 years to assess the level of oxidation at which the surface embrittlement, that is what we're dealing with here, that's what's created by the chlorine in the water, the level at which that becomes problematic and can cause – can be a contributing factor to a failure is a carbonyl index in excess of .1 in the first thousandth of an inch depth into the sample and when approaching .1 if not in excess of .1 in the second thousandth of an inch.

Q. Aside from your personal experience, is there some industry standard that would support the definition of excessive oxidation that you just provided to us?

A. Gedde and his crew in Sweden in that polymer testing article that I mentioned a while ago said that the material was considered oxidized if the carbonyl index was greater than or equal to .1, and they calculated carbonyl index the same way we do. We have applied that criterion across the board for 30 years, if not a little more.

Choi's work essentially supports that. I think he concluded that maybe a little lower carbonyl index -- well, because of the way he did the tests, he said that at a certain thickness the oxidation wasn't a problem; and then the next time he does measurements the carbonyl index is significantly higher and there is a problem. So he put in his dissertation I think the lower number as being the highest that he observed that didn't cause a problem.

*Id.*, 84:7-85:19.

Duvall went on to state, however, that the work Gedde performed approximately 40 years ago, on a non-PEX polymer, "was probably done with an old instrument that was not even an FTIR." *Id.*, 60:19-20. The use of FTIR for purposes of determining a minimum carbonyl index for oxidative failure was thereafter developed by Broutman, Duvall's thesis adviser, for whom Duvall worked for 11 years. *Id.*, 41:17-20; 60:20-61:11. Choi, mentioned above, also worked for Broutman while completing his thesis and being advised by both Broutman and Duvall throughout the process. *Id.*, 341:21-342:5. Mr. Shah and Mr. Grzetic worked for Broutman as well. *Id.*, 342:6-10; Ex. 2, Shah Dep., 228:7-15.

With respect to Choi's thesis, Shah conceded at his deposition that: (1) Choi's work "doesn't have anything to do with NIBCO PEX 1006 because he is looking at a different polyethylene"; (2) Choi took steps to minimize the residual stress in that other polyethylene material (something NIBCO did not do with respect to its PEX tubing), which steps Choi described as "important" because "initial residual stresses present may cause premature cracking of brittle surface making the data difficult to interpret"; (3) the polyethylene material Choi was using was a medium-density polyethylene (as opposed to NIBCO PEX tubing which is a high-density polyethylene product); (4) Choi used ultraviolet radiation

to degrade the polyethylene material (whereas the NIBCO PEX tubing at issue in this suit undergoes oxidative degradation from exposure to chlorinated potable water in residential plumbing applications); and (5) the polyethylene material had never been employed in a service environment. Ex. 2, Shah Dep., 291:10-12, 296:3-17, 302:6-21, 304:16-18.

Notwithstanding this litany of differences between the material, environment, methodology, and sample preparation in Choi's thesis when compared with the residential plumbing applications in which Plaintiffs' NIBCO PEX tubing was installed, Shah concluded that the "methodology still applies" because "we have used it to evaluate oxidative degradation and the cause of pipe failing from oxidative degradation that had been used in water service applications. So it applies." *Id.*, 305:8-20. In other words, because Choi's thesis advisor – Duvall – and others working for Broutman, including Shah, have used this "minimum carbonyl index" to assess water service application failures in pipe, it must be reliable. *See also* Ex. 1, Duvall/Shah Report, at 23, 25 n. 27 and n. 28 (citing, for the proposition that "[i]t was determined that there was a minimum carbonyl index required in at least the first 50 microns or so of the inside surface of a pipe that was needed to embrittle that surface and produce premature failure in the pipe," a four-page technical presentation given in 1989 by Broutman and Duvall, and Choi's thesis); *see also id.* (citing to Choi's thesis for the proposition

that "[i]t has also been shown that lesser quantities and depths of oxidation than that do not adversely affect the pipe lifetime"). In their report and depositions, Shah and Duvall do not point to *any* researchers, other than themselves, that have *ever* applied their ".1 at two thousandths of an inch" minimum carbonyl index requirement to PEX tubing.

Critically, Duvall has published at least one study that expressly contradicted the methodology employed in this case to determine whether oxidation caused NIBCO's PEX tubing to failure. In 2009, Duvall, with his ESI colleague Dale Edwards (also a former Broutman employee), published a paper entitled "Oxidative Degradation of High Density Polyethylene Pipes from Exposure to Drinking Water Disinfectants" ("Duvall/Edwards Report," attached to Declaration of Bruce D. Greenberg as **Exhibit 4**). In that report, Duvall employed several different tests to evaluate the degree of oxidation in the incident samples:

> 1) Bend Back Tests . . . an optical examination of the inner surface to determine crazing or cracking that would be a sign of embrittlement. (57 samples).
>
> 2) Fourier Transform Infrared Spectroscopy (FTIR) – two FTIR techniques were utilized tomeasure the degree of oxidation on pipe samples. Carbonyl Index measurements were taken to assess the extent of polyethylene oxidation at various depths from the inner surface. (30 samples)
>
> 3) Oxidative Induction Time (OIT) – samples were subjected to OIT measurements per ASTM D3895 to determine the amount of anti-oxidant remaining in the

> pipe samples after potable water service. Core and inner wall measurements were taken. (30 samples)
>
> 4) Ring Tensile Tests – a modified NOL-Ring Tensile Test was conducted on samples based on ASTM D2290. Elongation to break was measured to determine decreases that would indicate embrittled surfaces or degraded mechanical properties. (7 samples).

Ex. 4, Duvall/Edwards Report, 4. Based on these various tests, Duvall and Edwards concluded that "[s]ignificant oxidation was consistently found." *Id.*, 4-5.

Notably, for one particular sample Duvall and Edwards concluded that "[t]he large number of fracture origins and location at various locations around the circumference *suggest that crack initiation was facilitated by the inner surface oxidation that was detected*. These cracks then propagated through the pipe wall by a slow crack growth mechanism, driven by the in-service stresses." *Id.*, 42 (emphasis added). This is precisely the same failure theory Plaintiff's expert, Ms. Smith, has offered in this case. The carbonyl index for that sample, as measured by Duvall and Edwards using the same FTIR method Duvall and Shah employed here? .0006, approximately $6/1000^{th}$ of their purported minimum required index. *Id.*, 62.

Moreover, in this case, Duvall and Shah did not perform *any testing whatsoever* aside from FTIR to assess the effect of oxidation on Plaintiffs' NIBCO PEX tubing. They did not perform bend back or OIT tests (*see generally* Ex. 1), both of which Duvall has relied in the past upon as being indicative of "significant

oxidation" that *caused* a failure. *See also* Ex. 4, Duvall/Edwards Report, 62 (noting that Sample 3, from Central Maui, was "highly degraded" based on results from OIT testing, though carbonyl index measured via Shah and Duvall's FTIR method was .003).

Duvall and Shah's conscious decision not to perform these additional, probative tests, and to rely upon a methodology for evaluating whether oxidation contributed to a PEX tubing failure that is not generally accepted and which Duvall's prior work does not support, require excluding any opinion from either of them that oxidative degradation did not cause Plaintiffs' tubing to fail. In the alternative, their opinion that there is a "required minimum carbonyl index" for oxidative failures to occur should be excluded.

## III. STANDARD OF REVIEW

The admissibility of expert testimony under Rule 702 is a question of law. *Yarchak v. Trek Bicycle Corp.*, 208 F. Supp. 2d 470, 494 (D.N.J. 2002). It demands a factual determination based on specific criteria of the opinion being offered. *See Pineda v. Ford Motor Co.*, 520 F.3d 237, 245 (2008). "When faced with a proffer of expert scientific testimony, the trial judge must make a preliminary determination, pursuant to Rule 104(a), whether the expert testimony satisfies the standard of 'evidentiary reliability' established by the rule and will assist the trier

of fact to understand or determine a fact in issue." *Id.* (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)).

"Proper exercise of this 'gatekeeping' role, as it has been further clarified by subsequent decisions of the Third Circuit Court of Appeals, entails the consideration of three basic requirements: (1) qualifications—whether the expert is qualified to speak with authority on a particular subject or issue; (2) reliability—whether the expert's methodology is sound and whether his or her opinion is supported by 'good grounds;' and (3) fit—whether there is a relevant 'connection between the scientific research or test result to be presented and particular disputed factual issues in the case.'" *Id.* (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741-743 (3d Cir. 1994)); *see also Oddi v. Ford Motor Co.*, 234 F.3d 136, 144-46 (3d Cir. 2000). Plaintiffs' motion concerns the first and second of these requirements: qualifications and reliability.

***Qualifications.*** "Qualification refers to the requirement that the witness possess specialized expertise." *Schneider v. Fried*, 320 F.3d 396, 405 (3d Cir. 2003). This court has a "generally liberal standard" for qualifying experts. *Elcock v. Kmart Corp.*, 233 F.3d 734, 742 (3d Cir. 2000). "However, [it has] also set a floor with respect to an expert witness's qualifications." *Id.*; *see also Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) ("Even though we apply Rule 702 liberally, we have not pursued a policy of qualifying ***any*** proffered witness as an

expert") (emphasis in original). "[W]here a proposed expert's area of experience is adjacent to, but not actually encompassing, the subject matter of his testimony, he may be deemed unqualified." *Player v. Motiva Enters. LLC*, No. 02-cv-3216, 2006 U.S. Dist. LEXIS 2288, at *20 (D.N.J. Jan. 20, 2006), *aff'd*, 240 F. App'x 513 (3d Cir. 2007).

***Reliability.*** "'[A]n expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable.'" *Pineda* 520 F.3d at 244 (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)). In the Third Circuit, the reliability of an expert's methodology is generally tested by considering the non-exhaustive "*Daubert* factors":

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Id.* at 247-48 (citing *Paoli*, 35 F.3d at 742 n.8). The requirement "applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, and the link between the facts and the conclusion." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir. 2012) (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999) (alterations omitted)).

In support, the "litigant has to make more than a *prima facie* showing that his expert's methodology is reliable." *Pineda*, 520 F.3d at 247. However, the Supreme Court has held that "'nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Meadows v. Anchor Longwall & Rebuild, Inc.*, 306 F. App'x 781, 789 (3d Cir. 2009) (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

## IV. ARGUMENT

### A. The Court Should Preclude Duvall and Shah's Testimony Regarding the Propriety of Tubing Installation Because They Lack the Qualifications to Opine on the Subject

Duvall and Shah are unqualified to offer opinions concerning proper installation practices for PEX Tubing, or for plumbing systems in general, because their general experience in failure analysis for various materials and products in various applications, installations, and settings does not equate to expertise with plumbing installation. *Sloan Valve Co. v. Zurn Indus., Inc.*, 2013 WL 6068790, at *7 (N.D. Ill. Nov. 18, 2013) (striking expert testimony in patent case, noting that "[w]hile Dr. Magee has impressive experience in other areas and extensive credentials in the areas of fire and the disposal of chemical agents, he does not

have any of the requisite experience designing, assembling, and/or repairing plumbing systems or devices”).

There is nothing in the Duvall/Shah report indicating that either author has any credentials, training or other experience in installing, repairing, or re-piping plumbing systems, and Shah testified that, in other cases, NIBCO has actually retained a plumbing expert to analyze their data, which it did not do here. *See Higginbotham v. Volkswagenwerk Aktiengesellschaft*, 551 F. Supp. 977, 982-83 (M.D. Pa. 1982) (holding that an investigating officer was not qualified to offer an expert opinion regarding the movement of a person inside a vehicle during an accident because the officer only had minimal training in accident reconstruction, physics, and the movement of bodies); *Massok v. Keller Indus.*, 147 F. App’x 651, 655-56 (9th Cir. 2005) (affirming exclusion of forensics expert opinion concerning ladder design despite his degree in mechanical engineering and experience analyzing ladder slip-out cases where he “had never designed ladders, had never written or lectured on the subject and had produced no peer-reviewed work or independent confirmation of his qualifications”).

Conversely, where experts have been qualified to testify regarding plumbing systems, they have had many years of plumbing experience, including as Master Plumbers. *See, e.g.*, *Netwig v. Georgia-Pac. Corp.*,, 2005 WL 2122316, at *2 (D. Kan. July 26, 2005) (“In this case, Mr. Peugeot has 52 years of plumbing

experience, is licensed as a Master Plumber, is active in the National Association of Plumbing, Heating, and Cooling Contractors, and has published a book and articles in a trade publication. Based on plaintiff's expert disclosure and the issues on which plaintiff has proffered Mr. Peugeot's testimony, the court finds that Mr. Peugeot's testimony is limited to practices of which he has personal knowledge. He has been trained to brace pipe in the manner the plaintiff used and is also familiar with the type of I-joist plaintiff was using when he was injured. Based on Mr. Peugeot's level of knowledge and experience in the plumbing industry and the nature of his testimony, the court finds Mr. Peugeot's testimony to be reliable under Rule 702"); *Sterbenz v. Anderson*, 2012 WL 5387885, at *5 (M.D. Fla. Nov. 2, 2012) ("the Court finds that Mr. Mason's 10 years of experience in the plumbing profession are sufficient to qualify him as an expert in the plumbing field and that his testimony, as the person who retrieved the garment from the blocked sewer line, will aid the jury in determining relevant facts in this case"). Neither Shah nor Duvall is a plumber of any kind, let alone a certified, master plumber with "years of experience in the plumbing profession."

Shah and Duvall simply cannot "assist the trier of fact to understand the evidence" concerning the installation of the PEX tubing in these Plaintiffs' homes because they do not possess any "scientific, technical or other specialized"

knowledge regarding PEX tubing installations. F.R.E. 702. Their opinions concerning improper installation must be excluded on this basis.

### B. Duvall and Shah's "Minimum Carbonyl Index" Opinion is Not Based on a Reliable Methodology, and Should be Excluded

There is no dispute that FTIR testing is a generally reliable and scientifically sound methodology for determining the level of oxidative degradation present in PEX tubing. However, Duvall and Shah's extrapolation from their testing of Plaintiffs' NIBCO PEX tubing – that a minimum carbonyl index of .1 in the first two/thousandths of an inch from the interior surface of the PEX tubing is required for the tubing to fail from oxidative degradation – is *not* scientifically sound and/or based on a reliable methodology. Instead, it is based on data Choi generated based on testing uniform samples of a different polymer material that were not subjected to the applied stresses found in well-installed PEX tubing, or the residual stresses present in NIBCO's PEX tubing, which Choi intentionally minimized or eliminated. Ex. 2, Shah Dep., 297:7-10 (confirming that residual stress "can influence the onset of cracking"); Ex. 3, Duvall Dep., 387:13-22 (NIBCO PEX tubing installed in a residential potable water application will have residual stress present, and will be subject to applied stresses even when installed in accordance with all installation guidelines).

Notably, even under the conditions of Choi's testing, he did *not* assert that the minimum carbonyl index discussed above was "required," as Shah and Duvall

do, for failure to occur. Instead, he merely noted that, for those samples, "[t]he transition region characterized by rapid decrease of failure time corresponds to carbonyl index *of about 0.1*." *Surface Embrittlement of Polyethylene*, Sunwoong Choi (attached to Declaration of Bruce D. Greenberg as **Exhibit 5**), at 470 (emphasis added). Choi goes on to make reference, as do Duvall and Shah, to Gedde, but is careful to note that the results Gedde obtained were "based on the measurements of carbonyl index *on a limited number* of inner wall oxidized pipe," *id.* at 475 (emphasis added), and, again, using a different test method than the one employed by Duvall/Shah and Plaintiff's expert here.

Duvall and Shah's "one size fits all" standard for assessing failures resulting from oxidative degradation is simply not based on sufficient data or a reliable and scientifically sound methodology. *See Reliance Ins. Co. v. Keystone Shipping Co.*, 102 F.Supp.2d 181, 190 (S.D.N.Y.2000) (rejecting "unorthodox and unproven" application of standard technique); *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 594 (D.N.J. 2002), *aff'd*, 68 F. App'x 356 (3d Cir. 2003) (exclusion is appropriate when "expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion") (citing *Joiner*, 522 U.S. at 146).

Nor is it generally accepted within the scientific community. *See Young v. Burton*, 567 F. Supp. 2d 121, 139 (D.D.C. 2008), *aff'd*, 354 F. App'x 432 (D.C. Cir. 2009) (conclusion based on single, peer-reviewed study not generally accepted);

*McDowell v. Brown*, 392 F.3d 1283, 1300 (11th Cir. 2004) (excluding expert opinion premised on single, distinguishable study).

In *State v. Fortin*, 745 A.2d 509 (N.J. 2000), the New Jersey Supreme Court considered a challenge to an expert in "linkage analysis" – a procedure for determining whether different crimes were committed by the same person – named Hazelwood. *Id.* at 512. In affirming the Appellate Division's ruling that the Hazelwood's linkage analysis testimony was inadmissible, the *Fortin* court pointed to the fact that the field was one "in which only Hazelwood and a few of his close associates are involved." *Id.* at 514. The court went on to note, with regard to the lack of consensus on acceptance of linkage analysis in the scientific community, that "the other experts mentioned by in his testimony were either current or former co-workers." *Id.* The same is true here of Duvall, Shah, Broutman, and Choi (and, of course, the latter two never even attempted to make the specific assertion regarding minimum carbonyl index Duvall and Shah do), and accordingly their opinion should be excluded for similar reasons. *See also Windmere, Inc. v. International Ins. Co.*, 522 A.2d 405, 408-09 (N.J. 1987) (testimony of two experts who were both affiliated with development of voiceprint device at issue did not demonstrate general acceptance requiring admission of results of voiceprint analysis).

In addition, as discussed at length above, Duvall's own prior work gives lie to the threshold he and Shah attempt to set here, as Duvall has concluded that other tubing – HDPE pipe that was used in water applications, much more closely analogous to the NIBCO PEX tubing than Choi's samples – failed due to oxidative degradation with carbonyl index values well below that threshold. Duvall and Shah also failed to perform other tests (the OIT and bend back testing referenced above) that would have undermined their "magic number" for carbonyl index (as has been the case in Duvall's previous work).

As such, these opinions are not reliable and have a very serious possibility of misleading the jury. While Duvall and Shah had many different options at their disposal to establish the level of oxidation present in Plaintiffs' tubing and to relate those results to the failure mechanism at hand, they elected to rely on a single, potentially misleading metric – the carbonyl index, and their purported "minimum" – to quantify the amount of oxidation necessary to contribute a PEX tubing failure to oxidative degradation. Given the prejudice that would inure to Plaintiffs based on Duvall and Shah's unreliable and unsupported opinions on this point, they should be excluded.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court enter an order precluding Defendant NIBCO, Inc. from relying on any opinion proffered

by either Donald E. Duvall or Anand R. Shah that: (1) the NIBCO PEX tubing at issue in the Plaintiffs' homes was improperly installed; (2) Plaintiffs' PEX tubing failures did not result from oxidative degradation; or (3) in the alternative, that there is a "required minimum carbonyl index" in order for NIBCO PEX tubing to fail as a result of oxidative degradation.

**LITE DEPALMA GREENBERG, LLC**

Dated: July 28, 2017

*/s/ Bruce D. Greenberg*

Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, NJ 07102
Phone: (973) 623-3000
Email: bgreenberg@litedepalma.com

**MCCUNEWRIGHT LLP**
Joseph G. Sauder
555 Lancaster Avenue
Berwyn, PA 19312
Email: JGS@mccunewright.com

**CHIMICLES & TIKELLIS, LLP**
Steven A. Schwartz
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
Phone: (610) 642-8500
Email: SAS@Chimicles.com

***Counsel for Plaintiffs and the Class***