**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| KIMBERLY COLE and ALAN COLE, *et al.*, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NIBCO Inc.,<br><br>Defendant. | CIVIL ACTION NO. 13-CV-07871-FLW-TJB<br><br>Document Electronically Filed<br><br>Oral Argument Requested |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY OF DR. ERIC R. WEISHAUPT**

J. Gordon Cooney, Jr.
(admitted *Pro Hac Vice*)
Franco A. Corrado
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, Pennsylvania 19103-2921
(215) 963-5000

Jean Paul Bradshaw II
J. A. (Jay) Felton
Kevin M. Kuhlman
Rachel E. Stephens
(All admitted *Pro Hac Vice*)
Lathrop Gage LLP
2345 Grand Boulevard, Suite 2200
Kansa City, Missouri 64108-2618
(816) 292-2000

# TABLE OF CONTENTS

**Page**


INTRODUCTION ........................................................................................1

BACKGROUND .........................................................................................2

A. NIBCO..........................................................................................2

B. Dr. Weishaupt and His Opinions on Installation.......................................3

LEGAL STANDARD.....................................................................................9

ARGUMENT .............................................................................................10

A. Plaintiffs' Misrepresentations Regarding Dr. Weishaupt ........................10

B. Dr. Weishaupt is Qualified to Examine the Installation of the PEX Fittings as Part of His Failure Analysis. ..........................................12

C. Plaintiffs' Case Law Is Distinguishable And Unavailing. .......................15

CONCLUSION .........................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*DeLuca v. Merrell Dow Pharmaceuticals, Inc.*
911 F.2d 941 (3d Cir.1990) ....................................................................9

*Higginbotham v. Volkswagenwerk Aktiengesellschaft*
551 F. Supp. 977 (M.D. Penn. 1982)........................................................ 18-19

*Holbrook v. Lykes Bros. S.S. Co.*
80 F.3d 777 (3d Cir. 1996) ........................................................................ 9-10

*Jones v. Synthes USA Sales, LLC*
No. 08-2060, 2010 WL 3311840, at *7 (D. N.J. Aug. 19, 2010).......................16

*Massok v. Keller Industries, Inc.*
147 Fed. Appx. 651 (9th Cir. 2005)........................................................... 18-19

*Netwig v. Georgia-Pacific Corp*
No. CIV.A. 02-2143-CM, 2005 WL 2122316, at *1 (D. Kan. July 26, 2005) ........................................................................................ 19-20

*In re Paoli R.R. Yard PCB Litig.*
35 F.3d 717 (3d Cir.1994) ..........................................................................9

*Sloan Valve Co. v. Zurn Industries, Inc.*
No. 10-cv-00204, 2013 WL 6068790, at *1 (N.D. Ill. Nov. 18, 2013) ........................................................................................ 16-17

*Sterbenz v. Anderson*
No. 8:11-cv-1159, 2012 WL 5387885, at *4 (M.D. Fla. Nov. 2, 2012) ........................................................................................ 20-21

*United States v. Velasquez,*
64 F.3d 844 (3d Cir.1995) ..........................................................................9

**Other Authorities**

*ASM Handbook*, Vol 11 ............................................................................15

Fed. R. Evid. 702 ....................................................................................1, 9

## INTRODUCTION

Plaintiffs' Motion to Exclude the Testimony of Dr. Eric R. Weishaupt should be denied. Dr. Weishaupt is clearly qualified to testify regarding his findings and conclusions about the workmanship of the installation of the NIBCO fittings and clamps in the named Plaintiffs' homes. Dr. Weishaupt has a Ph.D. in Engineering Science and Mechanics, has over a decade of experience performing failure analysis, including analysis of plumbing products, and has done over a hundred in-home inspections of plumbing and related investigations. His evaluation of the installation of the fittings was done in reference to both industry and NIBCO's standards, was documented thoroughly, and was provided to Plaintiffs in his report. Moreover, Dr. Weishaupt's testimony will "help the trier of fact to understand the evidence" in this case. *See* Fed. R. Evid. 702.

Plaintiffs' challenge to Dr. Weishaupt's qualifications is a baseless attempt to keep overwhelming evidence of installation issues from the jury. Though she may disagree with Dr. Weishaupt's conclusions, Plaintiffs' expert agrees that evaluating installation is part of a failure analysis for residential plumbing products. Thus, Dr. Weishaupt's findings and opinions regarding installation of the Fittings will assist the trier of fact, and the Court should conclude that his qualifications meet the liberal policy for admissibility toward expert testimony.

## BACKGROUND

### A. NIBCO

NIBCO is based in Elkhart, Indiana. NIBCO has been manufacturing and selling plumbing products since 1922. These products include fittings, valves, piping, and tools to install and maintain these products.

Since 2004, NIBCO has sold plumbing tubing made out of cross-linked polyethylene ("PEX") for use in potable water applications, as well as fittings, crimps and clamps to be used with this PEX tubing. Fittings are used to connect tubing and crimps or clamps are used to secure the fitting to the tubing. Below shows a typical plumbing connection involving PEX pipe, a tee fitting, and a crimp:



(Ex. A, Weishaupt Report at 3.) From May 2006 forward, NIBCO manufactured its PEX tubing; NIBCO's PEX fittings, crimps and clamps are vendor-sourced products made to NIBCO's specifications and sold under the NIBCO brand name.

In this case, Plaintiffs allege that NIBCO's 1006 PEX tubing ("Tubing"), yellow brass fittings ("Fittings"), and stainless steel clamps ("Clamps") are

defectively designed and prone to prematurely degrade and leak, and that these defects had led to leaks in the plumbing in their homes.

On May 5, 2017, NIBCO designated Dr. Eric R. Weishaupt as its expert regarding alleged failures of the Fittings and Clamps and provided Dr. Weishaupt's Investigative Report to Plaintiffs. That Report reflects the results of his investigation into "the root cause for the failures of these products in the homes of the named Plaintiffs." (*Id*. at 3.) Dr. Weishaupt also addressed the findings of Plaintiffs' designated expert, Cynthia Smith, regarding the performance of the Fittings and Clamps in the named Plaintiffs' homes. (*Id.* at 62.)

**B. Dr. Weishaupt and His Opinions On Installation**

Dr. Weishaupt has a Bachelor's degree in Materials Science, a Master's degree in Engineering Science and Mechanics, and a Ph.D. in Engineering Science and Mechanics. (*Id.* at App'x B.) He is a Senior Consultant at Engineering Systems Inc. ("ESI") and has "over ten years of experience conducting complex failure investigations." (*Id*.) He "specializes in the study of mechanical behavior of materials in relation to the structure and properties," and his areas of technical interest include fatigue and fracture, corrosion, inspections, and testing of components and systems. (*Id*.)

Dr. Weishaupt's analysis in this case included assessment of the information gleaned from inspections of any accessible plumbing in the named Plaintiffs'

homes, which included observation (to the extent possible) and documentation of any remaining originally installed plumbing and any repairs, examination of PEX plumbing components removed from service (either before or during the inspections), metallographic inspection and testing of these components, examination of fracture surfaces, and testing of water samples. (*See* Ex. A at 4.) The purpose of these inspections was "to yield information about each plumbing system and the environment within which the plumbing components were asked to perform." (*Id*. at 20.)

Dr. Weishaupt was present at the inspection of the home of named Plaintiff James Monica–one of only three named Plaintiffs in this case to allege a Fitting leak. (Ex. B, Weishaupt Dep. at 17:14-16.) Dr. Weishaupt was accompanied by Joe Grzetic, a Senior Staff Consultant at ESI who specializes in failure analysis and investigations. (Ex. B, Weishaupt Dep. at 17:17-24; Ex. C (Grzetic CV).) Mr. Grzetic performed the inspections of the other named Plaintiffs' homes on behalf of ESI; Plaintiffs' designated expert Cynthia Smith did not inspect the Monica house, but she attended the other inspections. (*See* Ex. D, Smith Report at 29.)

As part of his work in this case, Dr. Weishaupt reviewed industry standards applicable to Fittings and the installation of Fittings, including ASTM F1807, the "Standard Specifications for Metal Insert Fittings Utilizing a Copper Crimp Ring for SDR9 Cross-Linked Polyethylene (PEX) Tubing," ASTM F2098, the Standard

Specification for Stainless Steel Clamps for Securing SDR9 Cross-Linked Polyethylene (PEX) Tubing to Metal Insert and Plastic Insert Fittings, and the Plastic Pipe and Fitting Association's Design Guide for residential PEX plumbing systems. (Ex. A at App'x E.) He also reviewed the NIBCO PEX Installation Manual (the "NIBCO Manual"). (*Id*. at App'x D.)

ASTM F1807 and F2098 and the NIBCO Manual have the same general requirements for making a proper crimp connection, including:

- Insert the fitting into the pipe until the tube touches the fitting shoulder;
- Position the crimp ring 1/8" to 1/4" from the end of the tube;
- Center the crimp tool over the ring;
- Hold the tool perpendicular (90°) to the fitting and close the tool; and
- Check each crimp for conformance to the after-crimped dimensional requirement (e.g., with a go/no-go gauge).

(Ex. E, ASTM F1807 § 9.1.1 (crimps); Ex. F, ASTM F2098 § 9.1.1 (clamps); Ex. G, NIBCO Manual at 7-8.) The NIBCO Manual also reminds installers to "[c]ut the pipe to length squarely" because "[a] rough, jagged or irregular cut may result in a failed connection." (Ex. G at 9.) It has the same general advice for when the installer opts to use Clamps instead of crimp rings: cut the pipe square, insert the pipe until it touches the shoulder of the fitting, and position the clamp 1/8" to 1/4" from the end of the tube. (*Id*. at 10-11; *see also* Ex. F.)

Using these standards, ESI evaluated the workmanship of the installation of each connection point of the fittings (both NIBCO and otherwise) that were removed during prior repairs or during the inspections – 89 in total. Each possible measurement was recorded. (*See* Ex. A at App'x F.) Dr. Weishaupt personally performed most of these measurements; Mr. Grzetic did a handful. (Ex. B, Weishaupt Dep. at 161:21-162:9.) They performed this work at Ms. Smith's facility in North Carolina using calipers. (*Id*. at 162:7-11; Ex. H, Grzetic Dep. at 124:23-125:20.) Dr. Weishaupt and Mr. Greztic brought equipment to the inspection in North Carolina specifically for the purpose of evaluating the workmanship of the installation of the fittings. (Ex. I, Weishaupt Decl. ¶ 4.) Ms. Smith had the opportunity to either observe this work or perform this analysis herself and appears to have done neither. (*Id*. ¶ 5.)

ASTM F1807 states that calipers may be used to measure the crimp diameters instead of a go/no-go gauge, and it defines the measurements for the minimum and maximum allowable sizes of crimp rings. (Ex. E, ASTM F1807 § X1.) Dr. Weishaupt evaluated these measurements and other visual indicators of whether a fitting was properly installed, such as the square-ness of the cut of the PEX pipe, whether the fitting was completely inserted into the pipe, and whether the crimp was made squarely. (*See* Ex. A, Weishaupt Report at App'x F.)

Dr. Weishaupt observed installation errors such as crimp rings being too close to the shoulder of the fitting, PEX tubing not being fully inserted into the fittings, and undercrimping. (*See id*.) For example, one of the NIBCO Fittings from the Medders' home (PPX-99) was crimped too close to the shoulder, which contributed to the stress corrosion cracking failure mechanism. (Ex. A at App'x F; Ex. B, Weishaupt Dep. at 163:14-164:21.) That crimp ring was also undercrimped. (*Id*. at 212:15-17, 213:8-15.) Undercrimping and improper placement of a crimp or clamp can lead to an inadequate seal between the fitting and tubing and allow water to escape from the assembly; this happened with the Monica Fittings, which allowed water to escape and get on the NIBCO Clamps used on those assemblies. (Ex. B, Weishaupt Dep. at 189:7-190:12.)

Based on these measurements and his observations, Dr. Weishaupt concluded that a large majority (87 of 89) of these fittings were improperly installed—not just NIBCO fittings, but also other manufacturers' fittings and products. (Ex. A at 21; *see id*. at App'x F.)

Evaluation of the quality of the installation of the plumbing in the named Plaintiffs' homes is an important component of failure analysis. As Dr. Weishaupt noted in his report, "factors such as increased applied stresses and other geometric factors that can increase corrosion of fittings are influenced by the installation conditions of the copper crimp rings or stainless steel clamps." (*Id*. at 21.) In

other words, installation issues may act to promote corrosion and have the potential to directly contribute to a loss of water which may result in a leak." (*Id*. at 22.) For example, undercrimping or underclamping can lead to "insufficient sealing between the pipe and the fittings allowing water to freely flow around the fitting barbs." (*Id*.)

Notably, Ms. Smith also inspected the named Plaintiffs' homes (except the Monica house) "in an effort to determine if the manner of installation . . . may have contributed to failure of the incident plumbing components." (Ex. D at 29.) She did not conclude that the manner of every pipe, fitting, and clamp she observed was correct. Rather, she concluded only that she found no evidence "to suggest that improper installation . . . contributed significantly to failure of the incident brass fittings and clamps." (*Id*. at 35.) Neither Ms. Smith's report nor the documents produced with her report reflect any measurements she took of the various plumbing assemblies removed from the named Plaintiffs' homes nor reflect any observations she made vis-à-vis installation. The lone exception is a single photo showing a go/no-go gauge placed over a single crimp connection on a NIBCO Fitting from the Medders' home (PPX-99). (Ex. D at 37.) But Dr. Weishaupt found that the specific crimp connection cited by Ms. Smith was improperly installed when compared to the NIBCO Manual and the applicable industry standards. (Ex. A at 64.)

## LEGAL STANDARD

FRE 702 governs the admission of expert testimony and provides that an expert may testify if:

> a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> b) The testimony is based on sufficient facts or data;
>
> c) The testimony is the product of reliable principles and methods; and
>
> d) The expert has reliably applied the principles and methods to the facts of the case.

The Federal Rules of Evidence embody a "strong and undeniable preference for admitting any evidence having some potential for assisting the trier of fact." *DeLuca v. Merrell Dow Pharmaceuticals, Inc*., 911 F.2d 941, 956 (3d Cir. 1990). "Rule 702, which governs the admissibility of expert testimony, specifically embraces this policy," *United States v. Velasquez,* 64 F.3d 844, 849 (3d Cir.1995), and has a liberal policy of admissibility. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir.1994). This liberal treatment extends to the expert's substantive qualifications as well as his formal qualifications. *Id*.

Because of this liberal approach, "most arguments about an expert's qualifications relate more to the weight to be given the expert's testimony than to its admissibility." *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir.

1996). An expert witness need not be the "best" qualified to be worthy of testifying. *Id*. It is thus "an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Id*.

## ARGUMENT

### A. Plaintiffs' Misrepresentations Regarding Dr. Weishaupt

In their Preliminary Statement, Plaintiffs made several grossly inaccurate statements regarding Dr. Weishaupt and his work in this case that must be addressed.

First, Plaintiffs cite Dr. Weishaupt's conclusion that 97% of the fitting assemblies he examined showed signs of improper installation and claim that his "only basis for concluding that the installations were improper is the installation guide NIBCO uses for its PEX plumbing systems." (Doc. 135-1 at 1.) As noted above, the basis of Dr. Weishaupt's opinion regarding improper installation is based not only on the published NIBCO Manual, but also industry standards that dictate similar information regarding the installation of PEX insert fittings, including ASTM F1807 and ASTM F2098. (*See* Ex. A at 6-7, 22.)

Second, Plaintiffs claim that "Dr. Weishaupt does not have the proper background or experience to provide this opinion" regarding improper installation

of the fitting assemblies. (Doc. 135-1 at 1.) Analyzing the installation of the PEX insert fittings at issue is not subjective; rather, it is largely an objective analysis that involves quantifying specific dimensions associated with the fitting assembly, including crimp/clamp placement on the tube relative to the fitting and crimp size (overcrimp or undercrimp). Dr. Weishaupt did document some subjective workmanship issues, such as pipe not being cut straight or a fitting not being inserted into the pipe completely; however, the vast majority of the fittings examined showed some form of improper connection that could be objectively, quantified, e.g., improper crimp/clamp placement. (*See* Ex. A at App'x F.) This analysis does not require experience re-piping homes or professional licensure as a plumber.

Finally, Plaintiffs claim that "Dr. Weishaupt's deposition testimony reveals that he cannot point to evidence that *any* of the fitting assemblies at issue in this case failed to comply with the instructions in NIBCO's guide." (Doc. 135-1 at 1.) They similarly claim that he "does not, and cannot, point to a single instance where any fitting assembly did not meet the standard that NIBCO itself set forth in its installation guide." (Doc. 135-1 at 1-2.) Dr. Weishaupt's deposition testimony and report indicate the exact opposite. Dr. Weishaupt specifically stated in his report and deposition testimony that 97% of the fitting assemblies he inspected exhibited improper installation as per the both the NIBCO Manual and industry

standards. (Ex. A at 22.) He specifically documented his findings in Appendix F of his report, and Plaintiffs had the opportunity to question him about those findings during his deposition – and did. (Ex. A at App'x F; *see, e.g.*, Ex. B, Weishaupt Dep. at 161:21-164:21.)

### B. Dr. Weishaupt is Qualified to Examine the Installation of the PEX Fittings as Part of His Failure Analysis.

As noted above, Plaintiffs claim that Dr. Weishaupt's investigation "does not, and cannot, point to a single instance where any fitting assembly did not meet the standard that NIBCO itself set forth in its installation guide." (Doc. 135-1 at 1-2.) This is a bizarre and false statement. Dr. Weishaupt documented his measurements and observations as part of his report. (*See* Ex. A at App'x F.) He also discussed specific examples of improper installation and how that affected NIBCO Fittings that failed in service. For example, Dr. Weishaupt noted that the metallographic examination of an allegedly failed Fitting from the Cole residence (PPX-29) showed "no indication of abnormal dezincification, let alone through-wall dezincification"; he observed that the sleeve[1] used to install that fitting was not crimped squarely in contravention to the instructions in the NIBCO Manual (which he copied into his report); and Dr. Weishaupt thus attributed any leak associated with the Fitting to improper installation. (Ex. A at 44-48.) He

[1] Plaintiffs do not allege that NIBCO's sleeves are defective. (Ex. A at 42.)

discussed examples from the Monica and Medders homes as well. (*See, e.g.*, *id.* at 52-55 (Monica); *id*. at 58-59 (Medders).)

Dr. Weishaupt is qualified to make these observations about the installation of the fittings in the named Plaintiffs' homes and draw conclusions on the impact improper installation had on the fittings that failed. He has a Ph.D in Engineering Science and Mechanics and over ten years of experience conducting complex failure investigations. (Ex. A at App'x F.) He has performed numerous failure analyses of plumbing components. (*Id*.) He has expertise in understanding the performance of plumbing systems from a metallurgical perspective as well as how engineering mechanics and corrosion engineering apply to plumbing components. (Ex. B, Weishaupt Dep. at 12:16-22.) He has looked at plumbing in over a hundred homes and condo units and has done similar work for those cases as he did here, including taking components back for further analysis and analyzing the installation. (*Id*. at 12:24-13:5.) Although he's never done a full plumbing installation or repipe, he has done plumbing work, including performing PEX crimps and clamps and the installation of fixtures and fittings in his own home. (*Id*. at 13:6-10.)

Moreover, as an engineer with over ten years of experience conducting failure analyses, Dr. Weishaupt has the education, knowledge and experience to understand how improper installation can promote corrosion and reduce the service

life of individual fittings. For example, based on his metallographic examination of the fittings, Dr. Weishaupt found that many of the NIBCO Fittings in the Monica house "did not exhibit through-wall dezincification, let alone through-wall porosity." (Ex. A at 55.) So how did water get to the outside of those Fittings and onto the clamps if there was no path for water to pass through the Fittings? To answer this question, Dr. Weishaupt took simple measurements and made visual observations regarding the NIBCO Fittings and found installation problems. For example, PPX-11 has corrosion on the exterior of the Fitting but no through-wall dezincification, specifically on the Fitting body. (*Id*.) He concluded that these installation issues provided "a competent path for water," and this allowed water to escape the plumbing system and stagnate on the exterior of the Fitting, resulting in corrosion on that side of the Fitting. (*Id*. at 55.)

Finally, by Plaintiffs' own standards, being a licensed plumber is not required to evaluate the installation of plumbing for the purposes of performing failure analysis. Ms. Smith is not a licensed plumber either, yet she considered installation as part of her failure analysis. Unlike Dr. Weishaupt, Ms. Smith did not present any data or document her observations regarding the installation of the plumbing in the Plaintiffs' homes in her report, aside from a single photo. Notably, Ms. Smith did not categorically conclude that all of the installations were

done properly, only that improper installation did not "contribute[] significantly" to any Fitting failures. (Ex. D at 35.)

Understanding and evaluating installation conditions and service history are common and expected methods of performing any engineering failure investigation. In fact, defective installation is one of the four root cause categories listed in the first section of the authoritative handbook for performing failure analysis, *ASTM Handbook* Volume 11. (Ex. I, Weishaupt Decl. Ex. 1.) Understanding the installation conditions for a component that has failed is a well-known fact in the engineering community, specifically for investigations of corrosion failures.[2] Obtaining the knowledge and proper information to evaluate the installation of any component is a task that any engineer must undertake in order to perform a failure analysis because installation practices can influence the performance of a component or system. (*Id*. ¶ 6.) Dr. Weishaupt has the education, credentials and experience to undertake this work.

**C. Plaintiffs' Case Law Is Distinguishable And Unavailing.**

Plaintiffs claim that Dr. Weishaupt's "specialization in metallurgy and materials science does not overlap with plumbing installation." (Doc. 135-1 at 6.) But the facts and the cases cited by Plaintiffs on this point do not support the

[2] Ex. I, Weishaupt Decl. ¶ 8, *see also id*. Ex. 2 ("Details of the material specifications, quality assurance records, installation and maintenance records, and a history of the environment are all useful resources in resolving corrosion failures.").

exclusion of Dr. Weishaupt's findings and opinions regarding installation. In *Jones v. Synthes USA Sales, LLC*, the expert at issue was a metallurgical engineer with a background in aircraft development. No. 08-2060, 2010 WL 3311840, at *7 (D.N.J. Aug. 19, 2010). But the case was about allegedly defective surgical screws; thus, the admissibility of the expert's opinions hinged on whether he had "the requisite qualification to offer testimony regarding how to make biomaterials and surgical devices meant for bodily implantation suitable for spinal fusion surgery." *Id*. The expert had no experience whatsoever with medical devices or spinal fusion; he had never even witnessed a surgical procedure; and he revealed his lack of expertise on the subject matter during his deposition. *Id*. The district court concluded that while the expert was qualified to attest to the properties of metal generally, his general knowledge was not sufficient.

*Sloan Valve Co. v. Zurn Industries, Inc*. is distinguishable because in a patent case, an expert must be "qualified as a person of ordinary skill in the art ('POSITA') as of the time of the invention disclosed." No. 10-cv-00204, 2013 WL 6068790, at *1 (N.D. Ill. Nov. 18, 2013). Thus, the *Sloan* court examined whether or not the defendant's expert's experience in designing fluid systems was sufficient or if he instead needed to have experience in the flush valve industry to be able to testify. The district court concluded that the "field of the invention at issue in this case is sufficiently sophisticated to warrant a requirement of some experience

within the field to qualify as a POSITA." *Id*. at *7. Because the expert did not have experience designing, assembling, or repairing plumbing systems or devices, he was not a POSITA regarding the patent at issue. *Id*.

In contrast, Dr. Weishaupt's failure analysis work has included work in the field of plumbing. He had been in over a hundred homes to observe the plumbing and done similar analysis on plumbing components removed from those homes. In his Report and in his deposition, Dr. Weishaupt was able to describe why and how he conducted the workmanship study, the impact improper installation can have on a plumbing assembly, and in particular, how improper installation can affect the performance of Fittings and Clamps. His analysis of the installation conditions of the plumbing assemblies from the named Plaintiffs' homes was based on objective criteria and simple visual observations. He reviewed the various applicable standards and instructions, and applied those to his work. Dr. Weishaupt clearly has the academic qualifications, experience, and knowledge to perform this simple analysis. And while most plumbing installations are done by licensed plumbers (and should be for the NIBCO Limited Warranty to apply), assessing whether or not a particular fitting was properly installed vis-à-vis the relatively simple standards laid out in ASTM F1807, ASTM F2098, and the NIBCO Manual is well within the ability and knowledge of a man with Dr. Weishaupt's credentials and experience.

Plaintiffs' reliance on *Higginbotham v. Volkswagenwerk Aktiengesellschaft*, 551 F. Supp. 977 (M.D. Pa. 1982), and *Massok v. Keller Industries, Inc*., 147 Fed. Appx. 651 (9th Cir. 2005), to challenge Dr. Weishaupt's credentials and experience is also without merit. In *Higginbotham*, the plaintiff claimed that a defect in the collapsible steering column made the car manufacturer strictly liable for a motorist's death. *Id*. at 978. The district court found that a police accident investigator was "not properly [ ] termed a qualified expert in accident reconstruction" because he had minimal training in that field" and "the area of physics and the movement of bodies." *Id*. at 982-83. Thus, the expert's testimony regarding the movement of the plaintiff's body within the vehicle was properly excluded. *Id*. at 983.

In *Massok*, the plaintiff fell from a ladder and was injured. 147 Fed. Appx. at 653. In his product liability suit against the ladder manufacturer, the plaintiff attempted to introduce the written report of a proposed expert who concluded that the ladder was defectively designed. *Id*. at 655. The expert worked at a firm specializing in product failure analysis and claimed to be a forensic expert with a bachelor's degree in mechanical engineering and to have extensive experience in ladder cases. *Id*. at 655-56. But the district court excluded the expert's testimony, finding him unqualified because he had never designed ladders, had never written or lectured on the subject, and had produced no peer-reviewed work. *Id*. at 656.

The court also noted that he based his conclusions on inadequate testing and had failed the Georgia state mechanical engineering examination five times. *Id*. The Circuit Court affirmed the expert's exclusion, finding the district court's concerns about his qualifications reasonable. It noted that plaintiff's expert did not have a Ph.D. (unlike defendant's expert), did not test the plaintiff's ladder, and was unable to pass the mechanical engineering examination.

Unlike the proposed experts in *Higginbotham* and *Massok*, Dr. Weishaupt has a Bachelor's degree, a Master's degree, and a Ph.D in engineering mechanics and is a licensed professional engineer. He has ten years of experience conducting complex failure investigations, including analysis of plumbing failures. And he performed testing on the products at issue, including "incident" NIBCO Fittings and clamps, and performed his workmanship study on assemblies removed from the named Plaintiffs' homes. It simply is not credible to compare Dr. Weishaupt's credentials and work product in this case to those of the excluded experts *Higginbotham* and *Massok.*

Finally, Plaintiffs cite two cases that they claim stand for the proposition that "where experts have been qualified to testify regarding plumbing systems, they have had many years of experience, including as Master Plumbers." (Doc. 135-1 at 7.) Both cases are clearly distinguishable and do not support the need to be a licensed plumber to make observations about installation of fittings. In *Netwig v.*

*Georgia-Pacific Corp*., the plaintiff was injured when a piece of copper pipe he was bracing popped out from an engineered floor joist manufactured by the defendant and hit plaintiff in the eye. No. CIV.A. 02-2143-CM, 2005 WL 2122316, at *1 (D. Kan. July 26, 2005). As part of his products liability action against the manufacturer, the plaintiff designated a plumber as an expert on the issue of whether plaintiff's actions (i.e., bracing the pipe) were a common practice in the plumbing industry. *Id*. at *2. Defendant challenged the proposed testimony of the expert as unreliable and irrelevant, but the court disagreed because his testimony was limited to practices of which he had personal knowledge and had been trained. *Id*. It also found that his testimony regarding "common practices in the plumbing industry" would assist the trier of fact in assessing the reasonableness and foreseeability of plaintiff's method of installing pipe. *Id*.

In *Sterbenz v. Anderson*, a garment had been retrieved from the plaintiff and defendant's shared sewer line. No. 8:11-cv-1159, 2012 WL 5387885, at *4 (M.D. Fla. Nov. 2, 2012). Plaintiff proposed a number of experts to testify as to the potential source of the garment retrieved from the sewer pipe district court. *Id*. at *5. The defendant challenged one of the plumber's qualifications. *Id*. The district court rejected that challenge because the plumber had 10 years of experience *and was the person who retrieved the garment from the sewer*; thus, his testimony would aid the jury in determining the relevant facts of the case, i.e., the source of

the garment in the sewer line. *Id*. The court noted that even if his "methods or conclusions may be lacking, such will go to [the plumber's] credibility," the defendant would have the opportunity to vigorously cross-examine him. *Id*.

Unlike in *Netwig*, Dr. Weishaupt is not broadly opining about "common practices in the plumbing industry" regarding installation or the foreseeability that a plumber would improperly install PEX Products. Rather, Dr. Weishaupt observed the condition of the installation of the fittings (NIBCO or otherwise) that were removed from the named Plaintiffs' homes as part of his overall failure analysis, and his workmanship study was based on the criteria stated in ASTM F1807, ASTM F2098, and the NIBCO Manual. Dr. Weishaupt does not need to be a licensed plumber to make these observations, and his findings will be helpful to the jury in assessing a key issue, i.e., what caused the fitting failures in the Plaintiffs' homes—the fittings or how they were installed or used. And as in *Sterbenz*, if Plaintiffs believe his "methods or conclusions may be lacking," they can challenge his credibility via cross-examination.

## CONCLUSION

For the above reasons, Defendant respectfully requests the Court deny Plaintiff's Motion to Exclude the Testimony of Dr. Eric R. Weishaupt, and for such other relief as this Court deems just and proper.

LATHROP GAGE LLP
MORGAN, LEWIS & BOCKIUS LLP

/s/ Franco A. Corrado

Jean Paul Bradshaw II (Admitted *Pro Hac Vice*)
J. A. (Jay) Felton (Admitted *Pro Hac Vice*)
Kevin M. Kuhlman (Admitted *Pro Hac Vice*)
Rachel E. Stephens (Admitted *Pro Hac Vice*)
2345 Grand Boulevard, Suite 2200
Kansas City, Missouri 64108-2618
Tel: (816) 460-5726; Fax: 816-292-2001
jbradshaw@lathropgage.com
jfelton@lathropgage.com
kkuhlman@lathropgage.com
rstephens@lathropgage.com

J. Gordon Cooney, Jr. (Admitted *Pro Hac Vice*)
Franco A. Corrado
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, Pennsylvania 19103-2921
(215) 963-5000
jgcooney@morganlewis.com
fcorrado@morganlewis.com

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of August, 2017, I served a true and correct copy of the foregoing via electronic mail to the following:

Benjamin F. Johns
Steven A. Schwartz
Chimicles & Tikelllis, LLP
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
bfj@chimicles.com
sas@chimicles.com

Joseph B. Kenney
Joseph G. Sauder
Matthew D. Schelkopf
McCune Wright, LLP
1055 Westlakes Drive
Berwyn, PA 19312
jgs@mccunewright.com
mds@mccunewright.com
jbk@mccunewright.com

Bruce Daniel Greenberg
Lite Depalma Greenberg, LLC
570 Broad Street, Suite 1201
Newark, NJ 07102
bgreenberg@litedepalma.com

Kyle A. Shamberg
Lite Depalma Greenberg, LLC
211 W. Wacker Drive, Suite 500
Chicago, IL 60606
kshamberg@litedepalma.com

/s/ Franco A. Corrado
Franco A. Corrado