**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| KIMBERLY COLE and ALAN COLE, *et al.*, on behalf of themselves and all others similarly situated, | : | CIVIL ACTION NO. 13-CV-07871-FLW-TJB |
| Plaintiffs, | : | Document Electronically Filed |
| v. | : | Oral Argument Requested |
| NIBCO Inc., Defendant. | : | |

**MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFFS' MOTION TO EXCLUDE**
**<u>TESTIMONY OF DONALD E. DUVALL AND ANAND R. SHAH</u>**


J. Gordon Cooney, Jr.
(admitted *Pro Hac Vice*)
Franco A. Corrado
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, Pennsylvania 19103-2921
(215) 963-5000

Jean Paul Bradshaw II
J. A. (Jay) Felton
Kevin M. Kuhlman
Rachel E. Stephens
(All admitted *Pro Hac Vice*)
Lathrop Gage LLP
2345 Grand Boulevard, Suite 2200
Kansa City, Missouri 64108-2618
(816) 292-2000

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..... 1

BACKGROUND ..... 1

A. NIBCO ..... 1

B. Dr. Duvall and Mr. Shah's Credentials and Experience. ..... 2

C. ESI's Opinions Regarding Installation of the Tubing in the Named Plaintiffs' Homes. ..... 4

D. Dr. Duvall and Mr. Shah's Analysis of the Level of Oxidation in the Incident PEX Tubing Using the Carbonyl Index Parameter. ..... 9

LEGAL STANDARD ..... 17

ARGUMENT ..... 19

A. Dr. Duvall and Mr. Shah are Qualified to Examine the Installation of the PEX Fittings as Part of Their Failure Analysis. ..... 19

1. ESI determined that installation issues affected only two of the named Plaintiffs' homes. ..... 20

2. Dr. Duvall and Mr. Shah are qualified to address the plumbing installation issues in the named Plaintiffs' homes. ..... 21

3. Plaintiffs' case law regarding experts' qualifications is distinguishable and unavailing. ..... 24

B. Dr. Duvall and Mr. Shah's "Minimum Carbonyl Index" Opinion is Reliable and Admissible. ..... 29

1. Dr. Duvall and Mr. Shah have "good grounds" for applying the minimum carbonyl index concept in this case. ..... 30

2. Plaintiffs' case law regarding reliability is distinguishable and unavailing. ..... 32

CONCLUSION ..... 37



27893015v1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) .......... 18, 19, 31, 32

*DeLuca v. Merrell Dow Pharmaceuticals, Inc.*,
911 F.2d 941 (3d Cir. 1990) .......... 17

*Higginbotham v. Volkswagenwerk Aktiengesellschaft*,
551 F. Supp. 977 (M.D. Penn. 1982) .......... 25, 26, 27

*Holbrook v. Lykes Bros. S.S. Co.*,
80 F.3d 777 (3d Cir. 1996) .......... 17, 18

*Jones v. Synthes USA Sales, LLC*,
No. 08-2060, 2010 WL 3311840 (D. N.J. Aug. 19, 2010) .......... 23, 24

*Magistrini v. One Hour Martinizing Dry Cleaning*,
180 F. Supp. 2d 585 (D.N.J. 2002) .......... 34, 35

*Massok v. Keller Industries, Inc.*,
147 Fed. Appx. 651 (9th Cir. 2005) .......... 25, 26, 27

*McDowell v. Brown*,
392 F.3d 1283 (11th Cir. 2004) .......... 35

*Netwig v. Georgia-Pacific Corp.*,
02-2143-CM, 2005 WL 2122306 (D. Kan. July 26, 2005) .......... 27, 28

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3d Cir. 1994) .......... 17, 18, 19, 32

*Reliance Ins. Co. v. Keystone Shipping Co.*,
102 F. Supp. 2d 181 (S.D.N.Y. 2000) .......... 34

*Sloan Valve Co. v. Zurn Industries, Inc.*,
No. 10-cv-00204, 2013 WL 6068790 (N.D. Ill. Nov. 18, 2013) .......... 24, 25

*State v. Fortin*,
745 A.2d 509 (N.J. 2000) .......... 32, 33

*Sterbenz v. Anderson*,
No. 8:11-cv-1159, 2012 WL 5387885 (M.D. Fla. Nov. 2, 2012) ................28, 30

*United States v. Velasquez*,
64 F.3d 844 (3d Cir. 1995) ....................................................................17

*Windmere, Inc. v. International Ins. Co*.,
522 A.2d 405 (N.J. 1987) ....................................................................33, 34

*Young v. Burton*,
567 F. Supp. 2d 121 (D.D.C. 2008), *aff'd* 354 F. App'x 432 (D.C. Cir. 2009) ....................................................................35

**Other Authorities**

Fed. R. Evid. 702 ....................................................................1, 17, 18

## INTRODUCTION

Plaintiffs' Motion to Exclude the Testimony of Donald E. Duvall and Anand R. Shah should be denied. Dr. Duvall and Mr. Shah, who are both licensed professional engineers with decades of experience performing failure analysis on plastic piping, are qualified to testify regarding the impact improper installation had on the failure of the NIBCO PEX tubing in the named Plaintiffs' homes. Moreover, their opinions on how to measure the oxidation level of the failed PEX tubing and the impact that oxidation did (or did not) have on the performance of the tubing is admissible because it is based on published research, has been applied by Dr. Duvall and Mr. Shah for decades in analyzing plastic tubing failures, and has been part of numerous published articles and presentations made to industry peers. Because Dr. Duvall's and Mr. Shah's opinions on these issues are reliable and will "help the trier of fact to understand the evidence" in this case, they should be admitted. *See* Fed. R. Evid. 702.

## BACKGROUND

### A. NIBCO

NIBCO is based in Elkhart, Indiana. NIBCO has been manufacturing and selling plumbing products since 1922. These products include fittings, valves, piping, and tools to install and maintain these products.

Since 2004, NIBCO has sold plumbing tubing made out of cross-linked polyethylene ("PEX") for use in potable water applications, as well as fittings,

crimps and clamps to be used with this PEX tubing. Fittings are used to connect tubing and crimps or clamps are used to secure the fitting to the tubing. In this case, Plaintiffs allege that NIBCO's 1006 PEX tubing ("Tubing"), yellow brass fittings, and stainless steel clamps are defectively designed and prone to prematurely degrade and leak, and that these defects had led to leaks in the plumbing in their homes.

On May 5, 2017, NIBCO designated Dr. Donald E. Duvall and Dr. Anand R. Shas as its experts regarding alleged failures of the Tubing and provided their Investigative Report to Plaintiffs. The Duvall/Shah Report reflects the results of their investigation into the root cause(s) of the alleged plumbing failures in the homes of the named Plaintiffs. (Ex. A at 3.) As part of their Report, Dr. Duvall and Dr. Shah also addressed the findings of Plaintiffs' designated expert, Cynthia Smith, regarding the performance of the Tubing in the named Plaintiffs' homes. (*Id*. at 93-114.)

**B. Dr. Duvall and Mr. Shah's Credentials and Experience.**

Dr. Duvall has a Bachelor's degree in chemistry, a Master's degree in Materials Science and Engineering, and a Ph.D. in Metallurgical and Materials Engineering. (Ex. B (Duvall CV).) He is a licensed professional engineer. (*Id*.) He is a Senior Managing Consultant at Engineering Systems Inc. ("ESI"), where he has worked for more than 20 years. (*Id*.) Prior to joining ESI, Dr. Duvall

worked at L. J. Broutman & Associates ("LJBA") for over ten years. (*Id*.) LJBA is a consulting, research, and testing organization that specializes in work with polymetric materials. (*Id*.) At LBJA, Dr. Duvall managed projects involving plastic piping and set up LJBA's plastic piping testing laboratory. (Ex. B.)

Dr. Duvall has "more than 40 years experience in the plastics industry." (*Id*.) He specializes in "engineering, testing and failure analysis of products manufactured from polymetric materials." (*Id*.) He has taught courses at the Illinois Institute of Technology for 25 years, including courses related to polymer science and failure analysis. (*Id*.) Dr. Duvall has published numerous articles and given presentations related to failure analysis of plastics, including writing about the "Effect of Environment on Plastics Performance" for the *ASM Handbook* on failure analysis. (*Id*.) For over a decade, Dr. Duvall led "Plastics Failure Analysis" seminars co-sponsored by the Society of Plastics Engineers. (*Id*.)

Dr. Shah has a Bachelor's degree in biomedical engineering, a Master's degree in Macromolecular Science, and an MBA. (Ex. C (Shah CV).) He is a licensed professional engineer. (*Id*.) He is a Senior Managing Consultant at ESI and ESI's Director for Polymetric, Composite & Non-metallic Materials. (*Id*.) He conducts and leads investigations into the performance of products made from plastics and specializes in failure analysis. Mr. Shah's 20 years of experience has included failure investigations into plastic plumbing products. (*Id*.) He has

chaired an industry group and a technical program related to failure analysis for plastics engineers and published articles and given presentations related to failure analysis of plastics. (*Id*.) Mr. Shah is the co-author of a book, *Fractography in Failure Analysis of Polymers*. (Ex. C.) He has been a failure analysis instructor for the Society of Plastics Engineers and is currently an adjunct professor at Illinois Institute of Technology. (*Id*.)

### C. ESI's Opinions Regarding Installation of the Tubing in the Named Plaintiffs' Homes.

ESI was retained to investigate the root cause for the failures of the NIBCO PEX products in the named Plaintiffs' homes. (Ex. A, Duvall/Shah Report at 3.) Its investigation included home inspections, during which ESI "documented the plumbing system, identified locations of the repairs to the plumbing system, documented the plumbing installation method, measured water flow and water pressures, analyzed water chemistry on site, and obtained water samples." (*Id*.) This work was done by Joe Grzetic, a Senior Staff Consultant at ESI who specializes in failure analysis and investigations. (Ex. D (Greztic Resume).)

As part of its investigation, ESI also conducted laboratory inspections of the PEX tubing samples harvested from the named Plaintiffs' homes. There were 18 tubing samples available to ESI and Plaintiffs' expert that were associated with incident leaks:

| Residence | Number of incident samples in the group |
|---|---|
| McCoy | 2 |
| Cole | 12 |
| Sminkey | 1 |
| Boyd | 0 |
| McMahon | 1 |
| Peperno | 2 |

(Ex. A, Duvall/Shah Report at 3.) No incident tubing was analyzed by ESI (or Plaintiffs) from three of the homes at issue: Linda Boyd (no sample available), James Monica (no tubing leaks), and James and Judy Medders (no tubing leaks).[1] Thus, of the eight homes belonging to the named Plaintiffs, ESI conducted failure analysis on incident PEX tubing from five.

In conducting its failure analysis on the 18 incident tubing samples available to it, "ESI considered information learned about the plumbing system, plumbing installation practice, plumbing repair locations, examination of PEX tubing removed from service, testing of PEX tubing to applicable industry standards, examination of the fracture surfaces, and review of the file material in identifying the cause(s) of the failures." (Ex. A, Duvall/Shah Report at 4.) ESI concluded that there was no single root cause for the leaks in the tubing; rather, the failures were caused by different factors or a combination of factors such as "exposure to water

[1] ESI did examine and test some non-incident tubing from the Medders' homes. (*See* Ex. A at 70.)

temperatures [and pressures] beyond specification, improper installation practices, and use of recirculating pumps on the hot water side." (*Id*.)

Ultimately, ESI attributed the plumbing leaks in just two homes to improper installation issues. ESI concluded that improper installation, in combination with high water temperatures, was the root cause of the leaks in the Pepernos' home. The Pepernos claimed to have had four leaks total – all of which were on the hot water side of the system and within 15 feet of the water heater. (Ex. A, Duvall/Shah Report at 38; *id.* at App'x C at 45.) Only two incident pipes were made available to ESI. During the inspection, ESI matched the location of one of the leaks, i.e., where the original NIBCO Tubing had developed a longitudinal split, to where the tubing had been affixed to a wood beam with a clamp bracket. (Ex. A, App'x C at 53.) The NIBCO PEX Installation Manual ("NIBCO Manual") does require tubing to be properly supported to protect against excessive strain, but the tubing should also have slack in it to allow for expansion and contraction. (Ex. E, NIBCO Manual at 14.)

The other leak occurred where NIBCO Tubing was connected directly to the water heater. The Pepernos have a gas water heater (Ex. A, App'x C at 54), but the plumber who installed the Tubing in their home apparently ignored the warning in NIBCO Manual that a "metal adapter at least 12" long should be used to connect NIBCO Dura-PEX pipe to a gas water heater." (Ex. E at 16; *see also* Ex. A at 54-

55.) A video taken by the Pepernos shows the Tubing connected directly to their gas water heater. (*Id*. at 39 (Photo 2.4).)

ESI also attributed leaks in the Cole residence to installation issues. Based on the home inspection and the incident tubing samples provided, "ESI identified seven locations of previously repaired leaks," which were "at locations where PEX tubing changed directions." (Ex. A, App'x C at 14.) Specifically, ESI located repairs "at the header where piping transitions from the attic into the floor below"; these repairs were evident from where non-NIBCO fittings and stainless steel flexible tubing was visible. (*See id*. at 14-20.)

ESI also did a laboratory inspection of the 12 incident tubing samples provided from the Cole residence. Eight of the samples had full or partial circumferential cracks. (Ex. A, Duvall/Shah Report at 86.) Cracks oriented circumferentially are "consistent with failure resulting from PEX tubing experiencing mechanical stress from bending." (*Id*.) ESI noted that "[n]one of the incident samples from any of the other residences failed from a circumferential through wall crack" and that "[n]one of the samples from any of the other residence showed any evidence of any precursor cracking that was oriented in the circumferential direction." (*Id*.) Regarding the samples from the Cole house with axial cracks, those cracks were located on the inner side of a bend in the tubing, which was caused by impingement of the tubing against wooden framing. (Ex. A

at 91-92.) Thus, ESI concluded that installation issues were the cause of the Coles' plumbing leaks.

ESI attributed the leaks in the other three homes to issues other than improper installation. The originally installed NIBCO Tubing had already been replaced in the McCoy or McMahon homes before the inspections in this case. (Ex. A, App'x C at 24, 35.) Only three incident tubing samples total were available for analysis from these two homes. (Ex. A at 3.) Regardless, ESI did not attribute the failure of these three samples to installation issues. Rather, it found that the Tubing in the McMahon home failed because of the use of a recirculating pump that was recirculating hot water in the plumbing system 24 hours a day, i.e., the NIBCO tubing was exposed to operating conditions above the design limit for the product.[2] (*Id*. at 76.)

Similarly, the McCoy residence had a recirculating pump that was set to circulate hot water for 11.5 hours a day, again well beyond the operating limits of NIBCO PEX tubing. (*Id*. at 79.) Perhaps tellingly, a leaking piece of PEX tubing manufactured by Zurn (i.e., not NIBCO) that was part of the original plumbing installation was discovered during the McCoy home inspection. (*Id*. at 78-79.)

[2] NIBCO PEX 1006 tubing carried a "1" designation because it met the ASTM standards for use in a plumbing system where hot water was recirculated for no more than 25% of a day (6 hours). (*See* Ex. F, ASTM F876 § 3.2.7.1(2).)

In the Sminkey home,"[t]he only available plumbing for inspection was the plumbing from the water heater down to the slab floor." (Ex. A at 41.) On the day of the inspection, the water temperature ranged from 139°F (as measured by ESI) to 160°F (as measured by Plaintiffs' expert). (*Id*. at 42, 82.) The three leaks in the Sminkey home occurred in November 2013 in hot water lines at or near the water heater, and Mr. Sminkey has not had any leaks since then. (*Id*. at 41.) Mr. Sminkey testified that he does not know if his home has ever had a pressure reducing valve (Ex. G, Sminkey Dep. at 54:13-21); ESI did not find one during its inspection (Ex. A, App'x C at 59). Mr. Sminkey admitted his house did not have an expansion tank until 2014, when he installed one himself. (Ex. G, Sminkey Dep. at 51:13-22.) The NIBCO Manual requires either a pressure reducing valve or expansion tank to help regulate pressure in a closed plumbing system. (Ex. E at 5 (footnote).) ESI concluded that the leaks in the Sminkey home were caused by exposure of the NIBCO PEX tubing to temperatures and pressures above the design limits for the product. (Ex. A at 82.)

### D. Dr. Duvall and Mr. Shah's Analysis of the Level of Oxidation in the Incident PEX Tubing Using the Carbonyl Index Parameter.

In her report, Plaintiffs' expert Cynthia Smith opined that the incident pipes in "the named Plaintiffs' homes leaked due to through-wall brittle cracking resulting from oxidative degradation and creep rupture of the PEX material." (Ex. H, Smith Report at 14, ¶ 1.) She further opined that NIBCO PEX 1006 pipe is

defectively designed and manufactured. (*Id*. ¶ 5.) But Dr. Duvall and Mr. Shah did their own investigation into the failures of the incident pipes in the named Plaintiffs' homes and found that "[t]here is no scientific basis for attributing all failures of NIBCO PEX 1006 tubing as occurring due to oxidative degradation of inner surface caused by defective design and manufacturing." (Ex. A at 116, ¶ 6.) Instead, as described above, the failures were attributed to other factors.

It is well known that "oxidative degradation of polyethylene pipe can lead to premature failure" and that long-term performance of the pipe can be reduced by exposure to elevated water temperatures. (Ex. A at 19, 21.) As was expected by NIBCO, the NIBCO PEX Tubing in the named Plaintiffs' homes was exposed chlorinated water and was used for hot-water applications so some oxidative degradation is to be expected. But at what point does oxidative degradation affect the long-term performance of PEX tubing and/or cause a failure?

Dr. Duvall and Mr. Shah addressed this issue. In their Report, they describe the method they used to quantify the intensity of the oxidative degradation of the NIBCO Tubing from the named Plaintiffs' homes. The method they used is called the "carbonyl index." (*Id*. at 23.) Citing peer-reviewed publications, they explained that "[i]t was determined that there was a minimum carbonyl index required in at least the first 50 microns or so of the inside surface of a pipe that was needed to embrittle that surface and produce premature failure in the pipe." (*Id*.)

In other words, oxidation of a pipe surface must be sufficiently intense to affect the performance of the pipe, i.e., a minimum carbonyl index value greater than 0.1 to a depth of about 0.002" (roughly 50 microns) into the pipe.[3] (Ex. A, Report at 104; Ex. I, Duvall Dep. at 84:7-21.)

Using a micro-FTIR instrument, ESI profiled tubing samples from five of the named Plaintiffs' homes to determine the extent of any oxidation. ESI's method of quantifying the level of oxidative degradation testing is derived from published, peer-reviewed research. It originated with a group in Sweden who worked under the direction of U.W. Gedde (hereinafter "Gedde"); Gedde studied thermal oxidation in polyethylene pipes. (Ex. E, Duvall Dep. at 54:14-56:3; Ex. A at 25, n. 24.) Based on their research, Gedde's group determined that a minimum carbonyl index of 0.1 in both the first thousandth of an inch and the second thousandth of an inch is needed for pipe to be considered oxidized. (Ex. J.) In other words, for oxidation to contribute to a pipe failure, the carbonyl index in the first two thousandths of an inch must be more than 0.1. (*See* Ex. E, Duvall Dep. at 58:12-19, 84:7-21.)

---

[3] The minimum carbonyl index value of 0.1 must be present in both the first "layer" (a depth of 0 to 0.03 mm) and second "layer" (0.03 to 0.06 mm) of the inner surface of the pipe to indicate sufficiently intense oxidation to affect the performance of the pipe. In other words, ESI was looking for a minimum level of oxidative degradation in roughly first 2% of the 3/4" NIBCO PEX tubing.

Plaintiffs try to make hay of the fact that Gedde did not use FTIR in his work. It is undisputed that Gedde did not use FTIR to determine the carbonyl index of the oxidized tubing specimens. Instead, his group used a spectrophotometer, specifically a Perkin Elmer Model 257. (Ex. K, Duvall Decl. ¶ 5.) The spectrum obtained by an older spectrophotometer and a modern FTIR instrument will be identical; the difference is how the "guts" of the instruments operate and how quickly one can obtain a spectrum. (*Id*. ¶ 7.) Thus, Gedde's use of a spectrophotometer to determine the carbonyl index does not undermine ESI's use of FTIR to do the same in this case; the results would be the same. (*See id.* ¶¶ 6-7.)

The work by Gedde and his colleagues was expanded upon by S.W. Choi, a Ph.D. student at the Illinois Institute of Technology who did his thesis on surface embrittlement of polyethylene.[4] (Ex. L.) Dr. Choi's thesis advisor, Dr. Broutman, had done previous work in this area. (*See* Ex. J at 502 (citation 81BRO).) Dr. Choi was studying fracture mechanisms for medium density polyethylene pipes and found that a "rapid decrease in failure time corresponds to carbonyl index of about 0.1," a value that "is in close agreement with that obtained by Gedde and

[4] Dr. Choi and Dr. Duvall were contemporaries at IIT. Contrary to the claims made by the Plaintiffs (Doc. 140-1 at 9); Dr. Duvall was not Dr. Choi's thesis advisor; they were both graduate students. (Ex. K, Duvall Decl. ¶¶ 8-9.) In fact, Dr. Choi published his dissertation in 1992, a year before Dr. Duvall received his Ph.D. (*See* Ex. J; Ex. B.)

coworkers." (Ex. L at 1-2, 470-75.) Dr. Choi's research was funded by the Gas Research Institute and thus monitored by a GRI project manager and an advisory group of industry experts. (Ex. K, Duvall Decl. ¶ 8.)

Building upon the work of Gedde and Choi, Dr. Duvall has applied the 0.1 minimum carbonyl index criterion during his 30-plus years of performing failure analysis of plastic products. (Ex. I, Duvall Dep. at 84:7-85:19.) This work has included more investigations regarding plastic pipe than any other type of product. (*Id*. at 155:6-156:8.) He has been published in peer-reviewed publications and/or presented to his peers at least a dozen times regarding investigations in which the minimum carbonyl index concept was applied. (Ex. K, Duvall Decl. ¶ 10.) This work has included non-litigation related assessments. For example, Dr. Duvall presented at the 2013 Annual Technical Conferences of the Society of Plastics Engineers (SPE) regarding the evaluation of the condition of a polybutylene plumbing system in an apartment complex; the owner was doing a general rehabilitation project and wanted to know the condition of the plumbing. (Ex. K, Duvall Decl. ¶ 11, Ex. 2.) That evaluation included FTIR and determination of the carbonyl index for each sample. (*Id*., Ex. 2 at 2-3.) As stated in the materials for that presentation, "In order for oxidation to negatively affect the PB pipes, the carbonyl index should be at least 0.1 and the depth of oxidation at least two

thousands of inch deep," but none of the pipes exhibited the level of oxidation necessary to affect the long-term performance of the pipe. (*Id*. at 3.)

Plaintiffs attempt to brush aside any studies or testing done on non-PEX plastic tubing, claiming there are a "litany of differences" between the un-crosslinked polyethylene material studied by Gedde and Choi and crosslinked polyethylene (PEX) tubing. (Doc. 140-1 at 9.) That is not true. Polyethylene (along with polypropylene, polybutylene and polymethylpentene) is one of a group of very closely related thermoplastic polymers called polyolefins. (Ex. K, Duvall Decl. ¶ 15.) Radiation crosslinked polyethylene (such as the PEX-C made by NIBCO) is, chemically, polyethylene. (*Id*. ¶ 16.) Its infrared spectrum is indistinguishable from that of an uncrosslinked polyethylene of the same density. (*Id*.) PEX is affected by exposure to oxidizing environments in the same way as other polyolefins; it exhibits all three stages of creep rupture, just like medium density polyethylene, high density polyethylene and polybutylene. (*Id*. ¶ 17.) The Court should not be swayed by the unsubstantiated claims of Plaintiffs' counsel, who are clearly not experts in polyolefins or their chemical properties.

Moreover, the basis of ESI's carbonyl index criteria is in stark contrast to the basis of the criteria used by Plaintiffs' expert to quantify the oxidation in the tubing from the named Plaintiffs' homes. To be blunt, Ms. Smith has no basis for her work. As discussed in NIBCO's Motion to Exclude her opinions on this subject,

Ms. Smith determined the surface oxidation index for a handful of tubing specimens and found the levels to be "significant." (Doc. 139-1 at 19-22.) But Ms. Smith's conclusions are nothing more than her subjective assessment; her work is not based on any peer reviewed research and is in direct contradiction to the test method she employed. (*Id*.) And unlike ESI's report, which was done by both Dr. Duvall and Mr. Shah, Ms. Smith's report was not peer reviewed. (*See* Ex. H.)

Plaintiffs also criticize ESI's work based on a 2009 study published by Dr. Duvall, claiming it contradicts the methodology in this case because Dr. Duvall did additional tests on the polyethylene pipes at issue, not just FTIR. (Doc. 140-1 at 10.) In that study, Dr. Duvall performed bend back tests, FTIR, Oxidative Induction Time ("OIT") testing, and ring tensile testing. (*Id*. at 10-11.) But Plaintiffs' argument that ESI did not perform similar testing in this case is factually inaccurate and/or irrelevant. First, ESI did, of course, perform FTIR testing. Second, a bend back test is simply a "quick and dirty" method to determine whether the surface if oxidized and further investigation is needed. (Ex. I, Duvall Dep. at 125:5-127:4; 363:24-364:18.) It has limited usefulness as an indicator of oxidation when other testing, such as FTIR and tensile testing, are already being done. (*Id.* at 241:4-242:8.)

Third, ESI *did* perform tensile testing in this case; however, unlike the 2009 study, ESI did standard tensile testing pursuant to ASTM D1708 rather than ring tensile testing pursuant to ASTM D2290. (*See id*. at 241:1-242:8; Ex. K, Duvall Decl. ¶ 14.) The two tests use different sizes and shapes of specimens but yield similar data. (*See id.*) And the tensile testing done by ESI indicated that the material at the inner surface of the samples tested did not show embrittlement even after 500% tensile elongation. (Ex. A at 69 (Boyd), 72 (McMahon), 84 (Peperno), and 91 (Cole).) These tensile test results confirmed that where the carbonyl index measurements exceeded 0.1 in the first layer,[5] the oxidation level was below what was needed to cause embrittlement of the tubing. (*See*, *e.g*., Ex. A at 76.)

Also, some OIT testing was done in this case – by Plaintiffs' expert. Those results were available to ESI, but as ESI explained in its report, OIT is a *qualitative* assessment of the level of stabilization of the material tested. (Ex. A at 105.) The meaning of the results can be uncertain and subjective. (*Id*.) It is not a tool to determine the oxidation risk of a product. (Ex. I, Duvall Dep. at 136:21-140:11.) The limitations of OIT testing were also discussed at length in NIBCO's Motion to Exclude Smith's opinions. (Doc. 139-1 at 13-18.) Because of those limitations

[5] A few specimens had a carbonyl index values that exceeded 0.1 in the first layer. (Ex. A at 76 (PPX-77), 82 (PPX-42 & -43), 85 (PPX-86 & -88), 91 (PPX-23 & -35).) But none of these had a value that exceeded 0.1 in second layer. (*Id*.)

and because none of the samples met the 0.1 carbonyl index threshold in both the first two layers, ESI did not perform or rely on OIT this case.

Indeed, in other investigations, when it has found the carbonyl index exceeds the 0.1 threshold in both the first two layers, ESI has performed additional tests such as OIT and tensile testing. (Ex. K, Duvall Decl. ¶ 18.) But here, none of the samples met that criteria, making additional testing was unnecessary.

## LEGAL STANDARD

FRE 702 governs the admission of expert testimony and provides that an expert may testify if:

> a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> b) The testimony is based on sufficient facts or data;
>
> c) The testimony is the product of reliable principles and methods; and
>
> d) The expert has reliably applied the principles and methods to the facts of the case.

The Federal Rules of Evidence embody a "strong and undeniable preference for admitting any evidence having some potential for assisting the trier of fact." *DeLuca v. Merrell Dow Pharmaceuticals, Inc.*, 911 F.2d 941, 956 (3d Cir. 1990). "Rule 702, which governs the admissibility of expert testimony, specifically embraces this policy," *United States v. Velasquez*, 64 F.3d 844, 849 (3d Cir. 1995),

and has a liberal policy of admissibility. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994). This liberal treatment extends to the expert's substantive qualifications as well as his formal qualifications. *Id*.

Because of this liberal approach, "most arguments about an expert's qualifications relate more to the weight to be given the expert's testimony than to its admissibility." *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996). An expert witness need not be the "best" qualified to be worthy of testifying. *Id*. It is thus "an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Id*.

Moreover, an expert's testimony is admissible if he or she has "scientific, technical or other specialized knowledge [that] will help the trier of fact." Fed. R. Evid. 702. In other words, the process or technique the expert used in formulating the opinion must be reliable, i.e. based on "methods and procedures of science" rather than on "subjective belief or unsupported speculation"; the expert must have "good grounds" for his or her belief. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-90 (1993). In *Paoli*, the Third Circuit identified factors the Court may consider in making this assessment:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential

> rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

35 F.3d 742, n.8 (citing *Daubert* and *United States v. Downing*, 753 F.2d 1224, 1236 (3d Cir. 1985)). But as the Third Circuit made clear, "[t]he grounds for the expert's opinion merely have to be good, they do not have to be perfect." *Id*. at 744. There may be "good grounds" for an expert's conclusion even if the expert's methodology has some flaws. *Id*. Ultimately, whether or not a particular scientific technique or method is reliable is flexible, and "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 594-95.

## ARGUMENT

### A. Dr. Duvall and Mr. Shah are Qualified to Examine the Installation of the PEX Fittings as Part of Their Failure Analysis.

Plaintiffs claim that Dr. Duvall and Mr. Shah "are unqualified to offer opinions concerning the proper installation practices for PEX Tubing, or for plumbing systems in general, because their general experience in failure analysis for various materials and products in various applications, installations, and settings does not equate to expertise in plumbing installation." (Doc. 140-1 at 15.) As discussed below, this claim is without merit.

**1. ESI determined that installation issues affected only two of the named Plaintiffs' homes.**

NIBCO must first address Plaintiffs' claim that Dr. Duvall and Mr. Shah "go so far to attribute the root cause of failures at issue to improper installation for a number of Plaintiffs." (*Id*. at 1 (citing pages 86, 92, 97-98 and 112 of Duvall/Shah Report).) This is a misleading statement because ESI concluded that improper installation was the root cause of the tubing failures in just two homes – the Cole and Peperno residences. (Ex. A at 86 (Peperno) & 92 (Cole).) As described above, the tubing failures in the McCoy, McMahon, and Sminkey residences were attributed to "use of NIBCO PEX tubing beyond the normal operating limits and design limits associated with NIBCO PEX 1006 tubing." (*Id*. at 92.) The McCoy and McMahon homes both had pumps that were recirculating hot water through the NIBCO PEX tubing system for more than 6 hours a day. (CITE)

Regarding Sminkey, Plaintiffs' own expert measured the water temperature in his home at 160°F on the day of the inspection—well above the 140°F limit for NIBCO 1006 tubing for use with chlorinated water. (Ex. E, NIBCO Manual at 5.) And all three of Sminkey's leaks occurred on the hot water side of his plumbing system before he had installed either a pressure relief valve or expansion tank (Ex. A at 41-42), both of which help protect against increased water pressure from thermal expansion. NIBCO states that either a pressure relief valve or an expansion tank "must be incorporated" into a closed plumbing system for this

reason. (*Id*.) Since he added an expansion tank to his system in 2014, Mr. Sminkey has not had any pluming leaks. (Ex. A at 42.)

**2. Dr. Duvall and Mr. Shah are qualified to address the plumbing installation issues in the named Plaintiffs' homes.**

Dr. Duvall and Mr. Shah are more than qualified to draw conclusions regarding how installation issues may have affected the tubing in the Plaintiffs' homes. They both have decades of experience performing failure analysis, including analysis related to plastic pipes. (*See* Exs. B & C.) In fact, Dr. Duvall has done failure analysis regarding plastic pipe more than any other product. (Ex. I, Duvall Dep. at 155:6-156:8.) And Dr. Duvall and Mr. Shah are justified in relying on the work of Mr. Grzetic, who has 14 years of experience at ESI and who specializes in home inspections and photography. (Ex. D.) Notably, Plaintiffs do not claim that any of the observations or measurements made by Mr. Grzetic and reported back to Dr. Duvall and Mr. Shah are inaccurate. They just disagree with the conclusions ESI derived from that work.

These conclusions are drawn from simple observations that do not require plumbing installation experience. In the Peperno home, one failure occurred where PEX tubing was connected directly to the water heater and the other occurred where the tubing was bracketed to a wood beam. (Ex. A at 39-40.) The NIBCO Manual specifically warns that a 12" metal adapter should be used when connecting NIBCO PEX tubing to a gas water heater and about using approved

fastening devices and leaving slack in the tube to allow for expansion and contraction. (Ex. E at 14, 16.) In the Cole home, the repair locations that were located were all in areas were the tubing changed direction. (Ex. A, App'x C at 14.) Upon inspection of the failures, ESI discovered that many of the incident pipes exhibited circumferential cracks that indicate the bending caused the failures; other failures were on the inside of a bend where it appears the tubing was impinged. (Ex. A at 86-91.)

These observations and conclusions are well within Dr. Duvall and Mr. Shah's ability to make, based on their academic credentials and decades of experience with plastic pipe and failure analysis. Their opinions regarding installation are confined to root cause analysis. They are not purporting to be plumbing inspectors who are evaluating the original installation of a plumbing system before the home is completed and the system is put into service. They are evaluating plumbing failures that occurred years after the named Plaintiffs' homes were completed; their work is based on the information available regarding the original installation conditions and the location of the failures, as well as whatever incident tubing the named Plaintiffs had retained.

To the extent Plaintiffs' argument extends to the other operating and environmental factors that ESI found to be the root cause of failures in the named Plaintiffs' homes, their argument has even less merit. Making environmental and

operating observations regarding a plumbing system does not require a plumbing license. Whether or not a home has an expansion tank, pressure relief valve, and/or recirculating pump requires mere visual observation of a system (when accessible) and basic knowledge regarding what to look for. (*See*, *e.g.*, Ex. M, Grzetic Dep. at 70:21-71:17.) And taking simple measurements such as pressure and water temperature do not require a plumbing license. Again, Plaintiffs do not question the accuracy of any of the measurements or findings made by Mr. Grzetic. That Dr. Duvall, Mr. Shah, and Mr. Grzetic do not have plumbing licenses is irrelevant to their ability to make these observations regarding the operating conditions of the named Plaintiffs' plumbing systems and/or draw conclusions from those observations as part of failure analysis.

Finally, by Plaintiffs' own standards, being a licensed plumber is not required in order to evaluate the installation of plumbing for the purposes or performing failure analysis. Though she did not present any data or document her observations regarding the installation of the plumbing in the Plaintiffs' homes in her report, aside from a single photo, Ms. Smith also considered installation as part of her failure analysis. She did not categorically conclude that all of the installations were done properly, only that improper installation did not "contribute[] significantly to failure of the incident pipes." (Ex. H, Smith Report at 14, ¶ 2.) Ms. Smith is not a licensed plumber either.

### 3. Plaintiffs' case law regarding experts' qualifications is distinguishable and unavailing.

Plaintiffs claim that Dr. Duvall's and Mr. Shah's "general experience in failure analysis for various materials and products in various applications does not equate to expertise with plumbing installation." (Doc. 140-1 at 15.) The cases cited by Plaintiffs on this point do not support the exclusion of ESI's findings and opinions regarding installation. In *Jones v. Synthes USA Sales, LLC*, the expert at issue was a metallurgical engineer with a background in aircraft development. No. 08-2060, 2010 WL 3311840, at *7 (D.N.J. Aug. 19, 2010). But the case was about allegedly defective surgical screws; thus, the admissibility of the expert's opinions hinged on whether he had "the requisite qualification to offer testimony regarding how to make biomaterials and surgical devices meant for bodily implantation suitable for spinal fusion surgery." *Id*. The expert had no experience whatsoever with medical devices or spinal fusion; he had never even witnessed a surgical procedure; and he revealed his lack of expertise on the subject matter during his deposition. *Id*. The district court concluded that while the expert was qualified to attest to the properties of metal generally, his general knowledge was not sufficient.

*Sloan Valve Co. v. Zurn Industries, Inc*. is distinguishable because in a patent case, an expert must be "qualified as a person of ordinary skill in the art ('POSITA') as of the time of the invention disclosed." No. 10-cv-00204, 2013 WL

6068790, at *1 (N.D. Ill. Nov. 18, 2013). Thus, the Sloan court examined whether or not the defendant's expert's experience in designing fluid systems was sufficient or if he instead needed to have experience in the flush valve industry to be able to testify. The district court concluded that the "field of the invention at issue in this case is sufficiently sophisticated to warranty a requirement of some experience within the field to qualify as a POSITA." *Id*. at *7. Because the expert did not have experience designing, assembling, or repairing plumbing systems or devices, he was not a POSITA regarding the patent at issue. *Id*.

Dr. Duvall is a licensed engineer with over 30 years of experience performing failure analysis, and he has done such analysis on plastic pipe more than any other product. (Ex. B.) Mr. Shah is also a licensed engineer and has 20 years of experience with failure analysis, including analysis of plastic pipe failures. (Ex. C.) The installation observations and related conclusions they drew in their report do not require a plumbing license. There is no comparison between their credentials and experience and the work they did in this case to the experts in *Jones* and *Sloan*. Dr. Duval and Mr. Shah are clearly qualified to discuss observed plumbing installation issues and their impact on the plumbing failures in this case.

Plaintiffs' reliance on *Higginbotham v. Volkswagenwerk Aktiengesellschaft*, 551 F. Supp. 977 (M.D. Penn. 1982), and *Massok v. Keller Industries, Inc*., 147 Fed. Appx. 651 (9th Cir. 2005), to challenge Dr. Duvall and Mr. Shah's credentials

and experience is without merit. In *Higginbotham,* the plaintiff claimed that a defect in the collapsible steering column made the car manufacturer strictly liable for a motorist's death. *Id*. at 978. The district court found that a police accident investigator was "not properly [ ] termed a qualified expert in accident reconstruction" because he had minimal training in that field" and "the area of physics and movement of bodies." *Id*. at 982-83. Thus, the expert's testimony regarding the movement of the plaintiff's body within the vehicle was properly excluded. *Id*. at 983.

In *Massok*, the plaintiff fell from a ladder and was injured. 147 Fed. Appx. at 653. In his product liability suit against the ladder manufacturer, the plaintiff attempted to introduce the written report of a proposed expert who concluded that the ladder was defectively designed. *Id*. at 655. The expert claimed to be a forensic expert with a bachelor's degree in mechanical engineering and to have extensive experience in ladder cases; he worked at a firm specializing in product failure analysis. *Id*. at 655-56. But the district court excluded the expert's testimony, finding him unqualified because he had never designed ladders, had never written or lectured on the subject, and had produced no peer-reviewed work. *Id*. at 656. It also noted he based his conclusions on inadequate testing and had failed the Georgia state mechanical engineering examination five times. *Id*. The Circuit Court affirmed the expert's exclusion, finding the district court's concerns

about his qualifications reasonable. It noted that plaintiff's expert did not have a Ph.D. (unlike defendant's expert), did not test the plaintiff's ladder, and was unable to pass the mechanical engineering examination.

Unlike the proposed experts in *Higginbotham* and *Massok*, Dr. Duvall and Mr. Shah have more than minimal training – they have decades of experience performing failure analysis of plastid products, including plastic piping; both have passed their engineering exams; and they have published peer-reviewed work in the field of failure analysis of plastic pipe. (*See* Exs. B & C.) Moreover, for their report, they performed various tests on the tubing at issue, including "incident" tubing from the named Plaintiffs' homes. To compare Dr. Duvall's and Mr. Shah's credentials and work product in this case to those of the excluded experts *Higginbotham* and *Massok* is preposterous.

Finally, Plaintiffs cite two cases that they claim stand for the proposition that "where experts have been qualified to testify regarding plumbing systems, they have had many years of experience, including as Master Plumbers." (Doc. 140-1 at 16.) Both cases are clearly distinguishable and do not support the need to be a licensed plumber to make observations about installation as was done in this case. In *Netwig v. Georgia-Pacific Corp.*, the plaintiff was injured when a piece of copper pipe he was bracing popped out from an engineered floor joist manufactured by the defendant and hit plaintiff in the eye. No. CIV.A. 02-2143-

CM, 2005 WL 2122316, at *1 (D. Kan. July 26, 2005). As part of his products liability action against the manufacturer, the plaintiff designated a plumber as an expert on the issue of whether plaintiff's actions (i.e., bracing the pipe) were a common practice in the plumbing industry. *Id*. at *2. Defendant challenged the proposed testimony of the expert as unreliable and irrelevant, but the court disagreed because his testimony was limited to practices of which he had personal knowledge and had been trained. *Id*. It also found that his testimony regarding "common practices in the plumbing industry" would assist the trier of fact in assessing the reasonableness and foreseeability of plaintiff's method of installing pipe. *Id*.

In *Sterbenz v. Anderson*, a garment had been retrieved from the plaintiff and defendant's shared sewer line. No. 8:11-cv-1159, 2012 WL 5387885, at *4 (M.D. Fla. Nov. 2, 2012). Plaintiff proposed a number of experts to testify as to the potential source of the garment retrieved from the sewer pipe district court. garment. *Id*. at *5. The defendant challenged one of the plumber's qualifications. *Id*. The district court rejected that challenge because the plumber had 10 years of experience *and was the person who retrieved the garment from the sewer*, and thus his testimony would aid the jury in determining the relevant facts of the case, i.e., the source of the garment in the sewer line. *Id*. It noted that even if his "methods

or conclusions may be lacking, such will go to [the plumber's] credibility," the defendant would have the opportunity to vigorously cross-examine him. *Id*.

Unlike in *Netwig*, Dr. Duvall and Mr. Shah are not purporting to testify regarding "common practices in the plumbing industry" regarding PEX tubing installation or the foreseeability that a plumber would improperly install PEX tubing. Rather, they observed and considered the condition of the installation of the tubing that was removed from the named Plaintiffs' homes as part of their overall failure analysis. They did not need to be licensed plumbers to make these observations or draw the conclusions that they did. Moreover, their findings will be helpful to the jury in assessing a key issue, i.e., what caused the NIBCO PEX Tubing failures in the Plaintiffs' homes. And as in *Sterbenz*, if Plaintiffs believe his "methods or conclusions may be lacking," they can challenge his credibility via cross-examination.

### B. Dr. Duvall and Mr. Shah's "Minimum Carbonyl Index" Opinion is Reliable and Admissible.

Plaintiffs' critique of Dr. Duvall and Mr. Shah's opinions on the minimum carbonyl index issue reads like cross examination material rather than grounds for excluding their opinions altogether. Unlike Ms. Smith's method of quantifying oxidation levels of the incident tubing from the named Plaintiffs' homes, Dr. Duvall and Mr. Shah's methodology for measuring the carbonyl index and the 0.1 threshold they apply to reach their conclusions are based on peer-reviewed,

published research. Moreover, they have applied the methodology and criteria used in this case for over 30 years, and not just to litigation. They have also published articles and given presentations to their peers regarding the same, with no objection, for decades. (*See* Ex. K, Duvall Decl. ¶¶ 10-13.)

**1. Dr. Duvall and Mr. Shah have "good grounds" for applying the minimum carbonyl index concept in this case.**

Plaintiffs seek to exclude Dr. Duvall and Mr. Shah's conclusion that oxidative degradation did not cause the NIBCO PEX tubing in the named Plaintiffs' home to fail. (Doc. 140-1 at 12.) Alternatively, they seek to exclude Dr. Duvall and Mr. Shah's opinion that a certain minimum carbonyl index is required for oxidative failures to occur. (*Id*.) The latter issue is really the crux of Plaintiffs' motion and should be rejected.

Plaintiffs do not challenge the carbonyl index method of measuring oxidative degradation as unreliable in and of itself or the carbonyl index values found in this case. Rather, they challenge Dr. Duvall and Mr. Shah's "extrapolation from their testing," i.e., their use of 0.1 as the minimum value the carbonyl index must be in the first two "layers" of the inner surface of the pipe before oxidation has contributed to the failure of a pipe. (Doc. 140-1 at 18.) Dr. Duvall and Mr. Shah's use of this threshold in their work is scientifically sound. It is based on published, peer-reviewed work by Gedde's group in Sweden in the early 1980s, which was confirmed by Choi's work at the Illinois Institute of

Technology.[6] Choi's work was not only overseen by Dr. Broutman but also industry experts associated with the Gas Research Institute. (*See* Ex. K, Duvall Decl. ¶ 8.)

Dr. Duvall and Mr. Shah's work is built on that of Gedde, Choi, Broutman, and others. Specifically, they have used the 0.1 threshold in their failure analysis work regarding polyolefins for decades. (*See* Ex. K, Duvall Decl. ¶¶ 10-12.) They have published articles and given presentations to their peers that have relied on this very concept. (*See id*.) Dr. Duvall is not aware of any literature or studies critical of this method or how it is applied by ESI. (*Id.* ¶ 13.)

Plaintiffs' argument that Dr. Duvall and Mr. Shah's method should be excluded because they did not perform bend back, OIT and ring-tensile testing is also without merit. (*See* Doc. 140-1 at 12.) The bend back test is unnecessary when other, more definitive testing, such as FTIR analysis and tensile testing, will be done to analyze oxidation. (Ex. K, Duvall Dep. at 125:5-22, 241:4-242:8.) Regarding OIT testing, as discussed herein and in NIBCO's Motion to Exclude Smith's opinions, OIT is not relevant to measuring the long-term performance of PEX pipe. (*See* Doc. 139-1 at 13-18.) And ESI did, in fact, perform standard

---

[6] As discussed above, that Gedde's foundational work was done using an instrument rather than FTIR is irrelevant. The measurements that could be obtained using earlier technology are the same that can be obtained (much more quickly) today using FTIR. (Ex. K, Duvall Decl. ¶ 7.)

tensile testing on samples from the named Plaintiffs' homes. These results confirmed that oxidative degradation did not cause to the pipe failures at issue.

Accordingly, Dr. Duvall and Mr. Shah's opinions regarding oxidative degradation and the minimum carbonyl index issue should be admitted. Their work is based on "methods and procedures of science" rather than on "subjective belief or unsupported speculation" and they have "good grounds" for their opinions. *See Daubert*, 509 U.S. at 589-90. Their carbonyl index method is testable and replicable, based on objective criteria, and has been subject to peer review; moreover, it has been used for decades by Dr. Duvall and Mr. Shah in failure analysis – both for litigation purposes and otherwise. Thus, the relevant factors favor admitting their expert testimony. *See Paoli*, 35 F.3d at 742 n.8. The Court should allow the jury to decide whether or not to accept Dr. Duvall and Mr. Shah's work and conclusions and leave Plaintiffs' criticisms to cross examination.

**2. Plaintiffs' case law regarding reliability is distinguishable and unavailing.**

There is simply no equivalence between the work of Dr. Duvall and Mr. Shah and the cases cited by Plaintiffs where expert testimony was excluded or limited. Plaintiffs discuss only one case at length, *State v. Fortin*, 745 A.2d 509 (N.J. 2000). (*See* Doc. 140-1 at 20.) In *Fortin*, the defendant was charged with sexually assaulting and killing a woman. *Id*. at 510. The State sought to present evidence of an allegedly similar incident in which the defendant sexually assaulted

and strangled a state trooper in Maine. *Id*. Using "linkage analysis," the State's proposed expert witness determined that the likelihood that two different people committed the Maine assault and the New Jersey one was highly improbable. *Id*. at 512.

The admissibility of the expert's testimony was a decided under New Jersey state law, not *Daubert*. The New Jersey standard for admissibility of expert testimony requires that expert testimony be "state of the art" in the field. *Id*. at 514. The expert claimed that a sexual predator's behavior is as unique as his fingerprints, but the court found that the authorities and literature he wrote and cited for this point had not attained state-of-the-art status. *Id*. Moreover, the study of "linkage analysis" was confined to the expert and only a few close associates so there were no peers to test the expert's theories and no way in which to duplicate his results. *Id*. Finally, the expert acknowledged that linkage analysis was not a science. *Id*. at 515. Ultimately, the court ruled that the expert could testify regarding the similarities between two crimes, just not the ultimate issue of the defendant's guilt or innocence. *Id*.

Plaintiffs' attempt to compare the behavioral science testimony proposed by the *Fortin* expert in a criminal case should be rejected. Here, the minimum carbonyl index concept originated in Sweden – not with Dr. Broutman or his former graduate students, Dr. Choi and Dr. Duvall. Moreover, Dr. Duvall and Mr.

Shah employ a scientific method – measuring the carbonyl index – that can be replicated and critiqued by their peers.

*Windmere, Inc. v. International Ins. Co.*, 522 A.2d 405 (N.J. 1987), cited in *Fortin* and by Plaintiffs, is also distinguishable. (*See* Doc. 140-1 at 21.) In *Windmere*, the issue was whether or not to admit evidence to determine the identity of a human voice based on voiceprint technology. *Id*. at 406. The court was concerned that the "science of voiceprint analysis . . . appear[ed] to be a sole source industry" because the proposed witnesses were affiliated with the development of the voiceprint device. *Id.* at 408-09. Moreover, the reliability of voiceprint technology had been challenged in literature in the field, and the relevant industry group had voted unanimously against it. *Id*. at 410.

Here, the origin of the carbonyl index criteria was the work of Gedde in Sweden to whom ESI has no connection. Dr. Choi's work built upon Gedde and found similar results. Dr. Duvall has relied on their research in his decades of work with polyolefin piping and presented on it to his peers. (*See* Ex. K, Duvall Decl. ¶¶10-11.) It has never been rejected by any industry group nor is Dr. Duvall aware of any literature critical of the method or the 0.1 threshold. (*See* Ex. K, Duvall Decl. ¶ 13.)

The other cases cited by Plaintiffs are also unavailing. In *Reliance Ins. Co. v. Keystone Shipping Co.*, 102 F. Supp. 2d 181 (S.D.N.Y. 2000), the expert's

testimony was "unorthodox and unproven" because he "knew of no study or surveying company that used gauging data" in the way that he had and his analytical methods had not been industry sanctioned. *Id*. at 190. Plaintiffs cite *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 585, 594 (D.N.J. 2002), for the proposition that "exclusion is appropriate when 'expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion.'" (Doc. 140-1 at 19.) But "unjustifiabl[e] extrapolat[ion]" was not listed as grounds for exclusion but rather one of the "additional factors relevant in determining reliability." *Id*. at 594. Moreover, the district court warned that "[n]ovel conclusions should not be excluded where the methodology and its application are reliable." *Id*. at 595 (citing *Heller v. Sha*w, 167 F.3d 146, 152-53 (3d Cir. 1999) (internal quotations omitted)).

In *Young v. Burton*, 567 F. Supp. 2d 121 (D.D.C. 2008), *aff'd*, 354 F. App'x 432 (D.C. Cir. 2009), the expert's testimony was found to be unreliable for a host of reasons. First, the expert relied on only a single publication of his own for his opinion. *Id*. at 139. Second, that publication was problematic because the expert's study was based on a limited number of samples and the criteria applied were no longer in accordance with medically accepted standards at the time of publication. *Id.* Finally, even the expert acknowledged that his hypothesis was controversial. *Id*.

In *McDowell v. Brown*, 392 F.3d 1283 (11th Cir. 2004), the expert opined that the delay in treatment caused or worsened the plaintiff's condition. *Id*. at 1299. His theory was based on common sense and a single study that analyzed the effect of a 48-hour delay in treatment. *Id*. But the expert's opinions were based on a delay of treatment of no more than 24 hours. *Id*. The "leap" from the 48-hour study to the expert's opinion based on a delay of half that time was too great to allow; thus, the expert's testimony was properly excluded. *Id*. at 1300.

Here, Dr. Duvall and Mr. Shah do not rely solely on their own work. Moreover, although Plaintiffs claim to be challenging ESI's methodology as unreliable, they do not actually question the carbonyl index values that ESI found via FTIR but rather ESI's conclusions. Finally, Plaintiffs' argument that the 0.1 minimum carbonyl index threshold has not been applied to PEX tubing is without merit, as PEX is chemically the same as other polyethylene products and similarly affected by oxidation. (*See* Ex. K, Duvall Decl. ¶¶ 15-17.) Plaintiffs cite no literature or studies to the contrary. Meanwhile, Dr. Duvall and Mr. Shah have published articles and given presentations to their peers regarding evaluations in which they applied the 0.1 minimum threshold. Again, Plaintiffs cite no literature or studies contradicting Dr. Duvall and Mr. Shah's work.

## CONCLUSION

For the above reasons, Defendant respectfully requests the Court deny Plaintiff's Motion to Exclude the Testimony of Donald E. Duvall and Anand R. Shah and for such other relief as this Court deems just and proper.

LATHROP GAGE LLP
MORGAN, LEWIS & BOCKIUS LLP

/s/ Franco A. Corrado
Jean Paul Bradshaw II (Admitted *Pro Hac Vice*)
J. A. (Jay) Felton (Admitted *Pro Hac Vice*)
Kevin M. Kuhlman (Admitted *Pro Hac Vice*)
Rachel E. Stephens (Admitted *Pro Hac Vice*)
Lathrop Gage LLP
2345 Grand Boulevard, Suite 2200
Kansas City, Missouri 64108-2618
Tel: (816) 460-5726; Fax: 816-292-2001
jbradshaw@lathropgage.com
jfelton@lathropgage.com
kkuhlman@lathropgage.com
rstephens@lathropgage.com

J. Gordon Cooney, Jr. (Admitted *Pro Hac Vice*)
Franco A. Corrado
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, Pennsylvania 19103-2921
(215) 963-5000
jgcooney@morganlewis.com
fcorrado@morganlewis.com

ATTORNEYS FOR DEFENDANT

**CERTIFICATE OF SERVICE**

I hereby certify that on the 18th day of August, 2017, I served a true and correct copy of the foregoing via electronic mail to the following:

Benjamin F. Johns
Steven A. Schwartz
Chimicles & Tikelllis, LLP
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
bfj@chimicles.com
sas@chimicles.com

Bruce Daniel Greenberg
Lite Depalma Greenberg, LLC
570 Broad Street, Suite 1201
Newark, NJ 07102
bgreenberg@litedepalma.com

Joseph B. Kenney
Joseph G. Sauder
Matthew D. Schelkopf
McCune Wright, LLP
1055 Westlakes Drive
Berwyn, PA 19312
jgs@mccunewright.com
mds@mccunewright.com
jbk@mccunewright.com

Kyle A. Shamberg
Lite Depalma Greenberg, LLC
211 W. Wacker Drive, Suite 500
Chicago, IL 60606
kshamberg@litedepalma.com

/s/ Franco A. Corrado
Franco A. Corrado