# EXHIBIT A

## PART I

# Confidential Investigative Report

Cole v. NIBCO INC.

ESI Project: 50105A

4215 Campus Drive
Aurora, IL 60504

# Confidential
# Investigative Report

Cole v. NIBCO INC.

ESI Project: 50105A

**Report Prepared for:**

Lathrop & Gage LLP
2345 Grand Boulevard, Suite 2200
Kansas City, MO 64108

**Submitted by:**

DONALD E. DUVALL 062-050452 LICENSED PROFESSIONAL ENGINEER STATE OF ILLINOIS

May 5, 2017
Date

Donald E. Duvall, Ph.D., P.E.
Senior Managing Consultant
IL P.E. | Expires: November 30, 2017

**Submitted by:**

LICENSED PROFESSIONAL ENGINEER ANAND R. SHAH, P.E. 062.058788 STATE OF ILLINOIS

May 5, 2017
Date

Anand R. Shah, M.S., M.B.A., P.E
Senior Managing Consultant
IL P.E. | Expires: November 30, 2017

This report and its contents are the Work Product of Engineering Systems Inc. (ESI). This report should only be duplicated or distributed in its entirety. This report may contain confidential or court protected information; please contact an authorized entity prior to distributing. Conclusions reached and opinions offered in this report are based upon the data and information available to ESI at the time of this report, and may be subject to revision after the date of publication, as additional information or data becomes available.

Copyright ESI © 2017 - All Rights Reserved

## Summary

Engineering Systems Inc. (ESI) was retained to investigate the root cause for the failures of NIBCO INC. (NIBCO) manufactured PEX products from the residences of eight named Plaintiff groups in the Cole v. NIBCO INC (Cole) litigation matter.

Plaintiffs claim the NIBCO PEX plumbing products at issue are crosslinked polyethylene (PEX) plastic tubing, brass metal fittings, and stainless steel clamps used within the plumbing system. The PEX tubing performance is addressed in this report. A separate ESI report is provided regarding the brass fittings and stainless-steel clamps' performance. The PEX tubing involved in the Cole litigation was manufactured by NIBCO with a PEX 1006 resin compound formulation.

Reportedly, the named plaintiff groups in the Cole matter are: Kimberly and Alan Cole, James Monica, Linda Boyd, Michael McMahon, Ray Sminkey, James and Judy Medders, Robert and Sarah Peperno, and Kelly McCoy. Plaintiffs James and Judy Medders and James Monica allege leaks associated with only NIBCO brass fittings and stainless-steel clamps. The performance related to fittings and clamps removed from the residences of these particular named plaintiffs is discussed in a separate ESI report.

ESI's investigation to determine the root cause(s) of the alleged failures included conducting home inspections, laboratory inspections, and performing a file review of the documents produced in this case. During the home inspections, ESI documented the plumbing system, identified locations of the repairs to the plumbing system, documented the plumbing installation method, measured water flow and water pressures, analyzed water chemistry on site, and obtained water samples. A plumber was also present at the time of the home inspections to remove any desired PEX tubing/fitting samples from each of the residences.

The plumbing system, water heater location, and access to plumbing lines varied in each home. For example, the original plumbing at Boyd, McCoy, and McMahon was replaced prior to inspection. The plumbing at Sminkey is primarily under the slab flooring and in the walls of the home and therefore obscured from visual inspection. Only the plumbing located in the basements at the Monica and Peperno residences was available for inspection; the rest of the plumbing is in ceilings and walls and therefore obscured from visual inspection. The plumbing lines at Medders and Cole were run through the attic and thus were available for inspection and documentation of the original and repair locations. In the Cole residence, the tubing was fed to terminal locations from the attic and thus the plumbing conditions could be documented. Additionally, there were locations of drywall cut-outs exposing the plumbing located behind the walls and ceilings of the home. ESI documented numerous repair locations as well as observed the condition of the original installation at Cole residence.

In subsequent laboratory inspections, ESI inspected the samples harvested from the residences of the named Plaintiffs and samples provided directly to Cynthia Smith of Paragon Polymer Consulting, LLC by the named Plaintiffs. Below is a table that summarizes the available NIBCO PEX Tubing samples that were identified as associated with incident leaks.

| Residence | Number of incident samples in the group |
|---|---|
| McCoy | 2 |
| Cole | 12 |
| Sminkey | 1 |
| Boyd | 0 |
| McMahon | 1 |
| Peperno | 2 |

ESI performed several independent tests and analyses on representative samples to identify the cause(s) of the failures. ESI considered information learned about the plumbing system, plumbing installation practice, plumbing repair locations, examination of PEX tubing removed from service, testing of PEX tubing to applicable industry standards, examination of the fracture surfaces, and review of the file material in identifying the causes(s) of the failures.

Plaintiffs allege that NIBCO's PEX 1006 tubing is defectively designed and defectively manufactured. Specifically, it is alleged that the materials and manufacturing processes were inadequately designed to produce tubing with suitable resistance to oxidative degradation causing premature failure in the intended service environment. Investigation conducted by ESI finds that these allegations have no merit.

Based on the information gathered in this investigation and on the education, training and experience of the authors of this report, ESI concludes that there is no material, manufacturing, or design defect in the PEX tubing manufactured by NIBCO using the PEX 1006 resin compound formulation. The PEX 1006 tubing met or exceeded the performance requirements of the applicable industry standards. The PEX 1006 tubing removed from the residences of named Plaintiffs was found to meet or exceed the performance requirements of the applicable industry standards set for new, unused tubing. The PEX tubing failures at the Cole, McMahon, Sminkey, Peperno, and McCoy residences can be explained based on unique circumstances that existed at each location and are not a result of an inherent product defect.

Furthermore, there is no single root-cause for the observed leaks in the PEX tubing. The PEX tubing failures experienced by each Plaintiff are a result of different causes and/or a combination of factors which may be any of the following: exposure to water temperature beyond specification, improper installation practices, and use of re-circulating pumps on the hot water side to continuously or for long time duration recirculate hot water. The information learned during this investigation shows that PEX tubing can fail from a variety of reasons, and to properly assess the cause of failure, the localized plumbing conditions at each residence, locations of leaks, orientation of the developing cracks, and laboratory examination and proper testing of the PEX 1006 material must be conducted to determine the root cause(s) for the failure.

4215 Campus Drive
Aurora, IL 60504

## Introduction

In October 2015, Engineering Systems Inc. (ESI) was retained to investigate the root cause for the failures of NIBCO manufactured crosslinked polyethylene (PEX) plastic tubing, brass fittings, and stainless-steel clamps used in domestic water supply in the residential homes of named Plaintiffs in the Cole v. NIBCO Inc. matter. Reportedly, the named Plaintiff groups in the Cole matter are: Kimberly and Alan Cole, James Monica, Linda Boyd, Michael McMahon, Ray Sminkey, James and Judy Medders, Robert and Sarah Peperno, and Kelly McCoy. Plaintiffs James and Judy Medders and James Monica allege an issue with leaks associated with only NIBCO brass fittings and stainless-steel clamps. The performance related to fittings removed from the residences of these two named plaintiffs is discussed in a separate ESI report. Plaintiff Linda Boyd did not retain any failed tubing and re-plumbed her residence with other manufacturers tubing and thus no information could be gathered regarding that tubing or the potential root-cause of experienced leaks. This report addresses the performance of the NIBCO PEX 1006 tubing at the residences of the other named plaintiffs.

ESI's investigation included a review of file materials, site visits to the named plaintiffs' residences, review of the installation practice, review of repairs in the system, examination of PEX tubing removed from service, testing of PEX tubing to applicable industry standards, examination of the fracture surface, as well as testing of water samples from homes involved in this matter. The investigative steps taken are detailed in the following report.

## Relevant Experience of Authors of this report

This report details the findings and opinions expressed by Donald E. Duvall, Ph.D., P.E., and Anand R. Shah, M.S., M.B.A, P.E., pertaining to the engagement described above. This report summarizes the opinions reached and the basis for those findings. ESI reserves the right to clarify or supplement this report, if warranted, as new information becomes available. Attached hereto are the curricula vitae of Donald E. Duvall, Ph.D., P.E., and Anand R. Shah, M.S., M.B.A., P.E., which set forth pertinent qualifications and experience and list the technical presentations and publications authored (Appendix A).

Donald E. Duvall, Ph.D

Dr. Duvall has been engaged in failure analysis of plastic piping products since 1981. He investigated dozens of polybutylene pipe / acetal plastic fitting plumbing system cases between 1985 and 1993. During these investigations, he conducted site inspections of installed plumbing systems, laboratory examinations and testing of over 1000 leaking pipe and fitting assemblies. Many of these cases settled prior to deposition or trial but Dr. Duvall did testify in deposition or at trial 10 times in these matters. He has also managed failure analysis programs of polyethylene piping for some of the largest natural gas distribution companies in the United States. For 28 years, he has been a member of the associate staff of the U.S. Department of Transportation (DOT) Transportation Safety Institute and the U.S. DOT/Pipeline and Hazardous Materials Safety Administration (PHMSA) Inspector Training and Qualification Division, teaching plastic gas pipe failure analysis to employees of PHMSA, NTSB, and state gas pipeline regulatory agencies. He has investigated failures of polyethylene pipe in municipal water distribution systems, industrial polyethylene piping systems transporting various liquid chemicals including chlorine solutions used to bleach paper, and polypropylene piping used for purified water and potable water systems. He has also investigated failures in polyvinyl chlorine (PVC) piping for potable water and sewage transport, chlorinated PVC piping for potable water transport and fire suppression systems, ultrahigh molecular weight polyethylene pipe used in natural gas and potable water distribution, and fluoropolymer pipe and fitting systems for specialized chemical transport applications. In his 36 year career of performing failure analyses on

thermoplastic piping systems, he has examined literally thousands of leaking pipes and pipe fittings. Dr. Duvall has been a member of plastic pipe and fitting standards writing bodies including ASTM Committee F17 on Plastic Piping Systems and the American Water Works Association (AWWA) Standards Committee #263 on Polyolefin Piping.

Anand R. Shah M.S., M.B.A., P.E

Mr. Shah has been engaged in failure analysis of plastic piping products since 1995. During his master's thesis research at Case Western Reserve University, Cleveland, Ohio, Mr. Shah developed material characterization techniques to investigate the slow crack growth failure mechanism of polyethylene materials used in piping applications. Later, between 1997-2005, he assisted in the investigation of dozens of polybutylene pipe / acetal plastic fitting plumbing system failures during his employment with L. J. Broutman and Associates, a prominent laboratory at the time for failure analysis of plastic products.

Mr. Shah has taught failure analysis and prevention seminars for Society of Plastics Engineers. Mr. Shah's research during employment with L. J. Broutman and Associates, led to development of an ASTM standard regarding "An alternative method for determining the hydrostatic design basis for plastic pipe materials". Mr. Shah is a co-author of a book titled "Fractography in Failure Analysis of Polymers".

In his 20 year career of performing failure analyses on thermoplastic piping systems, he has examined failures of polyethylene pipes, cross-linked polyethylene pipes, polyvinylchloride (PVC) and Chlorinated polyvinyl chloride (CPVC) pipes, and Acrylonitrile Butadiene Styrene (ABS) and other pipe and fitting materials. Mr. Shah has been a member of plastic pipe and fitting standards writing bodies including ASTM Committee F17 on Plastic Piping Systems.

Attached in Appendix B is a listing of depositions and trials wherein expert testimony has been given over the last four years. ESI currently bills Dr. Duvall's time at $410 per hour and Mr. Shah's time at $350 per hour for research and analysis in this matter.

This report is divided into five chapters as described below:

1. NIBCO PEX 1006 tubing manufacturing, certification, and specification and oxidative degradation
2. Plumbing conditions and NIBCO PEX 1006 tubing performance at each named plaintiff's residence
3. Laboratory analysis of available NIBCO PEX 1006 tubing
4. Review of Plaintiff's expert's, Paragon Polymer LLC, reports and basis
5. Conclusions

Report figures, photographs, video, excerpts from literature and other materials reviewed may be utilized at the time of trial as demonstrative exhibits.

## Basis for this Report

This report is based on a review of the documents and literature listed below, a number of site and laboratory inspections, material characterization and testing, and other engineering analyses (all detailed below).

## Materials Reviewed

**Legal**

- Subpoena to Produce Documents, etc. dated 6-2-2016;
- Plaintiff Kelly McCoy's Objections and Responses to Defendant NIBCO INC.'s First Set of Interrogatories, dated 11-2-2015;
- Plaintiffs Kimberly and Alan Cole's Objections and Responses to Defendant NIBCO INC.'s First Set of Interrogatories, dated 11-2-2015;
- Plaintiff Linda Boyd's Objections and Responses to Defendant NIBCO INC.'s First Set of Interrogatories, dated 11-2-2015;
- Plaintiffs James and Judy Medders' Objections and Responses to Defendant NIBCO INC.'s First Set of Interrogatories, dated 11-2-2015;
- Plaintiff Michael McMahon's Objections and Responses to Defendant NIBCO INC.'s First Set of Interrogatories, dated 11-2-2015;
- Plaintiff Ray Sminkey's Objections and Responses to Defendant NIBCO INC.'s First Set of Interrogatories, dated 11-2-2015;
- Plaintiffs Robert and Sarah Peperno's Objections and Responses to Defendant NIBCO INC.'s First Set of Interrogatories, dated 11-2-2015;
- Discovery Confidentiality Order, dated 3-16-2015;
- Second Amended Class Action Complaint, dated 6-19-2015;
- Defendant NIBCO INC.'s Initial Disclosures in Accordance with Rule 26 of the Federal Rules of Civil Procedure, dated 5-16-2014;
- Plaintiffs' Initial Disclosures, dated 5-18-2014;
- Defendant NIBCO INC.'s First Request for Production of Documents to Plaintiffs, dated 6-13-2014;
- Plaintiffs' First Request for the Production of Documents Electronically Stored Information, and Tangible Things, dated 6-13-2014;
- Plaintiffs' Responses and Objections to Defendant NIBCO, INC.'s First Request for Production of Documents to Plaintiffs, dated 1-30-2015;
- Defendant NIBCO INC.'s Responses and Objections to Plaintiffs' First Request for Production of Documents, Electronically Stored Information, and Tangible Things, dated 2-24-2015;
- Defendant NIBCO INC.'s First Set of Interrogatories Directed to Plaintiffs, dated 9-17-2015;
- Plaintiff James Monica's Objections and Responses to Defendant NIBCO INC.'s First Set of Interrogatories, dated 11-2-2015;
- Plaintiffs' Second Set of Interrogatories to Defendant NIBCO, INC., dated 3-17-2016;
- Plaintiffs' Second Set of Requests for Production to Defendant NIBCO, INC., dated 3-17-2016;
- Plaintiffs' Third Set of Interrogatories to Defendant NIBCO, INC., dated 4-1-2016;
- Defendant NIBCO INC.'s Objections and Responses to Plaintiff's Second Set of Interrogatories, dated 5-17-2016;

- Defendant NIBCO INC.'s Responses to Second Requests for Production of Documents, dated 5-17-2016;
- Defendant NIBCO INC.'s Objections and Responses to Plaintiff's Third Set of Interrogatories, dated 5-17-2016;
- Plaintiffs' Responses and Objections to Defendant NIBCO, INC.'s First Set of Interrogatories, dated 10-24-2016;

**Depositions**

- Thomas Coe, with Exhibits, taken 6-21-2016;
- Earl Sexton, with Exhibits, taken 10-11-2016;
- Mark Clark, with Exhibits, taken 10-11-2016;
- Kenneth McCoy, with Exhibits, taken 10-12-2016;
- James Medders, with Exhibits, taken 11-16-2016;
- Judy Medders, with Exhibits, taken 11-16-2016;
- Steven Forbus, with Exhibits, taken 11-16-2016;
- Michael McMahon, with Exhibits, taken 11-17-2016;
- Shanks Plumbing, with Exhibits, taken 11-17-2016;
- James Monica, with Exhibits, taken 11-29-2016;
- Richard Roman, with Exhibits, taken 11-29-2016;
- Debbie Premus, with Exhibits, taken 12-14-2016;
- Linda Boyd, with Exhibits, taken 1-11-2017;
- Ray Sminkey, with Exhibits, taken 12-20-2016;
- Kelly McCoy, with Exhibits, taken 1-16-2017;
- Robert Dupree, with Exhibits, taken 1-16-2017;
- Randy Doering, with Exhibits, taken 1-18-2017;
- Robert Peperno, with Exhibits, taken 1-23-2017;
- Sarah Peperno, with Exhibits, taken 1-23-2017;
- Brock Lameo, with Exhibits, taken 1-23-2017;
- Scott Perry, with Exhibits, taken 2-1-2017;
- David Bobo, with Exhibits, taken 2-2-2017;
- Alan Cole, with Exhibits, taken 2-13-2017;
- Kim Cole, with Exhibits, taken 2-13-2017;
- Aleesha Valentine, with Exhibits, taken 2-17-2017;

**Expert Reports**

- Cynthia Smith Report dated 4-11-2017 with Work Product;
- Cynthia Smith documents referenced in report;
- Cynthia Smith Documents received 3-17-2017;
- Cynthia Smith Documents received 4-11-2017;

- First Environmental Lab 16-4715 Report dated 8-25-2016;
- First Environmental Lab 16-4714 Report dated 8-25-2016;
- First Environmental Lab 16-4716 Report dated 8-25-2016;
- First Environmental Lab 16-4835 Report dated 9-1-2016;
- First Environmental Lab 16-4836 Report dated 9-1-2016;
- First Environmental Lab 16-5893 Report dated 10-25-2016
- First Environmental Lab 15-5515 Report dated 10-27-2015;

**Jana Consulting Reports**

- "Project 07-2169 – Final Report", Jana Laboratories Inc., dated February 6th, 2008(Jana – 000369 – 000389);
- "Project 07-2178 – Final Report", Jana Laboratories Inc., dated February 6th, 2008;
- "Project 08-1120 – Final Report, Development of a Plan to Improve the Consistency of Residual Stabilizer Distribution in NIBCO PEX Pipe", Jana Laboratories Inc., dated July 31st, 2008 (NIBCO-Cole 00158195-00158204);
- "Project 08-1136 – NIBCO PEX Development Program", Jana Laboratories Inc., dated February 20th, 2009 (NIBCO-Cole 00133858 – 00134121);
- "Project 08-3777 – Final Report, Influence of E-Beam Process Parameters on PEX Piping", Jana Laboratories Inc., dated March 3rd, 2009;
- "Project 09-1160 Report – Draft PEX-c Plaque Screening Summary, Jana Laboratories Inc., dated May 22nd, 2009 (NIBCO-Cole 00015541 – 00015544);
- "Project 09-1160 – Extrusion Pipe Trial Iteration 0 – Final Report Draft", Jana Laboratories Inc., dated July 17th, 2009 (NIBCO-Cole 00015873 – 00015972);
- "Project 09-1160 – Final Report – Pigment Plaque Screening (Iteration 0)", Jana Laboratories Inc., dated September 4th, 2009 (NIBCO-Cole 00016103 – 00016180);
- "Project 09-1160 Summary – Extrusion Pipe Trial (Iteration 1)", Jana Laboratories Inc., dated November 16th, 2009 (NIBCO-Cole 00015545 – 00015566);
- "Project 09-1160 Summary – Extrusion Pipe Trial (Iteration 1)", Jana Laboratories Inc., dated November 30th, 2009 (NIBCO-Cole 00015688 – 00015827);
- "Project 09-1159 – Exposure Trial Results, Interim Report No. 1", Jana Laboratories Inc., dated July 23rd, 2009 (NIBCO-Cole 00016030 – 00016102);
- "Project 09-1159 E-Beam Process Improvement – Compilation Report", Jana Laboratories Inc., dated October 30th, 2009 (NIBCO-Cole 00016181 – 00016510);
- "Project 09-1157 - Final Report, ASTM F876-05 Testing", Jana Laboratories Inc., dated December 17th, 2009 (NIBCO-Cole 00016667 – 00016687);
- "Project 12-1400 - Final Report, Sample 12-522 (OIT Results)", Jana Laboratories Inc., dated September 21st, 2012 (NIBCO-Cole 00163027 – 00163035);
- "Project 12-1400 - Final Report, Sample 12-522", Jana Laboratories Inc., dated September 21st, 2012 (NIBCO-Cole 00163018 – 00163026);

**Chlorine Resistance Testing**

- "Project 227091 DURA-PEX Atofina (Red)", PSF Number J-00014572, NSF International, dated November 4th, 2005 (NSF 00042 – 00047);
- "Project 227091 DURA-PEX Atofina (Orange Barrier)", PSF Number J-00014574, NSF International, dated November 4th, 2005 (NSF 00048 – 00052);
- "Project 229592 DURA-PEX Equistar (Red)", PSF Number J-00017040, NSF International, dated November 14th, 2005 (NSF 00059 – 00064);
- "Project 229592 DURA-PEX Equistar (Orange)", PSF Number J-00017042, NSF International, dated November 14th, 2005 (NSF 00070 – 00075);
- "Project 247610 – Final Report", PSF Number J-00025679, NSF International, dated October 12th, 2007 (NIBCO-Cole 00134302 - 00134311);
- "Engineering Laboratory Test Report", Report Number J-00082096, NSF International, dated March 31st, 2010 (NIBCO-Cole 00101763 – 00101767);
- 2005 testing of the Blue product made from the Atofina resin (NSF 00037 – 00041);
- 2005 testing of the White product made from the Atofina resin (NSF 00031 – 00036);

**NSF Annual Reports**

- Test Report, Annual Collection, Job Number A-00017673, NSF International, dated December 14th, 2007 (NIBCO-Cole 00030635 – 00030645);
- Test Report, Annual Collection, Job Number A-00017674, NSF International, dated November 7th, 2007 (NIBCO-Cole 00162986 – 00162991);
- Test Report, Qualification Testing, Job Number J-00062044, NSF International, dated November 17th, 2008 (NIBCO-Cole 00162976 – 00162980);
- Test Report, Annual Collection, Job Number J-00069519, NSF International, dated August 19th, 2009 (NIBCO-Cole 00162981 – 00162985);
- Test Report, Annual Collection, Job Number A-00035867, NSF International, dated September 15th, 2009 (NIBCO-Cole 00046931 – 00046941);
- Test Report, Annual Collection, Job Number A-00035869, NSF International, dated September 21st, 2009 (NIBCO-Cole 00031818 – 00031824);
- Test Report, Annual Collection, Job Number A-00042828, NSF International, dated October 21st, 2010 (NIBCO-Cole 00162997 – 00163009);
- Test Report, Annual Collection, Job Number A-00042830, NSF International, dated September 24th, 2010 (NIBCO-Cole 00162992 – 00162996);
- Test Report, Annual Collection, Job Number A-00042831, NSF International, dated October 29th, 2010 (NIBCO-Cole 00163010 – 00163016);
- Test Report, Annual Collection, Job Number A-00104723, NSF International, dated July 8th, 2011 (NIBCO-Cole 00042006 – 00042016);
- Test Report, Annual Collection, Job Number A-00104725, NSF International, dated June 10th, 2011 (NIBCO-Cole 00042018 – 00042021);
- Test Report, Annual Collection, Job Number A-00104726, NSF International, dated July 5th, 2011 (NIBCO-Cole 00042035 – 00042041);
- Test Report, Annual Collection, Job Number A-00114668, NSF International, dated April 20th, 2012 (NIBCO-Cole 00042023 – 00042033);

- Test Report, Annual Collection, Job Number A-00114670, NSF International, dated April 11th, 2012 (NIBCO-Cole 00042043 – 00042046);

**Standards & Regulations**

- ASTM-D2765-01 (2006): Standard Test Methods – Determination of Gel Content and Swell Ratio of Crosslinked Ethylene Plastics;
- ASTM-D2765-11: Standard Test Methods – Determination of Gel Content and Swell Ratio of Crosslinked Ethylene Plastics;
- ASTM-F876-09: Standard Specification – Crosslinked Polyethylene (PEX) Tubing;
- ASTM-F876-10e1: Standard Specification – Crosslinked Polyethylene (PEX) Tubing;
- ASTM-F877-11a: Standard Specification – Crosslinked Polyethylene (PEX) Hot- and Cold-Water Distribution Systems;
- ASTM-F1807-10: Standard Specification – Metal Insert Fittings Utilizing a Copper Crimp Ring for SDR9 Cross-linked Polyethylene (PEX) Tubing and SDR9 Polyethylene of Raised Temperature (PE-RT) Tubing;
- ASTM-F2023-2005: Standard Test Method – Evaluating the Oxidative Resistance of Crosslinked Polyethylene (PEX) Tubing and Systems to Hot Chlorinated Water;
- ASTM-F2102-06: Standard Guide – Evaluating the Extent of Oxidation in Ultra-High-Molecular-Weight Polyethylene Fabricated Forms Intended for Surgical Implants;
- ASTM-F2159-10: Standard Specification – Plastic Insert Fittings Utilizing a Copper Crimp Ring for SDR9 Cross-linked Polyethylene (PEX) Tubing and SDR9 Polyethylene of Raised Temperature (PE-RT) Tubing;
- DIN 16892 Crosslinked polyethylene (VPE) pipes;
- NSF/ANSI 14-2003: Plastics Piping System Components and Related Materials;
- NSF/ANSI 14-2008e: Plastics Piping System Components and Related Materials;
- NSF Certification Policies for Plastics Piping, March 28, 2006;
- PPI TN-17/2013: Crosslinked Polyethylene (PEX) Pipe & Tubing;

**Background – Other Non-Lit Documents**

- NIBCO File
  - NIBCO PEX Piping Systems Installation Manual dated 2011 (NIB 00000190 – 00000209, NIBCO-Cole 00005046 – 00005065);
  - NIBCO DURA-PEX Piping Systems Installation Manual dated 2008 2008 (NIB 00000529 – 00000548);
  - NIBCO DURA-PEX Piping Systems Installation Manual dated 2007 (NIB 00000489 – 00000508, NIB 00000569 – 00000588);
  - NIBCO DURA-PEX Piping Systems Installation Manual dated 2009 (NIBCO-Cole 00011812 – 00011831);
  - NIBCO PEX Piping Systems Plumbing Installation Manual dated 2013 (NIBCO-Cole 00004460 – 00004479);
  - NIBCO/Jana Correspondence (JANA-000001 - 002470);
  - NIBCO Certifications Report dated March 30th, 2009;
  - CPI Burst Test Records (NIBCO-Cole 00066437 – 00066886);
  - NIBCO Burst Test Records (NIBCO-Cole 00066887 – 00067581);

- Burst Test Records for 2000 (NIBCO-Cole 00067582 – 00068205);
- CPI Burst Test Records (NIBCO-Cole 00068206 – 00068335);
- NIBCO Calibration Reports (NIBCO-Cole 00068336 – 00068614);
- Miscellaneous Calibration Documents (NIBCO-Cole 00068615 – 00068815);
- NIBCO Calibration Spreadsheet dated May 25th, 2011 (NIBCO-Cole 00068816 – 00068818);
- CPI Quality Assurance Documents (NIBCO-Cole 00068819 – 00068850);
- 2008-09 Dimensional Inspection Data (NIBCO-Cole 00068913 – 00069364);
- Dimensional Inspection Data (NIBCO-Cole 00069954 – 00070653);
- 2010 Dimensional Inspection Data (NIBCO-Cole 00070654 – 00071093);
- 2012 Dimensional Inspection Data (NIBCO-Cole 00071094– 00071356);
- Gel Testing Data and Correspondence;
- Jana Laboratories Inc. Test Reports (NIBCO-Cole 00071357 – 00071803);
- STR Analytical Reports and Gel Test Results (NIBCO-Cole 00071804 – 00071961);
- Jana Laboratories Inc. Reports and Correspondence (NIBCO-Cole 00071962 – 00072311);
- NIBCO Cross-Linking/Oven Check Data (NIBCO-Cole 00072312 – 00073164;
- CPI/NIBCO Leak/Pressure Test Data (NIBCO-Cole 00073165 – 00073620);
- NIBCO Print Stream/String Inspection Data (NIBCO-Cole 00098582 – 00098589);
- CPI Print String Inspection Data (NIBCO-Cole 00075525 – 00075976);
- NIBCO Print Stream Inspection Data (NIBCO-Cole 00073621 – 00075524, NIBCO-Cole 00075977 – 00076384);
- NIBCO Crosslinking Data (NIBCO-Cole 00076385 – 00078909);
- NIBCO Audit Documents (NIBCO-Cole 00078910 – 00079289);
- NIBCO/CPI Audit Data (NIBCO-Cole 00079290 – 00079331);
- Dock Audit Forms (NIBCO-Cole 00079332 – 00079751);
- CPI Audit Data and Dock Audit Forms and Employee List (NIBCO-Cole 00079752 – 00079925);
- NIBCO/CPI Audit Data (NIBCO-Cole 00079926 – 00080006);
- NIBCO Audit Data and Shipping Documents (NIBCO-Cole 00080007 - 00081153);
- Reel Tagging Receipts and Reports (NIBCO-Cole 00081154 - 00081308);
- NIBCO Product Hold Documents, Defect Reports and List of Transfer Orders;
- Order, Transfer, Hold, Return and Tracking Documents;
- Total Petrochemical, Padanaplast and ColorTech Documents;
- Melt Index and Density Test Data, Loading/Delivery Documents and Analysis Certificates;
- NSF/ANSI 14-2015 Plastics Piping System Components;
- NIBCO Control of Records;
- NIBCO Control of Documents;
- Audit Checklist;
- NIBCO Dimensional Inspection (NIBCO-Cole 00098413 - 00098440);
- NIBCO Pressure Test (NIBCO-Cole 00098452 - 00098463);
- NIBCO Burst Test and NSF Alternate Quality Assurance Plan;

- NIBCO Crosslinking Verification;
- NIBCO Customer Complaint Investigation Form;
- CPI QC Facility Audits (NIBCO-Cole 00098404 – 00098407, 00098373 - 00098376);
- CPI Dimensional Inspection (NIBCO-Cole 00098408 – 00098412, 00069365 – 00069701, 00069702 - 00069953);
- NIBCO QC Facility Audits (NIBCO-Cole 00098377 - 00098403);
- NIBCO Leak Test (NIBCO-Cole 00098441 - 00098403);
- CPI Leak Test (NIBCO-Cole 00098464 - 00098468);
- CPI Burst Test (NIBCO-Cole 00098469 - 00098473);
- NIBCO Burst Test (NIBCO-Cole 00098474 - 00098491);
- CPI QC Barrier Product Testing (NIBCO-Cole 00098492 - 00098514);
- NIBCO QC Manifold Testing (NIBCO-Cole 00098515 - 00098520);
- NIBCO Oven Test for Crosslinking Verification (NIBCO-Cole 00098521 - 00098528);
- CPI Oven Test for Crosslinking Verification (NIBCO-Cole 00098529 - 00098532);
- NIBCO Melt Index (NIBCO-Cole 00098533 - 00098554);
- NIBCO Density Testing Using the MD-200S Electronic Densimeter (NIBCO-Cole 00098555 - 00098572);
- CPI Print String Inspection (NIBCO-Cole 00098573 - 00098581);
- NIBCO Print Stream Inspection (NIBCO-Cole 00098590 - 00098681);
- NIBCO Non-Conforming Product (NIBCO-Cole 00098682 - 00098692);
- CPI Care and Use of Calipers, Micrometers, and PI Tape (NIBCO-Cole 00098693 - 00098700);
- NIBCO Care and Use of Calipers, Micrometers, and PI Tape (NIBCO-Cole 00098701 – 00098708, 00098709 - 00098720);
- CPI Care and Use of Calipers, Micrometers, and PI Tape (NIBCO-Cole 00098721 - 00098728);
- NIBCO E-BEAM Crosslinking and Sampling (NIBCO-Cole 00098729 - 00098735);
- CPI E-BEAM Post Production Sampling and In-Processing Testing (NIBCO-Cole 00098736 - 00098740);
- NIBCO Customer Complaint Investigation Form (NIBCO-Cole 00098745 – 00098748, 00098741 - 00098744);
- CPI Customer Complaint Investigation Form;
- NIBCO QC Gel Content Testing;
- Design Guide: residential PEX Water Supply Plumbing Systems, NAHB Research Center, November 2006 (NIBCO-Cole 00017856 - 00017983);

Other Case Material

Outside the context of this Project, ESI has conducted other failure analyses on NIBCO PEX and other PEX tubing. This report is based on the testing performed for this Project, and the materials provided for this Project. ESI has not relied on data from testing performed for other projects to reach the conclusions expressed herein, but reserves the right to rely on, cite to, and utilize data, pictures, or other materials from other ESI projects to the extent necessary to rebut claims being made about other projects by other experts or the Plaintiffs in this lawsuit.

# Chapter 1

NIBCO PEX 1006 tubing manufacturing, certification, specification, and oxidative degradation

# 1.0 Background of NIBCO PEX Certification Testing and Manufacturing

In the potable water supply industry, third party certifications are an important component in the design and manufacturing of products for that industry. Independent organizations like the National Sanitation Foundation (now NSF International, or simply NSF), the International Organization of Plumbing and Mechanical Officials (IAPMO), and Underwriters Laboratories (UL) provide the service of evaluating products for the industry for compliance with applicable standards. Sometimes the standards are ones created by the organization itself, like NSF Standards 14 and 61. Other times the standards are ones created and maintained by other organizations like ASTM International. In either case, the standards are available to the public and the certification organizations perform their evaluations independent of any testing by the product manufacturers. These organizations then publish the results of their evaluations so that any interested party can find out whether any particular product has been found to meet the requirements of the standards that apply to the product.

The standards for PEX plumbing products were in a state of flux in the early 2000's. New standards and testing protocols were being developed by groups of individuals who represented agencies like NSF and IAPMO, plastic pipe and fitting manufacturers, plastic resin manufacturers, plastic pipe trade organizations like the Plastics Pipe Institute (PPI), the Plastic Pipe and Fitting Association (PPFA) and the Uni-Bell PVC Pipe Association (Uni-Bell) plus some others who all had an interest in the products' performance. The convening groups clearly intended to generate standards and test methods which would ensure that the products were safe and effective.

By this point in time, it had come to be understood that disinfectant chemicals put in drinking water to protect users from contracting bacterial illnesses might also have an adverse effect on the long-term performance of plastic water transport piping, particularly for pipe manufactured from polyolefin plastics (polyethylene, polypropylene, polybutylene). Since "chlorine" water treatments (added to water in the form of gaseous chlorine or chlorine bleach) were commonplace in the U.S., members of these standards writing groups worked on the creation of an accelerated test method to assess the resistance of polyolefin pipes to degradation by chlorinated drinking water. Out of these efforts, one such test method (NSF Protocol P171[1]), involving testing of polyolefin pipe at elevated temperatures and at a higher than normal "chlorine" content in the water, was created and published in September 1999. The NSF P171 protocol became the core of a new ASTM standard the next year: ASTM F2023[2] was first published in 2000. Elevated temperature chlorine resistance requirements were being developed and added to product standards; ASTM F876-02 (approved in 2002) was the first version of the PEX pipe standard to have the NSF P171/ASTM F2023 testing requirement added. NSF 14 did not reference F876-02 as the normative standard for PEX pipe until the September 2004 version, so chlorine resistance did not come into play with respect to compliance with NSF 14 until then. However, PEX tubing manufacturers were aware that the requirement would happen, so CPI[a] got started on having its products tested by ASTM F2023 in the 2004-2005 timeframe.

When NIBCO purchased Consolidated Plumbing Industries (CPI) in 2006[3], they purchased a crosslinked polyethylene (PEX) tubing product (Dura-PEX tubing) that had already been independently tested and its compliance with the relevant standards listed by two or three different independent organizations. All required testing had been completed and the results were acceptable for listing by the certification organizations at the time that the listings were published. The listings were for compliance with the ASTM PEX tubing standard F876[4] (and in some cases system standard F877[5]), NSF Standard 14[6] and NSF Standard 61[7] as they existed (see below).

[a] NIBCO purchased the assets of Consolidated Plumbing Industries (CPI) in May 2006, including the Dura-PEX tubing product and the equipment used in the extrusion process.

At that time the Dura-PEX tubing met what would later become the ASTM F876 requirements for a PEX 1006 product (see ASTM F876-09, Table 1).

Certification of compliance with the requirements of these standards (other than ASTM F2023 chlorine resistance) involved annual testing of tubing from each manufacturer. However, members of these standards writing groups recognized that the time and cost of performing the full battery of tests under ASTM F2023 and the limited number of laboratories capable of performing the tests made frequent, i.e. annual, testing of PEX pipe chlorine resistance impractical if not impossible. This understanding is reflected in the fact that ASTM F876-04 states in Section 7.11.1, with respect to the chorine resistance testing, "*Significance* – The test need only be performed on representative samples for the original validation of pipe made from a particular compound." It was also found to be prohibitively expensive to perform full F2023 tests on multiple versions of tubing produced from essentially the same compound that differed only in color. Therefore, a provision for having a "Dependent Transfer Listing" (or DTL) for chlorine resistance of a PEX compound which differed from the fully tested composition only in its color was also in the works. It appears that the DTL procedure was added to NSF 14 as early as the August 2006 version of that standard, although other references do not have it appearing in NSF 14 until as an addendum to the 2007 version. The section adding this DTL procedure is definitely in the body of NSF 14-2008e, the 2008 version.

The NSF Joint Committee on Plastics was also working on a policy for retesting the chlorine resistance of listed compounds. The retesting policy required a DTL-type of test every 3 years according to ESI's review of NSF policy PP-55. NIBCO through an NSF-supervised DTL test set on a sample of blue tubing in late 2009 – early 2010 (see NIBCO 01605 – 01609) met the requirements.

The NSF listing for Dura-PEX PEX 1006 tubing was continuous over the time period from 2004 – 2012. The listed NIBCO product, PEX 1006 tubing, was followed by a second generation PEX tubing product, PEX 3308, in the latter half of 2012.

With respect to the manufacturing methods employed by CPI and NIBCO to produce the PEX tubing from 2004-2012, the methods employed in extrusion of the tube were typical of what was being done in the polyethylene pipe industry at the time that these products were made. NIBCO records produced show that the tube was manufactured from a natural polyethylene base resin combined in the extruder with an additive concentrate. The process is essentially the only one employed in the U.S. to produce polyethylene tubing today. NIBCO employed a base resin, CD4300 from Total Petrochemicals. Tubing made from this base resin and the additive concentrates purchased from Colortech, Inc. was evaluated after cross-linking by independent third party agencies and found to comply with ASTM F876, ASTM F877, NSF 14, NSF 61 and other relevant standards for PEX tubing. The quality control (QC) records produced by NIBCO show that their product was properly inspected and tested to assure that the product shipped complied with the performance requirements of the relevant standards.

## 2.0 Review on NIBCO Installation Manual and Product Specification

It had also become very apparent throughout the investigation of polybutylene (PB) plumbing system failures in the 1980s and 1990s that while the biggest cause of failures was degradation of polyacetal plastic fittings by chlorinated water, a significant number of failures also occurred because of errors in installation of the plastic pipe and fitting system by the plumbers. Installations, which often ignored recommended installation practices from the pipe and fitting manufacturers, were carried out in ways that created excessive mechanical stresses in both the tubing and the associated fittings. The fact that high levels of mechanical stress can both accelerate degradation of polymers[8] (mechano-chemistry) and shorten the time to failure of undegraded polymers by accelerating creep rupture has been known for decades. The problematic installation practices employed in many PB plumbing

installations created local stress concentrations in PB tubing which caused creep rupture failure without oxidation of the PB material. Where oxidation was found, it was superficial, localized in areas of particularly high mechanical stress, and had nothing to do with cracking of the PB tubing. This is reflected in the numerated list of failures or resulting damage from PEX tubing failures not covered under the NIBCO Limited Warranty section of the NIBCO PEX Plumbing System Installation manual.

ESI reviewed the 7 versions of the NIBCO installation manuals from February 2007 to July 2013. In each installation manual, it is clearly stated that the operating pressure limits for chlorinated water service is as follows: Chlorinated water: 80 PSI @ 140 °F.

It is also stated that PEX tubing failure can be caused by:

1) Breaks, tearing, kinking, gouges, punctures or other external damages before, during, or after installation;
2) Exposure to temperatures and pressures beyond the product ratings as specified on the product or in the NIBCO installation manual
3) Exposure to damaging chemical, substances or corrosive water conditions;
4) Damage from abnormal operating conditions
5) Damage due to accident, abuse, misuse, or unauthorized modification or repair
6) Improper installation due to worn, damaged, unauthorized or improperly calibrated tools.
7) Components in the plumbing system other than those manufactured or sold by NIBCO
8) Not designing, installing, inspecting or testing the system in accordance with NIBCO installation instructions at the time of the installation; or
9) Failure to follow applicable code requirements and good plumbing practices.

In conducting a proper failure analysis for the root-cause of failure, not only it is important to ascertain the failure mechanism but also to determine the cause for that failure mechanism. The oxidative degradation mechanism, the characteristics associated with oxidative degradation, factors that contribute to oxidative degradation, and analytical methods for measuring the extent and depth of oxidation, if present in the tubing, are discussed below.

## 3.0 PEX Material and Oxidative Degradation Mechanism

As noted earlier, PEX is an acronym for crosslinked polyethylene. Crosslinked polyethylene differs from other types of polyethylene in that the molecules in PEX are covalently bonded together where in "normal" polyethylene they are not. One of the benefits of crosslinking is that PEX pipe can be employed to transport fluids at higher temperatures than the non-crosslinked variety can. This makes it possible to use PEX tubing for both cold and hot water transport. If the polyethylene is not crosslinked, it cannot be used for hot water piping.

Since its introduction in the 1950's, high density polyethylene (HDPE) and crosslinked polyethylene (PEX) pipe have been utilized in applications for the transport of water, either in the form of potable (drinking) water or in aqueous solutions such as sewage, liquids in industrial facilities, underfloor heating systems, etc. It was determined early on that establishment of a pressure rating and an estimate of expected service life for plastic pipes subjected to long term pressurization and in-ground burial was not a simple matter. The mechanical properties, e.g. strength and modulus, and physical characteristics like outside diameter and roundness when buried in the ground, are dependent upon the length of time that the pipe is under stress or deformation. For example, creep is the time dependent deformation of an object under stress. Products manufactured from plastics exhibit creep under constant loads. For example, an HDPE pipe at an applied stress of 800 psi, will creep after its initial deformation to the extent that the modulus of elasticity (equal to the applied stress divided by the total strain) will decrease from an initial value in the range of 125,000 to 150,000 psi to a value of 55,000 psi in one hour at that level of stress.[9]

The time dependent nature of the properties of polyethylene made it necessary to develop methods of material characterization that would account for this. Experimental determination of the time dependent strength characteristics of the HDPE and PEX resin compounds from which pipes were going to be made had to be carried out.[10,11,12,13,14,15,16] The results of such tests, when plotted as logarithm of stress versus logarithm of time to failure, clearly show the time dependent nature of the long term strength of polyethylene (see Figure 1.2).




**Figure 1.1:** Schematic creep rupture curve for polyolefin pipe

Traditional laboratory testing of this type created pipe failures having two different failure modes. One mode, which occurred in relatively high stress, short time tests, had ductile pipe rupture occurring with ballooning of the pipe specimen and yielding of the HDPE material in the failure area.[12] This failure mode has become known as Stage I failure.[17] The second mode, which occurred at lower stresses and longer test times, exhibited very non-ductile, slit and pinhole failures.[12] This failure mode has become known as Stage II failure.[17] Note in Figure 1.1 that the plot of Stage II failures on log(stress) vs. log(time) axes has a steeper slope than the plot of Stage I failures.

Protocols for this type of testing were developed many years ago and while the data analysis methods differ depending upon whether one is in Europe or North America, the end result, the allowable long term (i.e. for 50 years of service) level of stress in the pipe wall, is essentially the same.[18,19,20] The testing protocols provide direction as to how many pipe samples must be tested and under what conditions. For standardization purposes, the results are expressed in terms of categories of long term hydrostatic strength (LTHS) called Hydrostatic Design Bases (HDB's). An HDB may be further modified by a design factor (typically 0.5 for PEX pipe and tubing) to create what is called a Recommended Hydrostatic Design Stress (RHDS); see Figure 1.2 below. The Plastic Pipe Institute (PPI) maintains a listing of the hydrostatic design stresses for all of the plastic compounds (HDPE, PVC, PEX, etc.) employed to manufacture pressure piping. These are contained in a Plastics Pipe Institute publication, PPI Technical Report TR-4. Copies of the current version of PPI TR-4 can be downloaded from their web site; plasticpipe.org. However, it is worth remembering that these HDB and HDS values for PE and PEX pipe materials are determined on pipes that have no oxidative degradation associated with them.




**Figure 1.2:** Characterized long term strength of polyolefin pipe.

## 3.1 Oxidative Degradation of HDPE

It has long been known that polyethylene materials are susceptible to oxidative degradation in certain environments. Wholesale oxidative degradation of polyethylene leads to a reduction in the molecular weight of the polymer with a consequent loss of mechanical properties.[21,22,23] The oxidized polyethylene material eventually can become so degraded that it will respond to an applied stress in a very brittle fashion with an elongation to break of only a few percent. This is as opposed to HDPE and PEX pipe materials in their normal form where the elongation to break can range from 600 – 1000%.

It has been documented in the literature that oxidative degradation of polyethylene pipe can lead to premature failure of the pipe.[24,25,26,27,28] and that such pipe, used in the transport of water or aqueous solutions, is susceptible to oxidative degradation in that environment.[29,30,31,32,33,34] The steps that are normally taken to prevent oxidative degradation from occurring in PEX and HDPE materials are to add various chemical stabilizers, antioxidants (AO's) of various types, to the resin.[35,36,37,38,39,40,41] In this manner, a pipe compound is created by combining the base polyethylene resin with an assortment of antioxidants and other additives. A typical pipe compound includes the base polyethylene resin, processing stabilizers (antioxidants to prevent oxidation during pipe extrusion at 350º – 400ºF), and other antioxidants intended to provide protection against oxidation caused by long-term exposure to water containing dissolved air and disinfectants. The pipe compound will also contain pigments and other colorants to impart a desired color and may contain additives to protect against degradation by the ultraviolet radiation in sunlight.

This process has proven to be very successful in keeping oxidation from occurring. However, these antioxidants are consumed in doing their job by a variety of processes. The chemical reactions that occur to inhibit oxidation alter the chemical structures of the antioxidants and eventually render them ineffective.[31,42,43] In addition, the additives will migrate from throughout the pipe wall to the surfaces where oxygen is most plentiful and oxidation is first to occur. This is a desirable characteristic of the antioxidants but if the pipe is conveying flowing water, some of the antioxidants at the surfaces will be washed away without ever reacting.[44,45,46,47,48,49,50,51,52,53,54,55,56] The antioxidants in the pipe material are depleted by both of these mechanisms¸ until there is insufficient AO left to prevent oxidation of the pipe material.[31,40] At this point the material at the surface in contact with the water begins to degrade and eventually deterioration of the surface reaches the level at which fracture initiation will occur at stress levels that exist even in well installed pressure pipe.

The polyethylene pipe industry has recognized for many years that oxidation-controlled failure of pipe does occur. The impact of this is depicted on the schematic creep-rupture curve in Figure 1.3. To the two stages of failure shown in pipe testing results like that in Figure 1.2 is added a third stage of oxidation-controlled failure. Note that the line representing Stage III failure is very steep, indicating that once oxidation of the pipe material becomes the rate controlling step in pipe failure, that the level of stress in the pipe becomes much less of a factor in failure time.

## 3.1.1 Failure Mode – Surface Embrittlement

It is not necessary for all of the material in the pipe wall to degrade in order for pipe performance to be compromised. Historically, all that was required for the long-term performance of an HDPE pipe to be prematurely reduced was for a thin, 1 – 2 mil deep layer of material at the inner surface of the pipe to become sufficiently degraded.[24,25,27,28,57] Once a certain level of degradation of the surface material had occurred, fracture would commence in that brittle surface layer and the crack would subsequently grow through the entire pipe wall. Surface embrittlement, when extensive enough, reduces the crack incubation time by degrading the material at the pipe's inner surface and shortening the time necessary for a crack to start in that surface layer. Once the crack is formed in the degraded layer, crack growth proceeds in the normal slow crack growth (SCG) manner which is found in Stage II failures. The difference between pipe having a degraded surface layer and pipe that does not is that crack initiation occurs sooner in the degraded brittle surface layer than it does in an undegraded surface layer. However, for the surface embrittlement phenomenon to become controlling in a PE pipe failure, the layer of degraded material on the inner pipe surface must be deep enough into the wall of the pipe and oxidized enough for the material to become truly brittle. If oxidation of the surface layer is neither severe enough nor deep enough, then the oxidation does not reduce pipe life.[28]




**Figure 1.3:** Schematic creep rupture curve of PEX or HDPE pipe with oxidation-controlled Stage III failure occurring.

One environmental factor that has a significant effect on the performance of HDPE and PEX pipe is the temperature at which the pipe operates. The long term strength of the pipe is reduced by elevating the operating temperature. The pressure rating of un-crosslinked HDPE pressure pipe of the type used in buried water service applications decreases significantly as the operating temperature increases from 73°F (the temperature at which the ratings are established) to 140°F and such PE pipe is not recommended for pressure applications at temperatures above 140°F.[58,59] In PEX pipe and tubing the temperature derating effect is not quite as severe, but ASTM F876, Table 1 does show that the pressure rating of SDR 9 PEX tubing decreases from 160 psig at room temperature (73°F) to 100 psig at 180°F to 80 psig at 200°F. It should be noted that the elevated temperature HDS values on which these pressure ratings are based are determined in testing with static water that does not contain disinfectants. The pressure ratings for use with chlorinated water may be reduced by the manufacturer based upon ASTM F2023 test results. For example, NIBCO noted in its PEX Installation manual that the pressure and temperature operating limits of its tubing for use with chlorinated water was 80 psig and 140°F.

## 3.1.2 Physical Characteristics of Stage III Failure

Stage III failure in a PEX pipe is accompanied by clear physical changes in its appearance. The pipe develops a system of brittle cracks, like that shown in Figure 1.4, over its entire inside surface.[60] When viewed in cross section, the progression of cracks from the oxidized and embrittled inner surface can be seen as in Figure 1.5. Cracks opened for fracture surface examination look like that in Figure 1.6. The general breakdown of the inside surface can also be seen in Figure 1.6, below the fracture surface. It is important to remember that when there is surface embrittlement and premature failure from it, the surface deterioration seen in these pictures covers the entire inside tube surface.




**Figure 1.4:** Inside surface of a severely oxidized PEX pipe (from Ref. 60).




**Figure 1.5:** Circumferential cross-section of surface embrittled PEX pipe (from Ref. 60)




**Figure 1.6:** Longitudinal cross-section of surface embrittled PEX pipe (from Ref. 60)

## 3.1.3 Contributors to Oxidative Degradation

Oxidative degradation in polyolefin (including PEX) piping is caused by a number of factors. It may occur simply because the water being transported contains dissolved oxygen gas, which could react with the pipe material and cause oxidation of that material. However, the kinetics of this process at room temperature and normal operating pressures are extremely slow and this process alone is highly unlikely to cause oxidation-related failures in a 50-100 year time frame.

As noted above, residual chlorine disinfectants contained in potable water can facilitate antioxidant consumption and polyolefin material oxidation. The antioxidants in the PEX compound are present to protect the material and inhibit oxidation under anticipated operating conditions. However, if the concentration of the disinfectant species is greater than anticipated, antioxidant depletion and subsequent oxidation can occur prematurely, especially in hot water piping.

Water temperature has a strong effect on how much time is required for the antioxidants in polyolefin pipe to become depleted and for the pipe material to begin to oxidize. The basic pressure rating of the pipe itself, determined in the absence of oxidation of the material, decreases as the temperature rises above 73°C. The chlorinated water resistance ratings, denoted by the 1, 3, or 5 which appears in place of the "X" in the designation PEX X006, are determined by calculations that assume that the maximum temperature of the water used in the pipe will be 140°F (60°C). The other important parameter in these calculations is the length of time assumed for the 140° water to be in the pipe. The calculation for a PEX 1006 rating assumes the 140° water is present 6 hours out of every day and the remaining 18 hours of the day the water in the pipe is at 73°F.[61] The estimated lifetime of the pipe under these temperature conditions with an internal water pressure of 80 psig must exceed 50 years. CPI had its PEX tubing tested to ASTM F2023 by NSF to establish that this chlorine resistance rating requirement would be met.[62] The results of that testing, when used to perform the Miner's Rule estimate of pipe lifetime at 140°F for 6 hours and 73°F for 18 hours with a constant internal pressure of 80 psig, yielded a lifetime estimate of 78 years. This result met the ASTM F876 requirement for a PEX 1006 designation.

Thus, NIBCO had established pressure and temperature rating of 80 psig and 140°F for chlorinated water condition. Exposure to NIBCO PEX 1006 outside of these conditions will shorten the service life and product should not be used outside of these conditions.

## 3.1.4 Analytical Methods to Quantify Oxidation in HDPE

There are analytical methods that have been developed through the years to identify and quantify the presence of oxidative degradation in polyolefin pipes. Infrared spectroscopy was utilized as early as the 1950's as a technique by which oxidation could be identified in polyethylene.[63,64,65,66] When it became desirable to examine polyolefin pipe for oxidative degradation, a parameter called the “carbonyl index” was created to quantify the extent of degradation.[25,27,28,49,51] The carbonyl index was defined as the intensity of the infrared absorption peak of a specific carbonyl moiety formed in the oxidation of polyolefin material normalized by the intensity of a methylene absorption peak in the same spectrum. It was determined that there was a minimum carbonyl index required in at least the first 50 microns or so of the inside surface of a pipe that was needed to embrittle that surface and produce premature failure in the pipe.[27-28] It has also been shown that lesser quantities and depths of oxidation than that do not adversely affect the pipe lifetime.[28] Infrared spectroscopy continues to be utilized today to assess polyolefin pipe materials for the presence of oxidation.

## 4.0 Summary

NIBCO PEX 1006 tubing was thoroughly tested to applicable industry standards and a third-party NSF listing for Dura-PEX PEX 1006 tubing was continuous over the time period from 2004 – 2012. Based on the past performance of polyolefin based plumbing products the plumbing industry was aware of different causes of plumbing product failures and NIBCO installation manuals specifically identified 9 different potential causes of PEX tubing failure.

The testing and certification process of NIBCO PEX 1006 tubing ensured that the tubing was manufactured with adequate stabilizer package to prevent premature failures from oxidative degradation under normal operating conditions. Failure due to oxidative degradation of PEX material is one of the many different potential causes of PEX tubing failure, and proper analytical methods have to be applied to assign failure solely due to oxidative degradation.

## References

[1] NSF Protocol P171, "Chlorine Resistance of Plastic Piping Materials," NSF International, Ann Arbor, MI (1999).
[2] ASTM F2023-00, "Standard Test Method for Evaluating the Oxidative Resistance of Crosslinked Polyethylene (PEX) tubing and Systems to Hot chlorinated Water," ASTM International, West Conshohocken, PA (2000).
[3] Anon., "NIBCO buys Consolidated Plumbing Industries," *Contractor Magazine,* June 1, 2006.
[4] ASTM F876, "Standard Specification for Crosslinked Polyethylene (PEX) Tubing," ASTM International, West Conshohocken, PA.
[5] ASTM F877, "Standard Specification for Crosslinked Polyethylene (PEX) Plastic Hot- and Cold-Water Distribution Systems," ASTM International, West Conshohocken, PA.
[6] NSF/ANSI 14, "Plastic Piping System Components and Related Materials," NSF International, Ann Arbor, MI.
[7] NSF/ANSI 61, "Drinking Water System Components – Health Effects," NSF International, Ann Arbor, MI.
[8] A. Casale & R.S. Porter, *Polymer Stress Reactions. Volumes 1 & 2,* Academic Press, New York, NY (1978).
[9] Anon., *The Plastics Pipe Institute Handbook of Polyethylene Pipe, 1st Edition,* Chapter 3, Figure 11, page 61, The Plastic Pipe Institute, Washington, DC (2006).
[10] R.H. Carey, "Creep and Stress-Rupture Behavior" *Industrial and Engineering Chemistry,* **50**(7), 1045-8 (1958).
[11] K. Richard, G. Diedrich & E. Gaube, "Testing of Ziegler-Polyethylene Pipes," *Rubber and Plastics Age,* May 1958, pgs. 364 – 368.
[12] K. Richard, E. Gaube & G. Diedrich, "Drinking Water Pipes of Low Pressure Polyethylene," *Kunststoffe/German Plastics Digest*, **49**(10), 516-525 (1959).
[13] K. Richard, "The Testing of Plastic Pipes," *Recherché et Reception des Materiaux de Synthese Utilises Dans la Construction: Symposium de la R.I.L.E.M. tenu a l'Universite de Liege du 9 au 11 Novembre 1964,* pg 331-345 (1964).
[14] E. Gaube, G. Diedrich & W. Muller, "Thermoplastic Pipes: Experience of 20 Years of Creep Rupture Testing," *Kunststoffe/German Plastics* **66**(1), 2-8 (1976).
[15] F. Mutter, "The Evaluation of PE Types for the Use in Gas Distribution," *Proceedings Sixth Plastic Pipe Symposium, April 4 – 6, 1978,* pgs. 66 – 70, American Gas Association (1978).
[16] E. Gaube, H. Gebler, W. Muller & C. Gondro, "Creep rupture strength and aging of HDPE pipes: 30 years experience in testing of pipes," *German Plastics* (1985), translated from *Kunststoffe* **75**(7), 412-415 (1985).
[17] E. Gaube, H. Gebler, W. Muller & C. Gondro, "Creep rupture strength and aging of HDPE pipes: 30 years experience in testing of pipes," *German Plastics* (1985), translated from *Kunststoffe* **75**(7), 412-415 (1985).
[18] *Policies and Procedures for Developing Recommended Hydrostatic Design Stresses for Thermoplastic Pipe, Technical Report PPI-TR3-July 1968,* Plastics Pipe Institute, New York (1968).
[19] ASTM D2837 – 69, "Standard Test Method for Obtaining Hydrostatic Design Basis for Thermoplastic Pipe Materials," *Annual Book of ASTM Standards, Part 26*, American Society of Testing and Materials, Philadelphia, PA (1970).
[20] ISO/TR 9080:1992, "Thermoplastic pipes for the transport of fluids – Methods of extrapolation of hydrostatic stress rupture data to determine the long-term hydrostatic strength of thermoplastics pipe materials," International Organization for Standardization, Geneva, Switzerland (1992).

[21] C.K. Haywood, "Oxidation and Ageing," Chapter 6 in *Polythene*, ed. A. Renfrew & P. Morgan, Interscience Pub., New York (1957).
[22] J.H. Heiss & V.L. Lanza, "The Thermal Embrittlement of Stressed Polyethylene," *Wire* October 1958, pp. 1182-1187.
[23] H. Kambe, "The Effect of Degradation on Mechanical Properties of Polymers," Chapter 9 in *Aspects of Degradation and Stabilization of Polymers*, ed. H.H.G. Jellinek, Elsevier Scientific Publishing, New York (1978).
[24] U.W. Gedde, B. Terselius & J.-F. Jansson, "A new method for the detection of thermal oxidation in polyethylene pipes," *Polymer Testing*, **2**, 85 – 101 (1981).
[25] B. Terselius, U.W. Gedde & J.-F. Jansson, "Structure and morphology of thermally oxidized high density polyethylene pipes," *Polym. Eng. & Sci.* **22**(7), 422 – 431 (1982).
[26] M. Ifwarsson & P. Eriksson, "Experience from 12 years evaluation of cross linked polyethylene," *Proceedings of Plastics Pipes VI*, paper 40A (1985).
[27] L.J. Broutman, D.E. Duvall & P.K. So, "Fractographic study of a polyethylene sewer pipe failure," *Proceedings SPE 47th Annual Technical Conference* **35,** 1599 - 1602 (1989).
[28] S.W. Choi, *Surface Embrittlement of Polyethylene,* Ph.D. Thesis, Illinois Institute of Technology (1992).
[29] R.E. Chambers, *Performance of Polyolefin Plastic Pipe and Tubing in the Water Service Application, October 1984,* report prepared for the Plastics Pipe Institute by Simpson, Gumpertz & Heger, Inc., Arlington, MA (1984).
[30] M. Ifwarson, "Life-time of Polyethylene Pipes Under Pressure and Exposure to High Temperatures," *Kunststoffe/German Plastics* **79**(6), 20 – 22 (1989).
[31] U.W. Gedde, et al., "Long-Term Properties of Hot-Water Polyolefin Pipes – A Review," *Polym. Eng. & Sci.,* **34(**24), 1773 – 1787 (1997).
[32] L. Colin, et al., "Kinetic Modeling of the Aging of Polyethylene Pipes for the Transport of Water Containing Disinfectants," *Proceedings of Plastics Pipes XIII Conference*, Oct. 2 – 5, 2006, Washington, DC.
[33] S. Chung, et al., "An examination of the relative impact of common disinfectants (Chlorine, Chloramines, and Chlorine dioxide) on plastic piping system components," *ANTEC 2007 – Proceedings of the 65th Annual Technical Conference of the Society of Plastics Engineers,* 2894 – 8.
[34] S. Chung, et al., "Characterizing Long-Term Performance of Plastic Piping Materials in Potable Water Applications," *Proceedings of Plastics Pipes XIV Conference*, Sept. 22 – 24, 2008, Budapest, Hungary.
[35] K.W. Bartz, "Stabilization of Polyolefins," *Polymer Preprints,* **25**(1), 74-75 (1984).
[36] P.P. Klemchuk & P.-L. Horng, "Perspectives on the Stabilization of Hydrocarbon Polymers Against Thermo-Oxidative Degradation," *Polymer Degradation & Stability,* **7**, 131-151 (1984).
[37] R.E. King, III, "Advances in Polyolefin Stabilization," *Proceedings of the 1999 Society of Plastics Engineers Annual Technical Conference,* pg. 2266-2273 (1999).
[38] F. L. Gugumus, "Polyolefin Stabilization: From Single Stabilizers to Complex Systems," in *Handbook of Polymer Degradation, 2nd Edition,* S. Halim Hamid, Ed., Chapter 1, Marcel Dekker Inc. (2000).
[39] N.S. Allen, et al., "Diffusion and Extractability Characteristics of antioxidants in Blue Polyethylene Water Pipe: A DSC and Radiolabelling Study," *Polym. Deg. And Stability* **27**, 145-157 (1990).
[40] K. Karlsson, G.D. Smith & U.W. Gedde, "Molecular structure, morphology and antioxidant consumption in medium density polyethylene pipes in hot-water applications," *Polym. Eng. & Sci.,* **32**(10), 649 – 657 (1992).
[41] J. Viebke & U. W. Gedde, "Antioxidant diffusion in polyethylene hot-water pipes," *Polym. Eng. & Sci.,* **37(**5), 896 – 911 (1997).
[42] E. T. Denisov, "Polymer Oxidation and Antioxidant Action," in *Handbook of Polymer Degradation, 2nd Edition,* S. Halim Hamid, Ed., Chapter 9, Marcel Dekker Inc. (2000).
[43] N. Grassie & G. Scott, *Polymer Degradation and Stabillization,* Chapter 5, Cambridge University Press, Cambridge, UK (1985).
[44] P.D. Calvert & N. Billingham, "Loss of additives from polymers: A theoretical model," *J. Applied Polym. Sci.* **24**(2) 357 – 370 (1979).
[45] N.C. Billingham, P.D. Calvert & A.S. Mnake, "Solubility of phenolic antioxidants in polyolefins," *J. Applied Polym. Sci.* **26**(11), 3543 (1981).
[46] T. Schwarz, et al., "Diffusion of antioxidants in sheets and plates of isotactic polypropylene measured by isothermal differential thermal analysis," *J. Thermal Analysis*, **35**(2), 481 - 496 (1989).
[47] N.S. Allen, et al., "Diffusion and Extractability Characteristics of antioxidants in Blue Polyethylene Water Pipe: A DSC and Radiolabelling Study," *Polym. Deg. And Stability* **27**, 145-157 (1990).
[48] K. Karlsson, et al., "Modeling of Antioxidant Loss from Polyolefins in Hot Water Applications. 1: Model and application to Medium Density Polyethylene," *Polymer Engineering & Science,***32**(10), 658-667 (1992).

49 K. Karlsson, G.D. Smith & U.W. Gedde, "Molecular structure, morphology and antioxidant consumption in medium density polyethylene pipes in hot-water applications," *Polym. Eng. & Sci.,* **32**(10), 649 – 657 (1992).

50 K. Karlsson, et al., "Molecular structure, morphology and antioxidant concentration in polybutene-1 pipes in hot water applications," *Polym. Eng. & Sci.,* **33**, 303 - 310 (1993).

51 J. Viebke, et al., "Degradation of Unstabilized Medium-Density Polyethylene Pipes in Hot-Water Applications," *Polymer Engineering & Science,* **34**(17), 1354 - 1361 (1994).

52 J. Viebke, M. Hedvenquist, & U.W. Gedde, "Antioxidant efficiency loss by precipitation and diffusion to surrounding media in polyethylene hot-water pipes," *Polym. Eng. & Sci.,* **36**(24), 2896 – 2904 (1996).

53 J. Viebke & U. W. Gedde, "Antioxidant diffusion in polyethylene hot-water pipes," *Polym. Eng. & Sci.,* **37(**5), 896 – 911 (1997).

54 N.C. Billingham, "The Physical Behavior of Polymer Additives," in *Plastics Additives Handbook, 5th Edition,* ed. Hans Zweifel, Chapter 20, Hanser Publishers (2000).

55 J.P. Dear & N.S. Mason, "Effects of chlorine depletion of antioxidants in polyethylene," *Polymer and Polymer Composites,* **9**(1), 1 - 14 (2001).

56 J. Hassinen, et al., "Deterioration of polyethylene pipes exposed to chlorinated water," *Polym. Deg. & Stab.,* **84**(2), 261 - 267 (2000).

57 S.W. Choi & L.J. Broutman, "Ductile-Brittle Transitions for Polyethylene Pipe Grade Resins," *Proceedings of the 11th Plastic Fuel Gas Pipe Symposium,* 296 – 320, American Gas Association, (1989).

58 Anon., *Recommended Hydrostatic Strengths and Design Stresses for Thermoplastic Pipe and Fitting Compounds, Technical Report PPI-TR4/90,* The Plastics Pipe Institute, Wayne, NJ (1990).

59 Anon., *The Plastics Pipe Institute Handbook of Polyethylene Pipe, 2nd Edition,* Chapter 3, Table A2, Page 97 (year of publication unknown).

60 P. Vibien, et al., "Chlorine Resistance Testing of Cross-Linked Polyethylene Piping Materials," *Proceedings of ANTEC 2001: the Society of Plastics Engineers 59th Annual Technical Conference,* Dallas, TX, May 6-10, 2001.

61 ASTM F876-09, "Standard Specification for Crosslinked Polyethylene (PEX) Tubing," Section 3.2.7, ASTM International, West Conshohocken, PA (2009).

62 NSF International/Jana Laboratories report, Bates numbered NIBCO_Christianson0007521-6.

63 F.M. Rugg, J.J. Smith & R.C. Bacon, "Infrared Spectrophotometric Studies on Polyethylene. II. Oxidation," *J. Polym. Sci.* **13**, 535 - 547 (1954).

64 J.P. Longo, "Effect of oxidation on polyethylene morphology," *Polym. Lett.* **1**, 141 - 143 (1963).

65 P. Blais, D.J. Carlsson & D.M. Wiles, *J. Polym. Sci., A-1* **10**, 1077 (1972).

66 U.W. Gedde & M. Ifwarson, *Polym. Eng. & Sci.,* **30**(4), 202 (1990).

4215 Campus Drive
Aurora, IL 60504

# Chapter 2

## Plumbing Inspection at Named Plaintiffs' Residences, and Sampling of Tubing

## Introduction

ESI, along with Paragon Polymer LLC (Paragon) on behalf of the plaintiffs, performed home inspections at the named plaintiffs' homes. Paragon was not present for the inspection at Monica's residence, but otherwise was present at 7 of the 8 named plaintiffs' residences. ESI collected information regarding the plumbing which included documentation of water heater, water temperatures, water pressures, water flow measurements, as well as identifying the use of pressure regulating valves and/or expansion tank in the plumbing system. Measurements of pH, free chlorine, and alkalinity were performed on site, and water samples were collected for further lab analysis. Additional information regarding the home construction, original plumbing installation methods, pattern in the leak locations, and repairs performed to the plumbing was gathered and documented.

ESI and Paragon also collected tubing and fitting samples during the home inspections. Any incident tubing samples that were retained and provided by the home owner were collected by Paragon. A local plumber was also present at the home inspections to remove any desired tubing from the home plumbing system. Paragon and ESI requested removals where appropriate. In most cases, tubing and fittings obtained during the inspection were also collected by Paragon. ESI also took samples of exemplar tubing and fittings from some of the homes as will be discussed later.

The information learned from each home is summarized and discussed below.

## Home Inspections

ESI's findings from the home inspection are summarized below and more details regarding the home inspections can be found in Appendix C. The type of home construction, the plumbing installation method, and the history of NIBCO plumbing components varies with each named plaintiff but is summarized in Table 2.1 below.

| Plaintiff/Address | Date of Inspection | Home Type | Home/Plumbing Contractor | Home built/ move in date | Plumbing Component involved in the leaks | Home has Original plumbing as of date of inspection |
|---|---|---|---|---|---|---|
| Boyd Residence 13467 Sanctuary Drive Foley, AL 36533 | 8/17/16 | Ranch/Slab | Adams Homes/Monroe's Value Plumbing | December 2008 | Tubing | No |
| McCoy Residence 4401 Blackland Drive Marietta , GA 30067 | 8/16/16 | Two Story with Crawl | DuPree Plumbing Subcontractor | Rebuilt in 2010 due to fire in 2009 | Tubing | No |
| Medders 3557 County Road Stephenville, TX 76401 | 8/24/2016 | Ranch | Medders GC/ASAP Plumbing | 2011-2012 | Fittings | Yes |
| Monica 12 Hillcrest Blvd, Warren, NJ 07059 | 10/14/2015 | Two Story with basement | Monica GC/Richard Roman Plumbing contractor | July 2010-April 2011 | Fittings | Yes |
| McMahon 5101 Dusty Trail Rio Vista, TX | 8-23-2016 | Two/Three Story | Unknown | Built in 2007-2008 moved in 2013 | Tubing | No |
| Peperno 915 Moosic Road Old Forge, PA | 10-17-2016 | Two Story with Full basement | Hometown Builders/subcontractor for plumbing unknown | 2007-2008 | Tubing | Yes |
| Sminkey 1235 Red Rock Drive Elgin, OK 73538 | 11-14-16 | Slab/Ranch | Jesse Hoffepauir | 2009 | Tubing | Yes |
| Cole 19150 Highway 79 Gadsden, TN 38337 | 8-15-2016 | Two Story | Cobb Construction | 2008-2009 | Tubing/Fitting | Yes |

**Table 2.1:** Details of home, plumbing installation and replacement

The plumbing leaks experienced by two of the eight named plaintiffs, Medders and Monica, were limited to fitting assemblies, and no leaks occurred in the PEX tubing at these locations. Five of the six remaining named plaintiffs, Boyd, McCoy, McMahon, Peperno, and Sminkey, reportedly, experienced plumbing leaks in the PEX tubing and not in any fittings. The Coles claimed to experience both PEX tubing and fitting leaks; the Coles' alleged fitting leaks are addressed in a separate ESI report.

## Medders Residence Inspection

ESI inspected the Medders residence on 8/24/2016. Mr. Medders designed and acted as the general contractor for the home which was built in 2011-2012. ASAP Pluming was used as the sub-contractor for the plumbing. The Medders residence has experienced 3 leaks in the plumbing system. All 3 leaks were associated with fitting failures and not related to NIBCO PEX tubing. The water is pumped from a water-well. The date of the leaks and leak locations are discussed in Table 2.2 below.

| Leak # | Leak Date | Sample | Location |
|---|---|---|---|
| 1 | December 5, 2013 | Tee fitting | Attic above utility room |
| 2 | May 31, 2014 | Nipple fitting | Behind wall in master bedroom |
| 3 | June 10, 2014 | Tee fitting | Attic above master bathroom |

**Table 2.2**: Medders Leak Summary.

### Plumbing Details

The details regarding the measurements made on the plumbing system on the day of the inspection are provided in Table 2.3 below.

| | Medders |
|---|---|
| Date of Inspection | 8/24/2016 |
| Construction Type | Ranch |
| Plumbing installation method | Trunk and Branch |
| Tubing locations | Attic/walls |
| Recirculating Pump | No |
| Pressure Regulating Valve | No |
| Expansion Tank | No |
| Location of Water Heater | Foyer |
| Water heater gallon capacity | 50 gallon Electric |
| Water Pressure (ESI) | 40 psig |
| Hot water temperature (ESI) | 130.8 °F |
| Hot water Temperature (Paragon) | 136 °F |
| Incident Samples Provided | 0 |
| Non-Incident Samples Retained | 15 |

**Table 2.3:** Plumbing summary for Medders residence.

The original plumbing with repairs is currently in use at the residence. ESI photo documented two repair locations in the attic.

Samples Available for Examination

The home owner did not provide any fitting samples related to the leaks at the time of the inspection.

There have been no leaks in the NIBCO PEX tubing at this residence. There was no evidence of any cracking associated with any of the PEX tubing removed from the plumbing on the day of the inspection. The examination and analysis of the tubing samples will be discussed in Chapter 3.

## Monica Residence Inspection

ESI inspected the Monica residence on 10/15/2015. Paragon was not present for the home inspection. Mr. Monica acted as the General Contractor for the home which was built in 2010-2011. Mr. Monica hired Richard Roman as the plumbing sub-contractor. Monica residence has experienced 5 leaks in the plumbing system. All 5 leaks were associated with fitting failures and not related to NIBCO PEX Tubing. The water is municipality provided and there is a water softener at the residence. The date of the leaks and leak locations are discussed in Table 2.4 below.

| Leak # | Leak Date | Sample | Location |
|---|---|---|---|
| 1 | November 2012 | Fitting | Basement ceiling |
| 2 | June 12, 2013 | Fitting | Mud room on first floor |
| 3 | July 25, 2013 | Elbow | Above family room |
| 4 | Fall 2013 | Tee fitting | Above family room |
| 5 | November 2013 | Fitting | Basement ceiling |

**Table 2.4:** Leak history for Monica residence.

The home owner testified that there were approximately 5 leaks all related to fitting and none related to PEX tubing.

## Plumbing Details

The details regarding the measurements made on the plumbing system on the day of the inspection are provided Table 2.5 below.

| | Monica |
|---|---|
| Date of Inspection | 10/14/2015 |
| Construction Type | Two Story with full basement |
| Plumbing installation method | Trunk and Branch |
| Tubing locations | Basement/Ceilings/walls |
| Recirculating Pump | Yes |
| Pressure Regulating Valve | No |
| Expansion Tank | No |
| Location of Water Heater | Basement |
| Water heater gallon capacity | 75 gallon Natural Gas |
| Water Pressure (ESI) | 55 |
| Hot water temperature (ESI) | 123.1 °F |
| Incident Samples Provided | 3 fittings shown, retained by home owner |
| Non-Incident Samples Retained | None |

**Table 2.5:** Plumbing summary for Monica residence.

Samples Available for Examination

There have been no leaks in the NIBCO PEX tubing at this residence.

The home owner provided one elbow fitting and two tee fittings for examination at the time of the home inspection. The fittings were installed using stainless-steel clamps. These three samples were retained by the home owner and later provided to Paragon for examination and testing. The performance of these fittings is discussed in a separate ESI report.

## Boyd Residence Inspection

ESI inspected the Boyd residence on 8/17/2016. The home was built by Adams Homes in or around 2008. Monroe's Value Plumbing was the sub-contractor for the original NIBCO PEX system installation. Reportedly, 3 leaks occurred in the plumbing system at the Boyd residence. The water is supplied by a local water utility. Based on the information provided in the legal Complaint filed in this lawsuit and as a result of the subsequent deposition testimony, Table 2.6 below provides the alleged leak history at the Boyd residence. The home owner testified that there were approximately 3 leaks all related to tubing and none related to fitting or stainless steel clamps.

| Leak # | Leak Date | Sample | Location |
|---|---|---|---|
| 1 | March 26, 2013 | Hot | Coming off water heater in utility room next to garage |
| 2 | September 15, 2013 | Cold | Vertical section of pipe coming off water heater before pipe goes into wall |
| 3 | October 31, 2013 | Hot | Vertical section of pipe coming off water heater before pipe goes into wall |

**Table 2.6:** Leak history for Boyd residence.

At the time of the home inspection in August 2016, the plumbing had been replaced and therefore no accurate information regarding the original installation or operating conditions, locations of failures, or subsequent repairs could be gathered. The home owner did not provide any samples related to the failures at the time of the inspection. The details regarding the measurements made on the plumbing system on the day of the inspection are provided in Table 2.7.

| | Boyd |
|---|---|
| Date of Inspection | 8/17/2016 |
| Construction Type | Ranch |
| Plumbing installation method | Trunk and Branch |
| Tubing locations | Attic/Ceilings/walls |
| Pressure Regulating Valve | No |
| Recirculating Pump | No |
| Expansion Tank | No |
| Location of Water Heater | Garage |
| Water heater gallon capacity | 40 gallon |
| Water Pressure (ESI) | 62 and 71 psig |
| Hot water temperature (ESI) | 126.6 °F |
| Hot water temperature (Paragon) | 128.0 °F |
| Incident Samples Provided | None |
| Non-Incident Samples retained | 6 (3 NIBCO, 3 REHAU) |

**Table 2.7:** Plumbing summary from Boyd residence.

Samples Available for Examination

Reportedly, the three incident leaks at this residence were related to PEX tubing. The home owner provided no PEX tubing samples from the three incident leaks reported.

At the time of the home inspection, there were 6 samples taken from the Boyd residence. Three were NIBCO Terracotta tubing found in the attic, and other three samples were REHAU PEX tubing. Based on the manufacturer's identification on the fittings with tubing found in the attic, non-NIBCO fittings were used in the original installation. The examination and analysis of some of the NIBCO PEX tubing samples found in the attic of the Boyd residence will be discussed in Chapter 3.

## McMahon Residence Inspection

ESI inspected the McMahon residence on 8/23/2016. The home was built in 2007-2008. The general contractor and the plumbing sub-contractor for the original installation are unknown. McMahon, the third owner, moved into the home in January 2013. Reportedly, the McMahon residence experienced approximately 6 leaks in the hot water supply side of the plumbing system. The water is supplied by a local water utility. All 6 leaks were associated with PEX tubing and not related to NIBCO fittings or stainless steel clamps. The leaks and their locations are discussed in Table 2.8 below.

| Leak # | Leak Date | Sample | Location |
|---|---|---|---|
| 1 | December 27, 2013 | Hot | Under third floor in garage at least 40 feet from hot water heater; split in pipe within 2 inches of fitting |
| 2 | January 6, 2014 | Hot | NW corner of garage above A/C duct work; 15 feet from hot water heater; horizontal run of pipe; split in pipe couple inches from fitting |
| 3 | February 3, 2014 | Hot | NW corner of garage, several feet from leak #2; above duct work; next to wall before it goes down to hot water heater; horizontal run of pipe |
| 4 | March 18, 2014 | Hot | Northside in garage under 3rd floor about 30 feet from hot water heater |
| 5 | March 30, 2014 | Hot | Close to leak #4; not sure if the same line or not; split in pipe within inches of fitting |
| 6 | March 31, 2014 | Hot | Behind wall above water heater; near ceiling between first and second floors |

**Table 2.8:** Leak history for McMahon residence.

The leaks were associated with tubing on the hot-water supply line. There were no failures of tubing used in the cold-water supply. At the time of the home inspection in August 2016, the plumbing had been replaced, and therefore no accurate information regarding original installation or operating conditions, locations of failures, or subsequent repairs could be gathered. The house has no attic or basement and all the plumbing is between floors and ceilings and was not available for inspection.

## Plumbing Details

The details regarding the measurements made on the plumbing system on the day of the inspection are provided in Table 2.9 below. A Taco manufactured recirculating pump is present in the plumbing system. Mr. McMahon testified that he does not know whether the recirculating pump shuts off from time to time. A review of the Taco recirculating pump product literature indicates that it is a continuously recirculating pump.

| | McMahon |
|---|---|
| Date of Inspection | 8/23/2016 |
| Construction Type | Two/Three Story |
| Plumbing installation method | Unknown |
| Tubing locations | Ceilings and Walls |
| Recirculating Pump | Yes, Continuous |
| Pressure Regulating Valve | No |
| Expansion Tank | Yes |
| Location of Water Heater | Lower level closet |
| Water heater gallon capacity | 50 gallon |
| Water Pressure (ESI) | 69 psig |
| Hot water temperature (ESI) | 118.3 °F |
| Hot water temperature (Paragon) | 108.0 °F |
| Incident Samples Provided | None |
| Non-Incident Samples Retained | 15 (13 NIBCO, 2 Uponor PEX) |

**Table 2.9:** Plumbing summary for McMahon residence.

Samples Available for Examination

Reportedly, the six incident leaks at this residence were related to PEX tubing. The home owner provided no PEX tubing samples from the six incident leaks reported.

The home owner provided 13 samples of retained NIBCO tubing. None of these 13 samples were involved with any incident leaks. In addition, 2 Uponor PEX tubing samples were selected by Paragon. The examination and analysis of some of these samples will be discussed in Chapter 3.

## McCoy Residence Inspection

ESI inspected the McCoy residence on 8/16/2016. The home was re-built in 2010 because of a fire; the rebuild began in September 2009. The plumbing sub-contractor used for the re-build was Dupree Plumbing. Reportedly, the McCoy residence had experienced approximately 6 leaks in the hot water supply side of the plumbing system. The water is supplied by a local water utility. All 6 leaks were associated with PEX tubing and not related to NIBCO fittings or stainless steel clamps. The leaks and their locations are discussed in Table 2.10 below.

| Leak # | Leak Date | Sample | Location |
|---|---|---|---|
| 1 | Early/mid-2010 (or 2013 – testimony and documents unclear) | Hot | Crawl space near hot water heater (May not be NIBCO related) |
| 2 | May 6, 2013 | Hot | Along same line as previous leak but further from water heater |
| 3 | September 15, 2013 | Hot | Between two showers on first floor |
| 4 | December 2, 2013 | Hot | Between two showers on first floor |
| 5 | April 7, 2016 | Hot | Between two showers on first floor |
| 6 | June 1, 2016 | Hot | Between two showers on first floor |

**Table 2.10:** Leak history for McCoy residence.

All 6 leaks were associated with tubing on the hot-water supply line. There were no failures of tubing used in the cold-water supply. At the time of the home inspection in August 2016, the plumbing had been replaced with copper tubing except for some PEX plumbing in the crawl space. Therefore, no information regarding accurate locations of failures or subsequent repairs could be gathered. The home owner provided one retained sample of failed tubing as shown in Photo 2.1.



Photo 2.1 PEX tubing from incident leak which reportedly occurred on 12-2-13 at the McCoy Residence

There was use of non-NIBCO PEX (Zurn PEX) in the original plumbing installation. A leak was found on the day of the of the home inspection in a white Zurn PEX tubing that was part of hot water recirculating system as shown Photo 2.2 below.



**Photo 2.2:** A ½" Zurn White PEX tubing found leaking on the day of the inspection. The same line had a previous repair. This Zurn PEX tubing had a date code of 05/12/08 indicating that it was part of original install.

## Plumbing Details

The details regarding the measurements made on the plumbing system on the day of the inspection are provided in Table 2.11 below. A Watts manufactured recirculating pump is present in the plumbing system. Based on the settings it is on for 11.5 hours of the day. Mr. McCoy testified that it has been under the same settings since the house has been rebuilt. Additionally, there is an automatic instantaneous water heater which supplies the water to the main 50-gallon Rheem water heater. There is also a STEAMMIST Steambath equipment in the plumbing system for steam shower.

| | McCoy |
|---|---|
| Date of Inspection | 8/16/2016 |
| Construction Type | Two Story with Crawl |
| Plumbing installation method | Trunk and Branch |
| Tubing locations | Crawl/Ceilings/walls |
| Recirculating Pump | Yes (11.5 hours on, 12.5 hours off) |
| Pressure Regulating Valve | No |
| Expansion Tank | No |
| Location of Water Heater | Crawl |
| Water heater gallon capacity | 50 gallon |
| Water Pressure (ESI) | 60 psig |
| Hot water temperature (ESI) | 119.6 °F |
| Hot water temperature (Paragon) | 112.0 °F |
| Incident Samples Provided | 1NIBCO and 1 Zurn |
| Non-Incident Samples Retained | 1 Zurn |

**Table 2.11:** Plumbing summary for McCoy residence.

Samples Available for Examination

Reportedly, the six incident leaks at this residence were related to PEX tubing. The home owner provided one PEX tubing samples from the six incident leaks reported.

The NIBCO PEX tubing from an incident leak, shown in Photo 2.1, the leaking Zurn PEX tubing found on the day of the inspection shown in Photo 2.2, and another section of Zurn PEX without failure were retained by Paragon for further analysis. The examination and analysis of some of these samples will be discussed in Chapter 3.




**Photo 2.3:** The three samples removed from examination from McCoy residence. (Sample identification "McCoy #1" was reserved for an incident McCoy sample that may be with Attorneys.)

## Peperno Residence Inspection

ESI inspected the Peperno residence on 10/17/2016. The home was built in 2007-2008. The builder was Hometown Builders, and the plumbing sub-contractor for the original installation is unknown. Reportedly, the McMahon residence had experienced 4 leaks in the hot water supply side of the plumbing system. The water is supplied by a local water utility. All 4 leaks were associated with PEX tubing located at or near the water heater. There were no leaks related to NIBCO fittings or stainless steel clamps. The leaks and their locations are discussed in Table 2.12 below.

| Leak # | Leak Date | Sample | Location |
|---|---|---|---|
| 1 | December 13, 2013 | Hot | Vertical pipe coming off water heater, near joint |
| 2 | April 19, 2014 | Hot | Horizontal section of pipe coming off water heater |
| 3 | June 7, 2014 | Hot | Horizontal section of pipe coming off water heater; 5-6 feet from water heater |
| 4 | April 25, 2016 | Hot | Horizontal section of pipe coming off water heater; further from water heater than previous leaks |

**Table 2.12:** Leak history for Peperno residence.

The leaks were associated with tubing on the hot-water supply line. There were no failures of tubing used in the cold-water supply. At the time of the home inspection in October 2016, ESI was able to identify three locations of the failures, and subsequent repairs. The plumbing in the basement was accessible and that is where the failures had reportedly occurred.

One of the failures occurred in the tubing that was connected directly to the water heater as shown in Photo 2.4.



**Photo 2.4:** Water leak location. Digital photo taken from a video provided prior to attending the inspection.

The second and third failures were on the hot water supply line near the water heater. The failures had occurred where the tubing was connected to a hold-down bracket as shown in Photos 2.5 and 2.6 below.




**Photo 2.5:** Peperno Repair #2.



**Photo 2.6**: Peperno Repair #3.

## Plumbing Details

The details regarding the measurements made on the plumbing system on the day of the inspection are provided in Table 2.13 below.

| | Peperno |
|---|---|
| Date of Inspection | 10-17-2016 |
| Construction Type | Two Story with Full basement |
| Plumbing installation method | Trunk and Branch |
| Tubing locations | Basement Ceilings and walls |
| Recirculating Pump | No |
| Pressure Regulating Valve | No |
| Expansion Tank | Yes |
| Location of Water Heater | Basement |
| Water heater gallon capacity | 75 gallon |
| Water Pressure (ESI) | 55 psig |
| Hot water temperature (ESI) | 136.9 °F |
| Hot water temperature (Paragon) | 144 °F |
| Incident Samples Provided | 1 |
| Non-Incident Samples Retained | 11 NIBCO (7 Paragon, 4 ESI) |

**Table 2.13:** Plumbing summary for Peperno residence.

Samples Available for Examination

Reportedly, the four incident leaks at this residence were related to PEX tubing. The home owner provided one PEX tubing sample from the six incident leaks reported. The one retained sample from an incident leak provided is shown in in Photo 2.6. The other samples removed from the home were not involved in any leak incidents. The examination and analysis of some of these samples will be discussed in Chapter 3.

## Sminkey Residence

ESI inspected the Sminkey residence on 10/17/2016. The home was built in 2007-2008. The builder was Jesse Hoffepauir, and the plumbing sub-contractor for the original installation was All-Star Plumbing. Reportedly, the Sminkey residence had experienced 3 leaks in the hot water supply side of the plumbing system. The water is supplied by a local water utility. All 3 leaks were associated with PEX tubing located at or near the water heater. There were no leaks related to NIBCO fittings or stainless steel clamps. The leaks and their locations are discussed in Table 2.14 below.

| Leak # | Leak Date | Sample | Location |
|---|---|---|---|
| 1 | November 5, 2013 | Hot | Pipe coming out of top of water heater |
| 2 | Following week | Hot | Pipe running under water heater |
| 3 | Couple days after leak #2 | Hot | Run of pipe in wall off water heater |

**Table 2.14**: Leak history for Sminkey residence

The leaks were associated with tubing on the hot-water supply line. There were no failures of tubing used in the cold-water supply. At the time of the home inspection in October 2016, ESI was able to identify some of the locations of the failures, and subsequent repairs as shown in Photo 2.7. The only available plumbing for inspection was the plumbing from the water heater down to the slab floor. The water heater is located in the garage above a small cavity that has the plumbing running to the slab floor.




**Photo 2.7:** Possible locations of leak #2 and leak #3 (Below the water heater as tubing enters the slab flooring)

## Plumbing Details

The details regarding the measurements made on the plumbing system on the day of the inspection are provided in Table 2.14 below.

| | Sminkey |
|---|---|
| Date of Inspection | 11-14-2016 |
| Construction Type | Ranch |
| Plumbing installation method | Trunk and Branch |
| Tubing locations | Under slab and walls |
| Recirculating Pump | No |
| Pressure Regulating Valve | No |
| Expansion Tank | Yes (2014 installed) |
| Location of Water Heater | Garage |
| Water heater gallon capacity | 50 gallon |
| Water Pressure (ESI) | 57 psig |
| Hot water temperature (ESI) | 139.2 °F |
| Hot water temperature (Paragon) | 160 °F |
| Samples Provided | 4 provided by home owner |
| Incident Samples provided at time of home inspection | 0 |
| Non-Incident Samples Retained | 7 |

**Table 2.14:** Plumbing summary for Sminkey residence.

Based on the testimony of Mr. Sminkey, the expansion tank was installed in 2014. No leaks have occurred since installation of the expansion tank.

Samples Available for Examination

Reportedly, the three incident leaks at this residence were related to PEX tubing. The home owner provided four PEX tubing samples. The overall appearance of the four samples provided by the home owner is shown in Photo 2.8. None of the four samples showed any through wall cracks associated with leak incidents. The other 7 samples removed from the home were not involved in any leak incidents. The examination and analysis of some of these samples will be discussed in Chapter 3.




Sminkey #1

Sminkey #2

Sminkey #3

Sminkey #4

**Photo 2.8:** Overall appearance of the four samples provided by home owner at time of Sminkey residence inspection.

## Cole Residence

ESI inspected the Cole residence on 8-15-2016. The home was built in 2008-2009. The builder was Cobb Construction, which was owned and operated by Ms. Cole’s father, Roger Cobb. The plumbing was installed by Roger Cobb. The water is supplied by a local water utility. Reportedly, there have been 19 leaks in the NIBCO tubing from the original installation. The leaks had occurred in both the hot and cold water lines. Reportedly, there were two leaks related to NIBCO fittings; the Coles’ alleged fitting leaks are addressed in a separate ESI report. The home owner had repaired the individual leaks and has replaced a significant amount of ¾” hot water main NIBCO PEX with a white color ¾” Non-NIBCO tubing. Based on the testimony and complaint Table 2.15 below documents the leak history for Cole Residence.

| Leak # | Leak Date | Sample | Location |
|---|---|---|---|
| 1 | End of 2009 | Elbow fitting | Fitting leading to showerhead in master bath |
| 2 | November 12, 2010 | Hot | Under kitchen sink |
| 3 | March 20, 2012 | Hot | Master bedroom |
| 4 | March 27, 2012 | Hot | Kitchen ceiling |
| 5 | October 2012 | Hot | Former laundry room (now foyer) |
| 6 | October 2012 | Hot | Former music room (now living room) |
| 7 | October 2014 | Hot | Master bathroom vanity |
| 8 | October 2014 | Cold | Upstairs bathroom by toilet |
| 9 | September 2014 | Tee fitting on cold side | Kitchen right side of sink |
| 10 | September 2015 | Unsure | Living room ceiling |
| 11 | December 2015 | Unsure | Living room ceilings and walls |
| 12 | June 2016 | Hot | Kitchen sink left side |
| 13 | June 2016 | Hot | Living room and entrance to living room (old laundry room) |
| 14 | July 2016 | Cold | Half bath by toilet and above vent in ceiling |
| 15 | August 2016 | Cold | Master bath, vanity sink wall closest to door |
| 16 | August 2016 | Hot | Half Bath/vanity ceiling and wall |
| 17 | September 2016 | Hot | Master bath ceiling |
| 18 | Unknown | Hot | Laundry room |
| 19 | Unknown | Hot | Laundry room |

**Table 2.15:** Leak history for Cole residence.

ESI photo documented the original installation conditions and also the locations of plumbing repairs. There are exposed walls in the residence where failures occurred and repairs have been performed. These locations were photo documented. As shown in Photos 2.9 to 2.12, the locations were at points where tubing was bent from the attic to the plumbing fixtures. The plumbing repairs locations in the attic were primarily at bends where the tubing entered the attic.



**Photo 2.9:** The tubing exposed in the wall of the first-floor laundry room. The tubing is coming down from the attic to the washer, (1/2” hot & cold). Two repairs were performed at this location.



**Photo 2.10:** A view of repair locations identified as 3, 4 and 5 located in the kitchen ceiling. Notice the repairs occurred in the tubing sections that would be coming down from the ceiling.



**Photo 2.11:** ESI Repair# 6. 1/2" (blue) repair in the wall behind toilet. The repair performed with severe bending using flex Sharkbite.



**Photo 2.12:** ESI Repair #7. Attic fed to rear hose bib, (1/2" cold)1/2" cold, (blue) repair through the header most likely due to severe bending using flex Sharkbite

Additionally, ESI reviewed the multiple video files provided that captured the leak locations from the Cole residence. As described above, the leak locations were confirmed to be related to locations of bending in the tubing. Photo 2.13 and Photo 2.14 are digital photos taken from the provided videos. Photo 2.13 shows leak in the kitchen ceiling where the tube bends into the attic. Photo 2.14 shows a leak in the wall cavity of the bathroom.



**Photo 2.13:** Leak above the kitchen ceiling (Photo 2.10). The tubing is bent as it enters the attic. A digital photo taken from a video provided.



**Photo 2.14:** A digital photo taken from a video provided captures the leak in the bathroom wall cavity. The leak occurred in the region of maximum bending. This repair location is documented in Photo 2.11.

Samples Available for Examination

There were total of 11 samples removed from the attic at the time of the home inspection. The examination and analysis of some of these samples along with others provided directly to Paragon will be discussed in Chapter 3.

## Plumbing Details

The details regarding the measurements made on the plumbing system on the day of the inspection are provided in Table 2.16 below.

| | Cole |
|---|---|
| Date of Inspection | 8-15-2016 |
| Construction Type | Two Story |
| Plumbing installation method | Trunk and Branch |
| Tubing locations | Attic, Ceilings, and walls |
| Recirculating Pump | No |
| Pressure Regulating Valve | No |
| Expansion Tank | No |
| Location of Water Heater | Attic |
| Water heater gallon capacity | 50 gallon electric |
| Water Pressure (ESI) | 57/44/54 psig |
| Hot water temperature (ESI) | 131.9 °F |
| Hot water temperature (Paragon) | 132.0 °F |
| Samples provided at the time of inspection | Boxes provided to Paragon |
| Non-Incident Samples Retained | 11 removed from attic |

**Table 2.16:** Plumbing summary for Cole residence.

## Water Samples from the named Plaintiff's residence

ESI collected water samples from the Boyd, Cole, McCoy, McMahon, Medders, Monica, Peperno, and Sminkey homes. The water samples were taken both from the cold water service as well as from the hot water service. A few field measurements were also made at the time the samples were collected. The results of these field measurements are summarized in Appendix C to this report.

## Summary

The home construction, plumbing installation method, plumbing components used and the manufacturers of those components, and plumbing conditions vary in each of the eight homes inspected. The number of incident failures, time in service, and where within the plumbing system failures occurred also varies in each of the eight homes inspected. The mix of samples available for examination also vary.

Plaintiffs Monica and Medders allege failures related to fittings and not related to NIBCO PEX tubing. There are six named plaintiffs that allege failures related to NIBCO PEX tubing leaks. Of these six, Plaintiff Boyd did not retain any samples for examination, and has performed a complete re-plumbing of her home and thus no information can be gathered regarding original installation or repair locations to assist in determination of a root-cause of failure.

Plaintiffs McMahon and McCoy have also re-plumbed their residences. McMahon's plumbing system includes a use of a continuously operated recirculating pump on the hot-water supply side which can influence the performance of the NIBCO PEX tubing. McCoy's plumbing system also included use of a recirculating pump programmed to operate for 11.5 hours of the day which can influence the performance of the NIBCO PEX tubing.

McCoy and the Pepernos each provided one NIBCO PEX tubing sample related to the incident leaks at their residences. McMahon, Sminkey, and Boyd did not provide any incident samples at the time of the home inspections.

The Pepernos reported four leaks, all near the water heater. The location of three leaks was identified. One failure occurred on a piece of ¾" red PEX tubing connected directly to the water heater. The other two samples exhibited failure at locations of support brackets. The water temperature measured on the day of the inspection at the Peperno residence was in the range of 137-144 °F. Hot water temperatures over 140 °F are outside the operating limit of the NIBCO PEX tubing and can influence the performance of the NIBCO PEX tubing. Except for the repairs at the incident leak locations, the remaining original NIBCO plumbing is currently in use at the Peperno residence.

There have been three incident leaks at the Sminkey residence. At the time of the inspection, 4 retained samples by the home owner were provided. None of these were related to any incident leaks. The water temperature measured on the day of the inspection at the Sminkey residence was in the range of 139 -160°F. Hot water temperature over 140°F are outside the operating limit of the NIBCO PEX tubing and can influence the performance of the NIBCO PEX tubing. The PEX tubing failure locations at the Sminkey residence were close to the water heater, and no failures have occurred in the tubing away from the water heater and the original NIBCO plumbing modified with an expansion tank installed in 2014 is currently in use at the Sminkey residence.

Finally, the Coles have their plumbing in the attic and the locations of repairs indicates that failures have occurred where tubing transitions from the attic down into the walls. These locations typically experience localized bending and impingement against the wooden joists. A failure that occurred inside a bathroom wall cavity where tubing was excessively bent was also documented.

4215 Campus Drive
Aurora, IL 60504

# Chapter 3:

## Laboratory Analysis of Available NIBCO PEX 1006 Tubing

## 3.0 Catalog of Samples Retained in the Cole V. NIBCO Matter

The samples harvested during the home inspections (discussed in Chapter 2), and any samples that were submitted directly to Paragon Polymer LLC were all made available for examination and testing. ESI initially inspected the available NIBCO PEX tubing samples at Paragon between January 20, 2017 and February 7, 2017 during Paragon's testing. ESI performed additional testing and analysis between March 16, 2017 and March 29, 2017. During the inspection at Paragon, ESI visually inspected the available samples and developed a spreadsheet to catalog the samples. Paragon identified each available sample with a sequential "PPX" number. The range of PPX sample numbers for the PEX tubing from the 6 named plaintiffs that had PEX tubing failures is shown below:

| Residence | PPX designation | Number of samples available | Number of incident samples in the group |
|---|---|---|---|
| McCoy | PPX-1 to PPX-4 and PPX 40 | 5 | 3 (2 NIBCO, 1 Zurn) |
| Cole | PPX-15 to PPX-39 and PPX 171to 183 | 37 | 12 |
| Sminkey | PPX-42 to PPX-55 | 14 | 1 |
| Boyd | PPX-56 to PPX-69 | 14 | 0 |
| McMahon | PPX-70 to PPX-83 | 14 | 1 |
| Peperno | PPX-84 to PPX-92 | 9 | 2 |

**Table 3.1:** Summary of available PEX tubing samples from 6 named plaintiffs that had PEX tubing leaks. (Monica and Medders are not included as they only had fitting leaks)

More details regarding the samples available for examination are provided in Appendix D. As indicated in Table 3.1 and discussed in Chapter 2, there were no incident samples available for examination from the Boyd residence. Also, as discussed in Chapter 2, the number of samples available from each of the residences includes non-NIBCO plumbing samples harvested during the home inspections. Regarding the availability of NIBCO PEX 1006 tubing involved in incident leaks (having a through wall crack) at the Plaintiffs' residences, McMahon, Peperno, McCoy and Sminkey provided 1, 2, 2, and 1 incident samples respectively. Of the 18 NIBCO PEX tubing samples available from alleged incident leaks at these 6 named plaintiffs' homes, 12 samples are from a single residence (Cole). The specific details associated with samples from each residence are discussed below.

## McCoy Residence: PPX-1 – PPX-4 and PPX-40

Specific details for the 5 samples from McCoy residence available for examination are provided in Table 3.2 below. The three samples depicted in red color font indicate samples that were involved in a leak incident. Two of these three samples are ¾" blue NIBCO tubing and one is a ½" white Zurn tubing that failed on the day of the inspection as discussed in Chapter 2. PPX-3 is a sample of non-leaking Zurn tubing selected for removal at the time of home inspection. PPX-40 is a ¾" Terracotta tubing with no apparent failure submitted directly to Paragon.

| Identification at site inspection | Paragon ID. | Manufacturer | Color | Size | Length | Date Code |
|---|---|---|---|---|---|---|
| McCoy | PPX-1 | NIBCO | Blue | 3/4 | 16-1/2" | N/A (????-208-1-09) |
| McCoy | PPX-2 | NIBCO | Blue/Red | 3/4 | 2-1/2", 1-1/2" | N/A |
| McCoy | PPX-3 | Zurn | White | 1/2 | 59" | 05/12/08-18:21 |
| McCoy #4 | PPX-4 | Zurn | White | 1/2 | 59" | 05/12/08-18:21 |
| McCoy | PPX-40 | NIBCO | Terra Cotta | 3/4 | 21-1/2" | N/A |

**Table 3.2:** McCoy samples available for examination (PPX-1 to PPX 4 and PPX40)

Photo 3.1 below shows the overall appearance of the McCoy samples available for examination. The failure location on the tubing is identified with an arrow.




**Photo 3.1:** Overall appearance of the 5 McCoy samples (PPX-1 to PPX 4 and PPX 40) available for examination.

From the five samples, available for examination from the McCoy residence, three samples were of NIBCO PEX tubing and two of them were Zurn PEX tubing from original installation. PPX-1 and PPX-2 were ¾" blue color PEX tubing, possibly from hot-water service as home owner reported that all leaks occurred on the hot water supply side of plumbing. There was no failure found in terracotta color ¾" diameter tubing identified as PPX-40.

The complete date code information was not available in the short lengths NIBCO PEX tubing made available from this residence. The laboratory analysis conducted on some of these samples by ESI is discussed later in this chapter.

## Peperno Residence: PPX-84 – PPX-92

Specific details for the 9 samples from the Peperno residence available for examination are provided in Table 3.3 below. The two samples depicted in red color font indicate samples that were involved in a leak incident. The other six tubing samples were non-leaking tubing selected for removal at the time of home inspection. PPX-92 is a plastic clamp/bracket manufactured by Oatey.

| Identification at site inspection | Paragon Identification | Manufacturer | Color | Size | Length | Date Code |
|---|---|---|---|---|---|---|
| Peperno (a), (b) and (c) Elbow | PPX-84 | N/A | Red | 3/4 | 3", 7-3/8", 21-3/4", 1" | N/A |
| Peperno #1 | PPX-85 | NIBCO | Red | 3/4 | 35" | 07/02/07-2 (FR06-043-1-07) |
| Peperno #2 | PPX-86 | NIBCO | Red | 3/4 | 21" | 07/02/07-2 (FR06-043-1-07) |
| Peperno #3 | PPX-87 | NIBCO | Blue | 3/4 | 30" | 02/27/07-2 (FB06-030-1-07) |
| Peperno #4 | PPX-88 | NIBCO | Red | 3/4x3/4 x1/2 | 1", 2", 16" | (1/2”) 02/28/07-2 (FR04-015-4-07) (3/4") 07/02/07-2 (FR06-043-1-07) |
| Peperno #5 | PPX-89 | NIBCO | Blue | 3/4x3/4 x1/2 | 2", 1-1/2", 9" | (1/2”) 06/21/07-2 (FB04-100-2-07) (3/4") 02/27/07-2 (FB06-030-1-07) |
| Peperno #6 | PPX-90 | NIBCO | Red | 3/4x3/4 x1/2 | 5", 2", 29" | (1/2”) 02/28/07-2 (FR04-015-4-07) (3/4") 07/02/07-2 (FR06-043-1-07) |
| Peperno #7 | PPX-91 | NIBCO | Blue | 3/4x3/4 x1/2 | 6-1/2", 6", 17" | (1/2”) 06/21/07-2 (FB04-100-2-07) (3/4") 02/27/07-2 (FB06-030-1-07) |
| Peperno | PPX-92 | Oatey | Clamp/ Bracket | | | |

**Table 3.3:** Details on the 9 Peperno samples available for examination (PPX-84 to PPX 92)

Photo 3.2 below shows the overall appearance with failure location marked by an arrow of the Peperno samples available for examination.




**Photo 3.2:** Overall appearance of the Peperno samples (PPX-84 to PPX-92) available for examination.

Of the 8 available tubing samples from the Peperno residence, two samples of NIBCO PEX tubing were involved in incident leaks (PPX-84 and PPX-86). The date of manufacture for the ¾" red tubing PPX-86 sample was 07/02/07-2, which is consistent with the dates of manufacturing of the other ¾" red color tubing samples removed from the residence. The overall appearance of PPX-86 and the location of the failure of this sample at the Peperno residence (Discussed in Chapter 2) is shown in Photo 3.3 below.



**Photo 3.3:** Overall appearance of the PPX-86 and the location of failure in the Peperno residence.

The failure resulted from an axial crack that occurred in the tubing at a location where the tubing was fixed to a clamp bracket. The sample PPX-84 failure was captured by the home owner on a video clip, from which the failure location was determined. PPX-84 was connected directly to the top of the water heater as discussed in Chapter 2. Photo 3.4 shows the retained sample from this failure that was provided directly to Paragon for analysis.



**Photo 3.4:** Overall appearance of the PPX-84 and the location of failure in the Peperno residence.

The NIBCO DuraPEX Piping System Installation Manual (2007), requires that NIBCO Dura-PEX be installed away from high heat sources. Specifically, in the Installation Manual it states that "A metal adapter at least 12" long should be used to connect NIBCO DURA-PEX pipe to gas water heaters". It is further stated to "maintain a minimum distance of 12" vertically and 6" horizontally from sources of high heat such as gas appliances vents."

The laboratory analysis conducted by ESI on this and other samples from the residence is discussed later in this chapter.

## Sminkey Residence: PPX-42 to PPX-55

Specific details for the 14 samples from the Sminkey residence available for examination are provided in Table 3.4 below. One of the three samples depicted in red color font (PPX-47) had a through wall crack suggesting that the sample was involved in a leak incident. Samples PPX-43 and PPX-42 were examined and contained partial cracks as will be discussed later. Because of these partial cracks they are also identified in red color font, but these samples would not yet have been involved in a leak incident. The other samples were non-leaking NIBCO and Non-NIBCO tubing selected for removal at the time of the home inspection.

| Identification at site inspection | Paragon Identification | Manufacturer | Color | Size | Length | Date Code |
|---|---|---|---|---|---|---|
| Sminkey #1 | PPX-42 | NIBCO | Red | 3/4 | 3-3/4", 1-1/2" | N/A |
| Sminkey #2 | PPX-43 | NIBCO | Red | 3/4 | 7", 1" | N/A |
| Sminkey #3 | PPX-44 | N/A | Red | 3/4 | 10" | N/A |
| Sminkey #4 | PPX-45 | NIBCO | Red | 3/4 | 16" | N/A |
| Sminkey #4a | PPX-46 | NIBCO | Red | 3/4 | 36" | 09/01/09-2 (FR06-114-3-09) |
| Sminkey #4b | PPX-47 | NIBCO | Red | 3/4 | 35" | 09/01/09-2 (FR06-114-3-09) |
| Sminkey #5 | PPX-48 | Sharkbite | Blue | 3/4 | 21-1/2" | N/A |
| Sminkey #6 | PPX-49 | NIBCO | Blue | 3/4 & 1/2 | 1-1/2", 1-1/2", 5", 3", 3-3/4", 1-1/2, 4", 11-1/2" | 1/2" 08/18/09-1 (FB04-173-4-09) |
| Sminkey #7a | PPX-50 | NIBCO | Red | 3/4 & 1/2 | 2", 2", 1" | N/A |
| Sminkey #7b | PPX-51 | NIBCO | Red | 1/2 | 13" | 07/15/09-2 (FR04-115-4-06) |
| Sminkey #8 | PPX-52 | NIBCO | Blue / Red | 1/2 | 3/4", 1/2", 1-1/2", 9-1/2", 2-1/2" | N/A |
| Sminkey #9 | PPX-53 | NIBCO | Red | 1/2 | 8", 1" | N/A |
| Sminkey #10 | PPX-54 | NIBCO | Blue | 1/2 | 14", 1" | N/A |
| Sminkey #11 | PPX-55 | NIBCO | Blue / Red | 3/4 | 2", 4", 3", 2", 1-1/4" | N/A |

**Table 3.4:** Details of the 14 Sminkey samples available for examination (PPX- 42 to PPX-55). PPX-43 and PPX-42 had partial cracks.

Photo 3.5 below shows the overall appearance of the 14 Sminkey samples available for examination. The failure location on the tubing is identified with an arrow.




**Photo 3.5:** Overall appearance of the Sminkey residence samples (PPX-42 to PPX 55) available for examination

The date code information on the incident sample PPX-47 indicated it was manufactured on 9-01-09. The laboratory analysis conducted on some of these samples by ESI is discussed later in this chapter.

## Boyd Residence: PPX-56 PPX-69

Specific details for the 14 samples from the Boyd residence available for examination are provided in Table 3.5 below. As discussed previously in Chapter 2, there were no samples associated with incident leaks in the group of 14 samples available for examination. Nine samples were NIBCO Terracotta tubing found in the attic of the residence, and the other five of the 14 samples were Non-NIBCO tubing used in the re-plumbing of the home.

| Identification at site inspection | Paragon ID. | Manufacturer | Color | Size | Length | Date Code |
|---|---|---|---|---|---|---|
| Boyd | PPX-56 | NIBCO | Terra Cotta | 1/2 | 16" | N/A |
| Boyd | PPX-57 | NIBCO | Terra Cotta | 3/4 | 13-3/4" | N/A |
| Boyd | PPX-58 | NIBCO | Terra Cotta | 3/4 | 13-3/4" | 02-19-08-1 (FT06-022-2-08) |
| Boyd | PPX-59 | NIBCO | Terra Cotta | 3/4 | 16-1/4" | N/A |
| Boyd | PPX-60 | NIBCO | Terra Cotta | 1/2 | 17" | N/A |
| Boyd | PPX-61 | NIBCO | Terra Cotta | 3/4 | 12-1/4" | N/A |
| Boyd #1 | PPX-62 | NIBCO | Terra Cotta | 1/2 | 34" | 01/22/??/? |
| Boyd #2 | PPX-63 | NIBCO | Terra Cotta | 3/4x1/2x1/2 | 22-1/2", 5", 2" | 02-19-08-1 (FT06-022-2-08) |
| Boyd #3 | PPX-64 | NIBCO | Terra Cotta | 3/4x1/2x1/2 | 25", 38", 4" | 1/2", 4" long 05/28/08-2 (FT04-109-4-??) |
| Boyd #4 | PPX-65 | Rehau | Blue | 3/4 | 4-1/2" | 06.06.13 21 C2 |
| Boyd #5 | PPX-66 | Rehau | Red | 3/4 | 6" | N/A |
| Boyd #6a | PPX-67 | Rehau | Red | 3/4x3/4 | 24", 11" | N/A |
| Boyd #6b | PPX-68 | Rehau | Blue/Terra Cotta | 3/4 | 2", 2-1/2",18", 27-1/4" | N/A |
| Boyd #6c | PPX-69 | Rehau | Blue | 3/4 | 17" | N/A |

**Table 3.5:** Details of the Boyd samples available for examination (PPX-56 to PPX-69)

Photo 3.6 below shows the overall appearance of the Boyd samples available for examination.




**Photo 3.6:** Overall appearance of the 14 Boyd samples (PPX- 56 to PPX 69) available for examination. There were 9 NIBCO PEX tubing samples, none of which were involved in incident leaks.

The laboratory analysis conducted on some of these samples by ESI is discussed later in this chapter.

## McMahon Residence: PPX-70 PPX-83

Specific details for the 14 samples from McMahon residence available for examination are provided in Table 3.6 below. Two of the samples in the group of 14 were non-NIBCO samples retained at the time of the home inspection. Of the 12 available NIBCO tubing samples, only one was involved in an incident leak (PPX-70). PPX-70 is ¾" terracotta color PEX tubing manufactured on 4/03/07. The laboratory analysis conducted on some of these samples by ESI is discussed later in this chapter.

| Identification at site inspection | Paragon Identification | Manufacturer | Color | Size | Length | Date Code |
|---|---|---|---|---|---|---|
| McMahon | PPX-70 | NIBCO | Terra Cotta | 3/4 | 72" | 04/03/07-1 (FT06-073-1-07) |
| McMahon | PPX-71 | NIBCO | Terra Cotta | 1/2x1/2 | 3", 1" | N/A |
| McMahon | PPX-72 | NIBCO | Terra Cotta | 3/4 | 1", 2-1/4", 1" | N/A |
| McMahon | PPX-73 | NIBCO | Terra Cotta | 3/4x3/4x3/4 | 5/8", 7/8", 1-1/8" | N/A |
| McMahon | PPX-74 | NIBCO | Terra Cotta | 3/4x3/4x1/2 | 5/8", 7/8", 5/8" | N/A |
| McMahon | PPX-75 | NIBCO | Terra Cotta | 3/4x3/4x1/2 | 3/4"x3/4"x5/8" | N/A |
| McMahon #10 | PPX-76 | NIBCO | Terra Cotta | 3/4 | 32" | 04/03/07-1 (FT06-072-1-07) |
| McMahon #11 | PPX-77 | NIBCO | Terra Cotta | 3/4 | 58" | 04/03/07-1 (FT06-072-1-07) |
| McMahon #9 | PPX-78 | NIBCO | Blue/Terra Cotta | 1x3/4 | 35-1/2", 3", 2" | 05/22/06-2 (FT100-046-2-06) |
| McMahon #12 | PPX-79 | NIBCO | N/A | 3/4 | 62" | 04/03/07-1 (FT06-072-1-07) |
| McMahon #13 | PPX-80 | NIBCO | Terra Cotta | 1/2x1/2 | 83", 8" | |
| McMahon #8a | PPX-81 | NIBCO | Terra Cotta | 1/2 | 32", 16" | 04/05/07-1 (FT04-074-4-07) |
| McMahon #14 | PPX-82 | Uponor | Blue | 1/2 | 8-1/2" | N/A |
| McMahon #15 | PPX-83 | Uponor | Red | 1/2 | 10-1/2" | N/A |

**Table 3.6:** McMahon samples available for examination (PPX-56 to PPX-69)

Photo 3.7 below shows the overall appearance of the McMahon samples available for examination.




**Photo 3.7:** Overall appearance of the McMahon samples (PPX- 70 to PPX 83) available for examination. Only PPX-70 was involved in incident leak.

## Cole Residence: PPX-15 to PPX-39 and PPX 171 to 183

There were a total of 37 samples available for examination from the Cole residence. Of the 37 samples, 11 samples were removed from the plumbing system at the time of the inspection. None of these 11 were involved in incident leaks. The other 26 samples were provided directly to Cynthia Smith at Paragon. From these 26 samples, visual inspection identified 12 samples as having a through wall or partial slit. These samples were examined further by Paragon and ESI. The list of the samples with through wall cracks and partial cracks is provided in Table 3.7 below.

| Identification | Paragon ID. | Manufacturer | Color | Size | Length | Date Code |
|---|---|---|---|---|---|---|
| Cole #12 | PPX-23 | NIBCO | Blue | 3/4 | 4-1/2" | 02/18/0? |
| Cole #13 | PPX-24 | NIBCO | Blue | 3/4 | 5" | N/A |
| Cole #14 | PPX-25 | NIBCO | Blue | 1/2 | 12" | N/A |
| Cole #15 | PPX-26 | NIBCO | Blue | 1/2 | 12" | N/A |
| Cole #16 | PPX-27 | NIBCO | Blue | 1/2 | 15" | N/A |
| Cole #17 | PPX-28 | NIBCO | Blue | 1/2 | 11" | N/A |
| Cole #20 | PPX-31 | NIBCO | Red | 1/2 | 14" | N/A |
| Cole #24 | PPX-35 | NIBCO | Red | 1/2 | 23-3/4" | N/A |
| Cole #25 | PPX-36 | NIBCO | Red | 1/2 | 10" | N/A |
| Cole #26 | PPX-37 | NIBCO | Red | 1/2 | 10" | N/A |
| Cole #28 | PPX-39 | NIBCO | Blue | 1/2 | 11-1/2" | 07/21/08-1 (FB04-177-4-08) |
| Cole | PPX-171 | NIBCO | Red | 3/4 | 49" | 01/04/08-2 (FR06-161-1-07) |

**Table 3.7:** Incident samples from Cole Residence.

The overall appearance of all 12 identified samples for further examination with the failure location marked by an arrow is shown in Photo 3.8. Nine of the twelve tubing samples in this group were 1/2” red or blue tubing. The other 3 tubing were ¾” in diameter. Most of the samples were too small in length and did not provide any complete date code information. The samples that had date code information indicated that the ½” blue tubing was manufactured on 7/21/08 and the ¾” red tubing was manufactured on 1/4/08.




**Photo 3.8:** Overall appearance of the incident Cole samples available for examination.

As indicated by the arrows showing locations of failure, the failures were located in a region of maximum bending. The general trend was a circumferential slit on the outer bend radius, or a longitudinally oriented crack if it was located on the inner bend radius. The same photos (except for PPX-171, photo not taken on grid) were scaled to a 1-inch grid size and organized from smallest length to longest length sample as shown in Photo 3.9.




**Photo 3.9:** Shows incident tubing from Cole residence scaled to 1-inch grid size.

## 3.1 Laboratory Testing

Multiple samples from each residence were selected for examination and destructive testing at ESI. A laboratory inspection of NIBCO PEX 1006 tubing was undertaken during March 16, 2017 through March 29, 2017 at ESI's Laboratory in Aurora, Illinois. The inspection was attended by plaintiff's expert Cynthia Smith of Paragon Polymer LLC. The laboratory examination inspection protocol that was followed was agreed upon between all parties.

ESI developed a laboratory testing protocol for characterization of the PEX tubing samples utilizing ASTM F876 standard specification for crosslinked Polyethylene (PEX) tubing. The testing included evaluating performance qualifications for material, workmanship, dimensions, hydrostatic burst pressure, and hydrostatic sustained pressure.

ESI did not test for the degree of cross-linking because previous testing reported by Ms. Smith on materials from tubing from residences of plaintiffs involved in this matter showed that the degree of cross-linking on most samples met the requirements set forth in ASTM F876 of a range of 65% to 89% and a minimum of 65% Gel content when samples are tested according to ASTM D2765. The finding regarding degree of cross-linking is consistent with information in the file and Ms. Smith's previous testing of PEX 1006 resin. Of the 11 samples tested for Gel content, the Gel content for Cole PPX-31 and McMahon PPX-81a was reportedly slightly lower at 64.7 and 64.0, respectively, the reason for this will be discussed in Chapter 4.

In addition to material characterization, each incident sample was examined under the microscope for the appearance of the crack both on the outer surface and the inner surface. For most samples, fracture was exposed and opened either by Ms. Smith during her inspection, or by ESI, and examined in the optical microscope. The results are discussed below separately for each residence.

Micro Fourier-Transform Infrared Microscopy (FT-IR) was also performed on most incident samples using a depth profile technique to evaluate the extent and depth of any oxidation present on the inner surface and below the inner surface. The FTIR spectra were collected from the inner surface towards the core in increments of 0.0012 inches. For each sample three spectra were taken from the inner surface and an FTIR spectrum was also obtained from the core area of the tubing as well as from the external surface of the tubing.

Additionally, tensile testing was also performed on samples cut from the tubing. Microtensile specimens as described in ASTM D1708 were cut from the tubing using a mechanical press equipped with a punch die. The testing was conducted under ambient conditions.

The scope of work performed on PEX tubing samples from each of the seven residences is summarized in Tables 3.8. to 3.14.

| Property | PPX-62 | PPX-63 | PPX-64 |
|---|---|---|---|
| Dimensions | ✓ | ✓ | ✓ |
| Optical Microscopy | | ✓ | |
| Fracture Examined | Non-incident samples | | |
| FTIR analysis | | | |
| Tensile Testing | ✓ | | ✓ |
| Density | ✓ | | ✓ |
| Hydrostatic Burst strength | ✓ | | ✓ |
| Sustained Pressure Strength | ✓ | | ✓ |

**Table 3.8:** ESI scope of work on samples from the Boyd residence.

The scope of work performed on the samples from the Medders residence is summarized in Table 3.9.

| Property | PPX-103 | PPX-106 |
|---|---|---|
| Dimensions | ✓ | ✓ |
| Optical Microscopy | ✓ | ✓ |
| Fracture examined | Non-incident samples | |
| FTIR analysis | | ✓ |
| Tensile Testing | | |
| Density | | |
| Hydrostatic Burst strength | | |
| Sustained Pressure Strength | | |

**Table 3.9:** ESI scope of work on samples from the Medders residence.

The scope of work performed on the samples from the McMahon residence is summarized in Table 3.10.

| Property | PPX-70 | PPX-77 | PPX-81 |
|---|---|---|---|
| Dimensions | ✓ | ✓ | ✓ |
| Optical Microscopy | ✓ | ✓ | ✓ |
| Fracture Examined | ✓ | Non-incident | Non-incident |
| FTIR analysis | ✓ | ✓ | ✓ |
| Tensile Testing | ✓ | | |
| Density | ✓ | | |
| Hydrostatic Burst strength | ✓ | | |
| Sustained Pressure Strength | ✓ | | |

**Table 3.10:** ESI scope of work on samples from the McMahon residence.

The scope of work performed on the samples from the McCoy residence is summarized in Table 3.11.

| Property | PPX-1 | PPX-2 | PPX-4 Zurn |
|---|---|---|---|
| Dimensions | ✓ | ✓ | ✓ |
| Optical Microscopy | ✓ | ✓ | ✓ |
| Fracture Examined | | ✓ | |
| FTIR analysis | ✓ | ✓ | |
| Tensile Testing | | | |
| Density | | | |
| Hydrostatic Burst strength | | | |
| Sustained Pressure Strength | | | |

**Table 3.11**: ESI scope of work on samples from the McCoy residence.

The scope of work performed on the samples from the Peperno residence is summarized in Table 3.12.

| Property | PPX-84 | PPX-86 | PPX-88 | PPX-91 | ESI-2 |
|---|---|---|---|---|---|
| Dimensions | ✓ | ✓ | ✓ | ✓ | ✓ |
| Optical Microscopy | ✓ | ✓ | ✓ | ✓ | |
| Fracture Examined | | ✓ | Non-incident | Non-Incident | Non-incident |
| FTIR analysis | ✓ | ✓ | ✓ | ✓ | |
| Tensile Testing | ✓ | ✓ | | | |
| Density | ✓ | ✓ | | | |
| Hydrostatic Burst strength | | | | | ✓ |
| Sustained Pressure Strength | | | | | ✓ |

**Table 3.12:** ESI scope of work on samples from the Peperno residence.

The scope of work performed on the samples from the Sminkey residence is summarized in Table 3.13.

| Property | PPX-42 | PPX-43 | PPX-46 | PPX-47 | PPX-49 | PPX-51 |
|---|---|---|---|---|---|---|
| Dimensions | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Optical Microscopy | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Fracture Examined | Non-incident | Non-incident | Non-incident | | Non-incident | Non-incident |
| FTIR analysis | ✓ | ✓ | | | ✓ | ✓ |
| Tensile Testing | | | | | | |
| Density | | | | | | |
| Hydrostatic Burst strength | | | | | | |
| Sustained Pressure Strength | | | | | | |

**Table 3.13:** ESI scope of work on samples from Sminkey residence.

The scope of work performed on the samples from the Cole residence is summarized in Table 3.14.

| Cole | Dimensions | Optical Microscopy | Fracture examined | FTIR Analysis | Tensile | Density | Burst | Sustained |
|---|---|---|---|---|---|---|---|---|
| PPX-15 | ✓ | ✓ | Non-incident | | ✓ | ✓ | ✓ | ✓ |
| PPX-21 | ✓ | ✓ | Non-incident | | ✓ | ✓ | ✓ | ✓ |
| PPX-23 | ✓ | ✓ | ✓ | ✓ | | | | |
| PPX-24 | ✓ | ✓ | ✓ | ✓ | | | | |
| PPX-25 | ✓ | ✓ | | | | | | |
| PPX-26 | ✓ | ✓ | | | | | | |
| PPX-27 | ✓ | ✓ | | | | | | |
| PPX-28 | ✓ | ✓ | ✓ | ✓ | | | | |
| PPX-31 | ✓ | ✓ | ✓ | ✓ | | | | |
| PPX-35 | ✓ | ✓ | ✓ | ✓ | | | | |
| PPX-36 | ✓ | ✓ | ✓ | ✓ | | | | |
| PPX-37 | ✓ | ✓ | ✓ | ✓ | | | | |
| PPX-39 | ✓ | ✓ | ✓ | ✓ | | | | |
| PPX-171 | ✓ | ✓ | | | | | | |
| PPX-173 | ✓ | ✓ | Non-Incident | | ✓ | ✓ | ✓ | ✓ |

**Table 3.14:** ESI scope of work on samples from Cole residence.

The testing results and data collected regarding each sample are summarized in individual failure analysis reports in Appendices E-K. The results are discussed for each residence below. The samples subjected to sustained pressure testing at 180°F and 195 psi internal pressure have all passed the 1000 hour requirement of ASTM F876.

## 3.2 Analysis

### 3.2.1 Boyd Residence

Reportedly, three leaks occurred in the plumbing system at the Boyd residence. Two on the hot water side in the tubing coming off the water heater and one in the cold water side in tubing coming off the water heater. The incident samples were not available for examination.

A total of 9 Terracotta non-incident tubing samples found in the attic on the day of the home inspection were made available for analysis. It is assumed that these NIBCO PEX tubing samples were part of the original plumbing installation and were abandoned in the attic after re-plumbing of the home. There was no non-incident blue color tubing available for examination. Photo 3.10 below shows representative view of the inner surface of Boyd PPX-63 and PPX-64. There was no evidence of any white, chalky discoloration on the inner surface. There was no evidence of any cracking on the non-incident samples.




**Photo 3.10**: Inner surface of Boyd PPX-64 (left) and Boyd PPX-63 right.

The tensile strength and elongation was tested on 5 replicate specimens cut from sample PPX-62. The tensile strength for material from PPX-62 was found to be 3611 +/- 322 psi and elongation was found to be 599% +/- 43. The tensile strength for material from PPX-64 was found to be 3347 +/- 246 psi and elongation was found to be 572% +/- 65. The material exhibited yielding and necking behavior typical of PEX material. The material at the inner surface did not exhibit any embrittlement even after over 500% elongation as shown below in Photo 3.11.




**Photo 3.11:** Inner surface appearance after tensile testing and elongation of over 500%. (PPX-62)

Testing conducted by ESI on PPX-62, PPX-63, and PPX-64 on terracotta ½" and ¾" non-incident samples which included density, tensile properties, hydrostatic burst strength, and sustained pressure tests suggests tubing was manufactured according to requirements. There is no evidence of any oxidative degradation, surface crazing or cracking in any of the samples examined. The root-cause for the 3 reported failures in the plumbing at Boyd residence is unknown because that tubing had been discarded and was not available for inspection.

## 3.2.2 Medders Residence

Reportedly, three fitting leaks occurred in the plumbing system at the Medders residence. The cause for these fitting failures is discussed in a separate ESI report. ESI examined a ½" diameter terracotta tubing, date code 5/25/11 and a ¾" blue tubing, with a date of 07/12/11. Representative inner surface of the samples is shown in Photo 3.12 below. There was no chalky, white discoloration present on the inner surface.




**Photo 3.12**: Inner surface of ¾" blue and ½" red non-incident NIBCO PEX tubing from the Medders residence.

There is no evidence of any oxidative degradation, surface crazing or cracking in any of the non-incident samples examined from the Medders residence.

### 3.2.3 McMahon Residence

Reportedly, between December 27, 2013 and March 31, 2014, a total of 6 leaks occurred, all on the hot water side of the plumbing occurred at the McMahon residence. Of these 6 leaks, 1 sample (PPX-70), a ¾" Terracotta tubing 72 inches long with 04/04/07 date of manufacturing was available for examination. ESI analyzed PPX-70 and two other non-incident tubing identified as PPX-77 and PPX-81.

The dimensions were measured according to guidelines provided in ASTM D2122 for all three samples. The wall thickness of all samples met or exceeded the requirement of ASTM F876. The outer diameter was found to be out of tolerance by few thousands of inches (0.003-0.007 inches) in comparison with the standard requirement for as-manufactured uncoiled tubing. The outer diameter expansion is expected for PEX tubing that has been in service and experienced creep due to long-term pressure and temperature.

The overall appearance of the incident sample (PPX-70) is shown in Photo 3.13. The portion of the tubing with a small axial crack was cut and the fracture was exposed by manually bending it open. The fracture surface is shown in Photo 3.14.



**Photo 3.13:** Overall appearance of PPX-70. Arrow indicates the location of an axial crack.




**Photo 3.14:** The axial crack was exposed to examine the fracture surface features. (PPX-70)

The axial fracture resulted from a single crack origin. The fracture progressed from the inner surface toward the outer surface through mechanism of slow crack growth as indicated by the elliptical shape of the crack front markings. Failure from slow crack growth mechanism is a typical failure mode for PEX material. No additional cracking or crazing was observed directly below the fracture location.

In addition to the through wall axial crack, other smaller axial cracks at various locations had initiated along the length of the tubing. The inner surface did not exhibit any uniform surface crazing around the circumference of the tubing. There was no white, chalky discoloration present on the inner surface. The tensile strength and elongation was tested on 5 replicate specimens cut from sample PPX-70. The tensile strength was found to be 3264 +/- 224 psi and elongation was found to be 554% +/- 74. The material exhibited yielding and necking behavior typical of PEX material. The material at the inner surface did not exhibit embrittlement even after 500% tensile elongation as shown below in Photo 3.15.




**Photo 3.15:** Inner surface appearance after tensile testing and elongation of over 500%.

The hydrostatic burst strength test was conducted according to guidelines provided in ASTM D1599. The testing was performed on a 3/4” terracotta tubing available from Sample PPX-70. The hydrostatic burst strength was measured to be 942 psig. The burst pressure exceeded the requirement based on testing of new, unused tubing. The burst testing produced a ductile failure as shown in Photo 3.16 below.



**Photo 3.16:** Failure at 942 psig in a hydrostatic burst strength test of a section of tubing from sample PPX-70

Micro-FTIR spectroscopy was utilized to profile the degree and depth of oxidation in the PEX pipe samples. Infrared spectroscopy was utilized as early as the 1950's as a technique by which oxidation could be identified in polyethylene materials. A parameter called the "carbonyl index" was created to quantify the extent of degradation. The carbonyl index was defined as the intensity of the infrared absorption peak of a specific carbonyl moiety formed in the oxidation of HDPE material normalized by the intensity of a methylene absorption peak in the same spectrum. These carbonyl groups that result from oxidation of polyolefin materials have characteristic infrared absorption frequencies. Among these groups, the strongest absorption peak is observed at about 1710 to 1720 $cm^{-1}$. Weaker peaks are seen at about 1735 and 1775 $cm^{-1}$. The stabilizer commonly compounded into the polyethylene and other polyolefin pipe materials have a carbonyl group with a characteristic infrared absorption peak at 1740 $cm^{-1}$. When oxidation occurs, a peak near 1710 $cm^{-1}$ to 1720 $cm^{-1}$ is formed, which progressively increases in intensity as the degree of polymer oxidation increases. The carbonyl index is defined as the ratio of this carbonyl absorbance to that of the polymer absorption band at approximately 1465 $cm^{-1}$. The use of this ratio compensates for any differences in sample thickness and serves as an internal standard.

The carbonyl index was profiled through the thickness of the three PEX tubing samples from the McMahon residence in order to determine the extent of any oxidation, if it exists at all. This profiling is possible with a Micro-FTIR instrument, which allows one to focus the infrared beam at a precise location on the sample. The samples consist of microtomed cross-sections of the tubing wall that ranged from 0.0005 to 0.001 inches in thickness. The thickness of the microtomed specimens was sufficiently small so that all absorbance measurements were in the detector linear absorption range. The cross sections were taken near the failures (within an inch from the failure) at the same radial location. The infrared spectra were recorded in 0.03 mm increments (~0.0012 inches), using a 0.030 mm deep x ~0.300 mm wide aperture and starting at the inner surface. The profiling was continued until the carbonyl absorbance approached the pipe core values (little or no carbonyl absorbance at 1715 $cm^{-1}$. An example of the FT-IR spectra and analysis of a sample PPX-77 is shown in Photo 3.17 and Photo 3.18 below.




| Source Spectra Results | | | |
|---|---|---|---|
| Spectrum Name | Number Of Peaks | Height_1 | Height_2 |
| 55178A PPX-77 IS 0 to 0.03 mm_1 | 2 | 0.0544 | 0.3553 |

**Photo 3.17:** FTIR Spectra of tubing PPX- 77 from McMahon Residence. Sample shows profiling of material from 0 to 0.03 mm from the inner surface. The carbonyl index value based on relative height of peaks is 0.1531 (1714 cm-1 height= 0.0544, 1463 $cm^{-1}$ height = 0.3553.

PerkinElmer Spectrum Version 10.4.2
Wednesday, April 05, 2017 3:50 PM

Analyst Administrator
Date Wednesday, April 05, 2017 3:50 PM




| Source Spectra Results | | | |
|---|---|---|---|
| Spectrum Name | Number Of Peaks | Height_1 | Height_2 |
| 50105A PPX-70 IS 0.03 to 0.06 mm_1 | 2 | 0.0219 | 1.1268 |

**Photo 3.18:** FTIR Spectra of tubing PPX-77 from McMahon Residence. Sample shows profiling of material from 0.03 mm to 0.06 mm from the inner surface. The carbonyl index value based on relative height of peaks is 0.0194 (1714 cm-1 height= 0.0219, 1463 $cm^{-1}$ height = 1.1268)

The carbonyl index measurements made on three samples from McMahon residence is reported in Table 3.15 below.

| SAMPLE | Carbonyl Index 0 to 0.03 mm | Carbonyl Index 0.03 to 0.06 mm | Carbonyl Index 0.06 to 0.09 mm | Carbonyl Index Core |
|---|---|---|---|---|
| McMahon PPX-70 | 0.0519 | 0.0200 | 0.0013 | 0.0057 |
| McMahon PPX-77 | 0.1531 | 0.0194 | 0.0046 | 0.0189 |
| McMahon PPX-81b | 0.0491 | 0.0058 | 0.0030 | 0.0043 |

**Table 3.15:** Summary of Carbonyl index for McMahon samples.

Of the three samples analyzed in the FTIR, the carbonyl index value of greater than 0.1 was measured for the first 0.03 mm (0.001 inches) increment layer at the inner surface of non-incident sample PPX-77. The carbonyl index value was relatively lower for the inner surface of the incident sample. There is very little or no carbonyl absorbance deeper into the tubing. The level of oxidation is below what is needed to cause embrittlement of the tubing as demonstrated by the tensile testing of the material from the tubing from the McMahon residence. The locations of these samples within the plumbing system at McMahon residence is unknown.

As discussed in Chapter 2, there was use of a continuously recirculating pump at the residence for recirculating the hot water. The designation "1" in NIBCO PEX 1006 is because the material has met the industry standard requirements for operating at 140°F in chlorinated water at 80 psig for 6 hours (25% of the day), not the 24-hours/day that McMahon's operated.

To illustrate the effect of temperature on the pipe lifetime in chlorinated water, the data-set developed in the F2023 testing for PEX 1006 terracotta tubing was used to calculate a Miner's Rule lifetime estimate of pipe lifetime with the hot water temperature at 140ºF for 24 hours per day. This longer exposure to 140 °F temperature in service decreased the estimated life from 78 years to 20 years. It could be even shorter depending on the actual temperature and other installation related stresses. The calculation shows that the tubing would not meet the industry requirement of 50-year estimated service life for continuous hot water exposure at 140ºF.

The root cause for the failure of PEX tubing on the hot water side of the McMahon residence is attributed to use of continuous recirculating hot water in the plumbing system. The leak resulted from exposure of NIBCO 1006 PEX tubing to operating conditions that were well above the design limit for the NIBCO 1006 PEX material. The oxidative degradation did not result from any defect in the product.

## 3.2.4 McCoy Residence

Reportedly, a total of 6 leaks on the hot water side of the plumbing occurred at the McCoy residence. Of these 6 leaks 2 incident samples identified as PPX-1 and PPX-2 both ¾" blue tubing were available for examination. It is presumed that blue colored NIBCO PEX 1006 tubing was originally used on the hot water side as all failures were reportedly on the hot water side of the plumbing system.

ESI analyzed these two samples along with a white color ½" Zurn (PPX-4) tubing that failed on the day of the home inspection. The only other samples available were PPX-3, a non-incident Zurn tubing, and sample PPX-40, a non-incident NIBCO Terracotta ¾" tubing approximately 21 inches long.

The dimensions were measured according to guidelines provided in ASTM D2122 for all three (2 NIBCO, 1 Zurn) samples. The wall thickness of all samples met or exceeded the requirement of ASTM F876. The outer diameter was found to be out of tolerance by few thousands of inches (0.006-0.008 inches) in comparison with the standard requirement for as-manufactured uncoiled tubing. The outer diameter expansion is expected for PEX tubing that has been in service and experienced creep due to long-term pressure and temperature.

The overall appearance of the two NIBCO incident samples PPX-1 and PPX-2 is shown in Photo 3.19. Both samples failed from an axial crack.




**Photo 3.19** Axial crack in ½" blue PPX-1 and axial crack in ½ inch blue PPX-2.

Paragon designated PPX-1 as a court exhibit after slitting the sample open, thus the fracture was not exposed for PPX-1. The inner surface examination revealed that the axial slit in PPX-1 is throughout the length of the 16 inch long tubing. The inner surface appearance as shown in Photo 3.20 indicates that long axial slits resulted from multiple origins on the inner surface not from a single origin.



**Photo 3.20:** Inner surface appearance of PPX-1

The axial crack in PPX-2 was exposed to examine the fracture surface. The fracture surface is documented in Photo 3.21. The axial crack on the inner surface of PPX-2 was also found to span the complete 2.5 inch length of the sample. The long fracture resulting from multiple adjacent origin location was confirmed. The fracture progressed from the inner surface toward the outer surface through mechanism of slow crack growth as indicated by the elliptical shape of the crack front markings. Failure from slow crack growth mechanism is a typical failure mode for PEX material.



**Photo 3.21:** Fractures surface of an axial crack in PPX-2 exposed for observations.

The inner surface did not exhibit significant surface crazing around the circumference of the tubing. There was no chalky, white discoloration present on the inner surface. The carbonyl index measurements of two samples from McCoy residence is reported in Table 3.16 below.

| SAMPLE | Carbonyl Index 0 to 0.03 mm | Carbonyl Index 0.03 to 0.06 mm | Carbonyl Index 0.06 to 0.09 mm | Carbonyl Index Core |
|---|---|---|---|---|
| McCoy PPX-1 | 0.0519 | 0.0108 | 0.0110 | 0.0202 |
| McCoy PPX-2 | 0.0826 | 0.0102 | 0.0128 | 0.0144 |

**Table 3.16:** Summary of Carbonyl index for McCoy samples.

The carbonyl index value for the inner surface of the both samples is below 0.1 and there is very little or no carbonyl absorbance deeper into the tubing. The level of oxidation is below what is needed to cause embrittlement.

On the day of the home inspection a Zurn manufactured white PEX tubing originally installed at the McCoy residence as part of hot-water recirculating system leaked. The failure in the Zurn PEX tubing used in hot water recirculation also occurred from an axial slit as shown in Photo 3.22.




**Photo 3.22**: Failure in Zurn manufactured PEX tubing found at McCoy residence on the day of the home inspection.

As discussed in Chapter 2, there was a recirculating pump in use on the hot water side of the plumbing at McCoy residence. The pump was set to operate for 11.5 hours of the day for recirculating the hot water. The designation "1" in NIBCO PEX 1006 is because the material has met the industry standard requirements for operating at 140°F in chlorinated water at 80 psig for 6 hours (25% of the day), not 11.5 hours of the day that McCoy operated.

To illustrate the effect of temperature on the pipe lifetime in chlorinated water, the data-set developed in the F2023 testing for PEX 1006 terracotta tubing was used to calculate a Miner's Rule lifetime estimate of pipe lifetime with the hot water temperature at 140ºF for 12 hours per day. This longer exposure to 140 °F temperature in service decreased the estimated life from 78 years to 40 years. It could be even shorter depending on the actual temperature and other installation related stresses. The calculation shows that the tubing would not meet the industry requirement of 50-year estimated service life for continuous hot water exposure at 140ºF.

The root cause for the failure is attributed to leaks resulting from exposure of NIBCO 1006 PEX tubing to operating conditions that were well above the design intent for the NIBCO 1006 PEX the material. The failure did not result from a defect in the NIBCO 1006 PEX. Failure of the Zurn manufactured PEX tubing at this residence also indicates that PEX tubing from the time of original installation was not appropriate choice of material for the recirculating hot water operating conditions at McCoy residence. McCoy has re-plumbed his home with copper plumbing.

### 3.2.5 Sminkey Residence

Reportedly, a total of 3 leaks on the hot water side of the plumbing occurred at the Sminkey residence in November of 2013. The failures were all near the water heater located in the garage. The failures occurred in the plumbing that was behind a wall at the water heater and in a space below the water heater. The tubing away from the water heater enters into the floor slab of the ranch style home.

Of these 3 leaks, one incident sample identified as PPX-47 was available for examination. Along with this incident sample, ESI examined 5 other non-incident samples for dimensions, optical microscopy, and FTIR analysis.

The dimensions were measured according to guidelines provided in ASTM D2122 for six samples. Samples PPX-42, PPX-43, and PPX-46 were found to have cracking that had developed on the inner surface that had not propagated through the wall. PPX-49 and PPX-51 did not appear to have any cracking associated with them.

The wall thickness of all samples met or exceeded the requirement of ASTM F876. The outer diameter was found to be out of tolerance by few thousands of inches (0.004-0.009 inches) in comparison with the standard requirement for as-manufactured uncoiled tubing. The outer diameter expansion is expected for PEX tubing that has been in service and experienced creep due to long-term pressure and temperature.

The overall appearance of the one NIBCO incident sample from Sminkey residence PPX-47 is shown in Photo 3.23. A close up of the axial crack is shown in Photo 3.24.



**Photo 3.23:** Axial crack in 3/4" red tubing.



**Photo 3.24:** A close up of the axial crack in PPX-47

Paragon designated sample PPX-47 as a court exhibit. No destructive analysis has been performed on this sample. The tubing was not slit in half to inspect the inner surface and the fracture has not been exposed open for examination. The axial crack appears to have developed over the 36 inch length of the tubing.

A partial axial crack found in ¾" Terracotta tubing (Photo 3.25) identified as Sample PPX-43 was exposed open to examine the fracture surface features. Photo 3.26 shows the fracture surface.




**Photo 3.25**: Inner surface of PPX-43. A partial axial crack was found and exposed open for examination of fracture surface features.




**Photo 3.26**: Fracture surface features of a partial axial crack from sample PPX-43

The fracture surface shows evidence of multiple origin locations related to the axial crack. There is micro-ductility and stress-whitening of the material observed associated with the slow crack growth propagation. The micro-ductility and stress-whitening of the material indicates high level of stress associated with the fracture process. The

fracture progressed from the inner surface towards the outer surface through mechanism of slow crack growth as indicated by the elliptical shape of the crack front markings. Failure from slow crack growth mechanism is a typical failure mode for PEX material. The inner surface did exhibit axial crazing around the crack location. There was no chalky, white discoloration present on the inner surface. The carbonyl index measurements of four samples from Sminkey residence is reported in Table 3.17 below.

| SAMPLE | Carbonyl Index 0 to 0.03 mm | Carbonyl Index 0.03 to 0.06 mm | Carbonyl Index 0.06 to 0.09 mm | Carbonyl Index Core |
|---|---|---|---|---|
| Sminkey PPX-42 | 0.1315 | 0.0253 | 0.0114 | 0.0146 |
| Sminkey PPX-43 | 0.1619 | 0.0173 | 0.0112 | 0.0156 |
| Sminkey PPX-49 | 0.0132 | 0.0078 | 0.0090 | 0.0097 |
| Sminkey PPX-51 | 0.0187 | 0.0088 | 0.0056 | 0.0059 |

**Table 3.17:** Summary of Carbonyl index for Sminkey samples.

The carbonyl index value for the inner surface of samples PPX-42 and PPX-43 which exhibited micro-cracking was found to be above 0.1 for the inner surface layer. The carbonyl index value for the inner surface of samples PPX-49 and PPX-51 which exhibited no micro-cracking was found to be nearly zero. There is very little or no carbonyl absorbance deeper into the tubing. The level of oxidation is below what is needed to cause embrittlement.

As discussed in Chapter 2, the water temperature measured at Sminkey residence on the day of the inspection ranged from 139 °F to 160 °F. Furthermore, an expansion tank was not present as part of the plumbing system when failures developed. An expansion tank was installed in 2014, and no failures have occurred in the system since that time. The original NIBCO tubing is currently in use at the residence.

To illustrate the effect of temperature on the pipe lifetime in chlorinated water, the data-set developed in the F2023 testing for PEX 1006 terracotta tubing was used to calculate a Miner's Rule lifetime estimate of pipe lifetime with the hot water temperature at 160°F for 6 hours per day. The exposure to 160 °F temperature for six hours a day in service decreased the estimated life from 78 years to 31.5 years. It could be even shorter depending on the actual temperature, pressures, and other installation related stresses. The calculation shows that the tubing would not meet the industry requirement of 50-year estimated service life for hot water exposure at 160°F for 6 hours a day.

The root cause for the failure is attributed to leaks resulting from exposure of NIBCO 1006 PEX tubing to operating conditions that it is above the design limit for the NIBCO 1006 PEX the material and exposing the tubing to temperatures and pressures above the design limit. There was no expansion tank in the plumbing system at the time of the failures in 2013. An expansion tank was installed in 2014, and there have been no leaks since that time.

## 3.2.6 Peperno Residence

Reportedly, a total of 4 leaks on the hot water side of the plumbing occurred at the Peperno residence. The failures were all near the water heater located in the basement of the residence. During the home inspection, ESI identified three of the leak locations.

Of these 4 leaks, one incident sample identified as PPX-86 was provided at the time of the home inspection. Another sample identified as PPX-84 was sent directly to Cynthia Smith. Along with examination of these two incident samples, ESI examined 3 other non-incident samples for dimensions, optical microscopy, and FTIR analysis, and hydrostatic burst strength testing.

The dimensions were measured according to guidelines provided in ASTM D2122 for six samples. The wall thickness of all samples met or exceeded the requirement of ASTM F876. The outer diameter was found to be out of tolerance by few thousands of inches (0.005-0.006 inches) in comparison with the standard requirement for as-manufactured uncoiled tubing. The outer diameter expansion is expected for PEX tubing that has been in service and experienced creep due to long-term pressure and temperature.

The overall appearance of the two NIBCO tubing incident sample from Peperno residence PPX-84, and PPX-86 is shown in Photo 3.27.



**Photo 3.27** Overall appearance of incident samples from Peperno residence. PPX-84 (left) and PPX-86 (right).

The portion of the tubing with a small axial crack in PPX-86 was cut and the fracture was exposed by manual bending it open. The fracture surface is shown in Photo 3.28.




**Photo 3.28:** The axial crack was exposed to examine the fracture surface features. Sample was gold coated by Paragon. PPX-86.

The axial fracture resulted from multiple crack origin. The fracture progressed from the inner surface toward the outer surface through mechanism of slow crack growth as indicated by the elliptical shape of the crack front markings. Failure from slow crack growth mechanism is a typical failure mode for PEX material. No additional cracking or crazing was observed directly below the fracture location. There was no white, chalky discoloration present on the inner surface. The tensile strength and elongation was tested on 5 replicate specimens cut from sample PPX-86. The tensile strength was found to be 3509 +/- 382 psi and elongation was found to be 594% +/- 85. The material exhibited yielding and necking behavior typical of PEX material. The material at the inner surface did not exhibit embrittlement even after 500% tensile elongation as shown below in Photo 3.29.




**Photo 3.29:** Inner surface appearance after tensile testing and elongation of over 500%.

The hydrostatic burst strength test was conducted according to guidelines provided in ASTM D1599. The testing was performed on a 3/4" terracotta tubing available from Sample ESI-2, which had the same date of manufacturing as PPX-86. The hydrostatic burst strength was measured to be 961 psig. The burst pressure exceeded the requirement based on testing of new, unused tubing. The burst testing produced a ductile failure as shown in Photo 3.30 below.



**Photo 3.30:** Failure at 961 psig in a hydrostatic burst strength test of a section of tubing from sample ESI-2.

There was no cracking or crazing associated with PPX-91 (1/2" blue) and PPX-88. The carbonyl index measurements made on four samples from Peperno residence is reported in Table 3.18 below.

| SAMPLE | Carbonyl Index 0 to 0.03 mm | Carbonyl Index 0.03 to 0.06 mm | Carbonyl Index 0.06 to 0.09 mm | Carbonyl Index Core |
|---|---|---|---|---|
| Peperno PPX-84 | 0.0650 | 0.0084 | 0.0038 | 0.0039 |
| Peperno PPX-86 | 0.1302 | 0.0260 | 0.0156 | 0.0037 |
| Peperno PPX-88 | 0.1414 | 0.0112 | 0.0098 | 0.0060 |
| Peperno PPX-91 | 0.0249 | 0.0151 | 0.0053 | 0.0018 |

**Table 3.18:** Summary of Carbonyl index for Peperno samples.

Of the four samples analyzed in the FTIR, the carbonyl index value of greater than 0.1 was measured for the first 0.03 mm (0.001 inches) increment layer at the inner surface of sample PPX-86 and PPX-88. There is very little or no carbonyl absorbance deeper into the tubing. The level of oxidation is below what is needed to cause embrittlement of the tubing as demonstrated by the tensile testing of material from tubing from the Peperno residence.

As discussed in Chapter 2, one of the failures (Sample PPX-84) occurred where the PEX tubing was connected directly to the outlet of the water heater, and sample PPX-86 failed at a hold down bracket. Another incident sample which was not provided for analysis also failed at a hold-down bracket based on the repair location.

The root cause for the failure of PEX tubing at the Peperno residence is attributed to improper installation practices. The leak resulted from combination of improper installation practices and exposure of NIBCO 1006 PEX tubing to operating conditions that it is above the design limit for the NIBCO 1006 PEX material. The water temperature at this residence on the day of the inspection was measured to be in the range of 137 °F to 144 °F.

The oxidative degradation did not result from any defect.

## 3.2.7 Cole Residence

ESI examined 12 incident samples from Cole residence. The Table 3.19 below provides information regarding the sample sizes, and the orientation of the crack as observed on the outer and inner surfaces.

| Identification | Paragon ID. | Manufacturer | Color | Size | Length | Crack Orientation |
|---|---|---|---|---|---|---|
| Cole #12 | PPX-23 | NIBCO | Blue | 3/4 | 4-1/2" | Axial |
| Cole #13 | PPX-24 | NIBCO | Blue | 3/4 | 5" | Axial |
| Cole #14 | PPX-25 | NIBCO | Blue | 1/2 | 12" | Circumferential |
| Cole #15 | PPX-26 | NIBCO | Blue | 1/2 | 12" | Circumferential |
| Cole #16 | PPX-27 | NIBCO | Blue | 1/2 | 15" | Circumferential |
| Cole #17 | PPX-28 | NIBCO | Blue | 1/2 | 11" | Circumferential |
| Cole #20 | PPX-31 | NIBCO | Red | 1/2 | 14" | Axial through wall, Partial Circumferential on opposite side |
| Cole #24 | PPX-35 | NIBCO | Red | 1/2 | 23-3/4" | Axial |
| Cole #25 | PPX-36 | NIBCO | Red | 1/2 | 10" | Axial through wall, Partial Circumferential on opposite side |
| Cole #26 | PPX-37 | NIBCO | Red | 1/2 | 10" | Axial through wall, Partial Circumferential on opposite side |
| Cole #28 | PPX-39 | NIBCO | Blue | 1/2 | 11-1/2" | Circumferential |
| Cole | PPX-171 | NIBCO | Red | 3/4 | 49" | Axial |

**Table 3:19:** Orientation of the cracks in the incident samples from Cole residence.

As discussed in Chapter 2 and above in Chapter 3, the failure locations at the Cole residence were in places where the tubing was bent. The circumferential orientation of cracks is consistent with failure resulting from PEX tubing experiencing mechanical stress from bending. The internal pressure in the tube causes higher stress in the hoop direction and typically this would cause cracks to orient in the longitudinal direction, similar to those observed in hydrostatic burst testing. When the tubing is bent, the maximum stress will be in the longitudinal direction of the tubing and this will lead to development of circumferential cracks. Eight of the 12 incident samples from Cole residence showed presence of circumferential cracking. None of the incident samples from any of the other residences failed from a circumferential through wall crack. None of the samples from any of the other residence showed any evidence of any precursor cracking that was oriented in the circumferential direction.

Excessive bending leads to formation of a series of circumferential cracks on the inner surface within a short distance of the maximum bending location. This was observed in the ½" blue tubing from samples PPX- 25, PPX-26, PPX- 27, PPX- 28, and PPX- 39. Photo 3.31 and Photo 3.32 captures these characteristics associated with sample PPX-28.




**Photo 3.31:** The crack location in sample PPX #28. The crack was located in the region of maximum bending and crack orientation was circumferential. Samples PPX-26, PPX-27, and PPX-39 also exhibited these characteristics.



**Photo 3.32:** Circumferential orientation of the crack on sample PPX-28. The crack was located in the region of the maximum bending.

The sample tubing was cut into two halves to examine the inner surface of these samples. The inner surface appearance of these group of samples was different in comparison with the inner surface of failures from other Plaintiff's homes. In addition to the through wall circumferential crack, a series of circumferential cracks were observed in the bend area of the tubing. Photo 3.33 below shows the appearance of the inner surface of sample PPX-28.




**Photo 3.33:** Appearance of the inner surface showing multiple circumferential cracks.

The cracks on the inner surface were localized to few inches and were found at random locations relative to this half of the inner surface. There was no cracking on the mating half of the tubing and there was no cracking away from the bend area of the tubing. The fracture surface of Sample PPX-28 is shown in Photo 3.34 below. The fracture initiated from a single origin. The fracture progressed from the inner surface towards the outer surface through mechanism of slow crack growth as indicated by the elliptical shape of the crack front markings. Failure from slow crack growth mechanism is a typical failure mode for PEX material.




**Photo 3.34:** Circumferential crack in PPX-28 exposed open to examine the fracture surface features. The fracture initiated from a single origin.

The leaks in ½” red tubing from Cole residence marked as PPX-31, PPX-36, and PPX-37 developed from a longitudinal through wall crack on the inner side of the bend as shown in Photo 3.35 below for sample PPX-36. Similar location and orientation of cracking was observed for Sample PPX-31 and PPX-37. The samples were cut into two halves to examine the inner surfaces. The inner surfaces of the two halves for Sample PPX-36 are shown in Photos 3.36 and 3.37.



**Photo 3.35**: Longitudinal crack on the inner side of the bend of sample PPX-36.



**Photo 3.36:** Longitudinal crack on the inner surface of sample PPX-36.



**Photo 3.37:** Series of circumferential cracks on the inner surface on the side opposite to the axial crack on sample PPX-36

Incident samples PPX-31 and PPX-37 were also examined similarly. The inner surface of these two samples also revealed series of circumferential cracks on the opposite side of the axial incident crack.

The fracture surface was opened to examine the longitudinal through wall crack in sample PPX-36. Photo 3.38 below shows the fracture. The fracture initiated from multiple origins. The fracture progressed from the inner surface toward the outer surface through mechanism of slow crack growth as indicated by the elliptical shape of the crack front markings. Failure from slow crack growth mechanism is a typical failure mode for PEX material.




**Photo 3.38:** Fracture surface of PPX-36. The fracture progressed from the inner surface toward the outer surface through mechanism of slow crack growth as indicated by the elliptical shape of the crack front markings.

The longitudinal cracking developed from impingement of the tubing on the inner surface of the bend. When tubing is bend and experiences impingement resulting from contact with wood framing of the house, the tubing can develop axially oriented cracks at the points of contact and circumferential cracks from the bending stresses on the opposite side of the contact points.

The material properties for tubing from Cole residence were evaluated by testing of non-incident samples identified as PPX-173 (3/4" Red), PPX-15 (3/4" Blue) and PPX-21 (1/2" Blue). The tensile strength and elongation was tested on 5 replicate specimens cut from each of the three samples. The material exhibited yielding and necking behavior typical of PEX material. The average tensile strength and elongation to break for each sample is reported in Table 3.20 below. The hydrostatic burst strength test was conducted according to guidelines provided in ASTM D1599. The testing result for each of the three samples is also reported in Table 3.20 below. The burst pressure exceeded the requirement based on testing of new, unused tubing.

| | Tensile Strength (psi) | Elongation to break (%) | Burst Strength (psi) |
|---|---|---|---|
| PPX-15 (3/4" Blue) | 3326 ± 82 | 563 ± 40 | 970 |
| PPX-21 (1/2" Blue) | 3489 ± 324 | 572 ± 61 | 974 |
| PPX-173(3/4" Red) | 3493 ± 266 | 591 ± 57 | 900 |

**Table 3.20:** The material properties results are summarized in the table below.

The carbonyl index measurements made on eight samples from Cole residence is reported in Table 3.21 below.

| SAMPLE | Carbonyl Index 0 to 0.03 mm | Carbonyl Index 0.03 to 0.06 mm | Carbonyl Index 0.06 to 0.09 mm | Carbonyl Index Core |
|---|---|---|---|---|
| Cole PPX-23 | 0.1321 | 0.0402 | 0.0294 | 0.0242 |
| Cole PPX-24 | 0.0700 | 0.0126 | 0.0082 | 0.0174 |
| Cole PPX-28 | 0.0258 | 0.0182 | 0.0159 | 0.0144 |
| Cole PPX-31 | 0.0383 | 0.0252 | 0.0222 | 0.0274 |
| Cole PPX-35 | 0.1454 | 0.0241 | 0.0149 | 0.0153 |
| Cole PPX-36 | 0.0722 | 0.0269 | 0.0210 | 0.0198 |
| Cole PPX-37 | 0.3026 | 0.0165 | 0.0149 | 0.0279 |
| Cole PPX-39 | 0.0236 | 0.0204 | 0.0164 | 0.0131 |

**Table 3.21:** Carbonyl index values for samples from Cole residence.

## 3.3 Summary

ESI performed a comprehensive evaluation of all available incident tubing from Boyd, McCoy, McMahon, Medders, Peperno, Sminkey, and Cole residences. The root cause of these failures is not related to an inherent product defect. The extent of oxidative degradation varies in each sample examined and no samples shoed oxidative degradation deep enough to cause embrittlement of the tubing. Some failures did not exhibit significant inner surface material oxidation even in the first 0.001 inch depth of inner surface. The extent of oxidation in most samples is typical of tubing removed from service.

The crack size, crack initiation, crack orientation, micro-ductility on the fracture surface, and the extent of crazing or micro-cracking on the inner surface all vary for each sample. There were no incident failures available from Boyd, and thus the root-cause of failure at Boyd residence is unknown. The incident samples available for examination and evaluation of root-cause of failure from the McCoy, McMahon, Peperno, and Sminkey residences were limited to the 1 or 2 samples with through wall cracks. Based on the observations made on these samples which were involved in leaks on the hot water supply side of the plumbing, cracking developed over time due to use of NIBCO PEX tubing beyond the normal operating limits and the design limits associated with NIBCO PEX 1006 tubing. Over time, the cracking propagated by typical slow crack growth failure mode resulted in through wall cracks and incident leaks.

The crack orientation in many failures at Cole residence was different. Samples exhibited circumferential failures which were related to extensive bending of the tubing as discussed above. The samples that exhibited axial cracks revealed that location of the axial cracks was on the inner side of the bend in the tubing. This failure is from bending and impingement of the tubing against wooden framing structure. The failures at Cole residence were attributed to improper installation practices.

The failures at each of the named Plaintiffs' homes can be explained when all of the available information is reviewed in context of a root cause failure analysis. As reported above, the incident failures resulted from different causes and possibly from a combination of multiple causes. The causes of failures identified for each residence are known possible causes of failures in PEX tubing as identified in the NIBCO installation manual.

Samples of non-incident tubing made available for examination from McCoy, Medders, and Boyd residences did not exhibit any cracking, crazing or other signs of the alleged defect claimed by Plaintiffs or identified by their expert in her report.

4215 Campus Drive
Aurora, IL 60504

# Chapter 4:

Review of Plaintiff's experts, Paragon Polymer LLC, reports and basis

## 4.1 Review of Paragon Polymer LLC Activities

Plaintiffs expert Cynthia Smith of Paragon Polymer LLC, holds the opinion that NIBCO's PEX 1006 tubing is defectively designed and defectively manufactured. Specifically, it is opined that the materials and manufacturing processes were inadequately designed to produce tubing with suitable resistance to oxidative degradation causing premature failure in the intended service environment.

Investigation conducted by ESI and reported in Chapters 1 through 3 find that these allegations have no merit.

ESI has reviewed the report, and the work product related to the investigation performed by Ms. Smith on the samples from the residences of named plaintiffs in the Cole matter. The work product generated from the testing conducted by Ms. Smith and her comments made in her report are addressed below.

### 4.1.1 Cynthia Smith Approach and Work Product

The analytical methodology utilized in the investigation for determination of the cause for the failure of NIBCO PEX 1006 tubing involved in this matter by Ms. Smith was as follows:

| Technique | Number of Samples Analyzed |
|---|---|
| Home Inspection | 7 residences of named plaintiffs |
| Dimensional measurements | > 200 - not all had both wall thickness and diameter measured |
| Visual and Optical Microscopy (Before and after tubing is slit) | 36 samples |
| Fractography (Optical Microscopy) | 12 samples |
| Fractography (SEM) | 5 samples |
| Gel Content Measurement | 11 samples |
| FTIR analysis using ATR method | 2 from Cole, and 1 each from Sminkey, Peperno & Medders |
| Oxidation Induction Time | 7 from residences of 5 named plaintiffs |
| Water Chemistry | 7 residences of named plaintiffs |

With respect to Ms. Smith's measurements of the outside diameters and wall thicknesses of NIBCO tubing samples that have been in service in people's homes, such measurements made on used tubing samples are not sufficient to determine if the tubing was manufactured to the dimensional specifications. Outside diameters of polyolefin piping (including PEX) are well known to increase with time in service, due to creep of the material under the constant stress of internal water pressure. Bending of PEX tubing in use will also cause the cross section to become oval which could lead to higher than normal differences between the measured maximum and minimum diameter on a specific piece of tubing. There is nothing in the dimensional measurements reported by Ms. Smith to indicate that alleged dimensional "irregularities" contributed to the leaks in the Cole plaintiffs' plumbing systems.

The lack of evidence provided for the generalized statements Ms. Smith makes regarding her observations from visual and optical microscopy of the failed tubing will be discussed later in this chapter.

All but three of the Gel content measurements made by Ms. Smith using xylene as the extraction solvent met the requirement of the ASTM F876. Measurements Ms. Smith had done by an outside laboratory using decalin as the extraction solvent, as required by ASTM F876 and ASTM D3895, indicate that only one of the samples she tested (Burgos PPX-14) would likely have had a gel content less than the ASTM F876 requirement had all of her measurements been done with decalin. These results indicate that there is no pervasive manufacturing defect related to the degree of cross-linking of NIBCO PEX 1006 tubing. Further, she offers no independent support in the technical literature for the opinion that a gel content in the range of 61 - 65% by weight actually adversely affects the performance of NIBCO PEX 1006 tubing.

Ms. Smith alleges oxidative degradation as the root cause of failures but, as will be detailed below, the validity of her approach is questionable and has no scientific-peer reviewed support. The inappropriateness of the Fourier Transform Infrared Spectroscopy (FTIR) analysis method she employed and of the Oxidation Induction Time (OIT) technique in establishing that failures are due to oxidative degradation mechanism is addressed in more detail below. Further, she subjected only five samples from four named plaintiffs residences (one each from Sminkey, Peperno, Medders and two from Cole) to FTIR testing. These numbers are insufficient to condemn all NIBCO PEX piping in the named plaintiffs' homes.

Finally, even establishing that there is some level of inner surface oxidative degradation occurring in the NIBCO PEX 1006 tubing does not lead to the conclusion that the oxidative degradation results from a material, design, or manufacturing defect. As discussed in the earlier chapters and summarized in this report, the different plumbing conditions at each residence, and the contribution of installation stresses to causing premature failure have to be considered in order to reach a true root cause of failure.

### 4.1.2 Paragon Polymer Consultants Report

ESI has reviewed the work performed and the expert report dated March 7, 2017, authored by Cynthia Smith, President and Technical Manager of Paragon Polymer Consultants.[1] Ms. Smith has been retained by counsel for plaintiffs Kimberly Cole , et al. to perform a root-cause failure analysis of the PEX tubing involved in this matter.

Ms. Smith's report is far from unbiased and actually ignores several of these items and minimizes the importance of improper installation that leads to excessive in-service stresses acting on the failed parts and exposure to temperatures and pressures beyond the specified operating limits.

Ms. Smith states that she has based her opinions on results from the following analyses:

- Home inspections
- Visual inspection, dimensioning, and Stereo Microscopy of cracks in samples
- Scanning Electron microscopy and EDS only of inner surfaces
- FT-IR analysis using Attenuated Total Reflectance Method
- Oxidative Induction Time (OIT) using Differential Scanning Calorimeter
- Gel content Measurements
- Water Chemistry

[1] Cynthia L. Smith, *Analysis of NIBCO PEX Plumbing Components, Kimberly Cole, et al., v. NIBCO, Inc., U.S. District Court for the District of New Jersey, Civil Action No. 3-cv-07871,* Report Number 2013115, March 7, 2017

- Review of Christianson Plumbing and Repair Practices
- Review of NIBCO documents

ESI does not agree with claims and conclusions made by Ms. Smith. Although not exhaustive, the general basis for ESI's disagreement and specific criticism of her report regarding each of the methodology used by Ms. Smith are discussed below.

Home Inspections

In several locations in the report, Ms. Smith states that she personally inspected or evaluated the plumbing system at each named Plaintiff's' residence.[2] Based upon these inspections she states multiple times that she saw no evidence of installation errors that would have caused the PEX piping to leak. However, based upon the timing of the inspections, it is uncertain how much of the initially installed NIBCO PEX 1006 tubing she was actually able to see. She states in her report that she did not attend the inspection at the Monica residence. The Boyd, McCoy and McMahon residences had all been replumbed prior to the inspections at those locations, leaving little to none of the original NIBCO tubing installation to inspect. At the Peperno and Sminkey residences, the piping available to view was limited to plumbing close to the water heater only. This left only two residence inspections, at the Cole and Medders residences, available for Ms. Smith to examine the large areas of the original installations of NIBCO PEX 1006 in the homes of the named plaintiffs in the Cole matter.

The installation at the Cole residence was particularly interesting. Even though approximately half of the leaks reported by the name plaintiffs were from the Cole home, the homeowners have elected up to the point in time of the inspection to not replumb their house. Many of the repairs were made by cutting out the leaking NIBCO PEX 1006 tubing and replacing it with wire reinforced flexible hose. This made the locations of the repairs very obvious to the inspectors. Figure 4.1 shows one such repair in the attic of the Cole residence. The repair hose can be clearly seen, showing that the leak in the original NIBCO pipe occurred where it passed over a joist as it transitioned from running horizontally in the attic to dropping vertically to a fixture below. The NIBCO tubing would have been bent over the wooden joist, causing an impingement failure in the NIBCO PEX tubing at the point of contact.

In regard to the home inspections generally, Ms. Smith has not thoroughly evaluated the information that was available to her from those inspections. Further, she has provided in her report no photographs or other documentation to support her claim that installations were not a contributing factor.

[2] *ibid*. page 3.



**Figure 4.1:** Repairs to NIBCO tubing in attic of Cole residence using flexible reinforced hose where original PEX tubing would have been bent over a framing member causing impingement loading.

Visual Inspection and Stereo Microscopy

In the section of her report in which Ms. Smith offers her description of the pipe samples that were supplied to her for study,[3] she starts with an opinion but then eventually moves on to her observations. One statement in her opinion paragraphs deserves comment here. She says, "Once the craze cracks form, they will spontaneously grow by creep rupture because the pipe is under constant hydrostatic pressure. Cracks grow very easily once they initiate." This deceptively simple statement ignores several facts. One is that the process of crack initiation and propagation to a leak, under hydrostatic pressure alone, takes decades to go to completion (a leak) because of the relatively low level of the hoop stress. NIBCO PEX 1006 had a hydrostatic design stress/basis listed with the Plastics Pipe Institute over the entire time that the subject pipes in this case were manufactured.[3] The testing for this listing is done on pressurized pipes with no external mechanical stresses imposed on them. By definition, the hydrostatic design stress is the estimated maximum tensile stress the material is capable of withstanding continuously with a high degree of certainty that failure of the pipe will not occur."[4] Thus, to get Stage II failures (see Chapter 1 of this report), a mechanical stress in excess of the internal pressure (hoop) stress is required. Poor installation provides that excess mechanical stress, yielding premature failures without oxidation of the material. Also, the failure time decreases as the level of mechanical stress increases. Even with oxidation (Stage III failure), the results of ASTM F2023 testing of NIBCO PEX 1006 piping performed in 2004-2005 projected that the pipe would last 20 years when exposed *continuously* to 140ºF chlorinated water at a pressure of 80 psig and with no external mechanical stresses.[5] These test results mean that in order to have leaks occurring in a matter of a few years, the mechanical stresses at the location of crack initiation and growth must be well in excess of internal pressure stresses alone. This

[3] PPI TR-4/2005, *PPI Listing of Hydrostatic Design Basis (HDB), Strength Design Basis (SDB), Pressure Design Basis (PDB), and Minimum Required Strength (MRS) Ratings for Thermoplastic Piping Materials or Pipe,* Plastics Pipe Institute, Washington, DC (2005).

[4] ASTM F412-09, "Standard Terminology Relating to Plastic Piping Systems," *Annual Book of ASTM Standards, Volume 08.04,* ASTM International, West Conshohocken, PA (2012)

[5] A. Ciechanowski, *NSF International Report for Chlorine Resistance PSF Number 514910-04,* issued to Consolidated Plumbing Industries, Lebanon, OH, dated May 17, 2005, Bates No. NIBCO-Meadows 00046921 – 00046930.

can only be achieved by poor installation practices creating localized areas of excessive stress in the tubing that cause Stage II (and potentially Stage III) failures in the time frame that the leaks in these residences have occurred.

Throughout her report, Ms. Smith makes some very general statements regarding the visible condition of the inside surfaces of the pipe samples from this case. For example, in several places in her report she claims that, "… many of the incident pipes exhibited … extrusion defects and inclusions in the pipe wall that promoted crack initiation …"[6] However, nowhere in the report does she actually identify a crack that initiated at an extrusion defect or inclusion in the pipe wall. Ultimately, as noted above, Ms. Smith dismisses these alleged manufacturing defects as being, "… not necessary for failure to occur …" and "… not a root cause of the incident leaks." General comments about alleged extrusion defects in NIBCO PEX 1006 pipe appear to have been added to her report for the sole purpose of disparaging the product.

Another very broad, general statement in the report is found on page 33 where she says, "In each case, the interior surface of each pipe exhibited a chalky-looking, heavily oxidized and embrittled interior surface, with multiple cracks and extensive crazing. Extensive crazing consistent with oxidative degradation was observed in nearly every pipe examined." Visual examination of the pipe samples studied at ESI revealed nothing of the sort. While there were a few samples that showed surface whitening that might have been due to superficial oxidation of the surface, most were quite clean or at worst coated with a thin layer of mineral deposits. To state that, "In each case, the interior surface of each pipe exhibited a chalky-looking, heavily oxidized and embrittled interior surface …" is simply not true.

Another distortion of the appearance of the inner surfaces of these pipe samples is when she states that, "Most every pipe examined, even if only a few inches long, exhibited multiple cracks …" and to say, "*In several cases, more than 100 discrete cracks were noted in less than three inches of pipe length …"* [italicized in the original report]. Nowhere in her report does Ms. Smith actually identify even one piece of pipe that has "*100 discrete cracks … in less than three inches of pipe length …*" Further, while there are pipe samples where there are multiple cracks that have initiated on the inside surface, mostly the areas over which these multiple cracks exist are measured in fractions of an inch. Some were over a few inches in length. Her examples of multiple cracks in a single pipe sample appear to be in Figures 11 and 12 of her report. Only two of the photos used in these figures were taken from the home of a named plaintiff in this action; identified as PPX-23 and -39 from the Cole residence.

The other parts of Figures 11 and 12 are of samples from homes that are not owned by named plaintiffs in this case. The Foleys are not Plaintiffs in any pending suit against NIBCO, and the McLaughlins are plaintiffs in a separate putative class action.[7] In these photos, Figures 11(A), 11(B), 12(A) and 12(B) show only single cracks. In Figures 11(C) and 11(D) the areas in which there are multiple cracks are approximately ¾ inch long by a few thousandths of an inch wide (PPX-23, Cole incident), ¼ inch long by approximately 0.20 inch wide (PPX-39, Cole incident). Multiple fractures initiated in very small areas such as this will occur where a local impingement into the tubing wall creates a highly localized elevated mechanical stress. Multiple Stage II cracks will initiate in this high stress area with no cracking in the areas nearby where the stress level is much lower. Oxidative degradation of the surface is not required. Note that the inside pipe surfaces visible in the photos of Figure 8 show no generalized cracking away from those that are the focus of the pictures. If oxidation of the surface were the root cause of these cracks, one would expect to see cracking all over the field of view and there is none.

[6] Cynthia L. Smith, *op. cit.,* p. 32.

[7] Chad Meadow, et al., v. NIBCO, Inc., U.S. District Court for the Middle District of Tennessee, Nashville Division, Case No. 3:15-cv-1124.

In a similar vein, Ms. Smith states in Paragraph 8 of the "Summary of Opinions" section of her report, she writes, "Craze cracking indicative of oxidative degradation and embrittlement of the PEX material was observed at the interior surface of nearly every incident pipe examined."[8] This is an extreme exaggeration and inconsistent with ESI's examination of the incident pipes.

In multiple locations Ms. Smith claims to observe evidence of excessive residual stress in the extruded NIBCO pipe. One of these appears associated with her Figures 2 and 3, where in the figure captions she refers to cracks visible at the inside surface of pipes as "gaping cracks." She expands on this assertion in Paragraph I of the Basis of Opinions" section of her report.[9] There she states, "The appreciable crack opening and v-notch morphology associated with the gaping cracks revealed that the PEX material often contained a high level of residual stress from manufacturing …" While she is correct in saying that the appearance of these cracks at the inside surfaces of the pipes is affected by residual stresses from manufacturing, there is no possible way to quantify the amount of residual stress solely from looking at the cracks, whether that be done with the naked eye or with a microscope. The creation of residual stresses in extruded polyethylene pipe are an artifact of the extrusion process, created by the fact that the pipe is cooled once it exits the die by water sprayed on the outside surface but not on the inside surface. Rapid cooling of the polyethylene near the outside with cooling of the rest of the pipe wall by heat transfer through a poor thermal conducting material (the PE) results in a compressive residual stress at the outside surface which diminishes as you move through the thickness of the wall. The magnitude of the compressive stress decreases until at a location within the wall, it passes through a point of zero stress and then becomes a tensile stress as you continue toward the inner pipe surface. The maximum residual tensile stress exists at the inside surface of the pipe. It is the residual tensile stress at the inside pipe surface that causes cracks there to gap open while the compressive residual stress at the outside pipe surface causes cracks there to squeeze closed. This phenomenon has been studied by several different research groups in the last 35-40 years, and the results of the work have been highly consistent from group to group.[10,11,12] Figure 4.2 shows a typical residual stress distribution through the wall thickness of an extruded polyethylene pipe.

[8] Cynthia L. Smith, *op. cit.,* p. 83.

[9] Cynthia L. Smith, *op. cit.,* p. 49.

[10] L.J. Broutman, A. Bhatnagar and S. Choi, *Residual Stress Studies in Polyethylene Gas Pipes and Fittings, Final Report (January 1983-December 1985),* Gas Research Institute Report 86/0068, performed under GRI Contract No. 5082-271-0790, Gas Research Institute, Chicago, IL.

[11] J.G. Williams, J.M. Hodgkinson and A. Gray, *Polymer Engineering & Science* **21**, 822-828 (1981).

[12] J. Poduska, et al., *Polymer Testing* **54**, 288-295 (2016).




**Fig. 5.** Comparison of residual hoop stress in polyethylene pipe with master curve describing the residual stress in polypropylene pipes.

**Figure 4.2:** Residual stress distribution in an extruded polyethylene pipe. The inside surface of the pipe is at relative position 0 and the outside surface at relative position 1. Positive valued stresses are tensile and negative valued stresses are compressive. Figure taken from Reference 13.

In Paragraph N of the "Basis of Opinions" section of her report, Ms. Smith offers another comment related to residual stresses in NIBCO PEX 1006 pipe. She notes that some of the pipes examined had a print line that curved around the exterior surface of the tubing. This would have occurred during application of the print line onto the pipe, a process conducted after both the extrusion and the electron beam crosslinking processes. That this could create a "… torsional residual stress fields in the pipe wall …" as she asserts in Paragraph N is absurd. As described in the cited literature, residual stresses in polyethylene pipe are created by external cooling of the pipe wall when the extruded, molten polyethylene is cooled from well above 300°F to ambient temperature. The print line on NIBCO PEX-c pipe is applied long after the pipe has been cooled to ambient temperature and is fully solidified. Twisting of the fully crystallized material at room temperature will have no effect at all on the residual stress distribution which is set long before the printing process has started. To attempt to tie residual stresses in this pipe to twisting of it during the printing process is absurd, and she provides no basis for this speculation and actually ignored available scientific methods and comparisons that might have given her "opinion" a foundation.

Straight forward techniques have been available since the early 1980's to actually measure residual stresses in polyethylene pipes. Ms. Smith could have quantified the level of residual stress in NIBCO PEX 1006 pipes from the plaintiffs' residences and compared those to published results obtained on other polyethylene pipes. She chose not to do that, but instead decided to "eyeball" it. Her opinion that these naturally occurring residual stresses are excessive is based solely on speculation, and has no basis in fact.

<u>Dimensional Inspection</u>

Ms. Smith also comments several times in her report about what she terms "non-uniform pipe dimensions." She claims to have determined this through examination of NIBCO quality control records and by measurements she made during her laboratory inspections. However, the only consistent dimensional issues she found in NIBCO quality control records were pipes that were out of round, with a few that had average outside diameters 0.001" – 0.002" larger than the specification. ESI has also examined NIBCO quality control records and has verified that

there were pipes released for sale for which the average outside diameter was 1 – 3 mils larger than the specification and for which maximum and minimum outside diameter measurements were outside of ASTM F876 limits (out of round). In terms of the performance of this product, out of roundness as NIBCO recorded it in their records is irrelevant for two reasons. First, PEX 1006 is considered roundable pipe under ASTM D2122.[13] It appears that NIBCO performed maximum and minimum outside diameter measurements on unrounded pipe, even though ASTM D2122 allows rounding. Performing these measurements on pipe rounded in a cold ring clamp would likely have brought the measurements into specification. Second, out of roundness outside diameter measurements are also irrelevant is because for a soft material like PEX, the insert fittings used can be forced into the pipe even if the pipe is outside of the out of roundness specification. For the same reason, pipe with an outside diameter that is 1 – 3 mils too large does not constitute a performance problem. When a metal clamp or crimp ring is used to attach a PEX pipe to an insert fitting, the tools used to make the connection will compress the PEX material between the metal band and the fitting barb and make a water tight, lasting joint so long as the pipe wall thickness is in specification. ESI found no records of thin-walled NIBCO PEX 1006 tubing released for sale.

Ms. Smith also found pipes with high outside diameters after years in service. A high outside diameter measurement found on used tubing is most likely due to creep of the material in service rather than being out of specification to begin with. Regardless of her perceived "dimensional non-conformities," NSF audited and consistently listed NIBCO PEX 1006 as being in compliance with ASTM F876, NSF 14 and NSF 61. Wall thicknesses measured in NSF audits all exceed the required minima in the standards. Also, Ms. Smith ultimately dismissed these non-uniform pipe dimensions as being a contributor to any of the leaks. Making an issue of it in her report appears again to be an attempt on her part to demean NIBCO as a manufacturer rather than to actually determine the root cause these pipe leaks.

<u>Scanning Electron Microscopy</u>

Only five fracture surfaces from the Cole litigation were examined by scanning electron microscopy (SEM); one each from the McCoy (PPX-2), Sminkey (PPX-46), and Peperno (PPX-86) residences and two samples from the Cole residence (PPX-31 and -39). In her report, she shows only three of the SEM photographs as Figures 14 – 16. The SEM image she used as her Figure 15 is reproduced below as Figure 4.3. Ms. Smith offers this image as evidence of oxidative embrittlement of the inside surface of these pipe samples. She also makes a point of identifying, "… numerous craze cracks [that] were revealed during bending to expose the fracture surfaces." What she does not discuss here is that the area in this image is located beyond the end of a crack in the tube wall and that the pipe was reverse bent to open up the fracture surface. This bending subjects the inside surface of the tube to stresses and strains greater than those at the yield point of the material and far beyond any that a well installed pipe would experience in service. The presence of the "craze cracks" opened up during the bending process is not surprising given that craze formation is the first step in the initiation of slow crack growth, independent of whether there is embrittlement of the surface where the craze is situated. These features were located just beyond the end of the crack in a region likely exposed to stresses beyond those created by internal water pressure alone. Their presence, if they were indeed crazes, does not indicate that the pipe inner surface is oxidized but only that there was a level of stress applied at that location that caused crazing to commence in the material prior to it being put in the SEM. This photograph is not representative of the pipe surface in service but is an artifact of the severe bending of the pipe wall that occurred when the crack was being opened for fracture surface examination.

---

[13] ASTM F2122-15, "Standard Test Method for Determining Dimensions of Thermoplastic Pipe and Fittings," *2016 Annual Book of ASTM Standards, Volume 08.04,* ASTM International, West Conshohocken, PA.




**Figure 4.3:** SEM photograph of inside surface of Sample PPX-31 strained beyond the yield point. This appearance is not representative of the surface when the pipe was in service. Pipe has essentially been subjected to a reverse bend back test at this location.

Even if this appearance were, as Ms. Smith suggests, an indication of some superficial surface oxidation it does not address the question of whether the claimed oxidation is severe enough to facilitate premature failure of the PEX tubing. Any attempt at determining the dimensions of these "craze cracks" by the scale bar on the photograph will yield erroneous results because of the oblique view of the surfaces. The true test of the extent and depth of oxidation is to perform micro-FTIR spectroscopy on cross sections of the pipe wall. Ms. Smith has not done this. SEM photographs like Figure 4.3 below convey a false image of the true condition of the inner surface of sample PPX-31, providing an unappealing image without any quantitative data on which to evaluate the extent and depth of oxidation into the pipe wall.

Ms. Smith also had a few of the fracture surface samples evaluated for the elements present on the surfaces by energy dispersive x-ray analysis (EDX). The technique is a method of analysis for elements on a sample surface by stimulating the emission of x-rays from material at that surface that have energies characteristic of individual chemical elements. In this case, the stimulation for x-ray emission is provided by bombarding the sample surface with electrons in an SEM. The depth into the sample surface that is evaluated here is extremely shallow; about 1 – 2 microns (0.001 – 0.002 mm or 0.00004 - 0.00008 inch). The technique also does not identify the oxidation state of the element and cannot distinguish between an element bonded to the surface from one simply laying on that

surface. Some of the EDX results identify elemental chlorine and oxygen on the analyzed surfaces but can't provide any information as to how those elements got on the surface. They could be bonded to the PEX material or simply from dried water deposits. The EDX results provide nothing definitive about the condition of the PEX samples tested.

FTIR Analysis

In the section of her report labeled "Fourier Transform Infrared Spectroscopy (FTIR)," Ms. Smith talks about obtaining FTIR spectra on samples from leaking NIBCO PEX pipe using an FTIR instrument fitted with an attenuated total reflectance (ATR) attachment. One detail about the method she employs that is left out of her report is that ATR-FTIR spectroscopy is purely a surface analysis technique. The infrared beam only penetrates into the specimen being tested for a depth of a few microns (2.5 microns equals 0.0001 inch or 0.1 mil).[14] The infrared spectra obtained are, therefore, representative of only the material in that microscopically thin surface layer of the specimen.

Ms. Smith states that she performed the work "in general accordance" with an ASTM standard guide, ASTM D2102, which is the "Standard Guide for Evaluating the Extent of Oxidation in Ultra-High-Molecular-Weight Polyethylene Fabricated Forms for Surgical Implants."[15] As its title suggests, this ASTM guide was developed for use on ultrahigh molecular weight polyethylene fabricated forms for surgical implants, not for polyethylene piping.

Moreover, the following statement appears at the end of this ASTM guide (Appendix X1, Section X1.8), "At the present time, there is no clear correlation between the extent of oxidation or the oxidation profile present in a sample of UHMWPE and its functional characteristics. For this reason, no maximum SOI, MOI or BOI has been specified in this document." This statement is both accurate and important. There has been no research done of which the authors are aware that relates the parameters calculated in the D2102 method, that is the magnitude of the Surface Oxidation Index (SOI), the Bulk Oxidation Index (BOI), the Maximum Oxidation Index (MOI) or the Sample's Oxidation Index Profile, to the impact that the observed oxidation might have on the performance of the products being evaluated. Therefore, Ms. Smith's use of these results for the purpose of assessing the impact that any oxidation has on the service life of NIBCO PEX 1006 pipe is without any scientific basis. Nevertheless, Ms. Smith performs the calculations of the SOI on each of the locations she sampled from pipes taken from residences of four of the named plaintiffs; PPX-23 (Cole), -31 (Cole), -45 (Sminkey), -88 (Peperno) and -106 (Medders). She then uses the results obtained to justify her opinion that NIBCO PEX 1006 tubing is defective. Given that there has been no work published on the subject of what effect these indices have on PEX piping performance, her opinions based upon her FTIR work have no basis in fact or peer-reviewed scientific principles.

Ms. Smith provides, in Figure 17, exemplar FTIR spectra obtained on one specimen from the Cole residence. She claims in the figure caption that the amount of oxidation is "appreciable" without defining exactly what that term means. She presents in Table 4 the SOI values (which she now calls the "Oxidation Index") she calculated from spectra obtained on the five pipe specimens, However, as discussed above, none of the oxidation indices calculated in the ASTM D2101 guide have never been related to any adverse effect on the Stage III creep rupture performance

[14] H.W. Siesler and K. Holland-Moritz, *Infrared and Raman Spectroscopy of Polymers,* pp. 118-121, Marcel Dekker, Inc., New York (1980).

[15] ASTM F2102, "Standard Guide for Evaluating the Extent of Oxidation in Ultra-High-Molecular-Weight Polyethylene Fabricated Forms for Surgical Implants," *ASTM International,* West Conshohocken, PA.

of polyethylene pipe materials. Ms. Smith claims that her opinions on her FTIR work are offered to a reasonable degree of scientific certainty but in fact they are totally subjective.

In the text below Table 4, Ms. Smith states, "[E]ach failed pipe consistently showed significant oxidation at the interior surface, with comparatively little or no evidence of oxidation at the exterior surface and/or mid-wall." Again she makes this statement without defining what is "significant oxidation" and, as noted above, without any objective, science-based criterion by which to judge the significance of her findings. She then claims that her FTIR results of some level of oxidation only at the inner surface but not at the outer surface or the pipe mid-wall are consistent with, "… the non-uniform levels of stabilization revealed by the Jana Laboratories, Inc., testing performed on behalf of NIBCO." The Jana Laboratories (Jana) report she cites[16] has nothing to do with evaluating PEX tubing for oxidation and does not utilize FTIR spectroscopy in any way. This observed result of her FTIR work, that she is trying to explain as being due to non-uniform levels of stabilization, has been demonstrated by independent research performed at the Studsvik Laboratory in Sweden to be due to the natural process of stabilizer at the water contact surface being consumed performing its intended function and being replenished by diffusion from the higher concentration of stabilizer in the mid-wall to that surface.[17] Her FTIR results say nothing about the uniformity of stabilizer distribution in NIBCO PEX 1006 pipe and there is no scientific basis for the claim that it does.

Even though there has been no peer reviewed research relating the SOI (Ms. Smith's Oxidation Index) to polyethylene pipe performance, there has been research published that demonstrates a slightly different method for using infrared spectroscopy to evaluate the impact of oxidative degradation on polyethylene pipe performance.[18,19] This research has utilized a different method to evaluate the spectra than is employed in ASTM D2102. It has long been known that when polyethylene oxidizes, a variety of different carbonyl moieties (collections of atoms in which there is a carbon-oxygen double bond) are formed in the polyethylene molecules. Each of these different moieties absorbs infrared radiation at slightly different frequencies in the range from roughly 1650 – 1800 $cm^{-1}$. It was observed that of all of the carbonyl groups formed, the peak associated with ketone groups, located in the 1715 to 1720 $cm^{-1}$ region of the spectrum was more intense than the frequencies of the other carbonyl groups formed by the degradation reactions. This observation, coupled with the Beer-Lambert Law[20] which states that the intensity of an infrared spectral absorption is directly proportional to the concentration of the absorbing functional group, led to the creation of the carbonyl index. The carbonyl index was defined as early as 1980[21] as the ratio of the absorbance of the ketone carbonyl peak at 1715 to 1720 $cm^{-1}$ to the absorbance of the methylene ($-CH_2-$) bending peak at 1463 $cm^{-1}$. Taking this ratio eliminates the effect of sample thickness, providing a direct measure of the quantity of ketone carbonyl groups formed and thereby a direct measure of the intensity of the oxidation of the polymer. The research cited in References 19, and 20 then went on to demonstrate the intensity of oxidation and the depth into the wall of an oxidized pipe necessary for the resistance to crack initiation to be compromised by the observed oxidation. Oxidation at a pipe surface must be sufficiently intense to create a carbonyl index value of greater than 0.1 to a depth of about 0.002" into the pipe wall before the onset of oxidation-initiated failure will occur. ESI has

---

[16] Scott Tordoff and Patrick Vibien, *Project 09-1159 Compilation Report – E-Beam Process Improvement,* October 30, 2009, Jana Laboratories, Inc., Aurora, Ontario, Canada, Bates numbered NIBCO-Meadows 00016181-16510.

[17] G.D. Smith, K. Karlsson & U.W. Gedde, *Polymer Engineering & Science* **32**(10), 658-667 (1992).

[18] U. Gedde, B. Terselius and J.-F. Jansson, Polymer Testing **2**, 85-101 (1981).

[19] S.-W. Choi, *Surface Embrittlement of Polyethylene*, Ph.D. Thesis, Illinois Institute of Technology, Chicago, IL (1992).

[20] Norman B. Colthup, Lawrence H. Daly and Stephen E. Wiberley, *Introduction to Infrared and Raman Spectroscopy, 2nd Ed.*, p. 97, Academic Press Inc., New York (1975).

[21] U. Gedde, B. Terselius and J.-F. Jansson, Polymer Testing **2**, 211-222 (1981).

performed FTIR spectroscopy to determine the level and depth of oxidation in samples from residences of the named plaintiffs in the Cole matter. This work has been discussed elsewhere in this report.

Oxidation Induction Time (OIT) Analysis

Ms. Smith has a section in her report concerned with what she calls an "Oxidation Induction Time (OIT) Analysis." She had specimens from various pipe samples tested "in general accordance" with ASTM D3895,[22] for the stated purpose of evaluating, "… the degree of residual stabilization of the PEX material at various locations in select tubing samples …" Specimens were taken from varying locations on only two samples of tubing from Cole Plaintiffs' residences. The results of these tests are provided in Table 5 of her report. She sampled multiple locations on only one sample, PPX-106 (from Medders), and limited sites on PPX-46 (from Sminkey). However, there are some significant details of the test procedure which are not provided in the report. The temperature at which the test is performed strongly affects the test result. The ASTM D3895 test method directs that the test be performed at 200ºC.[23] The temperature at which these tests were performed is not given anywhere.

Another consideration here is the content of "Section 5 Significance and Use" of ASTM D3895 where it states, "The OIT is a *qualitative* assessment of the level (or degree) of stabilization of the material tested. This test can be used as a quality control measure to monitor the stabilization level in formulated resin as received from a supplier prior to extrusion." Additionally, Note 3 in this section states, "There is no accepted sampling procedure, nor have any definitive relationships been established for comparing OIT values on field samples to those on unused products, hence the use of such values for determining life expectancy is uncertain and subjective." Ms. Smith is using the OIT results she has obtained in this work for a purpose which the authors of the method (the members of ASTM Subcommittee D20.30 on thermal properties of plastics) describe as "uncertain and subjective." There is another caveat concerning the use of OIT testing found in ASTM F876. In Appendix X1, it states, "It should be mentioned that OIT tests are not an indication of life expectancy nor should differences in OIT values between compounds be construed to indicate differences in the stabilizer effectiveness of respective formulations." In other words, Ms. Smith is using OIT results here for purposes for which they were not intended and in fact, she is using them in a way that is explicitly warned against in the ASTM D3895.

An excellent example of the reason for this warning can be found in research work published by Pinter, et al.[24] Polyethylene pipe was prepared from three different resin compounds, each having a different stabilizer system. The compound with stabilizer system "K1" exhibited an OIT result that was only 20% of that given by stabilizer systems "S" and "K2". However, in elevated temperature, hydrostatic pressure testing of pipe made from these compounds that was monitored for oxidative degradation of the pipe material, pipe that used stabilizer "S" exhibited oxidation-controlled failures at about 17,000 hours of testing. Pipe made with stabilizer systems "K1" and "K2" did not exhibit Stage III failures in these tests, even after 32,000 hours of testing. The performance of the pipe made with stabilizer system "K1" yielded superior performance in the pressure tests in spite of having an initial OIT that was only 20% of the OIT for the compound using stabilizer system "S".

Another reason for using caution in interpreting OIT test results is that OIT is strongly dependent on the specific antioxidant additives in a stabilizer package and how well they protect the material at the temperature of the OIT test (typically 180º – 220º C or 356º – 428ºF) versus the end use temperatures for the product (typically 20º – 60ºC

[22] ASTM D3895-07, "Standard Test Method for Oxidation-Induction Time of Polyolefins by Differential Scanning Calorimetry," *ASTM International,* West Conshohocken, PA.

[23] *Ibid.,* Section 10.2.2.

[24] Gerald Pinter, et al., *Macromolecular Symposia* **181**, 213-223 (2002).

or 68° – 140°F). In the plastics industry it has long been known that antioxidants will perform very differently at highly elevated temperatures than they do at room temperature.[25] This is the reason why OIT results cannot be used to predict the efficacy of a stabilizer system used at a temperature 160°C or more lower than the OIT test temperature. Ms. Smith attempts to do exactly this where she reproduces and discusses two figures from a Jana Labs report that was a part of NIBCO's 2008-2012 product improvement program.[26] The figures compare the results of testing performed on NIBCO PEX 1006 manufactured in 2007 and 2008 with PEX products manufactured outside the United States. Although the Jana report describes these other products as competitive with NIBCO PEX 1006 (and Ms. Smith repeats that characterization in her report), they are in fact significantly different in their performance in the ASTM F2023 chlorine resistance test, as indicated by the initial numeral in their ASTM F876-09 designations. The Golan product (made in Israel) is a PEX 5006 product. The Hewing product is a PEX-Al-PEX composite pipe (made in Germany) and is also a PEX 5006 product. The Roth product (also made in Germany) is a PEX 3006. All three will exhibit superior performance to ASTM F2023 testing to any PEX 1006 product. The bar charts Ms. Smith reproduces on page 28 of her report show the OIT results on the Golan, Hewing and Roth products being greater than those on the NIBCO products. The presentation of these two bar charts conveys the impression that the NIBCO stabilizer system is far inferior to the systems in the foreign products, an unfair characterization given the temperature effects discussed above. It is also unfair given that the foreign products have been stabilized to yield superior performance in the ASTM F2023 accelerated chlorine resistance test.

Ms. Smith attempts to make much of the fact that the OIT results obtained on specimens excised from the inside surfaces of the field returned tubes are significantly lower than the results obtained on specimens taken from the outside surface and the middle of the pipe wall. This is hardly unusual, as research work performed in Sweden over the years has shown that this is the norm for polyethylene pipe used in water service.[27] In her report, Ms. Smith provided in Table 5 OIT results on only two pipe samples from Cole plaintiffs (PPX-46 from Sminkey and PPX-106 from Medders). Her later work product production included results on five other samples; PPX-2 from McCoy, PPX-31 from Cole, and PPX-70, -81A, -81B from McMahon. The tests on some of these samples were performed after the date on which her report was issued. Ms. Smith's OIT results are fully consistent with the research cited. When polyolefin pipes are in use in potable water service, the antioxidants are used up first at the water contact (inner) surface. This lowers the OIT of the material at that surface. Antioxidant in the core of the pipe wall diffuses to the inner surface to continue to provide protection from oxidation there. A higher OIT in the middle of the pipe wall indicates that there is still a reservoir of antioxidant in the material that can diffuse to the surface to provide protection there. A low inner surface OIT in a used pipe is a natural consequence of these processes occurring and is not an indication of any kind of defect in the pipe material.

Ms. Smith is also critical of the variability of the OIT results obtained in the experiments she had performed, which she equates to significant variability in stabilization in the as-manufactured condition of NIBCO pipes. However, another equally valid explanation for the variability of the OIT results is the inherent lack of reproducibility of the test method itself. ASTM D3895, like most ASTM test methods, has a section on the precision (repeatability of the result) and the bias (difference from a known property determined by a different method) of the test method. Table 1 in D3895 contains the results of a round robin test conducted in 1991 to evaluate how precise and reproducible this test method is. Interpretation of the results is presented in Section 12.3 of the method. Differences in OIT

[25] Norman Grassie & Gerald Scott, *Polymer Degradation and Stabilization,* Section 5.3.2, pp. 147-154, Cambridge University Press, Cambridge, UK (1985).

[26] Cynthia L. Smith, *op. cit.,* pp. 27-29.

[27] K. Karlsson, G.D. Smith and U.W. Gedde, *Polymer Engineering & Science* **32** (10), 649-657 (1992).

results performed on the same material by the same analyst in the same laboratory were only considered significantly different if they differed by more than 15% – 33% of the individual result. Also, the OIT results provided in Table 1 of the method are averages of duplicate tests, further increasing the range over which one could expect individual results on the same material to vary. The bottom line is that the method itself yields inherently variable results on identical samples. One cannot reliably use OIT test results to quantify variability of stabilizer content in a polyethylene pipe material unless the differences in measurements are beyond the range of variability of the test method. Further, there is inherently some variability in stabilizer concentration in a polyethylene pipe; the mixing of stabilizer into the polymer compound is never perfect. However, Ms. Smith's use of these results in this fashion is deceptive because there is not a discussion of how her results are affected by the fact that she has tested only one specimen from each location and she has not accounted for the inherent variability of the test method itself.

Gel Content Analysis

Ms. Smith next presents results of gel content testing. The method she employed was "in general accordance" with ASTM D2765[28] Method B using xylene as the extraction solvent. It appears that she performed only one test on material taken from each pipe sample. Although it is not stated in Table 6 of her Cole report, the last grouping of test results (duplicate tests on PPX-1, PPX-116 and PPX-136) were obtained on three samples tested at an outside laboratory where the extraction was performed with a different organic solvent called decalin (decahydronaphthalene).[29] ASTM F876 requires that the gel content of PEX piping materials be evaluated by ASTM D2765, Method B.[30] Method B of ASTM D2765 specifies the use of decalin as the extraction solvent, not xylene.[31] The results of this testing are presented at the bottom of Table 6, but the fact that these samples were tested with decalin, rather than xylene is not shown in Table 6. The testing performed with decalin as the extraction solvent is specifically identified only in Appendix 16 of her report, in a table titled "2016111 & 2013115 Gel Content Analysis." In short, the gel testing done by Ms. Smith was not done in accordance with ASTM D2765 Method B, a fact that she tries to bury in her report.

Ms. Smith barely acknowledges that 23 of the 26 samples conformed to the ASTM standard, and instead, is critical of the fact that three of the results, for samples PPX-14 (Burgos, who is not a plaintiff in any suit), PPX-31 (Cole), and PPX-81A (McMahon) were below the 65% gel content required in ASTM F876. Yet, she makes no attempt to explain how a gel content of 61% – 64.7% would compromise the performance of the pipe. She only complains that those results make the pipe non-compliant with the F876 specification. There is nothing in the literature that states or shows that a gel content of PEX pipe in the range of 63% – 65% makes that pipe defective in terms of its in-service performance. It is also very informative to examine the results of the testing performed with decalin as the solvent. Ms. Smith did not choose to have the three samples noted above tested with decalin, but chose instead three samples that yielded gel contents above 65% in her xylene tests: PPX-1 from the McCoy residence, PPX-116 from the Plisko (not a plaintiff in this action) residence and PPX-136 from the McLaughlin (also not a plaintiff in this action) residence. She also had duplicate tests performed on each of these samples. As noted above, the results

[28] ASTM D2765-11, "Standard Test Method for Determination of Gel Content and Swell Ratio of Crosslinked Ethylene Plastics," *Annual Book of ASTM Standards, Volume 08.01*, ASTM International, West Conshohocken, PA.

[29] Cynthia L. Smith, *Analysis of NIBCO PEX Plumbing Components in the Matter of Kimberly Cole, et al., v. NIBCO, Inc., U.S. District Court for the District of New Jersey, Civil Action No. 13-cv-07871-FLW-TJB,* Appendix 16.

[30] ASTM F876-10e1, "Standard Specification for Crosslinked Polyethylene (PEX) Tubing," *Annual Book of ASTM Standards,* ASTM International, West Conshohocken, PA (2012).

[31] ASTM D2765, op. cit., Section 7.9.

of the decalin tests are contained in Table 6 even though they are not identified as having been done in a different laboratory using a different solvent than Ms. Smith employed in the testing she performed. The significant thing about these results is that the decalin tests yielded gel contents that were consistently higher by 1% - 2% weight of gel compared to Ms. Smith's xylene tests on the same samples. This implies that if Ms. Smith had performed all of her tests in strict accordance with ASTM F876 and used Method B (decalin), the results for PPX-31 (64.7% in xylene) and PPX-81A (64.0% in xylene) would have been 65% gel or greater and would have complied with the letter of ASTM F876 for gel content. This would have left only sample PPX-14 (from the non-named plaintiff Burgos) as one with a possible gel content in decalin of less than 65% (likely 62%-63% based upon the differences in decalin vs. xylene testing described above). And again, Ms. Smith has presented no independent support for her contention that a gel content of 63% actually compromises the performance of NIBCO PEX 1006 tubing.

Water Chemistry

The water chemistry may impact the performance of brass fittings in the plumbing system, however the water chemistry results did not reveal any information to assess the root-cause for the PEX tubing failures. The on-site water analysis that provided information regarding water pressures and temperatures at each of the residences was informative as discussed in earlier chapters.

Review of Christianson Plumbing and Repair Practices

Ms. Smith states several times in her report that the leaking pipes associated with this matter failed in a virtually identical manner to other failed NIBCO PEX 1006 pipe that she has analyzed in other cases across North America.[32] She includes in this body of work her investigation in the matter of Christianson Air Conditioning, Heating and Plumbing (Christianson) v. NIBCO in the San Antonio, TX area. ESI also conducted a thorough investigation into this matter, including having a highly experienced technician attend repair and replacement calls made by Christianson crews at the homes of individuals with NIBCO PEX 1006 tubing originally installed by Christianson. ESI's conclusion in that investigation, detailed in the expert report issued for that matter,[33] was that the root cause of the leaks in those residences was poor installation practices by the original Christianson installers. The failures were caused by excessive bending of the installed tubing and impingement of wooden structural members of the homes on the tubing walls. The leaks in the Christianson matter had nothing to do with oxidative degradation of the NIBCO PEX 1006 tubing used in the original installations at the affected residences. Ms. Smith's claim that all of the NIBCO PEX 1006 piping leaks she has seen in her investigations were due to oxidation of the PEX material is inconsistent with the findings of ESI's thorough investigation into the Christianson matter, since the leaks in that case had nothing to do with degradation of the PEX material and everything to do with the manner in which the piping was originally installed.

[32] Cynthia L. Smith, *op. cit.,* pg. 14, Conclusion 3.

[33] Donald E. Duvall and Anand R. Shah, *Confidential Investigative Report: Christianson Air Conditioning and Plumbing, LLC v. NIBCO, Inc., ESI Project 48728A,* dated October 16, 2015.

Bias

Ms. Smith's bias against NIBCO PEX 1006 pipe is seen throughout her report. The report is riddled with pejorative terms applied to the product. While it is clearly her opinion that, "[A]ll NIBCO PEX 1006 pipe is defectively designed and manufactured using a defective process for the intended application …"[34] that is her opinion only and not one with which ESI agrees. The use of pejorative terms in other areas of the report is unnecessary and only serves to indicate her bias. For example, in the very first conclusion on page 14 of her report she describes the water leaks as being due to, "… through wall *brittle* cracking resulting from oxidative degradation of the PEX material" [emphasis added]. Use of the term "brittle" in this context is pejorative, implying that the PEX material is somehow glass like, when in fact the results of the tensile and burst tests performed by ESI show the material to be highly ductile, in the absence of any preexisting cracks. The terminology normally used to describe the type of fractures seen in all of the PEX 1006 leaks is "slow crack growth" fracture. This term has been used for decades to describe fractures that are macroscopically lacking in ductility but exhibit significant ductility on a microscopic scale. To call these PEX tubing leaks "brittle" is contrary to the practice in plastic pipe failure analysis and serves only to get the reader of her report to think that NIBCO PEX 1006 material is defective because it is "brittle as glass."

In Section iv of the "Summary of Findings" portion of the report,[35] Ms. Smith talks about her observations of the physical features she claims to see on the pipes she examined which were identified as having leaked. She makes a point of talking about various features such as alleged extrusion defects, alleged inclusions, alleged discontinuities in the pipe wall, and non-uniform pipe dimensions. She provides no photo documentation of this claim in her report. She then dismisses all of these as being, "… not necessary for failure to occur …" and "… not a root cause of the incident leaks." Given her stated opinion of these alleged "manufacturing defects," why bring them up at all if they contributed nothing to the leaks in her clients' homes? The only apparent reason is to denigrate NIBCO's manufacturing operations and lead the reader to an unwarranted conclusion, that NIBCO was an irresponsible manufacturer. Extrusion die lines and the like are common cosmetic features observed in extruded polyolefin pipe. This is a clear indicator of her bias against NIBCO

Another example of Ms. Smith's bias can be seen in Table 6 of her report, where she reports the results of gel content measurements. The column on the far right side of this table is headed "Conformed to ASTM F876?". With one exception, the entries in this column are either "Yes" or "No" depending upon whether the gel content reported was at or above the minimum value of 65% required by ASTM F876. The exception was the first entry, for Sample PPX-105, which yielded a 65.0% gel content in her tests. Instead of simply entering "Yes" for this sample since it met the ASTM F876 requirement, Ms. Smith wrote "(barely)" in this column. The only proper answer to the question of whether the result "Conformed to ASTM F876?" is yes or no. Editorializing on the significance of the results in this manner is inappropriate and only reflects Ms. Smith's bias against NIBCO.

One final observation on Ms. Smith's report is that most of the photographs she offers as being "typical" of the overall condition of the piping in the named plaintiffs' residences are from two locations that had the most severe operating conditions of the group. Figures 1 – 6 in her report are of a sample (PPX-46) from the Sminkey residence. This house is where Ms. Smith measured a hot water temperature of 160°F, well above the 140°F limit recommended

[34] Cynthia L. Smith, *op. cit.,* p. 14, Conclusion 5.

[35] *ibid.,*pp. 31-34.

by NIBCO for its PEX 1006 tubing use with hot, chlorinated water. The SEM photographs that appear as Figures 14 – 16 in her report (one of which is reproduced above as Figure 4.3) are all of one sample from the McCoy residence (PPX-31), which has a recirculating hot water system, for which any PEX 1006 would not be usable based upon the Miner's rule life prediction of data from ASTM F2023 testing. It is well known that elevated temperatures decrease the lifetime of polyolefin pipe for all three stages of failure. It is also well known that the longer a polyolefin pipe is maintained under stress at an elevated temperature the shorter will be its time to failure. Of the 12 figures in her report that depict the inside surfaces or fracture surfaces of NIBCO PEX 1006 tubing from the residences of named plaintiffs, nine of those figures are pictures of samples from a residence with the worst case operating conditions of the group, either very hot water (Sminkey) or with a recirculating hot water system (McCoy). It is a measure of her bias in this case that Ms. Smith chose those to be her examples of piping from "typical" operating conditions.

## 4.2 Potential Causes of PEX Material Failure

In any root cause failure analysis, it is necessary to consider several factors that can contribute to premature failure. These have been enumerated in numerous publications, a few of which are specifically cited here.[36,37,38] The causes of failure have been found to fall into these fundamental categories: (1) design deficiencies, (2) material issues, (3) manufacturing deficiencies, (4) assembly / installation defects and (5) end use environment (extreme service conditions). In the section that follows, each of these categories will be examined as they relate to the issues with NIBCO PEX 1006 tubing that are the basis of this legal proceeding.

Design of NIBCO PEX 1006 pipe and tubing. The design of any plumbing product is determined in large part by the codes and standards that the product is required, by statute, to meet. A tube by itself has a very basic design, it is a lengthy piece of material that has a circular cross-section defined by concentric inner and outer diameters. The relevant codes and standards determine the tolerances for these diameters and for the thickness of the tube wall in between. The primary standard for PEX tubing in the United States is ASTM F876[29], which contains requirements for tubing outside diameters, wall thicknesses, physical properties of the PEX material, short and long term mechanical properties and environmental resistance properties. As discussed above this includes the resistance of the PEX material to degradation by chlorinated water, added to the standard in 2002.

Plumbing products are regulated by codes referenced by municipal, county and/or state agencies. A product must demonstrate compliance with the plumbing code in effect in a particular jurisdiction before it can be installed in that jurisdiction. While some large municipalities create and maintain their own plumbing codes, many incorporate into their laws a reference to a model plumbing code, making the requirements of that model code the legal requirements for plumbing products and systems in that jurisdiction. There have historically been several model plumbing codes in existence in the US; regional ones like the Uniform Plumbing Code (IAPMO), National Plumbing Code (BOCA), Standard Plumbing Code (SBCCI) were a few. The International Plumbing Code (ICC) grew out of an effort to create one model code for the entire country; an effort that has been only partially successful. Each of these relies on compliance of PEX plumbing products with ASTM F876 and standards promulgated by NSF International to assure the safety and efficacy of certain products, plastic plumbing products being among

---

36 Anon., "Engineering Aspects of Failure and Failure Analysis: Fundamental Sources of Failures," *Metals Handbook, 8th Edition, Vol. 10: Failure Analysis & Prevention,* pp. 1-9, American Society for Metals, Metals Park, OH (1975).

37 James J. Scutti and William J. McBrine, "Primary Physical Root Causes of Failure," *ASM Handbook Volume 11: Failure Analysis & Prevention,* pp. 6-13, ASM International, Materials Park, OH (2002).

38 Myer Ezrin, *Plastics Failure Guide: Cause & Prevention, 2nd Ed.,* Chapter 1, Sect. 1.7, "Common Features and Differences in Performance of all Materials," pp. 5-8, Hanser Publications, Cincinnati, OH (2013).

them. NSF Standard 14[39] is the standard referenced by all of the model plumbing codes that plastic plumbing products, like PEX tubing must comply in order to meet code requirements. It was noted above that ASTM F876-2002 was not referenced in NSF 14 until its September 2004 version. Once NSF 14 – 2004 was picked up by the model code writing organizations, likely not until 2005-2007, the requirement for testing of PEX tubing for chlorine resistance by ASTM F2023 became a code requirement.

All of these model codes and other regional or local codes required that PEX tubing used in potable water plumbing systems had to comply with the requirements of ASTM F876 and NSF 14. This meant that PEX pipe manufacturers like NIBCO had to have their products tested for compliance. The testing organizations, often also the standards writing organizations like NSF, would perform the tests and publish listings of products that had been tested and demonstrated to meet the necessary requirements. Having a listing of compliance with the relevant standards published by NSF (or IAPMO or UL) told potential users of a PEX plumbing product that the product was also in compliance with the plumbing codes in effect in most of the United States. To not be listed by one of the recognized agencies meant that pluming contractors could not legally install a product within any jurisdiction where one of the model codes or any local code requiring compliance with NSF 14 and ASTM F876 was in force. Having a listing of compliance with ASTM F876 and NSF 14 was essential for a PEX product manufacturer to sell within most of the country. Over the period of time in which products connected to this case were manufactured, NIBCO's PEX 1006 product was listed by NSF as being compliant with all of the applicable design standards. The design of NIBCO's PEX 1006 piping products was not deficient.

<u>Material issues</u>. As to the materials employed in the manufacture of NIBCO PEX 1006 piping, the performance requirements were clearly specified in ASTM F876.[40] NSF performed testing on NIBCO PEX 1006 annually to verify compliance with ASTM F876 and the reports issued by NSF after the annual tests were completed always showed the material properties, gel content and density, to be in compliance with the standard. Ms. Smith performed gel content testing of samples taken from piping removed from each of the named plaintiffs in this case and all of those results exceeded the requirement of 65% by weight gel content. ESI performed density testing on samples taken from pipes that came from the residences of each of the named plaintiffs in this case and all were found to exceed the minimum requirement of 0.926 $Mg/m^3$ stated in ASTM F876-09, Section 6.4. Also, the long term hydrostatic strengths and hydrostatic design bases of NIBCO PEX 1006 at the required temperatures were continuously listed in PPI TR-4 over the time period of the manufacture of the products at issue in this case. In summary, the material from which NIBCO PEX 1006 was manufactured was consistently in compliance with all of the applicable codes and standards and was, therefore, not defective.

<u>Manufacturing deficiencies</u>. Ms. Smith has alleged in her report that NIBCO PEX 1006 was consistently afflicted with manufacturing defects or deficiencies that caused the pipe leaks in the plaintiffs' residences to occur. She supports some of these claims with the results of OIT testing she has performed on material taken from pipe samples, alleging that the results demonstrate that the amount of antioxidant in the material is inadequate and that it is poorly distributed throughout the wall of the tubing. She also alleges that there are weak areas of the tubing walls which she attributes to "die lines," cosmetic longitudinal lines visible on the inside of the pipe created by the surface of the pin or mandrel on the inside of the die that creates the central opening in the pipe through water flows. The errors in her analyses have been discussed in this Chapter. These errors derive from her inappropriate use of the results of OIT testing, her unwillingness to discuss the inherent irreproducibility of OIT test results, her apparent ignorance of how the distribution of antioxidants in polyethylene water piping changes during its use and a total

[39] *NSF/ANSI Standard 14, Plastics Piping System Components and Related Materials,* NSF International, Ann Arbor, MI

[40] ASTM F876-09, *op. cit.,* Section 5.2, "Basic Materials."

lack of evidence that the cosmetic features she calls die lines are actually weak points in the pipe wall. She also has produced no evidence that any of the cracks resulting in leaks actually initiated at debris trapped in the pipe wall during production. There is no evidence that any of the leaks in NIBCO PEX 1006 piping from this case occurred because of manufacturing defects.

*Assembly/Installation defect.* Because of the time dependent nature of the strength of thermoplastic materials like PEX which has been discussed above, the assembly and installation of such piping products must be done with care so as to not create mechanical stresses in the pipe that exceed the long term strength of the material. Internal water pressure in the pipe creates mechanical stresses in the pipe wall, but the pipe design and pressure rating process takes those into account. The process also accounts for a certain level of additional stress that can result from bending of the flexible PEX tubing within allowable limits, infrequent pressure surges from valve openings and closings, etc. However, these additional stresses must be limited through the use of good assembly and construction practices so that the total mechanical stress from all sources doesn't reach the long term strength of the material for some time less than the design life of the plumbing system. If that occurs then premature Stage II failure will occur. This is why it is so important to be able to see and document the as-installed plumbing system before components are removed and repairs are made. It appears that almost all of the tubing samples made available for examination and testing in this case were removed prior to the site inspections and the conditions under which they were originally installed were not documented. As is detailed in the other chapters of this report it is ESI's opinion, based upon an evaluation of all of the data and information available, that excessive secondary stresses created by the original installation conditions of the plaintiffs' plumbing systems was the root cause of many of the leaks.

*End use environment (extreme service conditions).* Plastic plumbing products are designed and manufactured to function safely and effectively within specific end use conditions. There are operating temperature, pressure and water chemistry limits that must be observed in order for the products to function over their design life without leaking. For NIBCO PEX 1006, the limitations are readily discernable. The material designation itself, PEX 1006, gives valuable information about the ability of the product to survive in potable water systems that employ the standard "chlorine" disinfectant system in the water once it leaves the treatment and goes to users' homes and places of business. Since the chlorine resistance requirement was added to the standards like ASTM F876 the first digit, the "1" in "PEX 1006" has indicated that the material has been tested by ASTM F2023 and the test data yielded a projected pipe lifetime of >/= 50 years when used 25% of the time at a hot water temperature of 140°F and the remainder of the time at 73°F with chlorinated water flowing through the pipe at an internal pressure at all times of 80 psig. As discussed before, when the temperature exceeds 140°F, even if the pressure and hot water "on" time don't change, the projected lifetime of the system decreases dramatically. Increasing the hot water "on" time, even if the hot water temperature doesn't change, also shortens pipe lifetime. This is why PEX 1006 was not recommended for continuous chlorinated hot water use above 140°F. It should also be noted that all PEX 1006-not just NIBCO's-have essentially the same limitations on their use. All PEX piping systems also exhibit reduced long term strength capabilities at elevated temperatures even when transporting non-disinfected water (see ASTM F876-09, Table 3). Use of PEX tubing beyond the time, temperature and pressure limits recommended by its manufacturer will shorten the lifetime of a system made with that tubing. Observations made on tubing that was exposed to environment conditions beyond the Manufacturer's recommendations cannot be used to generalize the material behavior under typical or expected service conditions.

## 4.3 Summary

In summary, Ms. Smith's expert report in this matter is deficient in a number of ways.

- Ms. Smith exhibits a clear bias against NIBCO and its PEX 1006 product. Her report at times reads more like a legal pleading than the report of a technical expert.

- Ms. Smith claims that she did not see, in her site inspections, evidence if installation issues that could have caused the reported leaks in NIBCO PEX 1006 tubing. However she did not see the Monica residence and three others (Boyd, McMahon and McCoy) had been replumbed leaving little, if any, of the original installations to view. Both the Monica and Medders residences had no PEX tubing leaks. The fitting issues reported in those homes are addressed in a separate report. All of the remaining three had clear installation or extreme operating conditions issues that likely contributed to their leaks. Sminkey had very hot water, as measured by Ms. Smith, which would reduce the service life of the PEX tubing for both Stage II and Stage III failures. Peperno had one leak in tubing connected directly to the gas water heater outlet, clearly ignoring NIBCO's installation manual and another under a clamp that was compressing the tubing against a wooden joist. The location of repairs at the Cole residence, clearly visible because of the materials used to replace leaking tubing, point strongly to installation issues. At best, Ms. Smith is basing her opinion on the adequacy of the installations of plaintiffs' residences on seeing only half of the original installations. She also appears to be ignoring some obvious installation and operations issues in her assessment of the causes of the leaks at these residences.

- Ms. Smith greatly exaggerates the alleged degraded condition of the pipes removed from these three residences. Her description of the number of samples afflicted with the problems she describes and the extent of the conditions that she describes are far more extreme than what is actually present for samples from these residences.

- The deviations from ASTM F876 dimensions that she describes, while real, are not contributors to the plumbing leaks at issue in this matter. In all but a very few instances, the average outside diameters recorded in NIBCO QC records exceeded the ASTM F876 limits by 0.002 inch or less. In roundable piping joined by insert fittings, like NIBCO PEX 1006, out of roundness will not adversely affect performance. The fact that NIBCO QC records showed a number of coils of tubing that exceeded the out of roundness limits has no bearing on the leaks at issue in this matter. Outside diameters measured on pipe that has been in service for several years that were above the ASTM F876 specification were more likely to have gotten that way due to creep deformation than to have been out of specification at the time of manufacture. It appears that Ms. Smith's comments on the tubing dimensions that were included in her report were there for the sole purpose of denigrating NIBCO's manufacturing process.

- The SEM photographs that show what appear to be nascent crazes at the ends of cracks where the inside pipe surface was strained far beyond he yield point are not an indication of oxidative degradation. Craze development is the first step in slow crack growth fracture of polyethylene and occurs whether or not the pipe surface is oxidized. The example photograph that Ms. Smith used was taken from a sample from a residence with very hot water in the plumbing. Excessive temperature is known to accelerate the processes occurring in the PEX pipe material that can lead to premature failure.

- Ms. Smith's FTIR results were analyzed by the methodology in ASTM F2102, an ASTM "standard guide" created for use with products other than polyethylene pipe. The text of the guide states, "…there is no clear correlation between the extent of oxidation or the oxidation profile present in a sample of UHMWPE and its functional characteristics. For this reason, no maximum SOI, MOI or BOI has been specified in this document." There is nothing in the peer reviewed technical literature that connects oxidation measured and quantified as directed by ASTM F2102 and the performance of PEX piping. Ms. Smith's claim that the results of her FTIR measurements demonstrate high levels of oxidative degradation that will compromise the performance of NIBCO PEX 1006 tubing is without any scientific foundation. Additionally, Ms. Smith tested only five pieces of tubing from four of the named plaintiffs residences; two from Cole (PPX-23 and -31) and one each from Sminkey (PPX-45), Peperno (PPX-88) and Medders (PPX-106). This is a very small sample from which to condemn the PEX tubing in all eight named plaintiffs homes.

- Ms. Smith's interpretation of the OIT measurements she performed is fatally flawed. Once again, she is using these results to draw conclusions that the ASTM D3895 test method itself warns are not appropriate. The fact of lower OIT values found at the inner surface of water pipe has been demonstrated to be a natural consequence of the presence of water inside the pipe. There is nothing to support her contention that this observation is due to a manufacturing defect in NIBCO PEX 1006 tubing. In her claim that her OIT results demonstrate poor distribution of antioxidants in NIBCO PEX 1006 tubing, she does not consider the inherent lack of reproducibility of the OIT test method as an alternative explanation for the results she obtained.

- The gel content measurements on the samples Ms. Smith tested from the homes of the named plaintiffs in this matter, when corrected for her use of an extraction solvent other than the one required in ASTM F876, all exceeded the F876 requirement of 65%. The correction was necessary because testing performed at an independent second laboratory showed that the gel contents obtained when the extraction solvent employed was the one required by ASTM F876 (decalin) were 1-2% gel greater than the results obtained by Ms. Smith using xylene as the extraction solvent. This result implies that all of Ms. Smith's results were lower than if her tests had been performed using the specified solvent.

In conclusion, Ms. Smith's opinions that NIBCO's PEX 1006 tubing is defectively designed and defectively manufactured, using materials and manufacturing processes that were inadequately designed to produce tubing with suitable resistance to oxidative degradation causing premature failure in the intended service environment have no merit. Ms. Smith has not considered all the possible causes for failure of PEX tubing. The analysis methods she used in reaching her conclusions are inappropriate. Ms. Smith has exhibited a significant bias against NIBCO PEX 1006 tubing and that bias has caused her to focus on only the design and manufacturing of the product as the causes of the leaks in the plaintiffs' homes and not to reasonably consider the contributions of installation and operating conditions to those leaks.

4215 Campus Drive
Aurora, IL 60504

# Chapter 5:

Conclusions

## Conclusions

The following conclusions regarding the performance of NIBCO PEX 1006 tubing at the Plaintiffs' residences are stated to a reasonable degree of engineering certainty based upon ESI's analysis conducted to date and outlined in this report, as well as prior professional experience:

1. There is no design or manufacturing defect in the NIBCO PEX 1006 tubing. There is no design or manufacturing defect in the NIBCO PEX 1006 that was installed at the residences of Boyd, Cole, Medders, McCoy, McMahon, Peperno, and Sminkey.

2. The NIBCO PEX 1006 tubing manufactured using the same resin and additive package as that in the NIBCO PEX 1006 tubing at Boyd, Cole, Medders, McCoy, McMahon, Peperno, and Sminkey residences was tested for compliance to industry standards governing design and manufacturing of PEX tubing, and NIBCO received NSF certification for listing the Dura-PEX PEX 1006 tubing.

3. NIBCO followed industry standards of practice and maintained third party certifications required during its manufacturing and distribution of the PEX tubing over the time period from 2004-2012.

4. NIBCO PEX 1006 tubing can fail from multiple causes. Failure can be due to any one of the following: breaks, tearing, kinking, gouges, punctures or other external damages before, during, or after installation; exposure to temperatures and pressures beyond the product ratings as specified on the product or in the NIBCO installation manual; exposure to damaging chemical, substances or corrosive water conditions; damage from abnormal operating conditions, damage due to accident, abuse, misuse, or unauthorized modification or repair, improper installation due to worn, damaged, unauthorized or improperly calibrated tools; components in the plumbing system other than those manufactured or sold by NIBCO; not designing, installing, inspecting or testing the system in accordance with NIBCO installation instructions at the time of the installation; or failure to follow applicable code requirements and good plumbing practices.

5. In order to determine the root cause for failure of NIBCO PEX 1006 tubing, contributions from the installation method, plumbing system components, and plumbing system operating settings, and plumbing system history, leak locations, leak frequency, water chemistry, and other background information as well as information learned from laboratory examination and testing of failed samples is necessary.

6. There is no scientific basis for attributing all failures of NIBCO PEX 1006 tubing as occurring due to oxidative degradation of inner surface caused by defective design and defective manufacturing.

    a. Oxidative degradation of inner surface is typical response of the material in service. A measurement of oxidation does not establish a root cause of failure.

    b. Not all NIBCO PEX 1006 failures are caused by inner surface oxidation. In NIBCO PEX 1006 failed tubing the extent of inner surface oxidation varies and is dependent on the service exposure conditions.

    c. The extent of oxidation on the inner surface is different for each tubing from Boyd, Cole, Medders, McCoy, McMahon, Peperno, and Sminkey residences

d. NIBCO PEX 1006 tubing is manufactured with adequate stabilizer package to prevent failures by oxidative degradation when tubing is used within the operating limits specified in NIBCO PEX System Installation Manual.

e. Abnormal operating conditions, and exposure to relatively high level of chlorine, temperature and pressure beyond the product ratings will lead to shorten service life due to accelerated oxidative degradation of the inner surface and can cause PEX tubing failure.

f. Ms. Smith has not established oxidation occurred in statistically significant number of samples from the named plaintiffs' residences to attribute all failures to oxidative degradation.

7. There is not a single common cause such as oxidative degradation of the PEX material that can be attributed to all of the PEX 1006 tubing from Boyd, Cole, McCoy, McMahon, Peperno and Sminkey residences.

    a. Samples of non-incident tubing made available for examination from McCoy, Medders, and Boyd residences did not exhibit any cracking, crazing or other signs of the alleged defect claimed by Plaintiffs or identified by their expert in her report.

    b. There is not a single common cause such as oxidative degradation of the PEX material that can be attributed to all of the prior PEX 1006 tubing examined by CLS and ESI.

8. The failures in NIBCO PEX 1006 tubing at Boyd, Cole, McCoy, McMahon, Peperno and Sminkey residences occurred due to different and combination of factors in the plumbing system.

9. The testing and analysis conducted by ESI according to industry standards for PEX tubing has determined that there is no design, material, or manufacturing defects in the PEX tubing manufactured using NIBCO 1006 formulation.

ESI reserves the right to amend or supplement this report and the opinions contained herein if additional information becomes available.

Attachments

Appendix A — Curricula Vitae of Authors
Appendix B — Testimony History of Authors
Appendix C — Home Inspections
Appendix D — Catalog of Available Samples for Examination
Appendix E — McCoy Laboratory Inspection
Appendix F — Cole Laboratory Inspection
Appendix G — Sminkey Laboratory Inspection
Appendix H — Boyd Laboratory Inspection
Appendix I — McMahon Laboratory Inspection
Appendix J — Peperno Laboratory Inspection
Appendix K — Medders Laboratory Inspection