# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| KIMBERLY COLE, ALAN COLE, JAMES MONICA, LINDA BOYD, MICHAEL MCMAHON, RAY SMINKEY, JAMES MEDDERS, JUDY MEDDERS, ROBERT PEPERNO, SARAH PEPERNO, KELLY MCCOY, LESA WATTS, CHAD MEADOW, JOHN PLISKO, SUSAN PLISKO, KENNETH McLAUGHLIN, RYAN KENNY, ALEXANDER DAVIS, and ANDREA DAVIS, on behalf of themselves and all others similarly situated, | Civil Action No. 13-7871-FLW-TJB |
| Plaintiffs, | |
| vs. | |
| NIBCO, Inc., | |
| Defendant. | |

## OBJECTION OF CLASS MEMBER JEFFREY PALMER

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

STANDING AND PROCEDURES TO OBJECTION ......................................................4

OBJECTIONS ......................................................................................................11

I.    This Claims-Made, Reversionary Settlement Is Likely to Pay Class Counsel
      More than the Class and Delays Most Class Recovery More than Six Years ........11

II.   The Claims Process Appears Structured to Limit Class Payout. ...........................15

III.  More Information Is Needed on the Number of Class Members and the
      Value of their Claims, Not to Mention the Results of the Claims Process. ............17

IV.   Any Fee Award Should Be Deferred Pending the Results (or at Least
      Estimated Results) of the Claims Process; Regardless, 75% of Fees Should
      Be Withheld as With Class Recovery ..................................................................20

V.    Class Counsels' Lodestar Submission Is Grossly Inadequate. ..............................21

VI.   Any Award under the Percentage Method Should Take Into Account Actual
      Class Recovery. ...............................................................................................27

CONCLUSION ....................................................................................................30

## TABLE OF AUTHORITIES

**Cases**

*In re Cendant Corp.*, 260 F.3d 183 (3d Cir. 2001) ....................................................25, 26

*In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 993 (9th Cir. 2010)......................10

*City of Burlington v. Dague*, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992) ..........................................................................................................................26

*Dewey v. Volkswagen of Am.,* 728 F.Supp.2d 546 (D.N.J.2010) ....................................22

*Dungee v. Davison Design & Dev. Inc*, 674 F. App'x 153 (3d Cir. 2017)........................26

*Eubank v. Pella Corp.,* 753 F.3d 718 (7th Cir. 2014) ......................................................16

*Fickinger v. C.I. Planning Corp.*, 646 F. Supp. 622 (E.D. Pa. 1986) ..............................28

*Girsh v. Jepson,* 521 F.2d 153 (3d Cir.1975)............................................................11, 19

*Glover v. Ferrero USA, Inc.*, No. CV 11-1086 (FLW), 2012 WL 12996302 (D.N.J. Sept. 18, 2012) (Wolfson, J.) ....................................................................22, 24

*Gray v. BMW of N. Am., LLC*, No. 13-CV-3417 (WJM), 2017 WL 3638771 (D.N.J. Aug. 24, 2017)..................................................................................................1, 22

*Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190 (3d Cir.2000)....................................27

*In re Baby Prods. Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013) ..............................*passim*

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768 (3d Cir. 1995)......................................................................................................11

*In re Johnson & Johnson Derivative Litig.*, No. 10-2033(FLW), 2013 WL 11228425 (D.N.J. June 13, 2013), *adopted,* No. CIV.A. 10-2033 FLW, 2013 WL 6163858 (D.N.J. Nov. 25, 2013) (Wolfson, J.)..........................................23

*In re Prudential Insurance Co. America Sales Practice Litigation,* 148 F.3d 283 (3d Cir.1998)........................................................................................................27

*In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294 (3d Cir. 2005) ..........................................29

*In re Warfarin Sodium Antitrust Litig.,* 212 F.R.D. 231 (D. Del.2002)............................27

*Interfaith Cmty. Org. v. Honeywell Int'l. Inc.,* 426 F.3d 694 (3d Cir. 2005) ...................22

*Jabbari v. Wells Fargo & Co*., No. 15-02159-VC, Dkt. 271 at 13 (N.D. Cal. Jun. 14, 2018) ....................................................................................................21

*Jacobson v. Persolve, LLC*, 14-CV-00735-LHK, 2016 WL 7230873 (N.D. Cal. Dec. 14, 2016) ....................................................................................10

*Kakani v. Oracle Corp.*, 2007 WL 1793774 (N.D. Cal. June 19, 2007) (Alsup, J.) ........................................................................................................14

*Lachance v. Harrington*, 965 F. Supp. 630 (E.D. Pa. 1997) ............................................23

*McLennan v. LG Elecs. USA, Inc.*, No. 2:10-CV-03604 WJM, 2012 WL 686020, at *10 (D.N.J. Mar. 2, 2012)..............................................................22

*Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781 (3d Cir. 2004) ........................................11

*Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014) ..............................................12, 14

*Petruzzi's Inc. v. Darling-Delaware Co.*, 983 F. Supp. 595 (M.D. Pa. 1996)..............2, 26

*Public. Int. Research Group of N.J., Inc. v. Windall,* 51 F.3d 1179 (3d Cir. 1995); ............................................................................................................22

*Rooker v. Gen. Mills Operations, LLC*, No. CV 17-467 PA (PLAX), 2018 WL 4962089 (C.D. Cal. Mar. 26, 2018)....................................................13

*Rougvie, et al. v. Ascena Retail Group, Inc. et al*., No. 2:15-cv-00724, Dkt. 185 at 2-3 (E.D. Pa. Jul. 29, 2016) .........................................................21

*Shane Group, Inc. v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299 (6th Cir. 2016)....................................................................................................25

*Sullivan v. DB Invs., Inc*., 667 F.3d 273 (3d Cir. 2011) ...................................................29

*True v. American Honda Motor Co.* (C.D. Cal. 2010)749 F. Supp. 2d. 1052, 1079........................................................................................................10

*Vines v. Covelli Enterprises*, No. CIV.A. 12-0028, 2012 WL 5992114 (W.D. Pa. Nov. 30, 2012) .................................................................................12

*Wallace v. Powell*, 301 F.R.D. 144 (M.D. Pa. 2014) ......................................................27

*Yedlowski v. Roka Bioscience, Inc.*, No. 14-CV-8020-FLW-TJB, 2016 WL
    6661336, at (D.N.J. Nov. 10, 2016) ...........................................................29

## Rules

Fed. R. Civ. P. 23 .............................................................................................*passim*

Fed. R. Civ. P. 23 (cmts. to 2018 amendments) ........................................... 15, 18, 19, 21

## Other Authorities

Claims-Made Class Action Settlements, 99 Judicature 81 (Winter 2015)................13

Sarah Gohmann Bigelow, *Reconsidering Reverters: The Benefits of
    Reversionary Funds in Class-Action Settlements*, Blog: Duty and The
    Breach, Savitt Bruce & Willey, LLP ......................................................13

# PRELIMINARY STATEMENT

Class counsel hold this out as a $43.5 million common fund settlement (Dkt. 179-1 at 1), but it is really a reversionary claims-made settlement likely to net class counsel more ($13 million in fees plus $1 million costs)[1] than the entire class. *See Gray v. BMW of N. Am., LLC*, No. 13-CV-3417 (WJM), 2017 WL 3638771, at *5 (D.N.J. Aug. 24, 2017).[2] The settlement requires NIBCO to place $22.5 million in escrow to cover attorneys' fees, claims, and expenses, and to maintain a $3 million balance throughout the claims period. Dkt. 173-1 at 17-18. It caps payout at $43.5 million, provides no equivalent settlement floor, and then returns any unclaimed funds to NIBCO. Dkt. 173-1 at 17-18.[3] That means, after deducting $13 million in proposed fees, $1.2 million in out-of-pocket expenses, and $850,000 in notice and

---

[1] NIBCO and class counsel agreed that fees would be 29.885% of the Gross Settlement Fund, which is $12,999,975. Dkt. 173-1 at 46; Dkt. 180 at 14. The objection will round up the $25 and refer to fees throughout as $13 million.

[2] "Plaintiffs … mischaracterized the relief obtained by Class Counsel as a 'common fund'" where "[n]o specific monetary figure has been set aside to provide relief to the class; rather, the Settlement Agreement permits class members to make individual claims in order to obtain relief." *Gray*, 2017 WL 3638771, at *5.

[3] "End of Claims Period. Following the close of the Claim Period and after all timely Claims have been determined and paid as set forth herein, including any gross-up for all Eligible Class Members as set forth in Paragraphs 9.a, 9.b, and 9.c, any remaining funds in the Gross Settlement Fund but not paid into the Settlement Escrow Account shall remain with NIBCO and any funds remaining in the Settlement Escrow account but not allocated to an Eligible Claimant will be returned to NIBCO as all Eligible Claimants will have received their complete remedy under this Agreement."

1

administration costs (Dkt. 173-3 at 15), the class could get theoretically nothing while NIBCO takes back $7.4 million. Dkt. 173-1 at 27.

Of course, some class members will file claims. But empirical data shows most won't. *See Petruzzi's Inc. v. Darling-Delaware Co.*, 983 F. Supp. 595, 607 (M.D. Pa. 1996) (noting "'statistical certainty' that only a fraction of class members would submit verifiable claims"). It is absolutely crucial for the Court to evaluate the claims process before approving the settlement and awarding any fees. *See In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 175 (3d Cir. 2013) (vacating order approving settlement and fund allocation plan where court "did not know the amount of compensation that will be distributed directly to the class"). If there is any chance class counsel will take more than the class members, then the settlement should be rejected out of hand.

The parties didn't leave NIBCO's limited payout to chance. The settlement includes a reversionary provision with a claims process likely to restrict claims paid. Dkt. 173-1 at 27. Class members must complete a twelve page claim form that repeatedly references deadlines based on the "Effective Date" which is not defined in the form. Dkt. 173-1 at Ex. 1.[4] In a footnote, the claim form tells them to consult the fifty-five page settlement agreement to look up undefined terms. *Id.* at 1 n.1. Additionally, the form gives a litany of items to substantiate a Covered

---

[4] http://www.pexsystemsettlement.com/pdf/NIBCO_Claim_Form_FINAL.pdf (last visited Feb. 25, 2019).

Product, including an inspection report, bills of sale or purchase orders, builder or plumbing records, correspondence identifying tubing, fittings, and/or clamps, a report from a plumber, engineer, architect or home inspector, a builder, plumber or contractor letter stating upon personal knowledge that tubing, fittings, and/or clamps were used, photographs, and other documentation. *Id.* at 6. But the claim form leaves out any discussion of attaching items to establish Reasonably Proven Property Damage for past damages. Presumably, class members must consult the settlement agreement for that as well.

If a class member successfully submits a claim form, NIBCO has the right "at any time" to request the settlement administrator conduct further review of the claim. Dkt. 173-1 at 25. The settlement also allows NIBCO and class counsel to agree to rejection of a claim, ostensibly without input from the settlement administrator. Dkt. 173-1 at 25-26. Further, if a class member wishes to appeal a rejected claim on the issue of whether there was a Qualifying Leak, he or she must appeal to an "independent" engineering consultant who is paid by NIBCO separate and apart from the settlement fund. Dkt. 173-1 at 26-27. That is, the class members' rejected claims are reviewed by a consultant beholden to NIBCO.

Of course, there is the question of why class members would go to the trouble of filing claims in the first place when the notice discloses that they won't get 75% of their payment until the end of the Claims Period, which is **six years**

after the Effective Date. Class Long Form Notice at 6; & Dkt. 173-1 at 5. The justification for drawing out payment is to ensure sufficient funds to pay claims. Dkt. 173-1, Ex. 2 at 6.[5] If that's the case, 75% of class counsels' fees should also be deferred to ensure the fund isn't depleted.

The 2018 amendments to Federal Rule of Civil Procedure 23(e) specifically require the court, in determining whether the relief provided for the class is adequate, to "tak[e] into account: … the effectiveness of any proposed effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims" and "the terms of any proposed award of attorney's fees, including timing of payment." FED. R. CIV. P. 23(e)(2)(C)(ii),(iii) (eff. Dec 1, 2018). These considerations call for rejection of the proposed settlement.

Further, any fee permitted should be far below $13 million, and in reasonable proportion to actual class recovery. To the extent lodestar is considered, class counsels' broad submission without hourly breakdown as to how they incurred their time will not support anything close to $13 million.

### STANDING AND PROCEDURES TO OBJECTION

Objector's full name, address, telephone number, and date of birth are as

---

[5] "In order to ensure that the Net Settlement Fund is not depleted during the Claim Period, the Eligible Claimants shall receive an initial payment of 25%, and at the end of the Claim Period, the Eligible Claimants shall receive a second *pro rata* payment."

follows: Jeffrey Paul Palmer; 700 West Walnut Street, Nocona, Texas 76255; (940) 232-1017; November 15, 1964.

Objector owns a residential structure in the United States containing plumbing systems that in 2014 contained NIBCO's Tubing, Fittings, and/or Clamps as defined by the Class Notice. Exhibit 1, Declaration of Jeffrey Palmer, incorporated by reference as though set forth in full. The residential structure is at 102 Northcott Street, Nocona, Texas 76255, and contained NIBCO Tubing, Fittings, and/or Clamps as defined by the Class Notice. *Id.* at 1. These would have been installed in June, 2014 to the best of Objector's recollection. *Id.* Objector is therefore a member of the class as defined by the Class Notice.

Objector completed a claim form, along with attachments, and timely forwarded it to the settlement administrator by email as instructed in the class notice. Attached hereto as Exhibit 1-A is a true and correct copy of the completed claim form and attachments. Attached hereto as Exhibit 1-B, is a true and correct copy of the email.

In support of the objection, Objector relies on the documents attached to his claim form to show that the structure at 102 Northcott, which he owns, contains a Covered Product as defined in the Class Notice. These documents, again attached hereto as Exhibit 1-A, include a contractor letter from Mr. Palmer stating upon personal knowledge that Fittings as defined in the class notice were used in the

property. The documents attached also include a true and correct copy of a receipt from Nocona Building Center, which includes the purchase of some PEX Tubing and Fittings. *Id*. Objector is not certain if this is the receipt for the fittings that leaked, but it was the only one from that time period he has been able to locate. Ex. 1. The documents attached also include a true and correct copy of an invoice from Classic Construction & Remodeling from October 18, 2014, which documents the expense incurred for the damage caused from the leak. Ex. 1-A.

As noted in Objector's declaration and the letter attached to the claim form, Objector is a general contractor, and has considerable experience in performing construction jobs on homes, including installation and repair of plumbing. Ex. 1 at 2. From 1993 until 2004, he was a general contractor in San Diego and Sacramento, California. *Id*. Part of his overall work as a contractor included installing and repairing plumbing. *Id*. Having spent over 10 years as a contractor working with insurance companies with water damage claims, Objector learned to make note of what causes leaks in a water damage situation. *Id*. He has also worked as an adjuster in catastrophe claims. *Id*.

Additionally, he has worked as a contractor in Nocona, Texas from 2004 until present, which also includes plumbing work. *Id*. In 2014 and 2015, he was a general contractor and operated under the business name, Classic Construction & Remodeling in Nocona, Texas. *Id*. He no longer operates under that business name.

*Id.* at 2-3.

In early 2014, Objector purchased a home at 102 Northcott Street, Nocona, Texas 76255 as a rental property. *Id*. at 3. After purchasing the home, he purchased NIBCO Pex Tubing and yellow brass Fittings for installation in the third bathroom of the house. *Id.* Objector specifically recalls the yellow brass Fittings with the word NIBCO stamped on them, and used them at the joints in the PEX tubing. *Id.* He does not recall the fittings stamped with interlocking ovals or stamped DR as depicted on the settlement website. *Id.*

In October 2014, a few months after putting in the plumbing, Objector learned there had been a leak in the bathroom where the NIBCO tubing and fittings were installed. *Id.* He is not certain exactly when the leak occurred because he was renting out the property to a tenant. *Id*. The leak damaged the drywall and water ran under the vanity, damaging the flooring and the vanity cabinet. *Id.* There was also a leak in the wall where the shower valve was installed, which damaged the drywall and allowed mold to grow in the wall. *Id*. The shower had to be replaced in order to repair the damage. *Id.* Objector recalls seeing the leaking yellow brass fittings with the NIBCO insignia on them after removing drywall behind the vanity and the wall at the side of the shower. *Id.*

Based on Objector's personal knowledge, as described in his declaration and contractor letter, the NIBCO Fittings as defined in the Class Notice were used in

the property. *Id*. As shown in the October 18, 2014 invoice attached to Objector's claim form, Objector sustained damages from the water leak at his property at 102 Northcott Street, Nocona, Texas 76255 from NIBCO Fittings, and paid out-of-pocket expenses of $2,337. Ex. 1 at 3-4, 1-A. Objector was required to replace the Fittings under the house and damage was done to the drywall, vanity, and flooring. *Id*. Objector was forced to gut the entire bathroom. *Id*. at 4. He was not reimbursed for the replacements/repairs. *Id*.

Objector has no reason to believe the leak was the result of a penetration of the Tubing, Fittings, and/or Clamp from a foreign object such as a nail or other physical abuse, or due to an improper attachment of the Tubing, Fittings, and/or Clamp to plumbing components or appliances, or due to an improper stress on the Tubing, Fittings, and/or Clamp due to improper installation, or due to an improperly set or malfunctioning pressure reducing valve not manufactured or sold by NIBCO, or due to age of fixture sealant components supplied or provided by a plumber, or due to any installation issue in violation of NIBCO's installation guidelines and/or unrelated to the design, manufacture, performance, or selection of the Tubing, Fittings, and/or Clamps. *Id*.

Objector is represented by local counsel, Janet L. Gold, Eisenberg, Gold & Agrawal, P.C., 1040 North Kings Highway, Suite 200, Cherry Hill, New Jersey 08034, and Robert Clore and Christopher Bandas, Bandas Law Firm, PC, 500

North Shoreline Blvd., Suite 1020, Corpus Christi, Texas 78401.[6] Contemporaneous with this objection, Mr. Clore and Mr. Bandas are moving for *pro hac vice* admission before this Court. Although Objector does not intend to appear personally at the Final Approval Hearing, his counsel intend to appear at the hearing on his behalf. To the best of his recollection, Objector has objected to a class action settlement on one prior occasion, *Gellis v. Verizon Communications*, 07-cv-03679, before the United States District Court, Northern District of California. The objection was overruled and the appeal was dismissed for want of prosecution. Objector's counsel Janet Gold has represented an objecting class member on one prior occasion, *Schwartz v. Avis*, No. 11-4052, United States District Court, District of New Jersey. The objection overruled and the appeal was dismissed. Mr. Clore, Mr. Bandas, and/or the Bandas Law Firm, P.C. have represented objecting class members on numerous occasions, assisting clients in returning millions of dollars in excess attorneys' fees to the rightful settlement beneficiaries, the class members. *See* Exhibit 2. In fact, Mr. Bandas was part of a group of attorneys representing objectors in the *Baby Products* class action settlement that resulted in reversal of a settlement that threatened, as here, to result

---

[6] The class notice states that "all attorneys who are involved in any way [in] asserting objections on behalf of the Settlement Class Member must be listed on the objection papers." Notice at 12. Objecting class member's brother, Darrel Palmer is an attorney, but has no involvement in asserting the objection and does not represent Jeffrey Palmer. Darrell simply suggested his brother give the Bandas Law Firm a call about the NIBCO class action settlement. Ex. 1.

in a disproportionate allocation of fees to class counsel relative to class recovery.

708 F.3d 163, 175 (3d Cir. 2013). As directed in the class notice, a list of cases

with captions, court and case number, and the disposition are attached as Exhibit

2,[7] and are incorporated herein by reference.[8]

The statement of the objections and the grounds therefor are set forth below.

Although this objection is asserted only on behalf of class member Jeffrey Palmer,

_____

[7] In complying with the requirement that objectors and their counsel disclose all cases in which they have filed an objection by caption, court and case number, and for each case, the disposition of the objection, a thorough review of records was made; and searches were made on Pacer and www.serialobjector.com. Although it is possible an objection may have been inadvertently missed, counsel made a good-faith effort to locate and identify every objection called for in the class notice. Any omission, discrepancy or shortcoming in these disclosures is strictly unintentional. Should counsel become aware of any such deficiencies, they will take immediate steps to address any such matters.

[8] Objection is made to the unlimited scope of the request for prior objections. Anything beyond five years is excessive and serves no purpose other than to obstruct class members' due process rights in objecting to the settlement. *Jacobson v. Persolve, LLC*, 14-CV-00735-LHK, 2016 WL 7230873, at *6 (N.D. Cal. Dec. 14, 2016) (disapproving of "burdensome requirements for class members to object to the settlement"); *see also In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 993 (9th Cir. 2010). There is no rational explanation for the disclosure other than to stifle objections. *See True v. American Honda Motor Co.* (C.D. Cal. 2010)749 F. Supp. 2d. 1052, 1079 (attorney's prior representation of class members not relevant). Although these Objectors were able to file their objections, there may have been many class members whose objections were chilled. Objection is further made to any other procedures or requirements to object in this case that require information or documents other than those that are contained herein on grounds that such requirements seek irrelevant information to the objections, are unnecessary, unduly burdensome, are calculated to drive down the number and quality of objections to the settlement and violate Objector's and counsel's due process rights and/or Rule 23.

he believes it applies equally to the entire class. Objector relies upon the documents contained in the Court's file in support of these objections.

## OBJECTIONS

I.   **This Claims-Made, Reversionary Settlement is Likely to Pay Class Counsel More than the Class and Delays Most Class Recovery More than Six Years.**

Given the inherent conflicts in class action settlements, the Third Circuit regards the district court as a "fiduciary who must serve as a guardian of the rights of absent class members." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995). The court must "give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole." *Baby Prods.*, 708 F.3d at 175 (citing *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 785 (3d Cir. 2004); *Gen Motors*, 55 F.3d at 785).

In carrying out that duty, not only should the Court consider the fairness, adequacy, and reasonableness of the settlement using the *Girsh* factors,[9] but it

---

[9] The *Girsh* factors are: (1) the complexity and duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement in light of the best recovery; and (9) the range of reasonableness of the settlement in light of all the attendant risks of litigation. *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir.1975); *see also In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995) (noting proponent of settlement bears burden of proving Girsh factors weigh in favor of approval.)

should also consider the direct benefit provided to the class. *Baby Prods.,* 708 F.3d at 174. The Third Circuit rightfully disapproves of any settlement allocation where "class counsel, and not their client, may be the foremost beneficiaries of the settlement." *Baby Prods.*, 708 F.3d at 179; *accord Pearson v. NBTY, Inc.*, 772 F.3d 778, 781 (7th Cir. 2014) ("in consumer class actions…the presumption should…be that attorneys' fees awarded to class counsel should not exceed a third or at most a half of the total amount of money going to class members and their counsel"); *Vines v. Covelli Enterprises*, No. CIV.A. 12-0028, 2012 WL 5992114, at *6 (W.D. Pa. Nov. 30, 2012) (disproportionate distribution for class counsel and reversionary provisions are classic warning signs of unfair arrangements). Further, allocation between the class and class counsel is now expressly part of the fairness inquiry under Rule 23(e). The court may only approve the settlement if it finds that it is fair, reasonable, and adequate after considering, among other things:

> (C) the relief provided for the class is adequate, taking into account:
>
> (i) the costs, risks, and delay of trial and appeal;
>
> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; [and]
>
> (iii) the terms of any proposed award of attorney's fees, including timing of payment[.]

FED. R. CIV. P. 23(e)(2)(C).

There is every reason to believe that $13 million in attorneys' fees will exceed class recovery in this claims-made, reversionary settlement with no floor. Reversionary claims-made settlements "create a risk that class counsel's recovery will be disproportionate to that of the class." Sarah Gohmann Bigelow, *Reconsidering Reverters: The Benefits of Reversionary Funds in Class-Action Settlements*, Blog: Duty and The Breach, Savitt Bruce & Willey, LLP.[10] For this reason, respected class action attorney Elizabeth Cabraser characterized reversionary provisions in claims-made settlements as "rare" and "disfavored." *Claims-Made Class Action Settlements*, 99 JUDICATURE 81 (Winter 2015).[11]

The problem isn't just that this is a reversionary claims-made settlement, although that's enough. It's that there is no settlement floor. This would at least provide some measure of proportionality. *See* Sarah Gohmann Bigelow, *Reconsidering Reverters: The Benefits of Reversionary Funds in Class-Action Settlements*, Blog: Duty and The Breach, Savitt Bruce & Willey, LLP;[12] *see e.g.*, *Rooker v. Gen. Mills Operations, LLC*, No. CV 17-467 PA (PLAX), 2018 WL 4962089, at *2 (C.D. Cal. Mar. 26, 2018) (in a claims-made reversionary

---

[10] Accessible at https://www.sbwllp.com/reconsidering-reverters-the-benefits-of-reversionary-funds-in-class-action-settlements (last visited Feb. 22, 2019).

[11] Accessible at https://judicialstudies.duke.edu/sites/default/files/centers/judicialstudies/judicature/judicature-vol99-no3_point-counter.pdf (last visited Feb. 22, 2019).

[12] Accessible at https://www.sbwllp.com/reconsidering-reverters-the-benefits-of-reversionary-funds-in-class-action-settlements (last visited Feb. 22, 2019).

settlement, setting a floor of at least 65% of the net settlement to be distributed to the class). If the parties had agreed to a $39 million floor, then after class counsels' proposed $13 million, the class might have recovered around $24 million after deducting litigation and settlement administration expenses. In that context, class counsels' fee would amount to around a third of the settlement fund.

Without a minimum payout, the disproportionate allocation could be worse than in *Pearson v. NBTY, Inc.*, where glucosamine buyers received only $0.8 million relative to class counsels' $2.1 million in fees. 772 F.3d 778, 781-82. The Seventh Circuit vacated approval of that settlement and required the settlement to be valued at the amount the class members actually received. *Id.*; *see also Kakani v. Oracle Corp.*, 2007 WL 1793774, at *5 (N.D. Cal. June 19, 2007) (Alsup, J.) (denying preliminary approval to a claims-made settlement where "$2.25 million might wind up being more in fees than the class receives in payments").

Any settlement structured to allow class counsel to be the primary beneficiary is, by definition, unfair and inadequate to the class. Unless class counsel can carry their burden to show the claims paid in this case will exceed by a considerable margin class counsels' proposed $13 million, the Court should reject the settlement. *Baby Prods.*, 708 F.3d at 175 (vacating order approving the settlement and fund allocation).

## II.     The Claims Process Appears Structured to Limit Class Payout.

The comments to the recent amendments to Rule 23 note that it will often "be important for the court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims. A claims process method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding." FED. R. CIV. P. 23 (e) (cmts. to 2018 amendments). The claims process here *is* unreasonably demanding, and has been communicated in confusing fashion in both the class notice and claim form itself. Further, the administration/appellate process yields too much influence to NIBCO over claim rejection.

The claim form is long—twelve pages—and the instructions require claimants to complete all questions. Dkt. 173-1, Ex. 1. Neither the claim form nor the class notice indicate whether a class member can submit multiple claims and if multiple forms are required if he or she owns separate effected properties.

The class notice uses the term "Effective Date" fifteen times without ever defining it. Dkt. 173-1, Ex. 2 at 5-6, 8-9, 11. The claim form uses it seven times without defining it. Dkt. 173-1, Ex. 1 at 1, 7-8, 10. Claimants are then repeatedly questioned whether they experienced a leak with respect to tubing, fittings, or clamps "on or after the Effective Date?" *Id.* at 7-8, 10. Since that date has yet to occur, how can claimants answer the question?

A footnote in the claim form (but not the notice) refers class members to the fifty-five page settlement agreement to look for definitions. Dkt. 173-1, Ex. 1 at 1 n.1. Even then, the term "Effective Date" is subject to variables not likely to be within the purview of most class members, including the date that the Court enters the Final Approval Order which is deemed "Final." Dkt. 672-1 at 7.

The claim form provides a litany of items that can be used to establish proof of a covered product, but nowhere does the form (or class notice) call for or explain what is required, if anything, for proof of Reasonably Proven Property Damage for past damages. Dkt. 173-1, Ex. 1 at 6. Presumably, class counsel will respond that the class members should again sift through the fifty-five page settlement to uncover the specifics of that ostensible requirement. All of that confusion increases the likelihood of class members submitting late, inaccurate, or incomplete forms; or more likely, no forms at all. Correspondingly, NIBCO has every incentive to reject claims where claimants did not file the form out completely or correctly. *See Eubank v. Pella Corp.,* 753 F.3d 718, 725–26 (7th Cir. 2014) (noting twelve page claim form was long and that the forms could lead to rejection of incomplete or incorrectly submitted claims).

The form is also unnecessarily invasive of class members' privacy. There's no reason they should have to list their date of birth to establish they have a Covered Product. Nor should they have been required to name their home owner's

insurance company and policy number if they didn't file a claim against their policy.

Aside from the confusing, unnecessarily invasive, and unduly burdensome claim form, the administration and appeals process gives NIBCO too much input over claims rejection. Dkt. 173-1 at 25-26. And, any claimant who wishes to appeal the rejection of a claim determined not to involve a Qualifying Leak must persuade a consultant paid by NIBCO outside of the settlement fund. Dkt. 173-1 at 26-27. The decision of this "independent" consultant is final. Notice at 7.

These hurdles make it unlikely class recovery will match or even come close to class counsels' proposed $13 million fee, particularly when those who do file claims are capped at  70% of their reasonably proven property damage.

## III.    More Information Is Needed on the Number of Class Members and the Value of their Claims, Not to Mention the Results of the Claims Process.

Aside from the obvious defects in settlement structure and claims process, the settlement cannot be approved at this stage because of a fundamental lack of information. Not only is it impossible to assign value to the claims-made reversionary settlement with no floor, but class counsel have yet to proffer any comparison with potential class recovery. From Objector's counsels' review, nowhere in the motion for preliminary approval, class notice, or fee motion is there any reference to the value of class damages released. Even the approximate size of the class appears unknown. According to the settlement administrator, the

overinclusive "potential audience size is estimated at approximately 10,732,000." Dkt. 173-3 at 7. However, NIBCO estimates there are between 157,700 to 400,000 structures in the United States in the settlement class. *Id.* at 8. The parties should submit a reasonable estimate of the class size and an aggregate value of class damages. Even with that, however, there is no real number to compare class damages with considering the the claims-made reversionary settlement with no floor.

As the Third Circuit has explained, the fairness inquiry "needs to be, as much as possible, practical and not abstract." *Baby Prods.*, 708 F.3d at 175. In determining the direct benefit to the class, the Court should consider the number of claims and estimated number of class members as well as class recovery relative to estimated damages. *Id.* at 174. Further, the Third Circuit instructs that where the parties have not supplied this data, the court "should affirmatively seek" it out. *Id.* at 174. The comments to the recent amendments to Rule 23 agree that "[t]he parties should … supply the court with information about the likely range of litigated outcomes[,]" and that it is often necessary to "forecast the likely range of possible classwide recoveries…." FED. R. CIV. P. 23(e) (cmts. to 2018 amendments).

On its face, the Court cannot adequately consider *Girsh* factors (8) the range of reasonableness in light of the best recovery, or (9) the range of reasonableness

of the settlement in light of all the attendant risks of litigation. *Girsh*, 521 F.2d at 157. Nor can it evaluate factor (2), the reaction of the class to the settlement, without the results of the claims process. *Id.*; FED. R. CIV. P. 23(e) (cmts. to 2018 amendments) ("[t]he relief that the settlement is expected to provide to class members is a central concern. Measuring the proposed relief may require evaluation of any proposed claims process; directing that parties report back to the court about actual claims experience may be important."); *see also Baby Prods.*, 708 F.3d at 175 (vacating approval of settlement where court lacked information about the amount of direct compensation to the class and thus could not properly assess "whether the settlement was in the best interest of the class as a whole").

The missing data also stifles class member participation in making informed decisions on whether to opt out or object. "Generally speaking, the notice should contain sufficient information to enable class members to make informed decisions on whether they should take steps to protect their rights, including objecting to the settlement or, when relevant, opting out of the class." *Baby Prods.,* 708 F.3d at 180. When class members lack "information on the membership for the class" or "the size of potential claims[,]" they may lack the ability to evaluate, as a matter of due process, whether "the settlement represents a superior alternative to litigating." *Gen. Motors*, 55 F.3d at 789. The notice represents that class members may recover 70% of Reasonably Proven Property Damage. Notice at 6. But, that does

not give them a real sense of the value of what they are releasing collectively. Class members should have an understanding of the aggregate value of their claims relative to the estimated actual value of the settlement. The Court should not approve the settlement without the parties producing this data, and without reissuing notice to include it, along with new objection and opt-out deadlines. Further, the Court should make no extrapolations about class approval of the settlement based on the number of objections and exclusions in the absence of this critical information.

## IV. Any Fee Award Should Be Deferred Pending the Results (or at Least Estimated Results) of the Claims Process; Regardless, 75% of Fees Should Be Withheld as With Class Recovery.

Even though the class must wait more than six years for 75% of their recovery, the settlement calls for payment of class counsels' $13 million plus $1 million in costs ten days after the Effective Date. Dkt. 173-1 at 46-47. If the class is to be the foremost beneficiary, and the reason for withholding most of the class relief is to ensure funds won't be depleted during the claims period (Dkt. 173-1 at 21), it follows that at least the same proportion of class counsels' fees should be withheld for the duration of the claims period.

Aside from the extensive delay endured only by the class, the uncertainty in actual class recovery further counsels for deferment of fees. As discussed in the comments to the 2018 amendments, this is precisely the type of case where it is

"important to relate the amount of an award of attorney's fees to the expected benefits to the class. One way to address this issue is to defer some or all of the award of attorney's fees until the court is advised of the actual claims rate and results." FED. R. CIV. P. 23(e) (cmts to 2018 amendments).

In similar circumstances, Judge Vince Chhabria in the Northern District of California sought to protect class interests by reserving "[t]en percent of Class Counsel's awarded fees … in the Settlement Fund until after Class Counsel files a Notice of Completion of Duties" and "after substantially all of the Settlement Fund has been distributed to the Class…" *Jabbari v. Wells Fargo & Co.*, No. 15-02159-VC, Dkt. 271 at 13 (N.D. Cal. Jun. 14, 2018); *see also Rougvie, et al. v. Ascena Retail Group, Inc. et al.*, No. 2:15-cv-00724, Dkt. 185 at 2-3 (E.D. Pa. Jul. 29, 2016) (withholding 25% of fees until class counsel provided certification of distribution to the class). This case requires a far greater withholding since the settlement delays most class recovery longer than six years.

## V.    Class Counsels' Lodestar Submission is Grossly Inadequate.

With the caveat that no fee approaching actual class recovery should be entertained, to the extent the Court awards a fee, it would be most appropriately calculated under the lodestar method because of the uncertain value of this claims-made reversionary settlement. "Courts in this district have previously found the lodestar method" should be applied because of the uncertain value of claims-made

settlements, which "cannot be characterized as true 'common fund[s]' for purposes of the percentage-of-the-fund analysis." *McLennan v. LG Elecs. USA, Inc.*, No. 2:10-CV-03604 WJM, 2012 WL 686020, at *10 (D.N.J. Mar. 2, 2012) (citing *Dewey v. Volkswagen of Am.,* 728 F.Supp.2d 546, 593 (D.N.J.2010)); *see also Gray*, 2017 WL 3638771, at *4–5.

Class counsel represent an $8.2 million lodestar (Dkt. 179 at 2)[13], but their submission is wholly inadequate, even if just as a cross-check for a percentage-based award. *Glover v. Ferrero USA, Inc.*, No. CV 11-1086 (FLW), 2012 WL 12996302, at *4 (D.N.J. Sept. 18, 2012) (Wolfson, J.) (transcript) (calling for detailed lodestar submission in context of lodestar cross-check). This case involves multiple law firms engaged in similar litigation in at least two separate lawsuits. Class counsels' assurances that they made efforts to avoid duplicative efforts are not enough given this Court's fiduciary obligations.

In calculating lodestar, the paramount requirement for the time spent on a given matter is reasonableness. *Interfaith Cmty. Org. v. Honeywell Int'l. Inc.,* 426 F.3d 694 (3d Cir. 2005). Hours must be excluded which are "excessive, redundant, or otherwise unnecessary." *Public. Int. Research Group of N.J., Inc. v. Windall,* 51 F.3d 1179, 1188 (3d Cir. 1995); *see In re Johnson & Johnson Derivative Litig.*,

---

[13] Specifically, class counsel identify their lodestar as $8,220,894.85, which would produce a 1.58 lodestar multiplier for $12,999,975 in fees. Dkt. 179 at 2. Or, if we include $1,095,000 in costs (Dkt. 180 at 14), the multiplier would be 1.7.

No. 10-2033(FLW), 2013 WL 11228425, at *9 (D.N.J. June 13, 2013), *adopted,* No. CIV.A. 10-2033 FLW, 2013 WL 6163858 (D.N.J. Nov. 25, 2013) (Wolfson, J.); *Lachance v. Harrington*, 965 F. Supp. 630, 650 (E.D. Pa. 1997) ("When evaluating at lodestar, the court must be cautious to ensure that class counsel does not engage in duplicative and repetitive work").

Class counsel have not disclosed the number of hours they spent by task to allow for elimination of duplicative or unnecessary hours among the collective 14,831.6 hours (divided among 36 attorneys and staff) reported by the three firms that submitted supporting declarations. Dkt. 179-2 (3,114.7 reported hours for $1.8 million lodestar by Lite De Palma Greenberg); Dkt. 1790-3 (4,706 hours reported for $2.6 mil lodestar by Sauder Schelkopf LLC and Chimicles Schwartz Kriner & Donaldson-Smith LLP); Dkt. 179-4 at 14 (7,010.9 reported hours for $3.7 million lodestar by Berger Montague). Considering the number of attorneys who worked on this case, there is almost certainly some duplicative labor. Not surprisingly then, Mr. Greenberg's and Mr. Sauder's declarations mirror each other's recitations of work performed. Dkt. 179-2 at 17-18; Dkt. 179-3 at 20-21 (describing the firms' overlapping work, including among other things, legal research, drafting of complaints, and briefing).

Objector would refer class counsel to this Court's reduction of fees and comments made during a fairness hearing about a similar generic lodestar

submission in *Glover*, 2012 WL 12996302, at *4 (D.N.J. Sept. 18, 2012 transcript

of July 9, 2012 hearing) (Wolfson, J.):

> Let me also, just at the outset I would like to discuss with
> counsel the manner in which your rates, hourly rates,
> were submitted for the work done, which was done only
> for purposes of the lodestar check, because you are not
> actually looking for a lodestar recovery but a percentage
> of the common fund. But I have a problem.
>
> I appreciate that you need not give me chapter and verse
> of what your fees are. But I must point out that at least
> with the Carella firm I had codes that indicated what kind
> of work was being done by which attorneys. I had
> nothing from the other attorneys as to how many hours
> were spent on what tasks; and it, one, creates grave
> concerns for this Court in determining whether you have
> provided me an adequate basis for determining what your
> real fees were for the lodestar check because everyone
> gives the same general descriptions: You worked on
> motions. You worked on discovery. You worked on
> the settlement. And I've got five law firms all telling me
> the same thing which leads me to believe duplication of
> effort, and no one has broken this down—and also such
> substantial number of hours that were spent where the
> Court can't even assess in the broadest fashion whether it
> was reasonable amounts of time being spent.
>
> I start with that. No breakdown at all even in a summary
> fashion.

*Id.* at *4. This Court should apply the same scrutiny to the broad submission as it

did in *Ferrero*. Further, class counsel shouldn't be heard to submit their time

records *in camera*. Dkt. 179-2 at 16. The class members have a right to know how

their attorneys spent their time and the basis upon which fees will be awarded. This

material should be filed of record, with appropriate redactions for work product where necessary.

"Class members cannot participate meaningfully in the process contemplated by Federal Rule of Civil Procedure 23(e) unless they can review the bases of the proposed settlement and the other documents in the court record." *Shane Group, Inc. v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299, 309 (6th Cir. 2016). In *Shane Group*, the Sixth Circuit vacated approval of the settlement where documents which the parties considered in reaching the settlement were sealed from the class. *Id*. at 306, 309. Because class members could not view this critical information, the Court found that "[t]he Rule 23(e) objection process seriously malfunctioned." *Id*. at 309.

The same is true of a fee entered based on sealed records. The need for transparency is particularly important with class actions because "many members of the 'public' are also plaintiffs in the class action." *In re Cendant Corp.*, 260 F.3d 183, 193 (3d Cir. 2001).

> Protecting the access right in class actions "promotes [class members'] confidence" in the administration of the case. . . . Additionally, the right of access diminishes the possibility that "injustice, incompetence, perjury, [or] fraud" will be perpetrated against those class members who have some stake in the case but are not at the forefront of the litigation. Finally, openness of class actions provides class members with "a more complete understanding of the [class action process] and a better perception of its fairness."

*Cendant*, 260 F.3d at 193 (quotations omitted).

There are simply no compelling interests that would allow for the sealing of class counsels' billing records, while still allowing for reasonable redaction of work product. *Cendant*, 260 F.3d at 193-98.

To the extent fees are awarded under the lodestar method, after reducing hours for duplicative and unnecessary time, a negative multiplier should be applied considering the claims-made, reversionary settlement with no floor. *See Petruzzi's Inc.*, 983 F. Supp. at 607 (rejecting an upward adjustment on lodestar because of the claims-made nature of the settlement). Of course, the Court should start with the "'strong presumption that the lodestar represents the 'reasonable fee,'" and only allow an upward adjustment in "rare" and "exceptional" circumstances. *Dungee v. Davison Design & Dev. Inc*, 674 F. App'x 153, 156–57 (3d Cir. 2017) (citing *City of Burlington v. Dague*, 505 U.S. 557, 562, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992)). The prospect that class counsels' fee will exceed class relief coupled with making the class wait more than six years to get most of it is anything but the extraordinary circumstances required for a positive multiplier. Nothing more than between .5 and .75 of class counsels' lodestar, after appropriate reductions for duplicitous and unreasonable billing, should be allowed.

## VI.   Any Award under the Percentage Method Should Take Into Account Actual Class Recovery.

If fees are awarded under the percentage method, the Court should allow nothing more than 25%[14] of the actual or reasonably estimated claims. *Baby Prods.*, 708 F.3d at 179-80. In general, the Third Circuit requires consideration of the *Gunter/Prudential* factors to assist in evaluating the reasonableness of fees. The factors include: (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases. *Baby Prods.*, 708 F.3d at 177 (citing *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 195 n. 1 (3d Cir.2000); *In re Prudential Insurance Co. America Sales Practice Litigation,* 148 F.3d 283 (3d Cir.1998)).

In *Baby Products*, the Third Circuit recognized that direct recovery by the class must be considered when the results appear to provide a disproportionate

---

[14] "Many courts, including several in the Third Circuit, have considered 25% to be the 'benchmark' figure for attorney fee awards in class action lawsuits, with adjustments up or down for significant case-specific factors." *Wallace v. Powell*, 301 F.R.D. 144, 166 (M.D. Pa. 2014) (quoting *In re Warfarin Sodium Antitrust Litig.,* 212 F.R.D. 231, 262 (D.Del.2002) (gathering case law and awarding 22.5% in fees on a $10.01 million settlement fund)).

award in favor of class counsel. *Baby Prods.*, 708 F.3d at 169-70, 179-80 (rejecting $14 million in fees where class would expected to recover around $3 million and the rest would go to *cy pres* recipients); *Fickinger v. C.I. Planning Corp.*, 646 F. Supp. 622, 636 (E.D. Pa. 1986) (where claims process resulted in disproportionate fees relative to class recovery, "the attorneys' fee must be based on the actual recovery of the class, not on the amount of the fund"). In this context, when "evaluating a fee award, [the court] should begin by determining with reasonable accuracy the distribution of funds that will result from the claims process." *Baby Prods.*, 708 F.3d at 179. Once the final numbers are in, the court should, "relying on the *Gunter/Prudential* factors and its experience, determine whether the level of distribution provided to the class by the settlement reflects a failure of class counsel to represent adequately the interests of the entire class." *Id.*

The most relevant factor here is the first—the size of the fund created and the number of persons benefitted. The true size of the fund and the number of members benefitted in this case depends entirely on the results of the claims process. As discussed, actual class recovery is likely to be below class counsels' proposed $13 million. If that's the case, then class counsel failed to represent adequately the interests of the class. Class counsel should recover no more than a percentage of the actual benefit to the class.

Class counsel have hamstrung the court in analyzing the amount of time

devoted to the case with an overly broad lodestar submission. The skill and efficiency of counsel should be measured on their results here—an attorney-first settlement. Class counsels' recitation of the risk of non-payment is a five sentence paragraph in their fee motion, and is essentially that insurance issues threatened the prospect of sufficient funds, which could be said in many cases. Dkt. 179-1 at 24. Finally, the two securities and one antitrust class action opinions class counsel cite as "similar" cases are nothing like this consumer class action that resulted in a claims-made reversionary settlement with no floor. Dkt. 179-1 at 25. *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294 (3d Cir. 2005) (securities); *Yedlowski v. Roka Bioscience, Inc.*, No. 14-CV-8020-FLW-TJB, 2016 WL 6661336, at *22 (D.N.J. Nov. 10, 2016) (securities); *see also Sullivan v. DB Invs., Inc.*, 667 F.3d 273 (3d Cir. 2011) (antitrust).

In particular, the *Roka Bioscience* settlement paid the class from a settlement fund *pro rata*, and the court provided for a second redistribution for any balance remaining. *Roka Bioscience*, No. 14-CV-8020-FLW-TJB, Dkt 71 at 2 (D.N.J. Nov. 8, 2017) (Wolfson, J). To the extent the redistribution was infeasible, the Court authorized the balance to be distributed *cy pres*. *Id*. Most importantly, none of the three cases mention a reversionary provision allowing unclaimed funds to return to the defendant as allowed under this settlement. Dkt. 173-1 at 27.

In short, there is no plausible justification for allowing class counsel to take

$13 million plus $1 million in costs when the class is likely to take far less. Nothing more than 25% of actual class recovery, or at least reasonably estimated class recovery, should be permitted.

## CONCLUSION

Objecting class member Jeffrey Palmer urges the Court to reject the settlement and find class counsel inadequate representatives in making themselves the foremost beneficiary at the expense of the class. Structurally, the Court should disapprove the reversionary, claims-made structure of the settlement coupled with a confusing and cumbersome claims process, which affords NIBCO significant control over claims approval. Any award of fees should be deferred until the Court has an understanding of the likely value of the settlement based on actual claims submitted. If the Court nevertheless entertains fees at this juncture, class counsel should be required to submit lodestar with breakdowns as to how individual attorneys incurred their time by task. This material should be filed, with appropriate redactions for work product, and not submitted under seal. After allowing for elimination of redundant and unnecessary time, class counsel should be awarded no more than .5 to .75 of their lodestar to account for having negotiated a settlement structure likely to reward class counsel more than the class. Alternatively, class counsel should recover no more than 25% of actual class recovery.

DATED:  February 27, 2019          Respectfully submitted,


/s/ *Janet L. Gold, Esquire*
Janet L. Gold, Esquire
Eisenberg, Gold & Agrawal, P.C.
1040 North Kings Highway, Suite 200
Cherry Hill, New Jersey 08034
Tel: (856) 330-6200
Fax: (856) 330-6207
jgold @egclawfirm.com

Robert W. Clore
*Pro Hac Vice* Admission Pending
Christopher A. Bandas
*Pro Hac Vice* Admission Pending
Bandas Law Firm, P.C.
500 North Shoreline, Suite 1020
Corpus Christi, TX 78401
Tel: (361) 698–5200
Fax: (361) 698-5200
rclore@bandaslawfirm.com
cbandas@bandaslawfirm.com

*Counsel for Objecting Class Member Jeffrey Palmer*

Jeffrey Palmer
Class Member/Objector

## Certificate of Service

The undersigned certifies that today she filed the foregoing objection and associated declarations on ECF which will send electronic notification to all attorneys registered for ECF-filing.  The undersigned further certifies he caused to be served via USPS First Class Mail, postage prepaid, a copy of this Objection and associated exhibits upon the following.

DATED:  February 27, 2019


Class Action Objections
Attn: NIBCO Class Action Settlement
PO Box 58086
1500 JFK Boulevard, Suite C31
Philadelphia, PA 19102


/s/ *Janet L. Gold, Esquire*
Janet L. Gold, Esquire
Eisenberg, Gold & Agrawal, P.C.
1040 North Kings Highway, Suite 200
Cherry Hill, New Jersey 08034
Tel: (856) 330-6200
Fax: (856) 330-6207
jgold @egclawfirm.com
*Attorney for Objector/Class Member*