UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| KIMBERLY COLE, ALAN COLE, JAMES MONICA, LINDA BOYD, MICHAEL MCMAHON, RAY SMINKEY, JAMES MEDDERS, JUDY MEDDERS, ROBERT PEPERNO, SARAH PEPERNO, and KELLY MCCOY, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> NIBCO, INC., <br><br> Defendant. | Civil Action No.: 3:13-cv-07871-FLW-TJB |

BRIEF IN SUPPORT OF OBJECTIONS TO PLAINTIFFS' NOTICE OF
MOTION FOR FINAL SETTLEMENT APPROVAL AND RELATED RELIEF
ON BEHALF OF INTERESTED PARTY, D.R. HORTON, INC.

**WOOD SMITH HENNING & BERMAN, LLP**
Kelly A. Waters, Esquire (KW- 4682)
Samuel John, Esquire (SJ - 3298)
400  Connell Drive, Suite 1100
Berkeley Heights, New Jersey 07922
(973)-265-9901
kwaters@wshblaw.com
sjohn@wshblaw.com
Counsel for Interested Parties D.R. Horton, Inc. and
Continental Homes of Texas, L.P.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT................................................................................1

PROCEDURAL HISTORY ................................................................................2

FACTUAL BACKGROUND................................................................................4

LEGAL ARGUMENT ................................................................................11

POINT I - THE SETTLEMENT AGREEMENT FAILS TO MEET THE STANDARD SET FORTH IN FED.R.CIV.P. 23(E)(2) AS IT IS UNFAIR, UNREASONABLE AND INADEQUATE .................................................................................11

  A.  The Settlement Agreement Unfairly and Unreasonably Exposes D.R. Horton to Potential Liability for NIBCO's Defective Products while Impairing or Extinguishing D.R. Horton's Claims Against NIBCO. ........................................................13

  1.  D.R. Horton's Contribution, Indemnity and Other Claims Are Impacted with No Compensation to D.R. Horton. ................................................................13

  2.  The Release's Carve Out Subjects D.R. Horton to Liability with No Ability to Shift Responsibility to NIBCO In Violation of D.R. Horton's Due Process Rights. ...................17

  3.  Even When a Class Member Is Determined to Have a Qualifying Leak, the Proposed Settlement Agreement Exposes D.R. Horton to Potential Liability for NIBCO's Defective Products.................................................................................19

  B.  The Settlement Fund is Inadequate. ................................................................19

POINT II - PLAINTIFFS' PROPOSED CLASS CANNOT BE PROPERLY CERTIFIED FOR PURPOSES OF SETTLEMENT AS IT FAILS TO SATISFY THE REQUIREMENTS OF F.R.C.P. 23(A) AND F.R.C.P. 23(B)(3)................................................................25

  A.  The Class Representatives Cannot Adequately Represent the Unnamed Class Members ................................................................................26

  B.  The Claims of the Class Representatives are not Typical of the Claims of Parties Asserting Contribution, Indemnity, and Similar Claims......................................31

  C.  Individualized Issues of Fact Predominate Over Common Questions, Thus Making Settlement Approval Improper. ................................................................33

  D.  Plaintiffs Are Unable to Satisfy the Requirements of F.R.C.P. 23(b)(3) as Class Settlement is Not the Superior Means for Resolving Class Claims...........................36

CONCLUSION................................................................................40

# TABLE OF AUTHORITIES

**Cases**

Adler's Quality Bakery, Inc. v. Gaseteria, Inc.,
   32 N.J. 55, 80 (1960)..............................................................................33

Amchem Products, Inc. v. Windsor,
   521 U.S. 591, 620-22 (1997).......................................... 11, 25, 27, 31, 36

Coates v. CTB, Inc.,
   173 F. Supp. 2d 1200, 1203 (M.D. Ala. 2001) ........................................15

Crawford v. Equifax Payment Servs. Inc.,
   201 F.3d 877, 882 (7th Cir. 2000)...................................................... 20, 24

Eichenholtz v. Brennan,
   52 F.3d 478, 482 (3d Cir. 1995)........................................................ 12, 14, 16

Equitable Recovery, L.P. v. Health Ins. Brokers of Texas, L.P.,
   235 S.W.3d 376, 387 (Tex. App. 2007);...................................................15

Fresh Coat, Inc. v. K-2, Inc.,
   318 S.W.3d 893 (Tex. 2010) ....................................................................15

Girsh v. Jepson,
   521 F.2d 153, 157 (3d Cir. 1975)................................................... 12, 20, 25

Hassine v. Jeffes,
   846 F.2d 169, 177 (3d Cir. 1988)..............................................................32

In re Cmty. Bank of N. Virginia,
   622 F.3d 275, 291 (3d Cir. 2010)...............................................................26

In re Ford Motor Co. Ignition Switch Products Liab. Litig.,
   194 F.R.D. 484, 490 (D.N.J. 2000) ..........................................................34

In re General Motors,
   55 F.3d 768, 785 (3d Cir. 1995)....................................... 11, 12, 27, 28, 29

In re Masters Mates & Pilots Pension Plan and IRAP Litig.,
   957 F.2d 1020, 1026 (2d Cir. 1992). ........................................................14

In re Nat'l Football League Players Concussion Injury Litig.,
   821 F.3d 410, 434 (3d Cir. 2016)..............................................................33

In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions,
   148 F.3d 283, 323 (3d Cir. 1998)...................................................... 13, 20, 36

In re Warfarin Sodium Antitrust Litig.,
    391 F.3d 516, 528 (3d Cir. 2004).............................................................................33

Liberty Lincoln Mercury, Inc. v. Ford Mktg. Corp.,
    149 F.R.D. 65, 77 (D.N.J. 1993)...........................................................................32

Mace v. Van Ru Credit Corp.,
    109 F.3d 338, 344 (1997)). ..................................................................................37

Marcus v. BMW of N. Am., LLC,
    687 F.3d 583, 604 (3d Cir. 2012)............................................................33, 34, 35

Mariner Health Care, Inc. v. PricewaterhouseCoopers LLP,
    638 S.E.2d 340, 342 (Ga. Ct. App. 2006). ...........................................................15

Morisky v. Pub. Serv. Elec. & Gas Co.,
    111 F. Supp. 2d 493, 500 (D.N.J. 2000) .........................................................32, 33

Murray v. GMAC Mortg. Corp.,
    434 F.3d 948, 952 (7th Cir. 2006)...................................................................20, 24

Oscar v. BMW of N. Am., LLC,
    274 F.R.D. 498, 511 (S.D.N.Y. 2011). .................................................................34

Richards v. Jefferson County, Alabama,
    517 U.S. 793, 804 (1996)......................................................................................18

Smith v. Arthur Anderson LLP,
    421 F.3d 989, 1001 (9th Cir. 2005)..................................................................14, 16

U.S. Shoe Corp. v. Jones,
    255 S.Ed.2d 73, 76 (Ga. Ct. App. 1979) .............................................................16

Zimmerman v. HBO Affiliate Group,
    834 F.2d 1163, 1169 (3d Cir. 1987). ...............................................................27, 29

**Statutes**

Tex. Civ. Prac. & Rem. Code § 82.002..........................................................................15

**Rules**

F.R.C.P 23(e)(2)(C)........................................................................................................20

F.R.C.P. 23 .....................................................................................................................11

F.R.C.P. 23(b)(3)......................................................................................................26, 37

R.R.C.P. 23(a)(4)...................................................................................................... 27

**Treatises**

Manual for Complex Litigation 4d §21.61, at 309.................................................. 20

**Constitutional Provisions**

U.S. Const. amend. VII ........................................................................................... 19

## PRELIMINARY STATEMENT

Eleven (11) homeowner plaintiffs, from seven (7) states across the United States, with the blessing of Defendant NIBCO, Inc. ("NIBCO") aver that their proposed settlement involving a $43.5 million settlement fund is an "excellent" result. [ECF No. 173-4, Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion For Preliminary Settlement Approval and Related Relief, p. 1]. While the within litigation was commenced in 2013, and the docket reflects the filing of amended pleadings and significant motion practice, the proposed class wide settlement is far from "excellent" in that it has little to do with the "Plaintiffs' allegations" and has more to do with seeking to improperly and unfairly insulate NIBCO from valid claims of contribution and indemnification held by anyone involved in the residential home building industry where NIBCO's PEX Products were used.

What we come to learn with the pending Motion for Final Settlement Approval is that non-represented parties to this action, from small businesses and self-employed contractors in the construction trades, to home builders like D.R. Horton, Inc., (hereinafter referred to as "D.R. Horton") are now faced with a putative Nationwide Class Settlement that extinguishes their claims for contribution and indemnification against NIBCO. As the following will show, the Proposed Settlement Agreement is a fourth quarter attempt by NIBCO and Plaintiffs' counsel to resolve unlitigated claims, to negatively affect parties who have not been represented, and provide for a

Settlement Fund that is wholly insufficient to equitably compensate those harmed by NIBCO. For these reasons and more, D.R. Horton, as an interested party, objects to the proposed class settlement and seeks that final approval be denied.

## PROCEDURAL HISTORY

This action was filed on December 27, 2013, by Plaintiffs Kimberly and Alan Cole, citizens of Tennessee, and James Monica, a New Jersey citizen, alleging that NIBCO's PEX 1006 tubing, brass fittings, and clamps, "suffer from undisclosed design and/or manufacturing defects that inevitably cause them to fail prematurely." [ECF No. 1]. Defendant NIBCO filed an Answer and Affirmative Defenses on March 17, 2014. [ECF No. 8]. On October 6, 2014, Plaintiffs amended their Complaint to add additional Plaintiffs. [ECF No. 37]. Much like the original Plaintiffs, the new Plaintiffs were all homeowners whose homes were damaged by malfunctioning NIBCO products. The Amended Complaint did not discuss claims of contribution or indemnity and focused only on the direct claims of homeowners against NIBCO. None of the homeowner Plaintiffs were or are corporate entities that are involved in the residential home building industry. [Cf. ECF Nos. 1, ¶¶ 14-42 ECF No. 37, ¶¶ 14-109].

Plaintiffs filed a Second Amended Complaint ("SAC") on June 19, 2015. [ECF No. 50]. The purported class in the SAC did not include contribution and indemnity claimants in the definition of a Class Member. [Cf. ECF No. 50, ¶¶ 147-148].

On March 21, 2017, the *Cole* Plaintiffs filed a Motion for Class Certification. [ECF Nos. 108, 109, 110, 111]. Plaintiffs did not seek certification based on a class definition that included contribution or indemnity claimants. [Id.]

On October 25, 2018, Plaintiffs moved for leave to file a Third Amended Complaint ("TAC"). [ECF No. 166]. In support thereof, Plaintiffs averred that the amendment sought "to add as plaintiffs in this case the plaintiffs from the parallel *Meadow v. NIBCO Inc.* case that [was] pending in the United States District Court for the Middle District of Tennessee," [ECF No. 166-1, page 1]. Plaintiffs failed to disclose their intention to broaden the class definition to include contribution and indemnity claimants.

One day later, on October 26, 2018, Plaintiffs moved for Preliminary Settlement Approval and Related Relief. [ECF No. 173-4 at 8]. Plaintiffs submitted the Joint Declaration of Bruce D. Greenberg and Joseph G. Sauder ("Joint Decl.") [Id.] and the Declaration of Steven Weisbrot on behalf of Angeion Group, LLC (hereinafter "Weisbrot Dec.") [ECF No. 173] in support of thereof. The pending Motion, failed to mention, let alone discuss, the claims of the contribution and/or indemnity claimants other than to include them within the expanded settlement class definition. On November 1, 2018, Plaintiffs filed the TAC. [ECF No. 175]. None of the *Cole* or *Meadow* named homeowner Plaintiffs hold themselves out to be entities involved in the residential home building industry. [Id.].

3

## FACTUAL BACKGROUND

Plaintiffs Kimberly Cole, Alan Cole (collectively, the "Coles"), James Monica ("Monica"), Linda Boyd ("Boyd"), Michael McMahon ("McMahon"), Ray Sminkey ("Sminkey"), James Medders, Judy Medders (collectively, the "Medders"), Robert Peperno, Sarah Peperno (collectively, the "Pepernos"), and Kelly McCoy ("McCoy") (collectively, "Plaintiffs"), homeowners, initially brought this putative products liability class action, arising from the alleged failures of various plumbing-related products (the "PEX Products") manufactured by Defendant NIBCO and installed in Plaintiffs' homes. With the filing of the TAC, Plaintiffs added the *Meadow* Plaintiffs. [ECF No. 175 at 1]. Plaintiffs bring these claims on behalf of themselves and a nationwide class.

Plaintiffs allege harm to their residential properties caused by defective plumbing products designed and manufactured by Defendant NIBCO. [ECF Nos. 50 and 175, SAC and TAC ¶¶ 1-13]. Plaintiffs allege that they purchased NIBCO's PEX Products, had them installed in their homes by licensed contractors, and used them for typical home plumbing purposes until one or more of the PEX Products failed, because of design and/or manufacturing defects, thus resulting in water damage to Plaintiffs' homes. TAC ¶¶ 14-173.

The Settlement Agreement

The Settlement Agreement defines "Settlement Class" in relevant part as:

All Persons that own or have owned at any time since January 1, 2005, a residential or commercial structure in the United States that contains or contained NIBCO's Tubing, Fittings, or Clamps, including their spouses, joint owners, heirs, executors, administrators, mortgagees, tenants, creditors, lenders, predecessors, successors, trusts and trustees, and assigns ("Occupant Persons"); *as well as all Persons who have standing and are entitled to assert a claim on behalf of any such Occupant Persons, such as but not limited to a builder, contractor, distributor, seller, subrogated insurance carrier, or other Person who has claims for contribution, indemnity or otherwise against NIBCO based on claims for Qualifying Leaks of the Tubing, Fittings, or Clamps with respect to such residential or commercial structures.*

\* \* \*

[ECF No. 173-1, Exhibit A, ¶A (1)(nn) at page 12 (hereinafter "SA") (emphasis added)].

Paragraph 34 of the Settlement Agreement defines "Released Party" as:

NIBCO, its administrators, insurers, reinsurers, agents, firms, parent companies/corporations, sister companies/corporations, subsidiaries and affiliates, and any sales agents and distributors, wholesalers, retailers, plumbers, homebuilders, contractors, engineers, architects, and any other product or service provider or any other party in the chain of distribution who distributed, specified, recommended, sold, and/or installed the Tubing, Fittings, and/or Clamps  and all of the foregoing Persons' respective predecessors, successors, assigns and present and former officers, directors, shareholders, employees, agents, attorneys, and representatives (collectively, the "Released Parties"). [Id. ¶ 34].

To qualify as a "Released Claim" the claim must be (1) held by one of the "Releasing Parties," (2) fall within the scope of Released Claims in Paragraph 34, and (3) not fall within the exclusion in Paragraph 35.  [Id. 1 (hh) ¶¶ 34, 35].  To that end, Paragraph 34 defines "Releasing Parties" as:

All Settlement Class Members, as well as any Person who receives any payment from the Net Settlement Fund, on behalf of themselves and

their agents, heirs, executors and administrators, successors, assigns, insurers, attorneys, representatives, and any and all Persons who seek to claim through or in the name or right of any of them (the "Releasing Parties").

Paragraph 34 provides a broad definition of "Released Claims" including "each and every claim of liability, on any legal or equitable ground whatsoever, including relief under federal law or the laws of any state, regarding or related to NIBCO's Tubing, Fittings, and/or Clamps. . . ." [Id.]. The defined scope of Released Claims further includes attorneys fees and costs of defense. [Id.].

Paragraph 35 creates a carve-out to the release of Paragraph 34, imposing two main requirements for avoiding application of the release. [Id. at ¶ 35]. First, to qualify for the Paragraph 35 exclusion, the claim must be "related solely and exclusively to the alleged faulty installation of the Tubing, Fittings, and/or Clamps." [Id.]. Second, the claim must allege that "a party or parties other than NIBCO are wholly responsible for a Leak of the Tubing, Fittings, or Clamps." [Id.].

The Settlement provides for the following remedies: Past Property Damage Claims, Future Property Damage Claims, and Re-Plumb Claims for Claimants with Multiple Leaks. [Id. ¶ (9)(a)-(c)]. The Agreement contemplates that Plaintiffs who submit Proof of a Qualifying Leak will initially receive compensation for 25% of the Reasonably Proven Property Damage and may receive up to 70% of their damages, depending on the amount remaining in the Gross Settlement Fund at the end of the Claim Period. [Id.] Proof of a Qualifying Leak will be satisfied upon the submission

of documentation that (a) supports the Claimant's position that the leak is a Qualifying Leak from a Covered Product; (b) states the best-known or estimated date of installation and first in-service date (if different); and (c) states the date(s) of the Qualifying Leak(s). [Id. ¶ 13]. The total Gross Settlement Fund is $43.5 million, less Attorneys' Fee, Cost and Service Award and Settlement Administration Costs. [Id. ¶ 1(s)]. Under Paragraph 7, NIBCO's liability is limited to the amount of the Gross Settlement Fund. [Id. ¶ 7].

D.R. Horton, Inc. and Continental Homes of Texas, LP

D.R. Horton is a corporation organized under the laws of the State of Delaware and is a home construction company operating throughout the United States. [See Declaration of David Fleury, Esquire, dated February 26, 2019 (hereinafter referred to as "Fleury Dec."]. Continental Homes of Texas, LP is a limited partnership organized under the laws of the State of Texas and is a wholly owned subsidiary of D.R. Horton[Id. ¶4] (D.R. Horton, Inc., Continental Homes of Texas, LP, and other subsidiaries of D.R. Horton are hereinafter collectively referred to as "D.R. Horton"). D.R. Horton is one of the largest homebuilders in the country and since 1978, it has sold more than 690,000 homes to customers. [Id. ¶¶ 6, 8] D.R. Horton only sells completed homes. [Id. ¶ 7] Between 2008 and 2012, D.R. Horton and/or its subcontractors contracted with numerous plumbing subcontractors, including but not limited to, Christianson Plumbing and Dupree Plumbing, for the installation of

plumbing piping and fixtures in new homes throughout the United States. [Id. ¶ 9]. Christianson Plumbing, Dupree Plumbing and other plumbing subcontractors purchased NIBCO 1006 PEX Plumbing tubing and NIBCO fittings and clamps that fall within the Proposed Settlement Agreement's definition of "Covered Products"[1] for installation in D.R. Horton homes in Texas, Alabama, and Georgia. [Id. ¶ 10].

Between 2008 and 2012, D.R. Horton constructed at a minimum 25,000 homes in the states of Texas, Alabama, and Georgia. [Id. ¶ 12]. As of November/ December 2018, it is estimated that D.R. Horton constructed approximately 6,000-7,000 homes in the Austin, Texas area that had NIBCO Products installed therein. [Id. ¶ 15]. Based on available data, from 2008 to 2012, NIBCO Products were installed in at least 7,000 D.R. Horton homes in Alabama and Georgia. [Id. ¶ 13].

In the Birmingham, Alabama area, D.R. Horton constructed approximately 2,000 homes that had NIBCO Products installed therein. [Id. ¶ 16] As of December 2018, there were reported leaks involving NIBCO Products at 503 of the approximately 2,000 homes located in the Birmingham, Alabama area. [Id. ¶ 16] Of the homes in the Birmingham, Alabama area that experienced a leak, the average cost of repair per home was $3,006.88. [Id.] As of December 2018, the total costs of

---

[1] NIBCO 1006 PEX Plumbing tubing and NIBCO fittings and clamps that fall within the Proposed Settlement Agreement's definition of "Covered Products" are hereinafter referred to as "NIBCO Product(s)."

repair relating to NIBCO Products in the Birmingham, Alabama area was $1,512,562.00. [Id.].

In San Antonio, Texas, D.R. Horton constructed approximately 6,500 homes that had NIBCO Products installed therein. [Id. ¶ 17]. As of December 2018, there were reported leaks involving NIBCO Products in at least 1,162 of said homes. [Id.] Of the homes in San Antonio, Texas that experienced a leak, the average cost of repair per home was $10,393.50. [Id.] Of the D.R. Horton homes in Austin, Texas, San Antonio, Texas and Birmingham, Alabama that experienced a leak as the result of a NIBCO Product, the average cost of repair per home was $8,161.98. [Id. ¶ 18]. As of December 2018, the total costs of repair related to NIBCO Products in San Antonio, Texas was alone $12,077,247.00. [Id.]

In addition to the above-referenced homes in Austin, Texas, San Antonio, Texas, and Birmingham, Alabama, D.R. Horton has constructed hundreds of thousands of homes across the United States. [Id. ¶ 8]. For many of the homes constructed by D.R. Horton and its subcontractors, the plumbing subcontractors were responsible for selecting plumbing products that conformed to the applicable specifications. [Id. ¶ 20]. As such, D.R. Horton is unable to identify the quantity and location of all D.R. Horton homes containing NIBCO Products. [Id. ¶ 21]. Accordingly, D.R. Horton cannot identify each home (by address) for the purposes of its Class Opt-Out, as requested by the Settlement Agreement. [Id. ¶ 22].

D.R. Horton has asserted claims against NIBCO in State Courts in Texas, Alabama, and Georgia seeking to recover repair costs expended as a result of damages caused by NIBCO Products, in addition to other relief. [Id. ¶ 24]. In the litigation captioned <u>Christianson Air Conditioning & Plumbing, LLC, and Continental Homes of Texas, LLP vs. NIBCO, Inc., et al.</u>, District Court Travis County, Texas D-1-GN-14-000962, D.R. Horton retained engineering expert Cynthia Leann Smith of Paragon Polymer Consulting, the same expert as retained by Plaintiffs in the within litigation. [Id. ¶ 25].

The Proposed Settlement Agreement provides for the release of claims and bar recovery against NIBCO based on a finding that a leak was caused by improper installation. [SA. ¶ 1(ff)(iv)]. In her deposition, Ms. Smith offered relevant testimony regarding this issue which establishes that NIBCO may be liable even where an improper installation occurs. [Id. ¶¶ 26-28]. Ms. Smith testified that the presence of evidence of the improper installation of a pipe or fitting does not mean that a leak was the result of improper installation. [Id. Ex. A at 205:25-206:12]. In fact, she testified that, even if installation was improper, a leak could be caused partly or entirely by a malfunctioning NIBCO Product. [See Id.]. Ms. Smith also testified regarding the variety of factors that can contribute to pipe failure, including the level of chlorine, water pressure, variation in the composition of the pipe, pipe configuration, and

temperature.  [Id. at 117:1-12, 125:12-16, 144:20-146:25, 147:5-148:16, 215:24-216:23, 239:3-21].

## LEGAL ARGUMENT

When approving a class action settlement, Federal Courts must determine (1) whether the proposed settlement class satisfies the criteria for certification and (2) whether the settlement is fair, reasonable, and adequate.  See F.R.C.P. 23; Amchem Products, Inc. v. Windsor, 521 U.S. 591, 620-22 (1997).  In the settlement context, Rule 23's requirements "demand undiluted, even heightened, attention" because a Court certifying a settlement class lacks "the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." Id. at 620. Here, there are numerous deficiencies in the Proposed Settlement Agreement which preclude certification and approval of the settlement.

## POINT I

### THE SETTLEMENT AGREEMENT FAILS TO MEET THE STANDARD SET FORTH IN Fed.R.Civ.P. 23(e)(2) AS IT IS UNFAIR, UNREASONABLE AND INADEQUATE

Federal Rule of Civil Procedure 23(e)(2) requires a fairness hearing for all proposed class action settlements.  In reviewing a proposed settlement under Rule 23(e), "the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members." In re General Motors, 55 F.3d 768, 785 (3d Cir. 1995). Further, when a proposed class action settlement impacts the claims of third parties,

those interests must be considered along with the interests of the parties to the proposed settlement. Eichenholtz v. Brennan, 52 F.3d 478, 482 (3d Cir. 1995).

As this Honorable Court is aware, the Third Circuit "has adopted a nine-factor test to help district courts structure their final decisions to approve settlements as fair, reasonable, and adequate as required by Rule 23(e)." In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig., 55 F.3d 768, 785 (3d Cir. 1995) (citing Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975)). Those factors are: (1) the complexity and duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement in light of the best recovery; and (9) the range of reasonableness of the settlement in light of all the attendant risks of litigation. The proponents of the settlement bear the burden of proving that these factors weigh in favor of approval. Id. (citations omitted).

Further, the Court may consider additional factors when appropriate, including among others: (1) the maturity of the underlying substantive issues; (2) the existence and probable outcome of claims by other classes and subclasses; (3) the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved or likely to be achieved for other claimants; (4)

whether class or subclass members are accorded the right to opt out of the settlement; (5) whether any provisions for attorneys' fees are reasonable; and (6) whether the procedure for processing individual claims under the settlement is fair and reasonable. In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions, 148 F.3d 283, 323 (3d Cir. 1998). As set forth below, the proposed Settlement Agreement is unfair as it impairs and/or extinguishes the claims of contribution and indemnity that D.R. Horton (and others) have against NIBCO. Additionally, the Settlement Fund is wholly inadequate.

A.   **The Settlement Agreement Unfairly and Unreasonably Exposes D.R. Horton to Potential Liability for NIBCO's Defective Products while Impairing or Extinguishing D.R. Horton's Claims Against NIBCO.**

Here, the Proposed Settlement Agreement is unfair to D.R. Horton as it extinguishes D.R. Horton's claims against NIBCO while exposing D.R. Horton to liability in the event that individual Settlement Class Members file suit against D.R. Horton. Although D.R. Horton preserves any contribution and indemnity claims it may have, and therefore disputes that those claims are released under the Proposed Settlement Agreement, D.R. Horton anticipates that in pending and/or future proceedings, NIBCO will argue that D.R. Horton's claims are released and that at least some Courts will agree with NIBCO.

1.   **D.R. Horton's Contribution, Indemnity and Other Claims Are Impacted with No Compensation to D.R. Horton.**

When a proposed settlement extinguishes non-settling defendants' contribution claims, the settlement should compensate the non-settling defendants for the loss of their contribution claims.  See Eichenholtz v. Brennan, 52 F.3d 478, 487 (3d Cir. 1995); In re Masters Mates & Pilots Pension Plan and IRAP Litig., 957 F.2d 1020, 1026 (2d Cir. 1992).  The Third Circuit recognized this in Eichenholtz when it endorsed the "proportionate judgment reduction method" which provides non-settling defendants with a credit in the amount of the settling defendant's share of the damages based on the settling defendant's percentage of fault.  Eichenholtz, 52 F.3d at 487. This setoff ensures that "the non-settling defendants are only responsible for their portion of the liability." Id.  Likewise,  even when non-settling defendants are given the benefit of a judgment reduction credit, they still suffer formal legal prejudice if they are not compensated for the elimination of "indemnity or other" claims. Smith v. Arthur Anderson LLP, 421 F.3d 989, 1001 (9th Cir. 2005).

Here, the Proposed Settlement Agreement extinguishes D.R. Horton's contribution claims by defining D.R. Horton as a Releasing Party in its capacity as a contribution claimant.  Specifically, the Proposed Settlement Agreement defines the term "Releasing Parties" as follows:

> All Settlement Class Members, as well as any Person who receives any payment from the Net Settlement Fund, on behalf of themselves and their agents, heirs, executors and administrators, successors, assigns, insurers, attorneys, representatives, and any and all Persons who seek to claim through or in the name or right of any of them (the "Releasing Parties"). [SA at ¶ 34]

Under state law, contribution claims are claims "through or in the name or right of" the underlying plaintiff.  See, e.g., Equitable Recovery, L.P. v. Health Ins. Brokers of Texas, L.P., 235 S.W.3d 376, 387 (Tex. App. 2007); Mariner Health Care, Inc. v. PricewaterhouseCoopers LLP, 638 S.E.2d 340, 342 (Ga. Ct. App. 2006). Thus, D.R. Horton's contribution claims are improperly extinguished given the language of the Settlement Agreement.

D.R. Horton also has viable common law indemnity or similar claims against NIBCO under state law.  Various state statutes or common law rules recognize D.R. Horton's right to seek indemnity or reimbursement from NIBCO where D.R. Horton proves that defects in NIBCO's products caused the leak.  For example, as a company that sells completed homes, D.R. Horton has statutory claims for indemnity and attorneys fees against NIBCO because it qualifies as a "seller" under Texas law.  See Tex. Civ. Prac. & Rem. Code § 82.002; Fresh Coat, Inc. v. K-2, Inc., 318 S.W.3d 893 (Tex. 2010) (subcontractor that installed EFIS cladding could assert a statutory indemnity claim against the manufacturer because the subcontractor qualified as a "seller").  Likewise, in Alabama, D.R. Horton can recover on a common law indemnity claim against NIBCO if D.R. Horton proves that it was only technically or constructively liable.  Coates v. CTB, Inc., 173 F. Supp. 2d 1200, 1203 (M.D. Ala. 2001) ("The employer, responsible for the injury to his employee, can shift liability for that harm to the manufacturer of the defective equipment that caused the harm.").

Similarly, D.R. Horton has indemnity claims against NIBCO under Georgia law. See U.S. Shoe Corp. v. Jones, 255 S. Ed.2d 73, 76 (Ga. Ct. App. 1979).  D.R. Horton's common law indemnity and other claims against NIBCO under state law will be extinguished if a court considering these claims concludes that they are claims "through or in the name or right of" a Class Member and therefore released by the Proposed Settlement Agreement.  [SA at ¶¶ 34-35].

The Proposed Settlement Agreement does not compensate D.R. Horton for the release of its contribution and indemnity claims. Unlike Eichenholtz, the members of the plaintiff class here are not agreeing to reduce their claims against D.R. Horton based on NIBCO's proportionate share of fault. The Proposed Settlement Agreement, while including contribution and indemnity claimants in the class definition, fails to provide these claimants with any recourse against NIBCO.   In fact, as explained in more detail below, D.R. Horton likely faces increased exposure to Class Member claims because of poorly-worded language and carve outs from the Release in the Proposed Settlement Agreement.  Extinguishing D.R. Horton's viable indemnity and similar claims against NIBCO unduly prejudices D.R. Horton. See Smith, 421 F.3d at 1001 (Application of judgment reduction credit will not cure formal legal prejudice if non-settling defendants are not also compensated for the elimination of "indemnity or other" claims.).  Therefore the Proposed Settlement Agreement unfairly harms D.R.

Horton by extinguishing its contribution and indemnity claims while leaving D.R. Horton exposed to potential liability for NIBCO's defective products.

> **2.      The Release's Carve Out Subjects D.R. Horton to Liability with No Ability to Shift Responsibility to NIBCO In Violation of D.R. Horton's Due Process Rights.**

The Proposed Settlement Agreement sets up a claims review process that does not include an appropriate method for attributing responsibility to NIBCO. Instead, NIBCO can escape liability even if a leak was caused in part by a defect in its products. This is achieved by the inclusion of a "carve out" in the definition of "Qualifying Leak" that excludes leaks caused by installation issues. [SA at ¶ 1(ff)(iv)]. Thus, if it is determined[2] that a leak is caused in part by an installation issue, then the leak will not be a "Qualifying Leak" even if a defect in NIBCO's products also contributed to the leak. Under Paragraph 9, Class Members that do not have Qualifying Leaks have no remedy against NIBCO. [SA at ¶ 9].

Although NIBCO escapes responsibility whenever it is determined a leak is caused in part by an installation issue, the definition of Qualifying Leaks provides a carve out to the release allowing Class Members to assert claims against third-parties:

> If it is determined that a Qualifying Leak has not occurred because the physical escape of water causing damage was clearly the result of one or more of the causes set forth in (1) through (6) above with respect to a particular Claimant, then that Claimant shall have the benefits of the

---

[2] It should be noted that the Proposed Settlement Agreement provides both NIBCO and the claimant with the ability to appeal the Claims Administrator's decision. However, D.R. Horton has no right to participate in this process.

carve-out of the release provision in Paragraph 35, meaning that Claimant shall not be precluded by the Release from filing claims against its installer or third parties. [Id.].

Under this provision, Class Members who are determined to not have Qualifying Leaks are thereafter free to assert claims against third-parties such as D.R. Horton.  The resulting prejudice to D.R. Horton is that it loses the ability to prove NIBCO's liability through   contribution or indemnity claims because the leak has already been determined to not be a Qualifying Leak.  By releasing claims "through or in the name or right of" class members, the Proposed Settlement Agreement strips D.R. Horton of its state law rights to seek a remedy against NIBCO.

This is especially inequitable given that D.R. Horton and similarly situated individuals and businesses have not had the opportunity to participate in the settlement process nor will they be permitted to participate in the determination of what constitutes a Qualifying Leak.  This is contrary to the basic requirements of due process, see Richards v. Jefferson County, Alabama, 517 U.S. 793, 804 (1996) (due process prohibits binding nonparties to adjudication in which they did not participate), and violates D.R. Horton's right to have its claims and defenses heard in Court before a jury. See U.S. Const. amend. VII. Because this Proposed Settlement Agreement violates well settled precepts of due process and fault allocation, final approval of the Proposed Settlement Agreement must be denied.

3.    **Even When a Class Member Is Determined to Have a Qualifying Leak, the Proposed Settlement Agreement Exposes D.R. Horton to Potential Liability for NIBCO's Defective Products.**

As indicated above, D.R. Horton faces potential liability when a claim is presented and determined not to be a Qualifying Leak. More egregious, D.R. Horton still faces potential liability even when a Qualifying Leak occurs and the terms of the release apply, because the Proposed Settlement Agreement does not explicitly release D.R. Horton in its capacity as a developer.

Under Paragraph 34, Released Parties are "release[d] and forever discharge[d] from" liability for all Released Claims. [Id.]. If the Proposed Settlement Agreement is approved, D.R. Horton will maintain that it is a Released Party because it is a "homebuilder." However, it is unclear whether D.R. Horton is a Released Party in its capacity as a "developer." As such, D.R. Horton may face lawsuits from Class Members whose claims are accepted. At the same time, given the extinguishment of D.R. Horton's contribution, indemnity, and other claims against NIBCO, D.R. Horton will be deprived of its right under state law to prove that NIBCO is the responsible party. This result is yet another reason why final approval of the Proposed Settlement Agreement must be denied.

**B.    The Settlement Fund is Inadequate.**

As set forth above, F.R.C.P 23(e)(2)(C) requires that a proposed class action settlement provide adequate relief to the class. In addition to the guidance provided

by <u>Girsh</u> and <u>Prudential</u>, the Manual for Complex Litigation cautions Courts to examine the reasonableness of a proposed settlement, even if there are no objectors as the lack of objections "might signify no more than inertia by class members or it may indicate success on counsel's part in obtaining, from likely opponents and critics, agreements not to object." <u>Manual for Complex Litigation</u> 4d §21.61, at 309.

Disparities among awards to similarly situated Class Members indicates that a settlement may not be tenable. <u>See</u> <u>Murray v. GMAC Mortg. Corp.</u>, 434 F.3d 948, 952 (7th Cir. 2006) (describing disproportion in award as leveraging "class device . . . for one person's benefit"); <u>Crawford v. Equifax Payment Servs. Inc.</u>, 201 F.3d 877, 882 (7th Cir. 2000) ("[T]he fact that one class member receives $2,000 and the other 200,000+ nothing is quite enough to demonstrate that the terms should not have been approved under Rule 23(e).").

Here the proposed fund is not sufficient to provide Class Members with an adequate recovery. By its own numbers, NIBCO has estimated that between "157,700 to 400,000 structures in the United States are covered under the Settlement Class definition." [Weisbrot Dec.¶ 24]. The Gross Settlement Fund is $43.5 million before paying expenses including attorneys fees and costs, administration expenses, and class representative payments. Angeion, the class administrator, predicts that the administration costs will not exceed $850,000.00. [Weisbrot Dec.¶ 52]. The proposed attorneys fee award is 29.885% of the Gross Settlement Fund, or

$12,999,975.00. [Joint Dec. ¶ 23; SA at ¶ 41.a]. Costs are estimated to be $1.1 million. [Joint Dec. ¶ 23]. Proposed class representative payments total $117,500.00. [Id.] Thus, only $28,432,525.00 will remain for the benefit of the Class Members after these fees, costs, and awards are taken from the Gross Settlement Fund.

Under the terms of the Proposed Settlement, the $28,432,525.00 remaining in the Gross Settlement Fund is proffered to cover up to 70% of past and future property damage caused by leaks nationwide, as well as up to 70% of the re-plumbing costs in structures where three or more leaks have occurred, ($600 per plumbing fixture up to $16,000.00 per structure). See SA at ¶ 9(a-c). As payments are to be made in two parts, Class Members will receive an initial payment of 25% of their recovery, and, if available, a later pro rata payment, for a total recovery of up to 70% of the property damage and/or re-plumb calculation. See SA at ¶¶ 21-24.

Plaintiffs' counsel and NIBCO have provided no information to support the contention that this Gross Settlement Fund will be adequate. Absent from their moving papers is any information about the anticipated number of product failures or leak rates, or the average expected per-structure cost for repairing property damage caused by leaks. Plaintiffs also fail to provide any data regarding the impact of municipal water supplies or plumbing designs on failure rates, or the average claim for property damage and re-plumbing costs per leak. Accordingly, the Court has no information to support the conclusion that the Gross Settlement Fund is adequate.

In fact, based on D.R. Horton's experience with homes built in the Austin and San Antonio, Texas, and Birmingham, Alabama markets, the proposed common fund will fall short of the recovery promised under the Proposed Settlement Agreement. For example, of the approximately 15,500 homes in those markets with NIBCO products, 1,665, or 10.74%, experienced a leak. [Fleury Dec. ¶¶ 15-17] Of the homes that experienced a leak, the average cost of repair was $8,161.98 per home. [Fleury Dec. ¶ 18]. Applying D.R. Horton's data and some conservative assumptions suggests that the Gross Settlement Fund will be woefully inadequate to fairly compensate Class Members.

While Plaintiffs have no data other than an estimate that there are 157,700 to 400,000 structures covered under the Settlement Class definition, see Weisbrot Dec. at ¶ 24, D.R. Horton submits that the Court, in determining whether the Gross Settlement Fund is adequate, should use 300,000 as a conservative assumption of the average number of structures covered under the Settlement Class definition. With this reasonable assumption, using a failure rate of between 10.74 % (actual leak rate experienced in D.R. Horton homes with NIBCO products in Austin, Texas, San Antonio, Texas and Birmingham, Alabama markets) and 5.0% (estimated nationwide leak rate) it is clear that the Gross Settlement Fund will be inadequate. Further, given the lack of data regarding the average cost of repair, D.R. Horton submits that the Court should consider its average cost of repair in the Austin, San Antonio, and

Birmingham markets of $8,161.98 per structure. [Fleury Dec. at ¶18]. Using the aforementioned assumptions, the total value of Class Member claims would be $122,429,700.00 which demonstrates that $28,432,525.00 will not suffice.

| | | Projected Claims and Common Fund Deficit (10.74% Leak Rate) ($8,161.98 per home) | | | | |
|---|---|---|---|---|---|---|
| # of Homes | Estimated Homes with Leaks | 25% of Total Projected Cost | 70% of Total Projected Cost | Total Projected Cost | Fund Balance after initial 25% payment | Fund Balance after 70% payout |
| 157,500 | 16,916 | $34,515,993.17 | $96,644,780.88 | $138,063,972.69 | ($6,083,468.17) | ($68,212,255.88) |
| 300,000 | 32,220 | $65,744,748.90 | $184,085,296.92 | $262,978,995.60 | ($37,312,223.90) | ($155,652,771.92) |
| 400,000 | 42,960 | $87,659,665.20 | $245,447,062.56 | $350,638,660.80 | ($59,227,140.20) | ($217,014,537.56) |

| | | Projected Claims and Common Fund Deficit (5% Leak Rate) ($8,161.98 per home) | | | | |
|---|---|---|---|---|---|---|
| # of Homes | Estimated Homes with Leaks | 25% of Total Projected Cost | 70% of Total Projected Cost | Total Projected Cost | Fund Balance after initial 25% payment | Fund Balance after 70% payout |
| 157,500 | 7,875 | $16,068,898.13 | $44,992,914.75 | $64,275,592.50 | $12,363,626.88 | ($16,560,389.75) |
| 300,000 | 15,000 | $30,607,425.00 | $85,700,790.00 | $122,429,700.00 | ($2,174,900.00) | ($57,268,265.00) |
| 400,000 | 20,000 | $40,809,900.00 | $114,267,720.00 | $163,239,600.00 | ($12,377,375.00) | ($85,835,195.00) |

As the above charts demonstrate, even with the most conservative assumptions:

7,875 homes (5% leak rate x 157,500 homes) at $8,161.98/home would only fund the initial payment of 25% of the total claim and would run a deficit at a 63% reimbursement rate, thus never providing the 70% reimbursement promised under the Proposed Settlement. Using D.R. Horton's actual leak rate data of 10.74%, highlights

the inadequacy of the gross, let alone the net settlement fund, such that the fund would not be able to pay the initial 25% payment as same totals $34,515,993.17, which is $6,083,468.17 short of what is earmarked for Class Members after attorneys fees and expenses. Notably, these projected deficits do not include any consideration for payments for all past damage to personal property, nor any future property damage for any class member, which is part of the proposed settlement.

D.R. Horton acknowledges that the above analysis is based on limited data. However, it illustrates how the Gross Settlement Fund is insufficient, even under conservative estimates, to cover the envisioned minimum reimbursement rate of 25%. Given the strength of Plaintiffs' claims against NIBCO, and the absence of any allegation that NIBCO is in a distressed financial condition, D.R. Horton respectfully submits that the Court should not allow NIBCO to cap its liability at $43.5 million. Like Murray and Crawford, the class stands to recover a *de minimis* amount of the damages they allege to be owed. Meanwhile, the Class Representatives and their counsel receive substantial payouts and NIBCO benefits from the global release of claims against it for over a decade of sales of allegedly defective products.

The Proposed Settlement Agreement is also inadequate because it bars claims that arise more than six (6) years after the Effective Date of the settlement. [SA at ¶ 1(e)]. This unfairly extinguishes homeowner claims against NIBCO based on defects that do not manifest themselves for several years because of differences in the level of

chlorine in the water or other factors.  [See Fleury Dec. Ex. A at 117:1-12, 125:12-16, 144:20-146:25, 147:5-148:16, 215:24-216:23, 239:3-21].

When viewed in conjunction with the Girsh factors, the proposed Gross Settlement Fund cannot be considered adequate, as even the most generous assumptions of what percentage of the class suffered a loss would vastly exceed the fund, even without consideration of the payment of fees, costs, and expenses. Troublingly, the Class Members who have suffered leaks or property damage would be better off without class certification, as they would stand to recover a larger percentage of their loss.  Accordingly, the Motion for Final Settlement Approval should be denied in its entirety.

### POINT II

### PLAINTIFFS' PROPOSED CLASS CANNOT BE PROPERLY CERTIFIED FOR  PURPOSES OF SETTLEMENT AS IT FAILS TO SATISFY THE REQUIREMENTS OF F.R.C.P. 23(a) AND F.R.C.P. 23(b)(3).

Under F.R.C.P. 23, before settlement in a class action matter will be approved, the class must satisfy the class certification requirements of Rule 23(a) and Rule 23(b). Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 621 (1997) (discussing F.R.C.P. 23).  The requirements for certification under Rule 23(a) include (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation.  Id. at 613.  Rule 23(b) requires a plaintiff to select from several alternatives, a specific basis for proceeding as a class action. In this case, Plaintiffs' counsel and NIBCO seek class

certification under F.R.C.P. 23(b)(3).  F.R.C.P. 23(b) is satisfied if "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." " Subdivisions (a) and (b) focus the court's attention on whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives.  That dominant concern persists when settlement, rather than trial, is proposed." Id.  Here, the Proposed Settlement Agreement does not satisfy the requirements for class certification in Rule 23(a) and (b) and thus the Motion for Final Approval of the Settlement should be denied.

## A.   The Class Representatives Cannot Adequately Represent the Unnamed Class Members

Rule 23(a)(4) requires the class representatives to fairly and adequately protect the interests of the class.  "The inquiry that a court should make regarding the adequacy of representation requisite of Rule 23(a)(4) is to determine that the putative named plaintiff has the ability and the incentive to represent the claims of the class vigorously, . . . and that there is no conflict between the individual's claims and those asserted on behalf of the class." In re Cmty. Bank of N. Virginia, 622 F.3d 275, 291 (3d Cir. 2010) (alteration in original) (citations omitted).  This inquiry is vital because class members with divergent or conflicting interests cannot be adequately represented. Id.  For a class representative to be adequate, "the named plaintiff must

be part of the class and 'possess the same interest and suffer the same injury' as the class members." Amchem Prod., Inc., 521 U.S. 591, 626 (1997).  "It is well settled that to be a class representative on a particular claim, the plaintiff must himself have a cause of action on that claim." Zimmerman v. HBO Affiliate Group, 834 F.2d 1163, 1169 (3d Cir. 1987).  When represented class members have "no incentive to maximize recovery" for absent parties and there is a "disparity in the prospective value to the different sections of the class", that Class "fail[s] to meet Rule 23(a)'s adequacy of representation test." In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig., 55 F.3d 768, 800 (3d Cir. 1995).

In Amchem, the United States Supreme Court denied approval of a class-wide settlement where class representation was inadequate.  521 U.S. 591 (1997).  There, the proposed class consisted of people who were currently injured by asbestos and people who were exposed to, but not yet injured by, asbestos. Id. The Court reasoned that, "for the currently injured, the critical goal is generous immediate payments. That goal tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future. " Id. It made no difference that the selected class representatives each alleged a wide variety of illnesses caused by asbestos exposure, because those claimants who were presently ill had no incentive to ensure an adequate fund for future claimants. Id. Likewise, in Zimmerman, the Third Circuit

found that a class could not be certified where the named plaintiff could not assert a cause of action held by the proposed class. 834 F.2d at 1170.

In In re Gen. Motors Litigation, the class was represented entirely by individual truck owners, despite the fact that the defined class also included private and government fleet owners. There, the class representatives had no incentive to seek recovery for fleet owners, and the terms of the proposed settlement reflected that fact, by providing a settlement that ensured "fleet owners will never enjoy the benefits of the settlement terms." Id. at 801.

Here, adequacy of representation is lacking because the named class representatives do not possess the same interests, injuries, or claims, as unnamed class members seeking indemnification or contribution. The Proposed Settlement Agreement defines the Settlement Class, in part, as:

> All Persons that own or have owned at any time since January 1, 2005, a residential or commercial structure in the United States that contains or contained NIBCO's Tubing, Fittings, or Clamps, including their spouses, joint owners, heirs, executors, administrators, mortgagees, tenants, creditors, lenders, predecessors, successors, trusts and trustees, and assigns ("Occupant Persons"); *as well as all Persons who have standing and are entitled to assert a claim on behalf of any such Occupant Persons, such as but not limited to a builder, contractor, distributor, seller, subrogated insurance carrier, or other Person who has claims for contribution, indemnity or otherwise against NIBCO based on claims for Qualifying Leaks of the Tubing, Fittings, or Clamps with respect to such residential or commercial structures*. The Settlement Class includes all Persons who subsequently purchase or otherwise obtain an interest in a property covered by this Settlement without the need of a formal assignment by contract or court order.

[SA at ¶ 12][emphasis added].

This definition includes both persons making claims for their own losses, and persons making contribution and/or indemnification claims. [Id.]  None of the named home owner representatives belong to the class of contribution and indemnity claimants.  As such, members of the Proposed Settlement Class with significant contribution and indemnity claims have gone entirely unrepresented in the settlement process.

Like the fleet owners in General Motors, the builders, contractors, and other entities, (who were covertly added to the class definition after many years of litigation, and on the eve of the request for approval for class settlement) have gone unrepresented and stand to gain little from the proposed settlement, drafted solely with the interests of NIBCO, the individual homeowners and Plaintiffs' counsel in mind. This is fatal to the Proposed Settlement Agreement.  See Zimmerman, 834 F.2d at 1169 ("It is well settled that to be a class representative on a particular claim, the plaintiff must himself have a cause of action on that claim.").  As in General Motors, the failure to adequately represent a substantial fraction of the proposed class necessitates a finding that Rule 23(a)'s requirements have not been met.

Moreover, the differences between contribution and indemnity claimants and the named Plaintiffs are more than just formal.  The two groups have very different interests that preclude the named Plaintiffs from being adequate representatives of contribution and indemnity claimants.  As homeowners, the named Plaintiffs are

seeking to have their homes or structures fixed.  Contribution and indemnity claimants are seeking to establish that they are not responsible for leaks and/or are seeking reimbursement for amounts already paid to the homeowner plaintiffs.  Therefore, their goals and interests in the present settlement are different.

Furthermore, the differing interests of contribution and indemnity claimants leaves them with little incentive to settle.  Unlike the representative Plaintiffs, contribution and indemnity claimants on the other side of the "v" and because of insufficient recoveries and/or leaks being deemed not a Qualifying Leak are likely to face numerous homeowner claims from the exact parties that are to designated their representatives.  Therefore, contribution and indemnity claimants have an interest in publicly establishing their lack of fault and NIBCO's liability through litigation.[3]

Plaintiffs have failed to acknowledge this apparent lack of adequate representation.  A review of Plaintiffs' arguments in support of certifying the putative nation-wide class, and state subclasses, are nearly identical to the arguments in favor of certifying this expanded class, which includes contribution and indemnity claimants.  Compare Pls.' Memorandum of Law in Support of Class Certification with Pls.' Memorandum of Law in Support of Motion to Approve Settlement.  In both instances, Plaintiffs fail to disclose, let alone explain, how indemnification and contribution claimants will be adequately represented by Plaintiffs without such

_____

[3] Depending on state law this may have collateral estoppel effects that make future claims against NIBCO more efficient.

claims in the settlement.   Therefore, it is clear that the class representatives are inadequate and settlement approval should be withheld.

Finally, there are conflicts among Class Members that vitiate adequacy of representation.   Much like the proposed settlement in <u>Amchem Products, Inc.</u> the settlement here is intended to compensate both past and future claimants.   <u>See</u> Proposed Settlement Agreement, pgs. 21-22.   As the Court explained in <u>Amchem</u>, the goal for currently injured claimants is generous immediate payments.   This goal leaves no room for assuring the sufficiency of the settlement fund for future claimants. This concern is particularly salient given the likely inadequacy of the proposed fund. As discussed above, it is likely that the Settlement Fund will not be sufficient to provide a 25% reimbursement for all Class Members.  If this occurs, current claimants will receive a 25% reimbursement while future claimants will be left with nothing.

**B.      The Claims of the Class Representatives are not Typical of the Claims of Parties Asserting Contribution, Indemnity, and Similar Claims.**

Before settlement will be approved or certification granted, a plaintiff class must show that the claims or defenses of the representative parties are typical of the claims or defenses of the class.   F.R.C.P. 23(a)(3).   "Plaintiffs' claims meet the typicality requirement if they 'arise[ ] from the same event or practice or course of conduct that gives rise to the claims of the class members, and . . . [are] based on the same legal theory.' Conversely, a representative's claims would be atypical if his or her 'factual or legal stance is not characteristic of that of the other class members.'"

Morisky v. Pub. Serv. Elec. & Gas Co., 111 F. Supp. 2d 493, 500 (D.N.J. 2000) (internal citations omitted).  The typicality requirement is designed "to screen out class actions involving legal or factual positions of the representative class which are markedly different from those of other class members." Liberty Lincoln Mercury, Inc. v. Ford Mktg. Corp., 149 F.R.D. 65, 77 (D.N.J. 1993) (citations and internal quotation marks omitted).  The typicality requirement will not be met where the legal theory upon which some class members' claims are based differs from that upon which other class members' claims are based.  Hassine v. Jeffes, 846 F.2d 169, 177 (3d Cir. 1988). Here, typicality is lacking because the Proposed Settlement Agreement includes contribution and indemnity claimants in the same class as homeowner plaintiffs.

As previously discussed, the Proposed Settlement Class includes claimants making direct claims for damages and claimants making indemnification and/or contribution claims.  The differences between these types of claims vitiates typicality. The representative Plaintiffs' claims require proof that NIBCO's products were defective and that these defects caused damages.  Contribution claims require a showing that NIBCO should ultimately be responsible for at least some portion of a claim for which the contribution claimant is or may be liable.  Indemnity claims generally require an individualized showing that the claimant, without personal fault, has become subject to tort liability for the unauthorized and wrongful conduct of another, and is entitled to indemnity from the other for expenditures properly made in

the discharge of such liability.  See, e.g., Adler's Quality Bakery, Inc. v. Gaseteria, Inc., 32 N.J. 55, 80 (1960).   Other state law claims require other sorts of individualized showings to properly allocated liability or responsibility to NIBCO. Parties asserting contribution, indemnity, or similar claims against NIBCO will have a "legal stance" that "is not characteristic" of the representative plaintiffs' claims and as such, typicality is lacking.  See Morisky, 111 F. Supp. 2d at 500.

**C.    Individualized Issues of Fact Predominate Over Common Questions, Thus Making Settlement Approval Improper.**

Rule 23(b)(3) imposes a predominance element that "requires that common issues predominate over issues affecting only individual class members."  In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 528 (3d Cir. 2004).    The predominance requirement may not be met when individual class members exhibit disparate damages, liability, and defenses to liability.  In re Nat'l Football League Players Concussion Injury Litig., 821 F.3d 410, 434 (3d Cir. 2016).   In products liability actions, the Third Circuit has found that individual fact questions predominate when  individualized fact examination is required to determine whether a product defect is the proximate cause of a  plaintiff's injury.  Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 604 (3d Cir. 2012) (finding predominance was not met when an "individual examination" of Defendant's allegedly defective "run-flat" tires was required, as "any tire can "go flat" for a myriad of reasons" unrelated to the alleged defect).  "[C]omplicated issues of individual causation [can] predominate over

common questions regarding the existence of a defect." Id. (citing Oscar v. BMW of N. Am., LLC, 274 F.R.D. 498, 511 (S.D.N.Y. 2011)).

Differences in available legal defenses, including comparative or contributory negligence, and differences in damages calculations weigh against class certification in products liability actions.  See In re Ford Motor Co. Ignition Switch Products Liab. Litig., 194 F.R.D. 484, 490 (D.N.J. 2000) (where individual issues of fact surrounding class members' car fires predominated over the common question of whether Plaintiff's ignition switch was defective).

Here, as explained above, the Proposed Settlement Class includes both plaintiff-homeowners as well as Class Members asserting contribution, indemnity, and similar claims.  The differences between these two groups predominates and thus creates unique legal and factual questions that support each group's claims uncommon from the other's.

As for homeowners, differences in plumbing systems, chemicals in the water, and damages make resolving individual claims on a class-wide basis impracticable. As Plaintiffs' TAC explains, PEX Tubing, PEX Fittings, and PEX Clamps all suffer from design and/or manufacturing defects because they are prone to premature oxidative failure and creep rupture, dezincification corrosion, and chloride-induced stress corrosion cracking respectively.  See [ECF No. 175 ¶¶ 2–4].  At her deposition in litigation in Texas State Court, D.R. Horton's engineering expert Cynthia Leann

Smith testified regarding the variety of factors that can contribute to pipe failure, including the level of chlorine, water pressure, variation in the composition of the pipe, pipe configuration, and temperature. [Fleury Dec. Ex. A at 117:1-12, 125:12-16, 144:20-146:25, 147:5-148:16, 215:24-216:23, 239:3-21]. These varying factors (geographic location, the construction of the home, and the composition of NIBCO products used), weigh against a finding of predominance.

The question of whether a leak is caused by an installation issue in whole or part will likewise depend on an individualized inquiry. Furthermore, the extent of property damage will vary between claimants and the costs of repair will vary depending on the type of plumbing system utilized in the property. Relatedly, questions of whether claimants have properly mitigated damages will always be individualized. Questions of liability, causation, and damages will all vary between claimants based on these factors, vitiating predominance.

Lastly, the differences between the claims of homeowner plaintiffs and those asserting contribution, indemnity, or similar claims defeat predominance. As explained above, the latter group will have to make a different showing than homeowner plaintiffs asserting claims for plumbing defects in their own homes, injecting even more individualized issues into the case. Settlement approval is therefore improper as here, much like in <u>Marcus</u>, 687 F.3d at 604, where  individual issues of law and fact predominate over the question of whether the subject NIBCO products were defective.

**D.    Plaintiffs Are Unable to Satisfy the Requirements of F.R.C.P. 23(b)(3) as Class Settlement is Not the Superior Means for Resolving Class Claims.**

To satisfy the requirements of Rule 23(b)(3), the Plaintiffs must show that the class action mechanism is the superior method for adjudicating their case. A finding of superiority requires the Court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication. In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 316 (3d Cir. 1998). The factors relevant to superiority include (a) the class members' interest in individually controlling the prosecution or defense of separate actions, (b) the extent and nature of any litigation concerning the controversy already begun by or against class members, (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum, and (d) the likely difficulties in managing a class action. F.R.C.P. 23(b)(3).

Here, the class action device is not superior to individual litigation. Class Members have a strong interest in individually controlling the prosecution of their claims as claimant damages in the present matter are not so small as to make individual litigation uneconomic. Also, one of the traditional justifications for proceeding as a class, to "overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights," is lacking. See Amchem Prod., Inc., 521 U.S. at 617 (quoting Mace v. Van Ru Credit

Corp., 109 F.3d 338, 344 (1997)).  Class Members can efficiently seek compensation and adjudicate NIBCO's liability by consolidating claims involving multiple structures into one non-class litigation.  One such suit was filed by D.R. Horton in the Circuit Court of Jefferson County Alabama on November 19, 2018 (hereinafter the "Alabama Action").  [Fleury Dec. Ex. B].  This Complaint involves hundreds of homes in the Birmingham, Alabama area. [Id.].  Such regional litigation is significantly superior to a nationwide class action because all of the interested parties are present.  The issues are simplified because the case involves one state's law, a limited number of water sources, and a limited number of contractors.  At the same time, it captures the efficiencies of a class action by grouping a large number of structures together.

In addition, there are numerous individual lawsuits against NIBCO pending.  In all of these suits, plaintiffs allege to have sustained property damages in excess of $10,000.00.[4]  State court matters are also pending in New Jersey, among other states.[5]  Permitting settlement is therefore improper as cases litigating these issues are currently pending nationwide. Further, there is no significant reason to concentrate all the claims in the District of New Jersey.  Many of the structures and evidence at issue

---

[4] Paul and Leslie Miller, at al. v. NIBCO, Inc., 5:18-cv-00465-D; Cesare Puleo v. NIBCO, Inc., 2:18-cv-05555-JFB-ARL; Admiral Insurance Company as subrogee of The Brownstone Condominium Assoc. v. NIBCO, Inc., at al., 1:19-cv-00670;
[5] New Jersey Manufacturers Ins. vs NIBCO, Inc.;-L-002563-17 ; Clark William vs McCarren Daniel; MON L-002784-18

are located in the south and southwest United States, making litigating in New Jersey an inconvenient choice.

As previously discussed, the evidence required to prove the legal theories of Class Members making direct claims differs from that required from contribution or indemnity claimants. Furthermore, a claimant's right to contribution or indemnity may vary depending on the law of the state in which the claimant's cause of action arose. Therefore, the Settlement Administrator will have to make individualized assessments of each claimant's evidence as well as an assessment of the claimant's right to contribution or indemnification under the laws of the claimant's state. The need to perform this type of legal assessment for each claimant defeats the purpose of resolving claims under the class action format. Further, a proper assessment of each claimant's damages cannot be determined through the use of a uniform calculation and instead requires the Claims Administrator to perform a "mini-trial" to determine each class member's alleged damages.

Here, the Proposed Settlement Agreement provides that the Settlement Administrator will assess damages based on a review of "the Claimant's receipts, invoices, expense records, checks, credit card statements, or any other verifiable indicia of such costs incurred." [SA at ¶¶ 10-11]. This damage assessment plan requires the Settlement Administrator to perform a detailed review of each claimant's

individual evidence and fails to explain how the Claims Administrator will address damages for contribution and indemnity claimants.

In light of the foregoing, it is respectfully submitted that the class action mechanism is not the superior method for resolving the present litigation. Therefore, in order to protect the rights of those already engaged in the litigation of their claims, and in order to protect claimants' ability to receive a fair and reasonable recovery, as well as the rights of those who claims are being extinguished without being part of the litigation, the Proposed Settlement Agreement must be rejected.

## CONCLUSION

It is respectfully submitted that for the reasons set forth above, that Plaintiffs'
Motion for Final Approval of the Proposed Settlement be denied in its entirety.
Alternatively, while D.R. Horton posits that this Settlement Agreement should not be
approved, D.R. Horton's objections would be satisfied, inter alia, if the following
conditions are met: (1) the class is limited to homeowners; (2) Builders and
Developers are deleted from the class definition; (3) the release makes clear that class
members release any and all claims against anyone, including but not limited to
Builders and Developers for defects in the product; (4) the release specifically
excludes contribution and indemnity claimants; (5) the release excludes contribution,
indemnity, and similar claims and provides that non-parties to the settlement retain the
right to assert such claims against Released Parties; (6) the settlement agreement
contains a covenant by class members not to sue anyone for defects in the product;
and (7) the Gross Settlement Fund amount is increased.

Respectively submitted,

WOOD SMITH HENNING & BERMAN, LLP
Attorneys for Interested Party and Objector,
D.R. Horton, Inc.

Kelly A. Waters, Esquire (KW-4682

Dated: February 27, 2019