# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KIMBERLY COLE, ALAN COLE, JAMES MONICA, LINDA BOYD, MICHAEL MCMAHON, RAY SMINKEY, JAMES MEDDERS, JUDY MEDDERS, ROBERT PEPERNO, SARAH PEPERNO, KELLY MCCOY, LESA WATTS, CHAD MEADOW, JOHN PLISKO, SUSAN PLISKO, KENNETH McLAUGHLIN, RYAN KENNY, ALEXANDER DAVIS, and ANDREA DAVIS, on behalf of themselves and all others similarly situated, | : Civil Action No.: 13-7871(FLW) (TJB) |
| Plaintiffs, | : |
| v. | : |
| NIBCO, INC., | : |
| Defendant. | : |

## BRIEF OF PLAINTIFFS AND THE CLASS IN SUPPORT OF FINAL SETTLEMENT APPROVAL

**LITE DEPALMA GREENBERG, LLC**
Bruce D. Greenberg
Susana Cruz Hodge
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Tel: (973) 623-3000
Fax: (973) 623-0858
bgreenberg@litedepalma.com
scruzhodge@litedepalma.com
*Counsel for Plaintiffs*
[Additional Counsel listed on signature page]

776912.1

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ iii

I.   INTRODUCTORY STATEMENT ................................................ 1

II.  SUMMARY OF FACTS AND PROCEDURAL HISTORY ......................... 2

ARGUMENT ............................................................................... 7

POINT I
THE COURT SHOULD GRANT FINAL SETTLEMENT APPROVAL .............. 7

      A.    The Settlement Is Entitled to A Presumption of Fairness and Satisfies the Third Circuit's Criteria for Settlement Approval ........................... 7

      B.    None of the Few Objections to the Settlement is Meritorious ........... 14

           1.    Earlean Collins, Jessie Andrews, and Forest/Jennifer Wilson . 14

           2.    Jeffrey Palmer ........................................................ 16

                  a.    The provisions concerning unclaimed funds are fair and reasonable ............................................................. 17

                  b.    The claim process is reasonable ..................................... 19

                        i.    The Claim Form is simple and not onerous ......... 20

                        ii.    The fact that NIBCO will pay an independent consultant in the event of appeals is not problematic ........................................................... 23

                  c.    The Notice Need Not State the Total Value of the Class Claims ........................................................................... 24

           3.    D.R. Horton, Inc. and the Plumbers, Christianson and Dupre . 25

i

POINT II
THE COURT SHOULD REAFFIRM ITS CERTIFICATION

OF A SETTLEMENT CLASS ................................................................31

    A.     Plaintiffs Are Typical and Adequate...................................................32

    B.     Predominance and Superiority Are Present Here................................38

    C.     The Class is Ascertainable and is Not "Fail-Safe" .............................40

CONCLUSION ........................................................................................41

776912.1

## TABLE OF AUTHORITIES

*Amchem Products, Inc. v. Windsor*,
    521 U.S. 591 (1997)...................................................................................37

*Baby Neal v. Casey*,
    43 F.3d 48 (3d Cir. 1994) ........................................................................33

*Beneli v. BCA Fin. Servs., Inc.*,
    324 F.R.D. 89 (D.N.J. 2018) ...................................................................8, 9

*Boeing v. VanGemert*,
    442 U.S. 472 (1980).................................................................................17

*Dewey v. Volkswagen A.G.*,
    681 F.3d 170 (3d Cir. 2012) ...............................................................37, 38

*Eichenholtz v. Brennan*,
    52 F.3d 478 (3d Cir. 1995) ......................................................................31

*Equitable Recovery, L.P. v. Heath Ins. Brokers of Texas, L.P.*,
    235 S.W.3d 376 (Tex. App. 2007) ...........................................................34

*Eubank v. Pella Corp.*,
    753 F.3d 718 (7th Cir. 2014) ...................................................................21

*Girsh v. Jepson*,
    521 F.2d 153 (3d Cir. 1975) ..............................................................*passim*

*Glasser v. Volkswagen of Am., Inc.*,
    645 F.3d 1084 (9th Cir. 2011) .................................................................26

*Griffin v. Zager*,
    2017 WL 3872401 (D.N.J. Sept. 1, 2017)................................................32

*Haas v. Burlington Cty.*,
    2019 WL 413530 (D.N.J. Jan. 31, 2019)...............................13, 17, 18, 19

*Hitachi Capital Am. Corp. v. Nussbaum Sales Corp.*,
    2010 WL 1379804 (D.N.J. Mar. 30, 2010) ..............................................35

iii

*In re AT&T Corp. Secs. Litig.*,
  455 F.3d 160 (3d Cir. 2006) ..........................................................................19

*In re Baby Products Antitrust Litig.*,
  708 F.3d 163 (3d Cir. 2013) .............................................................17, 18, 22

*In re Cendant Corp. Litig.*,
  264 F.3d 201 (3d Cir. 2001) ...........................................................................8

*In re Cendant Corp. Sec. Litig.*,
  109 F. Supp. 2d 235 (D.N.J. 2000)................................................................19

*In re CertainTeed Corp. Roofing Shingle Prods. Liab. Litig.*,
  269 F.R.D. 468 (E.D. Pa. 2010) ....................................................................23

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*,
  55 F.3d 768 (3d Cir. 1995) ............................................................................35

*In re Ins. Brokerage Antitrust Litig.*,
  282 F.R.D. 92 (D.N.J. 2012) ...................................................................25, 34

*In re National Football League Players Concussion Injury Litig.*,
  821 F.3d 410 (3d Cir. 2016) ...................................................................*passim*

*In re Ocean Power Techs., Inc. Sec. Litig.*,
  2016 WL 6778218 (D.N.J. Nov. 15, 2016) ...................................................32

*In re Prudential Ins. Co. of America Sales Practices Litig.*,
  148 F.3d 283 (3d Cir. 1998) ...................................................................*passim*

*In re Prudential Ins. Co. of America Sales Practices Litig.*,
  177 F.R.D. 216 (D.N.J. 1997) .......................................................................15

*In re Prudential Ins. Co. of America Sales Practices Litig.*,
  962 F. Supp. 450 (D.N.J. 1997)......................................................... 19-20, 39

*In re Sears, Roebuck and Co. Front-Loading Washer Products Liability Litig.*,
  867 F.3d 791 (7th 2017) ................................................................................18

iv

*In re TracFone Unlimited Serv. Plan Litig.*,
    112 F. Supp. 3d 993, 1008 (N.D. Cal. 2015)...................................................26

*In re Uponor, Inc., F1807 Plumbing Fittings Prod. Liab. Litig.*,
    716 F.3d 1057 (8th Cir. 2013) ........................................................33, 36, 38

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004) .............................................................8, 12, 24

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
    2013 WL 716088 (D. Minn. Feb. 27, 2013)...................................................34

*Kakani v. Oracle Corp.*,
    2007 WL 1793774 (N.D. Cal. June 19, 2007) .............................................18

*Landsman & Funk, P.C. v. Skinder-Strauss Assocs.*,
    639 Fed. Appx. 880 (3d Cir. Feb. 16, 2016) ....................................17, 18, 19

*Lazy Oil Co. v. Witco Corp.*,
    95 F. Supp. 2d 290 (W.D. Pa. 1997) ............................................................19

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).......................................................................................26

*Mariner Health Care, Inc. v. PricewaterhouseCoopers LLP*,
    638 S.E.2d 340 (Ga. Ct. App. 2006) ............................................................35

*McCoy v. Health Net, Inc.*,
    569 F. Supp. 2d 448 (D.N.J. 2008).......................................................*passim*

*McDonough v. Toys "R" Us, Inc.*,
    80 F. Supp. 3d 626 (E.D. Pa. 2015)..............................................................17

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    259 F.3d 154 (3d Cir. 2001) .........................................................................32

*Pearson v. NBTY, Inc.*,
    772 F.3d 778 (7th Cir. 2014) ........................................................................18

v

*Petrovic v. Amoco Oil Co.*,
    200 F.3d 1140 (8th Cir. 1999) ........................................................................24

*Rooker v. Gen. Mills Operations, LLC*,
    2018 WL 4962089 (C.D. Cal. Mar. 26, 2018) .......................................18, 19

*Rowe v. E.I. DuPont de Nemours & Co.*,
    2011 WL 3837106 (D.N.J. Aug. 26, 2011) .................................................25

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016)...............................................................................26

*Sullivan v. DB Investments, Inc.*,
    667 F.3d 273 (3d Cir. 2011) ......................................................................13

*Varacallo v. Mass. Mut. Life Ins. Co.*,
    226 F.R.D. 207 (D.N.J. 2005) ............................................................*passim*

*Zimmerman v. HBO Affiliate Group*,
    834 F.2d 1163 (3d Cir. 1987) ....................................................................37

## OTHER

Fed. R. Civ. P. 23(f) ....................................................................................10

776912.1

## I.  **INTRODUCTORY STATEMENT**

On November 14, 2018, this Court granted preliminary approval of the proposed $43.5 million nationwide Settlement of this matter and the *Meadow* action that has been pending in Tennessee.  ECF No. 177.  The Settlement enables Settlement Class Members who have suffered damages from NIBCO's Covered Products, as well as those who suffer such damage during the six-year Claim Period, to recover between 25% and 70% of their eligible damages.  Further, Settlement Class Members who have experienced three or more eligible leaks can get their entire properties re-plumbed, a remedy that likely could not have been achieved if the cases had been litigated through trial.

The Court-appointed Settlement Administrator disseminated notice in accordance with the Court's requirements.  *See id*. at 5-6 (approving and detailing notice requirements).  The objection/exclusion deadline passed on February 27, 2019.  Though there are thousands of Settlement Class Members, only 116 requests for exclusion (*i.e.*, opt-outs) were received (including four that were received after the exclusion deadline), and only seven persons or entities submitted objections.  ECF Nos. 184, 187, 192, 193, 194; *see* accompanying Declaration of Steven Weisbrot on behalf of Angeion Group, LLC ("Angeion Decl."), ¶51 & Exhibit K.   On the other hand, as of March 18, 2019, there have already been over 750 Claim Forms submitted to the Settlement Administrator.  *Id*., ¶¶39-45.

The few objections offer no valid grounds to deny final settlement approval. One objection was filed by Jeffrey Palmer, a repeat objector to class action settlements and the brother of a suspended attorney who is a notorious objector to class action settlements.  Palmer is represented by Bandas Law Firm, P.C. ("Bandas"), another serial objector to class action settlements with a history of discipline by courts.

Three other objections were submitted by a builder and two plumbing companies, each of whom has been involved in its own long-running dispute with NIBCO, and each of whom opted out of the Settlement so they could separately continue to pursue their claims, thus barring their objections, which in any event are without merit.  Finally, three other objectors request a "better" settlement while completely ignoring the substantial risks of continued litigation and the inherent compromise nature of a settlement.  Accordingly, Plaintiffs and the Class respectfully submit that the Court should grant final settlement approval.

## II.    SUMMARY OF FACTS AND PROCEDURAL HISTORY

Plaintiffs previously detailed the extensive procedural history of this case and *Meadow*, both of which alleged that NIBCO's Covered Products were defective.  ECF No. 173, 173-1, 173-2.  This case was heavily litigated for over five years.  NIBCO filed two extensive motions to dismiss, ECF Nos. 38, 53, each

776912.1

of which Plaintiffs defeated in part, ECF Nos. 48, 49, 84, 85.  In *Meadow* too, Plaintiffs there defeated NIBCO's motion to dismiss in part.  *Meadow* ECF No. 62.

The parties engaged in exhaustive, coordinated discovery in the two cases. Plaintiffs served multiple rounds of paper discovery on NIBCO, issued subpoenas to relevant third parties, received and analyzed tens of thousands of pages of documents produced by NIBCO and third parties, retained experts and consultants, and responded to written discovery served by NIBCO on each Plaintiff.

NIBCO inspected the homes of each Plaintiff in this case and in *Meadow*, and Plaintiffs' counsel and/or their expert were present at each inspection.  Those inspections took place at eleven different homes in eight states.

The parties in these cases took thirty fact depositions all over the United States.  Another deposition occurred in Canada, where Plaintiffs deposed Jana Laboratories, which had worked closely with NIBCO on certain Covered Products. The parties collectively retained six testifying experts, each of whom was also deposed.

Extensive motion practice followed.  In this Court, that included Plaintiffs' motion for class certification, ECF Nos. 108, 109, 110, 111, NIBCO's motion for summary judgment, ECF Nos. 118, 119, and the respective parties' motions to bar or limit opposing expert witnesses, ECF Nos. 135, 137, 138, 139, 140.  In

*Meadow*, Plaintiffs also moved for class certification.  *Meadow* ECF No. 125. Those motions were exhaustively briefed and supported by detailed Declarations.

Meanwhile, appreciating the risks and likelihoods after the extensive discovery and motion filings, the parties went to mediation.  There were seven formal mediation sessions, spanning ten months, with one or both of the two experienced mediators (Hon. Wayne R. Andersen, U.S.D.J. (Ret., N.D.  Ill.) and Ross R. Hart, Esq.) that the parties retained.  The parties had countless other communications as well (often overseen by the mediators).  Those efforts led to a lengthy Memorandum of Understanding and then, after more intense, arms-length negotiations, to the Settlement Agreement.  ECF No. 173-1, Exhibit A.

The Settlement creates a common fund of $43.5 million.  Settlement Agreement, ¶¶1.s, 5.  Settlement Class Members who experience Qualifying Leaks can make Claims against that fund for the costs to repair damage and the costs to replace products.  SA, ¶13.  A Qualifying Leak is defined as "a physical escape of water from [any of the Covered Products] causing damage," except for leaks resulting from intervening causes, such as physical damage (like a nail hole) or other specified causes for which the Covered Product is not at fault.  SA, ¶1.ff.

Claims will be submitted to a neutral Settlement Administrator, Angeion Group, LLC ("Angeion").  Settlement Class Members can seek compensation from the Settlement Fund for "Reasonably Proven Property Damage," which is defined

4

to include repair or replacement of the [Covered P]roducts as a result of a Qualifying Leak, the repair or replacement of other property damaged as a result of a Qualifying Leak, and material and labor costs necessary to restore the affected property or structure to its condition prior to the Qualifying Leak.  SA, ¶1.jj.

Settlement Class Members need not submit unusual proofs to obtain compensation; rather, receipts, invoices, expense records, credit card statements, and other readily available "verifiable indicia of such costs incurred" suffice.  *See* SA, ¶13.  As stated *supra* at 1, over 750 Claims have already been submitted for damage sustained.  Such Claims for past damage can be filed until 150 days after the Settlement's Effective Date.  SA, ¶9.a.  But the Settlement also enables Settlement Class Members who sustain Qualifying Leaks within the six-year period after the Effective Date ("Claim Period") to file Claims for compensation. *See* SA, ¶9.a, .b.

Moreover, Settlement Class Members who have suffered three or more Qualifying Leaks may obtain a re-plumb of their entire structure.  SA, ¶9.c.  The re-plumb will be compensated based on a calculation of $600 per full plumbing fixture (*e.g*., sink, washing machine, etc.) and $300 per half fixture (*e.g*., toilet), up to a maximum of $16,000.  *Id*.  The $600 per fixture is based on the opinion of Plaintiffs' plumbing expert, from his extensive experience in re-plumbing homes nationwide.

776912.1

Eligible Claimants will receive up to 70% of their claimed losses. SA, ¶9.a, .b. However, to ensure that the Settlement Fund is sufficient to treat all Settlement Class Members and their Claims equally, Eligible Claimants initially will receive 25% of eligible damages. *Id.* At or before the end of the Claim Period, based on the pattern of Claims paid, and with Court approval, a supplemental disbursement will be made so that each Eligible Claimant receives the same percentage. *Id.*

The $43.5 million Settlement Fund covers reasonable costs of class notice and administration, SA, ¶1.s, .kk, as well as attorneys' fees to Class Counsel and reimbursement of their approved expenses, SA, ¶41.a; ECF No. 179 (fee/expense motion), and Service Awards up to $10,000 for each Plaintiff commensurate with their efforts on behalf of the Class in these cases, SA, ¶41.a..

In consideration of the Settlement benefits, NIBCO, as well as "plumbers, homebuilders, contractors … and any other product or service provider or any other party in the chain of distribution who distributed, specified, recommended, sold, and/or installed" Covered Products are being released from liability. SA, ¶34. The Release does not, however, extend to personal injury claims, SA, ¶35, or to claims for leaks for which a party other than NIBCO was "wholly responsible," such as a leak resulting entirely from improper installation of a Covered Product, *id.*

As directed by the Court, Angeion disseminated notice of the Settlement in compliance with Rule 23 and in satisfaction of due process.  Angeion Decl., ¶¶6-38.  The notice program included extensive mail, publication, and internet notice targeted at owners of property in which the Covered Products were installed, and at plumbers, water damage repair companies, and homeowners' insurance companies nationwide.  *Id.*

Angeion also created a Settlement Website, www.pexsystemsettlement.com, that contains (among other things): (i) information concerning deadlines and procedures for filing a Claim Form, (ii) answers to frequently asked questions, and (iii) copies of all papers relevant to the Settlement, including the Preliminary Approval Order and the Motion for Attorney's Fees.  Additionally, Angeion maintained a toll-free telephone number that Settlement Class Members can call with questions or to receive Claim Forms and other relevant documents.  To date, the Settlement Website has received 18,412 unique visitors, and the toll-free number has fielded 515 calls.  *Id.*, ¶¶28, 33.

## ARGUMENT

## POINT I

## THE COURT SHOULD GRANT FINAL SETTLEMENT APPROVAL

### A.    The Settlement Is Entitled to A Presumption of Fairness and Satisfies the Third Circuit's Criteria for Settlement Approval

7

The law favors settlement of class actions.  *E.g.*, *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004); *Beneli v. BCA Fin. Servs., Inc.*, 324 F.R.D. 89, 101 (D.N.J. 2018).  Nonetheless, "[a] class action cannot be settled without court approval based on a determination that the proposed settlement is fair, reasonable, and adequate."  *In re National Football League Players Concussion Injury Litig.*, 821 F.3d 410, 436 (3d Cir. 2016) ("*NFL*").

In evaluating whether a class action settlement is fair, reasonable and adequate, an "initial presumption of fairness" applies where "(1) the negotiations occurred at arms length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected."  *Id.* (quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 232 n.18 (3d Cir. 2001); *Beneli*, 324 F.R.D. at 101.  That presumption applies even where, as here, "the settlement negotiations preceded the actual certification of the class."  *Beneli*, 324 F.R.D. at 101 (quoting *Warfarin*, 391 F.3d at 535).

The presumption of fairness should apply here.  As described *supra*, the settlement negotiations occurred at arms' length, and were supervised by two mediators, with seven formal, in-person mediation sessions, and numerous other communications over many months.  This case and *Meadow* were heavily litigated, for years, by experienced counsel.  Over 175,000 pages of documents were produced, and dozens of fact and expert depositions were taken.  The parties also

8

briefed class certification in both cases and, in the present case, summary

judgment, and expert exclusion motions.  Finally, only seven objections were filed.

The Third Circuit set forth the criteria for settlement approval in *Girsh v.*

*Jepson*, 521 F.2d 153, 157 (3d Cir. 1975), which identifies nine factors:

> (1) the complexity, expense and likely duration of the litigation; (2) the
> reaction of the class to the settlement; (3) the stage of the proceedings and
> the amount of discovery completed; (4) the risks of establishing liability; (5)
> the risks of establishing damages; (6) the risks of maintaining the class
> action through the trial; (7) the ability of the defendants to withstand a
> greater judgment; (8) the range of reasonableness of the Settlement Fund in
> light of the best possible recovery; and (9) the range of reasonableness of the
> Settlement Fund to a possible recovery in light of all the attendant risks of
> litigation.

*Id*.  Subsequently, in *In re Prudential Ins. Co. of America Sales Practices Litig*.,

148 F.3d 283, 323 (3d Cir. 1998), the Third Circuit held that several additional

factors are to be considered "when appropriate":

> [1] [T]he maturity of the underlying substantive issues ...; [2] the existence
> and probable outcome of claims by other classes and subclasses; [3] the
> comparison between the results achieved by the settlement for individual
> class or subclass members and the results achieved—or likely to be
> achieved—for other claimants; [4] whether class or subclass members are
> accorded the right to opt out of the settlement; [5] whether any provisions
> for attorneys' fees are reasonable; and [6] whether the procedure for
> processing individual claims under the settlement is fair and reasonable.

*Beneli*, 321 F.R.D. at 102 (citations omitted).  While each of the *Girsh* factors must

be considered, "the *Prudential* considerations are just that, prudential."  *Id*.

(quoting *NFL*, 821 F.3d at 437).  Here, all the *Girsh* factors (except one that is

neutral) and all the appropriate *Prudential* factors, support granting final approval.

**The complexity, expense, and duration of the litigation.**  This case was filed in December 2013.  ECF No. 1.  Its complexity is reflected in the Court's two opinions on NIBCO's motions to dismiss, in the extensive discovery, and in the voluminous, complicated briefing on class certification, summary judgment, and expert exclusion.  Class Counsel have incurred out-of-pocket expenses of over <u>$1.1 million</u> to date, with substantial additional costs were the litigation to continue.

Continued litigation would also mean addressing class certification, summary judgment, and expert exclusion issues in both cases, followed by Fed. R. Civ. P. 23(f) appeals from the rulings on class certification and, ultimately, lengthy trials in both courts.  This factor strongly favors final approval.[1]

**The reaction of the Class to the Settlement.**  After an extraordinary notice program, only 112 timely requests for exclusion and seven objections, none of them meritorious (*see infra* at 14-40), have been submitted.  More than 750 Claims have already been filed.  The Class has thus reacted strongly in favor of the Settlement.

---

[1] Christianson Air Conditioning & Plumbing, LLC ("Christianson") erroneously asserts that because the parties <u>previously</u> briefed class certification, summary judgment, and *Daubert* motions, the complexity/duration factor does not support final approval.  ECF No. 192, at 33.  Absent settlement, the parties would have to argue all those motions, deal with likely motions for interlocutory appeal under Rule 23(f) as to any class certification ruling, and prepare for and prosecute lengthy trials, including motions *in limine*, post-trial motions, and appeals.  The cases would remain complex and could continue for years.

10

**The stage of the proceedings and the amount of discovery completed.** In both cases, fact and expert discovery have closed. A huge amount of discovery has occurred, which enabled Class Counsel to understand the risks and likelihoods if the case(s) went to trial, and to engage in "informed negotiation" for a settlement. *Prudential*, 148 F.3d at 319. In *NFL*, the Third Circuit found this factor satisfied where no formal discovery at all had occurred, based on informal discovery and counsels' investigation. 821 F.3d at 438-39. This *Girsh* factor thus supports final approval here even more strongly than in *NFL*.

**The risks of establishing liability and damages.** These two *Girsh* factors are often considered together. *See*, *e.g.*, *McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448, 461-62 (D.N.J. 2008). NIBCO has defended these cases vigorously, asserting numerous legal defenses. *See*, *e.g.*, ECF No. 121 (motion for summary judgment). For example, NIBCO contended that: (a) Plaintiffs' express warranty claims failed as a matter of law because NIBCO's Limited Warranty covered only manufacturing defects, while Plaintiffs asserted a design defect; (b) the economic loss doctrine defeated the claims; (c) because Plaintiffs themselves did not select the Covered Products for their homes, or even know that the Covered Products were present there, their failure to warn claims failed as a matter of law; and (d) many other legal defenses, including statutes of limitations, applied as well. *Id*.

NIBCO also challenged Plaintiffs on the facts, offering potential alternative explanations for the failure of the Covered Products as to each Plaintiff.  A trial would likely devolve into a "battle of the experts" on complex scientific issues. Though Plaintiffs believe they would ultimately prevail, they took into account the significant risk of an unfavorable outcome when negotiating the Settlement.  Like the previous *Girsh* factors, these two factors also support final settlement approval.

**The risk of maintaining a class action through trial.**  Plaintiffs in both cases briefed class certification.  NIBCO responded strenuously as to why certification of any litigation class would be improper.  ECF No. 122; *Meadow* ECF No. 121.

Plaintiffs believe they have the better of the class certification argument. But there is risk that this Court and the *Meadow* Court might deny litigation class certification, leaving the Class with no recovery, or certify more limited classes than those that were requested.  This factor favors final approval.

**The ability of Defendant to withstand a greater judgment.**  The record does not indicate whether NIBCO could withstand a greater judgment.  But that is no barrier to settlement approval under Third Circuit law.  "[A] defendant's ability to withstand a much higher judgment does not necessarily mean that it is obligated to pay any more than what the [class members] are entitled to under the theories of liability that existed at the time the settlement was reached."  *Warfarin*, 391 F.3d at

12

538.  "[I]n any class action against a large corporation, the defendant entity is likely to be able to withstand a more substantial judgment, and, against the weight of the remaining factors, this fact alone does not undermine the reasonableness of the existing settlement." *Sullivan v. DB Investments, Inc*., 667 F.3d 273, 323 (3d Cir. 2011) (*en banc*).  Thus, this factor is neutral.

**The range of reasonableness of the Settlement Fund in light of the best possible recovery and the risks of litigation.**  The final two *Girsh* factors call for "a risk-adjusted estimate of the value of plaintiffs' claims."  *NFL*, 821 F.3d at 440. As in *NFL*, if fully successful here, Plaintiffs and the Class "would likely be entitled to substantial damages awards.  But we must take seriously the litigation risks inherent in pressing forward with the case."  *Id*.  Given the risks on liability, damages, and class certification, and with the opportunity to receive at least 25% and up to a remarkable 70% of claimed damages, "the settlement represents a fair deal for the class."  *Haas v. Burlington Cty*., 2019 WL 413530, at *8 (D.N.J. Jan. 31, 2019) ("Considering the relatively old age of the case and the dispute between Defendants and their insurer, it appears Plaintiffs are correct in asserting this is reasonable in light of the best possible recovery and the attendant litigation risks."); *McCoy*, 569 F. Supp. 2d at 461-62 (noting risks to plaintiffs from "difficult questions of law" and "inherent risks" of conflicting expert testimony). These *Girsh* factors support final settlement approval.

13

The *Prudential* factors applicable here all justify final approval as well. Settlement Class Members were permitted to opt out of the Settlement. The attorneys' fees sought are within the Third Circuit's guidelines for percentage awards and also supported by a lodestar cross-check, as Class Counsel demonstrated. ECF No. 179. Finally, the claims processing procedure is fair and reasonable, using an experienced Settlement Administrator to review easily-completed Claim Forms.

### B.    None of the Few Objections to the Settlement is Meritorious

The objections to the Settlement are without merit.

### 1. Earlean Collins, Jessie Andrews, and Forest/Jennifer Wilson

These three objections all assert that the Settlement should be more favorable to the Class. Earlean Collins complains that the common fund should be larger. The Wilsons contend that the Settlement does not compensate them in full for their particular losses. Jessie Andrews says that a re-plumb should be available to anyone who has suffered even a single leak, rather than requiring three leaks.

But "settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." *Prudential*, 148 F.3d at 317. The test is "not whether one could conceive of a better settlement." *Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 235 (D.N.J. 2005). The Settlement here is fair, reasonable, and adequate, for all the reasons discussed herein.

14

Collins also contends that a "mediation committee," acting after "2-3 estimates from qualified plumbers" for each claim, should replace the streamlined procedures of the Settlement. That proposal would delay awards, and would unwarrantably consume more of the Settlement Fund on administration, including paying the "mediation committee," to the detriment of the Settlement Class.

Finally, Collins speculates that initially paying only 25% of each Claim may be a hardship to some Settlement Class Members. But that is just another "the deal should have been better" argument. The Settlement was carefully structured to ensure that all Claimants are treated equally and fairly, while offering substantial upside of up to 70% of claimed damages. Paying early Claimants a higher percentage could prejudice Claimants who claim later in the process.

The Wilsons assert that the notice was "insufficient and unconstitutional" because they profess not to have learned of the Settlement until shortly before the objection/exclusion deadline. But this argument only highlights that they did receive notice in time to object, and even if they had not, there is no due process or other requirement that notice actually be received by all Settlement Class Members. *In re Prudential Ins. Co. of America Sales Practices Litig*., 177 F.R.D. 216, 231 (D.N.J. 1997) ("Courts have consistently recognized that due process does not require that every class member receive actual notice so long as the court reasonably selected a means likely to apprise interested parties.") (citing cases).

15

In sum, the Court should reject the Collins, Andrews, and Wilson objections.

### 2. Jeffrey Palmer

Palmer's objections, advanced by Bandas, who has been disciplined by multiple courts, are also groundless.  Bandas is a serial objector to class action settlements, whose baseless objections routinely fail (including all five times that Bandas has objected in this District).  *See* ECF No. 184-2.  Bandas has a lengthy record of bad conduct, which has continued here, as Plaintiffs have shown.  ECF No. 197 (opposition to Bandas motion for admission *pro hac vice*).  Palmer, represented by his suspended brother Darrell, unsuccessfully objected to a class action settlement before, filed a baseless appeal, and then, after causing unjustifiable expense and delay, failed to prosecute the appeal, resulting in dismissal.  ECF No. 184, at 9.[2]

On the merits, Palmer's objection fails.  He largely ignores the *Girsh* factors, dealing with only a few of them in a single, cursory paragraph.  ECF No. 184, at 18-19.  As demonstrated *supra* at 9-13, the few factors noted by Palmer, as well as virtually all the others, strongly support final settlement approval.

Instead, Palmer picks at certain aspects of the Settlement.  In particular, Palmer asserts, without support, that there will be so few claims by Settlement

---

[2] Palmer objected here only because his suspended brother Darrell told him about this case and referred him to Bandas.  Transcript of Palmer Deposition, attached as Ex. A to the accompanying Declaration of Shanon J. Carson) at 19-20.

Class Members that Class Counsel will end up with more money than the Class will.  But other objectors say that there will be <u>so many claims</u> that the Settlement Fund will be inadequate.  ECF No. 187, at 19-25; ECF No.192, at 37-38; Collins objection.  Both objector positions are erroneous, given Claims activity to date.

### a. The provisions concerning unclaimed funds are fair and reasonable

Under the Settlement Agreement, the Settlement will be funded on a rolling basis with a guaranteed minimum balance throughout the Claim Period.  SA at ¶5.a.  To the extent that this constitutes a "reverter," it is settled law that "the presence of a reverter . . . provision does not detract from the fairness of the settlement as a whole."  *McDonough v. Toys "R" Us, Inc.*, 80 F. Supp. 3d 626, 643 (E.D. Pa. 2015); *Landsman & Funk, P.C. v. Skinder-Strauss Assocs.*, 639 Fed. Appx. 880 (3d Cir. Feb. 16, 2016); *Haas*, 2019 WL 413530; *McCoy*, 569 F. Supp. 2d 448; *see also Boeing v. VanGemert*, 442 U.S. 472 (1980) (discussing Settlement Fund that, as noted in *In re Baby Products Antitrust Litig.*, 708 F.3d 163, 177 (3d Cir. 2013), involved "a Settlement Fund that will partially revert to the defendant").

In *Landsman*, the Third Circuit faced the circumstance of which Palmer warns here: class counsel there got "approximately 75% of all amounts being paid out to settle the class action," and the fee award was over 3.5 times the amount

actually received by class members.  639 Fed. Appx. at 882.  Despite that, the

Third Circuit affirmed approval of that settlement.[3]

*McCoy* rejected an objection to a reverter that had been negotiated at arms'

length.  569 F. Supp. 2d at 474.  And *Haas* recently approved a claims-made

settlement with a fixed fund, a *pro rata* reduction if there were too many claims,

and a reverter if there were too few.  2019 WL 413530, at \*2.  Even *Rooker v. Gen.*

*Mills Operations, LLC*, 2018 WL 4962089 (C.D. Cal. Mar. 26, 2018), cited by

Palmer, approved a claims-made settlement where nearly 20% of the Settlement

Fund reverted to the defendant.  *Id*. at \*2, 5.

*Baby Products*, Palmer's primary case, did not ban reverters.  It cited

reverters as one of "three principal options" for distributing unclaimed Settlement

Funds.  *Id*. at 172.  And, thereafter, *Landsman & Funk* rejected Palmer's argument

---

[3] Palmer cites *Kakani v. Oracle Corp*., 2007 WL 1793774 (N.D. Cal. June 19, 2007), as having rejected a claims-made settlement because class counsel there might have wound up with "more in fees than the class receives in payments." ECF No. 184, at 14.  In reality, that settlement failed for many reasons, starting with the fact that the parties disagreed as to the scope of the release, so there was not even a settlement agreed to.  *Id*. at \*4.  *Pearson v. NBTY, Inc*., 772 F.3d 778 (7th Cir. 2014), also cited by Palmer, is even further afield.  There, class members had to complete an onerous claim form in order to receive just $3.00.  Here, as discussed *infra*, the Claim Form is simple and Settlement Class Members can receive thousands of dollars, and even a complete re-plumb.  *In re Sears, Roebuck and Co. Front-Loading Washer Products Liability Litig*., 867 F.3d 791 (7th 2017), distinguished *Pearson* and approved a fee in a claims-made settlement that was between three and six times the amount paid to the class.

here that "the level of the direct benefit to the class" defeated the settlement. 639 Fed. Appx. at 882-83.

Palmer also demands, without authority, a settlement "floor." *Rooker* did not "set[ ] a floor of at least 65% of the net settlement ….," as Palmer claims. ECF No. 184, at 13-14. The parties there <u>agreed</u> to a floor. 2018 WL 4962089, at *2.

Cases in the Third Circuit have approved claims-made settlements without a minimum payout. *E.g*., *Landsman & Funk*, 639 Fed. Appx. at 882 (no floor; 55.7% of fund reverted); *Haas*, 2019 WL 413530, at *2 (no floor in reverter). A floor may be nice to have, as the blog post Palmer cites suggests, but the absence of a floor does not undermine the fairness of the Settlement. A 25% to 70% net recovery is reasonable, as courts often approve settlements at lower percentages.[4]

**b. The claim process is reasonable**

Palmer asserts that the "claims process here is unreasonably demanding." ECF No. 184, at 15 (emphasis omitted). He fires off arguments regarding that process "as buckshot in the air, hoping to hit at least something." *In re Prudential*

---

[4] *E.g., In re AT&T Corp. Secs. Litig*., 455 F.3d 160, 170 (3d Cir. 2006) (deeming "excellent" a settlement representing only 4% of total damages in light of litigation risks); *In re Cendant Corp. Sec. Litig*., 109 F. Supp. 2d 235, 263 (D.N.J. 2000) (citing cases approving settlements as low as 1.6% of claimed damages); *Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 339 (W.D. Pa. 1997) (citing cases that approved settlements as low as 1% of claimed damages). At deposition, Palmer agreed that a 70% recovery was non-objectionable but claimed that a 25% recovery (almost $600 for him) "wouldn't be worth my time to even file a [] claim." Carson Decl., Ex. A, at 98-102.

*Ins. Co. of America Sales Practices Litig.*, 962 F. Supp. 450, 507 n.39 (D.N.J. 1997), *aff'd in part, rev'd in part on other grounds*, 148 F.3d 283 (3d Cir. 1998) (rejecting scattershot objections).  None of his complaints is valid.

### i. The Claim Form is simple and not onerous

Palmer labels the Claim Form "confusing, unnecessarily invasive, and unduly burdensome."  ECF No. 184, at 17.  But he was easily able to fill out his own Claim Form, as have nearly 850 others already.  That alone debunks his position.  In fact, the Court-approved Claim Form is easy to understand and complete, and Settlement Class Members can do that by mail, by email, or on the Settlement Website.  ECF No. 184-1, at 9.  When asked at deposition what was difficult to understand, he conceded that most of the Claim Form was clear and offered only quibbles about the rest.[5]

---

[5] Carson Decl., Ex. A, at 32-33, 86-88, 90-91 (easy to download form, and documents required for proof were kept in his files); *id.* at 43-44 (Claim Form pages 1-2 "understandable"); *id.* at 50 (page 4 "straightforward"); *id.* at 68-69 (checklist of proof on page 6 a "good idea"); *id.* at 81-83 (pages 8-12 of Claim Form not problematic); *id.* at 32 (complaining he had to "make[] sure that … every single blank was filled out with an NA where it was not applicable to the claim"); *id.* at 47-49 (sole complaint about page 3 was the request to enter the "Notice ID # if you received notice by mail" (the Settlement Administrator uses that ID to track claims, and Palmer admitted that was a "good idea")); *id.* at 66-69 (claiming it was unclear if "Tubing, Fittings or Clamps" on page 6, right below bolded heading "**A. DESCRIPTION OF NIBCO TUBING, FITTINGS and/or CLAMPS,**" referred to NIBCO products); *id.* at 77-79 (finding pages 6-7 confusing because Palmer, a former insurance adjuster, claimed not to realize that bolded headings "**A. Tubing Leak**" and "**B. Fitting Leak**" distinguished between two types of leaks**).**

20

The Claim Form here is utterly unlike the one in *Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014), cited by Palmer. That claim form required class members to submit "a slew of arcane data, including the 'Purchase Order Number,' 'Glass Etch Information,' 'Product Identity Stamp,' and 'Unit ID Label' of <u>each affected window</u>" installed in their structures, all for a maximum recovery of $750. *Id*. at 725-26 (emphasis added). None of that is required here.

Instead, this Claim Form requires only that Claimants provide reasonable proof that they have or had one or more Covered Products in their structures. And the Settlement Website has photos to help Claimants be sure that Covered Products are present. *See* ECF No. 184-1, at 14 (Claim Form states that "You can access photos and a description of these [Covered Products] at [the Settlement Website]").

Palmer's purported questions about the meaning of terms, the ability to submit claims for multiple properties, and the like, ECF No. 184, at 15-16, certainly did not prevent him from filing his Claim. In any event, such questions can be answered by calling the toll-free number or checking the Settlement Website. Many others have done those very things to get questions answered.

Especially baseless is Palmer's complaint that the documents leave Settlement Class Members in the dark as to the "Effective Date." ECF No. 184, at

15-16.[6]  That date cannot be known until the approval process is complete, and as when it is known, the Effective Date will be posted on the Settlement Website. Indeed, Palmer's own Claim Form states that the "Effective Date will be posted on the Settlement Website once known."  ECF No. 184-1, at 9.  Settlement Class Members who sustained property damage prior to the Settlement but have not already made claims will have 150 days to submit a Claim, which is ample time.

Requiring Settlement Class Members to identify their homeowners' insurer, ECF No. 184, at 16-17, helps to avoid double recovery, or even fraud, if both a property owner and a subrogation insurer submit a Claim for the same loss.  *See Baby Products*, 708 F.3d at 175 (preventing fraud in settlement claims is "a good goal").  At deposition, Palmer conceded that this question is "certainly reasonable."  Carson Decl., Ex. A, at 51-53.

Palmer complains that it is improper to require a Claimant's date of birth, *id*., but the Claim Form does not do that.  ECF No. 184-1, at 9-20.  At deposition, Palmer conceded that and could not explain how his objection came to assert that date of birth was required.  Carson Decl., Ex. A, at 116, 119-123.  Bandas apparently cut and pasted that from another objection, as has been his wont.

---

[6] Palmer admitted that page 1 of the Claim Form said definitions like "Effective Date" could be found on the Settlement Website and if he were interested in knowing the definition he "probably would have done that," but he did not bother to go to the Settlement Website.  Carson Decl., Ex. A, at 44-45.  Despite objecting that the Claim Form was too long, he thought the Claim Form should have had "one more page" for definitions.  *Id*. at 45-47.

The Claim Form does not deter Claims.  It is based on claim forms approved in other class action settlements involving defective products, developed with the assistance of a nationally-recognized claim expert, and offers no basis to reject the Settlement.

### ii. The fact that NIBCO will pay an independent consultant in the event of appeals is not problematic

Palmer complains that NIBCO will be paying the independent consultant to whom appeals from the rejection of claims can be taken.  ECF No. 184, at 17.  But this was a negotiated advantage of the Settlement, not a negative, and is no different than placing on a defendant the costs of settlement administration, which courts regularly approve.  *See*, *e.g.*, *Prudential*, 148 F.3d at 329 n.95 (defendant paid for "claims evaluators and Appeals Committee members" in settlement process); *Varacallo*, 226 F.R.D. at 223 (defendant paid for claim evaluator).  The alternative is for the Settlement Class to pay the independent consultant, which would reduce the Settlement Fund.  Palmer's complaint is misguided.

In fact, courts approve claims-made settlements where the defendant itself had a role in adjudicating claims, which is not so here.  *E.g.*, *In re CertainTeed Corp. Roofing Shingle Prods. Liab. Litig.*, 269 F.R.D. 468, 474 (E.D. Pa. 2010) (noting that "the claims process is to be managed by a 'Claims Office' established by CertainTeed").  Here, the consultant is independent, and has been "agreed upon by the Parties," ECF No. 173-1, at 41, not imposed by NIBCO.

23

### c. The Notice Need Not State the Total Value of the Class Claims

Supported only by equivocal snippets of comments to the 2018 amendments to Rule 23, Palmer faults the notice for not having calculated "the value of class damages released."  ECF No. 184, at 17-19.  But the notice clearly stated that, no matter how many Settlement Class Members there are, claimants can receive up to 70% of <u>their individual losses</u> (as well as re-plumbing of their property, in specified circumstances).  That is what matters to a particular Claimant, not the aggregate amount that the rest of the class might receive.

Many cases say a notice need not state how much each class member might receive from a settlement.  *E.g.*, *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1153 (8th Cir. 1999); *Varacallo*, 226 F.R.D. at 227; *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 253 (D. Del. 2002), *aff'd*, 391 F.3d 516 (3d Cir. 2004).  An estimate of what the class might receive is merely the total of all such claimants.  Thus, *a fortiori*, a notice need not address aggregate damages.

Palmer's resort to the reference in the *Girsh* factors to "the best recovery" fails.  ECF No. 184, at 18-19.  In *NFL*, 821 F.3d at 440, the Third Circuit applied the *Girsh* factor of looking at the best recovery.  But beyond saying there might be "substantial damages," *id.*, the Third Circuit made no attempt to quantify precisely the best possible recovery classwide.  There is no such requirement for courts approving settlements, and no such requirement in notices of settlement either.

"The Rule 23(e) notice is designed to summarize the litigation and the settlement and 'to apprise class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings filed in the litigation.'" *Prudential*, 148 F.3d at 327.  The notice here, approved by the Court previously, ECF No. 177, at 5-6, met that standard.

### 3. D.R. Horton, Inc. and the Plumbers, Christianson and Dupree

D.R Horton, Inc., which opted out of the Settlement, has simultaneously and improperly objected to the Settlement on behalf of itself and its subsidiaries (together, "Horton").  ECF No. 187; ECF No. 187-2, at ¶23.   Christianson and Dupree (together, "the Plumbers"), also have objected despite having opted out. ECF No. 192, at 5 n.16 ECF No. 193-1, at 2 & Exhibit A.

As opt-outs, these entities cannot object.  *See*, *e.g.*, *In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92, 110 (D.N.J. 2012) ("the case law does not suggest that a class member requesting exclusion from a settlement may nonetheless object to that settlement"); *Rowe v. E.I. DuPont de Nemours & Co.*, 2011 WL 3837106, at *10 (D.N.J. Aug. 26, 2011) (internal citations omitted) ("only class members have standing to object to a proposed class settlement"); *Varacallo*, 226 F.R.D. at 213 n.3; ECF No. 177, at 6 (Preliminary Approval Order states that "A member of the Settlement Class who submits a timely and valid Request for Exclusion cannot object to the Settlement and is not eligible to receive a Settlement Payment.").

Separately, the Court should bar these objections because Horton and the Plumbers lack Article III standing.  *See Glasser v. Volkswagen of Am., Inc.*, 645 F.3d 1084, 1089 (9th Cir. 2011) (dismissing objector appeal for lack of standing).

Objectors bear the burden of establishing their standing.  *In re TracFone Unlimited Serv. Plan Litig.*, 112 F. Supp. 3d 993, 1008 (N.D. Cal. 2015) (citing cases).  To carry that burden, Horton and the Plumbers must prove "injury in fact." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (stating that injury in fact is "first and foremost" of the requirements for standing).  To do that, they must show that they "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id*. at 1548 (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992)).

Horton and the Plumbers cannot make that showing.  At most, their claim is that it is possible that a Settlement Class Member may sue them in connection with the Settlement.  But that may never in fact occur.  Their basis for standing is thus purely speculative, conjectural, and hypothetical, not concrete, actual, or imminent.

Since they have no injury in fact, Horton and the Plumbers cannot be heard to object.  *Glasser*, 645 F.3d at 1088 (finding lack of standing to object to class action fee award where required "injury" was "merely speculative," so that objector was not "aggrieved" as required for standing); *TracFone*, 112 F. Supp. 3d at 1008 (finding no standing where objector not "aggrieved").

26

But even if these opt-outs had standing, their key argument fails on the

merits.  The Settlement does <u>not</u> extinguish their claims for contribution and

indemnification against NIBCO that have been preserved by their opting out.  But

to avoid any possible ambiguity, the parties conferred and decided to clarify the

definition of "Releasing Parties" (albeit by stating what the parties believe was

already obvious) with the highlighted language:

> Upon the Effective Date, all Settlement Class Members, as well as
> any Person who receives any payment from the Net Settlement Fund,
> on behalf of themselves and their agents, heirs, executors and
> administrators, successors, assigns, insurers, attorneys,
> representatives, and any and all Persons who seek to claim through or
> in the name or right of any of them (==but excluding any Persons who
> timely opted out of the Settlement with regard to the buildings for
> which they opted out==) (the "Releasing Parties").

[Carson Decl., Ex. C].

As opt-outs, Horton and the Plumbers are not "Releasing Parties."  The

Settlement Agreement also clearly releases them from "each and every claim of

liability, on any legal or equitable ground whatsoever, including relief under

federal law or the laws of any state, regarding or related to NIBCO's Tubing,

Fittings, and/or clamps from a Settlement Class member with a claim."  SA, ¶34.

Horton worries that it will not be able to pursue its rights under state law for

contribution and indemnity as a "developer."  ECF No. 187, at 19.  This is just

semantics.  As stated in the preceding paragraph, Horton clearly falls within the

purview of paragraph 34 as a "homebuilder," "contractor," or a party "in the chain of distribution."  Horton itself admits it is a "homebuilder."  ECF No. 187-2, at 2.

Horton's claim that the "Exclusions from Release" in paragraph 35 of the Settlement Agreement exposes it to liability misreads that paragraph.  The Settlement Agreement does not simply leave "Class Members who are determined not to have Qualifying Leaks free to assert claims against third-parties such as D. R. Horton."  ECF No. 187, at 18.  Rather, the exclusion in paragraph 35 extends only to "claims alleging that a party or parties other than NIBCO are <u>wholly responsible</u> for a leak of" a Covered Product.  SA, ¶35 (emphasis added). Paragraphs 34 and 35, taken together, make plain that in any potential action by a Settlement Class Member, Horton is entitled not only to a proportionate reduction of liability for any fault on the part of NIBCO, but also to the <u>full</u> release of claims in the event it is established that NIBCO is even <u>partially</u> responsible.

Horton's attack on the adequacy of the Settlement Fund, joined by the Plumbers, also fails.  Horton "acknowledges that [its] analysis is based on limited data," ECF No. 187, at 24, from "D.R. Horton homes with NIBCO products installed in Austin, Texas, San Antonio, Texas and Birmingham markets."  *Id*. at 22.  But those communities, which NIBCO believes are subject to massive installer error and issues with their operating environment, <u>were excluded from the Settlement altogether and thus will not draw from the Settlement Fund</u>.  They

28

do not provide a fair basis for modeling claims, as Horton does not claim it has experienced a single leak beyond these excluded communities.

Moreover, Horton unrealistically assumes a 100% claims rate. Horton thus fails to show that the common fund is inadequate.

The parties carefully evaluated the adequacy of the Settlement Fund. As detailed in the Carson Decl., ¶¶7-20, as a result of an iterative process that began during mediation, where both sides modeled damage and claim scenarios, and continued thereafter, there are approximately 4,450 buildings nationwide where leaks of Covered Products have been reported. NIBCO estimates that of those 4,450 buildings, approximately 1,470 (33.03%) are located in Horton's San Antonio and Birmingham communities plumbed by Christianson or Dupree. Those homes were excluded from the definition of the Settlement Class, and accordingly cannot make a Claim on the Settlement Fund.

The parties also each evaluated the likely size of an average damage claim. Unsurprisingly, the two sides originally took different positions on that issue, with Plaintiffs contending, based on Class Counsel's investigation, the discovery in these cases, and the advice of Plaintiffs' experts, that the average claim would be higher than NIBCO believed. The mid-point of the parties' respective figures was $6,265. This number would yield average hypothetical payments of $1,566 at a 25% recovery level and $4,385 at a 70% recovery level. Carson Decl., ¶¶21-23.

After accounting for estimated costs of settlement administration, Class Counsel's attorneys' fees and expenses (if approved by the Court), and Service Awards that the Court approves, the Net Settlement Fund is expected to be approximately $28,277,756. *Id.*, ¶24.  At an average claim amount of $6,265, the Net Settlement Fund would permit approximately 18,053 Claims to be paid at the 25% measure.  If the total number of Claims is less than 18,053, the Settlement Agreement increases the payments to up to 70% of Claimants' claimed losses.

Actual experience to date bears out this analysis of average claims. Angeion has received approximately 758 Claim Forms, seeking approximately $4,350,038.00 in the aggregate, for an average total dollar amount of approximately $5,739 per actual Claim, which is <u>less</u> than the $6,265 per claim estimated during the mediation process.[7] *See* Angeion Decl., ¶45.  Thus, Claim activity to date (assuming all Claims are valid as stated) translates to an average Claim payout of an estimated $1,435 at the 25% recovery level and an estimated $4,017 at the 70% recovery level.  *Id*.  The Claims received to date would yield a total payment of $1,087,735 at the 25% level, leaving over <u>$27 million</u> in the Net Settlement Fund to satisfy future Claims during the six-year Claim Period.  Carson Decl., ¶29.

---

[7]  This Claim number and aggregate amount exclude one completely unsubstantiated Claim Form and approximately 88 Claims received from a single known fraudulent filer.  Angeion Decl., ¶¶42-43.  For other reasons, the Claim Form total reported here may be slightly overstated.  Carson Decl., ¶18 n.3.

30

Moreover, using the current $5,739 average per Claim amount as a measure of future claims, the Net Settlement Fund would support about 19,705 Claims at the 25% recovery level (nearly twenty-six times the Claims received to date).  Id., ¶30.  With an uplift to the 70% recovery level, the Net Settlement Fund would cover a total of 7,039 Claims.  *Id*.  That latter figure appears to be a fair and reasonable estimate of total claims, based on the considerations discussed in the Carson Decl., ¶¶31-37, including (among other things) experience in other plumbing settlements, some of which Co-Lead Class Counsel also handled.  The size of the Settlement Fund is unquestionably fair, reasonable, and adequate.

The objections of Horton and the Plumbers cannot be considered because these objectors opted out of the Settlement and lack Article III standing.  If the Court does consider those objections, they should be overruled for lack of merit.

## POINT II

### THE COURT SHOULD REAFFIRM ITS CERTIFICATION OF A SETTLEMENT CLASS

In granting preliminary settlement approval, the Court made detailed findings as to the appropriateness of the Settlement Class.  ECF No. 177, at 1-4.  Nothing has changed since then.  Only Horton and the Plumbers object to certification of the Settlement Class.  Their status as opt-outs bars their objections.  *See*, *e.g.*, *Eichenholtz v. Brennan*, 52 F.3d 478, 482, 488 (3d Cir. 1995) (refusing

776912.1

to entertain objection from non-class members who could not show how

settlement prejudiced them).  Regardless, those objections are meritless.

## A. Plaintiffs Are Typical and Adequate[8]

Horton and the Plumbers contend that Plaintiffs' claims are insufficiently

typical of the claims Horton and the Plumbers would hope to assert against

NIBCO.  ECF No. 187 at 31-33; ECF No. 192 at 26-29.  This reflects a

fundamental misunderstanding of Rule 23(a)(3)'s typicality requirement.

There is "a low threshold" for typicality.  *Newton v. Merrill Lynch, Pierce,*

*Fenner & Smith, Inc.*, 259 F.3d 154, 183 (3d Cir. 2001).  "If the claims of the

named plaintiffs and putative class members involve the same conduct by the

defendant, typicality is established regardless of factual differences."  *Id.* at 183-

84.  Otherwise, "[t]ypicality acts as a bar to class certification only when 'the legal

theories of the named representatives potentially conflict with those of the

absentees.'"  *In re Ocean Power Techs., Inc. Sec. Litig.*, 2016 WL 6778218, at *6

(D.N.J. Nov. 15, 2016) (citation omitted); *accord Newton*, 259 F.3d at 183.

Although their claims are principally derivative of alleged losses of their

homeowners, Horton and the Plumbers insist that builder and installer claims are

"atypical" because those entities might (a) assert additional claims not advanced by

---

[8] Since the adequacy inquiry "tends to merge" with the typicality inquiry because both consider whether there are fundamental conflicts in class members' interests, *Griffin v. Zager*, 2017 WL 3872401, at *5 (D.N.J. Sept. 1, 2017), Plaintiffs address those two criteria together.

homeowners, they might (b) secure better or different recoveries (*e.g.*, administrative costs or attorneys' fees), and (c) offer different proofs.  ECF No. 187 at 32-33; ECF No. 192 at 28-29.

But typicality does not "mandate[] that all putative class members share identical claims." *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994).  And "'even relatively pronounced factual differences [among class members] will generally not preclude a finding of typicality where there is a strong similarity of legal theories' or where the claim arises from the same practice or course of conduct." *Prudential*, 148 F.3d at 311 (quoting *Baby Neal*, 43 F.3d at 58).  *See also NFL*, 821 F.3d at 428 (similar; rejecting atypicality argument that was based on the number of football seasons played and the particular injuries sustained from head trauma).

Typicality is satisfied because all claims are premised on the alleged existence of defects rendering Covered Products prone to degrade and leak.  The whole Settlement Class seeks to hold NIBCO liable for losses from such leaks.

In *In re Uponor, Inc., F1807 Plumbing Fittings Prod. Liab. Litig.*, 716 F.3d 1057, 1063-64 (8th Cir. 2013), a recent class settlement involving a different manufacturer's PEX products, an objector argued that the class representatives were not "typical" because the settlement required manifestation of a leak or lost water pressure to recover, and he and other California residents were purportedly entitled to relief under a state statute that did not require manifestation.  *Id.* at

33

1061-62.  The Eighth Circuit held that the objection failed because "[c]lass representatives need not share identical interests with every class member, but only 'common objectives and legal and factual positions.'"  *Id.* at 1064 (citation omitted).  All class members there "share[d] the common objective of recovering costs associated with replacing defective brass plumbing fittings in their homes," which sufficed for typicality.  *Id.*; *see also In re Zurn Pex Plumbing Prods. Liab. Litig.*, 2013 WL 716088, at *4, *10 (D. Minn. Feb. 27, 2013) (finding typicality requirement easily satisfied in PEX plumbing products liability class action and noting that certain contribution and indemnification claimants fell within the class). The same is true here.

The argument of Horton and the Plumbers that Plaintiffs do not adequately protect the interests of class members who wish to assert claims for contribution and indemnification fares no better.  "[C]ourts have found that a conflict will not be sufficient to defeat class action 'unless [that] conflict is apparent, imminent, and on an issue at the very heart of the suit."  *In re Ins. Brokerage Antitrust Litig.*, 2007 WL 2589950, at *11 (D.N.J. Sept. 4, 2007), *aff'd*, 579 F.3d 241 (3d Cir. 2009). The very cases that Horton cites elsewhere in its objection make clear that claims for contribution or indemnity are completely aligned with, and indeed wholly derivative of, homeowners' underlying claims.  *Equitable Recovery, L.P. v. Heath Ins. Brokers of Texas, L.P.*, 235 S.W.3d 376, 387 (Tex. App. 2007)

34

("[C]ontribution and indemnity are not independent claims but are 'derivative' of the plaintiff's claim against each co-liable party."); *Mariner Health Care, Inc. v. PricewaterhouseCoopers LLP*, 638 S.E.2d 340, 342 (Ga. Ct. App. 2006) (characterizing "claims for contribution or indemnification" as "wholly derivative of [the] main action"); *see also Hitachi Capital Am. Corp. v. Nussbaum Sales Corp.*, 2010 WL 1379804, at *4 (D.N.J. Mar. 30, 2010) (noting that indemnification and contribution claims are derivative claims).

Horton and the Plumbers cite <u>no</u> case where a court found a class representative atypical or inadequate because some class members had indemnification and contribution claims and others did not. Instead, they rely on *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 803 (3d Cir. 1995). But that case did not suggest that class representatives must be able to assert every possible legal theory held by settlement class members. It dealt instead with a situation far removed from the facts here: a settlement that offered coupons toward purchase of a new truck. The settlement class included both individual owners and fleet owners, but all the class representatives were individual owners. The court held the representatives did not have the same interests as fleet owners because fleet owners faced "substantial impediments" to using the coupons that the individual truck owners did not face. *Id*. at 800-801.

35

No such impediments exist here.  The Settlement provides substantial cash relief to all Settlement Class Members, whether they seek reimbursement individually, as homeowners do, or for indemnification of amounts already paid to homeowners, as builders, plumbers, and others do.  And at least one other court has rejected adequacy challenges to a plumbing settlement.  *Uponor*, 716 F.3d at 1064 (stating that "[c]lass representatives need not share identical interests").

The only supposedly unprotected interest that Horton and the Plumbers attempt to identify for contribution and indemnification claimants is a supposed interest in "publicly establishing their lack of fault and NIBCO's liability through litigation" if they face lawsuits from Settlement Class Members "because of insufficient recoveries [in this Settlement] and/or leaks being deemed not a Qualifying Leak."  ECF No. 187, at 30.  This objection misunderstands the Settlement, which provides builders, plumbers, and others a <u>full</u> release from liability to Settlement Class Members if NIBCO is even partially at fault.  *See supra* at 27-28; ECF No. 173-1 at 40 (¶34); *see also id.* at 41-43 (¶35) (providing for proportionate share reduction for future lawsuits).[9]

---

[9] Christianson also argues that the Settlement "stacks the cards against Installers like Christianson" because "it provides NIBCO with the power to independently reject any claim it decides does not involve a Qualifying Leak and was instead the result of certain improper installation practices."  ECF No. 192, at 26.  This is false.  The Settlement does not give NIBCO unilateral power to reject claims.  Instead, the Settlement states that Co-Lead Counsel must agree with NIBCO that a Claim does not have a Qualifying Leak in order to reject a Claim.  SA, §14(b).

36

Horton claims that the Settlement Fund is too small, creating a conflict between Settlement Class Members that have already encountered leaks and those that have not.  ECF No. 187, at 31.  However, as discussed *supra* at 28-31, the Settlement Fund is adequate.

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), cited by Horton, is not remotely similar.  The settlement class there consisted of "perhaps millions" of class members with "diverse medical conditions."  *Id.* at 595.  The settlement treated past injuries and future injuries differently in numerous ways.  *Id.*  In contrast, all Settlement Class Members here, both those who already suffered damages and those who will suffer damages in the future, are treated identically.[10]

Horton's challenge is like the failed objection in *Dewey v. Volkswagen A.G.*, 681 F.3d 170 (3d Cir. 2012).  The settlement there provided several forms of relief to owners of vehicles with sunroofs that had an alleged propensity to leak.  *Id.* at 185-86.  The Third Circuit rebuffed an *Amchem* challenge like that of Horton: whether there was a conflict regarding the cash fund between class representatives, all of whom had experienced a leak, and class members who had not suffered a

---

[10] Horton's other cited case, *Zimmerman v. HBO Affiliate Group*, 834 F.2d 1163 (3d Cir. 1987), also does not support its argument.  *Zimmerman* was a RICO case where the named plaintiff lacked the required injury "in his business and property," so that he had no standing to assert a RICO claim and could not, therefore, represent a class.  *Id*. at 1167.  Here, Plaintiffs have standing and, as discussed *supra*, their claims are directly related to indemnification and contribution claims that builders and plumbers who did not opt out might make.

37

leak.  *Id.*  The court found adequate representation because even "[a] class member who has already suffered leakage, and is thus a 'past' claimant, can continue to suffer leakage into the future to the same extent as a future claimant, and can continue to make future claims."  *Id.*  Past claimants thus "have an incentive to protect the ability of class members to make claims for future damage."  *Id.*

Plaintiffs here include not only those who have experienced leaks but also an owner of Covered Products who has not suffered any leak.  Moreover, those who have experienced leaks continue to own their homes and, as in *Dewey*, are eligible and incentivized to submit Claims if they experience a leak from a Covered Product in the future.  The interests of both "wet" and "dry" class members are thus adequately represented.  *Dewey*, 681 F.3d at 185-86; *cf. In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, 2012 WL 2512750, at *5 (D. Minn. June 29, 2012) (rejecting adequacy objection even though all class representatives were "Soggy Plaintiffs" that had experienced leaks already), *aff'd*, 716 F.3d 1057.

## B. Predominance and Superiority Are Present Here

Horton and the Plumbers assert that Plaintiffs have failed "to provide evidentiary support" of the predominance of common questions of law and fact. *E.g.*, ECF No. 192, at 9-10.  But in moving for class certification, Plaintiffs submitted extensive briefing, supported by expert declarations on both liability and

damages that supported predominance.  ECF Nos. 108-111, 142; *Meadow* ECF Nos. 125, 126.  There is ample evidence of predominance.[11]

The argument of Horton and the Plumbers that superiority is lacking also fails.  Builders and installers who, like them, wanted to control and fund their own litigation could have opted out.  Remaining in the Settlement, however, allows them to save much of those costs.  And, the Settlement actually <u>reduces</u> installer liability to homeowners because NIBCO is 100% liable for all damages under the Settlement for any leaks for which NIBCO is even partially at fault.

Horton concedes that consolidating claims of Settlement Class Members, which this class action does, is the superior way to proceed.  ECF No. 187, at 36.  Its own argument that it is possible to aggregate claims against NIBCO, as Horton recently did in Alabama, *id*. at 37, defeats its opposition to superiority.[12]

The citation by Horton and the Plumbers of a few individual actions against NIBCO does not defeat superiority.  In *Prudential*, 962 F. Supp. at 523, *aff'd*, 148

---

[11] Christianson also attempts, unsuccessfully, to distinguish the cases upon which Plaintiffs relied in their class certification motions.  Christianson concedes that those cases demonstrate that if Plaintiffs are able to prove that the products fail in "ideal" environments, then predominance would be satisfied.  Plaintiffs argued that very theory in their class certification motions, with evidentiary support.

[12] Horton's reliance on that lawsuit is dubious at best.  Horton filed that case on November 19, 2018, ECF No. 187-4, five days <u>after</u> this Court had preliminarily approved this Settlement, ECF No. 177.  That makeweight, *post hoc* suit in no way shows that non-class litigation is superior to this class action.

776912.1

F.3d at 315-16, the pendency of "approximately 200" individual cases did not defeat superiority given the huge class there.  The same result follows here.

**C. The Class is Ascertainable and is Not "Fail-Safe"**

Next, Christianson argues that the Class is not ascertainable, plucking a snippet from the Settlement Class definition and contending that the Class includes "any individual/entity who has claims for contribution, indemnity or otherwise against NIBCO based on claims for Qualifying Leaks."  ECF No. 192, at 19.  In full context, the sentence reads: "as well as all Persons who have standing and are entitled to assert a claim on behalf of any such Occupant Persons, such as but not limited to a builder, contractor, distributor, seller, subrogated insurance carrier, or other Person who has claims for contribution, indemnity or otherwise against NIBCO based on claims for Qualifying Leaks of the Tubing, Fittings, or Clamps with respect to such residential or commercial structures."  SA, §A(1)(nn).  The full context shows that installers are covered as builders and contractors.[13]

Finally, in a throwaway footnote, Christianson calls this an "impermissible 'fail-safe' class" because it believes that one must have a valid claim to be a Settlement Class Member.  ECF No. 192, at 20 n.23.  That wrongly conflates Settlement Class membership with the requirements for submitting a Claim.

_____

[13] Christianson also cites a statement in Plaintiffs' class certification brief, which sought a different class, that class membership "turns on a single objective criterion: ownership of a residential structure in which NIBCO PEX Tubing" is installed.  ECF No. 192, at 20.  Plaintiffs have not proposed the same class here.

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs and the Class respectfully submit that the Court should grant final approval of the Settlement, grant final certification of the Settlement Class, and overrule all objections.

**LITE DEPALMA GREENBERG, LLC**

Dated: March 25, 2019

*/s/ Bruce D. Greenberg*
Bruce D. Greenberg
Susana Cruz Hodge
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile:  (973) 623-0858
bgreenberg@litedepalma.com
scruzhodge@litedepalma.com
*Class Counsel*

**SAUDER SCHELKOPF**
Joseph G. Sauder
Matthew D. Schelkopf
Joseph B. Kenney
555 Lancaster Avenue
Berwyn, PA  19312
Telephone:  (610) 200-0580
Facsimile:  (610) 421-1326
*Co-Lead Class Counsel*

**BERGER MONTAGUE PC**
Shanon J. Carson
Lawrence Deutsch
Jacob M. Polakoff
1818 Market Street, Suite 3600
Philadelphia, PA  19103
Telephone:  (215) 875-3000
Facsimile:  (215) 875-4604
*Co-Lead Class Counsel*

776912.1