## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| KIMBERLY COLE, *et al.*, on behalf of themselves and all others similarly situated, | : : : | Civil Action No. 3:13-cv-07871-FLW-TJB |
| | : | |
| *Plaintiffs,* | : : | |
| v. | : : | |
| NIBCO, Inc., | : : | |
| *Defendant.* | : : | |

## DECLARATION OF SHANON J. CARSON
## IN SUPPORT OF PLAINTIFFS' MOTION FOR
## FINAL SETTLEMENT APPROVAL AND RELATED RELIEF

I, Shanon J. Carson, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.     I am a member in good standing of the bar of the Commonwealth of Pennsylvania, and I am admitted to the United States District Court for the Eastern District of Pennsylvania and many other district courts throughout the country. I am admitted in this Court *pro hac vice* for this Litigation.

2.     I submit this Declaration in support of Plaintiffs' Motion for Final Settlement Approval and Related Relief. The following is based on my personal knowledge and if called to do so, I could and would competently testify thereto.

3.     Capitalized terms regarding the Settlement used in this Declaration

have the same meaning given to them in the Settlement Agreement.

4.     I am a Managing Shareholder of Berger Montague PC ("Berger Montague") and was appointed by this Court as Co-Lead Counsel for Plaintiffs and the Settlement Class. *See* Dkt. 177 (Nov. 14, 2018 Preliminary Approval Order at p. 4). My prior Declarations submitted in support of Plaintiffs' Motion for Preliminary Approval and Plaintiffs' Motion for Attorneys' Fees and Costs detail, among other things, the history of this litigation and the qualifications of Berger Montague to serve as Co-Lead Counsel.

5.     I co-chair my Firm's Consumer Protection Department and have an extensive background in class action litigation on behalf of consumers, including cases involving defective plumbing products and other products used in the construction industry.

6.     I submit this Declaration to provide the Court with additional information pertinent to the Court's evaluation at the final approval stage of whether the Settlement Agreement satisfies the eighth settlement approval factor set forth in *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975). This factor requires the Court to evaluate the range of reasonableness of the settlement fund in light of the best possible recovery. *Id.* This Declaration also provides information concerning the adequacy and appropriateness of the Gross Settlement Fund in response to certain assertions made by several objectors to the Settlement. Finally, this Declaration

2

provides the Court with several additional details relevant to final approval.

## I.    The Gross Settlement Fund and Data Supporting It

### A.    The Number of Homes with Reported Leaks Relative to the Size of the Settlement Class

7.      The Gross Settlement Fund of $43.5 million and the associated settlement structure – providing for a minimum recovery level of 25% and maximum recovery level of 70% of eligible economic losses caused by the failure of the Covered Products (depending on Claim volume) – is expected to provide an excellent recovery for Claimants and ensures equal treatment of all Claimants over the duration of the Claim Period.

8.      These numbers were negotiated and achieved by Class Counsel during an extensive ADR and mediation process, which was informed by significant discovery and investigation by all parties, and which was overseen by two experienced and well-respected mediators.

9.      Prior to and during the mediation process, the Parties each modeled various damage and claim scenarios and presented them to each other under the supervision of the mediators. As in any mediation, Class Counsel presented analyses that were favorable to the Settlement Class and NIBCO presented analyses that were favorable to NIBCO, and the mediators assisted the Parties in reaching a compromise resolution of the claims.

10.     NIBCO produced data and information to Class Counsel during the

3

mediation process on which it based estimates that between approximately 157,759 and 422,344 buildings (mostly residential) incorporated plumbing systems with Covered Products.[1]

11.     During the phase of settlement negotiations that took place during March 2018, NIBCO also provided information to Class Counsel estimating that it had received reports of approximately 4,860 buildings nationally (mostly residential) that had asserted a leak of a Covered Product. Coe Decl. at ¶ 39.

12.     This data was gathered and aggregated by NIBCO from a number of sources, including: (a) NIBCO's warranty records (*i.e.*, warranty claims); (b) pending and threatened lawsuits; (c) claims that had resolved; and (d) individuals who responded to a survey conducted by Co-Lead Class Counsel during the mediation process.[2]

---

[1] For the Court's convenience, additional background regarding these estimates can be found in the Declaration of Tom Coe ("Coe Decl.") which is being filed by NIBCO in support of final approval of the Settlement. Mr. Coe is NIBCO's Senior Product Manager for Flexible Piping Systems. *See* Coe Decl. at ¶ 16.

[2] Specifically, Berger Montague aggregated a number of inquiries about this Litigation that Class Counsel had received from potential Settlement Class Members during its pendency. To further support Plaintiffs' claims during the mediation process, my staff sent a confidential survey to every person that had contacted Class Counsel and inquired about the Litigation. While that communication and the results are privileged, for purposes of settlement only, and subject to FED. R. EVID. 408, my staff produced to NIBCO's counsel summary information regarding the 781 responses to the survey which claimed a leak from a Covered Product, again, without waiving any privilege.

13.     NIBCO has since stated that its March 2018 estimate is believed by NIBCO to be conservatively overstated, among other reasons, because it included certain records that were thereafter de-duplicated and other records that did not pertain to a leak of a Covered Product.  Coe Decl. at ¶ 44.

14.     NIBCO further states that it now calculates that it received reports of leaks of a Covered Product in approximately 4,450 buildings as of shortly before Plaintiffs filed for Preliminary Approval (including Class Counsel's list of survey responders described in footnote 2, above). Coe Decl. at ¶ 42.

15.     This estimated number of 4,450 buildings nationally that reported experiencing a leak, when compared to the estimate in Paragraph 10 above of the number of buildings containing the Covered Products, reflects that over the nearly 14 years since the Covered Products were first sold, between approximately **1.1% and 2.8%** of the estimated buildings containing the Covered Products reported having a leak where that information was communicated to NIBCO. Coe Decl. at ¶ 47.

16.     NIBCO's counsel also informed Co-Lead Class Counsel that of the estimated 4,450 buildings, approximately 1,470 (or 33.03%) are homes located in one of the D.R. Horton, Inc. ("Horton") communities plumbed by Christianson Air Conditioning and Plumbing, LLC ("Christianson") and Dupree Plumbing Co. ("Dupree"), respectively, in San Antonio, Texas and Birmingham, Alabama. Coe

Decl. at ¶¶ 46-48. These 1,470 homes are not included in the definition of the Settlement Class in the Settlement Agreement, are accordingly not at issue in this Settlement, and cannot make a Claim upon the Net Settlement Fund.

17.    In fact, Horton, Christianson, and Dupree have all opted out of the Settlement, even with respect to any homes they built or assisted in building that are *outside* of San Antonio and Birmingham, which means they will not make any Claim upon the Net Settlement Fund.

18.    The calculated claim rate of between approximately 1.1% to 2.8% described above, drops to a reported claim rate of between approximately 0.7% and 1.9% if the approximately 1,470 homes with alleged leaks in communities built by Horton in San Antonio and Birmingham are excluded.[3] Coe Decl. at ¶ 48.

19.    Moreover, of the homes in NIBCO's calculation of buildings with reported leaks that are *not* in the communities built by Horton in San Antonio and Birmingham, NIBCO informed Class Counsel during the mediation process that it estimated roughly 1,887 of those homes were assumed to be eligible to participate

---

[3] It is possible that even these percentages are slightly inflated due to the inability to further de-duplicate certain records at this time across sources. NIBCO also asserted during the mediation process that any figures it provided would be overstated for failing to account for causation, meaning that, according to NIBCO, leaks are being counted regardless of the cause, and may include leaks caused by installer or user error, physical damage to the component, or common environmental conditions such as freezing. This was an affirmative defense by NIBCO in litigation (*i.e.,* that someone or some cause other than NIBCO was at fault).

in this Settlement upon the submission of a valid Claim Form after one excluded: (a) previously resolved claims; and (b) claims that were likely to opt out based on previous communications with NIBCO, including the Horton/Christianson/Dupree related claims that were not included in the definition of the Settlement Class.

20.     In evaluating the adequacy and appropriateness of the Gross Settlement Fund, the above information is relevant to predicting the number of expected Claims during the Claim Period, which is further discussed below.

### B.     The Average Cost of Repair Per Home

21.     NIBCO estimated and communicated to Class Counsel during the mediation process that its historical average cost to resolve claims for leaks was approximately $3,080 in cash and/or credits. Coe Decl. at ¶ 41.

22.     In response during the mediation process, Plaintiffs proffered that an average claim could be settled for approximately $9,450. This figure was based on data and information that Class Counsel obtained during discovery and its investigation of the case, including both anecdotal information and consultation with its experts and consultants in the field.

23.     Averaging Defendant's historical payment above and Plaintiffs' proffered number resulted in an average predicted claim amount of $6,265. This number would yield average hypothetical payments of approximately $1,566 at a 25% recovery level and approximately $4,385 at a 70% recovery level.

7

C.    **Estimating the Number of Expected Claims, Including Based on the Best Available Information – the Claim Activity to Date**

24.    Based on the $43.5 Million Gross Settlement Fund and after payment of attorneys' fees and costs, service awards, and administration costs, if the amounts proposed in the Settlement Agreement are approved by the Court, the Net Settlement Fund is expected to be approximately $28,277,756, calculated as follows:

- $12,999,975.00 for Class Counsel's attorneys' fees;

- $1,254,768.94 to reimburse Class Counsel for litigation expenses;

- $117,500 in service awards to the Class Representatives; and

- $850,000 for notice and administration costs (approximate).

25.    Using the hypothetical average claim amount of $6,265 described above would mean that the Net Settlement Fund of approximately $28,277,756 would permit approximately 18,053 Claims to be paid at the 25% recovery level stated above. If the total number of Claims is ultimately less than 18,053, the Settlement Agreement provides a significant uplift mechanism that would increase the payments to up to 70% of Claimants' claimed losses. These percentages were the subject of intense negotiation during the mediation process and the 70% recovery level was one of the last material points to be negotiated in achieving the Settlement. This is a significant achievement for the Settlement Class because other defective plumbing class action settlements have resolved (and been Court-approved) where

8

the Claimant was entitled to a 25% recovery or less and with no opportunity for an uplift over 25% (let alone an uplift to 70% of losses).

26.     At this stage of the settlement approval process, however, the Court need not rely on hypothetical numbers. In fact, the actual Claim Form activity to date supports granting final approval of the Settlement and bolsters Class Counsel's confidence that the models it used during the mediation process were close to the mark, and that the Gross Settlement Fund is appropriate.

27.     According to the Settlement Administrator, as of March 17, 2019, approximately 758 Claim Forms have been received, seeking approximately $4,350,038 in the aggregate, for an average total dollar amount of approximately $5,739 per Claim -- which is less than the hypothetical average of $6,265/claim described above (which was modeled during the mediation process).[4] Angeion Decl. at ¶ 45.

---

[4] This number of Claims and estimated aggregate amount exclude one unsubstantiated Claim Form on which Angeion believes an error was committed, and approximately 88 Claims that were received from a single known fraudulent filer. Angeion Decl. at ¶¶ 42-43. The number, however, includes Claim Forms where the Claimant asserts that the products were installed in the home before NIBCO started selling the Covered Products or after NIBCO discontinued sales of the Covered Products. Therefore, the Claim Form total reported here may be slightly overstated, but this will be ascertained once Angeion has completed the administration of these Claims.

28.     Thus, the Claim Form activity to date (assuming all Claims are valid as stated) translates to an estimated average Claim payout of approximately $1,435 at the 25% recovery level and $4,017 at the 70% recovery level.

29.     Restated, the 758 Claims received to date would yield a total aggregate payment of approximately $1,087,730 out of the Net Settlement Fund at the 25% recovery level, leaving over $27 million to satisfy future Claims during the six year Claim Period. At the 70% recovery level, the 758 Claims received to date would yield a total aggregate payment of approximately $3,044,886 out of the Net Settlement Fund.

30.     Moreover, using the current $5,739 average per Claim amount as an approximation of future claims, the Net Settlement Fund would support an approximate total of 19,705 Claims at the 25% recovery level, and 7,039 Claims at the 70% recovery level.

31.     There are multiple good reasons supporting a prediction of 7,039 to 19,705 Claims, as detailed below.

32.     First, the overall claim activity since 2005 as set forth above supports this prediction, when one considers the extensive Notice Plan is expected to result in a doubling or tripling of the number of reported claims. If NIBCO's number of 4,450 is doubled, that would result in 8,900 Claims. Trebling would result in 13,350 Claims. The relationship between a manufacturer's pre-settlement warranty claim

experience and the claims rate in a class action settlement cannot be precisely defined or predicted as it depends on many factors, however, based on my experience in product defect class action cases, it is reasonable to believe that a settlement claim rate here following the extensive Notice Plan will result in between 7,039 to 19,705 Claims.

33.    Second, the last of the Tubing was manufactured in August 2012 and sold by early 2013 (*i.e.*, six years ago), and NIBCO substantially ceased selling Fittings and Clamps by the end of 2012 (*i.e.*, seven years ago). Coe Decl. at ¶¶ 4-5; 35-36. This is a factor that is likely to ensure that while Claims are expected during the six year Claim Period, the Net Settlement Fund will not become exhausted prematurely.

34.    Third, in order to provide additional certainty, the Settlement reasonably provides that Claims for past damage must be asserted by 150 days after the Effective Date. *See* Settlement Agreement at ¶ 9.a. ("Past Property Damage Claims are those that are based upon Qualifying Leaks that occurred between January 1, 2005 and the Effective Date. Such Claims must be submitted to the Settlement Administrator within 150 days after the Effective Date though the Settlement Administrator may extend the 150-day period for a particular Claimant upon a showing of good cause as determined by the Settlement Administrator.").

35.     Thus, while it is likely that there will be an influx of Past Property Damage Claims by the end of this 150 day period following the Effective Date, the vast majority of the six year Claim Period will be for Claims based on future leaks, and because NIBCO ceased selling the Tubing in early 2013 and ceased selling Fittings and Clamps by late 2012, the rate of future leaks may be less than in the past. This is especially true if NIBCO is correct that the situation in San Antonio, Texas and Birmingham, Alabama represents an anomaly.

36.     In sum, the Claim Form activity in this case compares favorably to other defective plumbing parts class action settlements in which the federal courts overseeing them granted final approval when much fewer claims were submitted by the time of the final approval hearing, even though claim windows would remain open for years. *See, e.g., In re Zurn PEX Plumbing Prods. Liab. Litig.*, No. 08-1958, 2013 WL 716088, at *1 (D. Minn. Feb. 27, 2013) (noting "several hundred claim forms" had been filed by the class consisting of "hundreds of thousands of individuals and entities" by the time of the hearing); *George v. Uponor Corp.*, 2015 WL 5255280, at *3-7 (D. Minn. Sept. 9, 2015) (49 claim forms received out of approximately 250,000 class members at the time of the hearing).[5]

---

[5] My Firm served as Co-Lead Counsel in *George v. Uponor Corp., et al.*, No. 12-cv-249 (D. Minn.), which involved Uponor's brass PEX plumbing fittings, a product similar to one of the Covered Products in this litigation. The parties in *George* reached a Court-approved class action settlement wherein Uponor guaranteed funding of up to $21 million for the reimbursement of repair and replacement costs

37.    For these reasons, the amount of the Gross Settlement Fund appears to be an excellent outcome for the Settlement Class based on all available data -- particularly given the substantial legal and factual hurdles and risks that Plaintiffs would have faced moving forward with litigation, which are further detailed in Plaintiffs' and NIBCO's accompanying briefs.

**II.    Interactions with Objectors**

38.    Following the dissemination of the Court-approved notice of the Settlement, only seven objections were received from the Settlement Class, which, as estimated above, includes between 157,700 and 422,344 homes or other buildings that incorporated plumbing systems with Covered Products. Coe Decl. at ¶ 18. The objections are detailed in the accompanying Declaration of Steven Weisbrot.

39.    Attached as **Exhibit A** hereto is the complete deposition transcript of objector Jeffrey P. Palmer (represented by Christopher Bandas), who was deposed on March 20, 2019.

40.    Attached as **Exhibit B** hereto is a letter I emailed to counsel for Horton, Christianson, and Dupree on March 19, 2019.

41.    Attached as **Exhibit C** hereto is a signed clarifying Amendment to the Settlement Agreement agreed to by counsel for Plaintiffs and NIBCO.

related to leaks or flow issues caused by the Uponor products at issue, and the settlement was approved.

Dated: March 25, 2019                    Respectfully,

                                         Shanon J. Carson
                                         Berger Montague PC
                                         1818 Market Street
                                         Suite 3600
                                         Philadelphia, PA 19103
                                         Telephone: (215) 875-3000
                                         Email: scarson@bm.net

                                         Co-Lead Class Counsel

14

# EXHIBIT A



SHANON J. CARSON / *MANAGING SHAREHOLDER*
d 215.875.4656 m 215.275.5623 | scarson@bm.net

March 19, 2019

**VIA EMAIL**

Kelly A. Waters
Samuel John
Wood Smith Henning & Berman, LLP
400 Connell Drive, Suite 1100
Berkeley Heights, New Jersey 07922
kwaters@wshblaw.com
sjohn@wshblaw.com

Gavin J. Rooney
LOWENSTEIN SANDLER LLP
One Lowenstein Drive
Roseland, New Jersey 07068
grooney@lowenstein.com

**Re:   Nibco Settlement**

Dear Counsel:

We write on behalf of all Parties (after meeting and conferring with NIBCO) in an attempt to resolve the objections your clients have raised to the proposed settlement in *Cole v. NIBCO, Inc.*, No: 3:13-cv-07871-FLW-TJB (D.N.J.).

First, your clients have objected to the Release on the grounds that it does not include a "proportionate judgment reduction" provision and leaves your clients potentially liable to Settlement Class Members for leaks resulting from any NIBCO liability for Covered Products. *See* Horton Objection (Doc. 187) at 13-18; Christianson Objection (Doc. 192) at 24; Dupree Obj. (Doc. 193) at 2. Please note, however, that Paragraphs 34 and 35 provide a complete release of such claims by Releasing Parties against not just NIBCO but also against "plumbers, homebuilders, contractors . . . and any other product or service provider or any other party in the chain of distribution who distributed, specified, recommended, sold, and/or installed the Tubing, Fittings, and/or Clamps."

The limited exception in Paragraph 35 does not prejudice you. That paragraph, which was carefully negotiated, makes plain that the exclusion extends only to "claims alleging that a party or parties other than NIBCO are wholly responsible for a leak of" a Covered Product (*e.g.*, claims for leaks that are not "Qualifying Leaks"). Paragraphs 34 and 35,

1818 MARKET STREET, SUITE 3600
PHILADELPHIA, PA 19103
215.875.3000 | *BERGERMONTAGUE.COM*

March 19, 2019
Page 2 of 2



taken together, make plain that in any potential action by a Settlement Class Member against you, you are entitled not only to a proportionate reduction of liability for any fault on the part of NIBCO, but also to the full release of claims in the event it is established that NIBCO is even partially responsible. The Settlement Agreement as drafted therefore includes greater protection than the "proportionate reduction" your clients seek because they are included in the definition of "Released Parties."

Second, your clients have objected to the Settlement on the grounds that the term "Releasing Party" defined in Paragraph 34 of the Settlement Agreement can be interpreted to include, and therefore release the claims of, those who have opted out of the Settlement. *See* Horton Objection (Doc. 187) at 13-17; Christianson Objection (Doc. 192) at 36-37; Dupree Obj. (Doc. 193) at 2 (incorporating Christianson objections). <u>In response to this objection, please note that the Settlement Agreement does not, and the settling parties did not intend to, treat opt-outs as "Releasing Parties."</u>

Although we disagree with your clients' concern and believe the Settlement Agreement is already clear in this regard, Plaintiffs and Defendants have met and conferred and if it would resolve your objections, would discuss a clarifying amendment to the Settlement Agreement that would make this point utterly without ambiguity. For example, a revised Paragraph 34 pursuant to a clarifying amendment could read, in pertinent part, as follows, with the additional language in bold typeface for purposes of this letter:

> 34. Release. Upon the Effective Date, all Settlement Class Members, as well as any Person who receives any payment from the Net Settlement Fund, on behalf of themselves and their agents, heirs, executors and administrators, successors, assigns, insurers, attorneys, representatives, and any and all Persons who seek to claim through or in the name or right of any of them **(but excluding any Persons who timely opted out of the Settlement with regard to the particular structure(s) for which they opted out) (the "Releasing Parties")**, release and forever discharge . . . .

Please confirm whether this letter resolves your objections. If it does not, we invite you to respond in writing with your basis for disagreement, and are willing to confer with you to determine whether the objections can be resolved.

Sincerely,

Shanon J. Carson

cc:  Defense Counsel (via email)

# EXHIBIT B

Jeffrey Palmer
March 20, 2019                                                    1

```
 1            IN THE UNITED STATES DISTRICT COURT
                   DISTRICT OF NEW JERSEY
 2
   KIMBERLY COLE, ALAN COLE, )
 3 JAMES MONICA, LINDA BOYD, )
   MICHAEL MCMAHON, RAY      ) CIVIL ACTION
 4 SMINKEY, JAMES MEDDERS,   ) NO. 13-7871-FLW-TJB
   JUDY MEDDERS, ROBERT      )
 5 PEPERNO, SARAH PEPERNO,   )
   KELLY MCCOY, LESA WATTS,  )
 6 CHAD MEADOW, JOHN PLISKO, )
   SUSAN PLISKO, KENNETH     )
 7 MCLAUGHLIN, RYAN KENNY,   )
   ALEXANDER DAVIS, AND      )
 8 ANDREA DAVIS, on behalf   )
   of themselves and all     )
 9 others similarly situated,)
                             )
10      Plaintiffs,          )
                             )
11 VS.                       )
                             )
12 NIBCO, INC.,              )
                             )
13      Defendant           )

14

15

16

17

18

19

20

21

22          VIDEOCONFERENCED ORAL DEPOSITION OF

23               MR. JEFFREY P. PALMER

24                  MARCH 20, 2019

25                  VOLUME 1 OF 1
```

Jeffrey Palmer
March 20, 2019                                                    2

1         VIDEOCONFERENCED ORAL DEPOSITION OF MR. JEFFREY P.

2   PALMER, produced as a witness at the instance of the

3   Plaintiffs, and duly sworn, was taken in the above-styled

4   and numbered cause on March 20, 2019, from 9:06 a.m. to

5   12:51 p.m., before Carol A. Curtis, CSR in and for the

6   State of Texas, reported by machine shorthand, at the

7   offices of Regus, 420 Throckmorton Street, Suite 200,

8   Fort Worth, Texas, pursuant to the Federal Rules of Civil

9   Procedure and the provisions attached hereto or stated on

10  the record.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jeffrey Palmer
March 20, 2019                                                   3

1                    A P P E A R A N C E S

2

FOR THE PLAINTIFFS:
3
        Mr. Steven A. Schwartz (Via Videoconference)
4       CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH, LLP
        361 West Lancaster Avenue
5       One Haverford Centre
        Haverford, Pennsylvania  19041
6       Telephone:  (610) 542-8500
        Facsimile:  (610) 649-3633
7       sas@chimicles.com

8

FOR THE DEFENDANT:
9
        Mr. Michael E. Kenneally (Via Videoconference)
10      MORGAN LEWIS & BOCKIUS, LLP
        1111 Pennsylvania Avenue NW
11      Washington, DC 20004
        Telephone:  (202) 739-3000
12      Facsimile:  (202) 739-3001
        michael.kenneally@morganlewis.com

13

14 FOR THE WITNESS:

15      Mr. Eric Stewart
        HUSEMAN LAW FIRM
16      615 North Upper Broadway, Suite 2000
        Corpus Christi, Texas  78701
17      Telephone:  (361) 883-3563
        Facsimile:  (361) 883-0210
18      estewart@husemanlawfirm.com

19
        Ms. Janet L. Gold (Via Videoconference)
20      EISENBERG GOLD & AGRAVWAL, P.C.
        1040 North Kings Highway, Suite 200
21      Cherry Hill, New Jersey  08034
        Telephone:  (856) 330-6200
22      Facsimile:  (856) 330-6207
        jgold@egclawfirm.com

23

24

25

Jeffrey Palmer
March 20, 2019                                        4

```
1                        I N D E X

2   Appearances . . . . . . . . . . . . . . . . . .    3

3   Stipulations  . . . . . . . . . . . . . . . . .    6

4   MR. JEFFREY P. PALMER

5         Direct Examination by Mr. Schwartz . . . 6

6   Signature Page . . . . . . . . . . . . . . . .   131

7   Reporter's Certificate . . . . . . . . . . . .   132

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Jeffrey Palmer
March 20, 2019                                          5

1                       E X H I B I T S

2  NO.                      DESCRIPTION                    PAGE

3  1                                                        12
            Objections of James J. Poindexter, Cery Perle
4           and Jeffrey Palmer to Proposed Settlement and
            Notice of Intent to Appear
5
   2                                                        25
6           Declaration of Jeffrey Palmer

7  3                                                       107
            Notice of Class Action Settlement
8
   4                                                       113
9           Objection of Class Member Jeffery Palmer

10 5                                                       123
            Memorandum of Law in Support of Plaintiffs'
11          Motion for Preliminary Settlement Approval and
            Related Relief

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jeffrey Palmer
March 20, 2019                                          6

```
 1                 A G R E E M E N T S

 2          MR. SCHWARTZ:  We'll -- we'll agree that we'll

 3  take the deposition pursuant to the Federal Rules of Civil

 4  Procedure.  Is that okay, Mr. Stewart?

 5          MR. STEWART:  Oh, you need to ask Janet, but I

 6  assume that's okay.  We're having technical --

 7          MS. GOLD:  I'm sorry.  Can you say that again?

 8          MR. SCHWARTZ:  Janet?

 9          MS. GOLD:  Yes.  Can you hear me?

10          MR. SCHWARTZ:  Yes.

11          MS. GOLD:  What was the question?  I'm sorry.

12          MR. SCHWARTZ:  We're going to take the

13  deposition pursuant to the Federal Rules of Civil

14  Procedure.

15          MS. GOLD:  That's fine.

16          MR. SCHWARTZ:  Okay.  Thank you.

17                  MR. JEFFREY P. PALMER,

18  having been first duly sworn, testified as follows:

19                    DIRECT EXAMINATION

20  BY MR. SCHWARTZ:

21      Q.   Good morning, Mr. Palmer.  My name is Steve

22  Schwartz.  I represent the Plaintiffs in this case.  I'm

23  going to be asking you some questions today for your

24  deposition.  Could you first please tell us your full

25  name?
```

Jeffrey Palmer
March 20, 2019                                                          7

```
 1      A.    Jeffrey Paul Palmer.

 2      Q.    And where do you live, sir?

 3      A.    I live in Nocona, Texas.

 4      Q.    Have you ever been deposed before?

 5      A.    Not that I recall, no.

 6      Q.    Have you ever testified in a trial or other

 7 legal proceeding under oath?

 8      A.    No, I do not believe so.

 9      Q.    Okay.  Why don't we go over some ground rules.

10 First of all, thanks for coming in today, and thanks for

11 working with us with the videoconferenced deposition.  The

12 most important rule for a deposition is since our court

13 reporter, Carol, is taking everything down, it's very

14 important for you to wait until I finish my question until

15 you give an answer, and it's just as important for me to

16 wait for you to finish your answer before I ask my next

17 question.  So we have to leave a little bit of space, more

18 than usual between question and answer.  Okay?

19      A.    Not a problem.

20      Q.    Also, if I ask a question that you don't

21 understand, just let me know.  I'll try to rephrase it.  I

22 want to make sure we're communicating effectively so the

23 record that the court reporter takes down is a fair and

24 accurate record of what happens today and what your

25 testimony is.  Okay?
```

Jeffrey Palmer
March 20, 2019                                          8

```
 1      A.   That will be fine.

 2      Q.   It's also possible that during the course of the

 3 deposition your attorneys will interpose some objections.

 4 Unless the objection goes to an area of attorney/client

 5 privilege or you get an instruction by your attorney not

 6 to answer, you still have to answer my question.

 7           So it's not necessary for you to pay attention

 8 to the objection.  That's for legal issues that the court

 9 may have to decide down the road, but I'll still want to

10 get answers to my question unless it impacts or discloses

11 something that's protected by the attorney/client

12 privilege.  Okay?

13      A.   All right.

14      Q.   Is there any reason why you're not prepared to

15 testify truthfully today about issues related to your

16 objection in this class action?

17      A.   Not that I'm aware of.

18      Q.   Okay.  Let's first talk about your brother.  And

19 your brother is Joseph Darrell Palmer?

20      A.   That's correct.

21      Q.   Okay.  And I just saw that you -- you -- you

22 smiled when -- when I mentioned your brother's name.  What

23 is the -- the current nature of your relationship with --

24 with -- with Joseph?  First of all, does he go by Darrell?

25      A.   Yes, he goes by Darrell primarily.
```

Jeffrey Palmer
March 20, 2019                                                    9

1      Q.   Okay.  So why don't you first describe what

2   your -- your current relationship is with your brother

3   Darrell in broad terms?

4      A.   Oh, we don't have a strong relationship.  He's

5   my brother.  He lives in Colorado.  We communicate

6   infrequently, mostly just about personal issues.  I sent

7   him a free food box the other day as a referral off of a

8   box meal service.  That's about the most communication

9   I've had with him in the last couple of weeks.

10      Q.   Okay.  Are you aware that Mr. Darrell Palmer,

11   your brother, has been suspended from practice by the

12   California State Bar?

13      A.   I had heard something to that effect, but I'm

14   not familiar with any details of that.

15      Q.   Okay.  So let's first talk about how you got

16   involved in this.  Actually let's talk about other cases.

17   Have you been a -- an objector in any other class actions

18   besides this one?

19      A.   Yes, I believe there's one.  It's noted in the

20   objection documents.

21      Q.   Okay.  And do you remember who the defendant was

22   in that case?

23      A.   I believe it was Verizon Wireless.  It's been

24   some time ago, though, so I'm not -- I'm not going to be

25   real up on the details of that case.

Jeffrey Palmer
March 20, 2019                                                    10

```
 1      Q.   Okay.  And I guess I should give you another

 2 instruction, too, which is, this is not designed as a

 3 memory test.  If there's something you don't remember,

 4 feel free to say you don't remember, if that's the truth,

 5 obviously.  If there is some fragments that you can

 6 remember, feel free to tell me that --

 7      A.   Okay.

 8      Q.   -- as well.  Okay?

 9      A.   That's fine.

10      Q.   In connection with the Verizon case, do you

11 remember generally what the class action was about?

12      A.   No.  No, not at this time, I don't.

13      Q.   Who was your lawyer in that case?

14      A.   That would have been Darrell.

15      Q.   And when your brother, Darrell, was representing

16 you in that case, did he ask you to be his client in that

17 case, or did you get a notice and come to him?  How -- how

18 did that communication flow work?

19      A.   I honestly don't remember.  I -- I remember

20 seeing some notice somewhere about it, but I don't recall

21 whether I inquired of him first, or he mentioned it to me.

22      Q.   Besides this case -- putting aside this case and

23 the Verizon case, have you received notices in any other

24 class actions that you're a class member and you might be

25 entitled to share in a recovery?
```

Jeffrey Palmer
March 20, 2019                                          11

1      A.    I received a notice on the Naked Juice case, I

2 believe.   And there was one other case that I remember

3 seeing -- receiving a notice on, but I can't tell you

4 exactly what it was.

5      Q.    And when you received the -- the notice in the

6 Naked Juice case, did you talk with any lawyer about that

7 notice that you received?

8      A.    No, I had no reason to.

9      Q.    And when you say you had no reason to, why do

10 you say that?

11      A.    I saw no great disparity in the -- the terms of

12 the settlement.   Plus the notice would have been received

13 after, I believe the -- the settlement was finalized.

14      Q.    Now, in the Verizon case, did you have an

15 economic relationship or any agreements with your brother

16 Darrell about either paying attorneys' fees and what, if

17 anything, you might get paid, and what, if anything, he

18 might get paid in that case in connection with your

19 objection?

20      A.    I can't recall any discussion about that.

21      Q.    Do you recall what the result was of your

22 objection in the Verizon case?

23      A.    No, I do not.

24      Q.    Do you recall whether the appeal in that case

25 was dismissed because of a failure of your lawyers to pay

1   the appeal bond?

2       A.   I'm not sure why it was dismissed.

3       Q.   Did you ever get any compensation or any

4   payments as a result of objecting in the Verizon case?

5       A.   No, I did not.

6            MR. SCHWARTZ:  Madam court reporter, I would

7   like to mark as Exhibit 1 the document that is in folder

8   seven, so if you could get that out and give that to the

9   witness.

10           MR. STEWART:  There's a folder here.  Is that my

11  folder?

12           THE REPORTER:  No, actually these came out of

13  the --

14           MR. STEWART:  Oh, that's that folder.  Okay.

15  I'm just making sure what we're looking at here.  Thank

16  you.

17           (Exhibit No. 1 marked)

18           THE REPORTER:  Exhibit 1 has been marked.

19           MR. SCHWARTZ:  Okay.  Thank you.

20      Q.   (BY MR. SCHWARTZ) So Exhibit 1, Mr. Palmer, is

21  a copy of a document numbered 128, filed in the -- the

22  Verizon case we're talking about.  And can you just verify

23  that this is the objection that was filed on your behalf

24  and on behalf of some others by your brother, Darrell

25  Palmer?

Jeffrey Palmer
March 20, 2019                                          13

```
 1       A.    That's what it appears to be.

 2       Q.    Before your brother, Darrell Palmer, filed this

 3  objection in the Verizon case, did you read the objection?

 4       A.    I'm sure I did.  That was seven years ago.

 5       Q.    Okay.  When you say you're sure you did,

 6  recognizing that -- that you said you -- you can't

 7  remember today exactly what you did, would that have been

 8  your practice to have read a document like this before it

 9  was filed on your behalf?

10       A.    Absolutely.

11       Q.    Okay.  If you go to Page 2, I'm going to ask

12  about some of the objections you made in this case.  The

13  very first Roman numeral talks about a cy pres nomination

14  being inadequately explained and improperly matched to the

15  class.  Do you see that?

16       A.    Yes.

17       Q.    Is -- is that something that somehow offended

18  you when your read the -- the notice that you got in the

19  Verizon case?  Is that an objection that -- that you

20  raised to your counsel, or is that a counsel that -- is

21  that an objection -- well, I'll leave it with my question,

22  was that -- was that an issue that you identified yourself

23  when you read -- when you read the notice in the Verizon

24  case?

25       A.    If you'll give me a moment to read it, I'll
```

Jeffrey Palmer
March 20, 2019                                                      14

1  answer that question.

2      Q.  Sure.  And -- and with all items that I put in

3  front of you, feel free to take as much time as you need

4  to get yourself familiar with it, if that will help you

5  with your answer.

6      A.  Okay.  Although I don't recall the specific

7  conversation that we had, the objection being put forth

8  does seem reasonable.  And had I -- if I had the original

9  settlement in front of me, I could probably make better

10 sense of this and better answer your question, but I'm not

11 sure at this time if that is exactly something we

12 discussed or if that's something -- or if that's something

13 I brought forth or just something we discussed as we were

14 going through the settlement.  So to answer your question,

15 I'm not a hundred percent certain how the objection came

16 about.

17     Q.  Okay.

18     A.  But clearly it was in a -- a reasonable

19 objection to the settlement.

20     Q.  But as you sit here today, you can't recall

21 whether you were first offended by the cy pres proposal in

22 the settlement when you read the notice and before you

23 talked with your brother as opposed to your brother,

24 Darrell, identifying the issue for you; is that fair?

25     A.  I'm sure we probably discussed it since not

Jeffrey Palmer
March 20, 2019                                                          15

1 being an attorney myself, I'm not terribly familiar with

2 the term "cy pres."

3      Q.   Do you recall in this Verizon case that the cy

4 pres proposal was only for money left over from uncashed

5 checks after checks were provided to class members and

6 efforts were made to identify class members who did not

7 cash their checks so that -- that the cy pres gifting, so

8 to speak, was only going to be for a residual amount left

9 over in the settlement fund from uncashed checks?  Do you

10 remember that detail?

11     A.   No, I do not remember that.

12     Q.   Okay.  On Roman numeral two on -- of this

13 objection that you filed in Verizon, and that's on Page 4,

14 the heading is that the requested attorneys' fees are

15 reasonable.  Do you see that?

16     A.   Yes, I can see that.

17     Q.   And -- and -- and I'm not going to ask you to --

18 to read and -- and give me any arguments pro or con for

19 the objection.  I just want to ask you whether -- whether

20 the issue of the amount of attorneys' fees was something

21 that you identified yourself when you read the notice and

22 said to yourself, Wow, I think these attorneys' fees are

23 unreasonable, I want to object to them, or rather that was

24 a thought that you only got after you consulted with your

25 brother.

Jeffrey Palmer
March 20, 2019                                                    16

  1      A.   Again, I'm not certain I recall that exactly,

  2 but looking at this, the amount of the attorneys' fees do

  3 appear to be somewhat unreasonable to me.

  4      Q.   Are you aware that your brother had a practice

  5 of objecting to class action settlements, having the

  6 objection denied, filing a notice of appeal, and then

  7 extracting a payment from class counsel in exchange for

  8 dismissing the appeal with no additional compensation or

  9 benefits going to the class?  Are you aware of that

 10 practice by your brother?

 11      A.   I -- I'm not privy to my brother's legal

 12 practice.  I'm aware that he dealt with --

 13      Q.   So is the ans --

 14      A.   I'm aware that he dealt --

 15      Q.   I'm sorry.  Go ahead.

 16      A.   Yeah, I'm sorry.  I am aware that he dealt with

 17 class action cases, but I was not privy to how he did his

 18 business or ran his practice.

 19      Q.   So have you ever heard from anyone that your

 20 brother had a practice, your brother, Darrell, had a

 21 practice of dismissing appeals of class action settlements

 22 in exchange for money paid to him with no corresponding

 23 benefit to the class?  I'm just asking if you're familiar

 24 or have ever heard that about your brother?

 25      A.   No.

Jeffrey Palmer
March 20, 2019                                                    17

1       Q.   Have you ever had a concern that your brother

2  was being paid attorneys' fees that were excessive in

3  light of the benefit he achieved for the classes he

4  purported to represent and objections that he filed?

5       A.   Not having been privy to his legal practice, it

6  would be difficult for me to express concern about

7  something that I'm not aware of.

8       Q.   Okay.  So you are not aware of -- of that

9  practice, and that's what I'm hearing; is that correct?

10      A.   That's correct.

11      Q.   Okay.  Why don't you tell me a little bit about

12 yourself.  Why don't you take me through your education

13 after high school?

14      A.   I spent two and a half years at Oral Roberts

15 University undergraduate, transferred from there to the

16 University of Northern Colorado where I spent a quarter

17 and left college for some time.  I don't recall exactly

18 how long it was after that that I attended a semester at

19 Grossmont College in San Diego.

20      Q.   Did you ever get a degree from college?

21      A.   No, I did not.

22      Q.   Okay.  In terms of your profession, and I don't

23 want to hear about every odd job you may have had, but why

24 don't you tell me what your professional vocation is

25 today, and if it's considerably different from earlier

Jeffrey Palmer
March 20, 2019                                                    18

 1 decades, just let me know?

 2     A.    Today I primarily run a cabinet shop and also do

 3 some kitchen remodeling.  In the past, since we moved to

 4 Nocona, Texas, I have done remodeling and built a couple

 5 of homes, run of gamut of pretty much handling all the

 6 trades from the ground up.  I have done electrical work

 7 since I was about 11 years old, started wiring the house

 8 that we were building for ourselves in Okmulgee, Oklahoma.

 9          When I was in San Diego, I ran a general

10 contracting business.  My partner there was a licensed

11 plumber, so I learned a lot about plumbing working with

12 him.  His name is Stan Hardin.  He is also still a

13 licensed plumber in Denver, Colorado.

14     Q.    As a result of working with Mr. Hardin, did you

15 become sufficiently conversant with the ins and outs of

16 plumbing, that you would perform plumbing services as part

17 of work you did as a -- as a contractor?

18     A.    Yes.

19     Q.    I don't want to talk about things like gift

20 baskets and little things like that, but today or -- or in

21 the last ten years, have you provided any material

22 financial assistance to your brother, Darrell Palmer?

23     A.    What would you define as material?

24     Q.    Any annual gifts over, say, $1,000, gifts, you

25 know, help him pay his rent or whatever?

Jeffrey Palmer
March 20, 2019                                          19

1      A.    Well, my brother suffered a massive stroke a

2 couple of years ago, so since then, we have helped him

3 out, but I don't think I've ever given him anything that

4 would amount to over $1,000 within a calendar year.

5      Q.    Okay.

6      A.    We did rent him an apartment.

7      Q.    Besides -- I'm -- I'm sorry.  Go ahead.

8      A.    We did rent him an apartment at a building that

9 we own in Nocona for some time, but we didn't even reduce

10 the rent from what we typically get.  We did some things

11 to make it --

12     Q.    Okay.  And he paid?

13     A.    Yeah.  Yes, he paid the rent.

14     Q.    And he paid the rent?

15     A.    Yes.

16     Q.    Okay.  Besides this case and the Verizon case we

17 talked about, have you consulted with any other attorney

18 about possibly objecting to a class action settlement?

19     A.    No, I've not.

20     Q.    How did you first hear about this class action

21 settlement in the NIBCO case?

22     A.    My brother, Darrell, made me aware of it.

23     Q.    What did he tell you?

24     A.    He asked me if we had used these fittings

25 somewhere and told me that there was a case, and I don't

1  recall exactly the conversation.  He knew that we had

2  redone plumbing on several buildings in town about that

3  time period, suggested that I look into it, asked if I had

4  had any damages as a result of those fittings, since that

5  was the -- the core issue with the case.

6         I told him, yes, we had had those fittings in --

7  installed in the house on Northcott Street, and we had

8  actually had a leak that looked like the fittings were

9  corroded.  And I found it odd that they would have failed.

10     Q.   Is there anything else that your brother told

11 you in this conversation about this case?

12     A.   I don't recall exactly what else was discussed

13 in the conversation, nothing material beyond that.  Other

14 than he suggested that I might contact Mr. Clore.

15     Q.   Mr. who?

16     A.   Rob Clore.  He's an attorney with the Bandas

17 firm.

18     Q.   Okay.  That's C-l-o-r-e?

19     A.   That's correct.

20     Q.   Did your brother give you the website that had

21 any information about the class action settlement?

22     A.   I don't recall whether he gave me the

23 information or if I simply looked it up through a web

24 search.

25     Q.   Did you review anything on the website, either

Jeffrey Palmer
March 20, 2019                                                    21

1 the claim form or the frequently asked questions or the

2 settlement agreement or anything else, before you reached

3 out to the Bandas firm?

4      A.   Yes, I did.

5      Q.   Now, you said something that when you were

6 talking with your -- your brother, or at least talking

7 about your answer about your conversation with your

8 brother, that you found it odd that these fixtures that

9 you mentioned that you thought were NIBCO fixtures leaked.

10 Do you remember that?

11      A.   Yes, I do.

12      Q.   So why don't you take me back in time, and I --

13 I think it was 2014, but tell me if I'm wrong, but what is

14 it about these fixtures that are leaking -- that were

15 leaking that you thought were -- was odd?

16      A.   There seemed to be an unusual amount of

17 corrosion for something that was no older than they were.

18      Q.   And what conclusion did you draw when you saw a

19 plumbing fixture leaking prematurely and having corrosion?

20      A.   That I should replace it.

21      Q.   That -- that's -- that's a good conclusion.  Did

22 you also reach a conclusion that maybe there's something

23 wrong about the fixtures?

24      A.   Yes, it did appear that it was defective, but I

25 had no way to know whether that was a common thing for

Jeffrey Palmer
March 20, 2019                                          22

1  that particular item or if I had just gotten one oddball

2  faulty fitting.

3          I assumed that it was a couple of oddball faulty

4  fittings that had leaked that had caused my problem.  So

5  although I took note of what they were, I did not save

6  them.  It wasn't worthwhile to file an insurance claim for

7  that amount of money, considering the deductible that I

8  had, so I simply repaired what needed to be done.

9      Q.  And about how much money did the -- the failure

10 of the fittings cost you in terms of not just replacing

11 the fittings, which don't cost that much, but in terms of

12 damage that had to be repaired?

13     A.  We ended up getting an entire bathroom, so we

14 spent about a little over $2,000.  I believe there's a --

15 an invoice that we've provided detailing those damages a

16 little bit more thoroughly.

17     Q.  Is it fair to say that, and tell me if I'm

18 wrong, do you have a -- do -- do -- is your memory -- let

19 me ask the question this way.  Do the invoices provide the

20 best current evidence of how much it cost you, or do you

21 have an independent memory about those numbers?  I'm just

22 trying to get a sense of how good your memory is compared

23 to what we see in the documents.

24     A.  I would say the documents are probably the best

25 indication, although I'm sure they don't actually reflect

Jeffrey Palmer
March 20, 2019                                              23

1 all of the costs that would have been involved in doing

2 the repairs.

3      Q.   Now, when these fittings failed prematurely, did

4 you consider picking up the phone and calling your

5 brother, Darrell Palmer, since he's a class action lawyer,

6 to see whether there was anything he might be able to do

7 to help you?

8      A.   Again, since I -- it appeared to me that it was

9 probably a couple of fittings and an unusual case at the

10 time.  I didn't even have any consideration that a class

11 action might be something to consider at that point.

12     Q.   And -- and do you remember what your deductible

13 was for your insurance?  Where you said it wouldn't be

14 worth file -- filing a claim, given the deductible, how --

15 how much was that if you remember?

16     A.   Typically in Texas, you have one percent

17 deductibles on those policies.  I would have to go back

18 and look specifically to see what we had that building

19 insured for at the time, but it would have been somewhere

20 in the neighborhood of 1,000 to $1,500.

21     Q.   And is that why you figured it wasn't worth your

22 while to file an insurance claim?  You just wouldn't get

23 that much money back after the deductible?

24     A.   Well, it's a -- a two-fold answer.  One, you

25 wouldn't get that much money.  Secondly, when you file an

Jeffrey Palmer
March 20, 2019                                                24

1  insurance claim, rates on that building are going to

2  continue to go up slightly.  And when you add that up over

3  the years I intended to own that structure, it would cost

4  me more to file the claim and pay higher rates for the

5  next ten years than it would cost me simply to repair the

6  damage.

7      Q.   Is it fair to say that at the time you reached a

8  conclusion that there was no economically viable way for

9  you to get reasonable compensation for the damages you

10 suffered from these fitting failures?

11     A.   I'm not sure if there may have been another

12 economically viable way to get some compensation, but it

13 was not worth my time at the mo -- moment for that amount

14 to spend researching that.

15     Q.   Okay.  Now, you will be getting some

16 compensation or you expect to get some compensation as

17 part of this class action settlement.  Is that your

18 current expectation?

19     A.   Most definitely.  If it wasn't, I would not be

20 here.

21     Q.   So are you pleased that there were people like

22 you who had NIBCO PEX products that had failed who took

23 the effort and had class action lawyers who took the

24 effort in order to bring a lawsuit and generate the

25 settlement fund so you can get compensation?  Are you --

1  are you pleased that that happened?

2      A.   I am pleased that the lawsuit was filed and that

3  there is the possibility of a reasonable settlement.  And,

4  of course, anyone is always pleased with the idea that

5  they could get some money from something where they had

6  already written it off.

7      Q.   Why don't you -- well, I'll -- I'll get to that

8  in a -- in a bit.  Let's take a look at the declaration

9  you filed in this case.  We'll mark that as Exhibit 2.

10          MR. SCHWARTZ:  And, Madam court reporter, that

11 is in folder number nine.

12          THE REPORTER:  Excuse -- excuse me.  What number

13 folder?

14          THE WITNESS:  Nine.

15          MR. SCHWARTZ:  Nine.

16          THE REPORTER:  Thank you.

17          MR. STEWART:  Make sure you keep this organized

18 so that she doesn't get mad at you later.

19          THE WITNESS:  Okay.

20          (Exhibit No. 2 marked)

21          THE REPORTER:  Exhibit 2 has been marked.

22          MR. SCHWARTZ:  Thank you.

23      Q.   (BY MR. SCHWARTZ)  And one other instruction

24 which is important, which is when you leave today, do not

25 take the original marked exhibits with you.  We've had

Jeffrey Palmer
March 20, 2019                                          26

1  that experience with some other cases, and it always

2  causes confusion.

3          So Exhibit 9 -- no, I'm sorry.  Exhibit 2 is a

4  document filed in this case as ECF Document Number 184-1.

5  And if you take a look at the second page, it's a

6  declaration of Jeffrey Palmer.  And if you then take a

7  look at the -- at page Number 5 of the document, it has

8  your signature declaring that the statement is true and

9  correct under penalty of perjury.  Do you see that?

10     A.   Yes, I do.

11     Q.   Okay.  And you understood when you signed this

12  declaration that -- that you were taking an oath that it

13  was truthful and accurate just like you took today,

14  correct?

15     A.   That's correct.

16     Q.   Did you read this declaration carefully before

17  you signed it?

18     A.   I not only read it, but I did go through it and

19  edit cer -- certain things.  I don't recall exactly what,

20  but it would be fair to say that I was very involved in

21  the drafting of this document.

22     Q.   Okay.  And now I want to -- your lawyer may tell

23  you this at some point, too.  I don't want you to divulge

24  the substance of communications you had with your lawyers

25  at the Bandas firm or with Ms. Gold or with Mr. Stewart.

Jeffrey Palmer
March 20, 2019                                                27

1  There are some things I do want to ask you about, though.

2  First of all, Ms. Gold, have you ever -- and this is a yes

3  or no.  Have you ever spoken with Ms. Gold or anyone from

4  her firm?

5       A.   Yes, I have.

6       Q.   Do you have a signed retainer agreement?  This

7  is another yes or no.  Do you have a signed retainer

8  agreement with Ms. Gold's firm?

9       A.   Yes, I do.

10      Q.   And I don't think we got on the record the name

11 of Mr. Stewart's firm.

12           MR. SCHWARTZ:  Mr. Stewart, could you enter your

13 appearance on the record for the court reporter?

14           MR. STEWART:  Sure.  Huseman Law Firm in Corpus

15 Christi.

16      Q.   (BY MR. SCHWARTZ)  So, Mr. Palmer, do you have a

17 signed retainer agreement with Mr. Stewart and his firm?

18      A.   I don't recall.  I would have to look at the

19 documents that I have, but I believe so.

20      Q.   Are you paying anything out of your pocket for

21 either Ms. Gold's firm or Mr. Stewart's firm?

22      A.   I have not as yet.

23      Q.   Do you -- do you have any obligation to pay them

24 anything out of your own pocket?

25      A.   I don't believe so.

Jeffrey Palmer
March 20, 2019                                              28

1        Q.    Do you know how they're getting paid in this

2   case?

3        A.    Well, that would depend on the success of their

4   objection.

5        Q.    Do you know whether Mr. Bandas and his firm is

6   paying Mr. Stewart's firm and Ms. Gold's firm an hourly

7   rate that's not contingent on the degree of success or

8   failure of their objections?

9        A.    That's not really anything that I would be privy

10  to.

11       Q.    And let's talk about the Bandas firm.  Are

12  you -- do you have any obligation to pay the Bandas firm

13  anything?

14       A.    I don't believe I've made any such obligation.

15       Q.    Do you know how the Bandas firm is going to get

16  paid in this case, if at all?

17       A.    I'm not absolutely certain how they would be

18  paid, no.

19       Q.    Are you expecting to get -- to get paid anything

20  in this case depending on the success or failure of the

21  objection?

22       A.    I expect to be paid the claim that I filed.

23       Q.    Okay.  Putting aside the -- let's talk about the

24  claim that you filed.  It's your expectation that you

25  would get paid on your claim the same way each and every

1  other class member would get paid on their claim based on

2  merits -- the individual merits of their claim; is that

3  fair?

4      A.   That's a fair statement.

5      Q.   Besides getting this payment that you're

6  entitled to for your claim, do you have any expectation

7  that you will get paid anything else in addition to that

8  due to the fact that you filed this objection?

9      A.   I have minor understandings of how this process

10 works when it comes to the federal court.  I understand

11 that there's a possibility that there may be a minor

12 payment, but it's not going to be anything significant.

13     Q.   Do you know whether any payment that you could

14 possibly get in addition to the payment for your claim, do

15 you know whether that's a payment that has to be approved

16 by a judge or not?

17     A.   I would assume that it would have to be approved

18 by a judge, but again, I'm not an attorney, so I'm not

19 intimately familiar with all of the workings of that.

20     Q.   Is it your expectation that the Bandas firm will

21 not receive any money in attorneys' fees unless it

22 achieves some benefit for the class in connection with the

23 objection that it has filed?

24     A.   That seems a reasonable understanding, yes, that

25 I would expect them to gain some benefit for the class, or

1 else if that were not the case, this entire proceeding is

2 useless.

3     Q.   So is it your understanding that unless the

4 Bandas firm can actually achieve some benefit for the

5 class, that it should -- it will not be getting paid

6 anything for the time it spends prosecuting the objection?

7 Is that your understanding?

8     A.   I'm not sure how the term "prosecuting" applies,

9 but it's my understanding that they'll only get paid if

10 they are able to receive or to make a favorable

11 improvement to the settlement.

12    Q.   And does that seem fair to you?

13    A.   Definitely it seems very fair to me.  They

14 should be paid if they are able to improve the settlement

15 for all of the other class members and myself.

16    Q.   And the flip side, does it also seem fair that

17 if they can't improve the settlement, that they should not

18 get paid because they did not create a benefit?

19    A.   It's not my place to consider the -- the ethics

20 of something like that.  But on the face of it, I would

21 say that that seems fair.  If they're going to try to

22 improve a settlement, they should be paid for improving

23 the settlement.  And if they fail, it seems reasonable

24 that they would not be paid for that.  It seems common;

25 however --

Jeffrey Palmer
March 20, 2019                                    31

1      Q.   Is that -- okay.  Go ahead.

2      A.   It seems common to the legal process, from what

3  limited knowledge I have of it, that attorneys often

4  attempt to create better settlements or take cases where

5  they incur no financial benefit if they don't succeed.

6      Q.   I'm sorry.  Could you -- could you restate that

7  answer.  I just want to make sure I understood it correct.

8      A.   It seems common to me that attorneys often take

9  cases where they don't get paid if they don't get a

10  result.

11      Q.   For example, my firm and the other firms who

12  represent the class in this case, if we had lost the case

13  and, therefore, delivered no benefit, it wouldn't strike

14  you as unfair that we don't get paid, even though we would

15  have spent millions of dollars on the case; is that fair?

16      A.   To discuss whether that's fair or not seems a

17  greater ques -- question than what these proceedings are

18  for.  That would require a rework of our entire legal

19  system to make that fair.

20      Q.   Okay.  I hear you.  So let's just go through

21  your declaration that we've marked as Exhibit 2.  Okay?

22      A.   Okay.

23      Q.   On the -- on the -- the page that's numbered

24  Page 1, in the third paragraph, You say you own a

25  residential structure, right?

1       A.   That's correct.

2       Q.   And then on the fourth paragraph, you wrote in

3  your declaration, I completed a claim form with

4  attachments and forwarded it -- forwarded it to the

5  settlement administrator by e-mail as instructed by the

6  class notice.  Do you see that?

7       A.   Yes.

8       Q.   And that is a truthful and accurate statement,

9  right?

10      A.   Yes, it is.

11      Q.   So tell me about the process you went through to

12  complete the claim form.

13      A.   I downloaded the claim form.  I filled it out on

14  my laptop with an Adobe PDF software and consulted with

15  Mr. Clore through the process, as the form is very

16  cumbersome and difficult to negotiate.  And when we had

17  gone back and forth several times making sure that every

18  single for -- or every single blank was filled out with an

19  NA where it was not applicable to the claim, I gave it a

20  final review and forwarded the e-mail as instructed.

21      Q.   And how about the attachments?  What did you

22  have to do to gather those?

23      A.   I went through my files and scanned them in

24  using my scanner in my office.

25      Q.   Okay.  Let's -- let's go to Page 3.  Before you

Jeffrey Palmer
March 20, 2019                                                    33

 1  go to Page 3, when you gathered those documents from your

 2  file, they were just documents you had kept in your files

 3  from the work that you had done that was relevant to this

 4  claim?

 5       A.   Yes.  Yes, that's correct.

 6       Q.   So on Page 3, in the first full paragraph, you

 7  say that you specifically recall the yellow brass fittings

 8  with the word "NIBCO" stamped on them.  Why don't you

 9  just -- just give me some more detail about what your

10  recollection is about that?

11       A.   Frankly, the word "NIBCO" is an odd word.  It's

12  kind of funny sounding, so it struck me as amusing.

13  That's probab -- probably why I made note of it.

14       Q.   When you went to get the fittings for that

15  particular project, did you care whether it was a NIBCO

16  fitting versus some other branded fitting, or did you just

17  care that it was a fitting that it could be used with a

18  PEX-type tubing?

19       A.   I was just looking for a PEX tubing fitting.  I

20  was not looking --

21       Q.   And why don't you tell me what your -- I'm

22  sorry.  Go ahead.

23       A.   I was not looking for a specific brand.

24       Q.   So the fact that you got a PEX -- a NIBCO

25  fitting was just luck of the draw?

Rodney Palmer
March 20, 2019                                                    34

1    A.   That's what the local lumberyard had on their

2  shelves at the time.

3    Q.   And why don't you just describe to me what your

4  understanding is of what a PEX tubing or PEX product is?

5    A.   It's a plastic tubing that is attached to

6  different fittings with a crimp ring.  I've used it pretty

7  extensively both in California and in Texas.  I'm not sure

8  exactly what you're ask -- asking my understanding of.

9    Q.   Oh, just -- just trying to get a general

10 description of how a PEX plumbing tubing might differ from

11 a copper plumbing tube or some other type of plumbing

12 tube.

13   A.   Well, the -- the PEX tubing is the evolution of

14 the old QEST fittings which -- or QEST tubing system,

15 which was similar, although a thinner wall.  The plastic

16 was a little bit more brittle, and there was a -- a lot of

17 damage that resulted from the original QEST fittings.

18        PEX was an upgraded system.  The beauty of the

19 PEX system is that they will withstand freezing, allowing

20 you to put them somewhere where it might occasionally

21 freeze without bursting the pipes.  That's one of the

22 things that makes the PEX appealing over the copper --

23 using copper tubing in a house.

24   Q.   And without going through the rest of the

25 written portion, Pages 1 to 5 of your declaration, is

Jeffrey Palmer
March 20, 2019                                                    35

1 there anything, as you sit here today, that you think is

2 not accurate in Page 1 to 5 of your declaration?

3     A.   No, I believe everything in this declaration is

4 accurate.

5     Q.   Okay.  So let's go to Page 1 of the claim form

6 that's attached.  This is Page 9 of 25 of the -- of the

7 court stamps on the top of the page, but do you see Page 1

8 of the claim form NIBCO PEX settlement administrator right

9 up at the top?

10     A.   Yes, the first page that has things filled out

11 with the information and address.

12     Q.   Now, I think you said that you went on the

13 website before -- after you talked with your brother,

14 Darrell, but before you talked with the folks at the

15 Bandas firm; is that correct?

16     A.   That's correct.  I did peruse the website.

17     Q.   Okay.  When you say you perused it, can you tell

18 me whether you looked at the frequently asked questions?

19     A.   I don't recall.

20     Q.   Why don't you tell me what you recall in terms

21 of either what you looked at or the information that you

22 gleaned from your, as you call it, a perusal of the

23 website before you spoke with the Bandas folks?

24     A.   I believe there was a -- a summation or a --

25 what's the term I'm looking for -- just a basic

Jeffrey Palmer
March 20, 2019                                                    36

1  description of what the settlement was.  I looked through

2  that.  I looked briefly at the claim form.  It seemed

3  unusual the way that the -- the settlement was structured.

4  I thought it would be worthwhile to contact the Bandas

5  firm to see what they thought of it.

6      Q.   Okay.  Let's stick to the time before you talked

7  with the Bandas firm.  What was unusual about the

8  structure that you identified by yourself?

9      A.   Well, I think some of those things are well

10 outlined in the objection.  One of them being a claim form

11 that seems quite onerous.  The other thing being an

12 unusual lag in time to get a claim paid.  It seems to be

13 a -- a bit out of the ordinary for a class action

14 settlement or any type of claim, for that matter.

15     Q.   Okay.  I just want to make sure we're talking

16 about the right time frame.  Those are two issues that

17 you're telling me that you identified by yourself before

18 you spoke with anyone from the Bandas firm; is that

19 correct?

20     A.   That's correct.

21     Q.   And is it also correct that those were two

22 issues that were not identified for you by your brother,

23 Darrell?

24     A.   There -- my brother, Darrell, and I didn't

25 discuss anything other than the fact that there was a

Jeffrey Palmer
March 20, 2019                                         37

1  settlement involving the NIBCO PEX fittings and that I had

2  used some of those.

3       Q.   Can you unequivocally state that your brother

4  Darrell, will not receive a single penny of money related

5  to your objection or to this case?

6       A.   I can unequivocally state that he will not

7  receive any -- a penny from me.  As far as what

8  arrangement he has anywhere else, that's beyond my ability

9  to speak to.

10      Q.   Can you guarantee me that he will not receive

11 any money from either the Bandas firm or Mr. Stewart's

12 firm or Ms. Gold's firm or from any other attorney who may

13 represent you in this case?

14      A.   I can only guarantee you that I'm unaware that

15 any such arrangement has been made.  I am not their

16 keeper.  I certainly cannot dictate what they do, but I am

17 certainly not aware of -- of any such arrangement, would

18 not be approving of an arrangement that's contingent like

19 that.

20      Q.   Now, you said that one of the issues you

21 identified by yourself before you spoke with the Bandas

22 firm -- and actually just to set the table, you first

23 spoke with the Bandas firm and the only reason that you're

24 being represented by Mr. Stewart's firm and by Ms. Gold's

25 firm is because Mr. Bandas hired them.  Is that -- is that

1  a fair description of how that worked?

2       A.   That's a fair assessment.

3       Q.   Do you know why the Bandas firm needs

4  Mr. Stewart's firm, another Texas firm, to represent you?

5       A.   I would assume it's because Mr. Stewart holds

6  some expertise that would be beneficial in this case.

7       Q.   Do you know what the scope of Mr. Stewart's

8  responsibilities are for the objection?  Is he just

9  representing you for this deposition, or is he helping you

10 and representing you for the overall objection?  Do you

11 have any sense of what the scope is of Mr. Stewart's role

12 here?

13      A.   Only in that I know that he's been helpful to me

14 for these proceedings.

15      Q.   Without telling me the substance of discussions,

16 tell me what you did to prepare for this deposition,

17 including how much time you spent with your attorneys,

18 whether you looked at documents.  Just give me a

19 description of what you did to prepare for your deposition

20 today.

21      A.   Well, the last thing that I did to prepare was I

22 read through the objection again this morning to

23 refamiliarize myself with some of the details of it.  I

24 spent a few hours yesterday going over just typical

25 deposition behavior and, you know, the way you would want

Jeffrey Palmer
March 20, 2019                                              39

1 to answer a question and not answer a question.

2      Q.   Did you look at -- besides reviewing the

3 objection, did you review any other documents to prepare

4 for the deposition?

5      A.   We reviewed a few of the documents involved in

6 this case, but --

7      Q.   Documents that were filed with the court?

8      A.   I'm not aware of what is specifically filed with

9 the court and what's not filed with the court, so it would

10 be difficult for me at this time without going back and

11 getting those documents and looking at them to tell you

12 what has or has not been filed with the court.

13     Q.   Perhaps meaning you don't live in our world, you

14 live in your world?

15     A.   That -- that is a good thing.  That's -- that's

16 why I am not an attorney.

17     Q.   About how much time did you spend with your

18 attorneys preparing for the deposition?

19     A.   I believe it was about three to four hours at

20 the most.

21     Q.   And which attorneys did you meet with or have on

22 the phone with you for this preparation?

23     A.   I spoke with Mr. Stewart and with Mr. Bandas and

24 also with Rob Clore.

25     Q.   Was everyone in person with you or some people

Jeffrey Palmer
March 20, 2019                                                    40

1  on the phone?

2       A.   Mr. Stewart was with me.  The rest are on the

3  phone.

4       Q.   Did Ms. -- Ms. Gold participate in that

5  preparation?

6       A.   I spoke with Ms. Gold a few days ago, and I'm

7  trying to remember if we spoke to her yesterday or not.

8  I -- I don't recall exactly if she was on the phone at

9  some point.

10      Q.   Okay.  So we took a little detour.  Let's go

11 back -- we're talking about thoughts that you had before

12 you spoke with the Bandas firm, and you mentioned

13 something that you thought was unusual in class actions or

14 any other settlements was a lag in the time to get paid.

15          Why don't you tell me what your thought process

16 was?  And as best you can, let's keep it for what your

17 thought process was before you talked with Bandas and the

18 other attorneys.  Okay?

19      A.   Well, it's -- it's difficult to go back and say,

20 This was my thought then, this is my thought now, and

21 generally thoughts evolve.  But certainly looking at that

22 at its face, looking at a six-year lag for the majority of

23 the payment in a claim, having worked as a claims adjuster

24 for some time, that seems very unusual.

25          When I worked for State Farm, they wanted us to

Jeffrey Palmer
March 20, 2019                                    41

1  get a --  a check to a customer within a certain number of

2  hours, not years.

3      Q.   Besides the NIBCO fittings that are the subject

4  of your claim, those specific ones, are there any other

5  NIBCO products in any other property that you own or did

6  own or might have responsibility for in connection with

7  any plumbing work or other work you or your companies did?

8      A.   Possible, but without going back and tearing out

9  walls to look at specific fittings, it would be difficult

10 to -- to state that unequivocally.

11     Q.   Okay.  So it's possible that there's some NIBCO,

12 either fittings or tubing, in some of your other

13 properties or were used in connection with work you did,

14 but you just don't know for sure as you sit here today; is

15 that fair?

16     A.   That's a fair statement.

17     Q.   And given the fact that there is this class

18 action that you had NIBCO fittings that did not perform,

19 there's at least the possibility that there could be other

20 NIBCO PEX failures that impact the work you did or the

21 properties that you own.  That's -- that's a possibility,

22 right?

23     A.   That's a possibility.

24     Q.   And I -- I -- I think this is an obvious

25 question, but I have to ask it so I get the answer.  Is it

Jeffrey Palmer
March 20, 2019                                    42

1  fair to say that if over the next six years you have a

2  situation where either a property you own or a -- a job

3  that you did has damage caused due to a failure of a NIBCO

4  product, you're going to want to get compensation from

5  this class action settlement if -- if the failure meets

6  the standards for payment; is that fair?

7       A.   That would be a fair statement.

8       Q.   Would it also be a fair statement that -- and,

9  again, I'll take you as an example, but it could really

10  apply to any other class member.  If there is a failure

11  that happens five years down the road, you would not be

12  happy if you get less for that payment that's -- than

13  someone who gets paid for a failure that happened one year

14  ago because the settlement funds ran out?

15      A.   That would be a fair statement for any class

16  action suit that's filed.

17      Q.   When you were at State Farm, were -- were you --

18  was your job function to determine whether or not State

19  Farm would approve claims for payment?

20      A.   Yes.  As -- as a catastrophe adjuster, my job

21  was to go out, inspect claims, determine what the cause

22  was, and quite often make a payment on the spot.

23      Q.   I'm not going to get too, you know, deep at all

24  into this issue, but is it fair to say based on your

25  experience as a claims adjuster for -- for State Farm,

Jeffrey Palmer
March 20, 2019                                                43

1 either for cases that you worked on or certainly for what

2 I'll call in general the work that State Farm and other

3 insurers do, a lot of times there are a lot of claimants

4 who think that insurance companies are very difficult to

5 deal with in terms of getting payments approved for

6 claims.

7        You -- you've -- you've heard some instances

8 like that where there had to be litigation to determine

9 whether or not State Farm or insurers would pay claims

10 that should be paid, right?

11   A.   It's difficult to enter that sort of hearsay

12 into evidence, but certainly you hear all sorts of things

13 in the world.  It's never been my experience that it was

14 difficult to deal with the State Farm's claims pro --

15 process when I was involved as an adjuster because it was

16 a fairly painless process.

17   Q.   Well, next time I have to get new insurance,

18 maybe I have to see if I can get someone like you, but --

19 but put -- putting that aside, are you aware that -- no, I

20 don't want to ask that question.  I'll move on.

21        So let -- let's go back to the claim form.  This

22 is Exhibit 2, and we're on Page 1 of the claim form.  And

23 Page 1 is -- and it goes on to Page 2.  There's some

24 instructions.

25        Were there any instructions on Pages 1 to 2 that

Jeffrey Palmer
March 20, 2019                                                    44

1  you did not understand when you read them?

2      A.   No, the first two pages appear fairly

3  informational.  It may not be worded extraordinarily well,

4  but they're understandable.

5      Q.   If you take a look at Page 1, at the bottom,

6  there's a footnote where it talks about definitions of

7  capitalized terms, that they could be found in the

8  settlement agreement, which could be downloaded at the

9  settlement website, pexsystemsettlement.com.  Do you see

10  that?

11      A.   No, it doesn't appear on the document I'm

12  holding.

13      Q.   I'm sorry.  So it's Page 1 of the claim form.

14      A.   Uh-huh.  That's correct.

15      Q.   At the very bottom of Page 1, there's a footnote

16  number one?

17      A.    No, there is not on the document that I'm

18  holding.  It -- the bottom thing on Page 1 is simply the

19  number three.  Position or title, there's a three under

20  it.  Anything beyond that is gone on my form.  If you're

21  talking about the first informational page or -- okay.

22  You're talking about --

23      Q.   Yeah.

24      A.   You're --

25      Q.   Yes.

Jeffrey Palmer
March 20, 2019                                        45

1      A.   Okay.

2      Q.   Yeah, it's the first informational page.

3      A.   Okay.

4      Q.   Do you see a footnote on there?

5      A.   Sure, I see that.

6      Q.   Okay.  So did you personally go onto the website

7  to look up any definition of any capitalized term?

8      A.   No, I did not.

9      Q.   If you were interested in doing that, is it fair

10  to say that you would have plugged the website into your

11  browser, gone onto the settlement website, opened up the

12  settlement agreement, and looked in the definition section

13  to see the defined term?  Is that what you could have done

14  if you wanted to do that?

15      A.   I probably would have done that, yes.  I find

16  that the average consumer probably would have gotten

17  frustrated at that point and thrown the thing in the

18  trash, though.

19      Q.   Well, do you think the average consumer -- and

20  we can talk about you, I guess.  Maybe you consider

21  yourself the average consumer.  Do you think it would have

22  been beneficial to put a long list of defined terms and

23  definitions in a claim form for the class members or for

24  you to slog through and try to complete a claim form?

25  Would that have been a good idea?

Jeffrey Palmer
March 20, 2019                                    46

1       A.   It would depend on how long that list was.  The

2   informational page on the front is in fairly small print

3   and has a lot of detail.  I don't think one more page like

4   that would have been very difficult or very cumbersome for

5   someone.

6       Q.   Do you have any idea whether putting in all the

7   defined terms of the settlement agreement would have just

8   taken one page?

9       A.   No, I don't.

10      Q.   And you haven't looked at the settlement

11  agreement or the definitions section of the settlement

12  agreement, have you?

13      A.   I don't recall if it's in any of the physical

14  forms that I looked at.  I did not browse that on the

15  Internet, no.

16      Q.   And you would acknowledge that in preparing the

17  documents, such as a claim form like this, that there has

18  to be a balance between having enough information that's

19  understandable to the average person, not lawyers who are

20  different from the average person, having a balance

21  between having enough information and being understandable

22  for the average person and lawyering it up with too much

23  excess information that just frustrates.  Do you at least

24  acknowledge it has to be a balance between those two; is

25  that fair?

Jeffrey Palmer
March 20, 2019                                                            47

1      A.    Certainly there has to be a balance.

2      Q.    And do you believe you have any particular

3  expertise yourself in evaluating exactly what that balance

4  should be?

5      A.    Only my layman's opinion on what appears to be

6  reasonable.

7      Q.    Okay.  So let's now go to Page 3 of the claim

8  form.  And just to make sure we're -- we're on the same

9  page, at the top, there are two boxes in the left and

10  right-hand corner.  One says for internal use only.  The

11  other says PEX.  Are you on the same page?

12      A.    Yes.

13      Q.    Okay.  So you filled this page out.  Was there

14  anything that you did not understand or thought it was

15  difficult to fill out on this page?

16      A.    You do have to reread a few things to -- to

17  understand them, but they're understandable.

18      Q.    Okay.  Which -- which item do you think you

19  would have to reread to understand?

20      A.    Well, where it says, Please enter your notice ID

21  number, and then it says, If you received a notice by

22  mail.  Someone less familiar with this sort of process

23  might be stumped at that.

24      Q.    Okay.  Now, you did not receive a notice by mail

25  or e-mail, did you?

1      A.    No, I did not.  I -- I --

2      Q.    Do you know why that was?

3      A.    Probably because I did not provide my e-mail

4  address to the lumberyard when I purchased the PEX

5  fittings.

6      Q.    And you also didn't make a complaint to NIBCO

7  that their product failed either when you had the failure;

8  is that right?

9      A.    That's correct.

10      Q.    Do you have any familiar -- familiarity with how

11  the parties and the settlement administrator gathered up

12  postal and e-mail addresses to send out notice to people?

13      A.    No, I would not be privy to any of that

14  information.

15      Q.    Are you aware that when notice was sent out to

16  people who could be identified from NIBCO's records and

17  various sources, that the postcard notice that those class

18  members received had a notice ID number which was to

19  facilitate the submission of claims so that the -- that

20  the claimant and the claims administrator would be able to

21  use that -- that notice ID number to help streamline the

22  process?  Are you aware of that?

23      A.    I'm aware of that.

24      Q.    How did you become aware of that?

25      A.    Common sense and having seen similar postcards

Jeffrey Palmer
March 20, 2019                                                49

1  in my lifetime.

2      Q.    Okay.  So do you agree or disagree with the --

3  with the decision that was made by the parties and the

4  settlement administrator and the court to have people

5  enter notice ID numbers on a claim form?  Do you think

6  that was a good idea or a bad idea, or do you have no

7  opinion?

8      A.    Well, clearly it's a good idea.  I never stated

9  that it was bad to have a spot to put that.  I only said

10  that it was a little bit cumbersome to read that and

11  understand that to a layman that has no familiarity with

12  filling out forms of this type.  If it were me, it --

13      Q.    Okay.  And -- and -- and would you also add to

14  that answer someone who had not gotten one of those notice

15  postcards with their unique notice ID where it would make

16  more sense if that was on the postcard that probably got

17  that --

18      A.    Definitely it would make more sense to someone

19  who had that postcard, but it would seem that the vast

20  majority of people who have a claim would not have gotten

21  a postcard because most of those people would have simply

22  picked up the fittings at their supply store or their

23  plumbing supply or wherever and not had any reason --

24  reason to have that transaction registered with PEX or

25  their attorneys or anyone else, for that matter.

Jeffrey Palmer
March 20, 2019                                                    50

1        Q.    But you don't know and you don't have any

2   detailed information about how many people complained to

3   NIBCO, how many people had that information from

4   suppliers.  You don't -- you don't have, as you sit here

5   today, any information about that other than your

6   particular experience; is that true?

7        A.    Of course, that's true.

8        Q.    Do you have any basis to dispute the fact that

9   the class counsel, that NIBCO, and that the settlement

10  administrator made all reasonable efforts to identify

11  potential class members from all the information that they

12  had?  Do you have any basis to dispute that?

13       A.    No, I have not disputed that.

14       Q.    Okay.  So let's go to Page -- we're now on

15  Page 4 of the claim form.  And at the top, it has Roman

16  numeral two, description of the property.  Let me know

17  when you're on that page.

18       A.    Okay.

19       Q.    Is there anything on this page that you found

20  confusing or difficult to -- to provide an answer to?

21       A.    No, that seems fairly straightforward.

22       Q.    Now, on question number three on this page, it

23  asks whether an insurance claim was made.  Do you see

24  that?

25       A.    Yes, I do.

Jeffrey Palmer
March 20, 2019                                                    51

1        Q.    Now, unlike most class members, apparently

2  you -- you were an insurance adjuster, so you actually

3  have some expertise in this particular area, right?

4        A.    I have some expertise, yes.

5        Q.    Okay.  Are you familiar with the concept of

6  subrogation, that if an insurance company pays for damage,

7  say, to -- suppose you had submitted an insurance claim

8  for the damage, the 2,000 and change that you paid.  If

9  your insurance company actually paid that, do you

10 understand that the insurance company would have a

11 subrogation right to collect that from whoever was the

12 tortfeasor who caused that damage, if that was possible?

13       A.    Yes, I'm familiar with that process.

14       Q.    And so -- okay.  And so the concept is that if

15 you, Mr. Palmer, as a consumer got paid from your

16 insurance company, you don't get to get paid from some

17 other source for the same damage that the insurance

18 company was out of.  That money would have to go to the

19 insurance company.  So as long as the tortfeasor pays out

20 of pocket, the insurance company has got at least a

21 subrogation right.  You understand that concept, right?

22       A.    Yes, I'm familiar with that concept.

23       Q.    And so would you agree or disagree with the

24 notion that in order to make sure the settlement fund in

25 this case goes to the right people and in order to avoid

Jeffrey Palmer
March 20, 2019                                              52

1 possible double payments, would you agree or disagree that

2 it was reasonable to ask this question number three about

3 whether -- whether the claimant had been paid by -- by

4 their homeowners insurer or some other insurer?

5      A.   It's certainly reasonable.  I think it would

6 have been more clear had you simply asked first whether an

7 insurance claim had been made.

8      Q.   So it sounds like you're nitpicking the precise

9 language, but not the concept of the question; is that

10 fair?

11      A.   I think nitpicking implies a negative

12 connotation that's unnecessary.  It's pointing out a --

13      Q.   Okay.  Okay.  Well, why don't I ask it -- why

14 don't I ask it this way.  Why don't you tell me exactly

15 what you believe you can make better in the language of

16 question number three so I can fully understand exactly

17 what you're complaining about?

18      A.   Well, first of all, I did not complain about

19 question number three.  If you look back at the -- the

20 record, you'll see you were the one who picked that out

21 and specifically began to ask me about question number

22 three.  When you asked me what I thought of this page, I

23 said it seemed fairly clear and fairly straightforward.

24 However --

25      Q.   Okay.

Jeffrey Palmer
March 20, 2019                                    53

1       A.    -- with your nitpicking about this particular

2  question, I simply made the comment that that question

3  would be more clear if you asked first was an insurance

4  claim made and then asked for the name of the insurance

5  company and claim number.

6       Q.    So basically you're saying that you think that

7  question number three would have been better if you broke

8  it up into two subparts, subpart one, was an insurance

9  claim made, and then subpart two, if so, give us the claim

10 number and insurance company.  Is that what you're saying?

11      A.    I -- I think that probably would have been

12 better and would have eliminated the necessity to ask me

13 on the next page for the name of my homeowner's insurance

14 and the policy number if no claim was made.

15      Q.    Okay.  Let's go to the next page.  We're on

16 Page 5.  Is there anything that was difficult to

17 understand or difficult to fill out on this page?

18      A.    I would say that it made me uncomfortable to

19 give you the name and policy number off of my insurance

20 when this claim had nothing to do with it.  I simply

21 filled that out at the instruction of my attorney because

22 my first response to that would have been you have no need

23 for that information.

24      Q.    Okay.  So that's kind of similar to what --

25 okay.  So -- so your view was we would have no need for

Jeffrey Palmer
March 20, 2019                                                    54

1  that information, but you do recognize that there is a

2  legitimate need to make sure that the proper balance is

3  made to avoid double payments or improper payments as

4  between claimants and their insurers and subrogation

5  rights.

6           You -- you agree with the concept that we've got

7  to, as part of administering the settlement fund, make

8  sure that we are cognizant of subrogation rights,

9  cognizant of possible double payment; is that fair?  Think

10  you said that already, but I just want to make sure.

11      A.   That seems like a fair thing certainly, but I --

12  I -- I'm curious as to why you would need that information

13  if no claim was made.  Is it your intent for the

14  settlement administrator to go back and contact everyone's

15  insurance company to see if they made a claim on a

16  particular case?

17      Q.   Okay.  Now, unfortunately with this deposition

18  process --

19      A.   I --

20      Q.   -- I think you've been told that today that I

21  get to ask the questions and not you.

22      A.   I understand.

23      Q.   But I -- I -- I -- I think I'll -- I'll close

24  this topic just by -- by asking this.  Is it fair to say

25  that notwithstanding your work at State Farm, in order --

Jeffrey Palmer
March 20, 2019                                              55

1  is it fair to say that you're not the right person who

2  would have the expertise to know exactly how subrogation

3  by insurers works in cases like this and that there are

4  people who've got more expertise than a layperson, the

5  person who did some claims adjustment work, or how

6  subrogation evaluations work as part of complex claims

7  processes?

8            So I'm just trying to get the point that you're

9  not the right expert who would be able to figure out how

10 that works and what needs to be done and what information

11 is necessary for that; is that fair?

12    A.   I -- I'm not sure that's a fair question because

13 you asked me to set aside my experience and say that --

14 that I'm not qualified to make that -- that decision or --

15 or draw any conclusion from it.  And it's very difficult

16 to do that because you're asking me to set aside and then

17 asking me specifically if I'm qualified.  Well, I don't

18 know how you do that.

19    Q.   You made -- you made your fair point.  So why

20 don't we break down the question.  If there's different

21 answers, let me know.  Tell me based on all your

22 experience whether you think what I said was fair, and

23 tell me whether you think some common ordinary person who

24 doesn't have insurance or subrogation experience might

25 have a different view, but let's talk about -- and we'll

Jeffrey Palmer
March 20, 2019                                              56

1  talk about -- about Jeffrey Palmer with all the experience

2  you've gained over the years, including your experience as

3  a claim adjuster.

4          Do you think you're the right expert who would

5  know exactly what information is reasonably relevant in

6  order to evaluate and protect against subrogation issues

7  as part of a complex claims process like this settlement?

8      A.   I'm not sure that I would define myself as an

9  expert, but it seem -- seems fairly simple that if a

10  question were asked did you have a -- were your losses

11  covered by an insurance claim and the answer to that

12  question is no, that it would be fairly unnecessary for

13  you to have the information on that person's insurance

14  company and policy.  I think that any reasonable person

15  would see that and make that assessment.

16      Q.   Do you know whether in class action cases like

17  this there are lawyers who specialize representing

18  insurers to pursue insurers' subrogation rights to get

19  pieces of settlements of class actions like this one?  Do

20  you know that?

21      A.   I'm not intimately familiar with any of those

22  proceedings, no.

23      Q.   So that -- that's -- that's something where you

24  don't really have a lot of information about; is that

25  fair?

Jeffrey Palmer
March 20, 2019                                                    57

1      A.   I don't have a lot of information about how they

2   go about pursuing that, but I'm not certain how your

3   question would assist them in that.

4      Q.   And you -- you also don't have any expertise in

5   actually administering class action settlements like this

6   one personally, right?

7      A.   No, I do not.

8      Q.   And are you aware that Chris Bandas and his firm

9   to my know -- don't worry about my knowledge, but do you

10  know of any case where Chris Bandas or his firm actually

11  prosecuted a class action, got a settlement, and had

12  responsibility for administering it?

13     A.   I haven't gone through their court files or

14  their cases, so, no, I would not be aware of whether they

15  had or not.

16     Q.   Well, you -- you made a decision to hire the

17  Bandas firm.  Did you -- did you hire them based for -- as

18  opposed to anyone else in the world, did you hire them for

19  any other reason other than your brother, Darrell Palmer,

20  suggested that you talk with them?

21     A.   That would be why I contacted them.  That would

22  not be why I hired them.

23     Q.   So why -- and -- and I'm not talking about

24  because you wanted to do an objection, but in terms of

25  assessing the qualifications, the ethics, the -- the

Jeffrey Palmer
March 20, 2019                                                    58

1  ability to do the work, why did you hire the Bandas firm

2  as opposed to any other firm in the world?

3      A.   When I spoke to them -- when I spoke to

4  Mr. Clore on the telephone, he seemed to be very

5  reasonable.  He seemed to be very familiar with the case,

6  and from what I could tell, seemed to be extremely

7  competent.  So it would be unreasonable for me to go out

8  and waste my time interviewing ten other attorneys and

9  decide which one I would ask to pursue this for me.  So,

10  yes, I went with Mr. Clore based on my conversation with

11  him.

12      Q.   Based on all the information that you know from

13  any source, do you know whether there's even a single case

14  where Mr. Bandas or his firm has actually prosecuted a

15  class action, generated a settlement, and had the

16  responsibility for overseeing the administration and

17  claims process of the settlement?

18      A.   No, I'm not aware of -- of whether they do or do

19  not have that -- that sort of case that they have

20  prosecuted.

21      Q.   Do you know whether or not the parties in this

22  case, NIBCO and the Plaintiffs, have hired a settlement

23  administrator, an independent settlement administrator?

24  Do you know whether that happened in this case?

25      A.   I recall some reference to a settlement

Jeffrey Palmer
March 20, 2019                                              59

1  administrator being hired.

2      Q.   Do you know whether or not the court had to

3  approve the choice of the settlement administrator?

4      A.   I could only assume so.  I don't have specific

5  knowledge of that.

6      Q.   Do you know whether the settlement administrator

7  has a great deal of experience and track record of

8  administering settlement class action?

9      A.   No.  All I know is that they were hired as a

10 settlement administrator.  They may have been homeless the

11 day before, for all I know.

12     Q.   Is that your expectation, that -- that that

13 settlement administrator was -- you said homeless the day

14 before, which I'll -- I'll assume is -- is just folksy

15 speak for they may not really have a long track record,

16 but do you have any basis to dispute that the settlement

17 administrator that was hired is a highly qualified

18 settlement administrator firm that has a long track record

19 of administering large and complex case action

20 settlements?

21     A.   I have no basis for understanding whether they

22 do or do not have a long track record of administrating

23 such cases.

24     Q.   Do you think it would be a good idea for class

25 action lawyers, like the class action lawyers representing

Jeffrey Palmer
March 20, 2019                                          60

1  Plaintiffs here, who have a great deal of expertise in

2  prosecuting class action lawsuits, do you think it's a

3  good idea for them and the Defendants to hire an

4  independent settlement administration practice who

5  actually has a different expertise, which is expertise

6  in -- in figuring out how to do the claims administration

7  process and administering it?

8          Does that seem like a -- a reasonable thing to

9  do to hire an expert for a specific task which may not be

10 the bailiwick or strength of -- of a class action lawyer

11 or -- or a Defendant?

12     A.   Let's just agree that we will assume that they

13 hired someone they thought was reasonable and qualified to

14 do the job.

15     Q.   Okay.  And would you agree with me that

16 notwithstanding your experience as a claims adjuster for

17 State Farm, that a settlement administration firm in

18 consultation with the class lawyers and the -- the

19 Defendants lawyers would be in better -- be in a better

20 position, based on their experience, to evaluate whether

21 or not the question that was asked regarding the

22 homeowner's insurance in Section E of Page 5 of the claim

23 form, that they would be in a better position to make that

24 evaluation than you would?

25     A.   I -- if I felt that were the case, I would not

Jeffrey Palmer
March 20, 2019                                                    61

1  have made that part of my objection.  Clearly I feel --

2       Q.   Okay.

3       A.   -- that was a mistake or else I would not have

4  objected to it.  So, no, I do not feel that they are more

5  qualified.  And if they are more qualified, I feel they

6  made an error.

7       Q.   Okay.  And why don't you assume for me that the

8  Bandas firm had never prosecuted a class action that

9  resulted in a settlement and claims administration process

10 and, therefore, never did any work actually overseeing,

11 monitoring, or processing claims administration process.

12           Do you think that the Bandas firm is in a better

13 position to evaluate what would be the best practices for

14 a claims administration process than either the settlement

15 administrator in this case or lawyers who actually have

16 generated millions and billions of dollars of class action

17 recoveries and, therefore, are overseeing the processing

18 and payments out of those millions and billions of dollars

19 collected?

20      A.   I can't answer a question that asks me to simply

21 assume something that I don't know.  It would be as fair

22 to assume that a passerby on the street is doing something

23 and say that they -- they have no qualification.

24 You're -- you're asking me to believe your assessment of

25 their qualifications and make a judgment based on that.

```
 1           I made an -- an assessment based on my

 2  understanding of their qualifications, not on yours.  To

 3  ask me to do something otherwise is -- simply has no

 4  relation to any of the proceedings at hand.

 5      Q.   Okay.  Let's talk about your assessment of the

 6  Bandas firm's qualifications.  The first thing we know is

 7  that you do not know of the Bandas firm until your

 8  brother, Darrell, said you might want to call them, right?

 9      A.   That's correct.

10      Q.   Are you aware that your brother, Darrell Palmer,

11  has done business in the past with the Bandas firm?

12      A.   I have no direct knowledge of any business

13  dealings they may have had in the past.  I only knew that

14  he was an acquaintance of Mr. Clore's.

15      Q.   Well, did you have an understanding based on

16  wherever you got the information from that your brother,

17  Darrell Palmer, had done a lot of business objecting to

18  class action settlements with the Bandas firm?

19      A.   I had no knowledge that he had done any work

20  with the Bandas firm.  I know vaguely that his work in the

21  past had to do with class actions, but as far as directly

22  who he's worked with, I have no understanding of who he

23  has or has not worked with in the past.

24      Q.   Okay.  Now, we -- we talked a little bit about

25  some of your understandings about the -- the suspension of
```

Jeffrey Palmer
March 20, 2019                                              63

1  your brother's law license.  Are you aware that your

2  brother, Darrell Palmer, has been criticized by many

3  courts across the country for his work in class action

4  objections?

5       A.   No, I'm not aware of that.

6       Q.   Do you know whether any federal courts have

7  criticized Mr. Bandas' practices in connection with class

8  action objections?

9       A.   No, I don't have the time to research such

10 things.

11      Q.   Did anyone tell you about the criticisms that

12 many federal judges and state court judges have lodged

13 against the Bandas firm for its practices in class

14 actions?

15      A.   I was informed that there was a website that

16 held a great deal of criticism about the Bandas firm.

17 There are probably websites that hold a great deal of

18 criticism about your firm and many other firms.  I didn't

19 feel it was necessary to follow all of those rabbit

20 trails.

21      Q.   Okay.  I -- I think you might be mistaken about

22 my firm's reputation, but we don't -- don't need to get

23 into that.

24      A.   No.  No, I -- I was not --

25      Q.   And -- and -- understood, understood.  And in --

Jeffrey Palmer
March 20, 2019                                          64

```
 1  in terms of websites, I was asking about websites.  I know

 2  people post things on Twitter and Instagram and Facebook,

 3  and lots of people have lots of opinions.

 4          But my -- my question was focused on -- on

 5  judges in federal and state courts across the country.

 6  I'm just trying to get a sense whether anyone has provided

 7  you information about the very sharp criticisms that have

 8  been made about the Bandas firm's practices in connection

 9  with objections in class actions settlements.

10      A.  I was aware that some criticisms had been made.

11  I was not aware of the actual substance of those.

12      Q.  Are you aware that a judgment was entered

13  against Mr. Bandas in Illinois related to his class action

14  practices that resulted in limitation of Mr. Bandas'

15  ability to practice in Illinois?

16      A.  Yes, I -- I was made aware that a judgment had

17  been made against him ordering him not to practice in a

18  state where he had -- was not licensed already and had not

19  actually practiced.

20      Q.  Are you aware that Judge Caproni in the Garber

21  versus Major League Baseball case excoriated Mr. Bandas

22  for his practices in connection with class action

23  settlements?

24      A.  No, I was not.

25      Q.  When you hired the Bandas firm, did you take any
```

1 steps to evaluate whether they met the minimum ethical

2 standards based on their reputation that you would hold

3 any lawyer representing you to have?

4       A.   I'm not sure exactly what you're asking me.

5       Q.   Okay.  When you hire anyone, whether it's a --

6 if you hire a contractor, you hire an accountant, you hire

7 a lawyer, do you have an expectation that those

8 professionals will meet certain minimum ethical standards?

9       A.   Of course, I do.

10      Q.   And when you decided to hire the Bandas firm,

11 did you do anything other than what you've testified to

12 already today to evaluate and determine whether or not the

13 Bandas firm's practices in connection with class action

14 objections met the minimum ethical standards that you

15 would expect any lawyer representing you to meet?

16      A.   Other than my conversations with members of the

17 Bandas firm, no, I did not go out and research

18 extensively.  And I would have to add to that, based on my

19 dealings in the past and my understanding of attorneys, if

20 you go research attorneys looking to find ethical

21 breaches, you are going to find people who have -- will

22 say things about any attorney that you research.  There

23 are always people who are mad at attorneys.  It is why

24 there are so many attorney jokes.

25      Q.   Right, I -- I get attorney jokes, but I think we

1  talked about before instead of -- I assume that you

2  don't -- you don't make important decisions based on

3  random postings on Facebook, Instagram, Twitter or the

4  like; is that fair?

5      A.   That's fair.  I've never even looked at

6  Instagram or Twitter, and Facebook is an entertainment

7  outlet for me, not an information outlet.

8      Q.   I -- I -- I've got to give a thumbs up for that

9  one, sir, but in terms of attorneys, you would agree,

10  though, that when it's judges, multiple judges, who are

11  all saying the same thing, that's something that -- that

12  is worthy of taking note of; is that fair?

13      A.   Given the proper context, yes.

14      Q.   Okay.  Let's go to Page 6 of the claim form.  Is

15  there anything on this page that was either difficult to

16  understand or you thought was in any way inappropriate or

17  hard to fill out?

18      A.   Question B is a little bit unclear.  It asks,

19  How have you determined that your structure contains

20  tubing, fittings, or clamps.  It doesn't specifically ask

21  if they're tubing, fittings, or clamps related to this

22  case.  One would have to assume that, but some people may

23  not make that assumption.

24      Q.   Okay.  Let -- let's talk about that before we

25  move on.  You see up on the top of the page, letter A,

Jeffrey Palmer
March 20, 2019                                                    67

1  description of NIBCO PEX tubing, fittings, and/or clamps?

2       A.   Yes.

3       Q.   Yes.  And then on B, is -- is it under B where

4  it says, How have you determined that your structure

5  contains tubing, fittings --

6       A.   Right.

7       Q.   -- or clamps?  Are -- is your criticism that the

8  use of the word "NIBCO" on section A right above that in

9  bold should have been reproduced in the unbolded text

10 before tubing, fittings, and clamps under B?  Is that what

11 the criticism is?

12      A.   It would clarify things.  I -- I think sometimes

13 attorneys make a great deal of assumptions about the

14 abilities of the common person to understand a form and

15 follow it correctly.

16      Q.   Were you confused about that when you personally

17 filled out this claim form?

18      A.   I did have to read it twice to -- to see what

19 you were saying or what the form was asking for, two or

20 three times actually.

21      Q.   And -- and so can you give me an estimate in

22 terms of how many seconds it took for you to determine

23 that under B, tubing, fittings, and clamps referred to

24 NIBCO tubing, fittings, and clamps?  How many extra

25 seconds did it take you to figure that one out?

Jeffrey Palmer
March 20, 2019                                              68

```
 1      A.   I'm really not certain.

 2      Q.   Are you prepared to testify under oath that it

 3 took you more than ten seconds?

 4      A.   Most likely.

 5      Q.   Do you believe it took you more than 30 seconds?

 6      A.   I couldn't say.  I probably went back and looked

 7 at some other documents to check, and it may or may not

 8 have.

 9      Q.   So you said you -- you -- you may have looked at

10 other documents to figure it out.  Were you not able to

11 figure out from -- from the bolded section A right up top

12 that says NIBCO PEX tubing, fittings, and clamps that

13 under section B, it was looking for information about

14 NIBCO tubing, fittings, and clamps as opposed to tubing,

15 fittings, and clamps from some other company?

16      A.   No, that's definitely what I was saying.

17      Q.   Okay.  Did you -- other than looking at the

18 bolded description of section A where it referred to

19 NIBCO, did you really actually go to look at any other

20 document in order to figure out whether the -- the

21 checklist was limited to NIBCO tubing, fittings, and

22 clamps?

23      A.   No, I did not.

24      Q.   Did you find it helpful to have a checklist as

25 opposed to just having a general question with no
```

Jeffrey Palmer
March 20, 2019                                                    69

1  checklist saying how to determine whether you have a NIBCO

2  tubing, fitting, and clamp?  Do you think it was a good

3  idea to have a checklist to help guide people, what kinds

4  of things they might want to look for?

5       A.   I would say the checklist is a good idea, but

6  when I said that I had --

7       Q.   Okay.

8       A.   -- to consult other documents, it was to see

9  where the documents I had fit into your checklist to make

10 sure I understand where to check.

11      Q.   Okay.  So under leaked fitting, that's one of

12 the boxes you checked.  What other documents did you need

13 to look for, documents that related to leaked fitting?

14      A.   Well, it lists bills of sale or purchase order.

15 Knowing how attorneys like to get things perfectly

16 defined, I wanted to look at the document, the receipt

17 that I had to see whether it stated it was a bill of sale,

18 an invoice, a purchase order or what, so.

19           Again, terminology in the South may differ

20 somewhat from what's typical in your part of the country,

21 so it's less common to use the term "bill of sale," but

22 that -- that is, I will give you, a nitpicky criticism.

23      Q.   Okay.  Same question about the other one you

24 checked below, Used in the property, did you have to look

25 at any other documents to understand that?

Jeffrey Palmer
March 20, 2019                                                    70

```
 1      A.   Are you reading your -- your form correctly?
 2 Used in the property is the last phrase of a larger
 3 sentence.
 4      Q.   Oh, no, yes, correct.  Yes.  The -- the
 5 sentence, Builder, plumber, or contractor letter stating
 6 upon personal knowledge that tubing, fittings, and/or
 7 clamps were used in the property, did you need to look at
 8 any other documents to understand what was being sought
 9 there?
10      A.   No.
11      Q.   Okay.  Is there anything else on this page
12 Number 6 that you have any criticisms of or had trouble
13 filling out?
14      A.   Well, looking at the next question, I realize
15 that I did not explain why I did not enclose the leaked
16 fitting.  It's fairly obvious.  When it had been several
17 years, I may retain documents and papers for that long,
18 but I don't keep broken parts that long.  I don't think
19 the average person would either, so.
20      Q.   And is that question number eight?
21      A.   No, it's not even --
22      Q.   Which question are you referring to?
23      A.   The bottom of the list that you were just asking
24 me about, it says, Enclosures required.
25      Q.   Oh, okay.  So you forgot to just write in
```

Jeffrey Palmer
March 20, 2019                                          71

1  "didn't keep it" in that section?

2      A.    That's correct.

3      Q.    But if you had focused on that, it would have

4  been easy to write in, Didn't keep it, it was X years ago,

5  fair?

6      A.    That's fair.  It would be easy to -- to say that

7  about every single question on this form if you focused on

8  it specifically, which would take quite a deal of time,

9  which is one of my objections about this settlement.

10     Q.    Do you believe that your claim will be penalized

11 in any way because you did not keep a few fittings that

12 failed several years ago that probably collectively cost

13 you about less than ten or $15?  Is it your expectation

14 that -- that processing your claim will be penalized in

15 any way because you did not keep the fitting?

16     A.    I have no idea whether it will be.  I know that

17 if it does go to the engineering firm that's been hired to

18 assess the claims and they have nothing to evaluate, they

19 will likely say insufficient information.  And there's

20 a -- a good chance that they could determine that -- that

21 the claim was not valid because they didn't have enough

22 information to evaluate it.  And that's another issue that

23 I have with the entire claims process.

24     Q.    You don't know that it would shake out that way.

25 This is just you speculating how it might shake out; is

Jeffrey Palmer
March 20, 2019                                    72

1  that fair?

2       A.   I'm speculating that that is a definite

3  possibility, and that possibility is unacceptable, the

4  fact that it could be thrown out simply because I didn't

5  send that in and because some engineer says, Well, I don't

6  know that this is real, you know, it doesn't look right to

7  me, yeah, don't pay this one, and that there isn't really

8  much of an appeals process for that situation.

9       Q.   What do you understand about the appeals process

10 for any negative determinations by either the

11 administrator or the independent evaluator?

12      A.   Well, I would have to go through the settlement

13 again to understand exactly what your claims process was

14 on that, or appeals process was.

15      Q.   And what do you understand class counsels' role

16 to be in terms of helping class members whose claims are

17 denied at any stage of the process?

18      A.   I'm not sure what their -- their role would be

19 in that process.

20      Q.   Do you have any idea whether -- let's take my

21 firm, my cases.  Do you have any idea what my track record

22 is in terms of protecting class members against improper

23 denials of claims by either settlement administrators or

24 defendants?

25      A.   I have no idea what your track record is.  I

Jeffrey Palmer
March 20, 2019                                           73

1  have not researched your firm, even as much as I have

2  researched Mr. Bandas' firm.

3       Q.   But you would hope, and tell me if I'm wrong,

4  you would hope that the firms who have brought this

5  settlement to the court and that the court would do their

6  job in making sure that valid claims get paid without the

7  claims administrator or the other evaluators being, I'll

8  use your word, excessively nitpicky.  That's your

9  expectation that we'll do our job, fair?

10      A.   Or that would be my expectation, but let's be

11 clear, nitpicky was first your term.  Okay.

12      Q.   Okay.  Fair enough.  As long as you're not

13 disagreeing with how both of us have used that word.

14      A.   No.

15      Q.   And -- and based on your work at State Farm, is

16 it -- is it fair -- is it fair to say that a consumer

17 having an advocate, no matter how a program is structured,

18 there's always a benefit for a consumer having an advocate

19 to make sure that if they're being treated unfairly, that

20 someone is there to try to protect them?  Is that fair to

21 say from your experience with State Farm?

22      A.   That would be fair to say just in general.

23      Q.   Okay.  On Page 7, any -- any complaints or

24 problems filling out this page?

25      A.   The reference to the effective date is very

Jeffrey Palmer
March 20, 2019                                    74

1  confusing and unclear because it's not even something

2  that's been defined because it's a date somewhere in the

3  future.  And the average person -- although I may be able

4  to go look that up and have a better understanding after

5  reading documents, the average person is going to look at

6  that and have no idea what that means.

7      Q.   Now, you would agree that it's necessary to have

8  a claims form, given the structure of the settlement, that

9  allows people to make claims in the future if there are

10 failures, right?  You don't want to cheat out those

11 people, correct?

12     A.   That's correct.

13     Q.   So there has to be provisions to deal with not

14 just claims that are what I'll call claims looking

15 backwards at the time this notice and approval process is

16 going but also that account for on claims going forward,

17 fair?

18     A.   That would seem to be fair, but I'm not sure

19 what relation that has to the -- the question at large

20 here.

21     Q.   Okay.  But it -- it sounds like your -- your --

22 your quibble with the use of the word "effective date" is

23 that you would pre -- (videoconference pauses) more easily

24 to understand language for claims that will be submitted

25 in the future after this case or the settlement is

Jeffrey Palmer
March 20, 2019                                              75

1  approved.  You would want some more descriptive language?

2  Is that what you want?  Is that what your complaint is on

3  this one?

4      A.   I'm sorry.  I think we lost about half of your

5  question there with the video feed.

6      Q.   Oh, okay.  Let me -- let me -- let me restate

7  it.  Because I have no idea what it will look like on the

8  court reporter's transcript either.  Is -- is -- is your

9  objection to the use of the word "effective date" that you

10 would have preferred that there be some language more akin

11 to for claims or failures that happened after the

12 settlement is approved by the court, something --

13 something like that, just changing the words a little bit?

14     A.   That would certainly make it much more

15 comprehensible.  As it is, it is -- it is confusing and

16 unclear.  The term is used several times through the

17 document, and even when you go through the other documents

18 related to it, it's never defined.

19     Q.   Is this something that bothered you when you

20 read the claim form yourself before you consulted the

21 Bandas firm?

22     A.   It's something that bothered me as I was trying

23 to fill out the form, and I questioned Mr. Clore about it

24 and what that meant, and he --

25     Q.   Did Mr. Clore have any problem -- I'm sorry.  Go

Jeffrey Palmer
March 20, 2019                                    76

```
 1  ahead.
 2      A.   Oh, I was going to say he -- he was equally
 3  confused about what it was.  He did some research and
 4  tried to figure out what that meant.
 5      Q.   So is it -- I just want to make sure I heard you
 6  right here.  Is it your testimony that Mr. Bandas'
 7  associate, Robert Clore, was confused about what the
 8  capitalized defined term effective date meant in his
 9  conversation with you, and that in order for him to figure
10  that out, he had to go look at other stuff?  Is that what
11  he told you?
12      A.   It is fair to say that when he read the term
13  "effective date," he did not know at what point in time
14  that date was and wasn't able to answer me when I asked
15  him what that date was.  And he went and researched the
16  term to see where in court documents it might refer to
17  exactly what the effective date was.
18      Q.   Was he able to tell you generally that the
19  effective date meant the date when the settlement had been
20  approved and all appeals had been exhausted so it was a
21  final judgment?  Did he know enough to tell you that, or
22  did he have to go research that?
23      A.   Yes, he would have known that, but, again, I had
24  an attorn -- attorney to speak to while I was filling the
25  form out.  The average consumer is not going to have an
```

Jeffrey Palmer
March 20, 2019                                              77

1   attorney present while they're filling this form out.

2        Q.   Okay.   Anything else on Page 7?

3        A.   Are you asking me to -- never mind.   If you're

4   asking me to rewrite the form, so that it's more legible

5   and less cumbersome, there would be all sorts of things,

6   but if you're asking me for a specific item that I would

7   say, I don't like this one thing, I can't point to a

8   particular item that I would say, This is terrible.

9        Q.   Okay.   And is there anything else on this page

10  that either you didn't understand or was very difficult or

11  time consuming for you to fill out?

12       A.   The only thing I would tell you made it

13  difficult on this page is while I was trying to fill it

14  out using an Adobe reader software, I filled out the form

15  not realizing that a tubing leak is separate from a

16  fitting leak, which on the next page, is different from a

17  clamp leak, because I did not go through and spend the

18  time to read the entire form line by line carefully before

19  I started filling it out.

20            So I had to do a lot of editing on it because I

21  put my information in under tubing leak and then realized,

22  Oh, wait, that is different than a fitting leak, so it --

23  it took me some time to fix that before I was able to

24  complete the form and -- and submit it for the claim.

25       Q.   Okay.   And so looking at Page 6, you'll see

 1 under Roman numeral four, it says, Description of loss,

 2 and then bolded heading A is tubing leak.  Do you see

 3 that?

 4      A.   Yes.  And I -- as I stated, I did not go through

 5 and read all of those, and the average person would say

 6 tubing leak, okay, yeah, I used PEX tubing, and it was

 7 leaking so started to fill it out.  Again, had I been an

 8 attorney who was used to reading documents carefully and

 9 filling out every nitpicky item, I would have gone through

10 it first and not had that confusion, but since your

11 average consumer that's filling this form out is not an

12 attorney -- attorney, I expect that's going to be a -- a

13 common confusion for people.

14      Q.   Oh, okay.  And you -- you started answering

15 before I asked my question.

16      A.   I'm sorry.

17      Q.   So let me -- let me -- no, that -- that's --

18 that's okay because we're here to get information from

19 you, and that was informative.  But let me -- let me just

20 ask my question full, so I can get a response.

21           I just want to make sure that -- is it your

22 testimony that when you read on Page 6, under Roman

23 numeral four, the bolded heading description of loss, and

24 A, tubing leak and then the next Page 7 and the bolded

25 heading is fitting leak, you just missed that they were

Jeffrey Palmer
March 20, 2019                                              79

1 being parsed out separately.  Is that -- that's your

2 testimony which drives your complaint?

3      A.   That drives part of my complaint, yes, that --

4 that would be my testimony.  I just missed it because it

5 is somewhat confusing.

6      Q.   Did you ever have an occasion while you were at

7 State Farm where State Farm would have a form for people

8 to submit claims, and then it would change the form to

9 hopefully make it better, and then it would change the

10 form again to hopefully make it better?  Did you ever --

11 ever notice any evolution of forms at State Farm?

12     A.   Most of the forms I dealt with were for the

13 adjuster, not for the claimant.

14     Q.   Did you ever have any criticisms, nitpicky or

15 otherwise, for the form -- forms that corporate sent to

16 you as the adjuster where you said to yourself, God, this

17 could be better, and then you saw a next iteration where,

18 yeah, this is better, but it still could be better?  Did

19 you have any of that experience with State Farm?

20     A.   I think that's common with anyone who commonly

21 fills out forms for the same company.  If it's -- if it's

22 my understanding that your intent is to revise this form

23 and make it more friendly to claimants, then I would

24 applaud that.

25     Q.   Yeah, my -- my intent is just to find out

Jeffrey Palmer
March 20, 2019                                                    80

1  whether -- whether you had the same criticisms that you're

2  talking about here with this form, whether you ever had

3  the same thoughts or criticisms about the various forms

4  you had to deal with at State Farm?

5       A.   I don't recall the exact forms, but I'm sure

6  there's probably things that could have been written

7  better there as well.

8       Q.   Did you -- do you ever recall thinking that

9  there was anything nefarious or wrong about the forms that

10 you as an adjuster were provided at State Farm that you

11 thought could maybe be written better?

12      A.   I'm not exactly certain what you mean by

13 nefarious, but I would certainly say some of them could

14 have been written better.

15      Q.   Were you still able to fill them out at State

16 Farm?

17           THE WITNESS:  Did you understand what he said?

18           THE REPORTER:  Yeah, could you repeat the

19 question, please?

20      Q.   (BY MR. SCHWARTZ)  Sure.  Were you still able to

21 fill out those forms at State Farm even if you thought

22 they could be written better?

23      A.   Yes.  And if the forms were written poorly, I

24 would consult a supervisor, just like in this case I

25 consulted an attorney.

Jeffrey Palmer
March 20, 2019                                                          81

1     Q.   Okay.  Let's go to Page 8.  Was there anything

2  difficult or -- difficult to understand or fill out on

3  this page?

4     A.   No, I would say that seems fairly

5  straightforward.

6     Q.   How about Page 9, anything difficult to fill out

7  or understand on Page 9?

8     A.   The only thing I would note on this page is that

9  here it does give another opportunity to explain why you

10 are not providing the fittings that it asked you again

11 earlier in the form to provide and explain.  So you are

12 explaining it twice, but that's something we could

13 definitely qualify as nitpicky.

14    Q.   And -- and -- and so I did want to talk about

15 that.  You apparently -- and I'm not -- you weren't doing

16 anything nefarious or wrong when you just missed putting

17 in why you didn't have the fittings back, I guess it was

18 earlier in the document, but you did fill out here on

19 Page 9 that you disposed of the fittings.

20         So I just want to make sure when you put it in

21 one place but not the other, you weren't doing anything

22 wrong or trying to confuse anyone or -- or mislead anyone.

23 You just didn't put it in one place, but you caught it on

24 the next place; is that fair?

25    A.   That would be fair to say that I just missed

Jeffrey Palmer
March 20, 2019                                                    82

1  that one just like -- never mind.

2      Q.   Okay.  And so I guess if someone wanted to be

3  nitpicky, they could say, Well, they ask the same thing

4  twice, so it's duplicative.  If you wanted to be -- look

5  at it a different way, you could say, Well, the benefit of

6  maybe asking that question twice is you will pick it up

7  somewhere if it's not somewhere else.

8           Given -- given those two possibilities and any

9  other possibilities you want to consider, good idea or bad

10 idea to have -- have that question asked twice so you can

11 get that answer for the form, or do you have no opinion,

12 but what is your opinion about that?

13     A.   I would say I have no strong opinion.  I -- I --

14 I'm not certain that was the intent when the form was

15 designed to make sure you duplicated it for the benefit of

16 the claimant, but if that's your assertion, I certainly

17 wouldn't argue with that.

18     Q.   Well, then let's -- let's ask it this way.  Do

19 you believe it is helpful for the processing of your

20 claim, and when I say helpful, I mean, helpful towards

21 getting it approved, that at least somewhere in this form

22 if you don't have the clamps anymore, there's a statement

23 that you have saying, Oh, I don't have them anymore

24 because they were disposed of?  Is that helpful to get

25 paid on this claim or not helpful, in your view?

Jeffrey Palmer
March 20, 2019                                                    83

1     A.   Not -- not being the claim administrator, I'm

2   not sure if it's helpful or not, but at least it got the

3   question answered.

4     Q.   Okay.  Same sets of questions on Page 10, any --

5   any difficulties understanding or filling out Page 10?

6     A.   I obviously had no difficulties because nothing

7   on that page applied to me.

8     Q.   Any difficulties understanding or filling out

9   Page 11?

10    A.   No, that's a fairly straightforward page.

11    Q.   Okay.  And let's look at Page 12.  This is more

12  informational and a reminder.  Any -- any difficulties

13  understanding or any criticisms about Page 12?

14    A.   No, that appears straightforward and

15  informational.

16    Q.   Do you see at number seven on Page 12, it says,

17  If you have any questions, you can contact the settlement

18  administrator at either their phone number which is toll

19  free or by e-mail?  Do you see that?

20    A.   Yes, I do.

21    Q.   And I'm not sure if you recall, but that same

22  information was provided on Page 1 of the claim form.  If

23  you had questions, you could reach out to the settlement

24  administrator by phone toll free or by e-mail or by

25  regular mail, too.  You could write to the address?  Do

Jeffrey Palmer
March 20, 2019                                                84

```
 1  you see that --

 2       A.   Yes.

 3       Q.   -- on Page 1?

 4       A.   Well, yes, that's there.

 5       Q.   Well, and the assumption that you don't think

 6  that -- pigeon carrier or some other mode of communication

 7  should have been available, to the extent that you were

 8  confused about any of the terms like the effective date,

 9  did you ever consider just picking up the phone or

10  shooting a quick e-mail to the claims administrator

11  saying, Hey, what does this mean?

12       A.   To be completely honest, since I was already in

13  communication with Mr. Clore, it was easier for me to talk

14  to him than to consult your claims administrator, so

15  that's not something that I would have entered my mind to

16  do.

17       Q.   For someone who did not lawyer up or get a

18  lawyer for the purpose of dealing with this settlement or

19  about this claim, that was an option that's available to

20  them.  Is that something that you think is reasonable,

21  that -- that if they have questions, they can call someone

22  who's a professional who can answer those questions in --

23  in three different ways, which are the easiest ways of

24  communication?

25       A.   It seems reasonable if you have a question to do
```

1  that, but having a -- a way to answer a question doesn't

2  always justify creating a question.

3          (Interruption in proceedings)

4      A.   Sorry about that.

5      Q.   (BY MR. SCHWARTZ)  Okay.  I know we've been

6  going about two hours or so.  I can continue going on, but

7  I just want to make sure you know that if you need a

8  break, just let me know, to go to the bathroom or just to

9  stretch your legs.

10     A.   That -- that would be great, sure, if we could

11 take a break about now.

12     Q.   Okay.  About how much time do you think we need

13 just so people who are on video -- five minutes okay or --

14     A.   Yeah, five minutes is fine.

15     Q.   Okay.  Great.  Okay.  Well, thank you so much.

16 I appreciate how it's gone so far.  I think the -- the

17 technology is working.  So let's take a break, and then

18 we'll -- I'll try to finish up and get you out of here.

19     A.   All right.  Thank you very much.

20          (Recess from 11:20 a.m. to 11:34 a.m.)

21          MR. SCHWARTZ:  Back -- back on the record.

22     Q.   (BY MR. SCHWARTZ)  Mr. Palmer, after Page 12 of

23 the claim form, the next page is a statement that you --

24 you wrote.  Is that something that -- that's something

25 that you added into your claim form as an attachment,

Jeffrey Palmer
March 20, 2019                                          86

 1 correct?

 2     A.   Give me just a moment to find that.  Yes, that's

 3 correct.

 4     Q.   And -- and just in terms of the process of

 5 submitting this claim form, did you e-mail it to the

 6 claims administrator?  How do you actually get it to the

 7 claims administrator?

 8     A.   I e-mailed it to them.

 9     Q.   Okay.  You didn't use a website to send it in

10 through that, did you?

11     A.   No, I did not.

12     Q.   Okay.  Did you have any problems mechanically

13 e-mailing your final claim package to the claims

14 administrator?

15     A.   Not anything that would be more than normal with

16 trying to attach a document to a form.

17     Q.   Okay.  And why did you attach this page?  And if

18 you look at the very top, you'll see there is the -- the

19 stamp that's actually generated by the court, and you'll

20 see it says Page 21 of 25.  This is your written

21 statement?

22     A.   That's correct.

23     Q.   Do you see that?

24     A.   Yes.

25     Q.   Okay.  And so for this Page 21 of 25, what was

Jeffrey Palmer
March 20, 2019                                                    87

1  the purpose for why you included this on your claims form

2  submitted to the settlement administrator?

3      A.   Well, if you refer back to the form, in looking

4  for documentation for proof of your claim or proof that

5  the NIBCO fittings were used, it states that a letter from

6  a contractor in the business who performed the work and

7  could specifically state that those fittings were used was

8  acceptable for proof that those were the fittings or that

9  the NIBCO fittings had been used.  This form is that

10  letter.

11      Q.   Okay.  Now, at the bottom of the letter in the

12  last paragraph, you -- you note that you -- you -- you

13  attached a -- that's on the next page, which is a -- a --

14  a receipt, and you said you're not certain if this is the

15  receipt for the fittings that leaked, but it was from that

16  time period.

17          And with that sentence in your mind, let's look

18  at what is Page 22 of 25, which is this Nocona,

19  N-o-c-o-n-a, Building Center receipt.  Why don't you tell

20  me what this was, where you got it from when you were

21  putting your claim form?  Why don't you start with those

22  two -- two questions, and then I'll go from there?

23      A.   You mean where did I get my original copy of

24  this paper?  Is that what you're asking me?

25      Q.   Well, I assume -- well, I assume you got the

Jeffrey Palmer
March 20, 2019                                                    88

1  original copy when you were doing the work way back when

2  in, what was it, 2014, 2012?

3      A.   2014, January of 2014.

4      Q.   Right, right.  So you got that in the normal

5  course of business in 2014.  When you're doing your claim

6  form, where was this document?  What -- what did you have

7  to do to get this document?

8      A.   It was in a box upstairs with the rest of my

9  receipts from that year.

10     Q.   Okay.  Now, you see in the description, the

11 description doesn't actually say NIBCO, but it does say

12 PEX.  Do you see that?

13     A.   Yes.

14     Q.   And -- and -- and -- and tell me if I've got

15 this wrong.  From -- from the statement you have on the

16 prior page, is it fair to say that -- that is the one

17 receipt you found that seems to match up with these NIBCO

18 PEX fittings that you recall getting.  You noticed that it

19 didn't say NIBCO on it, but you think that it is, but this

20 is the best you can do.  Is that basically a fair summary

21 of what your thought process was with respect to this --

22 this receipt?

23     A.   That would be a pretty fair assessment of the --

24 of the statement.  I did have multiple receipts similar to

25 this.  It seemed cumbersome to attach 15 different

Jeffrey Palmer
March 20, 2019                                              89

1  receipts from the lumberyard, all showing some PEX

2  fittings.   None of them specifically state NIBCO.   I doubt

3  that the proprietor at the lumberyard in Nocona would be

4  aware of the difference between a NIBCO or any other

5  fittings or probably not know exactly where he had gotten

6  those fittings as there was dust on them on the shelf when

7  I purchased them.

8       Q.    Okay.   But this -- this is -- this is your --

9  the best receipt that you were able to find for a purchase

10 that at least you have an independent memory of, oh, I

11 remember getting NIBCO fittings during this time period

12 because NIBCO is a weird name, right?

13      A.    That's correct.

14      Q.    And at least to date, you haven't heard the

15 settlement administrator or anyone else come back to you

16 and say there's something insufficient about this --

17 this -- this page in terms of proof for processing, and at

18 the end of the day approving your claim.   No one has told

19 you that there's anything insufficient about this, have

20 they?

21      A.    No, I haven't heard back anything from the

22 claims administrator or NIBCO except the acknowledgment

23 that they received my claim form.

24      Q.    Okay.   And then on the next page, this is Page

25 23 of 25, this is an invoice from Classic Construction

 1  Remodeling.  That was one of your companies back in 2014?

 2      A.   That is correct.

 3      Q.   And this is -- this is -- is this a document

 4  that was actually prepared in 2014 that was just in the

 5  normal course of your business, or did you prepare this

 6  specifically for your claim?

 7      A.   No, that would have been normal course of my

 8  business at that point to provide documents for our rental

 9  property business so that we can justify monies that were

10  spent when we're doing our taxes basically.

11      Q.   The normal kind of documentation that you as a

12  contractor would have to do in order to run your business

13  properly and do your taxes properly, fair?

14      A.   That's correct, yes.  That would be a fair

15  statement.

16      Q.   Okay.  And there's -- there's nothing unique

17  about -- about this invoice, that it's just serendipity

18  or -- or luck that it happened to be created at the time.

19  In order to do what you did for your normal business,

20  these are the kind of documents you would do; is that

21  fair?

22      A.   That's a fair statement, and it would have

23  probably been in the same box with the other invoice

24  because we have them set by years to keep our documents

25  for tax purposes.

Jeffrey Palmer
March 20, 2019                                                    91

1      Q.    And why do you have those boxes of documents for

2  your business?  Why do you still have them?

3      A.    Because it's my understanding that the IRS wants

4  me to keep these things for seven to ten years, so in

5  keeping with the requirements of the IRS and the federal

6  government, I keep them around.  My wife was an executive

7  secretary, so she's very good at filing things and keeping

8  them.

9      Q.    And -- and since you have customers back from,

10  say, 2014, 2012, 2015, there's always a possibility that

11  one of your customers could come back and say, Hey, I'm

12  having a problem.  Is one of the reasons why you keep

13  records also so you can deal with any complaints or

14  questions from customers?

15      A.    That would be a fair assessment.  It's also so

16  that if somebody contacts me and says, Hey, I need another

17  cabinet door made to match the existing ones, I have

18  documentation showing me the color of stain that I

19  purchased from the paint company so that I can match that

20  and -- and things of that nature.

21      Q.    So that's another reason why you keep the

22  documents, just as a matter of course?

23      A.    Yes.

24      Q.    And I can tell you from personal experience that

25  it would -- it's a lot easier when you have that document

Jeffrey Palmer
March 20, 2019                                                    92

 1 that says this door handle is this color as opposed to

 2 trying to match it up with 25 possibilities, but -- but so

 3 I -- I get it.  And then the last page of -- the last page

 4 that has any text in this document, this is just e-mail to

 5 the settlement administrator providing all your

 6 information, right?

 7      A.   Yes, that's correct.

 8      Q.   Okay.  So besides -- we can put that claims form

 9 or that document, Exhibit 2, down now, which is your

10 declaration and your claim form.  Besides the objections

11 that were filed on your behalf regarding the claim form,

12 why don't you tell me what your understanding is of the

13 other objections that you've made?

14      A.   Are you looking for a full list of all of those

15 objections or --

16      Q.   Well, I'm going to eventually put your objection

17 in front of you, but why don't we start from your memory

18 because I want to get a sense of -- of what you -- just

19 sitting here today are the keys things that you find

20 objectionable to this settlement.

21      A.   Well, some of them we've already discussed in

22 that it's objectionable that the class members would have

23 to wait up to six years for the remainder of their funds

24 when you and your law firm is get -- getting paid in full

25 all of your fees immediately.  And you're saying it --

Jeffrey Palmer
March 20, 2019                                                    93

1  wouldn't it be terrible -- you were asking me earlier if

2  it would be terrible for me to have a future claim and

3  then find that the money has all been spent and -- and

4  given to other claimants and also to your firm, your firm

5  having been paid in full.  I think that enters into it,

6  and that's one the things I find highly objectionable.

7          The -- there doesn't seem to be any correlation

8  between what the class members are going to get as a

9  payout and what the attorneys' fees are.  Typically there

10 is at least some point of reference between those two

11 things.

12         In this case, it would be real simple for your

13 company to get -- or your firm to get whatever its full

14 attorneys' fees are, and then -- something to the tune of

15 13 million, if I recall.  And it would not be outside the

16 realm of possibilities for very few claims to be filed and

17 only, you know, a million or two million to be paid out to

18 claimants.  I -- I -- as far as what the likelihood of

19 that is, I have no idea, but it is definitely a

20 possibility that ought to be addressed in the process.

21 That's one more thing --

22     Q.   Okay.

23     A.   -- that I think is unreasonable.

24     Q.   Any -- any other big things that you recall off

25 the top of your head?

Jeffrey Palmer
March 20, 2019                                              94

1      A.   Of course, you understand that the nature of

2  this process causes someone to forget things that ten

3  minutes ago they may have been freshly remembering.  So

4  keeping that in mind that I'm sure there are other things

5  that I'm not thinking of right at the moment, we'll go

6  with that for the moment.

7      Q.   Okay.  And so let's -- let's fist talk about

8  the -- the six-year period that you referred to.  We

9  already talked about how -- how you agree with the notion

10 that it makes sense for people who have not yet had a

11 failure with NIBCO products but have a failure in the

12 future, say, within the next six years, that you want to

13 have a settlement that provides compensation for those

14 people.

15          You don't object to the fact that there's the

16 ability for people to file claims over the next six years;

17 is that correct?

18     A.   That's -- that seems like a reasonable thought.

19     Q.   And, in fact, that six-year period could

20 actually end up benefiting you if you have another home

21 that you've worked on where there is damage, you may be

22 able to get paid for that if it happens a year, two years,

23 three years down the road, right?

24     A.   I suppose that's a possibility.  It would be

25 more beneficial for me to collect the entire claim at --

Jeffrey Palmer
March 20, 2019                                              95

1  at this point, just like you're collecting all of your

2  attorneys' fees once the settlement is made.

3       Q.   Okay.  Do you know how many years that we've

4  been working on this case up to this point in time?

5       A.   I'm not asking you to justify it.  I'm just

6  saying if you're -- if you're making that statement to me,

7  there's no reason that -- that -- if I'm being asked to

8  not be compensated for what I put out, how is that

9  different from you getting compensated for everything

10 you've put out?  One is no more reasonable or unreasonable

11 than the other.

12          I -- I'm not asking you to justify how much

13 time, money, or effort you've spent in the claims process

14 or in the -- in the process of filing this suit.  I --

15 likewise, you should -- shouldn't ask me to justify why I

16 don't need to wait six years.  There's -- why is one okay

17 and the other is not?  I realize that's your job is to try

18 and make it okay so that you can get your money, but that

19 doesn't make it more okay to me.

20      Q.   Okay.  My specific question is, do you know how

21 much -- how many years the -- the Plaintiffs' class action

22 lawyers have been working on this case?

23      A.   No, I do not.

24      Q.   Maybe you were told this, or maybe you saw this.

25 Would it refresh your recollection to know that the case

Jeffrey Palmer
March 20, 2019                                          96

1 was filed in 2013 and that the class counsel has been

2 working on this case for about six years?

3      A.   I'm sorry.  Are you asking if I was aware of

4 that, or would it surprise me?  I --

5      Q.   It -- it sounds like you're not aware of it.

6 Tell me if I'm wrong, but would it surprise you that we've

7 been working on this case for at least six years?

8      A.   No, it wouldn't surprise me.

9      Q.   Okay.  And -- and -- and just so I understand

10 your proposal, your proposal is that even if the

11 settlement is approved, we should have to wait up to

12 another six years before we get paid our attorneys' fees;

13 is that right?

14      A.   I didn't make any proposal.  I only made a

15 statement that one seems unfair.  I -- I would be

16 perfectly okay with the thought that you get 25 percent of

17 your fees upfront, and you're only allowed to collect

18 70 percent of what you're billing for it, just like I'm

19 only allowed to collect 70 percent of my claim.

20      Q.   Have you had any experience suing people in your

21 life?

22      A.   Not that I recall.

23      Q.   You understand that unless someone goes to trial

24 and wins at trials and wins every appeal, that all

25 settlements of cases, virtually all settlements at least,

Jeffrey Palmer
March 20, 2019                                                97

1  are compromises where not every side gets everything they

2  want?

3       A.   It seems reasonable from what I've watched on

4  TV.

5       Q.   Are you generally aware that NIBCO did not

6  simply raise its hands and say, Yes, we're -- we're --

7  we're guilty here, that they actually fought us tooth and

8  nail throughout the -- the years of litigation in this

9  case?  Are -- are you aware that NIBCO fought us very hard

10 in this case?

11      A.   I wouldn't say that I'm aware, but I would say

12 it's a fair assumption that they probably had their own

13 legal firm that was fighting you.

14      Q.   So -- so NIBCO's counsel is from the law firm of

15 Morgan, Lewis & Bockius.  Are you aware that that's one of

16 the -- the largest and most profitable and -- and most

17 highly regarded law firms in the world?

18      A.   No, I'm not.

19      Q.   But you're not surprised by that at all?

20      A.   No, I'm not surprised at all by that fact.

21      Q.   Let's talk about the amount of the settlement.

22 Do you think a recovery of between 25 percent and

23 70 percent of damages in a complicated case like this,

24 does that sound like a pretty good result in the face of

25 stiff opposition from NIBCO as a settlement in this case?

Jeffrey Palmer
March 20, 2019                                                98

 1      A.   I'm sorry.  Could you rephrase that question?

 2      Q.   Sure.  Let me -- let me break it down.  First,

 3 you understand that if we just litigated this case through

 4 trial and appeals, it's possible that NIBCO would have won

 5 and class members like yourself would have gotten zero,

 6 right?

 7      A.   I understand that could be a possibility, yes.

 8      Q.   Do you also understand that if -- if -- if there

 9 was no settlement and we litigated this case until the

10 bitter end, it could have been another six years before we

11 had a final judgment because that's how long it takes for

12 the legal process to -- to work in these kinds of large

13 cases?

14      A.   I understand that.

15      Q.   As a class member, are you happy that the

16 settlement was done now with some certainty that the

17 result will be between 25 and 75 percent, depending on the

18 number of claims that are approved, versus waiting another

19 possibly three, four, five, six years to see how the

20 litigation goes and take your chances?  Are you -- do you

21 have any dis -- do you have any complaint about having a

22 settlement within this range that we have just in terms of

23 the recovery given the risks?

24      A.   If you're asking if I'm okay with the fact that

25 there actually is a settlement and that getting 70 percent

1   is better than getting nothing, I would say that seems

2   like a fair -- a fair statement that I would be okay with

3   that thought.

4       Q.   And -- and -- and you also know any raises

5   that -- that the -- that the immediate payment for -- for

6   a claim such as yours is 25 percent of the damages.  Do

7   you -- is -- is it your view that if class members got

8   25 percent and not a penny more because there are so many

9   claims that were -- were approved that people only got

10  25 percent, are you raising an objection that that means

11  the sentiment fund wasn't big enough and that recovery

12  isn't good enough given all the risks and all the -- all

13  the potential for delay?

14           I just want to get a sense of whether you have

15  an objection to if it turned out the number was 25 percent

16  that people got, given the number of claims that are

17  assessed against the $43 million fund, because I don't

18  know whether you think even 35 or 45 or 50 is a better

19  number, but do you have a -- do you have an objection to

20  the -- to the minimum 25 percent number?

21      A.   It seems like you're asking me if I would be

22  okay if I was only getting 25 percent and then nothing

23  more, and in that case, I would probably say, no, I

24  wouldn't be okay with that idea, but I would have to see a

25  fair assessment or at least an estimation of how many

1 claims are expected and what the dollar amounts are

2 expected to be of all the claims.  And I haven't seen any

3 information that gives me a good assessment of that, so it

4 would be --

5      Q.   Well, let's make sure you understand -- I'm --

6 I'm sorry.  Let's make sure you understand how this works.

7 Is it your understanding that as claims are received and

8 approved, the settlement is approved, that there will be

9 an immediate payment of 25 percent of the claim, and then

10 once we're at the end of the six-year period so we now

11 have all claims, that the settlement administrator will --

12 will, after everyone got their initial 25 percent will

13 take the -- the amount of money that's left and then

14 distribute it to every approved claimant pro rata, meaning

15 in proportion to what their approved claim was, so that

16 they can get an increase from 25 percent to as much money

17 there is within the fund up to 70 percent?  Is that your

18 understanding as to how this is going to work?

19      A.   That would be my layman's understanding of the

20 way it appears to work, not having poured through the

21 documentation, you know, extensively, yes.

22      Q.   Okay.  And -- and maybe I should ask the

23 question this way.  In a complex case like this where

24 there is a vigorous defense, you've already told me what

25 you thought about a 70 percent recovery.  Is there

Jeffrey Palmer
March 20, 2019                                      101

1  anything objectionable on its face to you of a 25 percent

2  recovery being so low that that would be something you

3  would come in and say that it's got to be objectionable?

4  I just want to get a sense of whether there's something

5  about the minimum 25 percent number that's objectionable

6  in and of itself, whether you're just complaining about

7  how we're going to pay claims over time itself?

8       A.   Well, I would definitely object to a 25 percent

9  settlement on it because in cases like mine, it really

10 wouldn't be worth my time to even file a -- a claim on it.

11 And in that case, nobody else would probably file a claim,

12 and the funds available would be a lot more than

13 25 percent of the claim.  It -- it's kind of the same

14 round robin that you're chasing with the attorney fees.

15 It doesn't have a whole lot of reference to reality, I

16 don't think.

17      Q.   So you -- your -- your -- the damage that you

18 have listed is about $2,300, so, so 25 percent of 2,300 is

19 somewhere between five and $600, I believe, right?  Are

20 you with me?

21      A.   That's correct.

22      Q.   And then if you got 70 percent, you would be

23 looking at maybe $1,500, 15, $1,600.  Are you suggesting

24 that it wouldn't be worth your while, and in general,

25 class members' while to file claims where they could have

Jeffrey Palmer
March 20, 2019                                              102

1  potential payouts of between 500 and 15, 16, $1,700?

2      A.   No, I don't think that was what I said at all.

3  What I said was at $500, it -- it would barely be worth my

4  time.  I didn't say I wouldn't file it, and I can't --

5  can't speak to whether it would be worth anyone else's

6  time, but that's -- that's all I have.

7      Q.   Okay.  And just using the $500 number, you

8  really think that number is such a low number that it

9  would not be worth class members' while to -- reasonable

10  class members' while to go file claims for -- for amounts

11  of like $500?

12      A.   It would really depend on the individual class

13  member's situation.  I can see the case where a lot of

14  people would find that not worth their effort to deal

15  with -- with this process.

16      Q.   You've probably seen or heard about class

17  recoveries where class members might get five dollars or

18  ten dollars or -- or a five dollar off coupon.  You've --

19  you've heard of those kinds of settlements, right?

20      A.   Oh, yes, I've received five dollar -- or four

21  dollars from the Naked Juice Company, but I didn't have to

22  fill out a 12-page form and provide my insurance

23  information to get it.

24      Q.   Yeah, okay.  And I'll -- I'll -- I'll move on.

25  So you mention an objection about the correlation between

Jeffrey Palmer
March 20, 2019                                              103

1 the payments to class members and the attorneys' fees that

2 would -- that are being sought and that would be paid; is

3 that right?  You think there should be some correlation?

4      A.   Yes, that's typical --

5      Q.   Okay.

6      A.   -- in class action cases and in most contingent

7 cases that it -- my humble understanding as a layman.

8      Q.   Okay.  And do you know that the request for

9 attorneys' fees that we have made is approximately

10 30 percent of the 43 million dollar recovery?

11     A.   If the 43 million dollars is actually paid out,

12 then that would seem to be within what some consider

13 reasonable.

14     Q.   Okay.  Instead of talking about some, let's talk

15 about you, Jeffrey Palmer.  If 43 million dollars is paid

16 out, is the 30 percent request unreasonable in your view?

17 Is that what you're objecting to?  Let's -- let's stick

18 with this.  If the 43 million is paid out, are you going

19 to be telling the court, I still object to a 30 percent

20 payment for attorneys' fees?

21     A.   I think the standard would be closer to

22 25 percent, especially when you're looking at -- at cases

23 of this magnitude.

24     Q.   So -- so I'm hearing a couple of things, but one

25 thing I -- I think I'm hearing you from you is that if 43

Bradley Palmer
March 20, 2019                                          104

1 million is paid out, you think 25 percent is reasonable,

2 but you think maybe 30 percent is a little bit too much.

3 Is that -- is that where your head is at for this?

4      A.   I -- I would say that seems to be a pretty fair

5 assess -- assessment of what I'm thinking.  I -- my other

6 objection, though, is it doesn't appear likely that the

7 43 million is going to be paid out.  And my -- the other

8 objection I have is the fact that it's entirely possible

9 for something greatly less than 43 million to ever be paid

10 out on this -- on this settlement.

11      Q.   Okay.  Before we move on to that issue, let's

12 talk about this 25, 30 percent gap.  When you talked about

13 what was typical or standard of -- of percentages in class

14 actions, is that something that you have any independent

15 knowledge of, or is that just something you may have heard

16 either from your brother or from Mr. Bandas or from some

17 other objector attorney?

18      A.   Well, I've spoken to them, but I've also seen

19 documents on other class actions cases and read through

20 them.  I -- I'm -- I'm probably not typical to the average

21 person in that I -- I have this weird ability to read

22 legal documents, and it usually makes some sense to me.

23      Q.   Well, then, have you read enough to know that

24 there are legal standards that allow judges to give a

25 little more than the 25 percent or a little less when the

Jeffrey Palmer
March 20, 2019                                              105

1  judges take into consideration various factors?  Do you --

2  do you know enough to understand that?

3       A.   I -- I -- I think if you look closely at the

4  objection that I read this morning, some of that is pretty

5  clearly stated that, yes, there are factors where

6  sometimes it is okay to take more than that or expected to

7  take more than that.

8       Q.   Did you go to a settlement website or get from

9  your attorneys the motion for attorneys' fees that class

10 counsel filed before you filed your objection?

11      A.   No, I have not looked at that particular motion.

12      Q.   And did you look at the attorneys' fees motion

13 even after you filed your objection?

14      A.   I don't know that I've seen the actual motion

15 filed with the court, just the documents within the

16 settlement, proposed settlement.

17      Q.   You mean the document like the notice and the

18 FAQs on the website?

19      A.   No, I mean the -- the notice of class action

20 settlement.

21      Q.   Okay.  Generally the FAQs or frequently asked

22 questions are also called a notice, so is that what you're

23 referring to?

24      A.   I'm referring to the document I have in front of

25 me that says notice of class action settlement that does

1 have questions in it that I suppose could be what you're

2 referring to as FAQs.

3      Q.    Okay.  And just so we're clear, what document

4 that's in front of you are you talking about?

5      A.    Notice of class action settlement.

6      Q.    Okay.  And that is -- that is something that has

7 not been marked, but that you have brought with you; is

8 that right?

9      A.    I -- I have seen.  I just happen to have a copy

10 with me, yes.  And I'm sure you --

11      Q.    So why don't we attach that as --

12      A.    I'm sure you have a copy that you have, but

13 you're asking me where I --

14      Q.    Sure.  What --

15      A.    -- where I saw that, and I am answering your

16 question as to where I saw that.  I'm sorry that it's not

17 in a document you produced.

18      Q.    That's okay.  Why don't we just have the court

19 reporter mark that as Exhibit 3 just so there's clarity on

20 the record what it was.  Is it okay if you leave that

21 here?  There's no -- you don't have any handwritten notes

22 from your attorney on that document, do you?

23      A.    No, I don't.

24      Q.    So unless there's objection, why don't we mark

25 that just so -- just so there's no misunderstanding as to

Jeffrey Palmer
March 20, 2019                                               107

1  what you were talking about.  Is that okay?  The court

2  reporter will give you a sticker for that.

3       A.   Sure, that would be fine with me.

4       Q.   Okay.  Thank you.

5            (Exhibit No. 3 marked)

6            THE REPORTER:  Exhibit 3 has been marked.

7       A.   I'll staple this together.

8       Q.   (BY MR. SCHWARTZ)  Okay.  When the issue of

9  whether or not the 43 million maximum settlement fund will

10 actually be paid out, do you have any information about

11 the likelihood of the number of claims and the value of

12 claims that will be submitted and approved and the

13 likelihood that the 43 million will either be exhausted or

14 nearly exhausted?  Do you have any information about that

15 that allows you to speak to that with any degree of

16 certainty one way or the other?

17      A.   No, and that's one of my issues with it is that

18 there's been no documentation or -- or appear to have been

19 any research on that subject at all.  I would like -- love

20 to see some documentation to that regard.

21      Q.   Are you saying that you have an open mind about

22 it, and you would love to see some documentation to see if

23 you could be convinced one way or the other?  Maybe I

24 should ask the question this way.  Are you the type of

25 person who reaches an opinion and sticks to the opinion no

Jeffrey Palmer
March 20, 2019                                             108

1 matter what information you learn in the future, or is --

2 or are you the type of person who is willing to reevaluate

3 your opinion on various things as new information becomes

4 available?

5      A.   If you're asking if I'm reasonable person that

6 looks at all the facts, I would say, yes, I'm a reasonable

7 person that looks at all the facts, whether they be new or

8 old.

9      Q.   Okay.  And in connection with your objection,

10 you -- I -- I think you just said that you would be

11 interested in seeing information, more information, that

12 you don't think has been presented before that would give

13 you more insight as to what the likely number of claims or

14 payout would be.  Is that -- is that something that

15 you're -- that as you sit here today you're still

16 interested in -- in learning about as you evaluate whether

17 or not you continue to prosecute your objection?

18      A.   That's information that would be valuable.  I

19 would say that.

20      Q.   Is that one of the reasons why you -- you filed

21 your objection because you didn't think that information

22 was available?

23      A.   I would say the lack of that information factors

24 into the -- the entire objection.

25      Q.   Did you look for any such information as part of

Jeffrey Palmer
March 20, 2019                                                    109

1 the work you did in deciding to pull the trigger and file

2 your objection?

3      A.    I would have to say that I relied on that --

4 largely on my attorneys' research when it comes to that

5 information and also relied on the information in the form

6 that was just marked as Exhibit 3.

7      Q.    Before you filed your objection, how much time

8 did you spend talking with your attorneys on the substance

9 of what your objections would be?

10     A.    It would be difficult to put an actual number on

11 it.  I know that over the process of a couple of days, I

12 spent a good deal of time working on the forms, looking at

13 the class notice, a dozen phone calls at least back and

14 forth between myself and Mr. Clore and quite a few e-mails

15 back and forth on the subject.  I would have to pull my --

16     Q.    Did you --

17     A.    -- computer out to see.

18     Q.    I'm sorry.  Did you review and edit any drafts

19 of the actual objection that was filed, not the claim

20 form, not your declaration, but the actual objection that

21 was filed?

22     A.    Yes, as a matter of fact, I did.  I -- I made

23 some comments and some notes for Mr. Clore and some

24 revisions that were made -- made as a result of reviewing

25 those documents.

Jeffrey Palmer
March 20, 2019                                              110

1      Q.    Okay.  Now, since your objection has been filed,

2 you've remained in contact with your attorneys about your

3 objection, right?

4      A.    Yes.  It hasn't been very long since it's been

5 filed, so, yes.  I haven't called them every day, if

6 that's what you're asking, but, no, I -- I certainly

7 remain in contact with them.

8      Q.    Do you know whether besides your objection there

9 are any other objections to the settlement?

10      A.    It's my understanding that there were two other

11 objections, but as to the specifics of those objections, I

12 really don't have any information.

13      Q.    Do you know whether -- what, if anything, can

14 you tell me about who -- I don't mean the name, but the

15 type of person or type of entity that filed those

16 objections and what those are, or what -- what can you

17 tell me about what you -- you -- you know about that as

18 you're sitting here?

19      A.    Really as much as I know is that there were a

20 couple of other objections filed.  I -- I may have heard

21 other discussion, but I don't really recall a lot.  It

22 wasn't important enough to me as it relates to this

23 objection.

24      Q.    Do you know whether there have been any

25 objections filed claiming that the 43 million is not

Jeffrey Palmer
March 20, 2019                                              111

1  enough and, in fact, that the claims will be sufficient to

2  exhaust the 43 million dollars?

3      A.   No, that wouldn't be -- wouldn't be something

4  that I would need to know.

5      Q.   Well, I -- I thought you just said that you --

6  you would be interested in information as to whether the

7  43 million will be exhausted to make sure that the class

8  action lawyers aren't getting paid a percentage of an

9  amount that won't actually be paid to class members.

10         So I'm just trying to figure out whether --

11  whether you've received any information or learned from

12  anywhere that there were objections filed suggesting that,

13  if anything, the 43 million dollars is not enough to pay

14  people 70 percent of their damages and, therefore, the --

15  the fund would be exhausted.

16      A.   I -- it sounds like you're asking me if -- if I

17  would be willing or if I think someone else's objection is

18  sufficient if they're objecting to the same thing but

19  don't necessarily have that on the list.  I -- the

20  question seems confusing and not necessarily relevant,

21  but, no, I'm -- I'm not aware of what anyone else's

22  objections are specifically.  And I -- I don't know that

23  it would have a lot of bearing on my objection.  That's up

24  to the judge to look at the objections and decide whether

25  each one has merit.  That's really not my place to -- to

1 be involved in that.

2     Q.   Right, and just to be clear, because I don't --

3 I want to make sure you fully understand what I'm asking.

4 I think you've answered my question, but I just want to

5 make sure.

6          I have a very specific question, which is

7 whether you are aware from any source, whether it's from

8 our own research or from your attorneys, whether you are

9 aware that there were other objections filed saying that

10 the 43 million dollars was not enough to pay everyone who

11 had a valid claim 70 percent and, therefore, the fund

12 would be exhausted.  I think you answered you're not aware

13 of that.  I just want to make sure that -- that that's

14 correct, that you're not aware of such objection.

15     A.   No, I'm not specifically aware of such an

16 objection.

17     Q.   And is it also true that you're not aware that a

18 large builder and a large plumbing company filed such an

19 objection saying that they believed that there are a lot

20 of failures out there and there will be a lot of claims,

21 and they've raised concerns that the 43 million dollars

22 would basically be exhausted?  Are you not aware of that?

23     A.   No, I'm not aware of that.

24     Q.   Okay.  And I -- I -- I think in one of your

25 answers, you said it was really for the judge to weigh the

Jeffrey Palmer
March 20, 2019                                                    113

1  evidence, to make evaluation as to whether or not what the

2  likelihood is that 50 percent or 80 percent or 100 percent

3  or 10 percent of the -- of the 43 million would eventually

4  go to class members.  Is that -- is that -- is that a

5  process that you would expect the judge to do in making

6  the decision on attorneys' fees?

7        A.   I would say there's an entire process involved

8  in determining those fees.  Part of that process is the

9  judge's discretion.  Part of that process is class

10 members, such as myself, filing objections when they feel

11 that things are not in keeping with what would be

12 reasonable.  I feel like I'm part of that process as well.

13       Q.   Okay.  Why don't we mark as Exhibit 4 the

14 objections you filed.  The court reporter has that

15 already.  I believe you have your own copy, but why don't

16 we have the court reporter mark the copy she has.  And

17 you'll let me know if this is your objection.

18            (Exhibit No. 4 marked)

19            THE REPORTER:  Exhibit 4 has been marked.

20       Q.   (BY MR. SCHWARTZ)  And this is Document 184 on

21 the court filing system.  We've marked it as Exhibit 4.

22 Mr. Palmer, can you identify this as your objection?

23       A.   At surface, it appears to be such.

24       Q.   And if you'll take a look at the second-to-last

25 page, it's Page 32 of the document, just confirm that is

Bradley Palmer
March 20, 2019                                                114

1  your actual signature.

2       A.    Yes, that is.

3       Q.    And did you put your signature on that and then,

4  what, e-mail a -- e-mail a PDF of that over to your

5  counsel?  How did you get your signature to counsel?

6       A.    I signed that with a felt tip and marking pen,

7  scanned it in on my computer, converted it to a PDF

8  document, and then forwarded it to my attorneys.  So, yes,

9  that is indeed my true signature.

10      Q.    You didn't go through a process where some

11 attorney signed the document for you?

12      A.    No, that -- that would be unethical.

13      Q.    Why do you say that?

14      A.    Because I'm stating that that's my signature,

15 and I just told you that, and then you're asking me if

16 someone else signed it.  No, I signed it.  I just -- I

17 just answered your question, and you're asking it again.

18 It seems -- it seems like you're questioning my integrity

19 to ask the question the second time when I just told you I

20 signed it with a pen, scanned it in, and then you asked me

21 if I had someone else sign it.  That's -- that's -- that's

22 offensive to me.

23      Q.    Okay.  Well, sir, I was not actually asking that

24 question to -- to make a challenge to your integrity, so I

25 just state that I hope you appreciate that there are

Jeffrey Palmer
March 20, 2019                                                   115

 1  reasons why we ask questions, and sometimes there are

 2  reasons why we ask questions more than once for reasons

 3  that may not be apparent to a non-lawyer or even to

 4  lawyers.  So I just want you to know that I was not

 5  assaulting your integrity on that issue, but there was

 6  another reason why I asked that, which is because I'm

 7  curious to know if you have any information from any

 8  source about whether your brother, Darrell Palmer, has

 9  signed people's names to objections and filed them with

10  courts in cases where the people on whose objections were

11  purportedly filed came later and said, That's not my

12  signature, and I didn't authorize this.

13          Are you aware of anything like that with respect

14  to your brother, Darrell Palmer?

15      A.   I've stated in the past I'm not privy to my

16  brother's legal practice and certainly haven't inspected

17  any documents he's filed with the court.  I haven't had

18  any contact with his other clients, so I would say, no, I

19  have no knowledge of -- of any events like that.

20      Q.   But what I've described does not sound like an

21  ethical practice to you, does it?

22      A.   It would depend entirely upon the circumstance.

23      Q.   And how about with regard to the Bandas Law

24  Firm?  Do you know whether or not any former clients have

25  accused the Bandas Law Firm of signing their names on

Jeffrey Palmer
March 20, 2019                                          116

1  objections without getting authority from those clients?

2      A.   No, I certainly would have no knowledge of

3  anything like that.

4      Q.   Is that the kind of information you might be

5  interested in in evaluating whether or not you made a good

6  choice of counsel?

7      A.   I would say the thing that would interest me in

8  evaluating whether I made a good choice of counsel is how

9  they're handling my case.  How they've handled other cases

10 may have some significance, but the greatest significance

11 is whether they've done a fair job of handling this case

12 for me.

13     Q.   Okay.  On Exhibit 4, which is your objection, I

14 think you said this before, but you -- you carefully read

15 this and made edits that you felt were necessary before it

16 was filed, and you're satisfied that while you're not a

17 legal expert, you're satisfied that statements made in

18 this document are accurate to the best of your knowledge;

19 is that fair?

20     A.   That would be a fair statement.

21     Q.   And -- and I'm not suggesting that you -- you're

22 a legal expert.  They're just what I call factual

23 statements.  Okay.

24     A.   Excuse me.  Would -- would it be okay to take a

25 short break here for a minute?

Jeffrey Palmer
March 20, 2019                                              117

1      Q.   Oh, sure, we can take a break whenever, so let's

2  take another five minutes.  Okay.

3      A.   Okay.  That would be great.

4      Q.   Okay.  Not a problem.

5           (Recess from 12:22 p.m. to 12:28 p.m.)

6           MR. SCHWARTZ:  Let's go back on the record.

7      A.   Okay.

8      Q.   (BY MR. SCHWARTZ)  And I just want to talk about

9  a few things that -- in your objection that we've marked

10 as Exhibit 4.  If you can first look to Page 13 of the

11 document.  At the very top, the -- the first sentence

12 says, There is every reason to believe that 13 million in

13 attorneys' fees will exceed class recovery in claims made

14 reversionary settlement with no floor.  Do you see that?

15     A.   Yes, I do.

16     Q.   And I just want to get a sense of whether

17 there's any analysis or factual basis for this statement

18 that there's every reason to believe that 13 million in

19 attorneys' fees will be more than what will actually be

20 paid out to class members or whether maybe that -- that

21 statement, There's every reason to believe, is a little

22 bit of an overstatement in your view.  I just want to get

23 your -- your -- your response to that.

24     A.   I wouldn't say that I feel that's an

25 overstatement.  Again, in my layman's opinion, I don't

1 believe you'll see that many claims on this because the

2 process is cumbersome.  I know we just spent an hour going

3 over your claim form, but I -- I still feel that it could

4 use a lot of revision to make it more user friendly.  And

5 I think it's going to deter a lot of people, and I think

6 it's very likely that there are people that will not fill

7 your form out correctly and be rejected and probably not

8 feel that -- willing to go through the process, the

9 appeals process, after their claim is rejected.

10          I also feel that there just isn't enough data or

11 enough information to give us an accurate assessment of

12 how many claims will be made, but in -- in my humble

13 layman's opinion, I don't feel that it's likely that there

14 will be that many claims, at least not enough to reach the

15 13 million.

16          And I think the attorneys' fees should be

17 reasonably tied to the actual settlement, not, well, this

18 is the cap of the settlement, and if we get enough claims,

19 we'll pay this much, but let's pay you anyway.  That --

20 that does not seem fair or reasonable to the class at

21 large, or just in general, it doesn't seem fair.

22     Q.   In terms of your statement in that answer that

23 there's not enough data, besides everything else you've

24 told us today, have you personally undertaken any steps to

25 see what data is available on the issues of the number of

Jeffrey Palmer
March 20, 2019                                    119

1 claims and likelihood of the amounts of payout?

2    A.   The only place I would be able to find such data

3 would probably be from research done during your -- your

4 process of prosecuting this suit.  And I haven't seen

5 anything provided in the -- the settlement agreement, and

6 that's where I would expect to at least see some reference

7 to such data.  So, no, I have not done any other research.

8 I'm not sure where I would look to find any other research

9 on that.  That is not an area where I have great

10 expertise.

11    Q.   On Page 16 of the claim form -- of -- of the --

12 of your objection, at the very last paragraph at the

13 bottom, there's an objection that the claim form is

14 necess -- unnecessarily invasive of class members'

15 privacy.  Do you see that?

16    A.   Yes, I do.

17    Q.   Now, you see the second sen -- sentence after

18 that talks about the homeowner's insurance company, and we

19 talked about that already.  But the first sentence after

20 that says, There's no reason they should have to list

21 their date of birth to establish they have a covered

22 product.  What is your objection there?

23    A.   I don't understand why it is necessary to know

24 how old I am to determine whether or not I have a covered

25 product.  As long -- as long as someone is willing to

Jeffrey Palmer
March 20, 2019                                                    120

1  state that, yes, I'm over 18 years of age and have the

2  legal ability to make this claim, anything beyond that is,

3  no offense, frankly none of your business.

4       Q.   Okay.  And if you could take a look at Exhibit 2

5  again.  This is the claim form.  Actually it's your

6  declaration which has the claim form.  If you can take a

7  look at Exhibit 2 and the claim form, where did you list

8  your date of birth on the claim form?

9       A.   You know what, I cannot find that.  So your --

10 perhaps there may be one sentence in this entire objection

11 that would be worthy of disregarding.

12      Q.   Well, that -- that -- that's what I'm trying to

13 figure out.  Do you have any recollection that you had to

14 list your date of birth as part of your claim?

15      A.   Well, clearly if it's not on the form, I

16 misunderstood something that was being asked.

17      Q.   Well, when you filed this objection, did you

18 have some belief or recollection that you had been

19 required to list your date of birth, and that's why you

20 have it included in there?  Is that why it's in there, or

21 I'm trying to figure out why that's in there.  So what --

22 what can you tell me about that?

23      A.   Well, I would say that there's the possibility

24 that an error was made.  I'm sure that's something that

25 does not often happen in your office, but it does

Jeffrey Palmer
March 20, 2019                                        121

1  occasionally happen in mine.

2     Q.   Did you -- I'm just trying to figure out what

3  you think the mistake might have been.  Do you -- do you

4  think the mistake was you thought you had to put in your

5  date of birth, and that's why when you saw this in the

6  draft objection, you didn't edit it out, or did you not

7  review this sentence and think about it?  Do you have

8  any -- anything you can tell me as to how this mistake may

9  have happened in this objection?

10     A.   Well, clearly the -- the statement within the

11  objection does not cause any damage because I would still

12  agree with the statement that there's no reason we

13  would -- someone should have to list their date of birth,

14  but it -- it seems to be a superfluous statement if your

15  form is not asking for a date of birth, so it doesn't seem

16  to cause any harm anywhere.  It just was a statement put

17  in that was perhaps unnecessary.  I --

18     Q.   I think you answered something that wasn't quite

19  my question.  I'm -- I'm just trying to drill down how

20  that statement was put into this objection.  Is that

21  something that the lawyers put in and you just missed when

22  you were reviewing it and forgot to say, Oh, you never had

23  to do that, or is that something that was put in because

24  you mistakenly thought you had to put your date of birth

25  in?  I'm just trying to figure out how this mistake

1 | happened --

2 |     A.    You know, specifically I don't --

3 |     Q.    -- not whether it's relevant or -- or -- not

4 | whether it's relevant or important.  I just want to try to

5 | figure out how this mistake happened if you can shed light

6 | on that.

7 |     A.    Well, if you're not certain if it's relevant or

8 | important, then I'm not sure what the ques -- why the

9 | question is being asked.  But to answer the question,

10 | specifically I don't recall if the thought was first

11 | brought up in conversation by myself or Mr. Clore.  I know

12 | that we discussed it.  It may easily have been me

13 | misunderstanding the form, and neither one of us having

14 | carefully checked the form again after that.

15 |         I -- I would be less than shocked to find that

16 | such mistakes are -- are ever made in any legal

17 | proceedings.  But, again, like you said, it's not a matter

18 | of whether it's important or malicious or anything of that

19 | nature.  It's -- it's an extremely minor point, not

20 | something egregious to color the objection poorly, I would

21 | not think.

22 |     Q.    And -- and do -- do you have some recollection

23 | that you're referring to of at least discussing the topic

24 | of the date of birth being a required piece of information

25 | with your lawyers, or are you just speculating when you

Jeffrey Palmer
March 20, 2019                                          123

1  said that?

2      A.   I recall the subject having come up, and I think

3  I already stated that I don't recall whether it was myself

4  or Mr. Clore that first brought it up.  It likely was

5  myself.  Just looking at the onerous nature of the form,

6  it would not be surprising at all to find that they asked

7  for a date of birth.

8          It sounds like you're trying to determine

9  whether I initially brought it up or the Bandas Law Firm

10  brought it up.  And quite frankly, I can't answer that.

11     Q.   Okay.

12          MR. SCHWARTZ:  Let's mark as Exhibit 5

13  Plaintiffs' Memorandum of Law in support of Plaintiffs'

14  Motion for Preliminary Settlement Approval and Related

15  Relief.

16          (Exhibit No. 5 marked)

17          THE REPORTER:  Exhibit 5 has been marked.

18     Q.   (BY MR. SCHWARTZ)  And so this Exhibit Number 5

19  is docket entry Number 173-H on the court's ECF system.

20  This is one of those documents that was posted on the

21  settlement website.  I just want to verify, I think you

22  testified that you have not seen this document before, but

23  just tell me whether I'm right or wrong.  Have you seen

24  this document before?

25     A.   I don't recall specifically having seen this

Bradley Palmer
March 20, 2019                                    124

```
 1  document, but I wouldn't unequivocally say that I haven't.

 2      Q.   Okay.  I just want to ask you a few things

 3  that -- that's referenced in this document.  If you just

 4  start off on Page 1 on the --

 5      A.   Where the introductory statement is?

 6      Q.   Yeah, it's right under there.  So the first

 7  sentence refers to hotly contested litigation.  Do you see

 8  that?

 9      A.   Uh-huh.

10      Q.   You -- do you have any basis to dispute that

11  this was a hotly contested litigation?

12      A.   I have no basis to dispute or confirm anything

13  about the nature of your litigation.

14      Q.   And it next says there were seven in-person

15  mediations sessions before one or both of a retired United

16  States district court judge and a second experienced

17  private mediator.

18           Do you have any basis to dispute that that

19  statement is accurate?

20      A.   No, I certainly would not.  I mean, I have no --

21  I have no -- no direct knowledge of any of these things

22  other than what you've written here.

23      Q.   You don't believe that we were lying when we

24  said that in this document that was filed with the court,

25  do you?  I mean, if you do, you can say so.  I just want
```

Jeffrey Palmer
March 20, 2019                                              125

1  to know whether -- whether you think that that factual

2  statement is inaccurate --

3        A.   It was --

4        Q.   -- in your mind?

5        A.   It was equally factual to the placement of my

6  signature on a prior document.

7        Q.   Let's go to Page 5.

8        A.   Let -- let me rephrase.  I can only assume that

9  it was factual.

10       Q.   Okay.  That's fair.  Do you understand that

11 class action attorneys, the Plaintiffs' counsel, filed

12 declarations under oath, similar to your declaration,

13 providing factual and evidentiary support for the

14 statements that they made to the court?  Are you aware of

15 that?

16       A.   Well, I'm aware of that now.  It's not something

17 I would have ever perused or looked at or been aware of

18 or -- specifically, but it seems like a reasonable

19 statement to me.

20       Q.   And -- and understanding that you haven't

21 obviously gone and researched what may be in those

22 declarations under oath or tried to go do some sleuthing

23 as to the facts underneath it, I just want to make sure

24 that as you sit here today, you don't -- you personally

25 don't have any basis to think that any of the Plaintiffs'

Jeffrey Palmer
March 20, 2019                                    126

1  lawyers who submitted a declaration to the court under

2  oath lied in those declarations; is that fair?

3       A.   I really -- I have no ability to speak to the

4  character of those documents or to the declarations or to

5  whether they were factual or not.  I have no knowledge

6  whether they were or were not factual.  I can only assume

7  that they were factual, as they were sworn to before a

8  supreme court -- or a federal court judge.

9       Q.   Okay.  So on Page 5 of -- of this document,

10 heading B, the voluminous fact and expert discovery taken

11 by the parties, do you have any basis to dispute the fact

12 that there was an extensive degree of fact discovery,

13 including depositions and expert discovery, that the

14 various parties, the respective parties, submitted various

15 expert reports?  Do you have any basis to dispute that

16 happened in this case?

17      A.   No, I have no basis to dispute that, but I have

18 not been given time to look at this document and read the

19 page that you're asking me questions about or anything

20 else.  So it seems almost superfluous that you put this in

21 front of me.

22      Q.   Okay.  If you look at Page 26, the first full

23 paragraph talks about the notice plan.  And if you look

24 down towards the middle of that paragraph, there's a

25 sentence right be -- right after it says to reach as many

Jeffrey Palmer
March 20, 2019                                          127

1  settlement class members as is reasonably possible, it

2  says, To do that, the notice plan also emphasizes

3  notifying plumbers, who, though not the class, often play

4  a role in the installation of covered product in premises

5  of settlement class members and could notify their

6  customers of the settlement.

7            You don't have, as you've answered with respect

8  to other parts of this -- this document, you don't have

9  any basis to dispute the accuracy of that statement, do

10 you?

11     A.   I can't dispute that the plan notices emphasizes

12 notif -- emphasizes of notifying plumbers.  I have no idea

13 whether that's been done or not, but the statement, the

14 way it's read, is not something that bears disagreement.

15     Q.   Do you know whether an expert notice

16 administration submitted a declaration to the judge about

17 notice that was submitted to and then approved by the

18 judge in this case?

19     A.   Not being an attorney and not having access to

20 the records of federal court, I would have no knowledge of

21 whether such notices were filed or not filed.

22     Q.   When you say notices, you mean whether such a

23 declaration --

24     A.   Or a declaration, excuse me, a declaration.

25     Q.   -- that --

Jeffrey Palmer
March 20, 2019                                              128

1       A.    That's correct.

2       Q.    Okay.

3       A.    Let -- let's suffice it to say for all further

4  questions that I have no information on what has or has

5  not been filed in this federal court with the court.  I

6  have not gone through their files.  I do not have any

7  knowledge or understanding of what has or has not been

8  filed with the federal court.

9       Q.    With respect to the documents that were filed

10 with the federal court and were posted on the settlement

11 website in this case, can you tell me whether or not you

12 read each and every one of those court documents that was

13 posted on that website?

14      A.    No, I'm sure I did not read each and every

15 single document that was posted on the website in relation

16 to this case.

17      Q.    Mr. Palmer, those are all the questions I have

18 right now.  So I thank you for coming, and I thank you for

19 being cooperative in this deposition.  I don't know

20 whether NIBCO's counsel or your counsel have any

21 questions, but now it's their turn to ask questions if

22 they have any?

23      A.    All right.  Thank you for your courtesy.

24            MR. KENNEALLY:  There are no questions from

25 NIBCO's counsel.  Thank you, Mr. Palmer.

Jeffrey Palmer
March 20, 2019                                                  129

1              THE WITNESS:  Thank you, sir.

2              MS. GOLD:  Hi, this is Janet Gold.  I have no

3    questions.

4              THE WITNESS:  All right.  Thank you, Janet.

5              MR. SCHWARTZ:  Okay.  So -- so we are -- we are

6    done, so, again, thank you so much for coming, and I

7    appreciate it, and so the deposition is over.

8              (Deposition concluded at 12:51 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jeffrey Palmer
March 20, 2019                                    130

1                  CORRECTIONS AND SIGNATURE

2  PAGE           LINE           CHANGE          REASON

3  _____

4  _____

5  _____

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

Jeffrey Palmer
March 20, 2019                                                131

```
 1      I, MR. JEFFREY P. PALMER, have read the foregoing

 2 deposition and hereby affix my signature that same is true

 3 and correct, except as noted above.

 4                    _____
                      MR. JEFFREY P. PALMER
 5

 6 THE STATE OF   _____)

 7 COUNTY OF   _____)

 8      Before me, _____, on this day

 9 personally appeared MR. JEFFREY P. PALMER, known to me (or

10 proved to me under oath or through _____)

11 (description of identity card or other document) to be the

12 person whose name is subscribed to the foregoing

13 instrument and acknowledged to me that he executed the

14 same for the purposes and consideration therein expressed.

15      Given under my hand and seal of office this _____

16 day of _____, 2019.

17

18               _____
                 Notary Public in and for the State Of Texas

19 My commission expires: _____

20

21

22

23

24

25
```

Jeffrey Palmer
March 20, 2019                                    132

```
 1            CERTIFICATION PURSUANT TO FEDERAL RULES

 2         IN THE UNITED STATES DISTRICT COURT
                   DISTRICT OF NEW JERSEY
 3
   KIMBERLY COLE, ALAN COLE, )
 4 JAMES MONICA, LINDA BOYD, )
   MICHAEL MCMAHON, RAY      ) CIVIL ACTION
 5 SMINKEY, JAMES MEDDERS,   ) NO. 13-7871-FLW-TJB
   JUDY MEDDERS, ROBERT      )
 6 PEPERNO, SARAH PEPERNO,   )
   KELLY MCCOY, LESA WATTS,  )
 7 CHAD MEADOW, JOHN PLISKI, )
   SUSAN PLISKO, KENNETH     )
 8 MCLAUGHLIN, RYAN KENNY,   )
   ALEXANDER DAVIS, AND      )
 9 ANDREA DAVIS, on behalf   )
   of themselves and all     )
10 others similarly situated,)
                             )
11      Plaintiffs,          )
                             )
12 VS.                       )
                             )
13 NIBCO, INC.,              )
                             )
14      Defendant            )

15

16            REPORTER'S CERTIFICATION

17      DEPOSITION OF MR. JEFFREY P. PALMER

18                 MARCH 20, 2019

19      I, Carol A. Curtis, Certified Shorthand Reporter in

20 and for the State of Texas, do hereby certify to the

21 following:

22      That the witness, MR. JEFFREY P. PALMER, was sworn by

23 the deposition officer and that the transcript of the oral

24 deposition is a true record of the testimony given by the

25 witness;
```

Jeffrey Palmer
March 20, 2019                                          133

1       I further certify that pursuant to Federal Rules of

2  Civil Procedure, Rule 30(e)(1)(A) and (B) as well as Rule

3  30(e)(2) that the signature of the deponent:

4          _X_ was requested by the deponent and/or a party

5  before completion of the deposition and is to be returned

6  within 30 days from date of receipt of the transcript.  If

7  returned, the attached Changes and Signature page contains

8  any changes and the reasons therefor;

9          ___ was not requested by the deponent and/or a

10 party before the completion of the deposition.

11         I further certify that I am neither attorney nor

12 counsel for nor related to nor employed by any of the

13 parties to the action in which this deposition is taken;

14 Further, I am not a relative nor an employee of any

15 attorney of record in this cause, nor am I financially or

16 otherwise interested in the outcome of the action.

17     Subscribed and sworn to on this the 22nd day of

18 March, 2019.

19

20

21         *Carol A. Curtis*

22         Carol A. Curtis, Texas CSR 3202
           Expiration 12/31/19
           U.S. Legal Support
23         5910 N. Central Expressway, Suite 100
           Dallas, Texas  75206
24         Telephone:  (214) 741-6001
           Registration No. 343

25

## Exhibits

EX 0001 Jeffrey P.
  Palmer 032019   5:3
  12:7,17,18,20
EX 0002 Jeffrey P.
  Palmer 032019   5:5
  25:9,20,21 26:3
  31:21 43:22 92:9
  120:4,7
EX 0003 Jeffrey P.
  Palmer 032019   5:7
  106:19 107:5,6 109:6
EX 0004 Jeffrey P.
  Palmer 032019   5:8
  113:13,18,19,21
  116:13 117:10
EX 0005 Jeffrey P.
  Palmer 032019   5:10
  123:12,16,17,18

### $

$1,000   18:24 19:4
$1,500   23:20 101:23
$1,600   101:23
$1,700   102:1
$15   71:13
$2,000   22:14
$2,300   101:18
$43   99:17
$500   102:3,7,11
$600   101:19

### 0

08034   3:21

### 1

1   5:3 12:7,17,18,20
  31:24 34:25 35:2,5,7
  43:22,23,25 44:5,13,
  15,18 83:22 84:3
  124:4
1,000   23:20
10   83:4,5 113:3
100   113:2

107   5:7
11   18:7 83:9
113   5:8
11:20   85:20
11:34   85:20
12   5:3 83:11,13,16
  85:22
12-page   102:22
123   5:10
128   12:21
12:22   117:5
12:28   117:5
12:51   2:5 129:8
13   93:15 117:10,12,18
  118:15
131   4:6
132   4:7
15   88:25 101:23 102:1
16   102:1 119:11
173-H   123:19
18   120:1
184   113:20
184-1   26:4
19041   3:5

### 2

2   13:11 25:9,20,21
  26:3 31:21 43:22,23,
  25 92:9 120:4,7
2,000   51:8
2,300   101:18
20   2:4
200   2:7 3:20
2000   3:16
20004   3:11
2012   88:2 91:10
2013   96:1
2014   21:13 88:2,3,5
  90:1,4 91:10
2015   91:10
2019   2:4
202 739-3000   3:11
202 739-3001   3:12
21   86:20,25
22   87:18
23   89:25
25   5:5 35:6 86:20,25
  87:18 89:25 92:2

96:16 97:22 98:17
99:6,8,10,15,20,22
100:9,12,16 101:1,5,
8,13,18 103:22
104:1,12,25
26   126:22

### 3

3   4:2 5:7 32:25 33:1,
  6 47:7 106:19 107:5,
  6 109:6
30   68:5 103:10,16,19
  104:2,12
32   113:25
35   99:18
361 883-0210   3:17
361 883-3563   3:17

### 4

4   15:13 50:15 113:13,
  18,19,21 116:13
  117:10
420   2:7
43   103:10,11,15,18,25
  104:7,9 107:9,13
  110:25 111:2,7,13
  112:10,21 113:3
45   99:18

### 5

5   5:10 26:7 34:25
  35:2 53:16 60:22
  123:12,16,17,18
  125:7 126:9
50   99:18 113:2
500   102:1

### 6

6   4:3,5 66:14 70:12
  77:25 78:22
610 542-8500   3:6
610 649-3633   3:6
615   3:16

Jeffrey Palmer
March 20, 2019

2

**7**

**7**  73:23 77:2 78:24
**70**  96:18,19 97:23
   98:25 100:17,25
   101:22 111:14 112:11
**75**  98:17
**78701**  3:16

**8**

**8**  81:1
**80**  113:2
**856 330-6200**  3:21
**856 330-6207**  3:22

**9**

**9**  26:3 35:6 81:6,7,19
**9:06**  2:4

**A**

**a.m.**  2:4 85:20
**abilities**  67:14
**ability**  37:8 58:1
   64:15 94:16 104:21
   120:2 126:3
**above-styled**  2:3
**absolutely**  13:10
   28:17
**acceptable**  87:8
**access**  127:19
**account**  74:16
**accountant**  65:6
**accuracy**  127:9
**accurate**  7:24 26:13
   32:8 35:2,4 116:18
   118:11 124:19
**accused**  115:25
**achieve**  30:4
**achieved**  17:3
**achieves**  29:22
**acknowledge**  46:16,24
**acknowledgment**  89:22
**acquaintance**  62:14
**action**  5:7 8:16 10:11
   16:5,17,21 19:18,20

20:21 23:5,11 24:17,
23 36:13 41:18 42:5,
16 56:16 57:5,11
58:15 59:8,19,25
60:2,10 61:8,16
62:18 63:3,8 64:13,
22 65:13 95:21 103:6
105:19,25 106:5
111:8 125:11
**actions**  9:17 10:24
   40:13 56:19 62:21
   63:14 64:9 104:14,19
**actual**  64:11 105:14
   109:10,19,20 114:1
   118:17
**add**  24:2 49:13 65:18
**added**  85:25
**addition**  29:7,14
**additional**  16:8
**address**  35:11 48:4
   83:25
**addressed**  93:20
**addresses**  48:12
**adjuster**  40:23 42:20,
25 43:15 51:2 56:3
60:16 79:13,16 80:10
**adjustment**  55:5
**administering**  54:7
   57:5,12 59:8,19 60:7
**administrating**  59:22
**administration**  58:16
   60:4,6,17 61:9,11,14
   127:16
**administrator**  32:5
35:8 48:11,20 49:4
50:10 54:14 58:23
59:1,3,6,10,13,17,18
61:15 72:11 73:7
83:1,18,24 84:10,14
86:6,7,14 87:2
89:15,22 92:5 100:11
**administrators**  72:23
**Adobe**  32:14 77:14
**advocate**  73:17,18
**age**  120:1
**AGRAVWAL**  3:20
**agree**  6:2 49:2 51:23
52:1 54:6 60:12,15
66:9 74:7 94:9
121:12

**agreement**  21:2 27:6,
8,17 44:8 45:12
46:7,11,12 119:5
**agreements**  11:15
**ahead**  16:15 19:7 31:1
   33:22 76:1
**akin**  75:10
**allowed**  96:17,19
**allowing**  34:19
**amount**  15:8,20 16:2
19:4 21:16 22:7
24:13 97:21 100:13
111:9
**amounts**  100:1 102:10
   119:1
**amusing**  33:12
**analysis**  117:17
**and/or**  67:1 70:6
**annual**  18:24
**ans**  16:13
**answering**  78:14
   106:15
**answers**  8:10 55:21
   112:25
**anymore**  82:22,23
**apartment**  19:6,8
**apparent**  115:3
**apparently**  51:1 81:15
**appeal**  11:24 12:1
   16:6,8 96:24
**appealing**  34:22
**appeals**  16:21 72:8,9,
14 76:20 98:4 118:9
**appearance**  27:13
**Appearances**  4:2
**appeared**  23:8
**appears**  13:1 47:5
   83:14 100:20 113:23
**applaud**  79:24
**applicable**  32:19
**applied**  83:7
**applies**  30:8
**apply**  42:10
**approval**  5:11 74:15
   123:14
**approve**  42:19 59:3
**approved**  29:15,17
43:5 75:1,12 76:20
82:21 96:11 98:18
99:9 100:8,14,15

Jeffrey Palmer
March 20, 2019

3

107:12 127:17
approving  37:18 89:18
approximately  103:9
area  8:4 51:3 119:9
argue  82:17
arguments  15:18
arrangement  37:8,15,
  17,18
asks  50:23 61:20
  66:18
assaulting  115:5
assertion  82:16
assess  71:18 104:5
assessed  99:17
assessing  57:25
assessment  38:2 56:15
  61:24 62:1,5 88:23
  91:15 99:25 100:3
  104:5 118:11
assist  57:3
assistance  18:22
associate  76:7
assume  6:6 29:17 38:5
  59:4,14 60:12 61:7,
  21,22 66:1,22 87:25
  125:8 126:6
assumed  22:3
assumption  66:23 84:5
  97:12
assumptions  67:13
attach  86:16,17 88:25
  106:11
attached  2:9 34:5
  35:6 87:13
attachment  85:25
attachments  32:4,21
attempt  31:4
attended  17:18
attention  8:7
attorn  76:24
attorney  8:5 15:1
  19:17 20:16 29:18
  37:12 39:16 53:21
  65:22,24,25 76:24
  77:1 78:8,12 80:25
  101:14 104:17 106:22
  114:11 127:19
attorney/client  8:4,
  11

attorneys  8:3 31:3,8
  38:17 39:18,21 40:18
  49:25 58:8 65:19,20,
  23 66:9 67:13 69:15
  105:9 109:8 110:2
  112:8 114:8 125:11
attorneys'  11:16
  15:14,20,22 16:2
  17:2 29:21 93:9,14
  95:2 96:12 103:1,9,
  20 105:9,12 109:4
  113:6 117:13,19
  118:16
authority  116:1
authorize  115:12
Avenue  3:4,10
average  45:16,19,21
  46:19,20,22 70:19
  74:3,5 76:25 78:5,11
  104:20
avoid  51:25 54:3
aware  8:17 9:10 16:4,
  9,12,14,16 17:7,8
  19:22 37:17 39:8
  43:19 48:15,22,23,24
  57:8,14 58:18 62:10
  63:1,5 64:10,11,12,
  16,20 89:4 96:3,5
  97:5,9,11,15 111:21
  112:7,9,12,14,15,17,
  22,23 115:13 125:14,
  16,17

## B

back  21:12 23:17,23
  32:17 39:10 40:11,19
  41:8 43:21 52:19
  54:14 68:6 81:17
  85:21 87:3 88:1
  89:15,21 90:1 91:9,
  11 109:13,15 117:6
backwards  74:15
bad  49:6,9 82:9
bailiwick  60:10
balance  46:18,20,24
  47:1,3 54:2
Bandas  20:16 21:3
  26:25 28:5,11,12,15
  29:20 30:4 35:15,23
  36:4,7,18 37:11,21,
  23,25 38:3 39:23

40:12,17 57:8,10,17
  58:1,14 61:8,12
  62:6,7,11,18,20
  63:13,16 64:8,13,21,
  25 65:10,13,17 75:21
  104:16 115:23,25
  123:9
Bandas'  63:7 64:14
  73:2 76:6
Bar  9:12
barely  102:3
Baseball  64:21
based  29:1 42:24
  55:21 57:17 58:10,12
  60:20 61:25 62:1,15
  65:2,18 66:2 73:15
basic  35:25
basically  53:6 88:20
  90:10 112:22
basis  50:8,12 59:16,
  21 117:17 124:10,12,
  18 125:25 126:11,15,
  17 127:9
baskets  18:20
bathroom  22:13 85:8
bearing  111:23
bears  127:14
beauty  34:18
began  52:21
behalf  12:23,24 13:9
  92:11
behavior  38:25
belief  120:18
believed  112:19
beneficial  38:6 45:22
  94:25
benefit  16:23 17:3
  29:22,25 30:4,18
  31:5,13 73:18 82:5,
  15
benefiting  94:20
benefits  16:9
big  93:24 99:11
bill  69:17,21
billing  96:18
billions  61:16,18
bills  69:14
birth  119:21 120:8,
  14,19 121:5,13,15,24
  122:24 123:7

**bit**  7:17 17:11 22:16
  25:8 34:16 36:13
  49:10 62:24 66:18
  75:13 104:2 117:22
**bitter**  98:10
**blank**  32:18
**Bockius**  3:10 97:15
**bold**  67:9
**bolded**  68:11,18 78:2,
  23,24
**bond**  12:1
**bothered**  75:19,22
**bottom**  44:5,15,18
  70:23 87:11 119:13
**box**  9:7,8 88:8 90:23
**boxes**  47:9 69:12 91:1
**brand**  33:23
**branded**  33:16
**brass**  33:7
**breaches**  65:21
**break**  55:20 85:8,11,
  17 98:2 116:25 117:1
**briefly**  36:2
**bring**  24:24
**brittle**  34:16
**broad**  9:3
**Broadway**  3:16
**broke**  53:7
**broken**  70:18
**brother**  8:18,19 9:2,
  5,11 10:15 11:15
  12:24 13:2 14:23
  15:25 16:4,10,20,24
  17:1 18:22 19:1,22
  20:10,20 21:6,8 23:5
  35:13 36:22,24 37:3
  57:19 62:8,10,16
  63:2 104:16 115:8,14
**brother's**  8:22 16:11
  63:1 115:16
**brought**  14:13 73:4
  106:7 122:11 123:4,
  9,10
**browse**  46:14
**browser**  45:11
**builder**  70:5 112:18
**building**  18:8 19:8
  23:18 24:1 87:19
**buildings**  20:2

**built**  18:4
**bursting**  34:21
**business**  16:18 18:10
  62:11,12,17 87:6
  88:5 90:5,8,9,12,19
  91:2 120:3

---

## C

**C-L-O-R-E**  20:18
**cabinet**  18:2 91:17
**calendar**  19:4
**California**  9:12 34:7
**call**  35:22 43:2 62:8
  74:14 84:21 116:22
**called**  105:22 110:5
**calling**  23:4
**calls**  109:13
**cap**  118:18
**capitalized**  44:7 45:7
  76:8
**Caproni**  64:20
**care**  33:15,17
**carefully**  26:16 77:18
  78:8 116:14 122:14
**Carol**  2:5 7:13
**carrier**  84:6
**case**  6:22 9:22,25
  10:10,13,16,17,22,23
  11:1,2,6,14,18,22,24
  12:4,22 13:3,12,19,
  24 15:3 19:16,21,25
  20:5,11 23:9 25:9
  26:4 28:2,16,20 30:1
  31:12,15 37:5,13
  38:6 39:6 51:25
  54:16 57:10 58:5,13,
  19,22,24 59:19 60:25
  61:15 64:21 66:22
  74:25 80:24 93:12
  95:4,22,25 96:2,7
  97:9,10,23,25 98:3,9
  99:23 100:23 101:11
  102:13 116:9,11
  126:16 127:18
  128:11,16
**cases**  9:16 16:17 26:1
  31:4,9 43:1 55:3
  56:16 57:14 59:23
  72:21 96:25 98:13
  101:9 103:6,7,22

  104:19 115:10 116:9
**cash**  15:7
**catastrophe**  42:20
**caught**  81:23
**caused**  22:4 42:3
  51:12
**Center**  87:19
**Centre**  3:5
**cer**  26:19
**certainty**  98:16
  107:16
**Certificate**  4:7
**Cery**  5:3
**challenge**  114:24
**chance**  71:20
**chances**  98:20
**change**  51:8 79:8,9
**changing**  75:13
**character**  126:4
**chasing**  101:14
**cheat**  74:10
**check**  41:1 68:7 69:10
**checked**  69:12,24
  122:14
**checklist**  68:21,24
  69:1,3,5,9
**checks**  15:5,7,9
**Cherry**  3:21
**CHIMICLES**  3:4
**choice**  59:3 116:6,8
**Chris**  57:8,10
**Christi**  3:16 27:15
**circumstance**  115:22
**Civil**  2:8 6:3,13
**claim**  21:1 22:6
  23:14,22 24:1,4
  28:22,24,25 29:1,2,
  6,14 32:3,12,13,19
  33:4 35:5,8 36:2,10,
  12,14 40:23 41:4
  43:21,22 44:13
  45:23,24 46:17 47:7
  49:5,20 50:15,23
  51:7 52:7 53:4,5,9,
  14,20 54:13,15 56:3,
  11 60:22 66:14 67:17
  71:10,14,21 75:20
  77:24 82:20,25 83:1,
  22 84:19 85:23,25
  86:5,13 87:4,21 88:5

Jeffrey Palmer
March 20, 2019

5

89:18,23 90:6 92:10,
11 93:2 94:25 96:19
99:6 100:9,15
101:10,11,13 109:19
112:11 118:3,9
119:11,13 120:2,5,6,
7,8,14
**claimant** 48:20 52:3
79:13 82:16 100:14
**claimants** 43:3 54:4
79:23 93:4,18
**claiming** 110:25
**claims** 40:23 42:19,
21,25 43:6,9,14
48:19,20 55:5,6 56:7
58:17 60:6,16 61:9,
11,14 71:18,23
72:13,16,23 73:6,7
74:8,9,14,16,24
75:11 79:8 84:10,14
86:6,7,13 87:1 89:22
92:8 93:16 94:16
95:13 98:18 99:9,16
100:1,2,7,11 101:7,
25 102:10 107:11,12
108:13 111:1 112:20
117:13 118:1,12,14,
18 119:1
**clamp** 69:2 77:17
**clamps** 66:20,21 67:1,
7,10,23,24 68:12,14,
15,22 70:7 82:22
**clarify** 67:12
**clarity** 106:19
**class** 5:7,9 8:16 9:17
10:11,24 13:15 15:5,
6 16:5,7,9,17,21,23
19:18,20 20:21 23:5,
10 24:17,23 29:1,22,
25 30:5,15 31:12
32:6 36:13 40:13
41:17 42:5,10,15
45:23 48:17 50:9,11
51:1 56:16,19 57:5,
11 58:15 59:8,24,25
60:2,10,18 61:8,16
62:18,21 63:3,7,13
64:9,13,22 65:13
72:15,16,22 92:22
93:8 95:21 96:1
98:5,15 99:7 101:25
102:9,10,12,16,17
103:1,6 104:13,19

105:9,19,25 106:5
109:13 111:7,9
113:4,9 117:13,20
118:20 119:14 125:11
127:1,3,5
**classes** 17:3
**Classic** 89:25
**clear** 52:6,23 53:3
73:11 106:3 112:2
**client** 10:16
**clients** 115:18,24
116:1
**Clore** 20:14,16 32:15
39:24 58:4,10 75:23,
25 76:7 84:13
109:14,23 122:11
123:4
**Clore's** 62:14
**close** 54:23
**closely** 105:3
**closer** 103:21
**cognizant** 54:8,9
**collect** 51:11 94:25
96:17,19
**collected** 61:19
**collecting** 95:1
**collectively** 71:12
**college** 17:17,19,20
**color** 91:18 92:1
122:20
**Colorado** 9:5 17:16
18:13
**comment** 53:2
**comments** 109:23
**common** 21:25 30:24
31:2,8 48:25 55:23
67:14 69:21 78:13
79:20
**commonly** 79:20
**communicate** 9:5
**communicating** 7:22
**communication** 9:8
10:18 84:6,13,24
**communications** 26:24
**companies** 41:7 43:4
90:1
**company** 51:6,9,10,16,
18,19,20 53:5,10
54:15 56:14 68:15
79:21 91:19 93:13
102:21 112:18 119:18

**compared** 22:22
**compensated** 95:8,9
**compensation** 12:3
16:8 24:9,12,16,25
42:4 94:13
**competent** 58:7
**complain** 52:18
**complained** 50:2
**complaining** 52:17
101:6
**complaint** 48:6 75:2
79:2,3 98:21
**complaints** 73:23
91:13
**complete** 32:12 45:24
77:24
**completed** 32:3
**completely** 84:12
**complex** 55:6 56:7
59:19 100:23
**complicated** 97:23
**comprehensible** 75:15
**compromises** 97:1
**computer** 109:17 114:7
**con** 15:18
**concept** 51:5,14,21,22
52:9 54:6
**concern** 17:1,6
**concerns** 112:21
**concluded** 129:8
**conclusion** 21:18,21,
22 24:8 55:15
**confirm** 113:25 124:12
**confuse** 81:22
**confused** 67:16 76:3,7
84:8
**confusing** 50:20 74:1
75:15 79:5 111:20
**confusion** 26:2 78:10,
13
**connection** 10:10
11:18 29:22 41:6,13
63:7 64:8,22 65:13
108:9
**connotation** 52:12
**considerably** 17:25
**consideration** 23:10
105:1
**Construction** 89:25

Jeffrey Palmer
March 20, 2019                                                    6

consult  69:8 80:24
  84:14
consultation  60:18
consulted  15:24 19:17
  32:14 75:20 80:25
consumer  45:16,19,21
  51:15 73:16,18 76:25
  78:11
consuming  77:11
contact  20:14 36:4
  54:14 83:17 110:2,7
  115:18
contacted  57:21
contacts  91:16
contested  124:7,11
context  66:13
contingent  28:7 37:18
  103:6
continue  24:2 85:6
  108:17
contracting  18:10
contractor  18:17 65:6
  70:5 87:6 90:12
conversant  18:15
conversation  14:7
  20:1,11,13 21:7
  58:10 76:9 122:11
conversations  65:16
converted  114:7
convinced  107:23
cooperative  128:19
copper  34:11,22,23
copy  12:21 87:23 88:1
  106:9,12 113:15,16
core  20:5
corner  47:10
corporate  79:15
Corpus  3:16 27:14
correct  8:20 17:9,10
  20:19 26:9,14,15
  31:7 32:1 33:5
  35:15,16 36:19,20,21
  44:14 48:9 62:9 70:4
  71:2 74:11,12 86:1,
  3,22 89:13 90:2,14
  92:7 94:17 101:21
  112:14 128:1
correctly  67:15 70:1
  118:7
correlation  93:7
  102:25 103:3

corroded  20:9
corrosion  21:17,19
cost  22:10,11,20
  24:3,5 71:12
costs  23:1
counsel  13:20 16:7
  50:9 96:1 97:14
  105:10 114:5 116:6,8
  125:11 128:20,25
counsels'  72:15
country  63:3 64:5
  69:20
couple  9:9 18:4 19:2
  22:3 23:9 103:24
  109:11 110:20
coupon  102:18
court  7:12,23 8:8
  12:6 25:10 27:13
  29:10 35:7 39:7,9,12
  49:4 57:13 59:2
  63:12 73:5 75:8,12
  76:16 86:19 103:19
  105:15 106:18 107:1
  113:14,16,21 115:17
  124:16,24 125:14
  126:1,8 127:20
  128:5,8,10,12
court's  123:19
courtesy  128:23
courts  63:3,6 64:5
  115:10
covered  56:11 119:21,
  24 127:4
create  30:18 31:4
created  90:18
creating  85:2
crimp  34:6
criticism  63:16,18
  67:7,11 69:22
criticisms  63:11
  64:7,10 70:12 79:14
  80:1,3 83:13
criticized  63:2,7
CSR  2:5
cumbersome  32:16 46:4
  49:10 77:5 88:25
  118:2
curious  54:12 115:7
current  8:23 9:2
  22:20 24:18

Curtis  2:5
customer  41:1
customers  91:9,11,14
  127:6
cy  13:13 14:21 15:2,
  3,7

_____

D

damage  22:12 24:6
  34:17 42:3 51:6,8,
  12,17 94:21 101:17
  121:11
damages  20:4 22:15
  24:9 97:23 99:6
  111:14
Darrell  8:19,24,25
  9:3,10 10:14,15
  11:16 12:24 13:2
  14:24 16:20 18:22
  19:22 23:5 35:14
  36:23,24 37:4 57:19
  62:8,10,17 63:2
  115:8,14
data  118:10,23,25
  119:2,7
date  73:25 74:2,22
  75:9 76:8,13,14,15,
  17,19 84:8 89:14
  119:21 120:8,14,19
  121:5,13,15,24
  122:24 123:7
day  9:7 59:11,13
  89:18 110:5
days  40:6 109:11
DC  3:11
deal  43:5,14 59:7
  60:1 63:16,17 67:13
  71:8 74:13 80:4
  91:13 102:14 109:12
dealing  84:18
dealings  62:13 65:19
dealt  16:12,14,16
  79:12
decades  18:1
decide  8:9 58:9
  111:24
decided  65:10
deciding  109:1
decision  49:3 55:14
  57:16 113:6

decisions  66:2
declaration  5:6 25:8
  26:6,12,16 31:21
  32:3 34:25 35:2,3
  92:10 109:20 120:6
  125:12 126:1 127:16,
  23,24
declarations  125:12,
  22 126:2,4
declaring  26:8
deductible  22:7
  23:12,14,23
deductibles  23:17
deep  42:23
defective  21:24
defendant  3:8 9:21
  60:11
defendants  60:3,19
  72:24
defense  100:24
define  18:23 56:8
defined  45:13,22 46:7
  69:16 74:2 75:18
  76:8
definite  72:2
definition  45:7,12
definitions  44:6
  45:23 46:11
degree  17:20 28:7
  107:15 126:12
delay  99:13
delivered  31:13
denials  72:23
denied  16:6 72:17
Denver  18:13
depend  28:3 46:1
  102:12 115:22
depending  28:20 98:17
deposed  7:4
deposition  2:1 6:3,
  13,24 7:11,12 8:3
  38:9,16,19,25 39:4,
  18 54:17 128:19
  129:7,8
depositions  126:13
describe  9:1 34:3
description  5:2 34:10
  36:1 38:1,19 50:16
  67:1 68:18 78:1,23
  88:10,11

descriptive  75:1
designed  10:2 82:15
detail  15:10 33:9
  46:3
detailed  50:2
detailing  22:15
details  9:14,25 38:23
deter  118:5
determinations  72:10
determine  42:18,21
  43:8 65:12 67:22
  69:1 71:20 119:24
  123:8
determined  66:19 67:4
determining  113:8
detour  40:10
dictate  37:16
Diego  17:19 18:9
differ  34:10 69:19
difference  89:4
difficult  17:6 32:16
  39:10 40:19 41:9
  43:4,11,14 46:4
  47:15 50:20 53:16,17
  55:15 66:15 77:10,13
  81:2,6 109:10
difficulties  83:5,6,
  8,12
direct  4:5 6:19 62:12
  124:21
directly  62:21
dis  98:21
disagree  49:2 51:23
  52:1
disagreeing  73:13
disagreement  127:14
discloses  8:10
discovery  126:10,12,
  13
discretion  113:9
discuss  31:16 36:25
discussed  14:12,13,25
  20:12 92:21 122:12
discussing  122:23
discussion  11:20
  110:21
discussions  38:15
dismissed  11:25 12:2
dismissing  16:8,21

disparity  11:11
disposed  81:19 82:24
dispute  50:8,12 59:16
  124:10,12,18 126:11,
  15,17 127:9,11
disputed  50:13
disregarding  120:11
distribute  100:14
district  124:16
divulge  26:23
docket  123:19
document  12:7,21 13:8
  26:4,7,21 44:11,17
  68:20 69:16 75:17
  81:18 86:16 88:6,7
  90:3 91:25 92:4,9
  105:17,24 106:3,17,
  22 113:20,25 114:8,
  11 116:18 117:11
  123:22,24 124:1,3,24
  125:6 126:9,18 127:8
  128:15
documentation  87:4
  90:11 91:18 100:21
  107:18,20,22
documents  9:20 22:23,
  24 27:19 33:1,2
  38:18 39:3,5,7,11
  46:17 68:7,10 69:8,
  9,12,13,25 70:8,17
  74:5 75:17 76:16
  78:8 90:8,20,24
  91:1,22 104:19,22
  105:15 109:25 115:17
  123:20 126:4 128:9,
  12
dollar  100:1 102:18,
  20 103:10
dollars  31:15 61:16,
  18 102:17,18,21
  103:11,15 111:2,13
  112:10,21
DONALDSON-SMITH  3:4
door  91:17 92:1
double  52:1 54:3,9
doubt  89:2
downloaded  32:13 44:8
dozen  109:13
draft  121:6
drafting  26:21

Jeffrey Palmer
March 20, 2019

8

drafts  109:18
draw  21:18 33:25
  55:15
drill  121:19
drives  79:2,3
due  29:8 42:3
duly  2:3 6:18
duplicated  82:15
duplicative  82:4
dust  89:6

**E**

e-mail  32:5,20 47:25
  48:3,12 83:19,24
  84:10 86:5 92:4
  114:4
e-mailed  86:8
e-mailing  86:13
e-mails  109:14
earlier  17:25 81:11,
  18 93:1
easier  84:13 91:25
easiest  84:23
easily  74:23 122:12
easy  71:4,6
ECF  26:4 123:19
economic  11:15
economically  24:8,12
edit  26:19 109:18
  121:6
editing  77:20
edits  116:15
education  17:12
effect  9:13
effective  73:25 74:22
  75:9 76:8,13,17,19
  84:8
effectively  7:22
effort  24:23,24 95:13
  102:14
efforts  15:6 50:10
egregious  122:20
EISENBERG  3:20
electrical  18:6
eliminated  53:12
else's  102:5 111:17,
  21
emphasizes  127:2,11,
  12

enclose  70:15
Enclosures  70:24
end  89:18 94:20 98:10
  100:10
ended  22:13
engineer  72:5
engineering  71:17
enter  27:12 43:11
  47:20 49:5
entered  64:12 84:15
enters  93:5
entertainment  66:6
entire  22:13 30:1
  31:18 71:23 77:18
  94:25 108:24 113:7
  120:10
entitled  10:25 29:6
entity  110:15
entry  123:19
equally  76:2 125:5
Eric  3:15
error  61:6 120:24
establish  119:21
estewart@
husemanlawfirm.com
  3:18
estimate  67:21
estimation  99:25
ethical  65:1,8,14,20
  115:21
ethics  30:19 57:25
evaluate  56:6 60:20
  61:13 65:1,12 71:18,
  22 108:16
evaluating  47:3
  116:5,8
evaluation  60:24
  113:1
evaluations  55:6
evaluator  72:11
evaluators  73:7
events  115:19
eventually  92:16
  113:3
everyone's  54:14
evidence  22:20 43:12
  113:1
evidentiary  125:13
evolution  34:13 79:11

evolve  40:21
exact  80:5
Examination  4:5 6:19
exceed  117:13
excess  46:23
excessive  17:2
excessively  73:8
exchange  16:7,22
excoriated  64:21
excuse  25:12 116:24
  127:24
executive  91:6
exhaust  111:2
exhausted  76:20
  107:13,14 111:7,15
  112:12,22
exhibit  12:7,17,18,20
  25:9,20,21 26:3
  31:21 43:22 92:9
  106:19 107:5,6 109:6
  113:13,18,19,21
  116:13 117:10 120:4,
  7 123:12,16,17,18
exhibits  25:25
existing  91:17
expect  24:16 28:22
  29:25 65:15 78:12
  113:5 119:6
expectation  24:18
  28:24 29:6,20 59:12
  65:7 71:13 73:9,10
expected  100:1,2
  105:6
expecting  28:19
experience  26:1 42:25
  43:13 50:6 55:13,22,
  24 56:1,2 59:7
  60:16,20 73:21 79:19
  91:24 96:20
experienced  124:16
expert  55:9 56:4,9
  60:9 116:17,22
  126:10,13,15 127:15
expertise  38:6 47:3
  51:3,4 55:2,4 57:4
  60:1,5 119:10
explain  70:15 81:9,11
explained  13:14
explaining  81:12
express  17:6

extensive  126:12
extensively  34:7
  65:18 100:21
extent  84:7
extra  67:24
extracting  16:7
extraordinarily  44:3
extremely  58:6 122:19

**F**

face  30:20 40:22
  97:24 101:1
Facebook  64:2 66:3,6
facilitate  48:19
Facsimile  3:6,12,17,
  22
fact  29:8 33:24 36:25
  41:17 50:8 72:4
  94:15,19 97:20 98:24
  104:8 109:22 111:1
  126:10,11,12
factors  105:1,5
  108:23
facts  108:6,7 125:23
factual  116:22 117:17
  125:1,5,9,13 126:5,
  6,7
fail  30:23
failed  20:9 23:3
  24:22 48:7 71:12
failure  11:25 22:9
  28:8,20 42:3,5,10,13
  48:7 94:11
failures  24:10 41:20
  74:10 75:11 112:20
fair  7:23 14:24 22:17
  24:7 26:20 29:3,4
  30:12,13,16,21
  31:15,16,19 38:1,2
  41:15,16 42:1,6,7,8,
  15,24 45:9 46:25
  52:10 54:9,11,24
  55:1,11,12,19,22
  56:25 61:21 66:4,5,
  12 71:5,6 72:1 73:9,
  12,16,20,22 74:17,18
  76:12 81:24,25
  88:16,20,23 90:13,
  14,21,22 91:15 97:12
  99:2,25 104:4

116:11,19,20 118:20,
  21 125:10 126:2
fairly  43:16 44:2
  46:2 50:21 52:23
  56:9,12 70:16 81:4
  83:10
familiar  9:14 14:4
  15:1 16:23 29:19
  47:22 48:10 51:5,13,
  22 56:21 58:5
familiarity  48:10
  49:11
FAQS  105:18,21 106:2
Farm  40:25 42:17,19,
  25 43:2,9 54:25
  60:17 73:15,21 79:7,
  11,19 80:4,10,16,21
Farm's  43:14
faulty  22:2,3
favorable  30:10
federal  2:8 6:3,13
  29:10 63:6,12 64:5
  91:5 126:8 127:20
  128:5,8,10
feed  75:5
feel  10:4,6 14:3
  61:1,4,5 63:19
  113:10,12 117:24
  118:3,8,10,13
fees  11:16 15:14,20,
  22 16:2 17:2 29:21
  92:25 93:9,14 95:2
  96:12,17 101:14
  103:1,9,20 105:9,12
  113:6,8 117:13,19
  118:16
felt  60:25 114:6
  116:15
fighting  97:13
figure  55:9 67:25
  68:10,11,20 76:4,9
  111:10 120:13,21
  121:2,25 122:5
figured  23:21
figuring  60:6
file  22:6 23:14,22,25
  24:4 33:2 94:16
  101:10,11,25 102:4,
  10 109:1
filed  12:21,23 13:2,9
  15:13 17:4 25:2,9
  26:4 28:22,24 29:8,

23 39:7,8,9,12 42:16
  92:11 93:16 96:1
  105:10,13,15 108:20
  109:7,19,21 110:1,5,
  15,20,25 111:12
  112:9,18 113:14
  115:9,11,17 116:16
  120:17 124:24 125:11
  127:21 128:5,8,9
files  32:23 33:2
  57:13 128:6
filing  16:6 23:14
  91:7 95:14 113:10,21
fill  47:15 53:17
  66:17 75:23 77:11,13
  78:7 80:15,21 81:2,
  6,18 102:22 118:6
filled  32:13,18 35:10
  47:13 53:21 67:17
  77:14
filling  49:12 70:13
  73:24 76:24 77:1,19
  78:9,11 83:5,8
fills  79:21
final  32:20 76:21
  86:13 98:11
finalized  11:13
financial  18:22 31:5
find  45:15 65:20,21
  68:24 79:25 86:2
  89:9 92:19 93:3,6
  102:14 119:2,8 120:9
  122:15 123:6
fine  6:15 8:1 10:9
  85:14 107:3
finish  7:14,16 85:18
firm  3:15 20:17 21:3
  26:25 27:4,8,11,14,
  17,21 28:5,6,11,12,
  15 29:20 30:4 31:11
  35:15 36:5,7,18
  37:11,12,22,23,24,25
  38:3,4 40:12 57:8,
  10,17 58:1,2,14
  59:18 60:17 61:8,12
  62:7,11,18,20 63:13,
  16,18 64:25 65:10,17
  71:17 72:21 73:1,2
  75:21 92:24 93:4,13
  97:13,14 115:24,25
  123:9

firm's  62:6 63:22
  64:8 65:13
firms  31:11 63:18
  73:4 97:17
fist  94:7
fit  69:9
fitting  22:2 24:10
  33:16,17,19,25 69:2,
  11,13 70:16 71:15
  77:16,22 78:25
fittings  19:24 20:4,
  6,8 22:4,10,11 23:3,
  9 33:7,14 34:6,14,17
  37:1 41:3,9,12,18
  48:5 49:22 66:20,21
  67:1,5,10,23,24
  68:12,14,15,21 70:6
  71:11 81:10,17,19
  87:5,7,8,9,15 88:18
  89:2,5,6,11
fix  77:23
fixture  21:19
fixtures  21:8,9,14,23
flip  30:16
floor  117:14
flow  10:18
focused  64:4 71:3,7
folder  12:7,10,11,14
  25:11,13
folks  35:14,23
folksy  59:14
follow  63:19 67:15
food  9:7
footnote  44:6,15 45:4
forget  94:2
forgot  70:25 121:22
form  21:1 32:3,12,13,
  15 35:5,8 36:2,10
  43:21,22 44:13,20
  45:23,24 46:17 47:8
  49:5 50:15 60:23
  66:14 67:14,17,19
  70:1 71:7 74:8
  75:20,23 76:25 77:1,
  4,14,18,24 78:11
  79:7,8,10,15,22 80:2
  81:11 82:11,14,21
  83:22 85:23,25 86:5,
  16 87:1,3,9,21 88:6
  89:23 92:8,10,11
  102:22 109:5,20

118:3,7 119:11,13
  120:5,6,7,8,15
  121:15 122:13,14
  123:5
forms  46:14 49:12
  79:11,12,15,21 80:3,
  5,9,21,23 109:12
Fort  2:8
forward  74:16
forwarded  32:4,20
  114:8
fought  97:7,9
found  20:9 21:8 44:7
  50:19 88:17
fourth  32:2
fragments  10:5
frame  36:16
frankly  33:11 120:3
  123:10
free  9:7 10:4,6 14:3
  83:19,24
freeze  34:21
freezing  34:19
frequently  21:1 35:18
  105:21
freshly  94:3
friendly  79:23 118:4
front  14:3,9 46:2
  92:17 105:24 106:4
  126:21
frustrated  45:17
frustrates  46:23
full  6:24 33:6 78:20
  92:14,24 93:5,13
  126:22
fully  52:16 112:3
function  42:18
fund  15:9 24:25 51:24
  54:7 99:11,17 100:17
  107:9 111:15 112:11
funds  42:14 92:23
  101:12
funny  33:12
future  74:3,9,25 93:2
  94:12 108:1

**G**

gain  29:25

gained  56:2
gamut  18:5
gap  104:12
Garber  64:20
gather  32:22
gathered  33:1 48:11
gave  20:22 32:19
general  18:9 34:9
  43:2 68:25 73:22
  101:24 118:21
generally  10:11 40:21
  76:18 97:5 105:21
generate  24:24
generated  58:15 61:16
  86:19
gift  18:19
gifting  15:7
gifts  18:24
give  7:15 10:1 12:8
  13:25 15:18 20:20
  33:9 38:18 53:9,19
  66:8 67:21 69:22
  81:9 86:2 104:24
  107:2 108:12 118:11
gleaned  35:22
God  79:16
Gold  3:19,20 6:7,9,
  11,15 26:25 27:2,3
  40:4,6 129:2
Gold's  27:8,21 28:6
  37:12,24
good  6:21 21:21 22:22
  39:15 45:25 49:6,8
  59:24 60:3 69:2,5
  71:20 82:9 91:7
  97:24 99:12 100:3
  109:12 116:5,8
government  91:6
great  11:11 59:7 60:1
  63:16,17 67:13
  85:10,15 117:3 119:9
greater  31:17
greatest  116:10
greatly  104:9
Grossmont  17:19
ground  7:9 18:6
guarantee  37:10,14
guess  10:1 45:20
  81:17 82:2
guide  69:3

Jeffrey Palmer
March 20, 2019

11

| | | |
|---|---|---|
| guilty  97:7 | hired  37:25 57:22 | improper  54:3 72:22 |

**H**

half  17:14 75:4
hand  62:4
handle  92:1
handled  116:9
handling  18:5 116:9, 11
hands  97:6
handwritten  106:21
happen  106:9 120:25 121:1
happened  25:1 42:13 58:24 75:11 90:18 121:9 122:1,5 126:16
happy  42:12 98:15
hard  66:17 97:9
Hardin  18:12,14
harm  121:16
Haverford  3:5
head  93:25 104:3
heading  15:14 78:2, 23,25 126:10
hear  6:9 17:23 19:20 31:20 43:12
heard  9:13 16:19,24 43:7 76:5 89:14,21 102:16,19 104:15 110:20
hearing  17:9 103:24, 25
hearsay  43:11
held  63:16
helped  19:2
helpful  38:13 68:24 82:19,20,24,25 83:2
helping  38:9 72:16
hereto  2:9
Hey  84:11 91:11,16
high  17:13
higher  24:4
highly  59:17 93:6 97:17
Highway  3:20
Hill  3:21
hire  57:16,17,18 58:1 60:3,9 65:5,6,10

hired  37:25 57:22 58:22 59:1,9,17 60:13 64:25 71:17
hold  63:17 65:2
holding  44:12,18
holds  38:5
home  94:20
homeless  59:10,13
homeowner's  53:13 60:22 119:18
homeowners  52:4
homes  18:5
honest  84:12
honestly  10:19
hope  73:3,4 114:25
hotly  124:7,11
hour  118:2
hourly  28:6
hours  38:24 39:19 41:2 85:6
house  18:7 20:7 34:23
humble  103:7 118:12
hundred  14:15
Huseman  3:15 27:14

**I**

ID  47:20 48:18,21 49:5,15
idea  25:4 45:25 46:6 49:6,8 59:24 60:3 69:3,5 71:16 72:20, 21,25 74:6 75:7 82:9,10 93:19 99:24 127:12
identified  13:22 15:21 36:8,17,22 37:21 48:16
identify  15:6 50:10 113:22
identifying  14:24
Illinois  64:13,15
immediately  92:25
impact  41:20
impacts  8:10
implies  52:11
important  7:12,14,15 25:24 66:2 110:22 122:4,8,18

improper  54:3 72:22
improperly  13:14
improve  30:14,17,22
improvement  30:11
improving  30:22
in-person  124:14
inaccurate  125:2
inadequately  13:14
inappropriate  66:16
included  87:1 120:20
including  38:17 56:2 126:13
increase  100:16
incur  31:5
independent  22:21 58:23 60:4 72:11 89:10 104:14
indication  22:25
individual  29:2 102:12
information  20:21,23 35:11,21 46:18,21,23 48:14 50:2,3,5,11 53:23 54:1,12 55:10 56:5,13,24 57:1 58:12 62:16 64:7 66:7 68:13 71:19,22 77:21 78:18 83:22 92:6 100:3 102:23 107:10,14 108:1,3, 11,18,21,23,25 109:5 110:12 111:6,11 115:7 116:4 118:11 122:24 128:4
informational  44:3,21 45:2 46:2 83:12,15
informative  78:19
informed  63:15
infrequently  9:6
initial  100:12
initially  123:9
inquired  10:21
ins  18:15
insight  108:13
inspect  42:21
inspected  115:16
Instagram  64:2 66:3,6
installation  127:4
installed  20:7

Jeffrey Palmer
March 20, 2019

12

instance  2:2
instances  43:7
instructed  32:5,20
instruction  8:5 10:2
  25:23 53:21
instructions  43:24,25
insufficient  71:19
  89:16,19
insurance  22:6 23:13,
  22 24:1 43:4,17
  50:23 51:2,6,7,9,10,
  16,17,19,20 52:7
  53:3,4,8,10,13,19
  54:15 55:24 56:11,13
  60:22 102:22 119:18
insured  23:19
insurer  52:4
insurers  43:3,9 54:4
  55:3 56:18
insurers'  56:18
integrity  114:18,24
  115:5
intended  24:3
intent  5:4 54:13
  79:22,25 82:14
interest  116:7
interested  45:9
  108:11,16 111:6
  116:5
internal  47:10
Internet  46:15
interpose  8:3
interruption  85:3
interviewing  58:8
intimately  29:19
  56:21
introductory  124:5
invasive  119:14
invoice  22:15 69:18
  89:25 90:17,23
invoices  22:19
involved  9:16 23:1
  26:20 39:5 43:15
  112:1 113:7
involving  37:1
IRS  91:3,5
issue  13:22 14:24
  15:20 20:5 42:24
  71:22 104:11 107:8
  115:5

issues  8:8,15 9:6
  36:16,22 37:20 56:6
  107:17 118:25
item  22:1 47:18 77:6,
  8 78:9
items  14:2
iteration  79:17

## J

James  5:3
Janet  3:19 6:5,8
  129:2,4
January  88:3
Jeffery  5:9
Jeffrey  2:1 4:4 5:4,6
  6:17 7:1 26:6 56:1
  103:15
Jersey  3:21
jgold@egclawfirm.com
  3:22
job  17:23 42:2,18,20
  60:14 73:6,9 95:17
  116:11
jokes  65:24,25
Joseph  8:19,24
judge  29:16,18 64:20
  111:24 112:25 113:5
  124:16 126:8 127:16,
  18
judge's  113:9
judges  63:12 64:5
  66:10 104:24 105:1
judgment  61:25 64:12,
  16 76:21 98:11
Juice  11:1,6 102:21
justify  85:2 90:9
  95:5,12,15

## K

keeper  37:16
keeping  91:5,7 94:4
  113:11
Kenneally  3:9 128:24
keys  92:19
kind  33:12 53:24
  90:11,20 101:13
  116:4

kinds  69:3 98:12
  102:19
Kings  3:20
kitchen  18:3
knew  20:1 62:13
Knowing  69:15
knowledge  31:3 57:9
  59:5 62:12,19 70:6
  104:15 115:19 116:2,
  18 124:21 126:5
  127:20 128:7
KRINER  3:4

## L

lack  108:23
lag  36:12 40:14,22
Lancaster  3:4
language  52:9,15
  74:24 75:1,10
laptop  32:14
large  59:19 74:19
  98:12 112:18 118:21
largely  109:4
larger  70:2
largest  97:16
law  3:15 5:10 27:14
  63:1 92:24 97:14,17
  115:23,25 123:9,13
lawsuit  24:24 25:2
lawsuits  60:2
lawyer  10:13 11:6
  23:5 26:22 60:10
  65:3,7,15 84:17,18
lawyering  46:22
lawyers  11:25 24:23
  26:24 46:19 56:17
  59:25 60:18,19 61:15
  95:22 111:8 115:4
  121:21 122:25 126:1
layman  49:11 103:7
layman's  47:5 100:19
  117:25 118:13
layperson  55:4
League  64:21
leak  20:8 77:15,16,
  17,21,22 78:2,6,24,
  25
leaked  21:9 22:4
  69:11,13 70:15 87:15

leaking 21:14,15,19
 78:7
learn 108:1
learned 18:11 111:11
learning 108:16
leave 7:17 13:21
 25:24 106:20
left 15:4,8 17:17
 47:9 100:13
legal 7:7 8:8 16:11
 17:5 31:2,18 97:13
 98:12 104:22,24
 115:16 116:17,22
 120:2 122:16
legible 77:4
legitimate 54:2
legs 85:9
letter 66:25 70:5
 87:5,10,11
Lewis 3:10 97:15
license 63:1
licensed 18:10,13
 64:18
lied 126:2
life 96:21
lifetime 49:1
light 17:3 122:5
likelihood 93:18
 107:11,13 113:2
 119:1
likewise 95:15
limitation 64:14
limited 31:3 68:21
list 45:22 46:1 70:23
 92:14 111:19 119:20
 120:7,14,19 121:13
listed 101:18
lists 69:14
litigated 98:3,9
litigation 43:8 97:8
 98:20 124:7,11,13
live 7:2,3 39:13,14
lives 9:5
LLP 3:4,10
local 34:1
lodged 63:12
long 17:18 45:22 46:1
 51:19 59:15,18,22
 70:17,18 73:12 98:11
 110:4 119:25

looked 20:8,23 35:18,
 21 36:1,2 38:18
 45:12 46:10,14 66:5
 68:6,9 105:11 125:17
loss 78:1,23
losses 56:10
lost 31:12 75:4
lot 18:11 34:16 43:3
 46:3 56:24 57:1
 62:17 77:20 91:25
 101:12,15 102:13
 110:21 111:23
 112:19,20 118:4,5
lots 64:3
love 107:19,22
low 101:2 102:8
luck 33:25 90:18
lumberyard 34:1 48:4
 89:1,3
lying 124:23

### M

machine 2:6
mad 25:18 65:23
Madam 12:6 25:10
made 13:12 15:6 19:22
 28:14 33:13 37:15
 49:3 50:10,23 52:7
 53:2,4,9,14,18 54:3,
 13,15 55:19 57:16
 61:1,6 62:1 64:8,10,
 16,17 77:12 91:17
 92:13 95:2 96:14
 103:9 109:22,24
 116:5,8,15,17 117:13
 118:12 120:24 122:16
 125:14
magnitude 103:23
mail 47:22,24 83:25
Major 64:21
majority 40:22 49:20
make 7:22 14:9 19:11
 25:17 30:10 31:7,19
 36:15 42:22 47:8
 48:6 49:15,18 51:24
 52:15 54:2,7,10
 55:14 56:15 60:23
 61:25 66:2,23 67:13
 69:9 73:19 74:9
 75:14 76:5 78:21

79:9,10,23 81:20
 82:15 85:7 95:18,19
 96:14 100:5,6 111:7
 112:3,5,13 113:1
 114:24 118:4 120:2
 125:23
makes 34:22 94:10
 104:22
making 12:15 32:17
 73:6 95:6 113:5
malicious 122:18
March 2:4
mark 12:7 25:9
 106:19,24 113:13,16
 123:12
marked 12:17,18
 25:20,21,25 31:21
 106:7 107:5,6 109:6
 113:18,19,21 117:9
 123:16,17
marking 114:6
massive 19:1
match 88:17 91:17,19
 92:2
matched 13:14
material 18:21,23
 20:13
matter 36:14 49:25
 73:17 91:22 108:1
 109:22 122:17
maximum 107:9
meal 9:8
meaning 39:13 100:14
means 74:6 99:10
meant 75:24 76:4,8,19
mechanically 86:12
mediations 124:15
mediator 124:17
meet 39:21 65:8,15
meets 42:5
member 5:9 10:24 29:1
 42:10 98:15
member's 102:13
members 15:5,6 30:15
 45:23 48:18 50:11
 51:1 65:16 72:16,22
 92:22 93:8 98:5 99:7
 102:17 103:1 111:9
 113:4,10 117:20
 127:1,5

Jeffrey Palmer
March 20, 2019

14

members' 101:25
 102:9,10 119:14
Memorandum 5:10
 123:13
memory 10:3 22:18,21,
 22 89:10 92:17
mention 102:25
mentioned 8:22 10:21
 21:9 40:12
merit 111:25
merits 29:2
met 65:1,14
Michael 3:9
michael.kenneally@
morganlewis.com 3:12
middle 126:24
million 93:15,17
 99:17 103:10,11,15,
 18 104:1,7,9 107:9,
 13 110:25 111:2,7,13
 112:10,21 113:3
 117:12,18 118:15
millions 31:15 61:16,
 18
mind 77:3 82:1 84:15
 87:17 94:4 107:21
 125:4
mine 101:9 121:1
minimum 65:1,8,14
 99:20 101:5
minor 29:9,11 122:19
minute 116:25
minutes 85:13,14 94:3
 117:2
mislead 81:22
missed 78:25 79:4
 81:16,25 121:21
mistake 61:3 121:3,4,
 8,25 122:5
mistaken 63:21
mistakenly 121:24
mistakes 122:16
misunderstanding
 106:25 122:13
misunderstood 120:16
mo 24:13
mode 84:6
moment 13:25 24:13
 86:2 94:5,6
money 15:4 16:22

22:7,9 23:23,25 25:5
 29:21 37:4,11 51:18
 93:3 95:13,18
 100:13,16
monies 90:9
monitoring 61:11
Morgan 3:10 97:15
morning 6:21 38:22
 105:4
motion 5:11 105:9,11,
 12,14 123:14
move 43:20 66:25
 102:24 104:11
moved 18:3
multiple 66:10 88:24

## N

N-O-C-O-N-A 87:19
NA 32:19
nail 97:8
Naked 11:1,6 102:21
names 115:9,25
nature 8:23 91:20
 94:1 122:19 123:5
 124:13
necess 119:14
necessarily 111:19,20
necessity 53:12
needed 22:8
nefarious 80:9,13
 81:16
negative 52:11 72:10
negotiate 32:16
neighborhood 23:20
NIBCO 19:21 21:9
 24:22 33:8,11,15,24
 35:8 37:1 41:3,5,11,
 18,20 42:3 48:6
 50:3,9 58:22 67:1,8,
 24 68:12,14,19,21
 69:1 87:5,9 88:11,
 17,19 89:2,4,11,12,
 22 94:11 97:5,9,25
 98:4
NIBCO's 48:16 97:14
 128:20,25
nitpicking 52:8,11
 53:1
nitpicky 69:22 73:8,
 11 78:9 79:14 81:13

82:3
Nocona 7:3 18:4 19:9
 87:18 89:3
nomination 13:13
non-lawyer 115:3
normal 86:15 88:4
 90:5,7,11,19
North 3:16,20
Northcott 20:7
Northern 17:16
note 22:5 33:13 66:12
 81:8 87:12
noted 9:19
notes 106:21 109:23
notice 5:4,7 10:17,20
 11:1,3,5,7,12 13:18,
 23 14:22 15:21 16:6
 32:6 47:20,21,24
 48:12,15,17,18,21
 49:5,14,15 74:15
 79:11 105:17,19,22,
 25 106:5 109:13
 126:23 127:2,15,17
noticed 88:18
notices 10:23 127:11,
 21,22
notif 127:12
notify 127:5
notifying 127:3,12
notion 51:24 94:9
notwithstanding 54:25
 60:16
number 25:11,12 26:4,
 7 41:1 44:16,19
 47:21 48:18,21 50:22
 52:2,16,19,21 53:5,
 7,10,14,19 70:12,20
 83:16,18 98:18
 99:15,16,19,20 101:5
 102:7,8 107:11
 108:13 109:10 118:25
 123:18,19
numbered 2:4 12:21
 31:23
numbers 22:21 49:5
numeral 13:13 15:12
 50:16 78:1,23
NW 3:10

## O

oath  7:7 26:12 68:2
  125:12,22 126:2
object  15:23 94:15
  101:8 103:19
objected  61:4
objecting  12:4 16:5
  19:18 62:17 103:17
  111:18
objection  5:9 8:4,8,
  16 9:20 11:19,22
  12:23 13:3,19,21
  14:7,15,19 15:13,19
  16:6 28:4,21 29:8,23
  30:6 36:10 37:5
  38:8,10,22 39:3
  57:24 61:1 75:9
  92:16 99:10,15,19
  102:25 104:6,8
  105:4,10,13 106:24
  108:9,17,21,24
  109:2,7,19,20 110:1,
  3,8,23 111:17,23
  112:14,16,19 113:17,
  22 116:13 117:9
  119:12,13,22 120:10,
  17 121:6,9,11,20
  122:20
objectionable  92:20,
  22 93:6 101:1,3,5
objections  5:3 8:3
  13:12 17:4 28:8
  63:4,8 64:9 65:14
  71:9 92:10,13,15
  109:9 110:9,11,16,
  20,25 111:12,22,24
  112:9 113:10,14
  115:9,10 116:1
objector  9:17 104:17
obligation  27:23
  28:12,14
obvious  41:24 70:16
occasion  79:6
occasionally  34:20
  121:1
odd  17:23 20:9 21:8,
  15 33:11
oddball  22:1,3
offended  13:17 14:21

offense  120:3
offensive  114:22
office  32:24 120:25
offices  2:7
Oklahoma  18:8
Okmulgee  18:8
older  21:17
onerous  36:11 123:5
open  107:21
opened  45:11
opinion  47:5 49:7
  82:11,12,13 107:25
  108:3 117:25 118:13
opinions  64:3
opportunity  81:9
opposed  14:23 57:18
  58:2 68:14,25 92:1
opposition  97:25
option  84:19
Oral  2:1 17:14
order  24:24 51:24,25
  54:25 56:6 68:20
  69:14,18 76:9 90:12,
  19
ordering  64:17
ordinary  36:13 55:23
organized  25:17
original  14:8 25:25
  34:17 87:23 88:1
outlet  66:7
outlined  36:10
outs  18:15
overseeing  58:16
  61:10,17
overstatement  117:22,
  25

## P

P.C.  3:20
p.m.  2:5 117:5 129:8
package  86:13
pages  34:25 43:25
  44:2
paid  11:17,18 16:22
  17:2 19:12,13,14
  28:1,16,18,19,22,25
  29:1,7 30:5,9,14,18,
  22,24 31:9,14 36:12
  40:14 42:13 43:10

51:8,9,15,16 52:3
  73:6 82:25 92:24
  93:5,17 94:22 96:12
  103:2,11,15,18
  104:1,7,9 107:10
  111:8,9 117:20
painless  43:16
paint  91:19
Palmer  2:2 4:4 5:4,6,
  9 6:17,21 7:1 8:19
  9:10 12:20,25 13:2
  18:22 23:5 26:6
  27:16 51:15 56:1
  57:19 62:10,17 63:2
  85:22 103:15 113:22
  115:8,14 128:17,25
paper  87:24
papers  70:17
paragraph  31:24 32:2
  33:6 87:12 119:12
  126:23,24
parsed  79:1
part  18:16 24:17 54:7
  55:6 56:7 61:1 69:20
  79:3 108:25 113:8,9,
  12 120:14
participate  40:4
parties  48:11 49:3
  58:21 126:11,14
partner  18:10
parts  70:18 127:8
passerby  61:22
past  18:3 62:11,13,
  21,23 65:19 115:15
Paul  7:1
pauses  74:23
pay  8:7 11:25 18:25
  24:4 27:23 28:12
  43:9 72:7 101:7
  111:13 112:10 118:19
paying  11:16 27:20
  28:6
payment  16:7 29:5,12,
  13,14,15 40:23 42:6,
  12,19,22 54:9 99:5
  100:9 103:20
payments  12:4 43:5
  52:1 54:3 61:18
  103:1
payout  93:9 108:14
  119:1

Jeff Palmer
March 20, 2019

16

| | | |
|---|---|---|
| **payouts** 102:1 | **perused** 35:17 125:17 | **policy** 53:14,19 56:14 |
| **pays** 51:6,19 | **PEX** 24:22 33:19,24 | **poorly** 80:23 122:20 |
| **PDF** 32:14 114:4,7 | 34:4,10,13,18,19,22 | **portion** 34:25 |
| **pen** 114:6,20 | 35:8 37:1 41:20 | **position** 44:19 60:20, |
| **penalized** 71:10,14 | 47:11 48:4 49:24 | 23 61:13 |
| **penalty** 26:9 | 67:1 68:12 78:6 | **possibilities** 82:8,9 |
| **Pennsylvania** 3:5,10 | 88:12,18 89:1 | 92:2 93:16 |
| **penny** 37:4,7 99:8 | **PEX-TYPE** 33:18 | **possibility** 25:3 |
| **people** 24:21 39:25 | **pexsystemsettlement.** | 29:11 41:19,21,23 |
| 48:12,16 49:4,20,21 | **com.** 44:9 | 72:3 91:10 93:20 |
| 50:2,3 51:25 55:4 | **phone** 23:4 39:22 | 94:24 98:7 120:23 |
| 64:2,3 65:21,23 | 40:1,3,8 83:18,24 | **possibly** 19:18 29:14 |
| 66:22 69:3 74:9,11 | 84:9 109:13 | 98:19 |
| 78:13 79:7 85:13 | **phrase** 70:2 | **post** 64:2 |
| 94:10,14,16 96:20 | **physical** 46:13 | **postal** 48:12 |
| 99:9,16 102:14 | **pick** 82:6 | **postcard** 48:17 49:16, |
| 111:14 115:10 118:5, | **picked** 49:22 52:20 | 19,21 |
| 6 | **picking** 23:4 84:9 | **postcards** 48:25 49:15 |
| **people's** 115:9 | **piece** 122:24 | **posted** 123:20 128:10, |
| **percent** 14:15 23:16 | **pieces** 56:19 | 13,15 |
| 96:16,18,19 97:22,23 | **pigeon** 84:6 | **postings** 66:3 |
| 98:17,25 99:6,8,10, | **pipes** 34:21 | **potential** 50:11 99:13 |
| 15,20,22 100:9,12, | **place** 30:19 81:21,23, | 102:1 |
| 16,17,25 101:1,5,8, | 24 111:25 119:2 | **poured** 100:20 |
| 13,18,22 103:10,16, | **placement** 125:5 | **practice** 9:11 13:8 |
| 19,22 104:1,2,12,25 | **Plaintiffs** 2:3 3:2 | 16:4,10,12,18,20,21 |
| 111:14 112:11 113:2, | 6:22 58:22 60:1 | 17:5,9 60:4 64:15,17 |
| 3 | **Plaintiffs'** 5:10 | 115:16,21 |
| **percentage** 111:8 | 95:21 123:13 125:11, | **practiced** 64:19 |
| **percentages** 104:13 | 25 | **practices** 61:13 63:7, |
| **perfectly** 69:15 96:16 | **plan** 126:23 127:2,11 | 13 64:8,14,22 65:13 |
| **perform** 18:16 41:18 | **plastic** 34:5,15 | **pre** 74:23 |
| **performed** 87:6 | **play** 127:3 | **precise** 52:8 |
| **period** 20:3 87:16 | **pleased** 24:21 25:1,2, | **preferred** 75:10 |
| 89:11 94:8,19 100:10 | 4 | **Preliminary** 5:11 |
| **perjury** 26:9 | **plugged** 45:10 | 123:14 |
| **Perle** 5:3 | **plumber** 18:11,13 70:5 | **prematurely** 21:19 |
| **person** 39:25 46:19, | **plumbers** 127:3,12 | 23:3 |
| 20,22 55:1,5,23 | **plumbing** 18:11,16 | **premises** 127:4 |
| 56:14 67:14 70:19 | 20:2 21:19 34:10,11 | **preparation** 39:22 |
| 74:3,5 78:5 104:21 | 41:7 49:23 112:18 | 40:5 |
| 107:25 108:2,5,7 | **pocket** 27:20,24 51:20 | **prepare** 38:16,19,21 |
| 110:15 | **Poindexter** 5:3 | 39:3 90:5 |
| **person's** 56:13 | **point** 23:11 26:23 | **prepared** 8:14 68:2 |
| **personal** 9:6 70:6 | 40:9 45:17 55:8,19 | 90:4 |
| 91:24 | 76:13 77:7 90:8 | **preparing** 39:18 46:16 |
| **personally** 45:6 57:6 | 93:10 95:1,4 122:19 | **pres** 13:13 14:21 |
| 67:16 118:24 125:24 | **pointing** 52:12 | 15:2,4,7 |
| **perusal** 35:22 | **policies** 23:17 | **present** 77:1 |
| **peruse** 35:16 | | **presented** 108:12 |

pretty   18:5 34:6
  88:23 97:24 104:4
  105:4
primarily   8:25 18:2
print   46:2
prior   88:16 125:6
privacy   119:15
private   124:17
privilege   8:5,12
privy   16:11,17 17:5
  28:9 48:13 115:15
pro   15:18 43:14
  100:14
probab   33:13
problem   7:19 22:4
  75:25 91:12 117:4
problems   73:24 86:12
Procedure   2:9 6:4,14
proceeding   7:7 30:1
proceedings   31:17
  38:14 56:22 62:4
  85:3 122:17
process   29:9 31:2
  32:11,15 40:15,17
  43:15,16 47:22 48:22
  51:13 54:18 56:7
  58:17 60:7 61:9,11,
  14 71:23 72:8,9,13,
  14,17,19 74:15 86:4
  88:21 93:20 94:2
  95:13,14 98:12
  102:15 109:11 113:5,
  7,8,9,12 114:10
  118:2,8,9 119:4
processes   55:7
processing   61:11,17
  71:14 82:19 89:17
produced   2:2 106:17
product   34:4 42:4
  48:7 119:22,25 127:4
products   24:22 41:5
  94:11
profession   17:22
professional   17:24
  84:22
professionals   65:8
profitable   97:16
program   73:17
project   33:15
proof   87:4,8 89:17

proper   54:2 66:13
properly   90:13
properties   41:13,21
property   41:5 42:2
  50:16 69:24 70:2,7
  90:9
proportion   100:15
proposal   14:21 15:4
  96:10,14
proposed   5:4 105:16
proprietor   89:3
prosecute   108:17
prosecuted   57:11
  58:14,20 61:8
prosecuting   30:6,8
  60:2 119:4
protect   56:6 73:20
protected   8:11
protecting   72:22
provide   22:19 48:3
  50:20 81:11 90:8
  102:22
provided   15:5 18:21
  22:15 64:6 80:10
  83:22 119:5
providing   81:10 92:5
  125:13
provisions   2:9 74:13
pull   109:1,15
purchase   69:14,18
  89:9
purchased   48:4 89:7
  91:19
purported   17:4
purportedly   115:11
purpose   84:18 87:1
purposes   90:25
pursuant   2:8 6:3,13
pursue   56:18 58:9
pursuing   57:2
put   14:2,7 34:20
  43:19 45:22 49:9
  77:21 81:20,23 92:8,
  16 95:8,10 109:10
  114:3 121:4,16,20,
  21,23,24 126:20
putting   10:22 28:23
  43:19 46:6 81:16
  87:21

## Q

QEST   34:14,17
qualification   61:23
qualifications   57:25
  61:25 62:2,6
qualified   55:14,17
  59:17 60:13 61:5
qualify   81:13
quarter   17:16
ques   31:17 122:8
question   6:11 7:14,
  17,18,20 8:6,10
  13:21 14:1,10,14
  22:19 31:17 39:1
  41:25 43:20 50:22
  52:2,9,16,19,21
  53:2,7 55:12,20
  56:10,12 57:3 60:21
  61:20 64:4 66:18
  68:25 69:23 70:14,
  20,22 71:7 74:19
  75:5 78:15,20 80:19
  82:6,10 83:3 84:25
  85:1,2 95:20 98:1
  100:23 106:16 107:24
  111:20 112:4,6
  114:17,19,24 121:19
  122:9
questioned   75:23
questioning   114:18
questions   6:23 21:1
  35:18 54:21 83:4,17,
  23 84:21,22 87:22
  91:14 105:22 106:1
  115:1,2 126:19
  128:4,17,21,24 129:3
quibble   74:22
quick   84:10

## R

rabbit   63:19
raise   97:6
raised   13:20 112:21
raises   99:4
raising   99:10
ran   16:18 18:9 42:14
random   66:3

**range**  98:22
**rata**  100:14
**rate**  28:7
**rates**  24:1,4
**reach**  21:22 83:23
  118:14 126:25
**reached**  21:2 24:7
**reaches**  107:25
**read**  13:3,8,18,23,25
  14:22 15:18,21
  26:16,18 38:22 44:1
  49:10 67:18 75:20
  76:12 77:18 78:5,22
  104:19,21,23 105:4
  116:14 126:18 127:14
  128:12,14
**reader**  77:14
**reading**  70:1 74:5
  78:8
**real**  9:25 72:6 93:12
**reality**  101:15
**realize**  70:14 95:17
**realized**  77:21
**realizing**  77:15
**realm**  93:16
**reason**  8:14 11:8,9
  37:23 49:23,24 57:19
  91:21 95:7 115:6
  117:12,18,21 119:20
  121:12
**reasonable**  14:8,18
  15:15 24:9 25:3
  29:24 30:23 47:6
  50:10 52:2,5 56:14
  58:5 60:8,13 84:20,
  25 94:18 95:10 97:3
  102:9 103:13 104:1
  108:5,6 113:12
  118:20 125:18
**reasons**  91:12 108:20
  115:1,2
**recall**  7:5 10:20
  11:20,21,24 14:6,20
  15:3 16:1 17:17
  20:1,12,22 26:19
  27:18 33:7 35:19,20
  40:8 46:13 58:25
  80:5,8 83:21 88:18
  93:15,24 96:22
  110:21 122:10 123:2,
  3,25

**receipt**  69:16 87:14,
  15,19 88:17,22 89:9
**receipts**  88:9,24 89:1
**receive**  29:21 30:10
  37:4,7,10 47:24
**received**  10:23 11:1,
  5,7,12 47:21 48:18
  89:23 100:7 102:20
  111:11
**receiving**  11:3
**recess**  85:20 117:5
**recognize**  54:1
**recognizing**  13:6
**recollection**  33:10
  95:25 120:13,18
  122:22
**record**  2:10 7:23,24
  27:10,13 52:20 59:7,
  15,18,22 72:21,25
  85:21 106:20 117:6
**records**  48:16 91:13
  127:20
**recoveries**  61:17
  102:17
**recovery**  10:25 97:22
  98:23 99:11 100:25
  101:2 103:10 117:13
**redone**  20:2
**reduce**  19:9
**reevaluate**  108:2
**refamiliarize**  38:23
**refer**  76:16 87:3
**reference**  58:25 73:25
  93:10 101:15 119:6
**referenced**  124:3
**referral**  9:7
**referred**  67:23 68:18
  94:8
**referring**  70:22
  105:23,24 106:2
  122:23
**refers**  124:7
**reflect**  22:25
**refresh**  95:25
**regard**  107:20 115:23
**regarded**  97:17
**registered**  49:24
**regular**  83:25
**Regus**  2:7

**rejected**  118:7,9
**related**  5:11 8:15
  37:4 64:13 66:21
  69:13 75:18 123:14
**relates**  110:22
**relation**  62:4 74:19
  128:15
**relationship**  8:23
  9:2,4 11:15
**relevant**  33:3 56:5
  111:20 122:3,4,7
**relied**  109:3,5
**Relief**  5:11 123:15
**remain**  110:7
**remainder**  92:23
**remained**  110:2
**remember**  9:21 10:3,4,
  6,11,19 11:2 13:7
  15:10,11 21:10
  23:12,15 40:7 89:11
**remembering**  94:3
**reminder**  83:12
**remodeling**  18:3,4
  90:1
**rent**  18:25 19:6,8,10,
  13,14
**rental**  90:8
**repair**  24:5
**repaired**  22:8,12
**repairs**  23:2
**repeat**  80:18
**rephrase**  7:21 98:1
  125:8
**replace**  21:20
**replacing**  22:10
**reported**  2:6
**reporter**  7:13,23
  12:6,12,18 25:10,12,
  16,21 27:13 80:18
  106:19 107:2,6
  113:14,16,19 123:17
**reporter's**  4:7 75:8
**reports**  126:15
**represent**  6:22 17:4
  31:12 37:13 38:4
**represented**  37:24
**representing**  10:15
  38:9,10 56:17 59:25
  65:3,15

reproduced  67:9
reputation  63:22 65:2
request  103:8,16
requested  15:14
require  31:18
required  70:24 120:19
  122:24
requirements  91:5
reread  47:16,19
research  63:9 65:17,
  20,22 76:3,22 107:19
  109:4 112:8 119:3,7,
  8
researched  73:1,2
  76:15 125:21
researching  24:14
residential  31:25
residual  15:8
respect  88:21 115:13
  127:7 128:9
respective  126:14
response  53:22 78:20
  117:23
responsibilities  38:8
responsibility  41:6
  57:12 58:16
rest  34:24 40:2 88:8
restate  31:6 75:6
result  11:21 12:4
  18:14 20:4 31:10
  97:24 98:17 109:24
resulted  34:17 61:9
  64:14
retain  70:17
retainer  27:6,7,17
retired  124:15
reversionary  117:14
review  20:25 32:20
  39:3 109:18 121:7
reviewed  39:5
reviewing  39:2 109:24
  121:22
revise  79:22
revision  118:4
revisions  109:24
rework  31:18
rewrite  77:4
right-hand  47:10
rights  54:5,8 56:18

ring  34:6
risks  98:23 99:12
road  8:9 42:11 94:23
Rob  20:16 39:24
Robert  76:7
Roberts  17:14
robin  101:14
role  38:11 72:15,18
  127:4
Roman  13:13 15:12
  50:15 78:1,22
round  101:14
rule  7:12
rules  2:8 6:3,13 7:9
run  18:2,5 90:12

**S**

sale  69:14,17,21
San  17:19 18:9
sas@chimicles.com  3:7
satisfied  116:16,17
save  22:5
scanned  32:23 114:7,
  20
scanner  32:24
school  17:13
Schwartz  3:3,4 4:5
  6:2,8,10,12,16,20,22
  12:6,19,20 25:10,15,
  22,23 27:12,16 80:20
  85:5,21,22 107:8
  113:20 117:6,8
  123:12,18 129:5
scope  38:7,11
search  20:24
second-to-last  113:24
seconds  67:22,25
  68:3,5
secretary  91:7
section  45:12 46:11
  60:22 67:8 68:11,13,
  18 71:1
semester  17:18
sen  119:17
send  48:12 72:5 86:9
sense  14:10 22:22
  38:11 48:25 49:16,18
  64:6 92:18 94:10
  99:14 101:4 104:22

117:16
sentence  70:3,5 87:17
  117:11 119:17,19
  120:10 121:7 124:7
  126:25
sentiment  99:11
separate  77:15
separately  79:1
serendipity  90:17
service  9:8
services  18:16
sessions  124:15
set  37:22 55:13,16
  90:24
sets  83:4
settlement  5:4,7,11
  11:12,13 14:9,14,19,
  22 15:9 19:18,21
  20:21 21:2 24:17,25
  25:3 30:11,14,17,22,
  23 32:5 35:8 36:1,3,
  14 37:1 42:5,14
  44:8,9 45:11,12
  46:7,10,11 48:11
  49:4 50:9 51:24
  54:7,14 56:7 57:11
  58:15,17,22,23,25
  59:3,6,8,10,13,16,18
  60:4,17 61:9,14 71:9
  72:12,23 73:5 74:8,
  25 75:12 76:19
  83:17,23 84:18 87:2
  89:15 92:5,20 94:13
  95:2 96:11 97:21,25
  98:9,16,22,25 100:8,
  11 101:9 104:10
  105:8,16,20,25 106:5
  107:9 110:9 117:14
  118:17,18 119:5
  123:14,21 127:1,5,6
  128:10
settlements  16:5,21
  31:4 40:14 56:19
  57:5 59:20 62:18
  64:9,23 96:25 102:19
shake  71:24,25
share  10:25
sharp  64:7
shed  122:5
shelf  89:6
shelves  34:2

Jeffrey Palmer
March 20, 2019

20

shocked  122:15
shooting  84:10
shop  18:2
short  116:25
shorthand  2:6
showing  89:1 91:18
side  30:16 97:1
sign  114:21
signature  4:6 26:8
  114:1,3,5,9,14
  115:12 125:6
signed  26:11,17 27:6,
  7,17 114:6,11,16,20
  115:9
significance  116:10
significant  29:12
signing  115:25
similar  34:15 48:25
  53:24 88:24 125:12
simple  56:9 93:12
simply  20:23 22:8
  24:5 44:18 49:21
  52:6 53:2,20 61:20
  62:3 72:4 97:6
single  32:18 37:4
  58:13 71:7 128:15
sir  7:2 66:9 114:23
  129:1
sit  14:20 35:1 41:14
  50:4 108:15 125:24
sitting  92:19 110:18
situation  42:2 72:8
  102:13
six-year  40:22 94:8,
  19 100:10
sleuthing  125:22
slightly  24:2
slog  45:24
small  46:2
smiled  8:22
software  32:14 77:14
sort  43:11 47:22
  58:19
sorts  43:12 77:5
sought  70:8 103:2
sound  97:24 115:20
sounding  33:12
sounds  52:8 74:21
  96:5 111:16 123:8

source  51:17 58:13
  112:7 115:8
sources  48:17
South  69:19
space  7:17
speak  15:8 37:9 59:15
  76:24 102:5 107:15
  126:3
specialize  56:17
specific  14:6 33:23
  41:4,9 59:4 60:9
  77:6 95:20 112:6
specifically  23:18
  33:7 39:8 52:21
  55:17 66:20 71:8
  87:7 89:2 90:6
  111:22 112:15 122:2,
  10 123:25 125:18
specifics  110:11
speculating  71:25
  72:2 122:25
spend  24:14 39:17
  77:17 109:8
spends  30:6
spent  17:14,16 22:14
  31:15 38:17,24 90:10
  93:3 95:13 109:12
  118:2
spoke  35:23 36:18
  37:21,23 39:23 40:6,
  7,12 58:3
spoken  27:3 104:18
spot  42:22 49:9
stage  72:17
stain  91:18
stamp  86:19
stamped  33:8
stamps  35:7
Stan  18:12
standard  103:21
  104:13
standards  42:6 65:2,
  8,14 104:24
staple  107:7
start  87:21 92:17
  124:4
started  18:7 77:19
  78:7,14
state  2:6 9:12 37:3,6
  40:25 41:10 42:17,
  18,25 43:2,9,14

54:25 60:17 63:12
  64:5,18 73:15,21
  79:7,11,19 80:4,10,
  15,21 87:7 89:2
  114:25 120:1
stated  2:9 49:8 69:17
  78:4 105:5 115:15
  123:3
statement  26:8 29:4
  32:8 41:16 42:7,8,15
  82:22 85:23 86:21
  88:15,24 90:15,22
  95:6 96:15 99:2
  116:20 117:17,21
  118:22 121:10,12,14,
  16,20 124:5,19
  125:2,19 127:9,13
statements  116:17,23
  125:14
states  87:5 124:16
stating  70:5 114:14
steps  65:1 118:24
Steve  6:21
Steven  3:3
Stewart  3:15 6:4,5
  12:10,14 25:17 26:25
  27:12,14,17 38:5
  39:23 40:2
Stewart's  27:11,21
  28:6 37:11,24 38:4,
  7,11
stick  36:6 103:17
sticker  107:2
sticks  107:25
stiff  97:25
Stipulations  4:3
store  49:22
straightforward  50:21
  52:23 81:5 83:10,14
streamline  48:21
street  2:7 20:7 61:22
strength  60:10
stretch  85:9
strike  31:13
stroke  19:1
strong  9:4 82:13
struck  33:12
structure  24:3 31:25
  36:8 66:19 67:4 74:8
structured  36:3 73:17

```
stuff  76:10
stumped  47:23
subject  41:3 107:19
  109:15 123:2
submission  48:19
submit  77:24 79:8
submitted  51:7 74:24
  87:2 107:12 126:1,14
  127:16,17
submitting  86:5
subpart  53:8,9
subparts  53:8
subrogation  51:6,11,
  21 54:4,8 55:2,6,24
  56:6,18
substance  26:24 38:15
  64:11 109:8
succeed  31:5
success  28:3,7,20
suffered  19:1 24:10
suffice  128:3
sufficient  111:1,18
sufficiently  18:15
suggested  20:3,14
  57:20
suggesting  101:23
  111:12 116:21
suing  96:20
suit  42:16 95:14
  119:4
Suite  2:7 3:16,20
summary  88:20
summation  35:24
superfluous  121:14
  126:20
supervisor  80:24
suppliers  50:4
supply  49:22,23
support  5:10 123:13
  125:13
suppose  51:7 94:24
  106:1
supreme  126:8
surface  113:23
surprise  96:4,6,8
surprised  97:19,20
surprising  123:6
suspended  9:11
suspension  62:25
```

```
sworn  2:3 6:18 126:7
system  31:19 34:14,
  18,19 113:21 123:19


            T

table  37:22
takes  7:23 98:11
taking  7:13 26:12
  66:12
talk  8:18 9:15,16
  11:6 18:19 28:11,23
  45:20 55:25 56:1
  57:20 62:5 66:24
  81:14 84:13 94:7
  97:21 103:14 104:12
  117:8
talked  14:23 19:17
  35:13,14 36:6 40:17
  62:24 66:1 94:9
  104:12 119:19
talking  12:22 21:6
  36:15 40:11 44:21,22
  57:23 80:2 103:14
  106:4 107:1 109:8
talks  13:13 44:6
  119:18 126:23
task  60:9
tax  90:25
taxes  90:10,13
tearing  41:8
technical  6:6
technology  85:17
telephone  3:6,11,17,
  21 58:4
telling  36:17 38:15
  103:19
ten  18:21 24:5 58:8
  68:3 71:13 91:4 94:2
  102:18
term  15:2 30:8 35:25
  45:7,13 69:21 73:11
  75:16 76:8,12,16
terminology  69:19
terms  9:3 11:11 17:22
  22:10,11 35:20 43:5
  44:7 45:22 46:7
  57:24 64:1 66:9
  67:22 72:16,22 84:8
  86:4 89:17 98:22
  118:22
```

```
terrible  77:8 93:1,2
terribly  15:1
test  10:3
testified  6:18 7:6
  65:11 123:22
testify  8:15 68:2
testimony  7:25 76:6
  78:22 79:2,4
Texas  2:6,8 3:16 7:3
  18:4 23:16 34:7 38:4
text  67:9 92:4
thing  21:25 36:11
  38:21 39:15 44:18
  45:17 54:11 60:8
  62:6 66:11 77:7,12
  81:8 82:3 93:21
  103:25 111:18 116:7
things  18:19,20 19:10
  26:19 27:1 34:22
  35:10 36:9 43:12
  47:16 63:10 64:2
  65:22 67:12 69:4,15
  77:5 80:6 91:4,7,20
  92:19 93:6,11,24
  94:2,4 103:24 108:3
  113:11 117:9 124:2,
  21
thinking  80:8 94:5
  104:5
thinner  34:15
thought  15:24 21:9,15
  36:4,5 40:13,15,17,
  20 47:14 52:22 60:13
  66:16 80:11,21 88:21
  94:18 96:16 99:3
  100:25 111:5 121:4,
  24 122:10
thoughts  40:11,21
  80:3
Throckmorton  2:7
thrown  45:17 72:4
thumbs  66:8
tied  118:17
time  9:24 10:12 14:3,
  11 17:17 19:9 20:3
  21:12 23:10,19 24:7,
  13 30:6 34:2 36:6,
  12,16 38:17 39:10,17
  40:14,24 43:17 58:8
  63:9 71:8 74:15
  76:13 77:11,18,23
  85:12 87:16 89:11
```

Jeffrey Palmer
March 20, 2019

22

90:18 95:4,13 101:7,
  10 102:4,6 109:7,12
  114:19 126:18
**times**  32:17 43:3
  67:20 75:16
**tip**  114:6
**title**  44:19
**today**  6:23 7:10,24
  8:15 13:7 14:20
  17:25 18:2,20 25:24
  26:13 35:1 38:20
  41:14 50:5 54:20
  65:12 92:19 108:15
  118:24 125:24
**told**  19:25 20:6,10
  54:20 76:11 89:18
  95:24 100:24 114:15,
  19 118:24
**toll**  83:18,24
**tooth**  97:7
**top**  35:7,9 47:9 50:15
  66:25 68:11 86:18
  93:25 117:11
**topic**  54:24 122:23
**tortfeasor**  51:12,19
**town**  20:2
**track**  59:7,15,18,22
  72:21,25
**trades**  18:6
**trails**  63:20
**transaction**  49:24
**transcript**  75:8
**transferred**  17:15
**trash**  45:18
**treated**  73:19
**trial**  7:6 96:23 98:4
**trials**  96:24
**trigger**  109:1
**trouble**  70:12
**true**  26:8 50:6,7
  112:17 114:9
**truth**  10:4
**truthful**  26:13 32:8
**truthfully**  8:15
**tube**  34:11,12
**tubing**  33:18,19 34:4,
  5,10,13,14,23 41:12
  66:20,21 67:1,5,10,
  23,24 68:12,14,21
  69:2 70:6 77:15,21
  78:2,6,24

**tune**  93:14
**turn**  128:21
**turned**  99:15
**TV**  97:4
**Twitter**  64:2 66:3,6
**two-fold**  23:24
**type**  34:11 36:14
  49:12 107:24 108:2
  110:15
**typical**  38:24 69:20
  103:4 104:13,20
**typically**  19:10 23:16
  93:9

---

**U**

**Uh-huh**  44:14 124:9
**unacceptable**  72:3
**unaware**  37:14
**unbolded**  67:9
**uncashed**  15:4,9
**unclear**  66:18 74:1
  75:16
**uncomfortable**  53:18
**undergraduate**  17:15
**underneath**  125:23
**understand**  7:21 29:10
  44:1 47:14,17,19
  49:11 51:10,21 52:16
  53:17 54:22 66:16
  67:14 69:10,25 70:8
  72:9,13,15 74:24
  77:10 80:17 81:2,7
  94:1 96:9,23 98:3,7,
  8,14 100:5,6 105:2
  112:3 119:23 125:10
**understandable**  44:4
  46:19,21 47:17
**understanding**  29:24
  30:3,7,9 34:4,8
  59:21 62:2,15,22
  65:19 74:4 79:22
  83:5,8,13 91:3 92:12
  100:7,18,19 103:7
  110:10 125:20 128:7
**understandings**  29:9
  62:25
**understood**  26:11 31:7
  63:25
**undertaken**  118:24

**unequivocally**  37:3,6
  41:10 124:1
**unethical**  114:12
**unfair**  31:14 96:15
**unfairly**  73:19
**unique**  49:15 90:16
**United**  124:15
**University**  17:15,16
**unlike**  51:1
**unnecessarily**  119:14
**unnecessary**  52:12
  56:12 121:17
**unreasonable**  15:23
  16:3 58:7 93:23
  95:10 103:16
**unusual**  21:16 23:9
  36:3,7,12 40:13,24
**upfront**  96:17
**upgraded**  34:18
**Upper**  3:16
**upstairs**  88:8
**useless**  30:2
**user**  118:4
**usual**  7:18

---

**V**

**vaguely**  62:20
**valid**  71:21 73:6
  112:11
**valuable**  108:18
**vast**  49:19
**verify**  12:22 123:21
**Verizon**  9:23 10:10,23
  11:14,22 12:4,22
  13:3,19,23 15:3,13
  19:16
**versus**  33:16 64:21
  98:18
**viable**  24:8,12
**video**  75:5 85:13
**videoconference**  3:3,
  9,19 74:23
**videoconferenced**  2:1
  7:11
**view**  53:25 55:25
  82:25 99:7 103:16
  117:22
**vigorous**  100:24

Jeffrey Palmer
March 20, 2019                                                    23

| | | |
|---|---|---|
| **virtually**  96:25 | 109:12 | |
| **vocation**  17:24 | **workings**  29:19 | |
| **voluminous**  126:10 | **works**  29:10 55:3,10 100:6 | |

**W**

**wait**  7:14,16 77:22
 92:23 95:16 96:11
**waiting**  98:18
**wall**  34:15
**walls**  41:9
**wanted**  40:25 45:14
 57:24 69:16 82:2,4
**Washington**  3:11
**waste**  58:8
**watched**  97:3
**ways**  84:23
**web**  20:23
**website**  20:20,25
 35:13,16,23 44:9
 45:6,10,11 63:15
 86:9 105:8,18 123:21
 128:11,13,15
**websites**  63:17 64:1
**weeks**  9:9
**weigh**  112:25
**weird**  89:12 104:21
**West**  3:4
**who've**  55:4
**wife**  91:6
**wins**  96:24
**Wireless**  9:23
**wiring**  18:7
**withstand**  34:19
**won**  98:4
**word**  33:8,11 67:8
 73:8,13 74:22 75:9
**worded**  44:3
**words**  75:13
**work**  10:18 18:6,17
 33:3 41:7,13,20 43:2
 54:25 55:5,6 58:1
 61:10 62:19,20 63:3
 73:15 87:6 88:1
 98:12 100:18,20
 109:1
**worked**  38:1 40:23,25
 43:1 62:22,23 94:21
**working**  7:11 18:11,14
 85:17 95:4,22 96:2,7

**workings**  29:19
**works**  29:10 55:3,10
 100:6
**world**  39:13,14 43:13
 57:18 58:2 97:17
**worry**  57:9
**worth**  2:8 23:14,21
 24:13 101:10,24
 102:3,5,9,14
**worthwhile**  22:6 36:4
**worthy**  66:12 120:11
**Wow**  15:22
**write**  70:25 71:4
 83:25
**written**  25:6 34:25
 80:6,11,14,22,23
 86:20 124:22
**wrong**  21:13,23 22:18
 73:3 80:9 81:16,22
 88:15 96:6 123:23
**wrote**  32:2 85:24

**Y**

**year**  19:4 42:13 88:9
 94:22
**years**  13:4 17:14
 18:7,21 19:2 24:3,5
 41:2 42:1,11 56:2
 70:17 71:4,12 90:24
 91:4 92:23 94:12,16,
 22,23 95:3,16,21
 96:2,7,12 97:8
 98:10,19 120:1
**yellow**  33:7
**yesterday**  38:24 40:7

# EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KIMBERLY COLE, *et al.*, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>NIBCO, INC.,<br>*Defendant.* | Civil Action No. 13-cv-7871 (FLW)(TJB) |

-AND-

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| CHAD MEADOW, *et al.*, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>NIBCO, INC.,<br>*Defendant.* | Civil Action No. 3:15-cv-1124 |

## AMENDMENT TO SETTLEMENT AGREEMENT

Plaintiffs in the above-captioned cases, *Cole, et al. v. NIBCO Inc.*, No. 13-cv-7871 (D.N.J.), and *Meadow, et al. v. NIBCO Inc.*, No. 15-cv-1124 (M.D. Tenn.) (collectively, the "**Litigation**"), and Defendant NIBCO Inc. (together with Plaintiffs, the "**Parties**"), hereby agree to amend the Settlement Agreement as set forth below.

WHEREAS, the Parties never intended that the term "Releasing Parties" as defined in Paragraph 34 of the Settlement Agreement would release any claims of members of the Settlement Class who timely opted out of the Settlement;

WHEREAS, the Parties wish to clarify the Settlement Agreement in this regard;

NOW, THEREFORE:

1.      Pursuant to Paragraph VIII.B. of the Preliminary Approval Order, the Parties agree to amend Paragraph 34 of the Settlement Agreement to provide the following (with the amended language in bold):

34.     **Release**. Upon the Effective Date, all Settlement Class Members, as well as any Person who receives any payment from the Net Settlement Fund, on behalf of themselves and their agents, heirs, executors and administrators, successors, assigns, insurers, attorneys, representatives, and any and all Persons who seek to claim through or in the name or right of any of them (**but excluding any Persons who timely opted out of the Settlement with regard to the buildings for which they opted out**) (the "Releasing Parties"), release and forever discharge (as by an instrument under seal without further act by any Person, and upon good and sufficient consideration), NIBCO, its administrators, insurers, reinsurers, agents, firms, parent companies/corporations, sister companies/corporations, subsidiaries and affiliates, and any sales agents and distributors, wholesalers, retailers, plumbers, homebuilders, contractors, engineers, architects, and any other product or service provider or any other party in the chain of distribution who distributed, specified, recommended, sold, and/or installed the Tubing, Fittings, and/or Clamps, and all of the foregoing Persons' respective predecessors, successors, assigns and present and former officers, directors, shareholders, employees, agents, attorneys, and representatives (collectively, the "Released Parties"), from each and every claim of liability, on any legal or equitable ground whatsoever, including relief under federal law or the laws of any state, regarding or related to NIBCO's Tubing, Fittings, and/or Clamps, including without limitation their design, manufacture, purchase, use, marketing, promotions, sale, or certification, and including without limitation all past, present, or future claims, damages, or liability on any legal or

2

equitable ground whatsoever, and regardless of whether such claims might have been or might be brought directly, or through subrogation or assignment or otherwise, on account of or related to the Tubing, Fittings, and/or Clamps, which were alleged or could have been alleged in the Complaints filed in the Litigation. The Release is as a result of membership as a Settlement Class Member, status as Releasing Parties, the Court's approval process herein, and the occurrence of the Effective Date, and is not conditional on receipt of payment by any particular member of the Settlement Class or Releasing Party. Without in any way limiting its scope, and, except to the extent otherwise specified in the Settlement Agreement, the Release covers by example and without limitation, any and all claims for reasonable attorneys' fees, costs, expert fees, consultant fees, interest, litigation fees, costs, or any other fees, costs, and/or disbursements incurred by any attorneys, Class Counsel, Plaintiffs, Settlement Class Members, or any Releasing Party who claim to have assisted in conferring the benefits under this Settlement upon the Settlement Class. This Settlement Agreement and the Release provided for herein shall not and are not intended to release the claims of the Releasing Parties against the suppliers of raw materials, components, or ingredients used in the manufacture of the Tubing, Fittings, and/or Clamps, which the Releasing Parties hereby fully and forever assign, transfer, and convey to NIBCO. For purposes of any claims by NIBCO against the suppliers of raw materials, components, or ingredients used in the manufacture of the Tubing, Fittings, and/or Clamps, should such supplier seek to join any Releasing Party in such a claim, NIBCO shall defend, indemnify, and hold harmless the Releasing Party from any and all claims of any such supplier against the Releasing Party.

2.      The Parties shall ask the Court to include the terms of Paragraph 34 as amended in its Final Approval Order.

3.      In all other respects the terms of the Settlement Agreement are ratified, affirmed and remain the same.

**AGREED AND ENTERED INTO BY THE PARTIES AND THEIR RESPECTIVE COUNSEL ON THE DATES SET FORTH BELOW:**

3

Dated: March 25, 2019

Shanon J. Carson
Lawrence Deutsch
Jacob M. Polakoff
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA  19103

Dated: March 25, 2019

Joseph G. Sauder /s.j.c.
Joseph G. Sauder
Matthew D. Schelkopf
Joseph B Kenney
SAUDER SCHELKOPF LLC
555 Lancaster Avenue
Berwyn, PA 19312

Co-Lead Counsel for Plaintiffs and the
Settlement Class

J. Gordon Cooney, Jr.
Franco A. Corrado
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, Pennsylvania 19103

On behalf of NIBCO, Inc.

4